John G. Balestriere
Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (212) 374-5401
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HILLARY LAWSON, KRISTINA HALLMAN,** and **STEPHANIE CALDWELL,** | Case No.: 1:17-cv-06404 |
| Plaintiffs, | **COMPLAINT** |
| – against – | **JURY TRIAL DEMANDED** |
| **HOWARD RUBIN, JENNIFER POWERS, YIFAT SCHNUR,  STEPHANIE SHON, JOHN DOE, BLUE ICARUS, LLC,** and the **DOE COMPANY.** | |
| Defendants. | |

Plaintiffs Hillary Lawson ("Lawson"), Kristina Hallman ("Hallman"), and

Stephanie Caldwell ("Caldwell"), by their attorneys, Balestriere Fariello, for their

Complaint against Jennifer Powers ("Powers"), Howard Rubin ("Rubin"), Yifat Schnur

("Schnur"), Stephanie Shon ("Shon"), John Doe ("Doe"), Blue Icarus, LLC ("Blue

Icarus"), and the Doe Company (the "Doe Company") respectfully allege as follows,

upon information and belief, except as to allegations concerning Plaintiffs, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

1.     Under the leadership of Howard Rubin, all Defendants have worked and conspired together in a human trafficking enterprise exploiting women from around the United States (the "Enterprise"), causing many millions of dollars in damages to dozens of women over the years.

2.     Under the ruse of payments for supposed companionship and photoshoots, Rubin and his co-conspirators have lied to Plaintiffs and dozens of others, luring them across the country to assault them as part of a pattern of criminal sexual misconduct including beatings to the point of unconsciousness and acts of rape. Rubin even tells victims of the scheme that he will rape them after they are tied down but before proceeding to do so—threatening one victim, "I'm going to rape you like I rape my daughter"—as well as assault them and imprison them against their will.

3.     Defendants have, through their scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), caused injuries so extreme that multiple women have needed cosmetic and dental reconstructive surgery, and all victims of the scheme have required hospitalization and experienced extreme emotional trauma.

4.     Rubin and his co-Defendants have not only engaged in enterprise activity that violates RICO, but have repeatedly violated at least six separate federal laws, including, without limitation, statutes prohibiting wire fraud (18 U.S.C. § 1343), human

trafficking (18 U.S.C. § 1591(a)), money laundering (18 U.S.C. § 1596(a)), transportation for illegal sexual activity (18 U.S.C. § 2422), obstruction of criminal investigations (18 U.S.C. § 1510(a)), tampering with a witness through intimidation (18 U.S.C. §§ 512(b) and 1512(d)), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)).

5.     Rubin and his co-conspirators' misconduct even continued after Plaintiffs finally overcame their fear and engaged counsel. Rubin has directed co-conspirators to try to undermine and interfere with Plaintiffs' relationships with their counsel, to tamper with witnesses, and even illegally hacked into Plaintiffs' computer systems in an apparent attempt to destroy evidence.

## JURISDICTION AND VENUE

6.     Venue is appropriate in the Eastern District of New York as the Plaintiffs were transported into and out of airports located in the Eastern District.

7.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1962.

8.     This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

9.     This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1030.

10. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

11. This Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as Lawson, Hallman, and Caldwell reside in Florida; Rubin, Powers, and Shon reside in New York; Blue Icarus and the Doe Company reside and operate in New York; Schnur resides in and operates her law office in New Jersey, and the matter in controversy exceeds $75,000.

12. This Court has personal jurisdiction over the parties, as the actions that constitute the violations of 18 U.S.C. § 1962(c) and (d) were conducted in relation to the relationship between Hallman, Lawson, Caldwell, Rubin, Shon, and Powers at the Enterprise's chief crime location (the "Penthouse"), owned by Blue Icarus, at the Metropolitan Tower located on 146 West 57th Street, 76th Floor, New York, New York in the Southern District of New York and the Plaintiffs were flown into and out of airports in the Eastern District of New York.

13. Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b) for violations of 18 U.S.C. § 1962 as long as the Court has personal jurisdiction over at least one party.

## PARTIES

### *Plaintiffs*

14. Plaintiff Hallman is an individual who is a model for Playboy Enterprises, Inc. Hallman resides in Fort Lauderdale, Florida.

15.    Plaintiff Lawson is an individual who is a model for Playboy Enterprises, Inc. Lawson resides in Daytona Beach, Florida.

16.    Plaintiff Caldwell is an individual who is a freelance model. Caldwell resides in Fort Lauderdale, Florida.

### *Defendants*

17.    Howard Rubin is an experienced money manager with a highly regarded reputation in the financial field. Rubin also goes by Howie Rubin, and he is now a Portfolio Manager at Soros Fund Management, LLC. Upon information and belief, Rubin is also the manager of the Doe Company. Rubin resides in New York, New York. Rubin is a person under 18 U.S.C. § 1961(3). Unless otherwise specified, every time that Rubin is alleged to have committed an action, that action was committed both in his individual capacity, and on behalf of the Doe Company.

18.    Jennifer "Jenn" Powers is an individual who works with Rubin, and, upon information and belief, is an employee of the Doe Company. Powers resides in New York, New York. Powers is a person under 18 U.S.C. § 1961(3).

19.    Stephanie Shon is an individual who works with Rubin, or formerly worked with Rubin, and, upon information and belief, is or was an employee of the Doe Company. Shon resides in New York, New York. Shon is a person under 18 U.S.C. § 1961(3).

20.    Yifat Schnur is an individual who is an attorney for Rubin. Schnur resides in Edison, New Jersey. Schnur is a person under 18 U.S.C. § 1961(3).

21.    Blue Icarus, LLC is a limited liability corporation registered in New York

and located at 501 Madison Avenue, 14th Floor, New York, New York 10022. Blue Icarus owns the Penthouse located at 146 West 57th Street, 76th Floor, New York, New York, 10019. Blue Icarus is a person under 18 U.S.C. § 1961(3).

22.     John Doe is an individual who is responsible for hacking into the computers of Plaintiffs and Plaintiffs' family members. Doe is a person under 18 U.S.C. § 1961(3).

23.     Upon information and belief, the Doe Company is located in New York, New York. The Doe Company is a person under 18 U.S.C. § 1961(3). The Doe Company is the vehicle through which the Enterprise operates, and through which Rubin pays his employees—like Powers—as well as the models he hires, including Plaintiffs Hallman, Lawson, and Caldwell.

## STATEMENT OF FACTS

### Rubin Background

24.     Howie Rubin has worked in the financial industry for thirty-five years and has years of experience trading mortgage-backed securities.

25.     He is currently a Portfolio Manager at Soros Fund Management, LLC.

26.     Rubin was a chief mortgage-securities trader from 1985–1987 at Merrill Lynch and was a Senior Managing Director at Bear Stearns Companies, Inc. from 1987–1999.

27.     Rubin also served as a Director of the Commercial Industrial Finance Corporation (also known as Deerfield Capital Corporation) from December 2004 until May 19, 2009.

28.     From February 2007 to January 1, 2011, Rubin served as a Director of Fortress Investment Group, LLC.

29.     Rubin served as a Director of New Media Investment Group, Inc. from October 24, 2006, to December 18, 2008.

30.     Rubin served as a Director of GateHouse Media, Inc. from October 2006 to December 2008.

31.     He has also served as an Independent Director of Global Signal, Inc. since February 2004.

32.     Rubin is married to Mary Jullien Henry, who is highly involved in philanthropic work in New York.

33.     Rubin and his wife live in New York where they raised their children.

## With the Assistance of An Attorney, Blue Icarus Rents the Penthouse to Serve as the Base for the Enterprise

34.     Blue Icarus filed incorporation documents on November 30, 2010, and registered its address in New York to be located at 501 Madison Avenue, 14th Floor, 10022, the same address as Sanders Ortoli, LLP, now known as Ortoli Rosenstadt LLP.

35.     On February 7, 2011, the deed for Block 01009 Lot 1060 and Lot 1104—the Penthouse—was signed by seller Sanchez, JR., A.R. c/o Oved & Oved LLP, and buyer Blue Icarus c/o Sanders Ortoli, LLP.

36.     Blue Icarus's Department of State ("DOS") ID number is 4024393 and it has no registered agent.

37.     Blue Icarus is aware of the Enterprise as well as the Enterprise's purpose.

38.     Blue Icarus was at least recklessly indifferent to the Enterprise and its acts as Blue Icarus failed to inquire following separate incidents at the Penthouse where an ambulance was called on one occasion and police were called on a separate occasion.

39.     A non-recklessly indifferent owner would be concerned of potential liability regarding any injury that occurred on the premises and would want to remedy any potential defects or dangerous conditions on the premises.

