John G. Balestriere
Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **HILLARY LAWSON, KRISTINA HALLMAN,  STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON, and LAUREN FULLER,** | Case No.: 1:17-cv-06404 |
| Plaintiffs, | **AMENDED COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |
| – against – | |
| **HOWARD RUBIN, JENNIFER POWERS, YIFAT SCHNUR, STEPHANIE SHON, JOHN DOE, BLUE ICARUS, LLC, and the DOE COMPANY.** | |
| Defendants. | |

---

Plaintiffs Hillary Lawson ("Lawson"), Kristina Hallman ("Hallman"), Stephanie Caldwell ("Caldwell"), Moira Hathaway ("Hathaway"), Macey Speight ("Speight"), Rosemarie Peterson ("Peterson"), and Lauren Fuller ("Fuller") by their attorneys, Balestriere Fariello, for their Complaint against Jennifer Powers ("Powers"), Howard Rubin ("Rubin"), Yifat Schnur ("Schnur"), Stephanie Shon ("Shon"), John Doe ("Doe"),

Blue Icarus, LLC ("Blue Icarus"), and the Doe Company (the "Doe Company") respectfully allege as follows, upon information and belief, except as to allegations concerning Plaintiffs, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

1.      Under the leadership of Howard Rubin, all Defendants have worked and conspired together in a human trafficking enterprise exploiting women from around the United States (the "Enterprise"), causing many millions of dollars in damages to dozens of women over the years.

2.      Under the ruse of payments for supposed companionship and photo-shoots, Rubin and his co-conspirators have lied to Plaintiffs and dozens of others, luring them across the country to assault them as part of a pattern of criminal sexual misconduct including beatings to the point of unconsciousness and acts of rape. Rubin even tells victims of the scheme that he will rape them after they are tied down but before proceeding to do so—threatening one victim, "I'm going to rape you like I rape my daughter"—as well as assault them and imprison them against their will.

3.      Defendants have, through their scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), caused injuries so extreme that multiple women have needed cosmetic and dental reconstructive surgery, and all victims of the scheme have required hospitalization and experienced extreme emotional trauma.

4.      Rubin and his co-Defendants have not only engaged in enterprise activity

2

that violates RICO, but have repeatedly violated at least seven separate federal laws, including, without limitation, statutes prohibiting dealing in a controlled substance defined under Section 102 of the Controlled Substances Act (21 U.S.C. § 812), wire fraud (18 U.S.C. § 1343), human trafficking (18 U.S.C. § 1591(a) the "TVPA"), transportation for illegal sexual activity (18 U.S.C. § 2422), obstruction of criminal investigations (18 U.S.C. § 1510(a)), tampering with a witness through intimidation (18 U.S.C. §§ 1512(b) and 1512(d)), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)).

5.    Rubin and his co-conspirators' misconduct even continued after Plaintiffs finally overcame their fear and engaged counsel. Rubin has directed his co-conspirators to undermine and interfere with Plaintiffs' relationships with their counsel, to tamper with witnesses, and to even illegally hack into Plaintiffs' computer systems in an apparent attempt to destroy evidence. Such hacking has continued even since the filing of the original pleading in this action.

## JURISDICTION AND VENUE

6.    Venue is appropriate in the Eastern District of New York as the Plaintiffs were transported into and out of airports located in the Eastern District.

7.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1962.

8.    This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

9.      This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1030.

10.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

11.     This Court has personal jurisdiction over the parties, as the actions that constitute the violations of 18 U.S.C. § 1962(c) and (d) were conducted in relation to the relationship between Hallman, Lawson, Caldwell, Hathaway, Speight, Peterson, Fuller, Rubin, Shon, and Powers at the Enterprise's chief crime location (the "Penthouse"), owned by Blue Icarus, at the Metropolitan Tower located on 146 West 57th Street, 76th Floor, New York, New York in the Southern District of New York and the Plaintiffs were flown into and out of airports in the Eastern District of New York.

12.     Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b) for violations of 18 U.S.C. § 1962 as long as the Court has personal jurisdiction over at least one party.

## PARTIES

### *Plaintiffs*

13.     Plaintiff Hallman is an individual who is a model for Playboy Enterprises, Inc. Hallman resides in Fort Lauderdale, Florida.

14.     Plaintiff Lawson is an individual who is a model for Playboy Enterprises, Inc. Lawson resides in Daytona Beach, Florida.

15.     Plaintiff Caldwell is an individual who is a freelance model. Caldwell resides in Fort Lauderdale, Florida.

16.     Plaintiff Hathaway is an individual who is a model for Playboy Enterprises, Inc. Hathaway resides in Chicago, Illinois.

17.     Plaintiff Speight is an individual who is a freelance model and student. Speight resides in Atlanta, Georgia.

18.     Plaintiff Peterson is an individual who was a Playboy model. Peterson resides in Brooklyn, New York, but at the time of at least some of the conduct against her, she resided in Los Angeles, California.

19.     Plaintiff Fuller is an individual who is a model. Fuller resides in Miami, Florida.

### *Defendants*

20.     Howard Rubin is an experienced money manager with a highly regarded reputation in the financial field. Rubin also goes by Howie Rubin. At least one other member of the Enterprise, Shon, has referred to Rubin as the "boss." Upon information and belief, Rubin is also the manager of the Doe Company. Rubin resides in New York, New York. Rubin is a person under 18 U.S.C. § 1961(3). Unless otherwise specified, every time that Rubin is alleged to have committed an action, that action was committed both in his individual capacity, and on behalf of the Doe Company.

21.     Jennifer "Jenn" Powers is an individual who works with Rubin, and, upon information and belief, is an employee of the Doe Company. Powers herself admits to being Rubin's "assistant." Powers resides in New York, New York. Powers is a person

under 18 U.S.C. § 1961(3).

22.    Stephanie Shon is an individual who works with Rubin, or formerly worked with Rubin, and, upon information and belief, is or was an employee of the Doe Company. Shon admits to working directly for Rubin. Shon resides in New York, New York. Shon is a person under 18 U.S.C. § 1961(3).

23.    Yifat Schnur is an individual who is an attorney for Rubin and the Enterprise. Schnur resides in Edison, New Jersey. Schnur is a person under 18 U.S.C. § 1961(3).

24.    Blue Icarus, LLC is a limited liability corporation registered in New York and located at 501 Madison Avenue, 14th Floor, New York, New York 10022. Blue Icarus owns the Penthouse located at 146 West 57th Street, 76th Floor, New York, New York, 10019, and rented the Penthouse to Rubin for $18,000 per month from February 2011 until September 2017, following discussions will counsel for Plaintiffs regarding the initiation of this lawsuit. Blue Icarus is a person under 18 U.S.C. § 1961(3). Blue Icarus has sent its representatives to the Penthouse while Rubin's victims were present as recently as the spring or summer of 2016.

25.    John Doe is an individual who is responsible for hacking into the computers of Plaintiffs and Plaintiffs' family members at the direction of at least Rubin and Powers. Doe is a person under 18 U.S.C. § 1961(3).

26.    Upon information and belief, the Doe Company is located in New York, New York. The Doe Company is a person under 18 U.S.C. § 1961(3). The Doe Company is the vehicle through which the Enterprise operates, and through which Rubin pays his

employees—like Powers and Shon—as well as the models he hires, including Plaintiffs Hallman, Lawson, and Caldwell. Upon information and belief, the Enterprise paid Blue Icarus rent through the Doe Company.

## STATEMENT OF FACTS

### Rubin Background

27.     Howie Rubin has worked in the financial industry for thirty-five years and has years of experience trading mortgage-backed securities.

28.     Rubin was a chief mortgage-securities trader from 1985–1987 at Merrill Lynch and was a Senior Managing Director at Bear Stearns Companies, Inc. from 1987–1999.

29.     Rubin also served as a Director of the Commercial Industrial Finance Corporation (also known as Deerfield Capital Corporation) from December 2004 until May 19, 2009.

30.     From February 2007 to January 1, 2011, Rubin served as a Director of Fortress Investment Group, LLC.

31.     Rubin served as a Director of New Media Investment Group, Inc. from October 24, 2006, to December 18, 2008.

32.     Rubin served as a Director of GateHouse Media, Inc. from October 2006 to December 2008.

33.     He has also served as an Independent Director of Global Signal, Inc. since February 2004.

34.     Rubin is married to Mary Jullien Henry, who is highly involved in

philanthropic work in New York.

35.     Rubin and his wife live in New York where they raised their children.

**With the Assistance of An Attorney, Blue Icarus Rents the Penthouse to Serve as the Base for the Enterprise**

36.     Blue Icarus filed incorporation documents on November 30, 2010, and registered its address in New York to be located at 501 Madison Avenue, 14th Floor, 10022, the same address as Sanders Ortoli, LLP, now known as Ortoli Rosenstadt LLP.

37.     On February 7, 2011, the deed for Block 01009 Lot 1060 and Lot 1104—the Penthouse—was signed by seller Sanchez, JR., A.R. c/o Oved & Oved LLP, and buyer Blue Icarus c/o Sanders Ortoli, LLP.

38.     Blue Icarus's Department of State ("DOS") ID number is 4024393 and it has no registered agent.

39.     Blue Icarus is aware of the Enterprise as well as the Enterprise's purpose, and has benefitted financially by receiving monthly rent of $18,000 per month from Rubin because of Blue Icarus's participation in Rubin's sex trafficking venture.

40.     Indeed, representatives of Blue Icarus were present in the Penthouse on at least one occasion involving Plaintiffs. Rubin introduced the representatives of Blue Icarus to Plaintiff Speight at the Penthouse in the spring of 2016.

41.     Blue Icarus was at least recklessly indifferent to the Enterprise and its acts as Blue Icarus failed to inquire following separate incidents at the Penthouse where an ambulance was called on one occasion and police were called on a separate occasion.

42.     A non-recklessly indifferent owner would be concerned of potential

liability regarding any injury that occurred on the premises and would want to remedy any potential defects or dangerous conditions on the premises.

43.    Moreover, a non-recklessly indifferent owner would be concerned of potential criminal activity on its premises and would at least inquire as to the nature of the criminal activity that occurred and required police on the premises.

44.    Blue Icarus did not inquire as to either of these incidents, demonstrating Blue Icarus's reckless indifference towards how the Penthouse was being used by the Enterprise.

45.    Even if Blue Icarus was not aware of either of these incidents, Blue Icarus is at least recklessly indifferent in failing to monitor anything occurring on its property.

46.    Blue Icarus has given Rubin and the Enterprise access to the Penthouse and is aware that Rubin does not live at the Penthouse as Rubin has a primary residence, with his family, within walking distance of the Penthouse.

47.    Blue Icarus is aware of how Rubin and the Enterprise utilize the Penthouse.

48.    Blue Icarus's Penthouse has a built-in "dungeon," designed solely for the purposes of the Enterprise, which contains devices and other BDSM-type instruments designed solely to harm victims.

### The Enterprise

49.    Defendants conspired to form the Enterprise in or around February 2011, at the latest, when Rubin rented the Penthouse from Blue Icarus, Powers and Shon began to actively recruit women for transportation to the Penthouse, and, upon

9

information and belief, Schnur provided Rubin and his associates with the non-disclosure agreements (the "NDAs"), knowing that the Enterprise intended to use such agreements to cover up its conspiracy, and continues to do so to this day. In fact, Powers, at the direction of Rubin, has tried to contact at least Plaintiff Speight in furtherance of the improper objectives of the Enterprise as recently as February 7, 2018, less than two weeks before the filing of this Complaint.

50.    Rubin, Powers, Shon, Schnur, Blue Icarus, Doe, and the Doe Company currently comprise an association in fact enterprise. Defendants constitute a group of "person[s]" under 18 U.S.C. § 1961(3) who associated in fact to form an Enterprise to pay and transport women to New York to serve as companions and entertainment for Rubin and, at times, his associates. In exchange, many of these women expected that Rubin could help with their careers or otherwise supplement their income.

51.    The Enterprise did not reveal to Plaintiffs the other, improper, objective of the Enterprise: to cover up Rubin's sexual misconduct and criminal abuse of the women, and to serve as a cover for his wide-ranging human trafficking scheme.

52.    In the alternative, any other combination of the Defendants which includes Rubin currently comprises an association in fact enterprise.

53.    The Defendants further utilized their association in fact Enterprise to conspire to commit a pattern of racketeering activity, including the predicate acts of at least dealing in a controlled substance as defined under Section 102 of the Controlled Substances Act (21 U.S.C. § 812), wire fraud (18 U.S.C. § 1343), obstruction of criminal investigations (18 U.S.C. § 1510), tampering with a witness through intimidation (18

U.S.C. §§ 1512), human trafficking (18 U.S.C. § 1591(a)), and transportation for illegal sexual activity (18 U.S.C. § 2422), which proximately caused injuries to all seven Plaintiffs.

54.    However, some form of the Enterprise has been in existence for decades, likely with members beyond the current Defendants.

55.    The members of the Enterprise have defined roles, and the Enterprise as a whole has structure and hierarchies.

56.    Rubin is the head or, as Defendant Shon referred to him, the "boss" of the Enterprise. Individually or through his company, the Doe Company, Rubin pays each member of the Enterprise for their services.

57.    Powers, Rubin's admitted "assistant," participated in the direction of the Enterprise by working directly below Rubin. Powers is not only responsible for recruiting, transporting, and paying the Enterprise's victims directly through her personal PayPal account, but is the Enterprise's primary "fixer," coming in to cover up any injuries sustained by the women as a result of the Enterprise's crimes, as well as to prevent and even bribe the Enterprise's victims who threaten to go public with the Enterprise's crimes. Powers is paid for her services by Rubin individually or by the Doe Company.

58.    Shon works below both Rubin and Powers. Shon participated in the direction or conduct of the affairs of the Enterprise by recruiting women for the Enterprise and making those women feel comfortable before Rubin forces them to engage in commercial sex acts to which the women never agreed. Shon was frequently

the first point of contact for Plaintiffs and the Enterprise's other victims, introducing them to Rubin and the Enterprise. Shon is paid for her services by Rubin individually or by the Doe Company.

59.    There are multiple other women who have held and/or currently hold the same position as Shon and are also members of the Enterprise. These women include at least the unidentified female representative who initially contacted Plaintiff Hathaway through the Model Mayhem website, and a woman named "Tracy" who contacted Plaintiff Peterson on the Enterprise's behalf. These women are also paid for their services by Rubin individually or by the Doe Company.

60.    For the past six years, Blue Icarus has participated in the direction or conduct of the affairs of the Enterprise by providing the space in which the Enterprise harbors its victims, knowing or acting in reckless disregard of the fact that means of force and coercion would be used to cause women to engage in commercial sex acts. Rubin, either personally or through the Doe Company, paid Blue Icarus monthly rent of $18,000 from at least February 2011 to September 2017.

61.    Schnur participated in the direction or conduct of the affairs of the Enterprise by serving as an advisor to the Enterprise, counseling the Enterprise how to best cover up its crimes for the express purpose of hindering or delaying Plaintiffs and other victims of the Enterprise from coming forward with information regarding those crimes. Schnur even went so far as to interfere with the attorney-client relationship between Plaintiff Hallman and her criminal defense attorney in order to protect the Enterprise. Schnur knew or at least acted in reckless disregard of the fact that means of

force and coercion would be used to cause women to engage in commercial sex acts. Schnur was paid for her services by Rubin individually or by the Doe Company.

62.    John Doe participated in the direction or conduct of the affairs of the Enterprise by working at the behest of at least Rubin and Powers to hack into email and social media accounts belonging to at least Plaintiffs Peterson, Fuller, Hallman, and Caldwell for the express purpose of interfering with this lawsuit. Due to the content of the documents and information obtained by Doe, Doe knew this to be the purpose of his participation in the Enterprise. Doe was paid by the Enterprise for his services.

**Powers — a Former Model and Victim of Rubin's — Joins the Enterprise and Becomes an Integral Member of the Conspiracy**

63.    Powers, a former Hawaiian Tropics model, became involved with Rubin ten to twelve years ago, when Rubin was in what he has referred to as his "brunette phase." Rubin now prefers blondes.

64.    Like Plaintiffs here, Powers was induced into a BDSM relationship with Rubin, and, upon information and belief, sustained injuries as a result.

65.    However, Powers continued to associate with Rubin. Powers eventually married one of Rubin's associates after Rubin introduced Powers to him, and Powers has had multiple children with him.

66.    When she became involved with Rubin's associate, Powers began to work for Rubin in a professional capacity. Instead of acting as Rubin's girlfriend or playmate, Powers began to run the day-to-day operations of the Enterprise.

67. Powers's role was recruiting women to bring to New York, and arranging the logistics, including flight purchases and payment.

68. To advance the Enterprise's scheme and build trust with the victims of the Enterprise, Powers acts as a sister-figure for the women. After Powers builds some trust with the victims of the Enterprise, Rubin and Powers invite the women to New York under false pretenses. Rubin then physically assaults them, sexually abuses them, and falsely imprisons them.

69. Powers also acts as the Enterprise's "fixer," cleaning up Rubin's messes and seeking to minimize problems with victims of the Enterprise.

70. Indeed, once Plaintiffs here began to attempt to seek an escape from being continually victimized by the Enterprise, Powers attempted to interfere with Plaintiffs' plans, including, but not limited to, offering money to Plaintiffs to attempt to buy Plaintiffs' silence and to pay for medical services which were the result of Rubin's actions which have caused Plaintiffs great financial hardship.

71. Upon information and belief, Powers is paid through the Doe Company for her services.

72. Further, upon information and belief, the money used to sustain the Enterprise—for payment of Rubin's women, paying rent to Blue Icarus for the Penthouse, travel arrangements, and later pay-offs—goes from Rubin to the Doe Company, to Powers, to wherever the money is then needed.

73. Powers made the transfers to Plaintiffs in this action directly from her personal PayPal account.

14

## Schnur, One of Rubin's Attorneys, Joins the Enterprise and Furthers the Goals of the Conspiracy

74.     Yifat Schnur, a former prosecutor in the Manhattan District Attorney's Office, represents Howard Rubin in connection with the Enterprise's activities.

75.     Schnur drafts the NDAs that are provided to the victims prior to meeting Rubin, in the Enterprise's illegal attempt to prevent disclosure of the Enterprise's crimes.

