IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――
                                                  :
HILLARY LAWSON, KRISTINA          :       Case No.: 17-cv-06404
HALLMAN, STEPHANIE, MOIRA         :
HATHAWAY, MACEY SPEIGHT,          :
ROSEMARIE PETERSON, and           :
LAUREN FULLER,                           :
                                                  :
                    *Plaintiffs,*                 :
                                                  :
        -*against*-                               :
                                                  :
HOWARD RUBIN, JENNIFER POWERS,  :
YIFAT SCHNUR, STEPHANIE SHON,     :
JON DOE, BLUE ICARUS, LLC, and the :
DOE COMPANY,                             :
                                                  :
                    *Defendants.*                 :
―――――――――――――――――――――――――――:


**BLUE ICARUS LLC'S SUPPLEMENTAL MEMORANDUM
OF LAW IN FURTHER SUPPORT OF ITS MOTION TO
DISMISS PLAINTIFFS' COMPLAINT AND AMENDED COMPLAINT**


        On November 2, 2017, Plaintiffs Lawson, Hallman and Caldwell (all pseudonyms), filed

their multicount civil RICO Complaint against Defendants (*Dkt. 1*).  On February 12, 2018,

Defendant Blue Icarus filed its motion to dismiss Plaintiffs' Complaint pursuant to FRCP Rule

12(b)(6) based upon Plaintiffs' alleged failure to state a cause of action. (*Dkt. 65*).  At about this

time, the remaining Defendants did likewise, (*see, Dkts. 59, 61, 63 and 64*).  In an attempt to

cure their obvious pleadings deficiencies, on February 20, 2018, Plaintiffs filed their Amended

Complaint, adding Hathaway, Speight, Peterson and Fuller (also all pseudonyms) to the mis, all

of them alleging many of the same counts as contained in the original Complaint, as well as a

myriad of additional counts.  (*Dkt. 66*).  By Order of the Court, Defendants were granted leave to

supplement their motions to dismiss to address the additional facts and claims asserted therein.

(*Dkt. 67*).  The following is Defendant Blue Icarus' supplemental memorandum of law which

seeks to do just that.

At the outset, it should be noted that Plaintiffs' original eighteen count complaint has

been expanded to thirty-two counts.  However, the amended pleading has whittled the number of

counts asserted against Blue Icarus from five down to three.  As in the original Complaint, the

first two counts allege that Blue Icarus, along with the other Defendants, violated the RICO Act

(18 U.S.C. § 1962(c)) and conspired with the other Defendants to violate the RICO Act (18

U.S.C. § 1962(d)). Plaintiffs' third count alleges that Blue Icarus, along with all other

Defendants, violated the Human Trafficking Laws (18 U.S.C. § 1591(a). Blue Icarus seeks to

dismiss these first three counts (and thus the entire Amended Complaint) as against this

Defendant based upon all the reasons previously set forth in its initial moving papers, as well as

for the additional reasons set forth below.

## A.  Additional Plaintiffs

Plaintiff Moira Hathaway ("Hathaway") an international Playboy Playmate and model,

worked as a cocktail waitress at nightclubs in Los Angeles, Las Vegas, Seattle, and most recently

in Chicago.  (Complaint, ¶¶ 77-78).  Plaintiff Rosemarie Peterson ("Peterson") is a former

Playboy model who formerly lived in Los Angeles before moving to Brooklyn, New York in

2015.  (*Id.*, ¶¶ 79-80).  Plaintiff Lauren Fuller ("Fuller") is a freelance model and cocktail

waitress who resides in Miami Beach, Florida.  (*Id.,* ¶¶ 81-82).  Plaintiff Macey Speight

("Speight") is a freelance model, student, and cocktail waitress and server in Atlanta, Georgia.

(*Id.*, ¶¶ 83-84).

### (i)    Moira Hathaway

Hathaway met Defendant Rubin in late 2009, early 2010, having been contacted by an undisclosed employee of Rubin identified only as "a female representative" who informed her of Rubin's desire to meet her, which she did shortly thereafter. After a brief courtship over an undisclosed period of time, she and Rubin began a long and fully consensual intimate relationship lasting more than four years. (*Id.*, ¶¶ 94-121). Beginning in 2010, a period preceding Blue Icarus' existence, the couple met in a hotel room in New York, the key to which Rubin always had. (*Id.*, ¶113). Their sexual relationship included the use of sex toys, ropes and other BDSM-type objects which Rubin brought with him in a duffle bag. (*Id.*). In fact, on one occasion, Rubin sent Hathaway to a sex store with a list of various sex toys costing around $800 he wished her to acquire for their use. (*Id.* ¶ 112). During this period, "Rubin enjoyed initiating intercourse with [her] as she slept, telling her that he like [sic] to feel like he was raping her while she was sleeping." (*Id.*, ¶ 113). Following each encounter, Rubin would pay her between $2,000 and $5,000. It was not until mid-2011 that Hathaway was asked to meet Rubin at the apartment he recently rented from Blue Icarus and was asked to sign an NDA. Confused by this, she nevertheless continued to see Rubin for the next four years. (*Id.*, ¶¶ 117). In or around 2014, Rubin encouraged Hathaway to quit her job, promising he would take care of her. She did, and thereafter she visited Rubin in New York once a month, receiving a monthly stipend of $5,000. (*Id.*, ¶ 122). During this period, Rubin's interest in BDSM appeared to increase, with Rubin introducing new devices and equipment into the "Dungeon", generally seeking Hathaway's consent beforehand. (*Id.*, ¶ 124).

