UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                       :
HILLARY LAWSON, KRISTINA                               :
HALLMAN, STEPHANIE CALDWELL,                           :
MOIRA HATHAWAY, MACEY SPEIGHT,                         :
ROSEMARIE PETERSON, and LAUREN        :    **MEMORANDUM**
FULLER,[1]                                             :    **DECISION & ORDER**
                                                       :
                     Plaintiffs,                       :    17-cv-6404 (BMC)
                                                       :
            - against -                                :
                                                       :
HOWARD RUBIN, JENNIFER POWERS,                         :
YIFAT SCHNUR, STEPHANIE SHON,                          :
BLUE ICARUS, LLC, Doe Company, and                     :
John Doe,                                              :
                                                       :
                     Defendants.                       :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiffs bring this suit alleging that defendants conspired to lure them to New York City

so that defendant Howard Rubin could sexually assault them. The five named defendants have

moved to dismiss all of the claims against them.

## BACKGROUND

Plaintiffs allege that defendants formed a RICO enterprise (and were part of a RICO

conspiracy) through which they coerced plaintiffs and other women to travel to New York City

to meet with Rubin under the guise of payments for modeling, fetish photography, and

companionship. Plaintiffs claim that the RICO enterprise's real agenda was to transport women

across state lines so that Rubin could intoxicate, drug, beat, and rape them.

---

[1] The names listed in the caption are pseudonyms adopted by plaintiffs pursuant to a protective order.

Plaintiffs allege that, as part of this ongoing conspiracy, defendant Jennifer Powers and defendant Stephanie Shon recruit women and that Powers arranges for the transportation of these women to meet Rubin. Plaintiffs allege that defendant Yifat Schnur promoted the RICO enterprise by drafting the non-disclosure agreements that plaintiffs all signed and the waiver agreement plaintiff Caldwell signed, and by offering to represent plaintiff Hallman in Hallman's criminal case. Plaintiffs allege that defendant Blue Icarus, LLC enabled the RICO enterprise by leasing to Rubin the penthouse condominium where the violence took place from February 2011 to September 2017. John Doe allegedly hacked into the accounts of plaintiffs and one of their family members at the direction of Powers and Rubin to delete evidence of plaintiffs' interactions with Rubin. Plaintiffs allege that Rubin uses the Doe Company to pay his employees for their activities related to the RICO enterprise.

Plaintiffs allege that all of defendants except Rubin benefitted from the enterprise because they were paid to assist Rubin in carrying it out. Plaintiffs contend that the RICO conspiracy began in 2011 at the latest, when Blue Icarus purchased the condominium and subsequently leased it to Rubin. Plaintiffs claim that through this conspiracy, defendants collectively committed dozens of RICO predicate acts, including coercion and enticement, witness tampering, human trafficking, dealing in controlled substances, obstruction of criminal investigations, and wire fraud.

According to the amended complaint, plaintiffs are all current or former models. All except Peterson lived outside of New York during all of the events described in the complaint. Peterson lived in Los Angeles for at least some of the relevant time period, but now lives in Brooklyn.

Plaintiffs allege the following in the amended complaint:

**Plaintiff Moira Hathaway** met Rubin through someone who worked for him and who contacted Hathaway through a social media platform called Model Mayhem. Beginning in 2009, the two had a consensual sexual relationship. In 2010, Rubin flew Hathaway to New York to meet with him on at least three occasions. During this time period, Rubin communicated directly with Hathaway, arranged her flights himself, and either paid for the flights himself or would reimburse Hathaway. Following each interaction, Rubin would pay Hathaway $2,000 to $5,000 in cash or by wire transfer.

In or around early 2011, Rubin introduced Hathaway to defendant Powers, and told Hathaway that Powers would coordinate their meetings and handle Hathaway's travel arrangements going forward.

In mid-2011, Hathaway met Powers at the penthouse condominium for the first time. Powers presented Hathaway with a non-disclosure agreement, which Hathaway signed. Powers did not permit Hathaway to keep a copy of the agreement. Around this time, Hathaway noticed that Rubin's interest in BDSM seemed to increase, but Rubin generally sought Hathaway's consent and she did not feel threatened.

Beginning in 2015, Hathaway noticed a dramatic change in Rubin's behavior: he began to injure her as part of their sexual activity (giving her bruises) and began deliberately ignoring her requests for him to stop. She also noticed a dramatic increase in the devices in the condominium's side room where some of the sexual activity took place (the "red room"), including large-scale structures, ropes, and knives. Defendant Powers knew about the bruising Rubin caused Hathaway and recommended Arnica cream to Hathaway to reduce its appearance.

Later in 2015, Rubin's conduct escalated: he shoved a pool cue into Hathaway's vagina without her consent and then bound her to an X-shaped structure and punched her in the face.

This violence continued: during their sexual encounters in 2015 and 2016, Rubin would punch Hathaway in the face and stomach. On at least one occasion, Hathaway had to take a significant amount of time off work as a waitress at a night club because she had sustained such severe bruising. On more than one occasion, Hathaway lost consciousness completely while Rubin was punching her in the head. Hathaway stopped seeing Rubin at the end of 2016.

But then around June 2017, Hathaway agreed to see him one more time. Powers arranged for Hathaway's travel. When Hathaway arrived, Rubin bound and gagged her. He attached clothespins to her breasts without her consent. Hathaway attempted to tell Rubin to stop but could not because she was gagged. Rubin then approached Hathaway with a long device she did not first recognize (she later learned it was a cattle prod). Rubin then shocked Hathaway with the cattle prod in multiple places. Hathaway did not consent to Rubin shocking her with the cattle prod. Hathaway was left in intense pain. She did not see Rubin again.

Since her encounters with Rubin, Hathaway suffers from anxiety and has trouble sleeping, for which she has been prescribed Xanax. The bruising Hathaway sustained to her face and breasts was so significant that Hathaway had to miss work for significant amounts of time, causing her to lose income as a cocktail waitress.

**Plaintiff Rosemarie Peterson** was introduced to Rubin by one of his representatives, and first flew to New York City to meet him in May or June 2011. Once in New York, Peterson met Rubin and three other women at a hotel. After drinking and taking an unidentified pill at Rubin's request, Peterson felt unwell and uncomfortable; she left the hotel room without engaging with Rubin further.

Peterson did not see Rubin again for another three to five years, when she ran into him by chance in a restaurant in New York. She contacted him through email and met with him socially

on several occasions.  In one of their email discussions, Rubin said that Peterson "would be beaten and bound and would be black and blue."  Peterson did not take these statements seriously; she believed them to be part of Rubin's interest in role-playing.  Peterson and Rubin went out at least ten times for dinner and drinks.  On some of these occasions Peterson would go back to the condominium with Rubin and one or two other women, but each of these encounters was merely social and included no beatings or sex.

In 2015 or 2016, Rubin took Peterson out for drinks and "got Peterson very drunk." Rubin then forced her to take oxycodone.  Peterson was not fully conscious when Rubin dragged her to the red room, tied her to the X-shaped structure and began beating and whipping her.  The next morning Rubin paid her $5,000.

Peterson saw Rubin monthly for a few months.  Their sexual encounters eventually included electrocution and attaching various devices to Peterson's breasts.  Peterson often asked to leave, but Rubin would not let her.  During one of these encounters, Peterson's Bio Gel injection in her buttocks (a cosmetic prosthetic) burst.  Peterson's pain was so severe that she went to the hospital, where she was treated for the infection caused by the rupture with a course of strong antibiotics.  Peterson has since been treated for additional infections in the implant.

Peterson saw Rubin for the last time in the summer of 2017.  While they were drinking, Peterson became intoxicated quicker than normal and soon blacked out.  When she awoke, Rubin was beating and electrocuting her and had put devices on her vagina.  Peterson demanded that Rubin let her go and give her money to pay for her trip home, Rubin responded by hitting her in the face so hard that he split her lip.  Peterson did not see Rubin for a long time.  Eventually, Peterson went back to the Penthouse "because she wanted to understand what had happened to

her." It was only when Peterson went back that Rubin asked her to sign a non-disclosure agreement (and she did).

Peterson became addicted to oxycodone as a result of Rubin forcing her to take it and her taking it in conjunction with her injuries. Peterson has not been able to work as a model anymore as a result of the physical and emotional trauma of her encounters with Rubin.

**Plaintiff Rosemarie Fuller** met Rubin in early March 2016, when one of Fuller's girlfriends invited her to come to New York City with the friend to meet him. Fuller's friend "told Fuller a little bit about Rubin but was very vague" and "did not explain what Rubin would require of Fuller." When Fuller and her friend met with Rubin, he pressed the women to drink alcohol and take cocaine. After the women were intoxicated, Rubin asked Fuller to sign a non-disclosure agreement. After Fuller signed, Rubin's demeanor changed. He took her to the red room and began to tie her up. Rubin told her that "there was a safe word that she could use if she felt uncomfortable." But then Rubin blindfolded Fuller and gagged her, so she could not use the safe word. Rubin then penetrated Fuller and beat and punched her in the head, stomach, buttocks, and legs. Fuller tried to protest, but she could not through the gag.

