December 6, 2018

BY ECF
Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *Lawson, et al., v. Rubin, et al., Case No.:  17 CV 6404 (BMC)*

Dear Judge Cogan:

        A discovery dispute has arisen between the parties.  Pursuant to Your Honor's
Individual Practice Rule III(A)(1), defendants' and plaintiffs' respective positions are
set forth below.

        All parties had a meet and confer phone call on November 26, 2018, from 10:30
a.m. until approximately 11 a.m.  Brian Grossman and Jillian McNeil participated on
behalf of Plaintiffs; Ed McDonald, Michael Gilbert and Nicole Delgado for Defendant
Rubin; and Jolene LaVigne-Albert for Defendant Powers.

## DEFENDANTS' POSITION

Defendants make four requests with this letter: (1) an order to compel plaintiffs to
provide their Instagram login credentials so that defendants' e-discovery vendor can
extract Instagram direct messages consistent with the Court's November 1, 2018
Order (granting Dkt. 199); (2) an order allowing defendants' e-discovery vendor to
analyze information already extracted from the phones of plaintiffs Lawson, Speight
and Hathaway regarding their spoliation of relevant text messages; (3) an order
compelling plaintiffs to provide a log detailing the text messages that they
removed/withheld from the data produced by defendants' vendor, and the reasons
for the removal/withholding and (4) an order compelling plaintiffs' expert to be
deposed in New York on December 18, 2018 (or another date agreed upon by the
parties).

**Instagram Direct Messages**

The Second Amended Complaint ("SAC") in this action alleges that third-party
Stephanie Shon contacted plaintiff Hallman and Lawson on behalf of Rubin via
"Instagram direct message" in August 2016 to lure them to New York to meet Mr.

Rubin, falsely representing to them that the purpose of the trip was for a photoshoot. (SAC 291, 307) ("Instagram direct message" is a private messaging service that essentially functions like an e-mail service, within the application Instagram.) The SAC goes into detail about the specific statements that Ms. Shon allegedly made on these Instagram direct messages to Hallman and Lawson. And Ms. Lawson suggested, in her deposition, that Ms. Powers had also reached out to her via Instagram around the same time. (Lawson Depo, at 34:17-19.) But Ms. Powers *never* messaged any of the plaintiffs via Instagram direct message. On the other hand, Ms. Shon testified at her deposition that she did send direct messages on Instagram to plaintiff Hallman, but that she never told plaintiff Hallman that the purpose of the trip to New York City would be for a photoshoot: instead, Ms. Shon testified that she was very explicit in telling Hallman that the purpose of the trip was to engage in a BDSM relationship with Mr. Rubin. Plaintiff Lawson testified that she received Instagram direct messages from either or both Ms. Shon and Ms. Powers, but she could not remember specifically.

These alleged misleading Instagram direct messages luring plaintiffs Hallman and Lawson to New York under false pretenses are at the core of the allegations in this case. Thus, **evidence of these Instagram direct messages is highly relevant.** To date, **plaintiffs have produced no Instagram direct messages,[1] despite the detailed allegations in the SAC regarding such messages, and despite defendants' repeated requests for these, beginning in February 2018 (see, e.g. Powers First Request for Production of Documents (02/06/2018), Request 6).** (Defendants are at a loss for words in the face of plaintiffs' allegation (below) that defendants had never before requested the Instagram direct messages: defendants were *relentless* in their *repeated* requests for these messages.)[2]

On November 1, 2018, the Court ordered four plaintiffs to produce their phones to defendants' e-discovery vendor to "retrieve and produce in a useable form **all**

---

[1] When asked during the meet and confer call to confirm that plaintiffs in fact had produced no Instagram direct messages, despite the detailed allegations regarding these messages in the complaint, Mr. Grossman refused to provide this information, stating, in substance, that he was "not going to go into detail about what was produced and what was not produced."

[2] Plaintiffs fault Defendant Powers (below) for not producing Instagram messages in discovery, but the reality is, as plaintiffs well know, that **Defendant Powers never messaged plaintiffs on Instagram**.