40.     Moreover, a non-recklessly indifferent owner would be concerned of potential criminal activity on its premises and would at least inquire as to the nature of the criminal activity that occurred and required police on the premises.

41.     Blue Icarus did not inquire as to either of these incidents, demonstrating Blue Icarus's reckless indifference towards how the Penthouse was being used by the Enterprise.

42.     Even if Blue Icarus was not aware of either of these incidents, Blue Icarus is at least recklessly indifferent in failing to monitor anything occurring on its property.

43.     Blue Icarus has given Rubin and the Enterprise access to the Penthouse and is aware that Rubin does not live at the Penthouse as Rubin has a primary residence, with his family, within walking distance of the Penthouse.

44.     Blue Icarus is aware of how Rubin and the Enterprise utilize the Penthouse.

45.     Blue Icarus's Penthouse has a built-in "dungeon," designed solely for the purposes of the Enterprise, which contains devices and other BDSM-type instruments designed solely to harm victims.

## The Enterprise

46.     Defendants' actions lead all Plaintiffs to believe that the Enterprise has been in existence for many years, potentially with members beyond the current Defendants.

47.     Rubin, Powers, Shon, Schnur, Blue Icarus, Doe, and the Doe Company currently comprise an association in fact enterprise.

48.     In the alternative, any other combination of the Defendants which includes Rubin currently comprises an association in fact enterprise.

49.     The legitimate objective of the Enterprise is to pay and transport women to New York to serve as companions and entertainment for Rubin and, at times, his associates.

50.     In exchange, many of these women expected that Rubin could help with their careers or otherwise supplement their income.

51.     The Enterprise did not reveal to Plaintiffs the other objective of the Enterprise: to cover up Rubin's sexual misconduct and criminal abuse of the women, and to serve as a cover for his wide-ranging human trafficking scheme.

## Powers—a Former Model and Victim of Rubin's—Joins the Enterprise and Becomes an Integral Member of the Conspiracy

52.     Powers, a former Hawaiian Tropics model, became involved with Rubin ten to twelve years ago, when Rubin was in what he has referred to as his "brunette phase." Rubin now prefers blondes.

53.     Like Plaintiffs here, Powers was induced into a BDSM relationship with

Rubin, and, upon information and belief, sustained injuries as a result.

54.     However, Powers continued to associate with Rubin. Powers eventually married one of Rubin's associates after Rubin introduced Powers to him, and Powers has had multiple children with him.

55.     When she became involved with Rubin's associate, Powers began to work for Rubin in a professional capacity. Instead of acting as Rubin's girlfriend or playmate, Powers began to run the day-to-day operations of the Enterprise.

56.     Powers's role was recruiting women to bring to New York, and arranging the logistics, including flight purchases and payment.

57.     To advance the Enterprise's scheme and build trust with the victims of the Enterprise, Powers acts as a sister-figure for the women. After Powers builds some trust with the victims of the Enterprise, Rubin and Powers invite the women to New York under false pretenses. Rubin then physically assaults them, sexually abuses them, and falsely imprisons them.

58.     Powers also acts as the Enterprise's "fixer," cleaning up Rubin's messes and seeking to minimize problems with victims of the Enterprise.

59.     Indeed, once Plaintiffs here began to attempt to seek an escape from being continually victimized by the Enterprise, Powers attempted to interfere with Plaintiffs' plans, including, but not limited to, offering money to Plaintiffs to attempt to buy Plaintiffs' silence and to pay for medical services which were the result of Rubin's actions which have caused Plaintiffs great financial hardship.

60.     Upon information and belief, Powers is paid through the Doe Company for her services.

61.     Further, upon information and belief, the money used to sustain the Enterprise—for payment of Rubin's women, paying rent to Blue Icarus for the Penthouse, travel arrangements, and later pay-offs—goes from Rubin to the Doe Company, to Powers, to wherever the money is then needed.

62.     Powers made the transfers to Plaintiffs in this action directly from her personal PayPal account.

### Schnur, One of Rubin's Attorneys, Joins the Enterprise and Furthers the Goals of the Conspiracy

63.     Yifat Schnur, a former prosecutor in the Manhattan District Attorney's Office, represents Howard Rubin in connection with the Enterprise's activities.

64.     Schnur drafts the non-disclosure agreements ("NDAs") that are provided to the victims prior to meeting Rubin, in the Enterprise's illegal attempt to prevent disclosure of the Enterprise's crimes.

65.     Schnur also aides in obstructing justice and intimidating witnesses through her role as an attorney, attempting to represent those injured by the Enterprise so that they do not report the workings of the Enterprise.

### Hallman Background

66.     Hallman is an International Playboy Playmate. Approximately two years ago, after working as a cocktail waitress in her hometown of Fort Lauderdale, Florida, Hallman began modelling.

67. Playboy soon thereafter hired Hallman and Hallman has since then appeared in multiple international Playboy publications. She has participated in multiple modeling events and conventions, including Paradise Challenge in Jamaica, where Hallman met Plaintiff Lawson.

68. Hallman has a substantial social media following. As has become the industry standard for models in the Playboy or bikini model industries, social media sites Instagram and Snapchat are essential marketing tools for Hallman.

69. Hallman commonly arranges photo or video shoots through these social media platforms.

## Lawson's Background

70. Lawson is also an International Playboy Playmate. Lawson grew up in Rockford, Illinois, and is the oldest of five siblings. Lawson moved to Florida when she was 19, and, shortly thereafter, when her mother passed away, adopted her 10-year-old sister, who came to live with her.

71. Over the course of the next ten years, Lawson worked in an office performing accounts receivable and other clerical work to support her sister and other siblings. When her sister began college, Lawson began to pursue a modelling career, participating in workshops and training to further her career.

72. Lawson eventually left her clerical job, and became a full-time model. Lawson shoots for magazines and attends many of the same modeling conventions as Hallman, including the Paradise Challenge where the two met.

**Caldwell's Background**

73.     Caldwell is a single mother to her now five-year-old daughter. Before Caldwell met Rubin, she worked as a cocktail waitress and dancer at Eleven, a club in Miami, her hometown.

74.     Caldwell met Hallman at Eleven in October, 2015, and the two have been friends ever since.

**The Enterprise Lures Hallman**

75.     On or around August 23, 2016, Hallman received a direct message on Instagram from Stephanie Shon on behalf of Rubin. Shon indicated that she worked for Howard Rubin, and that Rubin, who had seen images of Hallman on Instagram, would like to meet Hallman in New York.

76.     While Shon initially identified Rubin by name, she then insisted that Hallman refer to him only as "H" so as to protect Rubin's identity.

77.     Shon noted that while she would not be at the meeting in New York, Hallman would have the opportunity to meet her "boss," Rubin.

78.     Shon told Hallman that Rubin would pay for Hallman to fly from Florida to New York and pay Hallman $2,000 to meet and spend time with Rubin.

79.     Shon explained that if Rubin liked her, Rubin would pay an additional $3,000, for a total of $5,000, to Hallman. Shon represented that Rubin loved spending time with Playboy models and frequently set up this type of arrangement.

80.     Because Hallman did not know who Rubin was, and was wary of the somewhat out-of-the-ordinary arrangement, she initially refused the offer.

81.     However, Rubin, was persistent. Rubin next had Powers contact Hallman to persuade Hallman to travel to New York. Powers spoke with Hallman on the phone and through the messaging application WhatsApp.

82.     When Hallman identified her reservations, consistent with the Enterprise's scheme of lying to its victims to induce them to meet with Rubin, Powers lied to Hallman.

83.     Powers assured Hallman that Rubin was "a great guy," and would not do anything to make Hallman feel uncomfortable. Powers noted that she herself had initially entered into a similar arrangement as proposed, and claimed she had a positive experience which led to her current employment with Rubin.

84.     In fact, Powers told Hallman that if Hallman ever felt uncomfortable she could simply ask to leave, and would not only be allowed to do so, but would still be paid the initial $2,000 for her time.

85.     Relying on Shon's and Powers's representations, Hallman agreed to come to New York, with the condition that she could bring a friend with her, who Rubin would also pay to travel to New York.

86.     Rubin and Powers agreed to Hallman's condition.

87.     Hallman contacted Plaintiff Lawson, another International Playboy Playmate, and asked Lawson if she would join her.

88.     As described further below, Lawson had in fact already been contacted by the Enterprise and was herself also wary of the arrangement.

89.     However, again at Rubin's direction and to further the Enterprise, Powers

also lied to Lawson and wrongly claimed that Lawson would be safe, and would not be asked to do anything that she did not want to do.

90.     As such, Powers purchased plane tickets on JetBlue Airways to New York for Hallman and Lawson with funds supplied by Rubin through the Doe Company, arranging for Hallman and Lawson to meet with Rubin at the Penthouse.