76.     Schnur also aides in obstructing justice and intimidating witnesses through her role as an attorney, attempting to represent those injured by the Enterprise so that they do not report the workings of the Enterprise.

## Hathaway's Background

77.     Hathaway, also a single mother to her nine-year-old son, is an International Playboy Playmate and model. Hathaway worked as a cocktail waitress at the LAX nightclub and shortly after, she worked as a cocktail server at Tao Nightclub at the Venetian in Las Vegas. Hathaway is the third oldest of eight siblings. At the time she was introduced to Rubin, Hathaway resided in Las Vegas, Nevada.

78.     In or around 2012, Hathaway moved to Chicago, Illinois. Hathaway then moved to Seattle on December 26, 2015, but returned to Chicago the following summer in June 2016.  works there as a server at Prysm Nightclub

## Peterson's Background

79.     Peterson is a former Playboy model.

80.    Peterson formerly lived in Los Angeles, California until 2015, but currently resides in Brooklyn, New York.

### Fuller's Background

81.    Fuller is a freelance model and cocktail waitress.

82.    Fuller resides in Miami Beach, Florida.

### Speight's Background

83.    Speight is a freelance model and student.

84.    Speight also works as a cocktail waitress and server at the Tavern in Atlanta, Georgia, where she met Stephanie Shon through her coworker.

### Hallman's Background

85.    Hallman is an International Playboy Playmate. Approximately two years ago, after working as a cocktail waitress in her hometown of Fort Lauderdale, Florida, Hallman began modelling.

86.    Playboy soon thereafter hired Hallman and Hallman has since then appeared in multiple international Playboy publications. She has participated in multiple modeling events and conventions, including Paradise Challenge in Jamaica, where Hallman met Plaintiff Lawson.

87.    Hallman has a substantial social media following. As has become the industry standard for models in the Playboy or bikini model industries, social media sites Instagram and Snapchat are essential marketing tools for Hallman.

88.    Hallman commonly arranges photo or video shoots through these social media platforms.

16

**Lawson's Background**

89.     Lawson is also an International Playboy Playmate. Lawson grew up in Rockford, Illinois, and is the oldest of five siblings. Lawson moved to Florida when she was 19, and, shortly thereafter, when her mother passed away, adopted her 10-year-old sister, who came to live with her.

90.     Over the course of the next ten years, Lawson worked in an office performing accounts receivable and other clerical work to support her sister and other siblings. When her sister began college, Lawson began to pursue a modelling career, participating in workshops and training to further her career.

91.     Lawson eventually left her clerical job, and became a full-time model. Lawson shoots for magazines and attends many of the same modeling conventions as Hallman, including the Paradise Challenge where the two met.

**Caldwell's Background**

92.     Caldwell is a single mother to her now five-year-old daughter. Before Caldwell met Rubin, she worked as a cocktail waitress and dancer at Eleven, a club in Miami, her hometown.

93.     Caldwell met Hallman at Eleven in October, 2015, and the two have been friends ever since.

**The Enterprise Lures Hathaway**

94.     In late 2009 or early 2010, Hathaway received a message through a social media platform called Model Mayhem, which is used to message models and initiate conversations, from a female representative. The representative indicated that she

17

worked for Howard Rubin and that Rubin, who was familiar with Hathaway's work as a Playboy model, would like to meet Hathaway in New York for dinner.

95.    Rubin's representative described Rubin as a kind businessman who simply loved spending time with and sharing meals with models, and would pay those models for their time.

96.    Rubin's representative even noted that she could provide references for Rubin, including a reference from a former model named Jennifer Powers, who had shared similar experiences with Rubin.

97.    While, Hathaway was living in Las Vegas at the time, she happened to be in New York for the weekend. Thus, relying on the representations of Rubin's representative, Hathaway agreed to meet Rubin for dinner.

98.    The brief communications through Model Mayhem were the only conversations Hathaway had with Rubin's representative. Hathaway never met her in person.

99.    Following her receipt of these messages, Hathaway met Rubin at the Russian Tea Room in midtown Manhattan. The two enjoyed drinks and dinner together. At the time, Rubin made no comments which caught Hathaway off guard or caused her to be suspicious.

100.    Towards the end of their dinner, Rubin asked Hathaway how long she planned to remain in New York and where she was staying.

101.    Hathaway confirmed that she would be in New York through the weekend, and told Rubin the name of her hotel.

102.    Rubin then asked if Hathaway would like to get together the next day. Rubin also offered to pay for Hathaway to stay in a nicer hotel, the Loews Regency New York Hotel on Park Avenue and East 61st Street (the "Loews"), for the rest of her time in New York.

103.    Hathaway, who had enjoyed her dinner with Rubin, agreed and accepted his offer.

104.    The two then said their goodbyes for the evening, and Rubin paid Hathaway $2,000 in cash for her time.

105.    The next day, after she had checked into the Loews, Hathaway again met Rubin for dinner. Because the dinner went well and the two of them got along well, Hathaway invited Rubin back to her hotel room.

106.    At the hotel, Rubin and Hathaway engaged in consensual sex. While Rubin made some out-of-the-ordinary requests, he did not ask for or do anything that Hathaway deemed extreme. Hathaway did not feel threatened and viewed this first encounter as simply fun and playful.

107.    Rubin then left the hotel, with a plan to stay in touch, and see each other in the near future.

**Rubin Flies Hathaway To New York on Multiple Occasions in 2010 and 2011**

108.    Following this first weekend with Rubin, Hathaway returned to Las Vegas, but remained in near constant contact with Rubin. The two texted each other nearly every other day, and continued to meet in New York.

109.    In 2010, Rubin flew Hathaway to New York form Las Vegas to meet with him on at least three occasions. During this time period, Rubin was in direct communication with Hathaway, and would help her to arrange the flights himself. Rubin would either pay for the flights himself, or would reimburse Hathaway for any flights she purchased. Rubin also arranged for and paid for Hathaway to stay at the Loews hotel for each of her trips.

110.    As with their first date, Rubin and Hathaway would typically meet for drinks or a meal at the Russian Tea Room or a restaurant called the Wayfarer, and then would return to the hotel to engage in consensual sex.

111.    Rubin would typically see Hathaway between the hours of noon to 4 p.m. or 4 p.m. to 10 p.m., when he would need to leave to return to his home. Rubin would see Hathaway depending on his schedule at home.

112.    On one occasion, Rubin sent Hathaway to a sex store with a list so that the she could pick up various sex toys to use that evening. Rubin's credit card was on file at the store and Rubin had Hathaway buy around $800 worth of sex toys from the list. At the time, Hathaway believed that Rubin simply had a curiosity about BDSM play, and, though it was all very new to her, she was accepting of his interest in exploring that curiosity with her. Rubin at first proceeded very slowly with Hathaway. As time went on, however, Rubin's conduct and requests grew more extreme.

113.    Rubin, who always kept a key to the hotel room in which Hathaway was staying, also liked to sneak into her room early in the mornings while she was still asleep. When he would come over, Rubin would visit with a duffle bag of sex toys,

ropes, and other BDSM-type objects. Rubin enjoyed initiating intercourse with Hathaway as she slept, telling her that he like to feel like he was raping her while she was sleeping.

114.    Following each encounter, Rubin would pay Hathaway a sum of $2,000 to $5,000 in cash or by wire transfer.

### The Enterprise's Criminal Acts Against Hathaway

115.    In or around early 2011, Rubin introduced Hathaway to Jennifer Powers, stating that Powers would be handling the travel arrangements and logistics of their meetings going forward.

116.    From that time forward, Powers purchased Hathaway's flights and coordinated Hathaway's meetings with Rubin. However, towards the end of the relationship, Hathaway purchased most of the flights and was reimbursed. Powers would then coordinate Hathaway's arrival time.

117.    On one occasion in mid-2011, Powers asked Hathaway to meet her at a new location: a condominium that turned out to by Rubin's newly rented Penthouse.

118.    Powers presented Hathaway with an NDA and persuaded her to sign. This was the first time Rubin or anyone associated with Rubin had asked her to sign any document.

119.    Hathaway felt confused by the sudden appearance of a legal document, but agreed to sign, thinking it was simply a whim of Rubin's.

120.    Powers did not give Hathaway, who was not familiar with legal documents, chance to consult with any advisor, and did not permit Hathaway to keep a copy of the NDA for her records.

121.    Over the next four years, Hathaway continued to see Rubin.

122.    At one point, in or around 2014, Rubin encouraged Hathaway to quit her job, promising that he would "take care of her." As a result, Hathaway visited Rubin once a month in New York and spent close to two years without a job. During this time period, Rubin paid Hathaway approximately $5,000 a month.

123.    On one occasion, Hathaway saw Rubin texting another woman and saw that he was belittling this woman by letting her know that he was with Hathaway.

124.    While Rubin's interest in BDSM appeared to increase, introducing new devices and equipment into the Dungeon, or as he referred to it to Hathaway, the "red room," Rubin generally sought Hathaway's consent during this time period, and she did not feel threatened.

125.    But, beginning in early 2015, Rubin's behavior changed completely—so much so that Hathaway feared that Rubin had started taking drugs, something she had never known Rubin to do.

126.    Hathaway also began to notice new devices in the Dungeon each time she arrived at the Penthouse, including large-scale structures, ropes, and knives, which caused her for the first time to begin to fear Rubin.

127.    Each time Rubin brought Hathaway to the Dungeon, his behavior escalated. Rubin began to subject Hathaway to painful experiences, which resulted in actual injury and severe bruising.

128.    Worse, Rubin ceased asking for Hathaway's consent, and deliberately ignored her requests to "stop."

129.    Following these encounters, Powers would recommend Hathaway a special cream, called Arnica cream, that was intended to treat the appearance of the bruising. Powers recommended the cream to speed up the healing process as Rubin did not like to see Hathaway until the bruising he had caused disappeared.

130.    On one occasion, in 2015, Hathaway met Rubin for dinner at a lounge across the street from the Penthouse. Rubin was with an older gentleman, and two other women, one of which Hathaway believed to also be in some sort of intimate relationship with Rubin.

131.    The group returned to the Penthouse to play pool. After a few rounds of pool, the older gentleman and the two other women left. Rubin pulled Hathaway onto the pool table, and, without warning or obtaining Hathaway's consent, shoved a pool cue into Hathaway's vagina, causing pain and tearing. Hathaway did not want Rubin to do this and begged for him to stop.

132.    Following her protestations, Rubin left the room and returned with ropes. Rubin proceed to bind Hathaway, and dragged Hathaway along the floor by the ropes through the Penthouse to the Dungeon.

133.    By the time they made it to the Dungeon, Hathaway had sustained burns across her body from the ropes and from contact with the floor. Rubin then proceeded to tie Hathaway to a large, black sex device, where her body was forced into an x-shape, and to punch her in the face. Hathaway could not escape this device as Rubin frequently tied her onto the machine.

134.    Rubin hurled insults at Hathaway while she was bound, and eventually untied her and left without saying anything further.

135.    After Hathaway returned home, Rubin continued to contact her and acted as though nothing out of the ordinary had occurred. Though Hathaway was afraid of Rubin, she thought that perhaps something had triggered him that evening, and decided to give him another chance.

136.    But, when Hathaway returned to New York (now from Chicago as she had moved from Las Vegas), Rubin's bad behavior continued.

137.    On several occasions, Rubin punched Hathaway in her face and in her stomach. Rubin also hit Hathaway in the ribs and would repeatedly say, "stupid girls." He would then laugh in Hathaway's face and force Hathaway to say, "I'm a stupid girl."

138.    On at least one occasion, without Hathaway's permission, Rubin penetrated Hathaway with a glass dildo, causing Hathaway to bleed. Rubin blamed the bleeding on Hathaway and yelled at her that the bleeding was from her period, not from the dildo. During this time, Rubin would smack Hathaway in the vagina over and over again and even proceed to whip Hathaway from the floor up to her vagina.

139.    When Hathaway protested, Rubin shouted at her, "Fuck you, you wasted my time," and left.

140.    Rubin would pay Hathaway based on how he perceived she acted. If Hathaway cried or protested in any way, he would pay her substantially less than if she simply took his threats and beatings without complaint.

141.    In October 2016, Hathaway asked Rubin for financial help as he was providing substantial financial support. Because of her credit and down payments for security, Hathaway needed $4,800 to move into her new apartment in Chicago. At this time, Hathaway asked Rubin for help, who responded by saying he could not help, knowing Hathaway could be homeless. As a result, Hathaway borrowed the money from her friend, who she paid back.

142.    Rubin reached out two weeks later and asked Hathaway to come to New York to see him. Rubin had no problem beating Hathaway for his selfish reasons to help Hathaway financially. As long as Rubin got what he wanted, he then felt it was okay to help Hathaway.

143.    On at least one occasion, Hathaway, who had returned to work, now as a waitress at the Prysm Club in Chicago, had to take a significant amount of time off of work due to bruising caused by Rubin. Hathaway had sustained such severe bruising to her breasts that she could not wear the v-cut uniform required for her job.

144.    On more than one occasion during this time period, Hathaway lost consciousness completely, waking up in a new location with no recollection of what had occurred.

145.    On the first of these occasions, Rubin ordered wine, cheese, and fruit up to the Penthouse between 4 p.m. and 5 p.m. The last thing Hathaway remembers is sitting on the couch, fully clothed, drinking the wine that Rubin had poured for her and engaging in a typical conversation.

146.    Hathaway had consumed no other alcoholic beverages, nor had she taken any medications or drugs.

147.    At approximately 8:30 p.m., Hathaway woke up in the guest room of the Penthouse completely naked and sore. Rubin was nowhere to be seen.

148.    Hathaway got up to explore the Penthouse to try to determine what happened. When she entered the Dungeon, it looked as though a tornado had run through the room, with equipment and toys strewn about and knocked over.

149.    Hathaway had no memory of being in the room, but, based on the injuries she felt, suspected that Rubin had taken her there after she had lost consciousness.

150.    On other occasions, Hathaway remembered being tied up in the red room, but would wake up in the bedroom with no recollection of what had occurred.

151.    Hathaway does not know whether Rubin had caused injuries which caused her to black out, or if Rubin had slipped some sort of drug into her drink.

152.    On any occasion that Hathaway blacked out, Rubin would act as though Hathaway had done something wrong. As a result, Rubin would give Hathaway significantly less money than he had otherwise.

153.    In or around June of 2017, Hathaway finally had enough of Rubin's treatment. Hathaway had avoided Rubin for approximately six months following several of the incidents described above.

154.    However, Rubin continued to contact Hathaway, and began to act and speak to Hathaway as he had prior to 2015. Hoping that Rubin was back to his old self, Hathaway agreed to meet with him.

155.    After Powers arranged for Hathaway's travel, Hathaway paid for her flight and flew to New York and met with Rubin.

156.    Once in the Penthouse, Rubin bound and gagged Hathaway. Without Hathaway's permission or consent, Rubin attached clothespins to Hathaway's breasts, causing Hathaway intense pain.

157.    The pain was simply too much for Hathaway, who, although gagged, attempted to plead with Rubin to stop. Rubin refused.

158.    Rubin then approached Hathaway with a device she had never seen before, which appeared to her to be a long electric shocker of some variety. Although she did not know it at the time, the device was a cattle prod.

159.    Again, without Hathaway's permission or consent, Rubin used the cattle prod to shock Hathaway on multiple occasions across her body.

160.    After Rubin was finished, he simply untied Hathaway and left, without anything more.

161.    Hathaway was left in pain and felt extremely uncomfortable and wary towards Rubin. This was the last time she saw him.

162.    Following the June encounter, Rubin and Hathaway exchanged a handful of text messages. Rubin never mentioned what had occurred in June, and acted as though nothing was out of the ordinary.

163.    On or around October 31, 2017, Rubin contacted Hathaway for the last time, wishing her happy birthday. Hathaway has not contacted him since.

### Hathaway's Injuries

164.    As a result of the Enterprise's violations of the TVPA and 18 U.S.C. § 2422, Hathaway suffered significant injuries.

165.    Following the incident in which Rubin dragged Hathaway through the apartment, Hathaway sustained burns on her body from the rope Rubin used to drag Hathaway around with.

166.    Hathaway sustained bruising to her face and breasts on numerous encounters with Rubin. Such injuries were so significant that Hathaway had to miss work for a significant period of time.

167.    Since the extreme encounters with Rubin, Hathaway suffered from anxiety and inability to sleep. As a result, Hathaway was prescribed Xanax pills to help Hathaway sleep and overcome anxiety.

168.    Hathaway is a cocktail waitress and model who depends on her appearance to earn her income. Thus, the injury to her body caused Hathaway to sustain economic damages.

**The Enterprise Lures Peterson**

169.    On or around May of 2011, after Peterson appeared in Playboy, a female representative of Rubin who identified herself as "Tracy" contacted Peterson to persuade her to meet Rubin.

170.    Tracy told Peterson that Rubin was interested in taking some fetish style pictures and that Peterson would be compensated for her time in the amount of $5,000 but could also leave at any time if she felt uncomfortable.

171.    Tracy also informed Peterson that she may receive minor bruises from the restraints for the pictures but not from Rubin himself.

172.    Tracy also told Peterson that Rubin was a little over the top but a sweet and great guy that is just into role playing and fantasy and that Peterson should just say yes to everything.

173.    Shortly thereafter, in May or June of 2011, Peterson flew from Los Angeles to New York City to meet with Rubin.

**The Enterprise's Criminal Acts against Peterson**

174.    Peterson met Rubin at the Mandarin Oriental Hotel in New York City, as well as three other women.

175.    While at the hotel, Rubin poured shots for all of the women, including Peterson, and had them drink until they became intoxicated.

176.    Peterson noticed sexual instruments on the bed and became nervous.

177.    Upon Rubin noticing that Peterson was nervous, he asked another woman in the hotel room to give Peterson something to take the edge off.

29

178.    The woman crushed a pill up and put it in Peterson's drink. Peterson did not see the pill, what shape it was, or what color it was.

179.    After some time in the hotel, Peterson began to not feel well and became very itchy. Peterson also did not like the way had been touching her. Because of this Peterson asked to, and did, leave the hotel room.

180.    Peterson later discovered that what was crushed up and put in her drink was oxycodone, a Schedule II narcotic.

181.    Peterson did not see Rubin again for three to five years.

182.    The next time Peterson saw Rubin was one of the times she was back in New York from Los Angeles, and it was by coincidence at a restaurant called BLT Prime in New York on Rubin's birthday.