By early 2015, Rubin's behavior changed. He began incorporating into the Dungeon and into their sexual relationship large-scale structures, ropes and knives which caused Hathaway to

fear Rubin for the first time.  Nevertheless, she continued to visit him there despite his subjecting

her to painful experiences which he continued to mete out over her requests to "stop" and which

resulted in her sustaining physical injury and severe bruising.  (*Id.*, ¶¶ 125-128).  On one

occasion (which occurred on some undisclosed date in 2015), Rubin pulled Hathaway onto the

pool table in the Penthouse raping her with a pool stick, ignoring her begging of him to stop.

Instead, he left the room and returned with ropes he used to bind her, dragging her along the

floor to the Dungeon. With burns across her body from the ropes and contact with the floor,

Rubin tied her to a large sex device and punched her in the face, hurling insults at her before

letting her loose. (*Id.*, ¶¶ 130-134).  Though afraid of him, she nevertheless voluntarily returned

to New York and continued to see him and suffer his abuses.  (*Id.*, ¶¶ 135-139).  By June of

2017, Hathaway "finally had enough of Rubin's treatment," (*Id.*, ¶ 153) and she ceased seeing

him.  Her last contact with him was around October 2017 when Rubin contacted her for the last

time to wish her a happy birthday.  (*Id.*, ¶ 163).

### (ii)    Rose Marie Peterson

Plaintiff Peterson first met Rubin in or around May 2011 after she appeared in Playboy.

A female representative of Rubin who identified herself as "Tracy," contacted her informing her

of Rubin's desire to meet her and to take some fetish style pictures of her for which she would be

compensated $5,000.  She was also informed that "she may receive minor bruises from the

restraints" Rubin intended using on her. In or about May or June 2011, Peterson flew from Los

Angeles to New York to meet Rubin for the first time. (*Id.*, ¶¶ 169-173).  Meeting at the

Mandarin Oriental Hotel in New York City with three other women, Rubin got them intoxicated

and then returned with them to the Penthouse.  Upon noticing sexual instruments on the bed,

Peterson became sufficiently nervous where Rubin asked another woman there to "give Peterson

something to take the edge off.  (*Id.*, ¶¶ 174-177).  The woman crushed a pill and put it in

Peterson's drink.  However, Peterson did not see the pill, nor did she know its shape or color.

(*Id.*, ¶ 178).  She did not see Rubin again for three to five years but for reasons not explained, she

reached out to Rubin by email at the end of this long hiatus, getting together with him "as a

friend" on several occasions. (*Id.*, ¶ 180-185).  In their email exchanges, Rubin informed

Peterson that when they got back together again, she "would be beaten and would be black and

blue."  (*Id.*, ¶ 186).  Notwithstanding the foregoing, Peterson went out to dinner with Rubin on at

least ten different occasions, often returning to the apartment with him and several other women.

(*Id.*, ¶ 188).

In or about 2015 or 2016, while at the Penthouse, Rubin got Peterson drunk and "forced

her to take oxycodone again", secretly dropping the drug into her drink.  Peterson woke up the

next day in a bed in the Penthouse with Rubin next to her.  Still numb from the drugs and

alcohol, Rubin took her to the Dungeon. While she went in and out of consciousness, Rubin tied

her up and began beating, whipping and screaming at her, and kicking her in her vagina. The

next morning, Rubin told her he had a great time to which she responded she did not and that she

was in pain. (*Id.*, ¶¶ 190-205). Notwithstanding the foregoing, Peterson continued to see Rubin

monthly claiming she had become addicted to oxycodone and only continued to see him since

Rubin was her only supplier.  (*Id.*, ¶ 206).  Each time she returned, she was supplied more drugs

but was also beaten, raped and severely abused.  (*Id.*, ¶¶ 207-223).  She last saw Rubin in the

summer of 2017 following another violent encounter with him.  Even after all of this abuse,

following another long absence from each other, Peterson returned to see Ruben as "she wanted

to understand what had happened to her and why." (*Id.*, ¶ 224).  Strangely, if was only upon this

last return that she was "required to sign an NDA." (*Id.*, ¶ 225).