The next morning, Fuller left. Powers sent Fuller $2,500 through PayPal on March 11, 2016. Fuller became depressed and developed anxiety as the result of her interaction with Rubin. She also had to treat the tears and bruises to her vagina with iodine to prevent infection. Fuller never had any contact with Rubin or Powers again.

**Plaintiff Macey Speight**, who lives in Atlanta, Georgia, met Rubin through defendant Shon (who also lived in Atlanta at the time). Shon told Speight about Rubin and that he was looking to spend time with beautiful women. Shon explained to Speight that Rubin would fly

her up to New York and pay for her to stay in a nice place.  Shon also said that Rubin was really nice.  Speight and Rubin had a consensual intimate relationship until Rubin became violent.

On March 24, 2016, Speight flew to New York City to visit Rubin on a flight arranged for and purchased by Powers.  When Speight arrived, she met Powers at the penthouse and signed the non-disclosure agreement Powers gave her.  After signing the agreement, Speight met Shon and Rubin for dinner.  There was no further interaction with Rubin that night.

Immediately after the trip, on March 30, 2016, Speight learned that Shon, without Speight's permission, had posted naked photos of Speight on Instagram.  Instagram, at Speight's urging, eventually removed these photos.

The next month, April 2016, Speight returned to New York to meet Rubin for dinner. Rubin encouraged Speight to drink heavily and continued serving her wine when they returned to the penthouse.  He then pushed her to the floor, slapped her in the face, and carried her to the red room where he tied her up.  Speight screamed and told Rubin to stop, but lost consciousness and does not remember the rest of the evening.

Speight continued to make monthly trips to New York until September 2016.  On other occasions, Rubin tied Speight down and shoved foreign objects into her vagina, whipped her, and had intercourse with her himself.  Speight did not consent to these things.  On multiple occasions, Rubin offered Speight (unidentified) pills at dinner or at the penthouse, telling Speight that they would help her anxiety.  On one of these occasions, Rubin punched Speight in her breasts, causing one implant to burst and creating severe bruising and scarring.  This damage to Speight's body forced her to take time off from work.

**Plaintiff Kristina Hallman** met Rubin through defendant Shon, who contacted Hallman via Instagram in August 2016.  Shon told Hallman that Rubin would pay for Hallman to fly to

New York and pay Hallman $2,000 to meet and spend time with him. Shon explained that if Rubin liked her, Rubin would pay an additional $3,000, for a total of $5,000. Hallman initially declined the offer, but, after discussing the proposal with Powers over the phone and the messaging application WhatsApp, agreed. Hallman was still reticent, but Powers assured her that Rubin would not do anything to make her uncomfortable and that Hallman could always ask to leave and would still be paid the initial $2,000. Hallman asked to bring her friend plaintiff Lawson with her. Powers arranged and purchased the flights for Hallman and Lawson.

**Plaintiff Hillary Lawson** was introduced to Rubin through defendant Shon, who contacted her via Instagram sometime around August 2016 (around the same time Shon contacted Hallman). Lawson initially ignored the message. Once plaintiff Hallman asked Lawson to accompany her to New York, Lawson discussed the offer with Shon and Powers. Shon and Powers told her that Rubin was not threatening. Powers told Lawson that "that the trip would not be about sex, and, at most, would entail some fetish play and potentially photos."

Both Hallman and Lawson traveled to New York City to meet Rubin in August 2016 on flights purchased for them by Powers on Rubin's behalf. Powers met them at the penthouse where they signed the non-disclosure agreements Powers provided. Plaintiffs Hallman and Lawson then met Rubin for dinner nearby. After dinner, the group returned to the penthouse, where Rubin ordered the women to change into fetish-style clothing and made them drinks. Rubin then paid both women $5,000 cash. Lawson began "to feel strange," and now thinks something had been added to her drink to increase her intoxication. Rubin took the women into the red room, where he tied them both up. Rubin told the women that he would stop if they became uncomfortable, but then gagged both of them so they could not respond.

Neither Lawson nor Hallman consented to being tied up or beaten. Once the women were tied up, Rubin beat both women, slapping and punching their breasts repeatedly. Rubin also punched Hallman in the back of the head; Hallman blacked out. Rubin penetrated Hallman without her consent. After approximately one hour, Rubin abruptly stopped and left.

Both women were badly bruised from the encounter. Hallman's left breast became swollen and later developed scar tissue, which hardened, causing visible damage. Both women messaged Powers to tell her what happened; Powers was not surprised.

A short time later, Powers contacted Hallman and asked if Hallman knew of any other women Rubin might like. Hallman was afraid of Rubin and what he might do to her if she did not cooperate; Hallman knew Rubin was very wealthy and that he knew her address, phone number, date of birth, and how to find her if he wanted to hurt her. Hallman introduced Powers to her friend, Stephanie Caldwell. Powers (on behalf of Rubin) paid Hallman $2,000 from Powers's PayPal account for making the introduction.

Powers then contacted **plaintiff Stephanie Caldwell** through WhatsApp and arranged for Caldwell to fly to New York City. Powers made Caldwell the same offer she made to Hallman and to Lawson: Rubin would pay Caldwell $2,000 to meet with him in New York. If Rubin liked her, he would ask her to stay and would pay her $3,000 more. Caldwell was nervous because she had spoken to Hallman about her previous experience, but Powers assured that Rubin would not ask her to do anything with which she was uncomfortable and downplayed Hallman's representations about what actually happened with Rubin.

Caldwell traveled to New York in early September 2016 to meet with Rubin. When Caldwell arrived at the penthouse, Powers presented her with a non-disclosure agreement, which Caldwell signed. Caldwell then met Rubin and Shon for dinner at a rooftop bar. Rubin and

Caldwell returned to the penthouse after dinner but did not engage in any sexual activity. Rubin left $2,000 cash for Caldwell in the Penthouse when he departed.

Days after Caldwell left, Rubin contacted her on WhatsApp directly and through Powers. Caldwell said that she would return only if Hallman could come with her. Rubin agreed; Powers arranged and paid for the flights.

Caldwell and Hallman went to New York in September 2016[2] and met Rubin for dinner and drinks. At one point during the dinner, Rubin became frustrated with the women and left. They then returned to the penthouse, expecting Rubin would not return. But Rubin came back and took them to the penthouse's master bedroom, where he tied up and gagged Caldwell. Rubin then beat Caldwell violently, punching her repeatedly in the back of the head and beating her breasts. Rubin ordered Hallman to hit Caldwell too, and struck Hallman when she hesitated. Caldwell attempted to tell Rubin to stop but could not through the gag. Rubin penetrated Caldwell without her consent. After about an hour, Rubin untied Caldwell and left, leaving $5,000 on the table for her. Powers sent $5,000 to Hallman the next day via PayPal.

Rubin beat Caldwell's breasts so badly that her right breast implant became inverted (the backside, which usually sat flush against her ribcage was fully exposed and facing outward). Caldwell's plastic surgeon refused to operate on her breasts after the incident due to the severe trauma. The areola on Caldwell's right breast was also damaged; a doctor concluded it would require surgery to correct.

Because of her injuries, Caldwell could not work and lost her job at a club in Miami. Caldwell contacted Rubin and Powers, seeking compensation for her injuries. Powers arranged for Caldwell to fly to New York to discuss the matter. Caldwell came to New York City on

---

[2] Paragraph 390 of the amended complaint refers to September 24, 2017, but that is likely a typographical error based on the rest of the timeline set forth in the amended complaint.

October 4, 2016.  When she arrived at the penthouse, Powers presented her with a release and promised Caldwell that she would be paid $20,000 in installments of $4,000 to repair her breasts. Caldwell received all but one of the payments before December 2016 or January 2017.  Caldwell received the final payment in August 2017.

In October 2016, plaintiff Hallman returned to New York, accompanied by a friend, Nancy Santi.  Hallman stayed at the penthouse with several other women, including one named Zoe Cacciola.  Hallman became so anxious that she got sick.  After Hallman had been ill for several hours, Powers called an ambulance, which took Hallman to the emergency room (Santi and Cacciola accompanied her).  After Hallman was discharged from the hospital around 2:00-3:00 a.m., she and the other women returned to the penthouse.

Later that night, Hallman and Cacciola got into a fight and Cacciola called the police. Hallman knew the police were coming and contacted Powers to ask her what she should do. Powers told Hallman to lie and say that the condominium belonged to Cacciola and directed Hallman to hide any evidence of illegal conduct.  When the police arrived, they arrested Hallman.  Hallman did not have a criminal record and was released with a desk appearance ticket.

Rubin, through Powers, told Hallman they would pay for her criminal-defense attorney, Jeremy Saland, in exchange for Hallman's silence about what happened in the penthouse.  Rubin had also offered Hallman $80,000 to sign a retainer with Schnur and a confidentiality agreement so that Hallman would not disclose anything about Rubin and the alleged enterprise.  Rubin has since paid for Hallman to fly to New York City for each of her court appearances and has paid for her to stay at a hotel during these trips.

On August 16, 2017, Hallman sent an email to Saland, drafted by Schnur, giving Saland "express permission to share any and all information in regards to [Hallman's] case with Ms. Schnur." With Hallman's permission, Saland immediately contacted Schnur through text message and phone call, telling her not to communicate with Hallman.