**messages** exchanged with defendants and with Shon, and, for Hallman's and Lawsons phones, **all text messages** involving plaintiffs Hallman, Lawson, and Caldwell since August 1, 2016" (granting Dkt. 199, emphasis added).

Defendants' e-discovery vendor was unable to retrieve from plaintiffs' phones any Instagram direct messages, explaining that each plaintiff's Instagram login credentials would be required to retrieve these messages. But when asked to provide the login information, Plaintiffs refused, taking the position that Instagram direct messages should be treated differently from SMS/MMS or iMessage and WhatsApp text messages, which have already been extracted from the phones. Plaintiffs argue that the court did not authorize defendants to "take plaintiffs' social media." Defendants, however, are not requesting any "social media": we are solely interested in the Instagram direct messages referenced in the SAC. There is no logical basis for plaintiffs' distinction, especially given the specific allegations in this case involving Instagram direct messages. Instagram direct messages is a messaging application just like iMessage and WhatsApp. Instead, plaintiffs' objection is just part of the same pattern of obstinately refusing to produce relevant electronic communications that has delayed discovery into its last weeks and led the Court to grant defendants' motion to compel the production of plaintiffs' cell phones; thus plaintiffs must be compelled to produce their Instagram login credentials.

**The Spoliation Searches**

Defendants' e-discovery vendor has extracted data from plaintiffs' phones, and it has now become apparent that at least three of the plaintiffs have recently deleted from their phones data relevant to this litigation. Specifically:

- No relevant data at all was recovered from the two iPhones produced by plaintiff Speight, even though Speight sent text messages and images to both defendants as late as February 21, 2018, the day *after* Speight was added as a plaintiff in this case. **When Speight deleted these text messages, she committed spoliation.** Speight also exchanged multiple text messages with both defendants throughout the course of 2016-2017, up to and including in November 2017, none of which have been recovered. Further, one of the phones sent by Speight had been "factory reset," meaning that it was essentially reset to the screen that one would see when the phone is newly purchased. Defendants do not know at this point if there was any data on

that phone, or if it had been wiped clean before it was sent to defendants.[3]

- The only relevant data that was recovered from the two iPhones produced by Lawson were text messages from after March 2018, even though Lawson sent hundreds of relevant text messages throughout 2016, 2017 and early 2018, some of which were produced by plaintiffs' counsel in September 2018. **Thus, these produced text messages and any other messages from before March 2018 have been deleted very recently.**

- Fewer than 80 relevant text messages were recovered from the two iPhones produced by Hathaway, **more than half of which had previously been deleted but were recovered by the vendor.** Plaintiff Hathaway had communicated with defendants at least up to the end of October 2017.

Defendants therefore request the Court's permission to analyze the phones produced by Speight, Lawson and Hathaway in order to determine:

1. The period of time during which each phone was used;

2. Whether the phone contained *any* data for those periods of time during which plaintiffs corresponded with defendants; and

3. The approximate date on which Speight's phone was "factory reset."

To be clear, defendants do not require plaintiffs to re-produce their phones; they only request permission to allow their vendor to analyze data that is already in the vendor's possession.[4]

The existing record clearly indicates that these plaintiffs deleted text messages very recently, and information concerning this spoliation is discoverable to show plaintiffs' discovery misconduct.

---

[3] The vendor indicated that data *could*, in theory, still be on the phone, even if it was on the "factory reset" screen. But defendants did not ask the vendor to indicate whether any data was in fact recovered on that phone, and instead sought permission from the court, through this letter, before giving any such instruction to the vendor.
[4] E-discovery vendors never run searches from within a phone. In order to run any search, they download the entirety of the phone.

**Log of Text Messages Removed/Withheld by Plaintiffs' Counsel**

After defendants' vendor provided to plaintiffs the data extracted from plaintiffs' phones for review, plaintiffs' counsel removed information from these reports on the grounds that it was either not relevant or privileged.  When asked about this during the meet and confer call, plaintiffs' counsel stated that he had not distinguished between irrelevant text messages and privileged text messages when he sent instructions to the vendor about removing certain texts.