## The Enterprise Lures Lawson

91.     At about the same time that Shon contacted Hallman, Shon also direct messaged Lawson through Instagram.

92.     Lawson initially ignored Shon. People contact Lawson frequently through Instagram with proposals and job offers, the vast majority of which are not legitimate. Thus, Lawson was initially very skeptical.

93.     But, after Powers convinced Hallman to travel to New York to meet Rubin, Hallman called Lawson to persuade her to join her on the trip.

94.     Still not completely convinced, Lawson had phone calls with both Shon and Powers. Because of her initial skepticism, Lawson wanted as much information as she could obtain.

95.     Consistent with the Enterprise's goals and Rubin's direction, both Shon and Powers lied in all communications with Lawson, claiming Rubin was not threatening, and noting that Rubin was a very wealthy man who enjoyed women and liked to take care of them.

96.     Powers and Shon told Lawson that Rubin liked large breasted women and that Rubin said he liked the photos he had seen of Lawson.

97.     Powers reassured Lawson that she did not need to worry and that the trip would not be about sex, and, at most, would entail some fetish play and potentially photos.

98.     As Lawson had previously done photo shoots involving light fetish work, and had always been treated well and with respect to her boundaries, she decided to travel to New York and to the Penthouse consistent with her previous professional work.

**The Enterprise's Criminal Acts Against Hallman and Lawson – The August 2016 Trip**

99.     Hallman and Lawson arrived in New York from Florida on flights purchased for them by Powers on behalf of Rubin on or around August 23, 2016.

100.     Upon arrival and as per Powers's instruction, Hallman took a cab from the airport to the Penthouse and Lawson took a car to the Penthouse after Lawson's flight had been delayed and the two did not arrive at the airport at the same time as planned.

101.     Hallman and Lawson were greeted at the Penthouse by Powers, who poured them cocktails and showed them around the Penthouse. The Penthouse appeared to be a typical high-end New York residence, but with photos of various Playboy Playmates displayed throughout. The models in the images were very well-known Playboy Playmates, as well as some lesser-known models. Many of the photos included Rubin with these other women.

102.     Hallman and Lawson recognized many of the models on the walls, and were comforted by the fact that women they knew had presumably entered into the same arrangement with Rubin that they had.

103.    At the Penthouse, Powers presented both Hallman and Lawson with a form NDA, drafted by Defendant Schnur.

104.    Powers requested that Hallman and Lawson sign the NDA before meeting with Rubin for dinner.

105.    Neither Hallman nor Lawson are familiar with legal documents and contracts like NDAs and did not understand the contents. Powers did not explain the contents, nor did Powers provide the women adequate time to review the NDAs nor have an attorney review the NDAs.

106.    Instead Powers persuaded each of them to sign, noting that it was simply standard practice for Rubin and not to worry, that "everything will be great."

107.    Despite Powers and the Enterprise knowing that they would require Hallman and Lawson to sign the NDAs upon arriving at the Penthouse, they did not provide Plaintiffs the NDAs in advance for their review, for them to have attorneys review, or for the women to keep, nor did they inform Plaintiffs prior to their trip that they would be required to sign any contracts to meet with Rubin.

108.    Powers then took the executed NDAs but refused to allow either Hallman or Lawson to keep a copy for their own records.

109.    At approximately 5:00 p.m., after signing the NDAs, Powers brought Hallman and Lawson to meet Rubin at a rooftop bar located at Viceroy Central Park, a hotel next door to the Penthouse.

110.    It is Rubin's practice to meet the victims whom the Enterprise lures to the Penthouse at this hotel immediately prior to returning to the Penthouse to sexually assault them.

111.    Rubin, Hallman, and Lawson had drinks and dinner at the hotel bar before heading back to the Penthouse. Throughout their interactions at the Viceroy, Rubin treated Hallman and Lawson respectfully and cordially. Hallman and Lawson slowly became more comfortable, believing that Rubin would treat them with respect as claimed by Powers.

112.    However, when the group returned to the Penthouse at approximately 7:00 p.m., the mood quickly changed. Upon entering the Penthouse, Rubin ordered Hallman and Lawson to change into fetish-style clothing before returning to the living room to have additional drinks with him. Rubin made each of the cocktails himself, out of the sight of Hallman and Lawson.

113.    Rubin's demeanor was different inside the Penthouse than in public. He became cold and authoritative, ordering Hallman and Lawson to do as he commanded. Because of this change, Hallman and Lawson grew nervous.

114.    In what appeared to be an attempt to assuage their concerns, Rubin went to a safe located in the Penthouse and paid both women $5,000 in cash.

115.    Even more concerning was that a room that had been previously locked was now open, and revealed a room with a white carpet and red walls, filled with ropes, chains, dildos labelled A–Z, and other apparatuses which neither Hallman nor Lawson recognized.

116.   Hallman noticed a large x-shaped machine with straps, a bench, full-face masks with zippers, and metal hooks.

117.   At this time, Lawson was also beginning to feel strange, and believes now that something had been added to her drink to increase her intoxication.

118.   Rubin brought the women into this side room (the "Dungeon") and immediately slapped Lawson across the face. Lawson protested, telling Rubin not to hit her in the face. Not only had the slap been unexpected and hurt, but Lawson had recently undergone a cosmetic treatment to her face, known commonly as fillers, and was concerned that Rubin would damage the treatment.

119.   At no point did Rubin or Powers ask either of the women about any potential medical conditions, something that someone in a responsible, consensual interaction would have done prior to any interactions of this type. However, had Rubin or Powers asked such a question, they would have lost the element of surprise, a crucial element of the Enterprise's ability to lure women to Rubin.

120.   At one point, Rubin demanded that Lawson hit Hallman for him. When Lawson objected, Rubin turned his violence on her. Lawson, who was at this point scared of what Rubin would do if she did not obey, then attempted to pretend to hit Hallman, slapping her leg instead of Hallman.  However Rubin quickly caught on, and, as a consequence, hit Lawson.

121.   Rubin ignored Lawson and proceeded to restrain both of the women, tying their hands behind their backs and binding their breasts with rope and what

appeared to be red flagging tape (a non-adhesive type of plastic ribbon typically used in surveying or construction).

122.   After telling Hallman and Lawson that if they became uncomfortable he would stop, Rubin gagged both of the women so that neither could speak or object to anything that Rubin was going to do.

123.   Rubin then told Hallman and Lawson, "I'm going to rape you like I rape my daughter."

124.   At this point, both Hallman and Lawson began to panic. While they had suspected that Rubin would want them to play some mild fetish games and perhaps take photos, neither one expected to be restrained in this manner or to be actually beaten.

125.   Neither Lawson nor Hallman consented to be restrained in this manner or beaten, nor could either woman verbally object after Rubin gagged them despite their many attempts to do so.

126.   Lawson had previously done some fetish modelling work, and, based on Powers's representations, expected the same scenario with Rubin. However, in her previous experiences, the restraint had been for show, and she had always felt that she was free to go when she requested.

127.   This was different. Not only was Lawson so restrained that she could not leave on her own, she could not even voice her objections. When either of Plaintiffs screamed and protested, Rubin would simply become more violent.

128.    Once the women were tied up, Rubin took the side of his fist and punched Hallman in the back of the head.

129.    Rubin began to beat both women in the breasts, calling the women "cunts," and slapping and punching their breasts and ribcages repeatedly.

130.    Rubin pushed Hallman to the ground, face down, and continued to punch Hallman in the back of the head, stating that Hallman "is the baby, and Howie is the daddy. The daddy has to beat his baby." Rubin punched Hallman so strongly that Hallman fell unconscious.

131.    Without her consent, Rubin penetrated Hallman, causing tears to her vagina. Because she was restrained and in and out of consciousness, Hallman does not know if Rubin penetrated her with an object or if it was Rubin himself.

132.    After approximately one hour of this rape and beatings, Rubin abruptly stopped and left the Dungeon, loosening Hallman's and Lawson's restraints before he left.

133.    Both Lawson and Hallman were shocked following Rubin's departure and simply lay in the Penthouse, attempting to gather themselves.

134.    Neither saw any other individuals in the Penthouse, but Hallman noticed a laptop and keys on the coffee table that had not been there previously.

135.    Both women experienced bruising and pain immediately thereafter. They were also tremendously emotionally distraught.

136.    They decided to message Powers to tell her what had happened.

137.    Powers was not surprised.

138.    Indeed, as it turns out, Powers had recruited many women to participate in the same exchange with Rubin. After Rubin is through with the victims—and returns home to his wife and children—it is Powers's job to soothe the traumatized women and to help make arrangements with doctors to take care of any of the damage that Rubin had done.