183.    Peterson ran into one of the women that she had met the night in the Mandarin Hotel in Rubin's room.

184.    Peterson also saw a number of other Playboy models with Rubin at the restaurant and decided that she would reach out to Rubin to give him another chance and because Peterson believed that if she refused to take the drugs she would still be paid for the modeling work.

185.    Peterson contacted Rubin through email and met up with Rubin as a friend on several occasions, simply having a meal together or getting a drink and talking.

186.    In the back and forth of the email, Rubin stated that Peterson would be beaten and bound and would be black and blue, but Peterson did not take these

statements seriously as she had previously been told by Rubin's female representative that Rubin was sweet and a great guy and only into role playing and fantasy.

187.    Peterson believed this conversation to all be part of this role playing and fantasy.

188.    Peterson and Rubin went out at least ten times for dinner and drinks. On some of these occasions Peterson would go back to the Penthouse with Rubin and one or two other women, but each of these encounters was merely social and included no beatings or sex.

189.    Peterson believed that Rubin did not want Peterson to be one of the women that he had BDSM relations with as he was dating one of her friends.

190.    However, in 2015 or 2016, after Rubin stopped seeing Peterson's friend he took Peterson out for drinks and got Peterson very drunk.

191.    Once Rubin got Peterson drunk, he forced her to take oxycodone again.

192.    At this time, Peterson was not aware that the pill that was crushed in her drink the first night was oxycodone, nor was she aware that this was oxycodone.

193.    The next thing Peterson remembers is waking up in a bed in the Penthouse with Rubin next her.

194.    Rubin then told Peterson that they were going to go do something fun and forcefully grabbed Peterson.

195.    Because Peterson was numb from the drugs and alcohol, so could not stop Rubin, and Rubin took her to the Dungeon while Peterson was going in and out of consciousness.

31

196.    Inside the Dungeon, Rubin tied Peterson to the "X" shaped cross and woke Peterson up by beating and whipping her.

197.    Rubin would scream at Peterson things such as "[i]t's just your pussy" and then kick Peterson in her vagina.

198.    If Peterson did not repeat what Rubin said, he would again hit her.

199.    The more Peterson screamed, the more involved Rubin would get, saying things such as "I love it when you cry."

200.    Peterson also noticed that the more she cried and screamed, the more erect Rubin would become and the more he wanted sex.

201.    Furthermore, during the beating, Rubin would use things he had learned about Peterson to upset her and elicit emotions, such as "nobody loves you," "you're so ugly," and "why do you think you don't have a boyfriend."

202.    Rubin also gave Peterson more oxycodone during the ordeal, finally telling Peterson what he had been giving her after he crushed up a pill and put it in a drink for Peterson.

203.    Peterson was in and out of consciousness throughout but remembers being placed in a machine that had her arms tied to her ankles, while blindfolded, gagged, and with her ears plugged.

204.    The next morning, Rubin told Peterson he had a great a time and paid her $5,000.

205.    Peterson told Rubin that she did not have a great time and that she was in pain.

206.    Peterson saw Rubin monthly for a span of a few months, as Rubin had caused Peterson to become addicted to oxycodone, and Rubin was Peterson's only supplier.

207.    Every time Peterson went back, she was supplied more of the drug but was also beaten and raped.

208.    This was Rubin's game with Peterson: he got her addicted to drugs so that she would have to keep coming back to him to get the drugs, allowing him to further abuse her.

209.    These encounters eventually became so bad that they included electrocution and attaching various devices to Peterson's nipples.

210.    Peterson often asked to leave, but Rubin would not allow her to leave and would say things such as, "no one can hear you scream or hear you cry."

211.    Following one occasion, Peterson sustained an injury to her buttocks. Peterson had previously had Bio Gel injections in her buttocks. Like breast implants and other cosmetic prosthetics, these injections are intended to provide a fuller appearance.

212.    Peterson experienced pain in her buttocks that was so severe that she had to be admitted to the hospital. As it turns out, Rubin had ruptured one of Peterson's Bio Gel injections.

213.    This rupture caused an infection, which required Peterson to take strong antibiotics.

214.    To this day, the ruptured Bio Gel injection continues to give Peterson problems. On more than one occasion since she was admitted to the hospital, Peterson's

ruptured injection has become infected causing additional pain and requiring treatment with antibiotics.

215.    The last time Peterson saw Rubin was in the summer of 2017.

216.    In 2017, Peterson reached out to Rubin to inform him that a mutual friend of theirs had passed away.

217.    Peterson met with Rubin and they had a few drinks while Peterson told Rubin what had occurred.

218.    However, Peterson became intoxicated quicker than normal and after having a cigarette blacked out. Peterson believes she was drugged on this occasion without her knowledge.

219.    Peterson woke up in the Dungeon to beatings, electrocution, and clamps on her vagina.

220.    Peterson demanded that he let her go.

221.    In retaliation, Rubin ripped her off of the "X" cross and threw her to floor.

222.    Peterson demanded money so that she could go home, as she had nothing on her because she believed she only meeting Rubin to tell about their friend passing away.

223.    Rubin then hit her in the face so hard that he split her lip.

224.    After a long time of not seeing Rubin, Peterson went back because she wanted to understand what had happened to her and why.

225.    It was only upon Peterson going back to see Rubin that she was required to sign an NDA.

**Peterson's Injuries**

226.   As a result of Rubin's abuse and the Enterprise's violations of the TVPA and 18 U.S.C. § 2422, Peterson suffered significant injuries to her business and to her property.

227.   After the Enterprise first transported Peterson to New York to meet with Rubin, she woke up in extreme pain, with one of her eyes swollen shut, her breasts swollen, and her shoulders hurting.

228.   As a result of Rubin forcing her to take oxycodone and in conjunction with her injuries, Peterson became addicted to the drug.

229.   This required Peterson to go back to Rubin for more pills, where Rubin then assaulted Peterson before giving her the pills, and resulted in a cyclical relationship: every time Peterson would go to Rubin, he would give her oxycodone and beat her so badly that she would need more the morning following the beatings. As the addiction grew worse, Rubin would take more and more advantage of Peterson and used her addiction to his advantage and forcing Peterson to come back to him for more drugs.

230.   Peterson has also sustained damage to her Bio Gel implants due to Rubin's use of force. As a result, Peterson frequently suffers from infections which require treatment with antibiotics and costly doctors' visits.

231.   Peterson, who previously earned her living as a model, has not been able to work in the industry as a result of the physical and emotional trauma she sustained at the hands of the Enterprise.

35

## The Enterprise Lures Fuller

232.    On or around early March of 2016, Fuller was contacted by one of her girlfriends, who invited her to come from Las Vegas, where Fuller had been vacationing, to New York for a night to meet her friend, Rubin.

233.    Fuller's friend told Fuller a little about Rubin but was very vague when describing Rubin. Fuller's friend did not explain what Rubin would require of Fuller, or what Fuller should expect.

## The Enterprise's Criminal Acts Against Fuller

234.    Later that night, Fuller and her friend were drinking and partying at the Penthouse when Rubin visited the apartment.

235.    Rubin provided Fuller and her friend alcohol and recreational drugs, such as cocaine. Rubin pressed the women to take the cocaine and continued to refill their drinks.

236.    After ensuring that the women were intoxicated, Rubin then proceeded to tell Fuller to sign an NDA. Fuller did not know what an NDA was and asked Rubin to explain why she needed to sign the document.

237.    Instead of providing any explanation, Rubin told Fuller, "If you can't sign this, you can't be here."

238.    Fuller did not know what she was signing as she had been drinking and partying and had no intention or prior knowledge of Rubin's requirement to sign any document. Fuller would not have signed the NDA had she not been intoxicated and pressured into doing so by Rubin.

239.    Fuller ended up signing the NDA, which promptly changed the mood. Rubin then proceeded to throw Fuller over his lap and started to hit Fuller on her buttocks. Fuller told Rubin that that had hurt.

240.    Then Rubin's behavior began to escalate. Rubin opened a door to a room, which Fuller entered with her friend. Rubin started tying Fuller up and told her that there was a safe word that she could use if she felt uncomfortable.

241.    But immediately thereafter, Rubin proceeded to insert a ball gag into Fuller's mouth, preventing her from saying the safe word or making any protestations.

242.    Rubin produced a dildo which he first showed to Fuller, and then forcibly inserted the dildo into Fuller's vagina, causing tears and bruising. Rubin did not ask Fuller if she was okay with his use of the dido.

243.    Fuller tried to protest, but could not as Rubin had gagged her.

244.    Rubin also blindfolded Fuller with a mask and bound her with rope. He then proceeded to beat and punch Fuller in the head, stomach, buttocks, and legs, causing bruising and a large contusion on the back of Fuller's thigh, approximately the size of a football.

245.    Rubin also hit Fuller with different instruments, but Fuller could not identify the instruments as she was blindfolded.

246.    At one point, Fuller was able to remove the gag from her mouth for long enough to say the safe word. Despite this, Rubin continued to beat Fuller.

247.    Rubin eventually became upset at Fuller's protestations and kicked Fuller of the room, shut the door, and locked it. He then proceeded to continue beating Fuller's friend.

248.    Left on her own, Fuller climbed onto the pool table and started crying. She could hear her friend get beaten during this time and feared what was happening to her.

249.    After another 30–45 minutes, both Rubin and her friend came out of the room.

250.    Rubin said "everything is fine," and left the apartment.

251.    Fuller's friend told Fuller that she would feel better once she goes to bed.

252.    The next morning, Fuller packed her stuff and left the Penthouse.

253.    Jennifer Powers sent Fuller $2,500 via PayPal on March 11, 2016.

254.    Following her encounter with Rubin, Fuller experienced extensive bruising and tears to her vagina, which Fuller had to treat with iodine to prevent further infection.

255.    Fuller grew depressed and suffered from insomnia and anxiety as a result of her trauma. Fuller could not stand to be hugged or otherwise touched following the experience. Fuller feared that Rubin, who she knew had far greater resources than she did, could do bad things to her if she contacted the police or otherwise came forward with regards to what had happened to her.

256.    Fuller never again came into contact with Rubin or Powers.

**Fuller's Injuries**

257.    Rubin's beating caused Fuller to suffer a contusion about the size of a football on the back of her leg, bruising on her backside and all over her body.

258.    Fuller also sustained extensive tearing to her vagina, requiring treatment with antiseptic.

259.    Since her encounter with Rubin, Fuller has struggled with intimacy, and does not like to be touched by other people, including even feeling twitchy when her child gives Fuller a hug or a kiss.

260.    Fuller has sustained extensive emotional and mental trauma which has required treatment.

261.    Fuller is model who depends on her appearance to earn her income. Thus, the injury to her body caused Fuller to sustain damages to her business.

**The Enterprise Lures Speight**

262.    Speight, while working as a cocktail waitress and server at the Tavern in Georgia, met Stephanie Shon through a mutual friend. At the time, Shon also lived in Atlanta, Georgia.

263.    Shon told Speight about Rubin and that Rubin, at the time, was looking to spend time with beautiful women. Shon explained to Speight that Rubin would fly Speight up to New York and that Speight would have a nice place to stay at during her trip there. Shon also said that Rubin was really nice.

264.    Shon introduced Speight to Rubin and Speight, believing Shon's portrayal of Rubin's character, flew to New York. Speight and Rubin had an intimate relationship with each other until Rubin became violent.

**The Enterprise's Criminal Acts Against Speight – The March Trip**

265.    On or around March 24, 2016, Speight arrived in New York on a flight purchased by Powers.

266.    Powers arranged for all of Speight's travel, and simply emailed Speight the flight itinerary when all was set.

267.    Per Powers's instructions, Speight went to the Penthouse.

268.    At the Penthouse, Powers presented Speight with a form NDA, drafted by Defendant Schnur.

269.    Powers requested that Speight sign the NDA before meeting with Rubin for dinner.

270.    Speight is not familiar with legal documents and contracts like NDAs and did not understand the contents. Powers did not explain the contents, nor did Powers provide Speight adequate time to review the NDA or have an attorney or advisor review the NDA.

271.    After signing the NDA, Speight met Shon and Rubin at a restaurant, where there was no further interaction between Speight and Rubin that night.

272.    Immediately following this trip, on March 30, 2016, Speight learned that Shon, without Speight's permission, had posted on the Internet naked photos of Speight, which Shon had previously procured for Rubin.

273.    Instagram, at Speight's urging, eventually removed these photos.

**The Enterprise's Criminal Acts Against Speight – The April Trip**

274.    A month later, in or around late April 2016, Speight flew from Georgia to New York and met Rubin for dinner.

275.    At the restaurant, Rubin encouraged Speight to drink heavily. Eventually Speight became intoxicated.

276.    Speight then returned to the Penthouse with Rubin, when Rubin forced Speight to open a bottle of wine and drink the whole bottle of wine herself, causing Speight to become nearly unconscious.

277.    Rubin then pushed Speight to the floor and slapped Speight's face and called her a "slut" and "whore" and jokingly laughed the comments off.

278.    Rubin then dragged Speight to the Dungeon, and even though Speighty was screaming and telling Rubin to stop, Rubin proceeded to tie Speight up on all fours.

279.    Speight was so intoxicated, she blacked out and woke up alone at the Penthouse with no memory of how the night ended.

280.    The next morning, Speight returned to Atlanta.

**The Enterprise's Criminal Acts Against Speight – May Through September 2016**

281.    Speight continued to make monthly trips to New York, which continued until September of 2016.

282.    On other occasions, without her consent, Rubin tied Speight down and shoved foreign objects, such as a glass dildo, into Speight's vagina.

283.    While Speight was screaming and crying, Rubin also whipped Speight. Speight did not consent to being whipped.

284.    Speight to this day has a scar from the whips on her arm.

285.    After shoving foreign objects into Speight and whipping Speight, Rubin would flip Speight over and rape Speight from behind. Speight did not consent to having sexual intercourse with Rubin.

286.    When Speight continued crying, Rubin slapped Speight and said, "Shut up, whore. This is what you like."

287.    Sometime during their relationship, Rubin found out about Speight's history of sexual and physical abuse at a young age and took advantage of this knowledge. Speight suspects Shon, who claimed to be Speight's friend and had knowledge of Speight's history of abuse, told Rubin. It was evident that Rubin used this knowledge to enhance his sexual experience.

288.    Rubin told Speight of his fantasies of pretending to rape women and scaring women. He then slapped Speight and called her names.

289.    During these interactions, Rubin would also say to Speight, "I'm your father raping you, like when he raped you as a little girl."

290.    On multiple occasions, Rubin offered Speight pills at dinner or at the Penthouse, assuring Speight that this is would help with her anxiety and help Speight get through their evening together. Speight felt that she had little choice but to do what Rubin said.

291.    On one of these occasions, Rubin punched Speight in her breasts, causing one implant to burst and creating very dark bruises. In fact, Speight's body was covered in bruises to the point Speight could not wear a bikini in the summer time.

292.    On another occasion, during dinner, Rubin bragged to Speight that he had broken a woman's jaw. Upon hearing this, Speight was scared as she thought Rubin could do the same thing to her as well.

293.    The last time Speight saw Rubin was in September of 2016 with no further contact.

## Speight's Injuries

294.    As a result of Rubin's abuse, Speight suffered significant injuries.

295.    Speight sustained major bruising to her face and body, as well as scarring to her arms where Rubin whipped her.

296.    On one occasion, Rubin beat Speight in the face so badly that he dislodged a facial injection.

297.    Speight had to go to a doctor and plastic surgeon to have the injection fixed. Because she was afraid and embarrassed, Speight did not tell the doctors what Rubin had done to her, simply noting that she wasn't sure what had occurred.

298.    On one occasion, Rubin punched Speight so hard in the breast that he popped her breast implant, causing severe bruising and scarring.

299.    Speight has also sustained emotional injuries after Rubin triggered Speight's memories from her abusive past.

300.    Speight's injuries harmed Speight in her business. As at least Rubin, Powers, and Shon knew, Speight is a model and cocktail server whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Speight's body prevented Speight from working, causing Speight to sustain economic losses.

301.    Further, the Enterprise caused injury to Speight's personal property in the form of the prosthetics implanted in her face and breasts.

**The Enterprise Lures Hallman**

302.    On or around August 23, 2016, Hallman received a direct message on Instagram from Stephanie Shon on behalf of Rubin. Shon indicated that she worked for Howard Rubin, and that Rubin, who had seen images of Hallman on Instagram, would like to meet Hallman in New York.

303.    While Shon initially identified Rubin by name, she then insisted that Hallman refer to him only as "H" so as to protect Rubin's identity.

304.    Shon noted that while she would not be at the meeting in New York, Hallman would have the opportunity to meet her "boss," Rubin.

305.    Shon told Hallman that Rubin would pay for Hallman to fly from Florida to New York and pay Hallman $2,000 to meet and spend time with Rubin.

306.    Shon explained that if Rubin liked her, Rubin would pay an additional $3,000, for a total of $5,000, to Hallman. Shon represented that Rubin loved spending time with Playboy models and frequently set up this type of arrangement.

307.    Because Hallman did not know who Rubin was, and was wary of the somewhat out-of-the-ordinary arrangement, she initially refused the offer.

308.    However, Rubin was persistent. Rubin next had Powers contact Hallman to persuade Hallman to travel to New York. Powers spoke with Hallman on the phone and through the messaging application WhatsApp.

309.    When Hallman identified her reservations, consistent with the Enterprise's scheme of lying to its victims to induce them to meet with Rubin, Powers lied to Hallman.

310.    Powers assured Hallman that Rubin was "a great guy," and would not do anything to make Hallman feel uncomfortable. Powers noted that she herself had initially entered into a similar arrangement as proposed, and claimed she had a positive experience which led to her current employment with Rubin.

311.    In fact, Powers told Hallman that if Hallman ever felt uncomfortable she could simply ask to leave, and would not only be allowed to do so, but would still be paid the initial $2,000 for her time.

312.    Relying on Shon's and Powers's representations, Hallman agreed to come to New York, with the condition that she could bring a friend with her, who Rubin would also pay to travel to New York.

313.    Rubin and Powers agreed to Hallman's condition.

314.    Hallman contacted Plaintiff Lawson, another International Playboy Playmate, and asked Lawson if she would join her.