### (iii)   Lauren Fuller

Plaintiff Fuller first met Rubin in or about early March 2016 after one of her friends invited her to come from Las Vegas, where Fuller had been vacationing, to New York for one night to meet "her friend, Rubin." (*Id.*, ¶ 232). While at the Penthouse with Rubin and her friend, Rubin provided alcohol and recreational drugs, which he "pressed the women to take," while continuing to fill their glasses. Once assured the women were intoxicated, Rubin pressed the women to sign NDAs. When Fuller pressed Rubin for an explanation as to why she needed to sign this document, Rubin told her, "if you can't sign this, you can't be here." (*Id.*, ¶¶ 234-237). Fuller signed the document which promptly changed the mood after which Rubin threw her over his lap and began hitting on her buttocks. Despite her telling Rubin that his spanking had hurt her, his behavior began to escalate. He opened a door to a room which Fuller entered with her friend following which Rubin tied her up, inserted a ball-gag into her mouth and then forcibly inserted a dildo into her vagina causing tears and bruising. He blindfolded her with a mast and bound her with rope, then proceeded to beat and punch her in the head, stomach, buttocks and legs with different instruments she was unable to identify. Upset by her protestations, Rubin kicked her out of the room, shut and locked the door, then proceeded to beat her friend who remained behind. (*Id.*, ¶¶ 239-247). After another 30-45 minutes, Rubin and her friend exited the room following which Ruben said, "everything is fine," then left the apartment. (*Id.*, ¶ 249). Fuller left the next morning never having contact with Rubin again. (*Id.*, ¶¶ 252-256).

### (iv)   Macey Speight

At some undisclosed time in the past, but prior to March 2016, Plaintiff Speight was similarly enticed to travel from Atlanta to New York by Defendant Shon, who also lived in

Atlanta where Speight met her while waiting tables there. Shon told Speight about Rubin and that he was looking to spend time with beautiful women.  Informed that Rubin would fly Speight to New York where she would have a nice place to stay, and describing Rubin as really nice, Speight few to New York where she and Rubin began an intimate relationship which lasted until Rubin became violent. (*Id.*, ¶¶ 262-264).  Plaintiffs fail to identify the duration of this intimate relationship.  On or around March 24, 2016, Speight arrived in New York on a flight purchased by Defendant Powers. Per Powers' instructions, Speight went to the Penthouse where she was presented with and signed an NDA before meeting Shon and Ruin at a restaurant.  (*Id.*, ¶¶ 265-271).  About one month later, Speight returned to New York from Georgia where she met Rubin for dinner.  Encouraged by Rubin to drink heavily, Speight became intoxicated and returned to the Penthouse with Rubin who "forced" Speight to open and consume an entire bottle of wine, causing her to become nearly unconscious. Thereafter, Rubin pushed her to the floor, slapped her face and called her a "slut" and "whore." He then dragged her screaming to the Dungeon where he tied her up on all fours.  Speight was so intoxicated, she blacked out and woke up alone with no memory of how the night ended, returning to Atlanta the next day.  (*Id.*, ¶¶ 274-280).

Notwithstanding the foregoing, Speight continued to make monthly trips to New York during which she suffered foreign objects being shoved into her vagina, rape, punches to her breasts (causing one of her implants to burst) and various forms of verbal abuse and what can only be described as psychological torture.  (*Id.*, ¶¶ 281-292).  The last time she saw or had contact with Rubin was in September 2016. (*Id.*, ¶ 293).

7

### B.  Plaintiffs' Amended Complaint Fails to Cure Their Prior Pleading Deficiencies

As it relates to the claims asserted against Blue Icarus, Plaintiffs' Amended Complaint relies upon pure conclusory allegations devoid of any substance to back up their conclusions. Recognizing that Plaintiffs' only hope of connecting Blue Icarus to Rubin's so-called criminal "Enterprise," Plaintiffs attempt but fail to establish that Blue Icarus had actual or constructive knowledge of Rubin's illegal activities within the apartment. This alleged knowledge, or at the very least, Blue Icarus' reckless indifference to it, forms the backbone of the predicate acts constituting Blue Icarus' alleged violation of the RICO Act. But Plaintiffs continue to fall short in establishing that Blue Icarus was anything more than a landlord whose only involvement in Rubin's affairs is leasing its very expensive apartment to him and collecting rent from him.