In late December 2016, Lawson met with Rubin in New York City a final time, after Powers and Rubin urged her to come via WhatsApp. Powers and Rubin offered her $5,000 for her time and assured her that her safety would not be threatened. Powers coordinated Lawson's travel and purchased her plane tickets. Rubin met Lawson for lunch and drinks. Afterwards, they returned to the penthouse. Rubin bound Lawson to a post and gagged her. He then began punching and slapping Lawson's breasts and body. Rubin then approached Lawson with a cattle prod. Rubin repeatedly shocked Lawson with the cattle prod, outside and inside her vagina. Lawson screamed and tried to beg Rubin to stop and to untie her. After shocking her with the cattle prod, Rubin penetrated Lawson repeatedly with a large sex toy and then himself. Lawson did not consent to this penetration. After more than an hour, Rubin left. After this encounter, Powers sent Lawson $5,000 from Powers's PayPal account.

In March 2017, Caldwell and Hallman had dinner with Rubin, Santi, and another person in Miami. Rubin offered, and eventually paid both of them $500 for joining him for dinner. There was no other interaction during the trip.

Plaintiffs Lawson, Hallman, and Caldwell filed a summons with notice, see N.Y.C.P.L.R. 304, against Rubin and Powers in Queens County Superior Court on September 21, 2017. The summons alleged common-law claims for assault, battery, false-imprisonment, and intentional infliction of emotional distress ("IIED").[3]

---

[3] According to an uncontroverted declaration filed by Powers's counsel, Rubin and Powers appeared by counsel in the Queens County action on December 28, 2017 and January 4, 2018, respectively, and both demanded a complaint

Beginning on October 5, 2017, several plaintiffs' email and other accounts were hacked. Plaintiffs allege that Rubin and Powers directed an unknown person (John Doe) to hack into their accounts to delete evidence of their interactions with defendants, including photos documenting plaintiffs' injuries. The passwords for Apple, Facebook, Google (and Gmail) accounts belonging to plaintiffs Hallman, Caldwell, Fuller, and Peterson were changed on various dates from October 5, 2017 to February 8, 2018, locking plaintiffs out of those accounts. Plaintiff Caldwell's images on her Apple account were shared and then deleted when her account was hacked on December 16, 2017. Several emails relating to and photographs of Peterson's interactions with Rubin were deleted through a Manhattan IP address while Peterson was locked out of her Apple and Gmail accounts on February 8, 2018.

Plaintiffs Lawson, Hallman, and Caldwell then filed this federal suit on November 2, 2017, alleging that all defendants participated in a pattern of racketeering, 18 U.S.C. § 1962(c) and a RICO conspiracy, id. § 1962(d), and committed human trafficking under id. § 1591(a).[4] Plaintiffs also brought a claim against defendants Rubin, Powers, and an unnamed individual defendant under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. In addition, plaintiffs brought state common-law claims for assault, battery, false imprisonment, and intentional infliction of emotional distress against Rubin and IIED claims against Powers and

in that action. As of the date of the declaration (February 12, 2018), neither Rubin nor Powers had been served with a complaint in the Queens County action.

On February 13, 2018, the parties to the Queens County action filed a stipulation of voluntary discontinuance without prejudice. See N.Y.C.P.L.R. 3217(a)(2). In their stipulation, the parties agreed that "if any tolling of the statutes of limitation took place by way of filing of the Summons with Notice . . . then such tolling remains and is not affected by the voluntary discontinuance" and "any party in this action may make any arguments in any related action with regards to any statutes of limitation that they could have made in this action."

[4] The Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA") includes a civil remedy for trafficking victims. See 18 U.S.C. § 1595(a). Section 1595 was amended by the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253, 1255 (2018), but this 2018 legislation did not alter the civil remedy provided in subsection (a).

Shon.  Plaintiffs sought $3 million in compensatory damages (before trebling under RICO) for each plaintiff for her injuries, punitive damages for the human-trafficking and intentional-tort claims, and attorneys' fees under the RICO and human-trafficking statutes, among other relief.

Plaintiffs filed an amended complaint on February 20, 2018, adding plaintiffs Hathaway, Speight, Peterson, and Fuller, and amending some of the alleged RICO predicates.

In the amended complaint, in addition to original jurisdiction under the RICO, human-trafficking, and CFAA claims, plaintiffs allege supplemental jurisdiction under 28 U.S.C. § 1367(a), as well as diversity jurisdiction over those claims under 28 U.S.C. § 1332(a).[5]

The named defendants now moved to dismiss, alleging that this Court is not the proper venue and that plaintiffs have failed to plead facts to state any of the claims alleged against them.

## DISCUSSION

### I.   Venue

Four of the five named defendants have moved to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3).[6]  On such a motion, the plaintiff must establish that venue is proper.  Cold Spring Harbor Lab. v. Ropes & Gray LLP, 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011).  In a case involving multiple claims, the plaintiff must normally demonstrate proper venue for each claim asserted.  See Rothstein v. Carriere, 41 F. Supp. 2d 381, 386 (E.D.N.Y. 1999).  However, where the claims arise out of the same nucleus of operative fact, a court may exercise "pendent venue" over another federal or state claim, if venue is proper as to the primary claim.  Cold Spring Harbor, 762 F. Supp. 2d at 552; see also Beattie v. United

---

[5] The amended complaint alleges that plaintiffs Lawson, Hallman, Caldwell, and Fuller reside in Florida, plaintiff Hathaway resides in Illinois, and plaintiff Speight resides in Georgia.  It alleges that plaintiff Peterson is currently a resident of New York, but was, at the time of at least some of the conduct at issue here, a resident of California. Defendants Rubin, Powers, and Schnur allegedly reside in New York.  Blue Icarus and the Doe Company allegedly reside and operate in New York.  Defendant Schnur allegedly resides in and operates her law office in New Jersey.

[6] Defendant Schnur withdrew her objection to venue in her reply brief.

States, 756 F.2d 91, 101 (D.C. Cir. 1984).  Pendent venue is an exception to the rule that venue must be established for each cause of action asserted in the complaint.  See Hsin Ten Enter. USA, Inc. v. Clark Enters., 138 F.Supp.2d 449, 462 (S.D.N.Y. 2000).  In deciding whether to exercise its discretion to hear a claim based on pendent venue, a court must consider factors such as "judicial economy, convenience to the parties and the court system, avoidance of piecemeal litigation and fairness to the litigants."  Id. at 462 (citation omitted).  Thus, if this Court is the proper venue for any of the federal claims, then it is also the proper venue for any other claims arising out of the same series of events.

The general federal venue statute provides that an action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2).  This requires the court to (1) identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims and then (2) determine whether significant events or omissions material to those claims occurred in this district.  Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432 (2d Cir 2005) ("'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts.").  Section 1391(b)(2) does not restrict venue to the district in which the "most substantial" events or omissions giving rise to a claim occurred; "[v]enue may be proper even if a greater part of the events giving rise to a claim happened in another forum."  City of New York v. Cyco.Net, Inc., 383 F. Supp. 2d 526, 543 (S.D.N.Y. 2005).

This Court is a proper venue for the RICO, RICO conspiracy, and human-trafficking claims under the general federal venue statute, 28 U.S.C. § 1391(b)(2).[7]  Plaintiffs allege that defendants arranged for plaintiffs to fly from other states to New York through airports located in the district.  Plaintiffs allege that defendants arranged for plaintiffs' transportation, including arranging for or purchasing their plane tickets.  Plaintiffs argue that their transportation was central to the enterprise's scheme, which was limited to out-of-state victims who might not otherwise have traveled to meet Rubin.

In the context of plaintiffs' trafficking-based claims, plaintiffs' flights into the district are a material part of the alleged RICO enterprise, conspiracy, and the substantive trafficking claims.  Plaintiffs' amended complaint alleges that defendants formed a RICO enterprise "to pay and transport women to New York to serve as companions and entertainment for [defendant] Rubin," which they allege amounted to a "wide-ranging human trafficking scheme" under the circumstances.  Two of the RICO predicates plaintiffs allege explicitly involve transportation of persons across state lines (human trafficking, 18 U.S.C. § 1591(a), and transportation for illegal sexual activity, 18 U.S.C. § 2422).

Defendants argue that this contact was merely incidental; plaintiffs could have flown into another nearby airport in another judicial district.  But plaintiffs allege that defendants themselves arranged for plaintiffs' transportation into this district; thus, even if the contacts were relatively fleeting, they were intentional and within defendants' control.  Although this district may not be the one where the "most substantial" events or omissions occurred, in the context of plaintiffs' claims of a conspiracy to traffic women to New York City, plaintiffs' flights into and

---

[7] Although the Court is dismissing the RICO and RICO conspiracy claims below, venue remains proper based on the human trafficking claims.

out of the district constitute a significant event material to their claims against defendants.[8]

Venue is therefore proper under § 1391(b)(2).

The Court has pendant venue over the claims brought under the Computer Fraud and Abuse Act because they arise out of the same nucleus of operative fact as the RICO, RICO conspiracy, and human-trafficking claims, and because it would not be in the interests of judicial economy or convenience to the parties and the court system to sever those claims.  See Basile v. Walt Disney Co., 717 F. Supp. 2d 381, 387 (S.D.N.Y. 2010).  For the same reason, the Court has pendant venue over the state common-law claims as well.  See Cyco.Net, Inc., 383 F. Supp. 2d at 544.