Defendants request that plaintiffs be compelled to provide a log detailing the text messages that were removed/withheld, and the reasons for the removal/withholding.  Without this information, defendants have no way of challenging plaintiffs' removal/withholding of certain texts, and defendants have already noticed that many text messages exchanged between plaintiffs appear to have been removed, including some that were previously produced.

**The Expert Deposition**

On November 6, 2018, plaintiffs' counsel served an expert report authored by Park Dietz.  On November 19, defendants sent plaintiffs' counsel a notice of deposition for Mr. Dietz, set for December 6.  Plaintiffs' counsel did not reply to the email, and did not indicate that they would not consent to the deposition until November 26, when plaintiffs' counsel for the first time indicated that they would not produce Mr. Dietz for a deposition.  Plaintiffs argued that the cut-off date for expert depositions was November 27, i.e. the very next day, and that defendants' deposition notice was therefore somehow improper and void.

For two reasons, it represents a waste of judicial resources for plaintiffs to force defendants to seek court intervention for this.

First, although they received defendants' deposition notice on November 19, plaintiffs waited until November 26—only one day before their supposed deadline— before informing defendants that they would not produce their expert.  Even if November 27 really had been the deadline, if plaintiffs had notified defendants promptly, the deposition could have been held on or before November 27.  But instead, plaintiffs waited until the very last minute, timing their objection so as to make it impossible to meet the deadline.

Second, there is no November 27 deadline.  The Court's FRCP 16 case management

plan provides that expert discovery "is to be completed by **December 18, 2018**." (Dkt. 166.)  Thus, a December 6, 2018, deposition would have been well before the real deadline.

Plaintiffs cite to a prior order dated May 3, 2018 (Dkt. 106), which provided that the "final date for expert depositions" would be November 27, whereas the "close of expert discovery" would be on December 18.  But this order was superseded by the Rule 16 order, which eliminated the distinction between "expert depositions" and "expert discovery"—the November 27 date is absent from that order; only the December 18 date remains in effect.

Alternativity, if the Court deems that the final date for expert depositions was November 27, then defendants request an extension to December 18, 2018, in order to depose Mr. Dietz.  This is the first request for an adjournment of the deadline for expert depositions.  Although plaintiffs do not consent to this adjournment, they do not provide any justification for this opposition, and their delay in objecting only after it was too late for defendants to take any corrective action contributed substantially to the problem.  Even if defendants were mistaken about the date of the deadline, plaintiffs will suffer absolutely no harm with this 9-day extension, which will not otherwise impact any other dates in the case management plan.

Plaintiffs seem to request that Mr. Dietz's deposition take place in California, but there is no basis for this request.  Defendants request that plaintiffs be compelled to produce Mr. Dietz for his deposition in New York.

**Plaintiffs' Baseless Claim that Defendants Violated the Nov. 1st Court Order and Request for Sanctions**

Although defendants hate to make this letter any longer, they have no choice but to respond to the baseless allegations that plaintiffs make in this letter regarding defendants' vendor's extraction of data from plaintiffs' phones.

Defendants did not violate the Court's November 1st order.  Plaintiffs complain that the searches conducted by defendants' vendor were overbroad.  That claim is: (1) not true; and (2) irrelevant because **defendants were never provided with this allegedly overbroad data – it was sent to plaintiffs' counsel only and removed before the reports were sent to defendants**.  The instructions that were sent to defendants' vendor, and shared with plaintiffs' counsel, are attached here as Exhibit 1.  Plaintiffs' counsel did not take issue with these instructions, which included the search terms,

contrary to what plaintiffs allege.  Defendants' vendor simply searched for the name, email address, Instagram handle, or phone number of Rubin, Powers, Shon, Hallman, Lawson or Caldwell.[5]  There is no other way the vendor could have looked for the conversations that the Court allowed defendants to extract—and what plaintiffs suggest below, somehow searching only "to" and "from" fields, is not doable for text messages, which are very different from emails—especially given that defendants' lawyers were not allowed to assist in any way.   Plaintiffs complain that some of the data extracted was beyond the confines of the Court's Order: defendants have no way to know if that is true because they never saw that data, but if it was, that is to be expected in any data extraction, and that is why the data was provided to plaintiffs' counsel first.