139.    This was not the first time Powers did this, nor would it be the last.

140.    Lawson and Hallman, who had nowhere else to go, stayed in the Penthouse for the night and returned to Florida the next day on the tickets the Enterprise had purchased for them.

## The Enterprise Lures Caldwell

141.    Shortly thereafter, Powers contacted Hallman and asked if Hallman knew any other women that Rubin might like.

142.    Hallman was afraid of what Rubin would do if she did not cooperate with Rubin. Rubin was, and remains, a very wealthy man who at this point knew her address, phone number, date of birth, and how to find her if he wanted to hurt her.

143.    Out of fear of not cooperating with the Enterprise, Hallman introduced Powers to her friend, Caldwell, who was looking for additional ways to supplement her income to support her daughter, and made the introduction of Caldwell to Powers.

144.    Rubin, through Powers's personal PayPal account, paid Hallman $2,000 for making the introduction.

145.    Powers contacted Caldwell through WhatsApp, and made arrangements to fly Caldwell to New York to meet with Rubin. Powers made the same offer and same

22

fraudulent representations to Caldwell that she had previously made to Hallman and to Lawson: simply for traveling to New York and meeting with him, Rubin would pay Caldwell $2,000. If Rubin liked her, he would ask her to stay and would pay an additional $3,000 for a total of $5,000.

146.   Hallman had told Caldwell everything about her previous experience with Rubin, so Caldwell was nervous about going. However, Powers assured Caldwell that Rubin would be respectful of Caldwell's concerns, and would not ask her to do anything she was uncomfortable with and downplayed Hallman's representations about what actually happened with Rubin.

147.   As a result, Caldwell travelled to New York in early September 2016, by herself to meet with Rubin. Like Hallman and Lawson, Caldwell met Powers at the Penthouse, who presented her with an NDA.

148.   Just as with Lawson and Hallman, Powers again did not provide any explanation of the NDA and did not confirm that Caldwell understood the agreement

149.   In fact, Caldwell did not. Powers also did not permit Caldwell to keep a copy of the NDA.

150.   Caldwell then met Rubin for dinner at the rooftop bar at the Viceroy Central Park. Defendant Stephanie Shon joined the two of them.

151.   At the dinner, Caldwell, who had become more anxious as the night proceeded, turned to Rubin and told him that she was feeling nervous about what he might want to do later. Caldwell told Rubin that she had seen Hallman's and Lawson's bruises and was concerned that he would do the same to her.

152.    Rubin told Caldwell that he did not like her attitude and refused to answer her questions regarding her concerns.

153.    Caldwell, Rubin, and Shon soon returned to the Penthouse. Caldwell, alone in New York, was quite scared at this point, and asked Shon to stay.

154.    But Shon said she could not, and left Caldwell at the Penthouse alone with Rubin for between thirty and forty-five minutes while Shon went to a party. Shon only returned after Caldwell kept messaging her to come back.

155.    Rubin continued to provide Caldwell alcoholic drinks. Due in part to her nervousness, and in part to Rubin continuously giving her drinks, Caldwell drank more than she intended to, becoming intoxicated. Caldwell began to speak to Rubin about her daughter.

156.    Rubin stood and slapped Caldwell across the face. Rubin told Caldwell that he was "completely turned-off" by the conversation.

157.    Rubin put $2,000 in cash on the table and left the Penthouse, telling Caldwell she needed to leave by the next day.

158.    Caldwell stayed the night at the Penthouse with Shon, while Shon attempted to take Caldwell under her wing, but Caldwell flew back to Florida on the ticket purchased by Powers because Caldwell needed to take care of her daughter.

159.    Days after Caldwell left New York, Rubin began contacting her through WhatsApp, both on his own and through Powers.

160.    Rubin proceeded to convince Caldwell to return to New York. Caldwell told Rubin she would only come if she could bring Hallman with her. Rubin eventually agreed and Powers again arranged and paid for flights and travel.

161.    When she agreed to meet with Rubin the second time, Caldwell believed that, at worst, she could go with Hallman, meet Rubin for dinner and simply be paid $2,000 for her time. Consistent with the representations of Powers and Shon, Caldwell did not expect to participate in anything further.

**The Enterprise's Criminal Acts Against Hallman and Caldwell – The September Trip**

162.    Hallman and Caldwell flew from Florida to New York on September 24, 2017. After arriving at the airport, the two went directly to the Penthouse.

163.    There, Hallman and Caldwell changed and met Rubin at a restaurant named Tao Uptown for dinner and drinks. Powers did not require Hallman or Caldwell to sign another NDA.

164.    At some point during the dinner, a man who had spoken with Hallman outside while Hallman smoked a cigarette came over to the dinner table to say hello. Rubin became angry and demanded security. That security removed the man from the restaurant.

165.    After the man left, Rubin stood up and walked out of the restaurant, leaving Hallman and Caldwell behind.

166.    Not knowing what to do, Hallman and Caldwell returned to the Penthouse together.

167.    Once Hallman and Caldwell arrived at the Penthouse, Rubin began to message them via WhatsApp.

168.    Rubin returned to the Penthouse and was extremely intoxicated. When Hallman and Caldwell apologized for the disruption at dinner—which was caused by neither of them—and acted nicely to Rubin, Rubin grew frustrated and left the Penthouse.

169.    Hallman and Caldwell changed out of their dinner clothes into more comfortable clothes, and stayed in the Penthouse, not expecting Rubin to return.

170.    But Rubin returned to the Penthouse. Rubin's conduct became so bizarre that Hallman contacted Powers, asking Powers to book a room at a hotel for Hallman and Caldwell to go to.

171.    Hallman grew frustrated and confronted Rubin. When Hallman began to yell at Rubin for how he was treating her and Caldwell and for scaring them, Rubin became more engaged, and then told the women that they were "going to do this."

172.    Rubin took both Hallman and Caldwell to the master bedroom and again tied each female up with rope from the nightstand.

173.    Rubin tied Caldwell's mouth shut with the red plastic ribbon. Caldwell grew frightened as she then understood she would have no way of telling Rubin that he was going too far.

174.    Rubin bound Caldwell's hands behind her back, and tightly wrapped rope around her breasts. Rubin pushed Caldwell face down on the bed so that she could not see.

175.    Rubin proceeded to beat both of the women, punching them repeatedly in the backs of their heads and beating their breasts.

176.    Both Caldwell and Hallman tried screaming out—as much as they could given their restraints—to ask Rubin to stop, but they could not.

177.    However, Rubin would not listen.

178.    Caldwell was beaten in the head so badly, that she went in and out of consciousness during the beating.

179.    While Hallman and Caldwell were bound, Rubin took scissors and cut off their clothing.

180.    At one point while bound, gagged, and unable to see, Rubin penetrated Caldwell, first with an object and then himself, without Caldwell's consent. Caldwell was powerless to stop.

181.    At one point, Caldwell looked up at Hallman and realized that both she and Hallman were crying. Caldwell wanted Rubin to stop hurting both of them, so when the tape around Caldwell's mouth loosened up due to sweat, she bit his finger.

182.    Rubin was initially surprised by the bite, but then grew even more violent and continued his attack.

183.    After about an hour of the rape and beatings, Rubin, seemingly satisfied, untied the women and left the Penthouse, leaving $5,000 on the table for Caldwell and having another $5,000 sent to Hallman via PayPal from Powers in the morning.

184.    Caldwell's head throbbed and both Caldwell and Hallman were already showing signs of physical trauma, including bruising and swelling.

185.    Caldwell and Hallman took photos and videos of their injuries. Both women had severe bruising on their faces, breasts, backs, and buttocks.

186.    Rubin beat the women on the breasts so badly, that Hallman's left breast became swollen and developed scar tissue and hardening, causing visible damage and pain.

187.    Rubin beat Caldwell's breasts so badly that her right implant flipped, so that the backside, which usually sat flush with her ribcage, faced outwards. Caldwell's breasts were beaten so badly that the closure for her breast implant was fully exposed and visible and Caldwell's plastic surgeon was not even willing to operate on her breasts after the incident due to the severe trauma.

188.    On the same breast, Caldwell's areola was damaged, becoming nearly twice as large as the areola on her left breast.

189.    The women's bruising only worsened as the days wore on after they returned to Florida.

190.    At the direction of the Enterprise, Powers paid Hallman $5,000 via PayPal the next morning and Caldwell was left $5,000 in cash as compensation.

**After Realizing How Severely Rubin Injured Caldwell, the Enterprise Attempts to Quiet Caldwell By Paying Her Additional Money**

191.    Caldwell's injuries, particularly those to her breasts, were so severe that she had to see a doctor. The doctor discovered not only the injury to Caldwell's breast implants, but that Caldwell had developed hematomas around the implants, causing

swelling and hardening of the breasts. The doctor also noted that Caldwell's right areola would require surgery to correct.