315.    As described further below, Lawson had in fact already been contacted by the Enterprise and was herself also wary of the arrangement.

316.    However, again at Rubin's direction and to further the Enterprise, Powers also lied to Lawson and wrongly claimed that Lawson would be safe, and would not be asked to do anything that she did not want to do.

317.    As such, Powers purchased plane tickets on JetBlue Airways to New York for Hallman and Lawson with funds supplied by Rubin through the Doe Company, arranging for Hallman and Lawson to meet with Rubin at the Penthouse.

## The Enterprise Lures Lawson

318.    At about the same time that Shon contacted Hallman, Shon also direct messaged Lawson through Instagram.

319.    Lawson initially ignored Shon. People contact Lawson frequently through Instagram with proposals and job offers, the vast majority of which are not legitimate. Thus, Lawson was initially very skeptical.

320.    But, after Powers convinced Hallman to travel to New York to meet Rubin, Hallman called Lawson to persuade her to join her on the trip.

321.    Still not completely convinced, Lawson had phone calls with both Shon and Powers. Because of her initial skepticism, Lawson wanted as much information as she could obtain.

322.    Consistent with the Enterprise's goals and Rubin's direction, both Shon and Powers lied in all communications with Lawson, claiming Rubin was not

threatening, and noting that Rubin was a very wealthy man who enjoyed women and liked to take care of them.

323.    Powers and Shon told Lawson that Rubin liked large breasted women and that Rubin said he liked the photos he had seen of Lawson.

324.    Powers reassured Lawson that she did not need to worry and that the trip would not be about sex, and, at most, would entail some fetish play and potentially photos.

325.    As Lawson had previously done photo shoots involving light fetish work, and had always been treated well and with respect to her boundaries, she decided to travel to New York and to the Penthouse consistent with her previous professional work.

**The Enterprise's Criminal Acts Against Hallman and Lawson – The August 2016 Trip**

326.    Hallman and Lawson arrived in New York from Florida on flights purchased for them by Powers on behalf of Rubin on or around August 23, 2016.

327.    Upon arrival and as per Powers's instruction, Hallman took a cab from the airport to the Penthouse and Lawson took a car to the Penthouse after Lawson's flight had been delayed and the two did not arrive at the airport at the same time as planned.

328.    Hallman and Lawson were greeted at the Penthouse by Powers, who poured them cocktails and showed them around the Penthouse. The Penthouse appeared to be a typical high-end New York residence, but with photos of various Playboy Playmates displayed throughout. The models in the images were very well-

known Playboy Playmates, as well as some lesser-known models. Many of the photos included Rubin with these other women.

329.    Hallman and Lawson recognized many of the models on the walls, and were comforted by the fact that women they knew had presumably entered into the same arrangement with Rubin that they had.

330.    At the Penthouse, Powers presented both Hallman and Lawson with an NDA, drafted by Defendant Schnur.

331.    Powers requested that Hallman and Lawson sign the NDA before meeting with Rubin for dinner.

332.    Neither Hallman nor Lawson were familiar with legal documents and contracts like NDAs and did not understand the contents. Powers did not explain the contents, nor did Powers provide the women adequate time to review the NDAs themselves or have an attorney review the NDAs.

333.    Instead Powers persuaded each of them to sign, noting that it was simply standard practice for Rubin and not to worry because "everything will be great."

334.    Despite Powers and the Enterprise knowing that they would require Hallman and Lawson to sign the NDAs upon arriving at the Penthouse, they did not provide Plaintiffs the NDAs in advance for their review, for them to have attorneys review, or copies for the women to keep, nor did they inform Plaintiffs prior to their trip that they would be required to sign any contracts to meet with Rubin.

335.    Powers then took the executed NDAs but refused to allow either Hallman or Lawson to keep a copy for their own records.

336.    At approximately 5:00 p.m., after signing the NDAs, Powers brought Hallman and Lawson to meet Rubin at a rooftop bar located at Viceroy Central Park, a hotel next door to the Penthouse.

337.    It is Rubin's practice to meet the victims who the Enterprise lures to the Penthouse at this hotel immediately prior to returning to the Penthouse to sexually assault them.

338.    Rubin, Hallman, and Lawson had drinks and dinner at the hotel bar before heading back to the Penthouse. Throughout their interactions at the Viceroy, Rubin treated Hallman and Lawson respectfully and cordially. Hallman and Lawson slowly became more comfortable, believing that Rubin would treat them with respect as claimed by Powers.

339.    However, when the group returned to the Penthouse at approximately 7:00 p.m., the mood quickly changed. Upon entering the Penthouse, Rubin ordered Hallman and Lawson to change into fetish-style clothing before returning to the living room to have additional drinks with him. Rubin made each of the cocktails himself, out of the sight of Hallman and Lawson.

340.    Rubin's demeanor was different inside the Penthouse than in public. He became cold and authoritative, ordering Hallman and Lawson to do as he commanded. Because of this change, Hallman and Lawson grew nervous.

341.    In what appeared to be an attempt to assuage their concerns, Rubin went to a safe located in the Penthouse and paid both women $5,000 in cash.

342.    Even more concerning was that a room that had been previously locked was now open, and revealed a room with a white carpet and red walls, filled with ropes, chains, dildos labeled A–Z, and other apparatuses which neither Hallman nor Lawson recognized.

343.    Hallman noticed a large x-shaped machine with straps, a bench, full-face masks with zippers, and metal hooks.

344.    At this time, Lawson was also beginning to feel strange, and believes now that something had been added to her drink to increase her intoxication.

345.    Rubin brought the women into this side room (the "Dungeon") and immediately slapped Lawson across the face. Lawson protested, telling Rubin not to hit her in the face. Not only had the slap been unexpected and hurt, but Lawson had recently undergone a cosmetic treatment to her face, known commonly as fillers, and was concerned that Rubin would damage the treatment.

346.    At no point did Rubin or Powers ask either of the women about any potential medical conditions, something that someone in a responsible, consensual interaction would have done prior to any interactions of this type. However, had Rubin or Powers asked such a question, they would have lost the element of surprise, a crucial element of the Enterprise's ability to lure women to Rubin.

347.    At one point, Rubin demanded that Lawson hit Hallman for him. When Lawson objected, Rubin turned his violence on her. Lawson, who was at this point scared of what Rubin would do if she did not obey, then attempted to pretend to hit

Hallman, slapping her leg instead of Hallman. However, Rubin quickly caught on, and, as a consequence, hit Lawson.

348.    Rubin ignored Lawson and proceeded to restrain both of the women, tying their hands behind their backs and binding their breasts with rope and what appeared to be red flagging tape (a non-adhesive type of plastic ribbon typically used in surveying or construction).

349.    After telling Hallman and Lawson that if they became uncomfortable he would stop, Rubin gagged both of the women so that neither could speak or object to anything that Rubin was going to do.

350.    Rubin then told Hallman and Lawson, "I'm going to rape you like I rape my daughter."

351.    At this point, both Hallman and Lawson began to panic. While they had suspected that Rubin would want them to play some mild fetish games and perhaps take photos, neither one expected to be restrained in this manner or to be actually beaten.

352.    Neither Lawson nor Hallman consented to be restrained in this manner or beaten, nor could either woman verbally object after Rubin gagged them despite their many attempts to do so.

353.    Lawson had previously done some fetish modeling work, and, based on Powers's representations, expected the same scenario with Rubin. However, in her previous experiences, the restraint had been for show, and she had always felt that she was free to go when she requested.

354.    This was different. Not only was Lawson so restrained that she could not leave on her own, she could not even voice her objections. When either Hallman or Lawson screamed or protested, Rubin would simply become more violent.

355.    Once the women were tied up, Rubin took the side of his fist and punched Hallman in the back of the head.

356.    Rubin began to beat both women in the breasts, calling the women "cunts," and slapping and punching their breasts and ribcages repeatedly.

357.    Rubin pushed Hallman to the ground, face down, and continued to punch Hallman in the back of the head, stating that Hallman "is the baby, and Howie is the daddy. The daddy has to beat his baby." Rubin punched Hallman so strongly that Hallman fell unconscious.

358.    Without her consent, Rubin penetrated Hallman, causing tears to her vagina. Because she was restrained and in and out of consciousness, Hallman does not know if Rubin penetrated her with an object or if it was Rubin himself.

359.    After approximately one hour of raping and beating Hallman and Lawson, Rubin abruptly stopped and left the Dungeon, loosening Hallman's and Lawson's restraints before he left.

360.    Both Lawson and Hallman were shocked following Rubin's departure and simply lay in the Penthouse, attempting to gather themselves.

361.    Neither saw any other individuals in the Penthouse, but Hallman noticed a laptop and keys on the coffee table that had not been there previously.

362.    Both women experienced bruising and pain immediately thereafter. They were also tremendously emotionally distraught.

363.    Rubin beat the women on the breasts so badly that Hallman's left breast became swollen and later developed scar tissue and hardening, causing visible damage to Hallman's implant and tissue, as well as pain.

364.    They decided to message Powers to tell her what had happened.

365.    Powers was not surprised.

366.    Indeed, as it turns out, Powers had recruited many women to participate in the same exchange with Rubin. After Rubin is through with the victims—and returns home to his wife and children—it is Powers's job to soothe the traumatized women and to help make arrangements with doctors to take care of any of the damage that Rubin had done.

367.    This was not the first time Powers did this, nor would it be the last.

368.    Lawson and Hallman, who had nowhere else to go, stayed in the Penthouse for the night and returned to Florida the next day on the tickets the Enterprise had purchased for them.

### The Enterprise Lures Caldwell

369.    Shortly thereafter, Powers contacted Hallman and asked if Hallman knew any other women that Rubin might like.

370.    Hallman was afraid of what Rubin would do if she did not cooperate with Rubin. Rubin was, and remains, a very wealthy man who at this point knew her address, phone number, date of birth, and how to find her if he wanted to hurt her.

371.    Out of fear of not cooperating with the Enterprise, Hallman introduced Powers to her friend, Caldwell, who was looking for additional ways to supplement her income to support her daughter, and made the introduction of Caldwell to Powers.

372.    Rubin, through Powers's personal PayPal account, paid Hallman $2,000 for making the introduction.

373.    Powers contacted Caldwell through WhatsApp, and made arrangements to fly Caldwell to New York to meet with Rubin. Powers made the same offer and same fraudulent representations to Caldwell that she had previously made to Hallman and to Lawson: simply for traveling to New York and meeting with him, Rubin would pay Caldwell $2,000. If Rubin liked her, he would ask her to stay and would pay an additional $3,000 for a total of $5,000.

374.    Hallman had told Caldwell everything about her previous experience with Rubin, so Caldwell was nervous about going. However, Powers assured Caldwell that Rubin would be respectful of Caldwell's concerns, and would not ask her to do anything she was uncomfortable with and downplayed Hallman's representations about what actually happened with Rubin.

375.    As a result, Caldwell travelled to New York in early September 2016, by herself to meet with Rubin. Like Hallman and Lawson, Caldwell met Powers at the Penthouse, who presented her with an NDA.

376.    Just as with Lawson and Hallman, Powers again did not provide any explanation of the NDA and did not confirm that Caldwell understood the agreement

377.    In fact, Caldwell did not. Powers also did not permit Caldwell to keep a copy of the NDA.

378.    Caldwell then met Rubin for dinner at the rooftop bar at the Viceroy Central Park. Defendant Stephanie Shon joined the two of them.

379.    At the dinner, Caldwell, who had become more anxious as the night proceeded, turned to Rubin and told him that she was feeling nervous about what he might want to do later. Caldwell told Rubin that she had seen Hallman's and Lawson's bruises and was concerned that he would do the same to her.

380.    Rubin told Caldwell that he did not like her attitude and refused to answer her questions regarding her concerns.

381.    Caldwell, Rubin, and Shon soon returned to the Penthouse. Caldwell, alone in New York, was quite scared at this point, and asked Shon to stay.

382.    But Shon said she could not, and left Caldwell at the Penthouse alone with Rubin for between thirty and forty-five minutes while Shon went to a party. Shon only returned after Caldwell kept messaging her to come back.

383.    Rubin continued to provide Caldwell alcoholic drinks. Due in part to her nervousness, and in part to Rubin continuously giving her drinks, Caldwell drank more than she intended to, becoming intoxicated. Caldwell began to speak to Rubin about her daughter.

384.    Rubin stood and slapped Caldwell across the face. Rubin told Caldwell that he was "completely turned-off" by the conversation.

385.    Rubin put $2,000 in cash on the table and left the Penthouse, telling Caldwell she needed to leave by the next day.

386.    Caldwell stayed the night at the Penthouse with Shon, while Shon attempted to take Caldwell under her wing, but Caldwell flew back to Florida on the ticket purchased by Powers because Caldwell needed to take care of her daughter.

387.    Days after Caldwell left New York, Rubin began contacting her through WhatsApp, both on his own and through Powers.

388.    Rubin proceeded to convince Caldwell to return to New York. Caldwell told Rubin she would only come if she could bring Hallman with her. Rubin eventually agreed and Powers again arranged and paid for flights and travel.

389.    When she agreed to meet with Rubin the second time, Caldwell believed that, at worst, she could go with Hallman, meet Rubin for dinner and simply be paid $2,000 for her time. Consistent with the representations of Powers and Shon, Caldwell did not expect to participate in anything further.

### The Enterprise's Criminal Acts Against Hallman and Caldwell – The September Trip

390.    Hallman and Caldwell flew from Florida to New York on September 24, 2017. After arriving at the airport, the two went directly to the Penthouse.

391.    There, Hallman and Caldwell changed and met Rubin at a restaurant named Tao Uptown for dinner and drinks. Powers did not require Hallman or Caldwell to sign another NDA.

392.    At some point during the dinner, a man who had spoken with Hallman outside while Hallman smoked a cigarette came over to the dinner table to say hello. Rubin became angry and demanded security, which eventually removed the man from the restaurant.

393.    After the man left, Rubin stood up and walked out of the restaurant, leaving Hallman and Caldwell behind.

394.    Not knowing what to do, Hallman and Caldwell returned to the Penthouse together.

395.    Once Hallman and Caldwell arrived at the Penthouse, Rubin began to message them via WhatsApp.

396.    Rubin returned to the Penthouse and was extremely intoxicated. When Hallman and Caldwell apologized for the disruption at dinner—which was caused by neither of them—and acted nicely to Rubin, Rubin grew frustrated and left the Penthouse.

397.    Hallman and Caldwell changed out of their dinner clothes into more comfortable clothes, and stayed in the Penthouse, not expecting Rubin to return.

398.    But Rubin returned to the Penthouse. Rubin's conduct became so bizarre that Hallman contacted Powers, asking Powers to book a room at a hotel for Hallman and Caldwell to go to.

399.    Hallman grew frustrated and confronted Rubin. When Hallman began to yell at Rubin for how he was treating her and Caldwell and for scaring them, Rubin became more engaged, and then told the women that they were "going to do this."

400.     Rubin took both Hallman and Caldwell to the master bedroom—rather than the usual dungeon room—and tied Caldwell up with rope from the nightstand.

401.     Rubin tied Caldwell's mouth shut with the red plastic ribbon. Caldwell grew frightened as she then understood she would have no way of telling Rubin that he was going too far.

402.     Rubin bound Caldwell's hands behind her back, and tightly wrapped rope around her breasts. Rubin pushed Caldwell face down on the bed so that she could not see.

403.     Up until this point, Hallman had simply been forced to observe. However, Rubin then threatened Hallman and forced her to hit Caldwell. When Hallman hesitated, Rubin hit her in the face.

404.     Hallman, fearing for her safety and in hopes of protecting both herself and Caldwell from further harm at the hands of Rubin, lightly hit Caldwell. At any point that Hallman refused to follow or hesitated to follow Rubin's instructions, Rubin would hit her or Caldwell harder.

405.     Rubin proceeded to beat Caldwell violently, punching her repeatedly in the back of the head and beating her breasts.

406.     Caldwell tried screaming out—as much as she could, given her restraints—to ask Rubin to stop, but she could not.

407.     However, Rubin would not listen.

408.     Caldwell was beaten in the head so badly, that she went in and out of consciousness during the beating.

409.    While Caldwell was bound, Rubin took scissors and cut off her clothing.

410.    At one point while bound, gagged, and unable to see, Rubin penetrated Caldwell, first with an object and then himself, without Caldwell's consent. Caldwell was powerless to stop him.

411.    At one point, Caldwell looked up at Hallman and realized that both she and Hallman were crying. Caldwell wanted Rubin to stop hurting both of them, so when the tape around Caldwell's mouth loosened up due to sweat, she bit his finger.

412.    Rubin was initially surprised by the bite, but then grew even more violent and continued his attack on Caldwell.

413.    After about an hour of the rape and beatings, Rubin, seemingly satisfied, untied Caldwell and left the Penthouse, leaving $5,000 on the table for Caldwell and having another $5,000 sent to Hallman via PayPal from Powers in the morning.

414.    Caldwell's head throbbed and she was already showing signs of physical trauma, including bruising and swelling.

415.    Caldwell took photos and videos of her injuries. Caldwell had severe bruising on her face, breasts, back, and buttocks. Hallman suffered bruising to her face from Rubin's assault.

416.    Rubin beat Caldwell's breasts so badly that her right implant flipped, so that the backside, which usually sat flush with her ribcage, faced outwards. Caldwell's breasts were beaten so badly that the closure for her breast implant was fully exposed and visible and Caldwell's plastic surgeon was not even willing to operate on her breasts after the incident due to the severe trauma.

417.   On the same breast, Caldwell's areola was damaged, becoming nearly twice as large as the areola on her left breast.

418.   The women's bruising only worsened as the days wore on after they returned to Florida.

419.   At the direction of the Enterprise, Powers paid Hallman $5,000 via PayPal the next morning and Caldwell was left $5,000 in cash as compensation.

**After Realizing How Severely Rubin Injured Caldwell, the Enterprise Attempts to Quiet Caldwell By Paying Her Additional Money**

420.   Caldwell's injuries, particularly those to her breasts, were so severe that she had to see a doctor. The doctor discovered not only the injury to Caldwell's breast implants, but that Caldwell had developed hematomas around the implants, causing swelling and hardening of the breasts. The doctor also noted that Caldwell's right areola would require surgery to correct.