For instance, Plaintiffs now allege that as recently as the spring or summer of 2016, Blue Icarus sent its representatives to the Penthouse while Rubin's "victims" were present. (*Id.*, ¶ 24). On at least one occasion, one of its representatives was present and was introduced by Rubin to Speight. (*Id.*, ¶ 40).  While Plaintiffs clearly intend to draw a link between these visits and Blue Icarus' knowledge of illicit activities, Plaintiffs fail to identify who these so-called "representatives" are, what positions they may have held, what they were doing there, what they saw, and/or how these visits by these unknown individuals might imbue Blue Icarus with knowledge of Rubin's sexual activities within its walls. There are no allegations that any of these "victims" were being abused or held against their will at the time of these visits.  Absent allegations that Speight, or any of the other so-called "victims" were tied up, gagged, bleeding or screaming for help at the time a Blue Icarus' representative was there, this allegation does nothing to advance Plaintiffs' narrative that Blue Icarus had to have known but ignored all of the

illegal acts complained of in their pleading. It should be noted that as it relates to the original

Plaintiffs, their alleged abuse did not even begin until August 2016.

To further support their claim that Blue Icarus had to have known what was happening

within its apartment, Plaintiffs further allege that Blue Icarus was aware that Rubin did not live

at the Penthouse; that his primary residence was with his family at an address within walking

distance from the apartment. (*Id.*, ¶ 46). Assuming this to be true, it begs the question, so what?

Many people of ample means have pied a terres which they use for business or yes, for illicit, yet

perfectly legal sexual trysts. As it relates to the four newly added Plaintiffs, they concede that

much of Rubin's tenancy consisted of just that – consensual trysts, albeit somewhat unorthodox

ones. None of the additional allegations woven into Plaintiffs' Amended Complaint, even if true,

support Plaintiffs' mere conclusory allegations that Blue Icarus was aware of a criminal

enterprise or its purpose, (*Id.*, ¶39), that Blue Icarus was aware of how Rubin and the Enterprise

utilized the Penthouse, (*Id.*, ¶ 47), or that Blue Icarus participated in the direction or conduct of

the Enterprise's affairs (*Id.*, ¶ 60). Yet, with no factual support, Plaintiffs assert that all

Defendants, inclusive of Blue Icarus, came together to form an association in fact enterprise (*Id.*,

¶ 555), engaged in racketeering activities (*Id.*, ¶ 560) and conspired with others to violate the

RICO Act. (*Id.*, ¶ 566). Obviously aware of its inability to establish Blue Icarus' actual

knowledge, Plaintiffs assert that Blue Icarus was at the very least "recklessly indifferent in

failing to monitor anything occurring on its property." (*Id.*, ¶ 45). Again, Plaintiffs fail to

support this allegation with any factual support. Plaintiffs have no basis to draw this conclusion

since "anything occurring on its property" presumably includes an infinite number of things that

may have occurred there, including an infinite number of things that Blue Icarus did monitor, but

which having nothing to do with the acts complained of here.

In addition to its failure to establish Blue Icarus' knowledge of Rubin's alleged criminal activities occurring within its apartment, Plaintiffs' Amended Complaint fails to adequately allege other facts necessary for its RICO or RICO conspiracy causes of action to survive dismissal. As argued in their initial Memorandum of Law, Plaintiffs' amended pleading continues to suffer from a failure to satisfactorily establish the existence of an enterprise, or to support the conclusion that defendants associated together for a common purpose of engaging in a course of conduct.  Absent from Plaintiffs' amended pleading are sufficient allegations to support its conclusion that Blue Icarus played some role in directing the affairs of an enterprise, or that Blue Icarus engaged in any racketeering activity whatsoever. Again, according to the Amended Complaint, Blue Icarus' predicate acts consist of Blue Icarus "harboring" each Plaintiff at various times while disregarding Rubin's use or threats of force, fraud and coercion to engage in a commercial sex act.  (*Id.*, ¶ 551).  For starters, Blue Icarus did not "harbor" anyone. It merely bought and then leased an apartment to Rubin many years after he is alleged to have formed his criminal enterprise, with each Plaintiff spending time there as his guests, all the while ignorant of any such means of force, coercion, etc. Plaintiffs' allegations of Blue Icarus' RICO conduct is based entirely on conclusory allegations unsupported by any credible fact.

Finally, in addition to the foregoing, Plaintiffs have failed to establish they possess standing to assert their RICO claims insofar as none of them have alleged injury to their business or property. Plaintiffs each claim to have suffered purely physical and mental harm which is not the type of injury recoverable under the RICO statute.

Based upon the foregoing, coupled with its previous legal arguments, Defendant Blue Icarus seeks dismissal of Plaintiffs' Amended Complaint.

Dated: New York, New York
       Mach 7, 2018

Respectfully submitted,

**ORTOLI ROSENSTADT, LLP**

By: _/s/ Marc S. Gottlieb_____
Marc S. Gottlieb
501 Madison Avenue, 14th Floor
New York, New York 10022
T: 212-829-8943
F: 866-294-0074

*Attorneys for Defendant Blue Icarus, LLC.*