## II.  RICO and RICO Conspiracy Claims

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, prohibits certain conduct involving a "pattern of racketeering activity."  RICO includes a private right of action, available to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions.  Id. § 1964(c).  The private right of action applies only where the alleged RICO violation was the proximate cause of the plaintiff's injury.  Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992).  That is, there must be "some direct relation between the injury asserted and the injurious conduct alleged."  Hemi Grp., LLC v. City of N.Y., 559 U.S. 1, 9 (2010) (quoting Holmes, 503 U.S. at 268).  Therefore, to plead a RICO claim, a plaintiff must plead facts to support (1) a RICO violation, (2) an injury to business or property,

---

[8] Although it does not affect the venue analysis under 28 U.S.C. § 1391(a), it is notable that plaintiffs have not advocated for transfer to a particular forum.  Defendant Rubin states in a footnote that "venue would in all likelihood lie in the Southern District of New York," but does not ask the Court to transfer the case there.  Given the proximity of the Eastern and Southern District courthouses – two miles by car or one subway stop – the Court doubts that transfer under 28 U.S.C. § 1404(a) would be appropriate.

and (3) a proximate causal connection between the injury and a substantive RICO violation.  See 18 U.S.C. § 1964(c).

Defendants argue that the RICO claims against them fail because the amended complaint does not allege any injuries to plaintiffs' "business or property" and does not allege proximate causation between the alleged injuries and any RICO violation.

Plaintiffs respond that they suffered injuries to their business because, as models, each is the sole proprietor of her own modeling business and their injuries prevented them from modeling either temporarily or permanently and therefore caused them to lose business.[9] Plaintiffs Hallman, Caldwell, Lawson, Speight, and Peterson also allege that they suffered injuries to their property because their facial, buttocks, and breast implants were allegedly damaged or destroyed by Rubin.

Plaintiffs are mistaken.  Personal injuries – and damages flowing from them – are simply not injuries to "business or property" under RICO.  See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 241 (2d Cir. 1999) (noting that plaintiff smokers could not prevail in a RICO action against tobacco companies because their injuries were "personal in nature" even if they were "direct personal injuries"); Spinale v. United States, No. 03CIV.1704, 2004 WL 50873, at *10 (S.D.N.Y. Jan. 9, 2004).  Pecuniary losses flowing from personal injuries are not compensable under RICO, even though the same sort of monetary damages might be sufficient under RICO if plaintiff alleged a non-personal injury.  Jackson v. Sedgwick Claims Mgmt. Servs., Inc., 731 F.3d 556, 565-66 (6th Cir. 2013) (en banc).  This means that

---

[9] Plaintiff Fuller does not allege that her injuries prevented her from modeling either temporarily or permanently. She conclusorily states that she "is a model who depends on her appearance to earn her income. Thus, the injury to her body caused [her] to sustain damages to her business."  Fuller alleges that she sustained "extensive emotional and mental trauma which has required treatment," but, as explained further below, these damages are not compensable under RICO.

even if plaintiffs lost wages or business opportunities because of their personal injuries, those damages do not qualify under the RICO statute.[10]

Plaintiffs' arguments about causation fare no better. In their opposition, plaintiffs acknowledge that the proximate-cause standard applies, but proceed to argue that "[b]ut for the Enterprise's predicate acts, Plaintiffs would not have sustained their injuries . . . . Plaintiffs['] injuries arose from all Defendants' participation in the sex trafficking venture which allowed Rubin to use threats of force . . . to cause Plaintiffs to engage in commercial sex acts."

A conclusory statement that this amounts to proximate cause does not make it so. All of plaintiffs' alleged injuries – including any injuries to their implants or injuries which forced them to take time off work or to stop modeling permanently – were directly caused by Rubin's alleged physical assaults. Any of the acts of fraud or trafficking or any other predicate that plaintiffs allege, even if proven, would be mere but-for causes, "well beyond the first step" of causation and therefore too remote from the alleged harm to qualify under RICO. As the Supreme Court has made clear, proximate cause is required. See Hemi Grp., 559 U.S. at 8-10; Holmes, 503 U.S. at 268.

Because the Court concludes that plaintiffs have not pleaded RICO damages or causation, their RICO claims against all defendants are dismissed. Additionally, because plaintiffs must adequately allege a substantive RICO violation to sufficiently plead a RICO conspiracy claim under 18 U.S.C. § 1962(d), plaintiffs' RICO conspiracy claims against all defendants are also dismissed. See Stein v. World-Wide Plumbing Supply Inc., 71 F. Supp. 3d 320, 327 (E.D.N.Y.

_____

[10] The only case plaintiffs cite to support their implants-as-personal property argument merely refers to prosthetic devices, prior to insertion in a human body, as the property at issue in a particular contract dispute. See Pfizer, Inc. v. Stryker Corp., No. 02 CIV.8613, 2003 WL 21660339, at *2 (S.D.N.Y. July 15, 2003).

2014) (citing <u>Cofacredit, S.A. v. Windsor Plumbing Supply Co.</u>, 187 F.3d 229, 244-45 (2d Cir. 1999)).

## III.    Defendant Schnur

The RICO claim against Schnur fails for two more reasons:  plaintiffs have failed to plead facts to support any RICO predicate acts committed by Schnur and have failed to plead that Schnur exerted operational or management control over the RICO enterprise.

Plaintiffs allege that Schnur committed six RICO predicate acts:  three acts of witness tampering under 18 U.S.C. § 1512 and three acts of sex trafficking under 18 U.S.C. § 1591. Plaintiffs claim that Schnur engaged in witness tampering by:  (1) drafting a stock non-disclosure agreement sometime in 2015; (2) drafting a general release agreement between Rubin and Caldwell; and (3) drafting an email for Hallman to send to her counsel in the state criminal case pending against her (based on the incident involving Cacciola).  Plaintiffs claim that Schnur is liable for human trafficking because she was paid for her time spent drafting these two agreements and the one email "in association with transporting, harboring, enticing, and preventing victims from coming forward regarding the TVPA violations."

Plaintiffs have not adequately pleaded either of these two sets of predicate acts against Schnur.

Although plaintiffs do not specify, the two provisions which could possibly apply to the alleged conduct are 18 U.S.C. § 1512(b)(1) and (d)(4).  The former makes it a crime to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding."  The latter makes it a crime to "intentionally harass[] another person and thereby hinder[], delay[], prevent[], or dissuade[] any

20

person from . . . causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding." "Official proceeding" as used in § 1512(b)(1) generally refers to a federal proceeding. Id. § 1515(a)(1)(A). "An official proceeding need not be pending or about to be instituted at the time of the offense" for someone to violate the statute. Id. § 1512(f)(1).

Plaintiffs assert in their amended complaint that Schnur drafted the non-disclosure agreement, general release agreement, and the email knowing that they would be used to "hinder, delay, or prevent women from communicating to law enforcement officers and courts Rubin's possible commission of multiple Federal offenses."[11] Plaintiffs plead no facts to support this conclusory statement. Although plaintiffs need not identify a pending or imminent federal proceeding, there must be some possible "prosecution or proceeding" and plaintiffs have not identified one. If plaintiffs believe that the connection to a federal proceeding is self-evident, I disagree.

Plaintiffs point to the email from plaintiff Hallman to her criminal-defense attorney, which they claim Schnur drafted, as evidence that Schnur "attempted to persuade Plaintiff Hallman to hire Schnur as Hallman's criminal defense attorney in an effort to prevent Hallman from revealing the enterprise to law enforcement and the criminal court." But if Schnur wanted to persuade Hallman "knowingly . . . corruptly" or to be "intentionally harassing," as required by § 1512(b)(1) and (d)(4), why would she do it through a communication to Hallman's attorney, who had a duty of loyalty to Hallman? Plaintiffs have pleaded no other facts, besides the fact of

---

[11] In their opposition, plaintiffs also state that Schnur assisted the enterprise by "forcing the Plaintiffs to sign non-disclosure agreements (AC ¶ 549(a)), paying off the Plaintiffs (AC ¶ 429), paying for Plaintiffs' injuries sustained from Rubin's beatings (AC ¶ 428), and attempting to represent Plaintiffs in criminal matters to avoid the enterprise from being ousted (AC ¶ 549(e))." The first three claims and citations are disingenuous. Far from alleging any facts to support the claim that Schnur did these things, the paragraphs cited from the amended complaint do not even mention Schnur, but allege either that other people did those things, or that "the Enterprise" generally did them.

the email draft itself, to support their theory that Schnur attempted to tamper with Hallman as a witness in a future, hypothetical federal criminal proceeding.

The Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595, creates a civil remedy against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture" which that person knew or should have known has engaged in a trafficking act, including the ones listed in § 1591(a)(1).  Section 1591(a)(1) makes it a crime to knowingly recruit, entice, transport, or solicit a person (among other things), or to knowingly benefit from a venture engaging in those acts, "knowing . . . that means of force, threats of force, fraud, coercion  . . . or any combination of such means will be used to cause the person to engage in a commercial sex act."