**Plaintiffs' Request for a One-Hour Video Depositions of Each Plaintiffs**

Plaintiffs request a one-hour video deposition for each of plaintiff Hallman and plaintiff Lawson.  But that request is premature.  Defendants will agree to specifics for these depositions once they have received all discovery in this case, that is, once the Court rules on the additional discovery requested in this letter, and until such additional discovery, if any, is provided to and reviewed by defendants.  Defendants request a reasonable extension of the November 30th discovery deadline to complete what the Court has ordered on November 1st, 2018, which is not yet completed, through no fault of defendants. Defendants do not anticipate that this extension will impact any other deadlines in the case.

<b>PLAINTIFFS' POSITION</b>

The Court should sanction Defendants and their counsel for violating this Court's November 1, 2018, Order (the "Nov. 1 Order"), and should stop their fishing expedition and attempts to further harass Plaintiffs. Defendants also should be held to this Court's scheduling orders (which Defendants themselves proposed) and not get any more time for discovery, either to harass Plaintiffs (as they previously did–including during depositions, as described below) or to obtain discovery they have not previously sought.

---

[5] The vendor also limited this search by time period for the texts between Hallman, Lawson and Caldwell (to texts after Aug. 1, 2016).

Defendants should be sanctioned for violating the Nov. 1 Order as they violated the Court's limited order by obtaining more private communications from Plaintiffs' phones than this Court permitted, and now admit that their vendor is maintaining the entirety of Plaintiffs' information (something Plaintiffs learned for the first time in Defendants' second draft of this letter). Specifically, Defendants searched the entirety of Plaintiffs' messages, after imaging all data stored on Plaintiffs' devices, including but not limited to thousands of highly personal messages which Plaintiffs exchanged with their family members and significant others.[6] Defendants did this even though this Court, in its Nov. 1 Order, permitted them to obtain only "messages exchanged *with defendants and with Shon*, and, for Hallman's and Lawson's phones, all text messages *involving Plaintiffs* Hallman, Lawson, and Caldwell since August 1, 2016." (emphasis added).

For example, Defendants attempted to have produced to them nearly 10,000 messages between one Plaintiff and her boyfriend, and hundreds of messages between Plaintiffs and their friends that have nothing to do with this case (and anyway are beyond the scope of the Court's limited Nov. 1 Order). This is well beyond the scope of the Nov. 1 Order, caused further work for Plaintiffs' counsel to prevent disclosure of these wrongfully obtained private communications, and constitutes harassment.

This Court should deny Defendants' attempt to get a third bite at the apple in reviewing Plaintiffs' phones, and sanction them[7] for violating the Court's Nov. 1 Order.

## DEFENDANTS' VIOLATION OF THIS COURT'S PREVIOUS ORDER AND PLAINTIFFS' REQUEST FOR SANCTIONS

Defendants' discovery vendor sent counsel for Plaintiffs the messages collected from Plaintiffs' phones on Thursday, December 15 at 6:48 p.m. However, when

---

[6] Despite Defendants' complaints about the format in which Plaintiffs produced the messages (in spreadsheets), Defendants' discovery vendor produced the messages in the same way. Moreover, despite Defendants' use of these documents in their portion of the letter, these documents have *not* been produced to Plaintiffs following their review of the documents and were supposed to be turned over to Plaintiffs as well as Defendants upon completion by Defendants' discovery vendor. Plaintiffs have still not seen what was produced from their own clients' phones despite the fact that Plaintiffs' counsel informed Defendants of this issue in their December 3 draft response of this letter.