192.    When her doctor asked what had happened to her, Caldwell lied and said that she had accidentally injured herself.

193.    Caldwell feared reprisal from Rubin if she had revealed what had truly occurred.

194.    Caldwell is a model and dancer, as such that her physical appearance is extremely important to her work. Because of her injuries, Caldwell could not work, and lost her job at Eleven.

195.    As such, she contacted Powers and Rubin to ask that they help to repair the damage Rubin caused.

196.    The Enterprise responded by requesting that Caldwell again fly to New York on her own so that they could discuss.

197.    Powers again purchased Caldwell's plane tickets and arranged for her travel to New York.

198.    Caldwell was terrified, but felt extremely vulnerable. She was hurt, just lost her job, and needed to take care of her daughter. Without any other options, Caldwell flew back to New York on October 4, 2016.

199.    When she arrived at the Penthouse, Powers showed Caldwell a stack of papers that had been drafted by Rubin's attorney, Defendant Schnur, and requested that she sign them. Powers then promised that the Enterprise would pay Caldwell $20,000 in installments of $4,000 to repair her breasts.

200.    The Enterprise directly paid the doctor who repaired Caldwell's breasts until the amount was paid off in December of 2016 or January of 2017. At such time there was one payment that remained to be paid directly to Caldwell.

201.    However, the Enterprise initially refused to pay Caldwell the final payment and only did so after Caldwell asked Powers for a copy of the NDA she had signed and Caldwell wrote an apology note to Rubin about demanding the money for so long.

202.    Caldwell never received the copy of the NDA she requested from Powers.

203.    Rubin requested that Caldwell have her breast implants replaced with a sturdier material like silicone (Caldwell had saline implants, which are typically safer than silicone) so that she could return and Rubin could beat her breasts without concern of further damage.

204.    Rubin was concerned only with preserving the Enterprises' ability to continue to engage in crimes, and with preserving Caldwell's breasts for future beatings, and not with any of Caldwell's other injuries or emotional state.

205.    Caldwell did not have the opportunity to review the document, and did not understand what she was signing. As with the NDAs, Powers again refused to allow Caldwell to take a copy of the document with her.

206.    Powers and Rubin paid Caldwell, on the condition that she not reveal to her doctor how she was injured.

**The Enterprise's Criminal Acts Against Hallman and Santi – The October Trip**

207.     Again, fearing that Rubin would engage in violent reprisals if Hallman did not succumb to the Enterprise's demands, Hallman returned to New York with another Playboy model, Nancy Santi.

208.     On this trip, Hallman became so anxious that she got sick, eventually throwing up on the plane from Miami, in the car, and at Rubin's apartment.

209.     To ease her anxiety, Rubin and Powers asked Hallman's acquaintance, Zoe Cacciola, to tend to Hallman.

210.     But Hallman could not stop and continued to be sick.

211.     After Hallman proceeded to vomit for hours, Powers called an ambulance, which took Hallman to the emergency room, accompanied by Santi and Cacciola, spending the evening at the hospital with Santi and Cacciola.

212.     Hallman was discharged from the hospital between 2:00 a.m. and 3:00 a.m. and returned to Rubin's apartment with her friends.

213.     Upon entering, Hallman saw that Rubin had multiple individuals over at the Penthouse, including Playboy Playmate Ashley Alexa.

214.     Most in the Penthouse were drinking alcohol and snorting cocaine.

215.     As Hallman was still recovering, and as Santi did not want to be around Rubin without Hallman, Hallman and Santi went to bed. Cacciola, who did not know about Rubin's violent history, chose to join the party.

216.    At one point, later in the night, Rubin came into the room in which Hallman and Santi were sleeping and removed a document and cash from the safe that was located therein.

217.    Hallman later learned that this was an NDA and payment for Cacciola to join Rubin in the Dungeon.

218.    After her encounter with Rubin, Cacciola returned to the room in which Hallman and Santi were resting. Cacciola was distraught and looked as though she had been hurt. Cacciola grew more and more upset over her interaction with Rubin and began to scream at Hallman and Santi.

219.    Cacciola continued to attack Hallman verbally and physically, and, eventually, Hallman fought back. Cacciola called the police.

220.    As Hallman knew the police were coming, she contacted Powers to ask her what she should do.

221.    Powers told Hallman to lie and say that the apartment belonged to Cacciola, and directed Hallman to hide any evidence of illegal conduct in the Penthouse.

222.    Hallman, who feared Rubin, did as she was told.

223.    When the police arrived they saw that Cacciola—who had just returned from Rubin's Dungeon—appeared to have sustained more physical injuries at first glance. The police arrested Hallman.

224.    Hallman did not have a criminal record and was released with a desk appearance ticket.

225.    Rubin, through Powers and the Doe Company, told Hallman they would pay for her criminal attorney in exchange for Hallman's silence as to the involvement of the Enterprise.

226.    Blue Icarus was aware, or should have been aware, and was on notice of the police being called to the Penthouse but chose not to determine what events had transpired in the Penthouse.

### The Enterprise's Criminal Acts Against Lawson – The December Trip

227.    In late December, Lawson found herself in a tough financial situation. Because Rubin and Powers had kept in touch via WhatsApp, they were aware of this and again convinced Lawson to travel to New York on her own, offering her $5,000 compensation for her time. And assuring her that her safety would not be threatened.

228.    Powers again purchased Lawson's plane tickets, and transmitted the flight records to Lawson via email. Lawson arrived in New York and immediately went to the Penthouse.

229.    This time, Rubin requested to meet Lawson at the Viceroy for lunch and drinks. Lawson's worries were initially assuaged due to the time of day, and because of how kind both Powers and Rubin appeared to treat her.

230.    However, this did not last. After lunch, Rubin and Lawson returned to the Penthouse. Rubin brought Lawson into the Dungeon room and tied Lawson to a post and inserted a ball gag into Lawson's mouth. Unlike in August, Rubin bound Lawson's feet, so that Lawson could not move in any way.

231.   Lawson was not expecting this and became frightened. Rubin again began to beat Lawson's breasts, repeatedly punching and slapping Lawson's body. While her first experience with Rubin had not been a positive one, this was quickly becoming more violent.

232.   Rubin then came towards Lawson with a large instrument, causing Lawson fear of imminent harm. Lawson was at first not certain what the device was, but quickly realized that Rubin was holding what appeared to be a cattle prod, which Lawson knew was supposed to be used to shock livestock. Lawson did not consent to being touched or shocked with the cattle prod.

233.   This did not stop Rubin. Rubin repeatedly shocked Lawson with the cattle prod, placing it on the outside and inside of Lawson's vagina before causing it to shock her. Lawson screamed and though she was gagged, tried to beg Rubin to stop and to untie her.

234.   Rubin refused. The more Lawson screamed, the more Rubin hurt her.

235.   After the cattle prod, Rubin penetrated Lawson repeatedly with a large dildo, and, eventually began to engage in sex with Lawson himself.  Lawson, who was still gagged and crying from the pain she was suffering, did not consent.

236.   After more than an hour, Rubin stopped and left Lawson alone.

237.   Following this incident, Lawson refused to stay in the Penthouse. Lawson left and stayed at a hotel in New York before flying back to Florida the next day.

238.   Powers sent Lawson a PayPal payment of $5,000 from Powers's personal PayPal account.

239.    After Lawson returned to Florida, Rubin continued to harass her. Rubin

sent Lawson WhatsApp messages, calling her a "cunt," but continuing to try to

convince Lawson to return.

240.    Lawson refused and has not seen Rubin since December 2016.

**Rubin Comes to Florida and Attempts to Lure Hallman and Caldwell Into Another Encounter – The March Trip**

241.    Following these encounters, Rubin and Powers continued to communicate

with Hallman, and, on occasion, with Caldwell. Caldwell refused to travel anywhere to

see Rubin, despite his urging that he would make her one of his "girlfriends."

242.    But, on or around March 29, 2017, Rubin came to Miami, Florida, and

invited Hallman and Caldwell to dinner. Rubin was dining with Wes Edens, a

prominent business man and owner of the Milwaukee Bucks in the National Basketball

Association ("NBA"). Rubin offered to pay Hallman and Caldwell $500 each if they

joined him and Santi for dinner.

243.    Hallman and Caldwell agreed. While they both still feared Rubin, neither

had any intention of going anywhere with him beyond dinner, and expected to be safe

in the public setting.