421.   When her doctor asked what had happened to her, Caldwell lied and said that she had accidentally injured herself.

422.   Caldwell feared reprisal from Rubin if she had revealed what had truly occurred.

423.   Caldwell is a model and dancer, as such that her physical appearance is extremely important to her work. Because of her injuries, Caldwell could not work, and lost her job at Eleven.

424.   As such, she contacted Powers and Rubin to ask that they help to repair the damage Rubin caused.

425.    The Enterprise responded by requesting that Caldwell again fly to New York on her own so that they could discuss.

426.    Powers again purchased Caldwell's plane tickets and arranged for her travel to New York.

427.    Caldwell was terrified, but felt extremely vulnerable. She was hurt, just lost her job, and needed to take care of her daughter. Without any other options, Caldwell flew back to New York on October 4, 2016.

428.    When she arrived at the Penthouse, Powers showed Caldwell a stack of papers that had been drafted by Rubin's attorney, Defendant Schnur, and requested that she sign them. Powers then promised that the Enterprise would pay Caldwell $20,000 in installments of $4,000 to repair her breasts.

429.    The Enterprise paid Caldwell until the amount was paid off in December of 2016 or January of 2017. At such time there was one payment that remained to be paid directly to Caldwell.

430.    However, the Enterprise initially refused to pay Caldwell the final payment and only did so after Caldwell asked Powers for a copy of the NDA she had signed and Caldwell wrote an apology note to Rubin about demanding the money for so long.

431.    Caldwell never received the copy of the NDA she requested from Powers.

432.    Rubin requested that Caldwell have her breast implants replaced with a sturdier material like silicone (Caldwell had saline implants, which are typically safer

than silicone) so that she could return and Rubin could beat her breasts without concern of further damage.

433.    Rubin was concerned only with preserving the Enterprise's ability to continue to engage in crimes, and with preserving Caldwell's breasts for future beatings, and not with any of Caldwell's other injuries or emotional state.

434.    Caldwell did not have the opportunity to review the document, and did not understand what she was signing. As with the NDAs, Powers again refused to allow Caldwell to take a copy of the document with her.

435.    Powers and Rubin paid Caldwell, on the condition that she not reveal to her doctor how she was injured.

### The Enterprise's Criminal Acts Against Hallman and Santi – The October Trip

436.    Again, fearing that Rubin would engage in violent reprisals if Hallman did not succumb to the Enterprise's demands, Hallman returned to New York with another Playboy model, Nancy Santi.

437.    On this trip, Hallman became so anxious that she got sick, eventually throwing up on the plane from Miami, in the car, and at Rubin's apartment.

438.    To ease her anxiety, Rubin and Powers asked Hallman's acquaintance, Zoe Cacciola, to tend to Hallman.

439.    But Hallman could not stop and continued to be sick.

440.    After Hallman proceeded to vomit for hours, Powers called an ambulance, which took Hallman to the emergency room, accompanied by Santi and Cacciola, spending the evening at the hospital with Santi and Cacciola.

441.    Hallman was discharged from the hospital between 2:00 a.m. and 3:00 a.m. and returned to Rubin's apartment with her friends.

442.    Upon entering, Hallman saw that Rubin had multiple individuals over at the Penthouse, including Playboy Playmate Ashley Alexa.

443.    Most in the Penthouse were drinking alcohol and snorting cocaine.

444.    As Hallman was still recovering, and as Santi did not want to be around Rubin without Hallman, Hallman and Santi went to bed. Cacciola, who did not know about Rubin's violent history, chose to join the party.

445.    At one point, later in the night, Rubin came into the room in which Hallman and Santi were sleeping and removed a document and cash from the safe that was located therein.

446.    Hallman later learned that this was an NDA and payment for Cacciola to join Rubin in the Dungeon.

447.    After her encounter with Rubin, Cacciola returned to the room in which Hallman and Santi were resting. Cacciola was distraught and looked as though she had been hurt. Cacciola grew more and more upset over her interaction with Rubin and began to scream at Hallman and Santi.

448.    Cacciola continued to attack Hallman verbally and physically, and, eventually, Hallman fought back. Cacciola called the police.

449.    As Hallman knew the police were coming, she contacted Powers to ask her what she should do.

63

450.    Powers told Hallman to lie and say that the apartment belonged to Cacciola, and directed Hallman to hide any evidence of illegal conduct in the Penthouse.

451.    Hallman, who feared Rubin, did as she was told.

452.    When the police arrived, they saw that Cacciola—who had just returned from Rubin's Dungeon—appeared to have sustained more physical injuries at first glance. The police arrested Hallman.

453.    Hallman did not have a criminal record and was released with a desk appearance ticket.

454.    Rubin, through Powers and the Doe Company, told Hallman they would pay for her criminal attorney in exchange for Hallman's silence as to the involvement of the Enterprise.

455.    Blue Icarus was aware, or should have been aware, and was on notice of the police being called to the Penthouse but chose not to determine what events had transpired in the Penthouse.

### The Enterprise's Criminal Acts Against Lawson – The December Trip

456.    In late December, Lawson found herself in a tough financial situation. Because Rubin and Powers had kept in touch via WhatsApp, they were aware of this and again convinced Lawson to travel to New York on her own, offering her $5,000 compensation for her time, and assuring her that her safety would not be threatened.

457.    Powers again purchased Lawson's plane tickets, and transmitted the flight records to Lawson via email. Lawson arrived in New York and immediately went to the Penthouse.

458.    This time, Rubin requested to meet Lawson at the Viceroy for lunch and drinks. Lawson's worries were initially assuaged due to the time of day, and because of how kind both Powers and Rubin appeared to treat her.

459.    However, this did not last. After lunch, Rubin and Lawson returned to the Penthouse. Rubin brought Lawson into the Dungeon room and tied Lawson to a post and inserted a ball gag into Lawson's mouth. Unlike in August, Rubin bound Lawson's feet, so that Lawson could not move in any way.

460.    Lawson was not expecting this and became frightened. Rubin again began to beat Lawson's breasts, repeatedly punching and slapping Lawson's body. While her first experience with Rubin had not been a positive one, this was quickly becoming more violent.

461.    Rubin then came towards Lawson with a large instrument, causing Lawson fear of imminent harm. Lawson was at first not certain what the device was, but quickly realized that Rubin was holding what appeared to be a cattle prod, which Lawson knew was supposed to be used to shock livestock. Lawson did not consent to being touched or shocked with the cattle prod.

462.    This did not stop Rubin. Rubin repeatedly shocked Lawson with the cattle prod, placing it on the outside and inside of Lawson's vagina before causing it to shock

her. Lawson screamed and though she was gagged, tried to beg Rubin to stop and to untie her.

463.    Rubin refused. The more Lawson screamed, the more Rubin hurt her.

464.    After the cattle prod, Rubin penetrated Lawson repeatedly with a large dildo, and, eventually began to engage in sex with Lawson himself.  Lawson, who was still gagged and crying from the pain she was suffering, did not consent.

465.    After more than an hour, Rubin stopped and left Lawson alone.

466.    Following this incident, Lawson refused to stay in the Penthouse. Lawson left and stayed at a hotel in New York before flying back to Florida the next day.

467.    Powers sent Lawson a PayPal payment of $5,000 from Powers's personal PayPal account.

468.    After Lawson returned to Florida, Rubin continued to harass her. Rubin sent Lawson WhatsApp messages, calling her a "cunt," but continued to try to convince Lawson to return.

469.    Lawson refused and has not seen Rubin since December 2016.

## Lawson's Injuries

470.    As a result of Rubin's abuse and the Enterprise's violations of the TVPA and 18 U.S.C. § 2422, Lawson sustained significant injuries.

471.    Following the August 2016 encounter, Lawson sustained bruising to her face and breasts, and felt intense pain in her left breast.

472.    Following the December 2016 encounter, Lawson's left breast capsulated as a direct result of Rubin's physical abuse. Lawson experienced severe pain in her left breast, which continues to throb today, nine months after the injury was sustained.

473.    Scar tissue has built up in Lawson's breast as a result of the trauma caused by Rubin, such that her breast has become hard.

474.    As a result of the December 2016 encounter, Lawson experienced tears and trauma to her vagina, and was in sever discomfort for weeks following her experience.

475.    Following the December 2016 encounter, Lawson suffered from depression, inability to sleep, and anxiety. After first attempting to self-medicate, Lawson eventually began seeing a doctor who is now treating her with sleeping pills and anti-depressants.

476.    Lawson informed Powers and Rubin of these injuries. Both Powers and Rubin urged Lawson to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Lawson has not yet done so.

477.    As at least Rubin, Powers, and Shon knew, Lawson is a model whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Lawson's body prevented Lawson from working, causing Lawson to sustain economic losses.

478.    Further, the Enterprise caused injury to Lawson's personal property in the form of the prosthetics implanted in her breasts.

## Rubin Comes to Florida and Attempts to Lure Hallman and Caldwell Into Another Encounter – The March Trip

479.    Following these encounters, Rubin and Powers continued to communicate with Hallman, and, on occasion, with Caldwell. Caldwell refused to travel anywhere to see Rubin, despite his urging that he would make her one of his "girlfriends."

480.    But, on or around March 29, 2017, Rubin came to Miami, Florida, and invited Hallman and Caldwell to dinner. Rubin was dining with Wes Edens, a prominent business man and owner of the Milwaukee Bucks in the National Basketball Association ("NBA"). Rubin offered to pay Hallman and Caldwell $500 each if they joined him and Santi for dinner.

481.    Hallman and Caldwell agreed. While they both still feared Rubin, neither had any intention of going anywhere with him beyond dinner, and expected to be safe in the public setting.

482.    At the dinner, Caldwell, who was feeling very emotional and angry at seeing Rubin again, lost control and told him he was a sick person that she never wanted to see him again. Caldwell continued, telling Rubin that he was a bad person and that, if he continued doing what he did to her, Hallman, and Lawson, that he was going to end up killing someone. Rubin did not respond, merely turning to Hallman and telling her to control Caldwell.

483.    The dinner ended shortly thereafter. When Rubin made no move to pay the Plaintiffs, Caldwell asked for her $500.

484.    Rubin was again turned on by the women's fear and anger, said no, and that he would only pay if both Hallman and Caldwell returned to his hotel room with him.

485.    The women refused, and eventually obtained their payments.

486.    Caldwell never saw Rubin again; however, she was still in occasional contact with Powers regarding the installment payments which the Enterprise completed in August of 2017, only after Caldwell requested a copy of the NDA (which the Enterprise never provided), and wrote an apology letter to Rubin at Powers's direction.

### Hallman's Injuries

487.    As a result of Rubin's abuse and the Enterprise's violations of the TVPA and 18 U.S.C. § 2422, Hallman suffered significant injuries.

488.    Following the August encounter, Hallman discovered that Rubin had broken one of her ribs. She experienced extreme pain and difficulty breathing. Hallman told Lawson, who in turn told Powers, who in turn told Rubin that Rubin had broken Hallman's rib.

489.    In August, Rubin beat Hallman's left breast so roughly that he left scar tissue and caused it to harden. This caused not only damage to the appearance of the breast, but has caused and continues to cause Hallman pain.

490.    Despite the fact that both Powers and Rubin knew that Rubin had broken Hallman's rib, the September encounter only exacerbated Hallman's injury, causing further pain to her damaged rib and chest.

491.    Hallman was knocked unconscious by Rubin's punches to the back of her head during at least the August encounter, and sustained head trauma, facial bruising, and headaches following both encounters.

492.    Since August 2016, Hallman has suffered from depression, anxiety, and an inability to sleep. Each of these maladies was exacerbated following the September and October encounters, and each continues to this day.

493.    Because of these physical, mental and emotional injuries, Hallman has been prescribed sleeping pills and anti-anxiety medication, without which she cannot sleep. Hallman is further considering anti-depressants at the request of her doctor, but has not yet decided whether to take the anti-depressants.

494.    Because of the emotional trauma she sustained, Hallman has been unable to do any professional photo shoots since her encounters with Rubin.

495.    Hallman informed Powers and Rubin of these injuries. Both Powers and Rubin urged Hallman to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Hallman has not yet done so.

496.    Once Hallman received criminal defense counsel as a result of the incident during the October trip, paid for by Rubin, she continued to lie regarding what happened out of fear of disclosing to anyone what Rubin had done.

497.    Finally, a few weeks ago, after building up trust over months, she admitted to her criminal defense lawyer Rubin's crimes and the Enterprise's scope.

## Caldwell's Injuries

498.    As a result of Rubin's abuse and the Enterprise's violations of the TVPA and 18 U.S.C. § 2422, Caldwell suffered significant injuries.

499.    Rubin's abuse caused damage to each of Caldwell's breasts, but severe damage to her right breast. As previously described, Rubin's beating caused Caldwell's right breast implant to flip completely around. Caldwell sustained hematomas in her right breast which caused pain and scarring. Caldwell's right areola also sustained damage, such that it became enlarged and disproportionate to her left areola. Caldwell's doctor recommended surgery as the only option to fix the appearance of the right areola, which would require actual cutting of the areola and loss of sensitivity. As a direct result of this injury, Caldwell lost her job and has been unable to return to similar work since.

500.    Rubin's beating also caused Caldwell to sustain bruising to her face and buttocks.

501.    Since her encounter with Rubin, Caldwell has suffered from extreme emotional distress, depression, and anxiety.

502.    Caldwell suffered from suicidal thoughts as a result and has been prescribed medication by her doctor.

503.    Caldwell informed Powers and Rubin of these injuries. Both Powers and Rubin urged Caldwell to get the damage to her breasts repaired. Due to the extensive recovery required, Caldwell has not yet undergone the repair surgery.

504.    As at least Rubin, Powers, and Shon knew, Caldwell is a model, waitress, and dancer whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Caldwell's body prevented Caldwell from working, causing Caldwell to sustain economic losses.

505.    Further, the Enterprise caused injury to Caldwell's personal property in the form of the prosthetics implanted in her breasts.

## The Enterprise Continues to Engage In Misconduct to this Day, and Is Likely To Continue Unless Stopped By the Court

506.    Rubin and the Enterprise continue their misconduct to this day.

507.    Hallman is aware of multiple women who have complained about Rubin's abuse and about Power's misrepresentations inducing them to enter into the arrangement in the first place.

508.    Rubin and Powers have threatened Caldwell, Hallman, and Lawson, warning each of them at different points that something bad could happen to they if they were to expose the Enterprise or reveal it to anyone at any time.

509.    Indeed, Rubin and Powers both told Hallman not to disclose to her own lawyer what had happened.

510.    Moreover, Rubin has told Hallman that she needs to control Caldwell and prevent her from going to the police or to a lawyer.

511.    Because of the criminal charges against her due to the altercation with Zoe Cacciola, Hallman has had continued contact with the Enterprise.

512.    Through Powers and the Doe Company, Rubin offered to pay for Hallman to hire a criminal defense attorney to represent her in connection with the criminal charges. Through Powers and the Doe Company, Rubin has also flown Hallman to New York for each of her court appearances and put her up in the 11 Howard hotel in SoHo.

513.    In exchange, Rubin and Powers requested that Hallman not tell the whole story regarding the October encounter, and continue to keep quiet about Rubin's ownership of the Penthouse, the existence of the Dungeon, and Rubin's misconduct. Rubin and Powers requested that Hallman lie and say that her friend, either Zoe Cacciola or Powers actually owns the Penthouse.

514.    As recently as August 18, 2017, Rubin and Powers attempted to convince Hallman to terminate her criminal attorney and allow Rubin's attorney, Schnur, to represent Hallman in her criminal action.

515.    Schnur agreed to represent Hallman, despite obvious conflicts of interest, and violations of her duties as an attorney.

516.    Rubin and Powers feared that Hallman had revealed the Enterprise's secrets to her criminal attorney, and feared exposure.

517.    Realizing this, and that Rubin and Powers were not acting in her best interest, Hallman ceased communicating with Rubin and Powers.

518.    Powers continued to contact Hallman, attempting to convince her to come meet with her and Rubin.

519.    Powers continues to do this to this day. In fact, when reviewing their WhatsApp messages on which Powers was previously copied, each of the Plaintiffs has

seen that Powers continues to check their WhatsApp conversations nearly daily, monitoring whether Plaintiffs plan to expose the Enterprise.

## The Enterprise Attempts to Cover Up Its Wrongdoing

520.    From the time the criminal prosecution of Hallman commenced, the Enterprise paid for her lawyer—Jeremy Saland—and refused to pay additional fees if the matter proceeded to trial because Hallman began speaking with counsel in this case. At the time Hallman retained Saland, Saland was unaware of the Enterprise, its scheme, or its members.

521.    The Enterprise would only pay for Saland so long as Hallman agreed not to mention in the criminal trial anything about Rubin or the other members of the Enterprise.

522.    On August 16, 2017, Hallman sent an email to Saland, drafted by Schnur, authorizing Saland "express permission to share any and all information in regards to [Hallman's] case with Ms. Schnur." Shortly after receiving this email, Saland spoke with Hallman who told him that the Enterprise had flown Hallman into New York to meet with Rubin, Schnur, and Powers. Further, the Enterprise sought to pay Hallman $80,000 to sign a retainer with Schnur and a confidentiality agreement so that Hallman would refrain from disclosing anything about Rubin and the Enterprise. Saland was unaware of any of these communications or the planned meeting despite Rubin's, Schnur's, and Powers's knowledge that Saland was Hallman's counsel.

523.    Upon learning of this planned meeting between Hallman, Rubin, Schnur, and Powers, Saland contacted Schnur with the permission of Hallman and advised

Schnur both through a text message and on the phone that she, or any member of the Enterprise directly, through third parties or otherwise, could not communicate with Hallman. Saland reasserted that he remained Hallman's counsel. Saland explained to Schnur that despite Schnur's contention that her interest was to protect Hallman, Schnur in fact had an ethical conflict in that Schnur sought to solely protect the interests of Rubin.

524.    Throughout the evening of August 16, 2017, Powers repeatedly called and texted Hallman, attempting to convince Hallman to meet on the evening of August 16, 2017, as planned, despite Saland's specific instructions to Schnur that neither she nor any third party should communicate with Hallman. In one communication, Powers made a veiled threat to Hallman stating, "I'm not sure who's going to fund what you're doing with [Saland]."

525.    The following day, Powers texted Hallman, "We've always taken care of you [because] we completely understand . . . we want to help you, we need to meet[.]"