Plaintiffs argue that Schnur is liable under § 1591(a)(1) because she was:  (1) paid to draft the stock non-disclosure agreement which was later signed by plaintiffs; (2) paid to draft the general release agreement signed by plaintiff Caldwell; and (3) paid to draft the email plaintiff Hallman later sent to her criminal-defense attorney.

Plaintiffs do not allege any facts to support either intent requirement of § 1591(a)(1).  That is, they do not allege any facts to show that Schnur "knowingly benefit[ted] . . . from participation in a [trafficking] venture," nor that she knew or acted in reckless disregard of the fact that "force, threats of force, fraud, or coercion" would be used to cause plaintiffs to engage in a commercial sex act.  Schnur therefore cannot have committed any of the predicate acts of human trafficking alleged under § 1591.

Schnur is not liable under RICO for the additional reason that there are no factual allegations tending to show that she exerted operational or management control over the alleged RICO enterprise.  A defendant is only liable under the "operation or management" test adopted

in <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 183 (1993), if she "participated in the operation or management of the enterprise itself."  In <u>Reves</u>, the Supreme Court held that an accounting firm did not participate in the defendant's management or operation and therefore was not liable under RICO even though the firm's accountants had knowingly overvalued assets on the corporation's balance sheet to misrepresent the corporation as solvent.  <u>Id.</u> at 175, 186.  "Thus, '[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.'"  <u>LaSalle Nat. Bank v. Duff & Phelps Credit Rating Co.</u>, 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996) (quoting <u>University of Md. v. Peat, Marwick, Main & Co.</u>, 996 F.2d 1534, 1539 (3d Cir. 1993), <u>abrogated on other grounds</u>, <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

In <u>Azrielli v. Cohen Law Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994), the Second Circuit reached a similar conclusion about attorneys whose only role in the alleged enterprise was providing legal work – even where the attorney involved allegedly knew about the fraudulent nature of the legal work.  In that case, there was evidence that the defendant attorney who had represented co-defendant clients in a securities sale knew that they had inflated the securities' values.  The Second Circuit concluded that the attorney was not liable under RICO because simply knowing about his clients' fraudulent scheme was not enough to show that the attorney participated in the operation or management of the racketeering enterprise.

District courts in this circuit have reached similar conclusions about attorneys, before <u>Reves</u> and since.  <u>See</u> <u>Nastro v. D'Onofrio</u>, 542 F. Supp. 2d 207, 217 (D. Conn. 2008) (concluding that judgment creditor who sued law firm and attorney for claims stemming from alleged fraudulent transfers from debtor's trust failed to demonstrate operation or management of racketeering enterprise because there was no evidence that defendants did more than offer legal

services); Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L., 832 F. Supp. 585, 592 (E.D.N.Y. 1993) (concluding that attorney did not violate § 1962(c) even if he intentionally assisted a scheme to defraud where his participation was limited to providing legal advice).

Because plaintiffs have failed to plead facts that tend to show defendant Schnur committed any RICO predicate acts and because Schnur lacked operational or management control of the alleged enterprise, the RICO claim against her is dismissed. Because a defendant cannot be held liable for a RICO conspiracy when no substantive RICO violation is alleged against her, the RICO conspiracy claim against Schnur is also dismissed.

Finally, for the same reason plaintiffs have failed to plead predicate acts of human trafficking against Schnur, their stand-alone human trafficking claim against Schnur under 18 U.S.C. § 1591 fails as well.

## IV.    Defendant Shon

Defendant Shon moves to dismiss all of the claims against her: RICO, RICO conspiracy, human trafficking under 18 U.S.C. § 1591(a), and common-law tort of intentional infliction of emotional distress. Plaintiffs allege that Shon advanced the enterprise by recruiting women and making them comfortable so that they would travel to New York City to meet with Rubin, where he could force them to engage in commercial sex acts.

As described in Part III addressing defendant Schnur's motion, § 1591(a) includes two intent requirements: (1) knowingly recruiting a person (or knowingly benefitting from such a venture) and (2) knowing that means of force, threats of force, fraud, or coercion will be used by a person or the venture to cause a person to engage in a commercial sex act.

Plaintiffs allege that defendant Shon violated § 1591(a) by recruiting plaintiffs Hallman, Lawson, and Speight through other people or through their Instagram accounts to travel to New

York to meet with Rubin in exchange for a fee. They also allege that she violated it by knowingly benefitting financially from participation in a trafficking venture, because she was paid a "finder's fee" for recruiting Hallman, Lawson, and Speight.[12]

However, plaintiffs have not alleged any *facts* to show that Shon knew or acted in reckless disregard of the fact that Rubin would use force, fraud, or coercion to cause plaintiffs to engage in commercial sex acts with him. The six sub-paragraphs they cite for that proposition simply repeat this element of the offense, without any further factual elaboration or support. The amended complaint, like the original complaint, does not allege that Shon was present for any of the alleged assaults, was told about them before or after they occurred, or knew that any of the plaintiffs were afraid of Rubin; nor does it allege anything similar, which might show knowledge or reckless disregard. The human-trafficking claim against Shon is therefore dismissed.

Finally, plaintiffs claim that Shon intentionally inflicted severe emotional distress on them by introducing them to Rubin, indirectly facilitating Rubin's abuse. Plaintiff Speight argues that Shon intentionally inflicted emotional distress on her directly by posting naked photographs of Speight on Instagram on March 30, 2016.

As a preliminary matter, the complaint does not allege that Shon had any contact at all with plaintiffs Hathaway, Peterson, and Fuller, so their intentional-tort claims against Shon are dismissed.

The claims brought by three of the remaining four plaintiffs are all barred by the statute of limitations. New York law provides one-year limitations period for intentional torts. See

---

[12] Plaintiff Caldwell does not allege that Shon recruited her or was paid a finder's fee for doing so but alleges that Shon attended dinner with her and Rubin when Caldwell first met him (and went back to the penthouse, although nothing happened) and made representations about what to expect when she came back to New York in September 2016.

N.Y.C.P.L.R. 215. Plaintiffs filed their federal complaint on November 2, 2017.[13] The

allegations of physical abuse by Rubin brought by plaintiffs Hallman, Caldwell, and Speight, and

Shon's alleged posting of pictures of Speight all occurred before November 2, 2016, and are

therefore time-barred.

The only timely allegation related to the intentional tort claim against Shon is that Shon

intentionally inflicted emotional distress on Lawson by introducing her to Rubin, knowing that

Rubin would physically abuse and rape Lawson when Lawson came to New York City in

December 2016. The problem with this argument is, like with the human-trafficking claim,

plaintiffs have not pleaded any facts to show that Shon knew about the physical harm that

allegedly caused Lawson emotional distress, let alone that Shon intentionally introduced Lawson

to Rubin to cause Lawson that eventual distress. The claim for intentional infliction of emotional

distress against Shon is therefore dismissed.

## V. Defendant Blue Icarus

Defendant Blue Icarus moves to dismiss the three claims brought against it: RICO,

RICO conspiracy, and a separate human-trafficking claim under 18 U.S.C. § 1591(a). The RICO

claims against Blue Icarus fail on the same damages and proximate-cause grounds that apply to

the other defendants, but on additional grounds as well.

First, as described above, § 1595 provides a civil remedy against "whoever knowingly

benefits, financially or by receiving anything of value from participation in a venture which that

person knew or should have known has engaged in an act in violation of this chapter." Plaintiffs

---

[13] Although plaintiffs Lawson, Hallman, and Caldwell filed the Queens County complaint on September 21, 2017, Shon was not a named defendant in that case and therefore any tolling of the statute of limitations based on the state-court action does not apply to the claims against her (although, as explained in Part VI, the Court concludes that plaintiffs do not meet the requirements for tolling and therefore November 2, 2017 is the relevant date for the claims against defendants Rubin and Powers as well).

argue that Blue Icarus is liable under § 1595 because it should have known that Rubin, who paid Blue Icarus to lease the penthouse, was engaged in human trafficking in violation of § 1591. Plaintiffs' human-trafficking claims against Blue Icarus (both alleged as RICO predicates and as a separate, stand-alone claim) all depend on a duty to monitor or duty to inspect the property it leased to Rubin.

First, plaintiffs have not cited any caselaw to support their argument that one visit by the police department and one ambulance sent to the residence over six years is sufficient to put the owner of the premises on notice of illegal activity. (Indeed, plaintiffs do not cite any cases at all for the standard for a property owner's duty to monitor the premises.). Plaintiffs did not claim that Blue Icarus had actual notice of the alleged activity,[14] only that it should have known about alleged trafficking based on its duty to monitor the premises.

Plaintiffs claim that Blue Icarus was "at least recklessly indifferent to the Enterprise and its acts" because it "failed to inquire following separate incidents at the Penthouse where an ambulance was called on one occasion and police were called on a separate occasion." Although the amended complaint does not specify, the ambulance visit referred to is presumably the one described a few paragraphs later, in which an ambulance took plaintiff Hallman to the hospital after she vomited for hours because she was sick with anxiety.