[7] Plaintiffs did not intend to seek relief related to the Court's Nov. 1 Order and had hoped simply to focus on pushing the case to trial, but now seek this relief since Defendants continue their efforts to harass Plaintiffs and prolong this litigation.

Plaintiffs opened the messages the next day, the documents revealed that Defendants searched and imaged more than the Court had permitted and lied to Plaintiffs about how they were going to be searching the Plaintiffs' devices. On November 8, 2018, the day Plaintiffs were required to send their devices to Defendants' vendor, Defendants provided to Plaintiffs what they claimed were the instructions to their vendor for searching Plaintiffs' devices (the same instructions attached as Defendants' Exhibit 1). On November 19, 2018, when counsel for Plaintiffs reviewed the messages, it became clear that Defendants must have provided further instructions to its vendor, without notifying Plaintiffs. Plaintiffs raised this issue with Defendants on the same day. The messages pulled from the Plaintiffs' devices included, for example, messages between Plaintiffs and their significant others, and not solely, as the Court ordered, "all messages exchanged with defendants and with Shon, and, for Hallman's and Lawsons phones, all text messages involving plaintiffs Hallman, Lawson, and Caldwell since August 1, 2016." Defendants' response was that they used search terms on *the entirety of Plaintiffs' devices* and then "whenever there was a hit, they exported the entire chat thread for review." In the same email, and for the first time, Defendants provided Plaintiffs with those additional search terms.

The global search that Defendants instructed their vendor to perform was not permitted by this Court and resulted in the production of thousands of irrelevant, non-responsive, private messages. Defendants' vendor should have not done a global search for any terms, but instead should have searched only the "to" and "from fields", as was permitted by the Nov. 1 Order. This, combined with Defendants' instruction to pull the entirety of conversations where only a single term was mentioned in a single instance resulted in the immense over-collection of information and invasion of our clients' privacy. That is, based on how Defendants' vendor searched Plaintiffs' devices, any single message where a Plaintiff gave someone their Instagram name, including but not limited to, friends, family, and colleagues entirely unrelated to this case, resulted in the Defendants' vendor pulling *every message sent* between the Plaintiff and that individual that was stored on that phone. Indeed, some messages pulled by Defendants' vendor *dated back to 2005*, well before any of the events at issue in this case had taken place.

Defendants should not be permitted to access the extensive irrelevant information this type of search produced, nor should Plaintiffs be required to conduct a review of these thousands of messages to cull irrelevant information that Defendants were never permitted to image in the first place.

In attempting to justify their invasion of Plaintiffs' privacy, Defendants admitted that they were "aware that some messages may have been beyond the confines of the court order – there was no other way to effectively perform the extraction" but this is simply not true. (Email from Jolene LaVigne-Albert, Esq. to Brian Grossman, attached hereto as Ex. 1 at 1.) While Plaintiffs do not contest that the search terms used were relevant to the Court's Order had they been properly utilized, the Defendants should have—and the Defendants' discovery vendor had the capability—searched *solely* the "to" and "from" fields of the messages and not the body of all of the Plaintiffs' messages. Moreover, Defendants had their vendor produce entire chats even if there was only a single hit (based on a search that never should have occurred), in one case resulting in 9,505 messages between one Plaintiff and her boyfriend, 687 messages between one Plaintiff and her make-up artist, and 354 messages between one Plaintiff and her friend that has nothing to do with this case.

Plaintiffs now seek sanctions regarding Defendants' violation of this Court's Nov. 1 Order that resulted in Plaintiffs' counsel needing to conduct excess work in the days immediately preceding the Thanksgiving holiday and for the invasion of Plaintiffs' privacy.