244.    At the dinner, Caldwell, who was feeling very emotional and angry at

seeing Rubin again, lost control and told him he was a sick person that she never

wanted to see again. Caldwell continued, telling Rubin that he was a bad person and

that, if he continued doing what he did to her, Hallman, and Lawson, that he was going

to end up killing someone. Rubin did not respond, merely turning to Hallman and telling her to control Caldwell.

245.    The dinner ended shortly thereafter. When Rubin made no move to pay the Plaintiffs, Caldwell asked for her $500.

246.    Rubin was again turned on by the women's fear and anger, said no, and that he would only pay if both Hallman and Caldwell returned to his hotel room with him.

247.    The women refused, and eventually obtained their payments.

248.    Caldwell never saw Rubin again, however she was still in occasional contact with Powers regarding the installment payments for Caldwell's payments which the Enterprise completed in August of 2017, only after Caldwell requested a copy of the NDA and wrote an apology letter to Rubin.

### Hallman's Injuries

249.    As a result of Rubin's abuse, Hallman suffered significant injuries.

250.    Following the August encounter, Hallman discovered that Rubin had broken one of her ribs. She experienced extreme pain and difficulty breathing. The September encounter only exacerbated this, causing further pain to her damaged rib and chest.

251.    During the September encounter, Rubin beat Hallman's left breast so roughly that he left scar tissue and caused it to harden. This caused not only damage to the appearance of the breast, but has caused and continues to cause Hallman pain.

252.   After both encounters, Hallman experienced extreme bruising to her breasts and face.

253.   Hallman was knocked unconscious by Rubin's punches to the back of her head during at least the August encounter, and sustained head trauma and headaches following both encounters.

254.   Since August 2016, Hallman has suffered from depression, anxiety, and an inability to sleep. Each of these maladies was exacerbated following the September and October encounters, and continues to this day.

255.   Because of these mental and emotional injuries, Hallman has been prescribed sleeping pills and anti-anxiety medication, without which she cannot sleep. Hallman is further considering anti-depressants at the request of her doctor, but has not yet decided whether to take the anti-depressants.

256.   Hallman informed Powers and Rubin of these injuries. Both Powers and Rubin urged Hallman to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Hallman has not yet done so.

257.   Once Hallman received criminal defense counsel as a result of the incident during the October trip, paid for by Rubin, she continued to lie regarding what happened out of fear of disclosing to anyone what Rubin had done.

258.   Finally, a few weeks ago, after building up trust over months, she admitted to her criminal defense lawyer Rubin's crimes and the Enterprise's scope.

**Lawson's Injuries**

259.   As a result of Rubin's abuse, Lawson sustained significant injuries.

260.   Following the August 2016 encounter, Lawson sustained bruising to her face and breasts, and felt intense pain in her left breast.

261.   Following the December 2016 encounter, Lawson's left breast capsulated as a direct result of Rubin's physical abuse. Lawson experienced severe pain in her left breast, which continues to throb today, nine months after the injury was sustained.

262.   Scar tissue has built up in Lawson's breast as a result of the trauma caused by Rubin, such that her breast has become hard.

263.   As a result of the December 2016 encounter, Lawson experienced tears and trauma to her vagina, and was in sever discomfort for weeks following her experience.

264.   Following the December 2016 encounter, Lawson suffered from depression, inability to sleep, and anxiety. After first attempting to self-medicate, Lawson eventually began seeing a doctor who is now treating her with sleeping pills and anti-depressants.

265.   Lawson informed Powers and Rubin of these injuries. Both Powers and Rubin urged Lawson to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Lawson has not yet done so.

## Caldwell's Injuries

266.     As a result of Rubin's abuse, Caldwell suffered significant injuries.

267.     Rubin's abuse caused damage to each of Caldwell's breasts, but severe damage to her right breast. As previously described, Rubin's beating caused Caldwell's right breast implant to flip completely around. Caldwell sustained hematomas in her right breast which caused pain and scarring. Caldwell's right areola also sustained damage, such that it became enlarged and disproportionate to her left areola. Caldwell's doctor recommended surgery as the only option to fix the appearance of the right areola, which would require actual cutting of the areola and loss of sensitivity. As a direct result of this injury, Caldwell lost her job and has been unable to return to similar work since.

268.     Rubin's beating also caused Caldwell to sustain bruising to her face and buttocks.

269.     Since her encounter with Rubin, Caldwell has suffered from extreme emotional distress, depression, and anxiety.

270.     Caldwell suffered from suicidal thoughts as a result and has been prescribed medication by her doctor.

271.     Caldwell informed Powers and Rubin of these injuries. Both Powers and Rubin urged Caldwell to get the damage to her breasts repaired. Due to the extensive recovery required, Caldwell has not yet undergone the repair surgery.

**The Enterprise Continues to Engage In Misconduct to this Day, and Is Likely To Continue Unless Stopped By the Court**

272.    Rubin and the Enterprise continue this misconduct to this day.

273.    Hallman is aware of multiple women who have complained about Rubin's abuse and about Power's misrepresentations inducing them to enter into the arrangement in the first place.

274.    Rubin and Powers have threatened Caldwell, Hallman, and Lawson, warning each of them at different points that something bad could happen to they if they were to expose the Enterprise or reveal it to anyone at any time.

275.    Indeed, Rubin and Powers both told Hallman not to disclose to her own lawyer what had happened.

276.    Moreover, Rubin has told Hallman that she needs to control Caldwell and prevent her from going to the police or to a lawyer.

277.    Because of the criminal charges against her due to the altercation with Zoe Cacciola, Hallman has had continued contact with the Enterprise.

278.    Through Powers and the Doe Company, Rubin offered to pay for Hallman to hire a criminal defense attorney to represent her in connection with the criminal charges. Through Powers and the Doe Company, Rubin has also flown Hallman to New York for each of her court appearances and put her up in the 11 Howard hotel in SoHo.

279.    In exchange, Rubin and Powers requested that Hallman not tell the whole story regarding the October encounter, and continue to keep quiet about Rubin's ownership of the Penthouse, the existence of the Dungeon, and Rubin's misconduct.

Rubin and Powers requested that Hallman lie and say that her friend, either Zoe Cacciola or Powers actually owns the Penthouse.

280. As recently as August 18, 2017, Rubin and Powers attempted to convince Hallman to terminate her criminal attorney and allow Rubin's attorney, Schnur, to represent Hallman in her criminal action.

281. Schnur agreed to represent Hallman, despite obvious conflicts of interest, and violations of her duties as an attorney.

282. Rubin and Powers feared that Hallman had revealed the Enterprise's secrets to her criminal attorney, and feared exposure.

283. Realizing this, and that Rubin and Powers were not acting in her best interest, Hallman ceased communicating with Rubin and Powers.

284. Powers continued to contact Hallman, attempting to convince her to come meet with her and Rubin.

285. Powers continues to do this to this day. In fact, when reviewing their WhatsApp messages on which Powers was previously copied, each of the Plaintiffs has seen that Powers continues to check their WhatsApp conversations nearly daily, monitoring whether Plaintiffs plan to expose the Enterprise.

## The Enterprise Attempts to Cover Up Its Wrongdoing

286. From the time the criminal prosecution of Hallman commenced, the Enterprise paid for her lawyer—Jeremy Saland—and refused to pay additional fees if the matter proceeded to trial because Hallman began speaking with counsel in this case.

At the time Hallman retained Saland, Saland was unaware of the Enterprise, its scheme, or its members.

287.    The Enterprise would only pay for Saland so long as Hallman agreed not to mention in the criminal trial anything about Rubin or the other members of the Enterprise.

288.    On August 16, 2017, Hallman sent an email to Saland, drafted by Schnur, authorizing Saland "express permission to share any and all information in regards to [Hallman's] case with Ms. Schnur." Shortly after receiving this email, Saland spoke with Hallman who told him that the Enterprise had flown Hallman into New York to meet with Rubin, Schnur, and Powers. Further, the Enterprise sought to pay Hallman $80,000 to sign a retainer with Schnur and a confidentiality agreement so that Hallman would refrain from disclosing anything about Rubin and the Enterprise. Saland was unaware of any of these communications or the planned meeting despite Rubin's, Schnur's, and Powers's knowledge that Saland was and remained Hallman's counsel.

289.    Upon learning of this planned meeting between Hallman, Rubin, Schnur, and Powers, Saland contacted Schnur with the permission of Hallman and advised Schnur both through a text message and on the phone that she, or any member of the Enterprise directly, through third parties or otherwise, could not communicate with Hallman. Saland reasserted that he remained Hallman's counsel. Saland explained to Schnur that despite Schnur's contention that her interest was to protect Hallman, Schnur in fact had an ethical conflict in that Schnur sought to solely protect the interests of Rubin.