526.    Later that month, Powers texted Hallman and Caldwell, that both Hallman and Caldwell were "plain rude and ungrateful by deliberately not answering [Powers's] phone calls or returning [Powers's] messages." Powers claimed that she only had the best interests of Hallman and Caldwell in mind. However, they should "keep in mind that both [Hallman and Caldwell] violated the [Non-Disclosure] agreement."

527.    Concerned that the Enterprise had lost control of and access to Hallman, Powers, on behalf of the Enterprise, again communicated with Hallman advising in

substance that "although the Enterprise paid the initial fee for Saland, [Hallman] can still call [Powers] if a final bill is presented."

528.   In fact, when the underlying events took place at the Penthouse that resulted in the current criminal prosecution of Hallman, Powers told Hallman to lie to the police and tell them that the Penthouse was either Hallman's or Zoe Cacciola's in an effort to keep Rubin and the rest of the Enterprise out of the news.

529.   When the Enterprise became concerned with Hallman and her criminal counsel, it offered to either substitute Schnur, a member of the Enterprise and an attorney, or stop paying for Hallman's attorney.

530.   On September 19, 2017, counsel for Plaintiffs contacted Schnur, an attorney for Rubin, as well as a Defendant in this action, to notify her of the impending lawsuit.

531.   While Schnur refused to discuss the matter and has been stalling for Defendants at Rubin's direction, other members of the conspiracy have attempted to intimidate Plaintiffs, interfere with their relationship with counsel, and have even attempted to obtain illegal access to Plaintiffs' computer systems.

532.   Since that time, multiple individuals associated with Rubin and the Enterprise have reached out to Plaintiffs at the direction of Rubin and the Enterprise, in an attempt to convince them not to file suit.

533.   In fact, as recently as February 7, 2018, Rubin and Powers were still attempting to contact the women. On that date, Powers messaged Plaintiff Speight over WhatsApp, writing "where are you little mama." Upon information and belief, Powers

was either trying again to recruit Speight to travel to New York for Rubin, or, in the alternative, was further attempting to cover up the Enterprise's crimes by ensuring that Speight, who had not yet joined this lawsuit, was not going to come forward against Rubin.

### Attempted Hacking of Plaintiffs' Accounts

534.   In order to cover up their crimes and further interfere with Plaintiffs' ability to seek relief for the injury caused by Rubin and his associates, the Enterprise has accessed at least four of the seven Plaintiffs' and Plaintiffs' families' Apple, Facebook, and Google accounts, changing the passwords and billing information in an attempt to interfere with evidence saved under Plaintiffs' accounts.

535.   In some cases, Defendants have even deleted images documenting Plaintiffs' injuries from Plaintiffs' accounts.

536.   On information and belief, an individual or group of individuals, at the direction of Rubin and Powers, are either known members of the Enterprise, unknown additional members of the Enterprise, or are working on behalf of members of the Enterprise.

537.   This illegal interference with Plaintiffs' accounts occurred only after Defendants and Defendants' counsel were contacted regarding this matter and notifying them of the impending lawsuit, and were designed to cover up the crimes of the Enterprise, to gather information regarding Plaintiffs' claims, intimidate and tamper with Plaintiffs, and convince Plaintiffs not to bring suit.

538.    Such hacking has occurred on multiple occasions to at least four of the

seven Plaintiffs:

- Doe, at the direction of Powers and Rubin, hacked into Hallman's Apple account on October 5, 2017 and October 8, 2017. Doe changed Hallman's password and Apple ID, locking Hallman out of her Apple account. After she contacted Apple for assistance, Apple informed Hallman that Doe accessed Hallman's Apple account from an iPad. Hallman does not own an iPad;

- Doe, at the direction of Powers and Rubin, hacked into Caldwell's Facebook account on October 8, 2017. Doe changed Caldwell's password, locking Caldwell out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Hallman's Facebook account on October 10, 2017. Hallman's Facebook account was accessed from two separate IP addresses in Fort Lauderdale, Florida, neither of which was associated with any device owned by Hallman;

- Doe, at the direction of Powers and Rubin, hacked into a Google account belonging to Hallman's brother—who was known to both Powers and Rubin—on October 10, 2017. Hallman's brother's account was accessed from an IP address located in North Tonawanda, New York;

- Doe, at the direction of Powers and Rubin, hacked into Fuller's Apple account on or around December 16, 2017. Doe changed Fuller's password and Apple ID, locking Fuller out of her Apple account, and first shared all of the images stored under Fuller's Apple ID—which Fuller had always maintained as "private"—and then deleted all of the images stored under Fuller's Apple ID;

- Doe, at the direction of Powers and Rubin, hacked into Fuller's Facebook account on or around December 16, 2017. Doe changed Fuller's password, locking Fuller out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Fuller's Google account on or around December 16, 2017. Doe changed Fuller's password, locking Fuller out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Peterson's Facebook and Instagram accounts on or around February 5, 2018. Doe changed Peterson's passwords, locking Peterson out of her social media accounts;

- Doe, at the direction of Powers and Rubin, hacked into Peterson's Apple account on or around February 8, 2018. Doe changed Peterson's password and Apple ID, locking Peterson out of her Apple account, and deleted several photographs relating to Peterson's interactions with Rubin. Doe accessed Peterson's Apple account through an IP address located in New York, New York; and

- Doe, at the direction of Powers and Rubin, hacked into Peterson's Google account on or around February 8, 2018. Doe changed Peterson's password, locking Peterson out of her Gmail account, and deleted several emails and attachments regarding Peterson's interactions with Rubin.

539.    Powers and Rubin knew these accounts belonged to Plaintiffs Hallman, Caldwell, Fuller, and Peterson. Not only had Powers and Rubin previously contacted Plaintiffs through several of these accounts, but such accounts were easily determined by plugging in variations of Plaintiffs' true names.

540.    Such hacking by Doe, under the direction of Rubin and Powers, involved interstate wires and affected interstate commerce by accessing Plaintiffs' billing information, communications, and personal records.

541.    Defendants have sought to intimidate Plaintiffs, interfere with their attorney-client relationships, tamper with witnesses in the eventual lawsuit against them, and illegally obtain access to Plaintiffs' computer records in a bald-faced attempt to destroy evidence and to discover information regarding Plaintiffs' case.

## RACKETEERING PREDICATE ACTS BY EACH DEFENDANT

### Rubin Engaged in Two or More Predicate Acts, Constituting a Pattern of Racketeering Activity

542.    From at least 2010 until the present, but likely for much longer, Rubin has engaged in a pattern of racketeering activity as defined under 18 U.S.C. § 1961(1) on at least 58 separate occasions.

543.    These predicate acts include the following:

a.  Violation of 18 U.S.C. § 2422: On at least three separate occasions in 2010, Rubin knowingly persuaded, induced, and enticed Plaintiff Hathaway to travel from Las Vegas, Nevada, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

b.  Violation of 18 U.S.C. § 2422: On multiple occasions from 2011-2014, Rubin knowingly persuaded, induced, and enticed Plaintiff Hathaway to travel from Las Vegas, Nevada, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. In or around 2014, Rubin persuaded Hathaway to quit her job so that she could be available to travel to New York once a month to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. In exchange, Rubin paid Hathaway approximately $5,000 a month.

c.  Witness Tampering: In mid-2011, Rubin directed Powers to bring Hathaway to his newly rented Penthouse for the first time. Once at the Penthouse, under Rubin's direction, Powers presented Hathaway with an NDA and persuaded Hathaway to sign. Rubin required Hathaway to sign the NDA in part for the purpose of hindering, delaying, and preventing Hathaway from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

d.  Violation of 18 U.S.C. § 2422: Beginning in 2015 through June 2017, Rubin knowingly persuaded, induced, and enticed Plaintiff Hathaway to travel from Chicago, Illinois, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

e. <u>Violation of the TVPA</u>: Beginning in 2015 through June 2017, Rubin transported and solicited Hathaway, who lived in Chicago, Illinois, to travel to New York, New York knowing that he would use means of force, threats of force, and coercion to cause Hathaway to engage in commercial sex acts. Rubin began ignoring Hathaway's pleas to "stop" and forced her to engage in sexual intercourse and other sexual activity without her consent. On several occasions, Rubin went so far as to drug Hathaway, rendering her unconscious, before sexually assaulting her.

f. <u>Dealing in a Controlled Substance</u>: On one occasion in or around 2016, Rubin drugged Plaintiff Hathaway, who had been enjoying wine and cheese in the Penthouse living room with Rubin, by placing an unidentified narcotic in Hathaway's wine without Hathaway's knowledge or consent while Hathaway. Rubin's conduct rendered Hathaway unconscious, at which point Rubin forcibly engaged in sexual intercourse and other sexual activity with Hathaway. Hathaway later woke up in a bedroom in the Penthouse with no recollection of how she got there.

g. <u>Dealing in a Controlled Substance</u>: On at least one other occasion in or around 2016, Rubin drugged Plaintiff Hathaway by placing an unidentified narcotic in Hathaway's drink without Hathaway's knowledge or consent. Rubin's conduct rendered Hathaway unconscious, at which point Rubin moved Hathaway to his Dungeon and proceeded to sexually assault Hathaway. Hathaway woke up in the Dungeon with no recollection of how she arrived there.

h. <u>Violation of 18 U.S.C. § 2422</u>: In May or June of 2011, Rubin knowingly persuaded, induced, and enticed Plaintiff Peterson to travel from Los Angeles, California, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate represent to Peterson that he was only interested in taking fetish-style photos of Peterson, and that Peterson would possibly experience some bruising from the restraint. While Peterson engaged in no sexual activity with Rubin on this occasion, Rubin made his intent clear.

i. <u>Violation of the TVPA</u>: In May or June of 2011, Rubin transported and solicited Peterson, who lived in Los Angeles, California, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Peterson to engage in commercial sex acts. Rubin eventually drugged Peterson so that she was past the point of being able to consent.

j.  <u>Dealing in a Controlled Substance</u>: In May or June of 2011, Rubin provided Peterson with what turned out to be a Schedule II narcotic, oxycodone, and persuaded Peterson to take the drug without identifying what it was. Peterson had never before taken oxycodone, and quickly became intoxicated.

k.  <u>Dealing in a Controlled Substance</u>: In 2015 or 2016, Rubin brought Peterson back to the Penthouse. Rubin again provided Peterson with a Schedule II narcotic, oxycodone. This was the first time Rubin brought Peterson back to the Dungeon, and the first time that he sexually assaulted her. Following the assault, Rubin had Peterson take additional oxycodone, telling her it would help with the pain.

l.  <u>Dealing in a Controlled Substance</u>: Following the Peterson's first experience with the Dungeon, Rubin continued to provide Peterson with oxycodone on a regular basis, causing Peterson to become dependent on the drug and on Rubin.

m.  <u>Witness Tampering</u>: In the summer of 2017, Rubin required Peterson to sign an NDA. Rubin required Peterson to sign the NDA in part for the purpose of hindering, delaying, and preventing Peterson from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

n.  <u>Violation of 18 U.S.C. § 2422</u>: On or around March 11, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Fuller to travel from Miami, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

o.  <u>Violation of the TVPA</u>: On or around March 11, 2016, Rubin transported and solicited Fuller, who lived in Miami, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Fuller to engage in commercial sex acts. Rubin ignored Fuller's pleas to "stop" and used means of force to cause Fuller engage in commercial sex acts.

p.  <u>Dealing in a Controlled Substance</u>: On or around March 11, 2016, after bringing her to the Penthouse, Rubin provided Fuller with a Schedule II substance, cocaine.

q.  <u>Witness Tampering</u>: On or around March 11, 2016, Rubin required Fuller to sign an NDA. Rubin required Fuller to sign the NDA in part for the purpose of hindering, delaying, and preventing Fuller from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

r.  <u>Violation of 18 U.S.C. § 2422</u>: On or around March 24, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Speight to travel from Atlanta, Georgia, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon, convince Speight to fly to New York, and had his other associate, Powers, purchase Speight's airfare and arrange for the travel.

s.  <u>Witness Tampering</u>: On or around March 24, 2016, under Rubin's direction, Powers met with Speight at the Penthouse and presented Speight with an NDA and persuaded her to sign. Rubin required Speight to sign the NDA in part for the purpose of hindering, delaying, and preventing Speight from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

t.  <u>Violation of 18 U.S.C. § 2422</u>: One month later, in late April 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Speight to travel from Atlanta, Georgia, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Rubin again had Powers purchase Speight's airfare and arrange for her travel.

u.  <u>Violation of the TVPA</u>: In late April 2016, Rubin transported and solicited Speight, who lived in Atlanta, Georgia, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Speight to engage in commercial sex acts. After forcing Speight to drink to the point of unconsciousness, Rubin did in fact use force to cause Speight to engage in commercial sex acts.

v.  <u>Violation of 18 U.S.C. § 2422</u>: Once a month over the next five months, from May through September 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Speight to travel from Atlanta, Georgia, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Rubin again had Powers purchase Speight's airfare and arrange for her travel.

w. <u>Violation of the TVPA</u>: Once a month over the next five months, from May through September 2016, Rubin transported and solicited Speight, who lived in Atlanta, Georgia, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Speight to engage in commercial sex acts. On each of these occasions, Rubin if fact used means of force—including physical violence and drugs—to cause Speight to engage in commercial sex acts. Rubin further used means of coercion to cause Speight to engage in commercial sex acts when he used information provided to him by Shon about Speight's past to convince Speight to continue returning to him.

x. <u>Dealing in a Controlled Substance</u>: On at least one occasion between April and September 2016, Rubin provided unidentified pills to Speight, telling Speight that the pills would calm her down. Upon information and believe, these pills were the Schedule II narcotic, oxycodone.

y. <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon (who referred to Rubin as her "boss") attempt to convince Hallman to fly to New York, and had his other associate, Powers, purchase Hallman's airfare and arrange for the travel.

z. <u>Violation of the TVPA</u>: On or around August 23, 2016, Rubin transported and solicited Hallman who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Ignoring Hallman's protests, Rubin did in fact force Hallman to engage in commercial sex acts.

aa. <u>Dealing in a Controlled Substance</u>: On or around August 23, 2016, Rubin slipped an unidentified pill into Hallman's drink without Hallman's knowledge, causing Hallman to feel excessively intoxicated. Upon information and believe, this pill was the Schedule II narcotic, oxycodone.

bb. <u>Witness Tampering</u>: On or around August 23, 2016, under Rubin's direction, Powers met with Hallman at the Penthouse, provided Hallman with cocktails, and then presented Hallman with an NDA and persuaded her to sign. Rubin required Hallman to sign the NDA in part for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

cc. <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Lawson to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon, attempt to convince Lawson to fly to New York, and had his other associate, Powers, purchase Lawson's airfare and arrange for the travel.

dd. <u>Violation of the TVPA</u>: On or around August 23, 2016, Rubin transported and solicited Lawson who lived in Daytona Beach, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Lawson to engage in commercial sex acts. Ignoring Lawson's protests, Rubin did in fact force Lawson to engage in commercial sex acts.

ee. <u>Dealing in a Controlled Substance</u>: On or around August 23, 2016, Rubin slipped an unidentified pill into Lawson's drink without Lawson's knowledge, causing Lawson to feel excessively intoxicated. Upon information and believe, this pill was the Schedule II narcotic, oxycodone.

ff. <u>Witness Tampering</u>: On or around August 23, 2016, under Rubin's direction, Powers met with Lawson at the Penthouse, provided Lawson cocktails, and then presented Lawson with an NDA and persuaded her to sign. Rubin required Lawson to sign the NDA in part for the purpose of hindering, delaying, and preventing Speight from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

gg. <u>Violation of 18 U.S.C. § 2422</u>: In September 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Caldwell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Powers, purchase Caldwell's airfare and arrange for the travel.

hh. <u>Violation of the TVPA</u>: In September 2016, Rubin transported and solicited Caldwell who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Caldwell to engage in commercial sex acts. While Rubin grew frustrated with Caldwell and did not cause her to engage in commercial sex acts on this occasion, this was his intent.

ii. <u>Witness Tampering</u>: In September 2016, under Rubin's direction, Powers met with Caldwell at the Penthouse and presented Caldwell with an NDA and

persuaded her to sign. Rubin required Caldwell to sign the NDA in part for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

jj.  <u>Violation of 18 U.S.C. § 2422</u>: On or around September 24, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiffs Caldwell and Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Powers, purchase Caldwell's and Hallman's airfare and arrange for the travel.

kk. <u>Violation of the TVPA</u>: In September 2016, Rubin transported and solicited Caldwell and Hallman who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Caldwell and Hallman to engage in commercial sex acts. Rubin did in fact use force and threats of force to cause Caldwell and Hallman to engage in commercial sex acts.

ll.  <u>Witness Tampering</u>: On or around October 4, 2016, under Rubin's direction and using documents drafted by Defendant Schnur, Powers flew Caldwell to New York and met with her at the Penthouse. Rubin required that Caldwell sign an agreement—without providing Caldwell the opportunity to thoroughly review the agreement, let alone consult with counsel or another advisor—for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

mm.    <u>Obstruction of Criminal Investigations</u>: On or around October 4, 2016, Rubin agreed to pay—and later paid—Plaintiff Caldwell $20,000 in part to prevent Caldwell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA.

nn. <u>Violation of 18 U.S.C. § 2422</u>: In or around October 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so.

oo. <u>Violation of the TVPA</u>: In or around October 2016, Rubin again transported and solicited Hallman who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Ignoring Hallman's protests, Rubin did in fact force Hallman to engage in commercial sex acts. While Hallman became so sick with her anxiety over encountering Rubin again that she had to be hospitalized and did not engage in any commercial sex acts, such was Rubin's intent.

pp. <u>Witness Tampering</u>: In or around October 2016, Rubin had Powers instruct Hallman to lie to the police regarding who owned or rented the Penthouse and for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. Because Hallman feared Rubin, she did as she was told.

qq. <u>Violation of 18 U.S.C. § 2422</u>: In or around December 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Lawson to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Powers again purchased Lawson's airfare and arranged for the travel.

rr. <u>Violation of the TVPA</u>: In or around December 2016, Rubin transported and solicited Lawson who lived in Daytona Beach, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Lawson to engage in commercial sex acts. Ignoring Lawson's protests, Rubin did in fact force Lawson to engage in commercial sex acts.

ss. <u>Witness Tampering</u>: On around August 18, 2017, Rubin told Hallman not to disclose to her own lawyer what had occurred at Rubin's Penthouse or what had actually occurred with her interactions with Cacciola. Powers did so for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

tt. <u>Obstruction of Criminal Investigations</u>: On or around August 18, 2017, Rubin paid Hallman's legal bills in order to prevent Hallman from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA.

uu. <u>Witness Tampering</u>: On October 5, 2017 Powers and Rubin directed Doe to hack into Hallman's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

vv. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Hallman's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ww. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Caldwell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

xx. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Hallman's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

yy. <u>Witness Tampering</u>: On or around December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

zz. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

aaa.    <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

bbb.    <u>Witness Tampering</u>: On or around February 5, 2018, Powers and Rubin directed Doe to hack into Peterson's Facebook and Instagram accounts for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ccc.    <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Peterson's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ddd.    <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Peterson's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

eee.    Violation of 18 U.S.C. § 2422: As recently as February 7, 2018, Rubin knowingly attempted to persuade, induce, entice, or coerce Plaintiff Speight to travel from Atlanta, Georgia to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Speight refused to respond.

fff.    Violation of the TVPA: As recently as February 7, 2018, Rubin recruited, enticed, and solicited Speight, who lives in Atlanta, Georgia, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts.