The only instance of policy being called to the penthouse described in the amended complaint was when Cacciola called them after getting into a fight with Hallman. Assuming the facts in the complaint to be true and even assuming that Blue Icarus had a duty to investigate any

---

[14] Plaintiffs allege that "Rubin introduced the representatives of Blue Icarus to Plaintiff Speight at the Penthouse in the spring of 2016," but this fact hardly demonstrates that Blue Icarus had knowledge of the alleged trafficking scheme or physical abuse. Plaintiffs also allege that Blue Icarus was "aware that Rubin does not live at the Penthouse" and that Rubin paid for the first year's rent upfront and in cash. Common sense dictates that these facts would not serve to put a landlord on notice of illegal activity, and plaintiffs cite no case suggesting otherwise.

time the police were called, there would not have been any reason for it to infer illegal conduct by Rubin or his employees based on why the police were called. In the only two instances of an ambulance or the police being called to the penthouse, any investigation by Blue Icarus would not have led to any more information about the alleged human-trafficking enterprise.

Because none of the facts plaintiffs allege support their theory that Blue Icarus knew or acted in reckless disregard of the fact of the alleged human trafficking, plaintiffs cannot show that Blue Icarus committed any RICO predicates of human trafficking under 18 U.S.C. § 1591(a). Their stand-alone claim under the same provision fails for the same reason.

## VI. Defendant Rubin

The RICO and RICO conspiracy claims against defendant Rubin are dismissed for the reasons given in Part II of this opinion. Defendant Rubin also moved to dismiss the other substantive counts against him: human trafficking under 18 U.S.C. § 1591(a), improper access under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and state common-law claims for assault, battery, false imprisonment, and intentional infliction of emotional distress. As explained further below, the Court grants Rubin's motion to dismiss as to the computer-fraud claim and the intentional-tort claims brought by plaintiffs Hallman, Caldwell, Speight, and Fuller, and denies it as to the human-trafficking claim and the intentional-tort claims brought by plaintiffs Lawson, Hathaway, and Peterson.

### A. Human-Trafficking Claim under 18 U.S.C. § 1591(a)

To state a claim under 18 U.S.C. § 1591(a) as relevant here, plaintiffs must plead facts to show that Rubin: (1) recruited, enticed, harbored, transported, obtained, patronized, or solicited a person; (2) knowing that means of force, threats of force, fraud, or coercion will be used to cause that person to engage in a commercial sex act. Rubin argues that plaintiffs have failed to

plead causation: he argues that the complaint itself establishes that plaintiffs willingly traveled to New York City on multiple occasions to engage in commercial sex with him, and therefore that commercial sex was not the result of force, threats of force, fraud, or coercion. Rubin concedes that there was force involved in his sexual interactions with plaintiffs as alleged in the amended complaint but argues that the force was incident to the commercial sex, not the cause of it.

The problem with Rubin's argument is that it requires the Court to draw inferences in his favor and against plaintiffs – the opposite of what the Court must do on a motion to dismiss. In the complaint, plaintiffs Hallman, Speight, Lawson, and Peterson all allege that they traveled to New York with the understanding that they were simply spending time with Rubin, having dinner with him, engaging in fetish play, or taking fetish photos.

Plaintiff Lawson specifically alleges that Powers told her before her first meeting with Rubin that "the trip would not be about sex." Hallman alleges that she was told that she would be permitted to leave if she ever felt uncomfortable and would still receive the initial $2,000 for her time. And although according to the complaint, Rubin told Peterson in their email conversations before her first trip that she would be "beaten and bound and would be black and blue." Peterson alleges that she did not take Rubin's statements seriously because she thought they were simply part of the role-playing and fantasy she had heard Rubin liked. Peterson alleges that she had dinner and spent time with Rubin and others at the penthouse at least ten times, but that all of these encounters were "merely social." Peterson alleges that when they did have sex in 2015 or 2016, she was very intoxicated and that Rubin "forced her to take oxycodone again" so that she was "going in and out of consciousness" during their sexual encounter. Peterson also alleges she was drugged and involuntarily tied up and beaten when she met Rubin

in the summer of 2017.  The allegations are sufficient to raise plausible claim that Rubin's sex act with Peterson was brought about by force, fraud, or coercion.

For the other two plaintiffs,[15] Caldwell alleges that she knew about Hallman's previous violent experiences with Rubin (Hallman introduced Caldwell to Rubin), but that Powers assured Caldwell that Rubin "would not ask her to do anything she was uncomfortable with."  And while the complaint alleges that plaintiff Hathaway had a consensual commercial sexual relationship with Rubin from 2010 to 2015, she alleges that beginning in 2015, she had some interactions with Rubin where she would wake up in the penthouse with injuries consistent with sexual activity but with no recollection of the evening.  She specifically alleges one occasion when Rubin offered her wine and cheese, and after, consuming no other alcoholic beverages, medication, or drugs, she lost consciousness and woke up hours later, with no memory of being in the condominium's red room.  Based on the complaint, Hathaway and Rubin did have a consensual sexual relationship from 2011 to 2015, but that it changed and became at least occasionally became non-consensual.

Although evidence produced in discovery may eventually show that the inferences Rubin seeks to draw are the correct ones, the Court must draw those inferences in plaintiffs' favor at this stage.

Plaintiffs Caldwell and Fuller only had these encounters with Rubin once.  That the other plaintiffs met with Rubin more than once does not establish their consent on any given occasion. And of the five plaintiffs who had these sexual encounters with Rubin more than once, Hallman pleaded that she was "afraid of what Rubin would do if she did not cooperate with [him]" and

---

[15] Plaintiff Fuller's allegations could not form the basis of a human-trafficking claim because she alleges that an unnamed friend invited her to go to New York to meet Rubin.  Fuller does not allege that Rubin or his associates contacted her or paid for her transportation to New York or in any way caused her to travel interstate.

because Rubin knew where she lived and "how to find her if he wanted to hurt her." Speight also alleged that she was afraid of Rubin physically after he bragged to her that he once broken a woman's jaw.

Taking the factual allegations to be true and drawing all reasonable inferences in plaintiffs' favor, plaintiffs travelled willingly to New York City, but not to engage in commercial sex with Rubin and only engaged in commercial sex because they were overpowered by Rubin or sedated past the ability to consent with alcohol or drugs. These allegations in the amended complaint covering plaintiffs' initial interactions with Rubin are sufficient to survive a motion to dismiss on the human-trafficking claim.

### B. Claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

Rubin also moves to dismiss the claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. That provision permits "[a]ny person who suffers damage or loss by reason of a violation of [§ 1030(c)(4)(A)(i)(I)-(V)]" to "maintain a civil action against the violator to obtain compensatory damages." Id. § 1030(g).

Subsection (I) (the one relevant here) refers to a situation where a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage" in the form of "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." Id. § 1030(c)(4)(A)(i)(I), referencing id. § 1030(a)(5)(B). The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."[16] Id. § 1030(e)(11). Under § 1030(g),

---

[16] The statute also defines "loss" to include "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service," but neither party argues that this clause is relevant here.

"[d]amages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages."

Here, plaintiffs allege that Rubin directed an individual or a group of individuals to access the Apple, Facebook, and Google accounts of at least plaintiffs Hallman, Caldwell, Fuller, and Peterson, and the Google account of plaintiff Hallman's brother to intimidate them and to interfere with evidence saved under plaintiffs' accounts. Plaintiffs allege that Powers and Rubin knew these accounts belonged to them because Rubin and Powers had previously contacted them through these accounts. For damages, plaintiffs alleged that the hacking "caused Plaintiffs to incur legal fees well in excess of $5,000 within a one-year period, in order for Plaintiffs to protect their accounts, information, the attorney-client privilege, and bank and credit card records."

Rubin argues that the claims should be dismissed because plaintiffs have not alleged that he personally conducted the hacking, have not plausibly alleged that he directed John Doe to conduct the hacking, and have not pleaded "loss" as required under the statute. The CFAA permits a civil plaintiff to recover compensatory damages against "the violator" of the statute. Id. § 1030(g). Although plaintiffs do not phrase it in these terms, they essentially allege that John Doe, acting as Rubin's agent, violated the statute on Rubin's behalf, for Rubin's benefit. Such an arrangement would make Rubin a "violator" of the statute. See, e.g., Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004); cf. Scottrade, Inc. v. BroCo Invs., Inc., 774 F. Supp. 2d 573, 584 (S.D.N.Y. 2011) (concluding no joint liability for violation of CFAA where co-conspirator benefitted from hacking but was not alleged to have participated in the hacking itself).

But plaintiffs have not stated a claim under § 1030(g), because they have not pleaded "loss" as required by the statute. Plaintiffs' only alleged loss is $5,000 in legal fees "for Plaintiffs to protect their accounts, information, the attorney-client privilege, and bank and credit card records." Plaintiffs do not explain exactly what they mean by this, but they presumably are referring to the legal fees incurred in this action since no other one is mentioned (besides the state-court action in which only state-law claims were alleged).[17]

Although the statute defines "loss" to include "any reasonable cost to the victim," other courts that have examined the statute have concluded that the reasonable costs must still be connected to the underlying unauthorized access. Courts have therefore considered "loss" to include investigating the offense, A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 646 (4th Cir. 2009), and assessing the damage, EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 585 (1st Cir. 2001); I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys., 307 F.Supp.2d 521, 525-26 (S.D.N.Y.2004). But courts have declined to include expenses that are not directly related to the computer or to the unauthorized access itself, such as the cost of traveling to the site of an unauthorized access or the cost of meals eaten while senior executives discussed their response to a breach. Nexans Wires, 319 F.Supp.2d at 476.