## DEFENDANTS ARE NOT ENTITLED TO PLAINTIFFS' SOCIAL MEDIA ACCOUNTS

Defendants now request—for the first time—Plaintiffs' social media passwords after Plaintiffs have already turned their phones over in order to image their social media accounts, despite Plaintiffs already turning over all responsive social media data.[8] Defendants previously attempted to argue to Plaintiffs that the Court's Order (that granted Dkt. No. 199) permitted the Defendants to image Plaintiffs' social media, despite Defendants intentionally omitting language to that effect from their portion of the joint letter (Dkt. No. 199) to create an ambiguity. Indeed, previous versions of Defendants' portion of the letter had a footnote that stated that "[t]he term 'text messages' is used generally and encompasses standard text messaging, as well as messages sent via iMessage, WhatsApp, and other similar applications." Defendants' claim that certain Plaintiffs must be compelled to turn over their social media passwords "consistent with the Court's November 1, 2018 Order" is disingenuous as the Court *never* ordered Plaintiffs to turn over any social media account information.

---

[8] Defendants' footnote 1 is incorrect and misleading. When asked at the meet and confer about the social media data that was produced, Brian Grossman stated that Plaintiffs produced everything relevant that was pulled from the Plaintiffs' social media accounts, but was not going to go through every document of the thousands produced on the call.

Further evidencing Defendants' understanding that the social media accounts were not considered in the Court's Nov. 1 Order, Defendants emailed Plaintiffs' counsel, asking "Will you consent to providing the login information for each of the four plaintiffs' Instagram account [sic]?" after the Court issued its Order. (Email from Jolene LaVigne-Albert, Esq., to Brian Grossman, attached hereto as Ex. 2 at 1.) Defendants *never* referenced the February 6, 2018, demand that they now point to until this letter, including when Defendants demanded that Plaintiffs consent to providing their login information. Finally, Defendants were aware of their allegations for months but failed to raise any issues until now. However, Defendants are still not entitled to Plaintiffs' social media accounts.

Defendants are not entitled to the usernames and passwords for certain Plaintiffs' social media accounts as their request is untimely. As Defendants have admitted, they have had Plaintiffs' pleadings for over a year now and even demanded Plaintiffs' social media messages in February, now ten months ago. As Plaintiffs' counsel has stated, Plaintiffs produced all responsive documents in their possession months ago. Defendants never challenged that production—until now, months after the close of discovery and after they have already sought additional discovery from Plaintiffs. At no point prior to the close of discovery did Defendants raise this issue so that Plaintiffs could address any purported deficiency (of which there is none) efficiently, but waited until now in order to further harass Plaintiffs. Defendants' timing betrays their intention: to further harass Plaintiffs.

Even if Defendants' late request is deemed sufficient, Defendants are already in control of the information they seek and can recover it through less intrusive means. Defendants claim they need Plaintiffs' social media accounts in order to gather messages between certain Plaintiffs and Defendant Powers and former Defendant Shon. However, Defendants can more readily access this information through Defendant Powers herself (who has not turned over a single page of social media data in discovery) and through former Defendant Shon who has been cooperating with Defendants Rubin and Powers in this case and who Defendant Rubin is paying for legal fees. (Deposition of Rubin ("Rubin Dep."), attached hereto as Ex. 3 at 197:6–8.) This would also be easier as instead of needing to image two Plaintiffs' social media accounts, Defendants could work with former Defendant Shon to get the information they are requesting for both Plaintiffs without the need for judicial intervention. Defendants now seek to further harass Plaintiffs and to fish for further information in their accounts, despite them being in control of a third-party that has all of this information.

### DEFENDANTS ARE NOT ENTITLED TO COLLECT
### PLAINTIFFS' DEVICES AGAIN

Defendants request that the Court= order that Plaintiffs, again, be required to turn over their devices to Defendants' discovery vendor in order for Defendants to search for evidence of alleged spoliation. This harassment needs to stop. Defendants had ample opportunity after going back and forth with Plaintiffs' counsel for weeks prior to submitting their October 29, 2018, letter that resulted in the Court's Nov. 1 Order permitting analysis of the phones.  Defendants should not get what is now a third attempt at discovery to fish through Plaintiffs' devices. Defendants are not entitled to their late discovery requests, made for the first time after discovery closed.