290.     Throughout the evening of August 16, 2017, Powers repeatedly called and texted Hallman, attempting to convince Hallman to meet on the evening of August 16, 2017, as planned, despite Saland's specific instructions to Schnur that neither she nor any third party should communicate with Hallman. In one communication, Powers made a veiled threat to Hallman stating, "I'm not sure who's going to fund what you're doing with [Saland]."

291.     The following day, Powers texted Hallman, "We've always taken care of you [because] we completely understand . . . we want to help you, we need to meet[.]"

292.     Later that month, Powers texted Hallman and Caldwell, that both Hallman and Caldwell were "plain rude and ungrateful by deliberately not answering [Powers's] phone calls or returning [Powers's] messages." Powers claimed that she only had the best interests of Hallman and Caldwell in mind. However, they should "keep in mind that both [Hallman and Caldwell] violated the [Non-Disclosure] agreement."

293.     Concerned that the Enterprise had lost control of and access to Hallman, Powers, on behalf of the Enterprise, again communicated with Hallman advising in substance that "although the Enterprise paid the initial fee for Saland, [Hallman] can still call [Powers] if a final bill is presented."

294.     In fact, when the underlying events took place at the Penthouse that resulted in the current criminal prosecution of Hallman, Powers told Hallman to lie to the police and tell them that the Penthouse was either Hallman's or Zoe Cacciola's in an effort to keep Rubin and the rest of the Enterprise out of the news.

295.    When the Enterprise became concerned with Hallman and her criminal counsel, it offered to either substitute Schnur, a member of the Enterprise and an attorney, or stop paying for Hallman's attorney.

296.    On September 19, 2017, counsel for Plaintiffs contacted Schnur, an attorney for Rubin, as well as a Defendant in this action, to notify her of the impending lawsuit.

297.    While Schnur refused to discuss the matter and has been stalling for Defendants at Rubin's direction, other members of the conspiracy have attempted to intimidate Plaintiffs, interfere with their relationship with counsel, and have even attempted to obtain illegal access to Plaintiffs' computer systems.

298.    Since that time, multiple individuals associated with Rubin and the Enterprise have reached out to Plaintiffs at the direction of Rubin and the Enterprise, in an attempt to convince them not to file suit.

### Attempted Hacking of Plaintiffs' Accounts

299.    Rubin has also directed someone to attempt to—and succeed in—accessing Plaintiffs' and Plaintiffs' families' Apple, Facebook, and Google accounts, changing the passwords and billing information in an attempt to interfere with evidence saved under Plaintiffs' accounts.

300.    The individual or individuals responsible for such illegal access—collectively John Doe—are either known members of the Enterprise, unknown additional members of the Enterprise, or working on behalf of members of the Enterprise.

301.    This illegal interference with Plaintiffs' accounts occurred only after Defendants and Defendants' counsel were contacted regarding this matter and notifying them of the impending lawsuit, and were designed to gather information regarding Plaintiffs' claims, intimidate and tamper with Plaintiffs, and convince Plaintiffs not to bring suit.

302.    Such hacking has occurred on multiple occasions, including Doe hacking Hallman's Apple account on October 5, 2017, and October 8, 2017, Caldwell's Facebook account on October 8, 2017, Hallman's brother's Google account on October 10, 2017, and Hallman's Facebook account on October 10, 2017.

303.    Such hacking by Doe involved interstate wires and affected interstate commerce by accessing Plaintiffs billing information and communications.

304.    Defendants have sought to intimidate Plaintiffs, interfere with their attorney-client relationship, tamper with witnesses in the eventual lawsuit against them, and illegally obtain access to Plaintiffs computer records in a bald-faced attempt to destroy evidence or discover information regarding Plaintiffs' case.

**FIRST CAUSE OF ACTION: ALL PLAINTIFFS**
**(Violation of Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1962(c)**
**("Pattern of Racketeering") - All Defendants)**

305.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

306.    All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) to the detriment of Plaintiffs.

307.    At all times relevant to these allegations, all Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

308.    Defendants came together to form an association in fact enterprise.

309.    At all times relevant to the above allegations, the Enterprise had a legitimate non-criminal purpose: to bring women to New York to provide companionship and entertainment for Defendant Rubin.

310.    However, this legitimate purpose was subverted by the Enterprises illegal acts and violations of federal laws, as detailed below.

311.    Moreover, members of the Enterprise repeatedly lied to Plaintiffs in WhatsApp messages, other written communication, and in verbal communications in order to induce them into the four encounters.

312.    In the case of each Plaintiff, the Enterprise made payments from at least New York to Florida, affecting interstate commerce.

313.    Defendants engaged in activities which constitute "racketeering activity," including wire fraud (18 U.S.C. § 1343), human trafficking (18 U.S.C. § 1591(a)), money laundering (18 U.S.C. § 1596(a)), transportation for illegal sexual activity (18 U.S.C. § 2422), obstruction of criminal investigations (18 U.S.C. § 1510(a)), and tampering with a witness through intimidation (18 U.S.C. §§ 1512(b) and 1512(d)), within the meaning of 18 U.S.C. § 1961(1).

314.    Defendants engaged in multiple predicate acts amounting to a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

315.     Plaintiffs were damaged by Defendants' violation of 18 U.S.C. § 1962(c) in an amount to be determined at trial.

### SECOND CAUSE OF ACTION: ALL PLAINTIFFS
### (Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) ("RICO Conspiracy") - All Defendants)

316.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

317.     All Defendants have acted in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d) to the detriment of Plaintiffs.

318.     At all times relevant to these allegations, Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

319.     All Defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) by associating in fact to create an Enterprise which then engaged in a pattern of racketeering activity resulting in injury to Plaintiffs.

320.     The period of the conspiracy began as early as February 8, 2017, and is ongoing today.

321.     As recently as August 18, 2017, Rubin and Powers requested that Hallman meet with and hire Rubin's attorney, Defendant Schnur, to defend Hallman in her criminal action in an effort to cover up the Enterprise Scheme.

322.     The object of the conspiracy was to procure women for Rubin to abuse and sexually assault, coercing those women to participate, often completely unwillingly, in Rubin's sexual games, and then covering up the injury and emotional

harm which resulted. Powers lied to the women in order to induce them to come to New York, leading the women to believe that Rubin simply wanted their company, or, in some cases, to participate in a fetish photo shoot.

323.    Each predicate act committed by the Enterprise was in furtherance of the conspiracy.

324.    The predicate acts caused physical and emotional injury to Plaintiffs, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION – ALL PLAINTIFFS**
**(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a) -**
**Powers, Rubin, and Doe)**

325.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

326.    Defendants knowingly accessed computers at Apple and Facebook without authorization and/or exceeded their authorized access.

327.    Defendants obtained financial information and records as well as credit card information of Plaintiff stored on computers.

328.    Defendants accessed such information on protected computers through hacking to obtain and/or change the passwords of the Plaintiffs.

329.    Defendants accessed such computers with the intent to defraud the Plaintiffs through changing Plaintiffs' payment and billing information as well as changing Plaintiffs' passwords such that Defendants would have access to the same.

330.    Defendants obtained something of value by accessing such computers without authorization in that Defendants obtained information regarding Plaintiffs

finances, passwords, communications, and other valuable information regarding a potential lawsuit against Defendants.

331.   Defendants' hacking, during a time period in which Defendants knew litigation was impending, caused Plaintiffs to incur legal fees in excess of $5,000 within a one-year period, in order for Plaintiffs to protect their accounts, information, the attorney-client privilege, and bank and credit card records.

332.   Plaintiffs were further damaged in excess of $5,000 within a one-year period in that Plaintiffs' financial records and credit card statements have been compromised and Plaintiffs must repair such damages as necessary.

333.   Plaintiffs had to take affirmative steps to protect their accounts as Plaintiffs communicate with one another regarding the litigation and advice of counsel on Facebook and through Facebook messenger.

334.   Defendants further hacked Plaintiffs computers with the intent to extort settlements in this litigation and to prevent potential criminal actions being taken against the Defendants.

335.   Defendants did this to impair confidential information which they attempted to collect through the protected computers which they hacked.

336.   It is unclear what information the Defendants have collected through their hacking at this time.

### FOURTH CAUSE OF ACTION: HALLMAN
### (Violation Of Human Trafficking Laws, 18 U.S.C. § 1591(a) -
### Rubin, Powers, Shon, Blue Icarus, the Doe Company)

337.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

338.    Defendants Rubin, Powers, Shon, and the Doe Company knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

339.    Defendant Blue Icarus knowingly affected interstate commerce by at least harboring Plaintiffs and others.

340.    All Defendants benefited, financially or by receiving something of value, from participation in recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

341.    All Defendants participated in this venture knowing that means of force, threats of force, fraud, and coercion would be used to cause Plaintiffs to engage in commercial sex acts.