### Powers Engaged in Two or More Predicate Acts, Constituting a Pattern of Racketeering Activity

544.    From at least 2011 until the present, Powers has engaged in a pattern of racketeering activity as defined under 18 U.S.C. § 1961(1) on at least 42 separate occasions.

545.    These predicate acts include the following:

a.    Witness Tampering: In mid-2011, Powers brought Hathaway to Rubin's newly rented Penthouse for the first time. Once at the Penthouse, Powers presented Hathaway with an NDA and persuaded Hathaway to sign. Powers had Hathaway sign the NDA in part for the purpose of hindering, delaying, and preventing Hathaway from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

b.    Violation of the TVPA: Beginning in 2015 through June 2017, Powers transported and maintained Hathaway for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Hathaway to engage in commercial sex acts. Additionally, by providing the means through which Rubin paid Hathaway and because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hathaway. Powers had actual knowledge of Rubin's use of force as she would meet with Hathaway after her encounters with Rubin and even provided Hathaway with special cream to treat the appearance of Hathaway's injuries.

c. <u>Violation of the TVPA</u>: In early March 2016, Powers paid Fuller, on Rubin's behalf, via PayPal. By doing so, Powers maintained Fuller for Rubin knowing—or acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, and coercion to cause Fuller to engage in commercial sex acts. Additionally, by providing the means through which Rubin paid Fuller and because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Fuller.

d. <u>Violation of the TVPA</u>: On or around March 24, 2016, Powers transported and maintained Speight for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Speight to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Speight.

e. <u>Witness Tampering</u>: In or around March 2016, Powers met with Speight at the Penthouse and presented Speight with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Speight from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

f. <u>Violation of the TVPA</u>: On or around March 24, 2016, Powers transported and maintained Speight for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Speight to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Speight.

g. <u>Violation of the TVPA</u>: Once a month over the next five months, from May through September 2016, Powers transported and maintained Speight for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Speight to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Speight.

h.  <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Powers lied to Hallman, telling her that Rubin was "a great guy" and that he would not do anything to make Hallman feel uncomfortable.

i.  <u>Violation of the TVPA</u>: On or around August 23, 2016, Powers recruited, enticed, transported, maintained, and solicited Hallman, who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hallman.

j.  <u>Wire fraud</u>: On or around August 23, 2016, through text messages, phone calls, and emails, Powers made representations to Hallman regarding Rubin, stating that he was "a great guy" and that he would not do anything to make Hallman feel uncomfortable. These representations, which induced Hallman to travel to New York to meet with Rubin were false. Powers was paid by the Enterprise for making these misrepresentations.

k.  <u>Witness Tampering</u>: On or around August 23, 2016, Powers met with Hallman at the Penthouse, provided Hallman with cocktails, and then presented Hallman with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts the Enterprise's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

l.  <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Lawson to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Powers lied to Lawson, noting that the trip would not be about sex, in order to induce her to come to New York.

m. <u>Violation of the TVPA</u>: On or around August 23, 2016, Powers recruited, enticed, transported, maintained, and solicited Lawson who lived in Daytona Beach, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lawson to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Lawson.

n. <u>Wire fraud</u>: On or around August 23, 2016, through text messages, phone calls, and emails, Powers made representations to Lawson regarding Rubin, stating that the trip was not about sexual intercourse. These representations, which induced Lawson to travel to New York to meet with Rubin were false. Powers was paid by the Enterprise for making these misrepresentations.

o. <u>Witness Tampering</u>: On or around August 23, 2016, Powers met with Lawson at the Penthouse, provided Hallman with cocktails, and then presented Lawson with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Lawson from communicating to law enforcement officers and courts the Enterprise's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

p. <u>Violation of 18 U.S.C. § 2422</u>: In September 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Caldwell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

q. <u>Violation of the TVPA</u>: In September 2016, Powers recruited, enticed, transported, maintained, and solicited Caldwell who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Caldwell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Caldwell.

r. <u>Wire fraud</u>: In September 2016, through text messages, phone calls, and emails, Powers made representations to Caldwell regarding Rubin. These representations, which induced Hallman to travel to New York to meet with Rubin, were false. Powers was paid by the Enterprise for making these misrepresentations.

s.  <u>Witness Tampering</u>: In September 2016, Powers met with Caldwell at the Penthouse and presented Caldwell with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Caldwell from communicating to law enforcement officers and courts the Enterprise's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

t.  <u>Violation of 18 U.S.C. § 2422</u>: On or around September 24, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Caldwell and Plaintiff Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

u.  <u>Violation of the TVPA</u>: On or around September 24, 2016, Powers recruited, enticed, transported, maintained, and solicited Caldwell and Hallman who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Caldwell and Hallman to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Caldwell and Hallman.

v.  <u>Witness Tampering</u>: On or around October 4, 2016, under Rubin's direction and using documents drafted by Defendant Schnur, Powers flew Caldwell to New York and met with her at the Penthouse. Rubin required that Caldwell sign an agreement—without providing Caldwell the opportunity to thoroughly review the agreement, let alone consult with counsel or another advisor—for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

w.  <u>Obstruction of Criminal Investigations</u>: On or around October 4, 2016, Powers assisted Rubin when he agreed to pay—and later paid—Plaintiff Caldwell $20,000 in part to prevent Caldwell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA. Powers made each payment to Caldwell through her personal PayPal account.

x. <u>Violation of 18 U.S.C. § 2422</u>: In or around October 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Hallman to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

y. <u>Violation of the TVPA</u>: In or around October 2016, Powers recruited, enticed, transported, maintained, and solicited Hallman who lived in Fort Lauderdale, Florida, to travel to New York, New York knowing that Rubin would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hallman.

z. <u>Witness Tampering</u>: In or around October 2016, Powers instructed Hallman to lie to the police regarding who owned or rented the Penthouse and for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. Because Hallman feared Rubin, she did as she was told.

aa. <u>Violation of 18 U.S.C. § 2422</u>: In or around December 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Lawson to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

bb. <u>Violation of the TVPA</u>: In or around December 2016, Powers recruited, enticed, transported, maintained, and solicited Lawson who lived in Daytona Beach, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Lawson.

cc. <u>Witness Tampering</u>: On around August 18, 2017, Powers told Hallman not to disclose to her own lawyer what occurred at Rubin's Penthouse or what had actually occurred with her interactions with Cacciola. Powers did so for the purpose of hindering, delaying, and preventing Hallman from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

dd. <u>Obstruction of Criminal Investigations</u>: On or around August 18, 2017, Powers facilitated Rubin's payment of Hallman's legal bills in order to prevent Hallman from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA. When Hallman expressed reservations with going along with Powers's and Rubin's plan, Powers threatened Hallman.

ee. <u>Witness Tampering</u>: On October 5, 2017, Powers and Rubin directed Doe to hack into Hallman's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ff. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Hallman's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

gg. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Caldwell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

hh. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Hallman's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ii. <u>Witness Tampering</u>: On or around December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

jj. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

kk. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Fuller's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ll. <u>Witness Tampering</u>: On or around February 5, 2018, Powers and Rubin directed Doe to hack into Peterson's Facebook and Instagram accounts for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

mm.     <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Peterson's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

nn. <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Peterson's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Enterprise's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

oo. <u>Violation of 18 U.S.C. § 2422</u>: As recently as February 7, 2018, at Rubin's direction, Powers knowingly attempted to persuade, induce, entice, or coerce Plaintiff Speight to travel from Atlanta, Georgia to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Speight refused to respond.

pp. <u>Violation of the TVPA</u>: As recently as February 7, 2018, Powers recruited, enticed, and solicited Speight, who lives in Atlanta, Georgia, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Hallman to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Speight.

<u>**Shon Engaged in Two or More Predicate Acts,
Constituting a Pattern of Racketeering Activity**</u>

546.     From, at the latest, March 2016, until the present, Shon has engaged in a pattern of racketeering under 18 U.S.C. § 1961(1) on at least 13 separate occasions.

547.     These predicate acts include the following:

a. <u>Violation of 18 U.S.C. § 2422</u>: On or around March 24, 2016, Shon persuaded, induced, and enticed Speight to travel from Atlanta, Georgia, to New York, New York to engage in sexual activity for which Speight could have been charged with a criminal offense.

b. <u>Violation of the TVPA</u>: On or around March 24, 2016, Shon recruited Speight, who lived in Atlanta, Georgia, to travel to New York to meet with Rubin knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Speight to engage in a commercial sex act.

c. <u>Violation of the TVPA</u>: On or around March 24, 2016, Shon was paid by the Enterprise for recruiting Speight. Shon thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff Speight knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Speight to engage in a commercial sex act.

d. <u>Wire fraud</u>: Shortly before March 24, 2016, through text messages and emails, Shon introduced Plaintiff Speight to Rubin. Shon represented to Speight that Rubin was a nice man who was simply looking to spend time with and potentially date a model, like Speight. These representations, which induced Speight to travel to New York to meet with Rubin, were false. Shon was paid by the Enterprise for making these misrepresentations.

e. <u>Violation of the TVPA</u>: On or around August 23, 2016, Shon recruited Hallman, who lived in Fort Lauderdale, Florida, to travel to New York to meet with Rubin knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Hallman to engage in a commercial sex act.

f. <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Shon persuaded, induced, and enticed Hallman to travel from Fort Lauderdale, Florida to New York, New York to engage in sexual activity for which Hallman could have been charged with a criminal offense.

g. <u>Violation of the TVPA</u>: On or around August 23, 2016, Shon was paid by the Enterprise for recruiting Hallman. Shon thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff Hallman knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Hallman to engage in a commercial sex act.

h. <u>Wire fraud</u>: On or around August 23, 2016, through Instagram direct messaging, Shon made representations to Plaintiff Hallman regarding Rubin that were false. These representations included that Rubin loved simply spending time with playboy models, and was ultimately a good guy. Hallman relied on these representations to eventually decide to travel to New York to meet with Rubin. Shon was paid by the Enterprise for making these misrepresentations.

i. <u>Violation of the TVPA</u>: On or around August 23, 2016, Shon recruited Lawson, who lived in Daytona Beach, Florida to travel to New York to meet with Rubin knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Lawson to engage in a commercial sex act.

j. <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Shon persuaded, induced, and enticed Lawson to travel from Daytona Beach, Florida to New York, New York to engage in sexual activity for which Lawson could have been charged with a criminal offense.

k. <u>Violation of the TVPA</u>: On or around August 23, 2016, Shon was paid by the Enterprise for recruiting Lawson. Shon thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff Lawson knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Lawson to engage in a commercial sex act.

l. <u>Wire fraud</u>: On or around August 23, 2016, through Instagram direct messaging and in a phone call, Shon made representations to Plaintiff Lawson regarding Rubin that were false. These representations included that Rubin was not threatening and simply enjoyed spending time with and taking care of beautiful women. Lawson relied on these representations to eventually decide to travel to New York to meet with Rubin. Shon was paid by the Enterprise for making these misrepresentations.

m. <u>Violation of the TVPA</u>: In early September 2016, Shon was paid by the Enterprise for having dinner with Rubin and Plaintiff Caldwell, and for spending time with Caldwell to calm her down before meeting with Rubin. Shon thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff Caldwell knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Caldwell to engage in a commercial sex act.

**Schnur Engaged in Two or More Predicate Acts
Constituting a Pattern of Racketeering Activity**

548.    From February 2011, until the present, Schnur has engaged in a pattern of

racketeering under 18 U.S.C. § 1961(1) on at least 6 separate occasions.

549.    These predicate acts include the following:

a.    <u>Witness Tampering</u>: Beginning in at least 2015 if not earlier, Schnur created a stock non-disclosure agreement at Rubin's direction. Schnur did not simply create a legal document for Rubin, but, instead, knew this non-disclosure agreement would be used to hinder, delay, or prevent women from communicating to law enforcement officers and courts Rubin's possible commission of multiple Federal offenses. Specifically, Schnur knew that, along with his associates, Rubin intended to bring women to New York to engage in commercial sex acts in violation. Schnur also knew that Rubin would use force or threats of force to coerce the women to engage in these acts as Schnur was a part of the eventual cover up.

b.    <u>Violation of the TVPA</u>: At the same time, Schnur was paid by the Enterprise for creating the stock non-disclosure agreement at Rubin's direction. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiffs knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs to engage in commercial sex acts.

c.    <u>Witness Tampering</u>: On or around October 4, 2016, Schnur drafted an unenforceable General Release Agreement between Rubin and Caldwell for the purpose of hindering, delaying, and preventing Caldwell from communicating to law enforcement officers and courts Rubin's actual commission of Federal offenses, including, without limitation using force to coerce Caldwell and Hallman to engage in commercial sex acts.

d.    <u>Violation of the TVPA</u>: On or around October 4, 2016, Schnur was paid by the Enterprise for creating the General Release Agreement between Rubin and Caldwell. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Caldwell and Hallman knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, fraud, and coercion to cause Caldwell and Hallman to engage in commercial sex acts.

e. <u>Witness Tampering</u>: On or around August 16, 2017, Schnur, with Powers and Rubin, attempted to persuade Plaintiff Hallman to hire Schnur to represent her in a criminal action in New York Supreme Court when Hallman was already represented by defense counsel, Jeremy Saland. Schnur drafted an email for Hallman to send to her counsel, Saland, which directed Saland how to proceed and raised the possible termination of Saland. Despite the obvious conflict of interest, Schnur's purpose in engaging in this conduct was to protect Rubin and his associates by preventing Hallman from revealing Rubin and his associates' commission of multiple Federal offenses to Saland and to any law enforcement officers.

f. <u>Violation of the TVPA</u>: On or around August 16, 2017, Schnur was paid by the Enterprise for her interference in Hallman's legal representation. Schnur thus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiff Hallman knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, fraud, and coercion to cause Hallman to engage in commercial sex acts.

### Blue Icarus Engaged in Two or More Predicate Acts <br> Constituting a Pattern of Racketeering Activity

550.    From February 2011 until September 2017, Blue Icarus has engaged in a

pattern of racketeering under 18 U.S.C. § 1961(1) on at least 76 separate occasions.

551.    These predicate acts include:

a. <u>Violation of the TVPA</u>: At various points from March 2016 to September 2016, Blue Icarus harbored Plaintiff Speight, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Speight to engage in a commercial sex act.

b. <u>Violation of the TVPA</u>: At various points from 2011 to June 2017, Blue Icarus harbored Plaintiff Hathaway, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Hathaway to engage in a commercial sex act.

c. <u>Violation of the TVPA</u>: At various points from 2011 to the summer of 2017, Blue Icarus harbored Plaintiff Peterson, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Peterson to engage in a commercial sex act.

d. <u>Violation of the TVPA</u>: In early March 2016, Blue Icarus harbored Plaintiff Fuller, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Fuller to engage in a commercial sex act.

e. <u>Violation of the TVPA</u>: In August, September, and October 2016, Blue Icarus harbored Plaintiff Hallman, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Hallman to engage in a commercial sex act.

f. <u>Violation of the TVPA</u>: In August and December 2016, Blue Icarus harbored Plaintiff Lawson, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Lawson to engage in a commercial sex act.

g. <u>Violation of the TVPA</u>: In September and October 2016, Blue Icarus harbored Plaintiff Caldwell, knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Lawson to engage in a commercial sex act.

h. <u>Violation of the TVPA</u>: From February, 2011, until September, 2017, the Enterprise paid Blue Icarus $18,000 in monthly rent. Rubin paid the first year's rent up front, and then, upon information and belief, paid rent on a monthly basis. Thus, on at least 55 separate occasions, Blue Icarus benefitted financially from participating in a venture that recruited, enticed, harbored, transported, and solicited Plaintiffs knowing—or at a minimum, acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause women to engage in a commercial sex acts.

**<u>FIRST CAUSE OF ACTION: ALL PLAINTIFFS</u>**
**<u>(Violation of Racketeer Influenced and Corrupt Organizations Act,</u>**
**<u>18 U.S.C. § 1962(c)</u>**
**("Pattern of Racketeering") - All Defendants)**

552.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

553.    All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) to the detriment of Plaintiffs.

554.    At all times relevant to these allegations, all Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

555.    Defendants came together to form an association in fact enterprise.

556.    At all times relevant to the above allegations, the Enterprise had a legitimate non-criminal purpose: to bring women to New York to provide companionship and entertainment for Defendant Rubin.

557.    However, this legitimate purpose was subverted by the Enterprise's illegal acts and violations of federal laws, as detailed below.

558.    Moreover, members of the Enterprise repeatedly lied to Plaintiffs in WhatsApp messages, other written communication, and in verbal communications in order to induce them into the four encounters.

559.    In the case of each Plaintiff, the Enterprise made payments from at least New York to Florida, affecting interstate commerce.

560.    Defendants engaged in activities which constitute "racketeering activity," including dealing in a controlled substance under section 102 of the Controlled Substances Act, wire fraud (18 U.S.C. § 1343), human trafficking (18 U.S.C. § 1591(a)), money laundering (18 U.S.C. § 1596(a)), transportation for illegal sexual activity (18 U.S.C. § 2422), obstruction of criminal investigations (18 U.S.C. § 1510(a)), and tampering with a witness through intimidation (18 U.S.C. §§ 1512(b) and 1512(d)), within the meaning of 18 U.S.C. § 1961(1).