Some courts have considered "loss" to include the cost of retaining counsel to determine whether the breach requires certain public disclosures to comply with state law, see A.V. ex rel. Vanderhye, 562 F.3d at 646, or paying an attorney to investigate the intrusion or oversee the investigation, see Animators at Law, Inc. v. Capital Legal Sols., LLC, 786 F. Supp. 2d 1114,

---

[17] In a sworn declaration attached to their oppositions to defendants' motions to dismiss, plaintiffs' counsel states that counsel "performed considerable work in the wake of Defendants' hack," including "interviewing clients as to what was taken, discussing the necessity of the accounts in regards to the case, changing passwords, and otherwise bolstering security on Plaintiffs' online accounts." Only the latter two are related to the unauthorized access itself rather than the litigation of these claims, and they are so vague that the Court cannot determine whether they satisfy the legal standard.

1122 (E.D. Va. 2011). However, courts appear to have uniformly rejected the conclusion that the cost of retaining and paying attorneys to prosecute an alleged CFAA violation is a "loss" under the statute. See, e.g., A.V. ex rel. Vanderhye, 562 F.3d at 646; Turner W. Branch, P.A. v. Osborn, No. CV 13-00110 MV/WPL, 2014 WL 12593991, at *18 (D. N.M. Mar. 26, 2014); NCMIC Fin. Corp. v. Artino, 638 F. Supp. 2d 1042, 1065-66 (S.D. Iowa 2009); Wilson v. Moreau, 440 F. Supp. 2d 81, 110 (D. R.I. 2006). The Court agrees with these cases: the cost of bringing an action under the CFAA or another statute is not sufficiently related to the computer or the unauthorized access itself to qualify as a consequential "loss" under § 1030(g). Plaintiffs cite no case to the contrary.

Plaintiffs' CFAA claim against Rubin is therefore dismissed.

### C. Common-law claims

Finally, Rubin moves to dismiss the state-law claims for assault, battery, false imprisonment, and intentional infliction of emotional distress. Rubin joins in the statute-of-limitations defense asserted by defendant Powers and asserts consent as a blanket defense to all of the alleged intentional torts.

As described above, the statute of limitations for intentional torts is in New York is one year. N.Y.C.P.L.R. 215. Plaintiffs argue that the statute of limitations on their original action filed November 2, 2017, was tolled by their filing of a "placeholder" summons with notice under N.Y.C.P.L.R. 203 against Rubin and Powers in Queens County Supreme Court on September 21, 2017. That provision lists the various ways an action may be "interposed" (that is, officially begun) through service. It includes when "the summons is served upon the defendant within sixty days after the period of limitation would have expired but for this provision," as long as the

summons is "filed with clerk of that county within the city of New York in which the defendant resides, is employed or is doing business."

Plaintiffs filed the summons with notice on September 21, 2017. They filed this federal case on November 2, 2017, 42 days later. But plaintiffs do not allege and have not produced any evidence that they served either Rubin or Powers with the summons within 60 days of filing it, as required by CPLR 203(b)(5)(i) to extend the limitations period, nor that Rubin or Powers reside, is employed, or does business in Queens County. The amended complaint alleges that both Rubin and Powers reside in Manhattan. The relevant date for the statute of limitations is therefore November 2, 2017, the date this federal action was filed.

The only conduct that falls within the one-year statute of limitations (counting from November 2, 2017) is Lawson's interaction with Rubin in late December 2016, Hathaway's interaction in Rubin in June 2017, and Peterson's interaction with Rubin in the summer of 2017. The state-law claims brought by the other four plaintiffs are therefore dismissed as time-barred.

Rubin argues that any timely claims should still be dismissed because the complaint itself establishes that plaintiffs knowingly and willingly came to New York to engage in the conduct of which they now complain. Rubin argues that each plaintiff signed a non-disclosure agreement and release in which they "voluntarily agree[] to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person . . .ʺ[18]

---

[18] Plaintiffs vigorously argue that the non-disclosure agreement attached to defendant Powers's motion to dismiss is invalid under contract law and unenforceable as contrary to public policy, but do not dispute that the agreement is the same one that they signed. Unlike the content of the text messages that Rubin seeks to rely on (as described later in this opinion), the complaint relies on the contents of the non-disclosure agreements to form part of the basis for plaintiffs' claims and is therefore properly before the Court at the motion to dismiss stage. The agreement is some evidence of plaintiffs' knowledge of what kinds of sexual activities Rubin expected, even if it is unenforceable.

Lack of consent is an element of battery, <u>Coopersmith v. Gold</u>, 172 A.D.2d 982, 984, 568 N.Y.S.2d 250 (3d Dep't 1991), and false imprisonment, <u>Torres v. Jones</u>, 26 N.Y.3d 742, 759, 27 N.Y.S.3d 468, 481 (2016).  To plead battery, a plaintiff must allege that (1) the defendant made contact with the plaintiff's body, (2) the contact was harmful or offensive, (3) the contact was intentional, and (4) the plaintiff did not consent.  <u>Naughright v. Weiss</u>, 826 F. Supp. 2d 676, 685 (S.D.N.Y. 2011).  And to plead false imprisonment, plaintiff must allege that (1) the defendant had the intent to confine the plaintiff, (2) the plaintiff was aware they were confined, (3) the plaintiff did not consent, and (4) there was no privilege to the confinement.  <u>King v. Crossland Sav. Bank</u>, 111 F.3d 251, 256 (2d Cir. 1997).

Lack of consent is not an element of the intentional tort of assault or intentional infliction of emotional distress, but consent would neutralize at least one of the elements of each:  Assault is "the intentional placing of another person in apprehension of imminent harmful or offensive contact."  <u>Naughright</u>, 826 F. Supp. 2d at 685.  And to plead intentional infliction of emotional distress, a plaintiff must plead (1) extreme and outrageous conduct by the defendant, (2) the defendant intended to cause severe emotion distress, (3) a connection between the conduct and the plaintiff's injury, and (4) severe emotional distress.  <u>Pepe v. Maklansky</u>, 67 F. Supp. 2d 186, 187 (S.D.N.Y. 1999).

Rubin cannot show on a motion to dismiss that plaintiffs consented to all the actions described in the complaint.  Plaintiffs specifically allege that they did not consent to certain acts or that they withdrew their consent.  As to the three encounters at issue for these claims, plaintiff Lawson alleges that she did not consent to being touched or shocked with the cattle prod or to having sex with Rubin.  Lawson alleges that during this interaction in December 2016, she begged Rubin to stop, but that she was prevented from protesting because she was gagged.

Plaintiff Hathaway alleges that, during their encounter in June 2017, Rubin attached clothespins to her breasts and shocked her with a cattle prod. Hathaway alleges that she did not consent to either of those things, and that she pleaded with him to stop. Plaintiff Peterson alleges that during her interaction with Rubin in the summer of 2017, she "became intoxicated quicker than normal" and blacked out, waking to Rubin beating and electrocuting her while she was tied up. She alleges that he had put "clamps on her vagina." Peterson alleges that she demanded that Rubin let her go and give her money to get home, and that in response to her request for money he "hit her in the face so hard that he split her lip."

Rubin argues that the non-disclosure agreements both plaintiffs signed demonstrate that they did in fact voluntarily engage in all of the sadomasochistic activity alleged, because plaintiffs signed those agreements before the incidents in question. The non-disclosure agreement uses the broad term "sadomasochistic (SM) activity" without any further description. To the extent plaintiffs' signing of the non-disclosure agreement shows a general consent, that consent does not override their allegations in the complaint that they did not consent to these activities in December 2016, June 2017, and the summer of 2017.[19] Lawson in particular alleges that her December 2016 interaction with Rubin was "more violent" than her first interaction in August 2016, and neither Lawson nor Hathaway alleges that she was shocked with a cattle prod on any occasion before the ones at issue for the intentional tort claims.

Defendant Rubin argues that he can establish plaintiff Hathaway's consent through text message exchanges following what the amended complaint refers to as Hathaway's last

---

[19] The Court has considerable doubt whether there can ever be valid consent to many of the actions that plaintiffs allege. In addition, the non-disclosure agreements may be unenforceable as contrary to public policy against prostitution, see N.Y. Penal Law § 230.02(1)(a), or because there was no meeting of the minds as to the extent of violence and potential injury involved. See Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F.Supp.2d 329, 337 (S.D.N.Y.2006). But the Court need not resolve these issues to conclude that Rubin and Powers cannot prevail on this issue on a motion to dismiss.

encounter with Rubin. Rubin cites what are allegedly transcripts of these text messages attached to defendant Powers' motion to dismiss. These transcripts are not properly before the Court on a motion to dismiss.

When resolving a motion to dismiss, the Court considers the pleadings in the complaint. However, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Even where a document is not incorporated by reference, the court may still consider it if the complaint "'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. at 153 (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)). Noting that this standard is occasionally misinterpreted, the Second Circuit has clarified that "plaintiff's *reliance* on the terms and effect of a document in *drafting the complaint* is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers, 282 F.3d at 153 (first emphasis in original).