### DEFENDANTS' COUNSEL MISSED A DEADLINE AND NOW SEEKS TO
### BLAME PLAINTIFFS

Defendants also request that this Court grant them an extension of a deadline that they missed. Defendants blame Plaintiffs for not informing them of the then-looming deadline, but that is not Plaintiffs' responsibility.

Defendants also argue that the deadline for expert depositions was not November 27, 2018, as the Civil Case Management Plan states the close of expert discovery is December 18, 2018 (Dkt. No. 166), and that the Civil Case Management Plan superseded the previous schedule that was submitted by Defendant Powers and so ordered by the Court. (Dkt. No. 106.) However, the dates for the filing of expert reports and the close of expert discovery are exactly the same on the two schedules, and the only difference is the omission of a deadline for expert depositions on the Civil Case Management Plan. The Civil Case Management Plan does not supersede dates that it does not address, and this Court, throughout its schedules up until the Civil Case Management Plan, provided for time between the final date of expert depositions and the close of expert discovery. (*See e.g.* Dkt. No. 57-1.) Defendants have missed their deadline to depose Plaintiffs' expert.[9]

While Defendants are simply too late, if there is an expert deposition taken it should be at Plaintiffs' expert's office in order to better accommodate Plaintiffs' expert following Defendants' late attempt at deposing him, and to minimize costs. Moreover, regardless of where the deposition occurs, Defendants should be ordered to pay the

---

[9] Plaintiffs offered to make their expert available prior to the Christmas break as a concession in the event that Defendants also made certain concessions. Defendants did not make such concessions.

entirety of Plaintiffs' expert's fees, both for time spent preparing for, and during the deposition, as well as any travel needed for such deposition. *See* Fed. R. Civ. P. 26(b)(4)(E)(i); *AP Links, LLC v. Russ*, No. CV095437JSAKT, 2015 WL 9050298, at \*2 (E.D.N.Y. Dec. 15, 2015) (requiring opposing party to pay expert's fees under Fed. R. Civ. P. 26(b)(4)(E), and noting that the opposing party would also be required to pay for the "expert's travel time as well as the expert's out-of-pocket expenses" if the expert was required to travel for the deposition).

## PLAINTIFFS REQUEST THE COURT'S CLARIFICATION ON ITS PRIOR DEPOSITION ORDER

Plaintiffs also seek clarification on the Court's Nov. 1 Order as to the means of any deposition of the Plaintiffs. In the Court's Nov. 1 Order, the Court stated that "[t]he Court also expects the parties to continue the depositions of Hallman and Lawson, as the parties have agreed." In the previous joint letter (Dkt. No. 199) addressing these issues, Plaintiffs suggested a form and time of one-hour video depositions of each of Plaintiffs Hallman and Lawson. Defendants did not provide any suggestions for time, scope, or means and still have not provided a counter-offer for a length of time or the means of the deposition. Plaintiffs raised this on the meet and confer call on November 26, and Defendants denied that the Court had ruled that the depositions should be one-hour video depositions but had no counter as to what the Court meant by it "expects the parties to continue the depositions of Hallman and Lawson, as the parties have agreed."

Part of the reason Plaintiffs have requested that the depositions be conducted via video is due to Defendants' conduct during the depositions in this matter. Defendant's counsel invaded a private attorney-client conversation while I attempted to comfort a Plaintiff who had been crying during a deposition. The breakout room provided by Defendant Rubin had glass windows and counsel could clearly see Plaintiff Lawson sitting on the floor of the room crying while I sat on the floor next to her attempting to both comfort her and discuss the case prior to barging in. Counsel for Rubin did not deny this on the record when raised even though he was in the room during the following colloquy:

> MR. GROSSMAN: I would like to make one statement on the record before we continue. During that the last break, Mr. McDonald decided to barge into our break room while we were having attorney-client privileged discussions, without knocking, causing my client to begin crying yet again. Mr. McDonald then told me that

he was not going to leave the room, because this was 'his office,' and we couldn't tell him to leave the room like that. So I had a conversation with him outside, and he then asked me to go to lunch rather quickly and come back.