342.    As a result of Defendants' violations of 18 U.S.C. § 1591(a), Hallman suffered serious injury and damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION: HALLMAN
### (Assault - Rubin)

343.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

344.    On August 23, 2016, and on September 24, 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Hallman.

345.    Plaintiff Hallman reasonably believed she was about to be touched in a harmful or offensive manner.

346.    Plaintiff Hallman did not consent to be touched in this harmful and offensive manner.

347.    Plaintiff Hallman was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

348.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## SIXTH CAUSE OF ACTION: HALLMAN
### (Battery - Rubin)

349.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

350.    On August 23, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Hallman, punching Hallman in the head until the point that Hallman blacked out, and beating Hallman about the face and breasts, causing bruising and damages to Hallman's breasts, including Hallman's breast implants.

351.    Hallman did not consent to these acts by Defendant Rubin.

352.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

353.    On September 24, 2016, Defendant Rubin again physically and intentionally attacked Plaintiff Hallman, beating Hallman about the face and breasts, causing bruising and further damages to Hallman's breasts, including Hallman's breast implants.

354.    Hallman did not consent to these acts by Defendant Rubin.

355.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION: HALLMAN
### (False Imprisonment - Rubin)

356.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

357.    On August 23, 2016, and September 24, 2016, Rubin restrained and detained Hallman against her will.

358.    This restraint and detention, done without the consent of Hallman, was unlawful. In detaining Hallman, Rubin exercised force, drugging, beating, and gagging Hallman so that she was unable to protest. This force compelled Hallman to remain in Rubin's Dungeon when she wished to leave.

359.   Rubin's false imprisonment of Hallman caused Hallman physical and mental suffering and humiliation.

360.   As a direct and proximate result of Defendant Rubin's false imprisonment, Hallman suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION: HALLMAN**
**(Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)**

361.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

362.   In the course of battering Plaintiff Hallman, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Hallman to suffer extreme mental and emotional distress, agony, and anxiety.

363.   Defendants' conduct was intentional and malicious.

364.   Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

365.   Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Hallman.

366.   As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Hallman has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and

emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## NINTH CAUSE OF ACTION: LAWSON
### (Violation Of Human Trafficking Laws - Rubin, Powers, Shon, Blue Icarus, the Doe Company)

367.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

368.    Defendants Rubin, Powers, Shon, and the Doe Company knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

369.    Defendant Blue Icarus knowingly affected interstate commerce by at least harboring Plaintiffs and others.

370.    All Defendants benefited, financially or by receiving something of value, from participation in recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

371.    All Defendants participated in this venture knowing that means of force, threats of force, fraud, and coercion would be used to cause Plaintiffs to engage in commercial sex acts.

372.    As a result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiff Lawson suffered serious injury and damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION: LAWSON
### (Assault - Rubin)

373.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

374.    On August 23, 2016, and on September 24, 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Lawson.

375.    Plaintiff Lawson reasonably believed she was about to be touched in a harmful or offensive manner.

376.    Plaintiff Lawson did not consent to be touched in this harmful and offensive manner.

377.    Plaintiff Lawson was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

378.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## ELEVENTH CAUSE OF ACTION: LAWSON
### (Battery - Rubin)

379.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

380.    On August 23, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Lawson.

381.    Lawson did not consent to these acts by Defendant Rubin.

382.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff Lawson suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

383.    In December 2016, Defendant Rubin again physically and intentionally attacked Plaintiff Lawson, repeatedly shocking Lawson in and around the vagina with a cattle prod, and penetrating Lawson against her will, causing interior and exterior damage to Lawson's vagina. Rubin again beat Lawson about the face and breasts, causing bruising and further damages to Lawson's breasts, including Lawson's breast implants.

384.    Lawson did not consent to these acts by Defendant Rubin.

385.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION: LAWSON
## (False Imprisonment - Rubin)

386.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

387.    In December 2016, Rubin restrained and detained Lawson against her will.

388.    This restraint and detention, done without the consent of Lawson, was unlawful. In detaining Lawson, Rubin exercised force, drugging, beating, and gagging Lawson so that she was unable to protest. This force compelled Lawson to remain in Rubin's Dungeon when she wished to leave.

389.    Rubin's false imprisonment of Lawson caused Lawson physical and mental suffering and humiliation.

## THIRTEENTH CAUSE OF ACTION: LAWSON
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

390.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

391.    In the course of battering Plaintiff Lawson, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Lawson to suffer extreme mental and emotional distress, agony, and anxiety.

392.    Defendants' conduct was intentional and malicious.

393.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

394.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Lawson.

395.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Lawson has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION: CALDWELL
### (Violation Of Human Trafficking Laws - Rubin, Powers, Shon, Blue Icarus, the Doe Company)

396.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

397.   Defendants Rubin, Powers, Shon, and the Doe Company knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

398.   Defendant Blue Icarus knowingly affected interstate commerce by at least harboring Plaintiffs and others.

399.   All Defendants benefited, financially or by receiving something of value, from participation in recruiting, enticing, harboring, transporting, obtaining, and soliciting Plaintiffs and others.

400.   All Defendants participated in this venture knowing that means of force, threats of force, fraud, and coercion would be used to cause Plaintiffs to engage in commercial sex acts.

401.   As a result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiff Caldwell suffered serious injury and damages in an amount to be determined at trial.

## FIFTEENTH CAUSE OF ACTION: CALDWELL
### (Assault - Rubin)

402.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

403.   On September 24, 2016, Defendant Rubin acted, intending to cause

harmful or offensive contact with Caldwell.

404.   Plaintiff Caldwell reasonably believed she was about to be touched in a harmful or offensive manner.

405.   Plaintiff Caldwell did not consent to be touched in this harmful and offensive manner.

406.   Plaintiff Caldwell was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

407.   Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## SIXTEENTH CAUSE OF ACTION: CALDWELL
### (Battery - Rubin)

408.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

409.   On September 24, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Caldwell, punching Caldwell in the head until the point that Caldwell blacked out, and beating Caldwell about the face and breasts, causing bruising and damages to Caldwell's breasts, including Caldwell's breast implants.

410.   Caldwell did not consent to these acts by Defendant Rubin.

411.   As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

412.   As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and

mental and physical anguish in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION: CALDWELL
### (False Imprisonment - Rubin)

413.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

414.   On September 24, 2016, Rubin restrained and detained Caldwell against her will.

415.   This restraint and detention, done without the consent of Caldwell was unlawful. In detaining Caldwell, Rubin exercised force, drugging, beating, and gagging Caldwell so that she was unable to protest. This force compelled Caldwell to remain in Rubin's Dungeon when she wished to leave.

416.   Rubin's false imprisonment of Caldwell caused Caldwell physical and mental suffering and humiliation.

## EIGHTEENTH CAUSE OF ACTION: CALDWELL
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

417.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

418.   In the course of battering Plaintiff Caldwell, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Caldwell to suffer extreme mental and emotional distress, agony, and anxiety.

419.   Defendants' conduct was intentional and malicious.

420.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

421.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Caldwell.

422.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Caldwell has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs demand judgment against Defendants as follows:

A.    At least $3 million in compensatory damages, before trebling, for each Plaintiff for the injuries of Plaintiffs caused by the Enterprise;

B.    A permanent injunction enjoining Defendants, their partners, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from in any way engaging in the Enterprise of any of the practices or crimes set forth herein;

C.    Imposition of a constructive trust upon all assets associated with the Enterprise, including the property owned by Blue Icarus, LLC;

D. Compensatory and punitive damages for injury caused to Plaintiff Hallman;

E. Compensatory and punitive damages for injury caused to Plaintiff Lawson;

F. Compensatory and punitive damages for injury caused to Plaintiff Caldwell;

G. Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

H. Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

I. Punitive damages pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595;

J. Attorneys' fees pursuant to the civil remedy for human trafficking in  18 U.S.C. § 1595(a);

K. Punitive damages for Plaintiffs' state law claims of assault, battery, false imprisonment, and intentional infliction of emotional distress;

L. Costs of suit herein;

M. Applicable interest on the foregoing amounts;

N. Declaratory relief; and

O. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: New York, New York
          November 2, 2017

                                      By: */s/ John G. Balestriere*
                                          John G. Balestriere
                                          Jillian L. McNeil
                                          **BALESTRIERE FARIELLO**
                                          225 Broadway, 29th Floor
                                          New York, New York 10007
                                          Telephone:     (212) 374-5401
                                          Facsimile:     (212) 208-2613
                                          john.balestriere@balestrierefariello.com
                                          jillian.mcneil@balestrierefariello.com
                                          *Attorneys for Plaintiff*