561.    Defendants engaged in multiple predicate acts amounting to a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

562.    Plaintiffs were damaged by Defendants' violation of 18 U.S.C. § 1962(c) in an amount to be determined at trial.

## SECOND CAUSE OF ACTION: ALL PLAINTIFFS
### (Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) ("RICO Conspiracy") - All Defendants)

563.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

564.    All Defendants have acted in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d) to the detriment of Plaintiffs.

565.    At all times relevant to these allegations, Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

566.    All Defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) by associating in fact to create an Enterprise which then engaged in a pattern of racketeering activity resulting in injury to Plaintiffs.

567.    The period of the conspiracy began as early as February 8, 2017, and is ongoing today.

568.    As recently as August 18, 2017, Rubin and Powers requested that Hallman meet with and hire Rubin's attorney, Defendant Schnur, to defend Hallman in her criminal action in an effort to cover up the Enterprise Scheme.

569.    The object of the conspiracy was to procure women for Rubin to abuse and sexually assault, coercing those women to participate, often completely unwillingly, in Rubin's sexual games, and then covering up the injury and emotional

harm which resulted. Powers lied to the women in order to induce them to come to New York, leading the women to believe that Rubin simply wanted their company, or, in some cases, to participate in a fetish photo shoot.

570.    Each predicate act committed by the Enterprise was in furtherance of the conspiracy.

571.    The predicate acts caused physical and emotional injury to Plaintiffs, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION: ALL PLAINTIFFS
### (Violation Of Human Trafficking Laws, 18 U.S.C. § 1591(a) - All Defendants)

572.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

573.    Defendants knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, maintaining, and soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

574.    Further, all Defendants benefited, financially or by receiving something of value, from participating in a venture which has engage in recruiting, enticing, harboring, transporting, obtaining, maintaining, and soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

575.    The venture was a group consisting of at least Rubin, Powers, Shon, Schnur, Blue Icarus, the Doe Company, and John Doe.

576.    As a direct result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiffs each suffered serious injury and damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION – PETERSON, FULLER, LAWSON, HALLMAN, and CALDWELL
## (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a) - Powers, Rubin, and Doe)

577.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

578.    Defendants knowingly accessed computers at Apple, Facebook, Google, and Instagram without authorization and/or exceeded their authorized access.

579.    Defendants obtained financial information and records as well as credit card information of Plaintiff stored on computers.

580.    Defendants also obtained confidential attorney-client communications, as well as photographs and emails documenting Defendants' crimes.

581.    Defendants accessed such information on protected computers through hacking to obtain and/or change the passwords of Plaintiffs Peterson, Fuller, Hallman, and Caldwell.

582.    Defendants accessed such computers with the intent to defraud the Plaintiffs through changing Plaintiffs' payment and billing information as well as changing Plaintiffs' passwords such that Defendants would have access to the same.

583.    Defendants also intended to hinder Plaintiffs in the prosecution of this action, as well as to cover-up the various federal and state crimes Defendants have committed.

584.    Defendants obtained something of value by accessing such computers without authorization in that Defendants obtained information regarding Plaintiffs finances, passwords, communications, and other valuable information regarding a potential lawsuit against Defendants.

585.    Defendants' hacking, during a time period in which Defendants knew litigation was impending, caused Plaintiffs to incur legal fees well in excess of $5,000 within a one-year period, in order for Plaintiffs to protect their accounts, information, the attorney-client privilege, and bank and credit card records.

586.    Plaintiffs were further damaged in excess of $5,000 within a one-year period in that Plaintiffs' financial records and credit card statements have been compromised and Plaintiffs must repair such damages as necessary.

587.    Plaintiffs had to take affirmative steps to protect their accounts as Plaintiffs communicate with one another regarding the litigation and advice of counsel on Facebook and through Facebook messenger.

588.    Defendants did this to impair confidential information which they attempted to collect through the protected computers which they hacked.

589.    It is unclear what information the Defendants have collected through their hacking at this time.

## FIFTH CAUSE OF ACTION: HATHAWAY
### (Assault - Rubin)

590.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

591.    On numerous occasions, Defendant Rubin acted, intending to cause harmful or offensive contact with Hathaway.

592.    Plaintiff Hathaway reasonably believed she was about to be touched in a harmful or offensive manner.

593.    Plaintiff Hathaway did not consent to be touched in this harmful and offensive manner.

594.    Plaintiff Hathaway was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

595.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## SIXTH CAUSE OF ACTION: HATHAWAY
### (Battery - Rubin)

596.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

597.    On June 12, 2017, Defendant Rubin physically and intentionally attacked Plaintiff Hathaway, and beating Hathaway about the face and breasts, causing bruising and damages to Hathaway's breasts.

598.    Hathaway did not consent to these acts by Defendant Rubin.

599.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and

mental and physical anguish in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION: HATHAWAY
### (False Imprisonment - Rubin)

600.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

601.    On multiple occasions, including November 3, 2015, May 11, 2016, March 17, 2017, and June 12, 2017, Rubin restrained and detained Hathaway against her will.

602.    This restraint and detention, done without the consent of Hathaway was unlawful. In detaining Hathaway, Rubin exercised force, drugging, beating, and gagging Hathaway so that she was unable to protest. This force compelled Hathaway to remain in Rubin's Dungeon when she wished to leave.

603.    Rubin's false imprisonment of Hathaway caused Hathaway physical and mental suffering and humiliation.

## EIGHTH CAUSE OF ACTION: HATHAWAY
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

604.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

605.    In the course of battering Plaintiff Hathaway, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Hathaway to suffer extreme mental and emotional distress, agony, and anxiety.

606.    Defendants' conduct was intentional and malicious.

607.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

608.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Hathaway.

609.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Hathaway has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## NINTH CAUSE OF ACTION: PETERSON
### (Assault – Rubin)

610.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

611.    In 2015 or 2016, and in July 2017, Defendant Rubin acted, intending to cause harmful or offensive contact with Peterson.

612.    Plaintiff Peterson reasonably believed she was about to be touched in a harmful or offensive manner.

613.    Plaintiff Peterson did not consent to be touched in this harmful and offensive manner.

614.    Plaintiff Peterson was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

615.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## TENTH CAUSE OF ACTION: PETERSON
### (Battery – Rubin)

616.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

617.    Defendant Rubin physically and intentionally attacked Plaintiff Peterson, punching Peterson all over her body, and beating Peterson about the face and breasts, causing bruising and damages to Peterson's face.

618.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION: PETERSON
### (False Imprisonment – Rubin)

619.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

620.    In 2015 or 2016 and in July 2017, Rubin restrained and detained Peterson against her will.

621.    This restraint and detention, done without the consent of Peterson, was unlawful. In detaining Peterson, Rubin exercised force, drugging, beating, and gagging Peterson so that she was unable to protest. This force compelled Peterson to remain in Rubin's Dungeon when she wished to leave.

622.    Rubin's false imprisonment of Peterson caused Peterson physical and mental suffering and humiliation.

623.     As a direct and proximate result of Defendant Rubin's false imprisonment, Peterson suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION: PETERSON
### (Intentional Infliction of Emotional Distress – Powers, Rubin, Shon)

624.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

625.     In the course of battering Plaintiff Peterson, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Peterson to suffer extreme mental and emotional distress, agony, and anxiety.

626.     Defendants' conduct was intentional and malicious.

627.     Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

628.     Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Peterson.

629.     As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Peterson has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION: FULLER
### (Assault - Rubin)

630.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

631.    In March 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Fuller.

632.    Plaintiff Fuller reasonably believed she was about to be touched in a harmful or offensive manner.

633.    Plaintiff Fuller did not consent to be touched in this harmful and offensive manner.

634.    Plaintiff Fuller was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

635.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## FOURTEENTH CAUSE OF ACTION: FULLER
### (Battery - Rubin)

636.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

637.    In March 2016, Defendant Rubin physically and intentionally attacked Plaintiff Fuller, beating Fuller until she got a huge contusion on the leg, and bruising all over her body.

638.    Fuller did not consent to these acts by Defendant Rubin.

639.   As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

### FIFTEENTH CAUSE OF ACTION: FULLER
### (False Imprisonment - Rubin)

640.   Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

641.   In March of 2016, Rubin restrained and detained Fuller against her will.

642.   This restraint and detention, done without the consent of Fuller, was unlawful. In detaining Fuller, Rubin exercised force, drugging, beating, and gagging Fuller so that she was unable to protest. This force compelled Fuller to remain in Rubin's Dungeon when she wished to leave.

643.   Rubin's false imprisonment of Fuller caused Fuller physical and mental suffering and humiliation.

644.   As a direct and proximate result of Defendant Rubin's false imprisonment, Fuller suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

### SIXTEENTH CAUSE OF ACTION: FULLER
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

645.   Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

646.   In the course of battering Plaintiff Fuller, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to

cause Plaintiff Fuller to suffer extreme mental and emotional distress, agony, and anxiety.

647.    Defendants' conduct was intentional and malicious.

648.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

649.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Fuller.

650.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Fuller has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION: SPEIGHT
### (Assault - Rubin)

651.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

652.    On multiple occasions from March to September 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Speight.

653.    Plaintiff Speight reasonably believed she was about to be touched in a harmful or offensive manner.

654.    Plaintiff Speight did not consent to be touched in this harmful and offensive manner.

655.    Plaintiff Speight was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

656.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## EIGHTEENTH CAUSE OF ACTION: SPEIGHT
### (Battery - Rubin)

657.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

658.    On multiple occasions between March and September 2016, Defendant Rubin physically and intentionally attacked Plaintiff Speight

659.    Speight did not consent to these acts by Defendant Rubin.

660.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## NINETEENTH CAUSE OF ACTION: SPEIGHT
### (False Imprisonment - Rubin)

661.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

662.    On multiple occasions from March to September 2016, Rubin restrained and detained Speight against her will.

663.    This restraint and detention, done without the consent of Speight was unlawful. In detaining Speight, Rubin exercised force, drugging, beating, and gagging Speight so that she was unable to protest. This force compelled Speight to remain in Rubin's Dungeon when she wished to leave.

664.    Rubin's false imprisonment of Speight caused Speight physical and mental suffering and humiliation.

### TWENTIETH CAUSE OF ACTION: SPEIGHT
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

665.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

666.    In the course of battering Plaintiff Speight, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Speight to suffer extreme mental and emotional distress, agony, and anxiety.

667.    Defendants' conduct was intentional and malicious.

668.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

669.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Speight.

670.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Speight has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## TWENTY-FIRST CAUSE OF ACTION: HALLMAN
### (Assault - Rubin)

671.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

672.    On August 23, 2016, and on September 24, 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Hallman.

673.    Plaintiff Hallman reasonably believed she was about to be touched in a harmful or offensive manner.

674.    Plaintiff Hallman did not consent to be touched in this harmful and offensive manner.

675.    Plaintiff Hallman was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

676.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## TWENTY-SECOND CAUSE OF ACTION: HALLMAN
### (Battery - Rubin)

677.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

678.    On August 23, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Hallman, punching Hallman in the head until the point that Hallman blacked out, and beating Hallman about the face and breasts, causing bruising and damages to Hallman's breasts, including Hallman's breast implants.

679.    Hallman did not consent to these acts by Defendant Rubin.

680.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

681.    On September 24, 2016, Defendant Rubin again physically and intentionally attacked Plaintiff Hallman, beating Hallman about the face and breasts, causing bruising and further damages to Hallman's breasts, including Hallman's breast implants.

682.    Hallman did not consent to these acts by Defendant Rubin.

683.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## TWENTY-THIRD CAUSE OF ACTION: HALLMAN
### (False Imprisonment - Rubin)

684.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

685.    On August 23, 2016, and September 24, 2016, Rubin restrained and detained Hallman against her will.

686.    This restraint and detention, done without the consent of Hallman, was unlawful. In detaining Hallman, Rubin exercised force, drugging, beating, and gagging Hallman so that she was unable to protest. This force compelled Hallman to remain in Rubin's Dungeon when she wished to leave.

687.    Rubin's false imprisonment of Hallman caused Hallman physical and mental suffering and humiliation.

688.    As a direct and proximate result of Defendant Rubin's false imprisonment, Hallman suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

### TWENTY-FOURTH CAUSE OF ACTION: HALLMAN
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

689.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

690.    In the course of battering Plaintiff Hallman, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Hallman to suffer extreme mental and emotional distress, agony, and anxiety.

691.    Defendants' conduct was intentional and malicious.

692.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

693.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Hallman.

694.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Hallman has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and

emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## TWENTY-FIFTH CAUSE OF ACTION: LAWSON
### (Assault - Rubin)

695.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

696.    On August 23, 2016, and on September 24, 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Lawson.

697.    Plaintiff Lawson reasonably believed she was about to be touched in a harmful or offensive manner.

698.    Plaintiff Lawson did not consent to be touched in this harmful and offensive manner.

699.    Plaintiff Lawson was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

700.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## TWENTY-SIXTH CAUSE OF ACTION: LAWSON
### (Battery - Rubin)

701.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

702.    On August 23, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Lawson.

703.    Lawson did not consent to these acts by Defendant Rubin.

704.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff Lawson suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

705.    In December 2016, Defendant Rubin again physically and intentionally attacked Plaintiff Lawson, repeatedly shocking Lawson in and around the vagina with a cattle prod, and penetrating Lawson against her will, causing interior and exterior damage to Lawson's vagina. Rubin again beat Lawson about the face and breasts, causing bruising and further damages to Lawson's breasts, including Lawson's breast implants.

706.    Lawson did not consent to these acts by Defendant Rubin.

707.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## TWENTY-SEVENTH CAUSE OF ACTION: LAWSON
### (False Imprisonment - Rubin)

708.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

709.    In December 2016, Rubin restrained and detained Lawson against her will.

710.    This restraint and detention, done without the consent of Lawson, was unlawful. In detaining Lawson, Rubin exercised force, drugging, beating, and gagging Lawson so that she was unable to protest. This force compelled Lawson to remain in Rubin's Dungeon when she wished to leave.

711.    Rubin's false imprisonment of Lawson caused Lawson physical and mental suffering and humiliation.

### TWENTY-EIGHTH CAUSE OF ACTION: LAWSON
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

712.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

713.    In the course of battering Plaintiff Lawson, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Lawson to suffer extreme mental and emotional distress, agony, and anxiety.

714.    Defendants' conduct was intentional and malicious.

715.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

716.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Lawson.

717.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Lawson has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

### TWENTY-NINTH CAUSE OF ACTION: CALDWELL
### (Assault - Rubin)

718.    Plaintiffs repeat and reallege the allegations made above as if fully set

forth herein.

719.    On September 24, 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Caldwell.

720.    Plaintiff Caldwell reasonably believed she was about to be touched in a harmful or offensive manner.

721.    Plaintiff Caldwell did not consent to be touched in this harmful and offensive manner.

722.    Plaintiff Caldwell was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

723.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## THIRTIETH CAUSE OF ACTION: CALDWELL
### (Battery - Rubin)

724.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

725.    On September 24, 2016, Defendant Rubin physically and intentionally attacked Plaintiff Caldwell, punching Caldwell in the head until the point that Caldwell blacked out, and beating Caldwell about the face and breasts, causing bruising and damages to Caldwell's breasts, including Caldwell's breast implants.

726.    Caldwell did not consent to these acts by Defendant Rubin.

727.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## THIRTY-FIRST CAUSE OF ACTION: CALDWELL
### (False Imprisonment - Rubin)

728.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

729.    On September 24, 2016, Rubin restrained and detained Caldwell against her will.

730.    This restraint and detention, done without the consent of Caldwell was unlawful. In detaining Caldwell, Rubin exercised force, drugging, beating, and gagging Caldwell so that she was unable to protest. This force compelled Caldwell to remain in Rubin's Dungeon when she wished to leave.

731.    Rubin's false imprisonment of Caldwell caused Caldwell physical and mental suffering and humiliation.

## THIRTY-SECOND CAUSE OF ACTION: CALDWELL
### (Intentional Infliction of Emotional Distress - Powers, Rubin, Shon)

732.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

733.    In the course of battering Plaintiff Caldwell, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Caldwell to suffer extreme mental and emotional distress, agony, and anxiety.

734.    Defendants' conduct was intentional and malicious.

735.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

736.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Caldwell.

737.    As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Caldwell has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiffs demand judgment against Defendants as follows:

A.    At least $3 million in compensatory damages, before trebling, for each Plaintiff for the injuries of Plaintiffs caused by the Enterprise and its individual members;

B.    A permanent injunction enjoining Defendants, their partners, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from in any way engaging in the Enterprise of any of the practices or crimes set forth herein;

C.    Imposition of a constructive trust upon all assets associated with the Enterprise, including the property owned by Blue Icarus, LLC;

D.    Compensatory and punitive damages for injury caused to Plaintiff Hathaway;

E.      Compensatory and punitive damages for injury caused to Plaintiff Peterson;

F.      Compensatory and punitive damages for injury caused to Plaintiff Fuller;

G.      Compensatory and punitive damages for injury caused to Plaintiff Speight;

H.      Compensatory and punitive damages for injury caused to Plaintiff Hallman;

I.      Compensatory and punitive damages for injury caused to Plaintiff Lawson;

J.      Compensatory and punitive damages for injury caused to Plaintiff Caldwell;

K.      Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

L.      Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

M.      Punitive damages pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595;

N.      Attorneys' fees pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595(a);

O.      Punitive damages for Plaintiffs' state law claims of assault, battery, false imprisonment, and intentional infliction of emotional distress;

P.      Costs of suit herein;

Q.      Applicable interest on the foregoing amounts;

R.      Declaratory relief; and

S.      Such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.


Dated: New York, New York
      February 20, 2018

                  By: *<u>/s/ John G. Balestriere</u>*
                    John G. Balestriere
                    Jillian L. McNeil
                    **BALESTRIERE FARIELLO**
                    225 Broadway, 29th Floor
                    New York, New York 10007
                    Telephone:    (212) 374-5401
                    Facsimile:    (212) 208-2613
                    john.balestriere@balestrierefariello.com
                    jillian.mcneil@balestrierefariello.com
                    *Attorneys for Plaintiff*