Although the amended complaint refers to emails and text messages between Rubin and some of the plaintiffs (as well as to some between Powers and plaintiffs), the amended complaint neither quotes these messages nor relies on their contents to form the basis of plaintiffs' claims. The Court cannot conclude that the complaint was drafted in reliance on the text-message transcripts Rubin seeks to use to support his consent argument.[20]

For all of these reasons, Rubin's motion to dismiss is denied as to the state-law claims for assault, battery, false imprisonment, and intentional infliction of emotional distress brought by

---

[20] The Court notes that these text-message transcripts, if authenticated, may provide evidence of consent on summary judgment, but they are not properly before the Court at this stage.

plaintiffs Lawson, Hathaway, and Peterson, but granted as to the claims brought by the remaining four defendants.

## VII. Defendant Powers

Defendant Powers moves to dismiss all of the claims against her, including the stand-alone claim for human-trafficking under 18 U.S.C. § 1591(a), the claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the state common-law claim for intentional infliction of emotional distress. The Court denies her motion as to the human-trafficking claim brought by some plaintiffs but grants it as to the claim under the Computer Fraud and Abuse Act and the claim for intentional infliction of emotional distress.

### A. Human-Trafficking Claim under 18 U.S.C. § 1591(a)

The human-trafficking claim brought by plaintiffs Hathaway, Speight, Hallman, Lawson, and Caldwell[21] against Powers survives dismissal for largely the same reason it survived dismissal against Rubin. These plaintiffs have adequately pleaded that defendants knowingly solicited and transported them knowing or in reckless disregard of the fact that force, threats of force, fraud, or coercion would be used to cause plaintiffs to engage in commercial sex. The complaint clearly pleads (and Powers does not deny) that she knowingly recruited and solicited women in interstate commerce to travel to New York to meet with Rubin. Plaintiffs have also plausibly alleged that Powers benefitted financially from this arrangement by alleging that Rubin paid her to contact plaintiffs on Rubin's behalf, to make their travel arrangements and other logistical plans, and to have them sign non-disclosure agreements.

---

[21] Peterson does not allege any interaction with Powers (directly or indirectly) in the amended complaint. And, as noted in Part VI.A. addressing the human-trafficking claim against Rubin, defendant Fuller's allegations cannot form the basis for a human-trafficking claim under 18 U.S.C. § 1591 because she does not allege that Rubin or Powers recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited her in or affecting interstate commerce. Fuller does allege that Powers paid her $2,500 via PayPal on March 11, 2016, but this alone is not sufficient to establish a human-trafficking claim.

And, unlike with defendant Shon, plaintiffs have alleged significant evidence that Powers knew or recklessly disregarded the fact that they would be (as they allege) forced, threatened, or coerced into commercial sex acts by Rubin.

Plaintiff Hathaway alleges that Rubin introduced her to Powers in or around early 2011, and from that time forward, Powers coordinated (and sometimes purchased) Hathaway's flights to New York. Plaintiffs Hathaway, Speight, Hallman, Lawson, and Caldwell all allege that Powers contacted them to make their travel arrangements to visit Rubin in New York on at least one occasion, and that she presented them with the non-disclosure agreement to sign. Plaintiffs Hallman and Lawson allege that Powers called them to convince them to come to New York to meet Rubin.

Plaintiff Hallman alleges that, after Hallman's first encounter with Rubin, Powers contacted her about finding new women for Rubin. Hallman alleges that Powers paid her $2,000 on Rubin's behalf after Hallman introduced Powers to Caldwell. Caldwell and Lawson allege that Powers sent them money from Powers's personal PayPal account on Rubin's behalf after their encounters with Rubin at the end of September 2016 and the end of December 2016 (respectively).

Based on the allegations of plaintiffs Hathaway and Caldwell, plaintiffs have successfully pleaded that Powers was at least in reckless disregard of the fact that Rubin using force to cause the women to engage in commercial sex acts. Plaintiff Hathaway alleges that, when her interactions with Rubin turned violent beginning in early 2015, Powers knew about the violence because she recommended Arnica cream to Hathaway to reduce the appearance of her bruises. Caldwell also alleges that she told both Rubin and Powers how a doctor informed her that the severe injury to her breasts would require surgery to correct. Caldwell alleges that, when she

traveled to New York in October 2016 to discuss compensation for that surgery, Powers was the one who met with her to discuss Rubin's offer to pay $20,000 in $4,000 installments and that Powers presented her with the releases Caldwell signed.

Powers argues that she reasonably believed, in light of the non-disclosure agreements that she saw all plaintiffs sign, that plaintiffs' injuries were the result of consensual BDSM activity, not force or coercion. Powers may well be able to show on summary judgment that, in light of all of the evidence, she reasonably believed that the injuries Hathaway and Caldwell received were the result of consensual BDSM activity rather than forced or coerced sex. But plaintiffs have produced sufficient evidence to state a claim and therefore survive Powers's motion to dismiss the sex-trafficking claim.

### B.   Claim under Computer Fraud and Abuse Act, 18 U.S.C. § 1030

The claim against Powers under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, fails for the same reason that the claim fails against Rubin: plaintiffs have failed to allege $5,000 in "loss" as defined under the Act.

### C.   Common-law Claim for Intentional Infliction of Emotional Distress

As for the claim of intentional infliction of emotional distress, plaintiffs allege that Powers (and Rubin) engaged in a malicious, willful, and grossly negligent course of conduct intended to cause them extreme mental and emotional distress. Powers argues that any conduct underlying those claims is outside New York's one-year statute of limitations for intentional torts. See N.Y.C.P.L.R. 215. Powers also argues that, even if the allegations were timely, the specific acts that she engaged in are not sufficiently "extreme or outrageous" to meet the legal standard.

For the same reasons described in Part VI.C. (addressing the same claims against Rubin), most of the intentional-tort claims against Powers are barred by the statute of limitations. The claims brought by plaintiff Peterson against Powers fail because Peterson does not allege any contact with Powers at all.

But as for the claims brought by plaintiffs Lawson and Hathaway based on their respective interactions with Rubin in December 2016 and June 2017, Powers's motion to dismiss is denied. Powers argues that her role was administrative, limited to: urging Lawson to travel to New York in December 2016; "assuring her that her safety would not be threatened"; purchasing and emailing Lawson her plane tickets for the December 2016 trip; sending Lawson $5,000 from Powers's personal PayPal account; and arranging plaintiff Hathaway's travel to New York in June 2017. Although the administrative acts such as booking a plane ticket or sending money via PayPal may not be "extreme and outrageous," doing them to knowingly aid Rubin in inflicting emotional distress on plaintiffs through the brutal violence alleged in the complaint would be.

Whether plaintiffs Lawson and Hathaway will ultimately be able to prove these claims will depend on how much Powers knew. Hathaway's allegation that Powers recommended the Arnica cream is enough to show Powers knew that these encounters involved beatings. Caldwell's allegation that she told Powers about how she needed reconstructive surgery because of the damage to her breasts, although time-barred, also supports the inference that Powers knew about the extent of the violence involving other women. Knowingly facilitating these violent encounters, if proven, would be conduct "outrageous in character" and "utterly intolerable in a civilized community." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353 (1993).

Defendant Powers's motion to dismiss the IIED claims is therefore granted as to plaintiffs Hallman, Caldwell, Speight, Peterson, and Fuller, but denied as to plaintiffs Lawson and Hathaway.

## CONCLUSION

The RICO and RICO conspiracy claims against all defendants are dismissed. The human-trafficking claims against defendants Schnur, Shon, and Blue Icarus are dismissed. The claims under the Computer Fraud and Abuse Act against defendants Rubin and Powers are dismissed. The common-law claims for intentional infliction of emotional distress against defendant Shon are dismissed.

The remaining claims are: human-trafficking claims under 18 U.S.C. § 1591 against defendant Rubin brought by all plaintiffs except plaintiff Fuller; human-trafficking under 18 U.S.C. § 1591 against defendant Powers brought by plaintiffs Hathaway, Speight, Hallman, Lawson, and Caldwell; common-law claims against defendant Rubin for assault, battery, false-imprisonment, and intentional infliction of emotional distress brought by plaintiffs Lawson, Hathaway, and Peterson as to their encounters with Rubin in December 2016, June 2017, and the summer of 2017[22]; and common-law claims against defendant Powers for intentional infliction of emotional distress brought by plaintiffs Lawson and Hathaway as to their encounters with Rubin in December 2016 and June 2017.

The following motions are hereby GRANTED in their entirety: [59] motion to dismiss by defendant Schnur; [63] motion to dismiss and [76] supplemental motion by defendant Shon; and [65] motion to dismiss and [82] supplemental motion by defendant Blue Icarus, LLC.

---

[22] The dates alleged by plaintiff Peterson are general, but her intentional-tort claims against Rubin based on her interactions with Rubin which took place within the one-year statute of limitations running from November 2, 2016 to November 2, 2017 are not dismissed.

Defendant Powers's [64] motion to dismiss is granted in part and denied in part, as described above.

Defendant Rubin's [61] motion to dismiss is granted in part and denied in part, as described above.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      April 29, 2018