MR. ROSENBERG: Okay. Well, I'm not going to comment on that, although I think that there was really some puzzlement as to whether you were going to lunch or not going to lunch or staying or not, and I think he was trying to find out about that. I'm not going to--

(Deposition of Lawson ("Lawson Dep."), attached hereto as Ex. 4 at 146:8–147:7.) Counsel for Rubin was not attempting to be polite by not intruding during that colloquy, as he had previously interrupted the deposition on five occasions to complain that the witness was not speaking loud enough, while counsel was sitting on the side of the room and not at the table, even getting into a back and forth with the witness about the fact that there was room at the table for him but that he chose to instead sit by the door. (*See* Lawson Dep. at 25:5–6, 25:12–13, 32:14–15, 79:19–20, 84:8–24.)

Finally, Defendants have delayed these depositions long enough. Despite their claim that the depositions have not been conducted "through no fault of defendants," the Defendants are the sole reason the depositions have not yet been conducted. The Court first ordered that these depositions be completed by November 30 on November 1. On November 20, Plaintiffs offered a one-week extension to Defendants because of the time it was taking Defendants' vendor to get Plaintiffs the documents to review and for Defendants' vendor to in turn get Defendants the documents following Plaintiffs' review. (Email from Brian Grossman to Jolene LaVigne-Albert, Esq., attached hereto as Ex. 5 at 2.) On November 21, Defendants accepted that offer and asked what days the week of December 3, would work for Plaintiffs. (Email from Jolene LaVigne-Albert, Esq. to Brian Grossman, attached hereto as Ex. 6 at 1.) On November 26, Plaintiffs emailed Defendants letting them know that Plaintiffs Hallman and Lawson were available for their depositions on December 7. (Email from Brian Grossman to Jolene LaVigne-Albert, Esq., attached hereto as Ex. 7 at 1.) Defendants never responded. That extension was not a free pass to delay the Court ordered depositions of Plaintiffs, but rather a reasonable accommodation that Plaintiffs offered. Nor is Defendants' misconduct with regards to the imaging of Plaintiffs' phones a basis for a further extension.

For these reasons, and because both Plaintiff Hallman and Lawson have already traveled to New York to be deposed for the full seven hours in the past, Plaintiffs request that the depositions take place as soon as possible, and be limited in time to one-hour and be conducted by video.

### PLAINTIFFS HAVE ALREADY AGREED TO PROVIDE DEFENDANTS WITH A PRIVILEGE LOG FOR THE NEW DOCUMENTS

During the meet and confer call Defendants requested, Plaintiffs agreed to provide a log of the information withheld from the new documents on privilege grounds. Plaintiffs do not agree to provide a log of the approximately 11,000 messages that should never have been collected by Defendants' vendor in the first place. Indeed, during discovery no party is required to log anything that is not responsive to demands, and this case should be no different. Defendants' request for a privilege log by way of this letter, when Plaintiffs have already agreed to provide such a document is inappropriate.


Date:   New York, New York
        December 6, 2018


_____
Douglas E. Grover
Jeffrey M. Eilender
Niall D. Ó Murchadha
Jolène F. LaVigne-Albert
26 Broadway, 19th Floor
New York, NY 10004
Telephone:    (212) 344-5400
Facsimile:     (212) 344-7677
*Attorneys for Defendant Jennifer Powers*

/s/Edward A. McDonald_____
Edward A. McDonald
Benjamin E. Rosenberg
Michael J. Gilbert
Benjamin M. Rose
Dechert LLP
1095 Avenue of the Americas

New York, NY 10036
Telephone:     (212) 698-3672
Facisimile:    (212) 698-3599
*Attorneys for Defendant Howard Rubin*


By: /s/Brian L. Grossman
John G. Balestriere
Brian L. Grossman
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (646) 912-8462
Facsimile:     (212) 208-2613
brian.grossman@balestrierefariello.com
*Attorneys for Plaintiffs*