# Exhibit 1

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants

**Administrative Offices**

2906 Lafayette
Newport Beach, CA  92663
Tel:  949-723-2211
Fax:  949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

- **Forensic Psychiatry**
- **Forensic Psychology**
- **Forensic Pathology**
- **Forensic Neurology**
- **Forensic Social Work**
- **Forensic Science**
- **Child Sexual Abuse**
- **Criminology**
- **Security**

November 5, 2018

John Balestriere, Esq.
Brian Grossman, Esq.
Balestriere Fariello
225 Broadway
29th Floor
New York, NY 10007

Via e-mail:  john.balestriere@balestrierefariello.com
             brian.grossman@balestrierefariello.com

Re:  Lawson, et al. v. Rubin, et al.

Dear Mssrs. Balestriere and Grossman:

I am a board certified psychiatrist specializing in forensic psychiatry and a criminologist.  Among my longstanding research and forensic interests are sexual sadism, sexual masochism, the BDSM subculture, and their intersection with injurious and criminal conduct.

This report is based on my professional education, knowledge, training, and experience, including my own and others' studies of sexual sadism, sexual masochism, and the BDSM subculture, and my review of the October 25, 2018, deposition of Howard Rubin.  At your request, I am writing this report to educate the fact finder about the conventions of the BDSM subculture and the departures from those conventions described in the deposition of Howard Rubin.

## Background and Qualifications

I attach as Exhibit "A" a true and correct copy of my *curriculum vitae*.  I received a Bachelor's Degree in psychology and biology from the Cornell University College of Arts and Sciences (1970), an M.D. degree from the Johns Hopkins University School of Medicine (1975), a Master's degree in Public Health from the Johns Hopkins School of Hygiene and Public Health (1975), and a Ph.D. in sociology from the Johns Hopkins University (1984).  I completed my psychiatric residency at the Johns Hopkins Hospital (1975-77) and the Hospital of the University of Pennsylvania (1977-78), where I was Chief Fellow in Forensic Psychiatry.

1

I have been board certified in psychiatry by the American Board of Psychiatry and Neurology since 1979.

I am a Clinical Professor of Psychiatry and Biobehavioral Sciences at the UCLA School of Medicine.  From 1986 to 1989, I was a Professor of Law at the University of Virginia School of Law and a Professor of Behavioral Medicine and Psychiatry at the University of Virginia School of Medicine. From 1982 to 1986, I was an Associate Professor of Law and of Behavioral Medicine and Psychiatry at the University of Virginia Schools of Law and Medicine.  From 1978 to 1982, I was an Assistant Professor of Psychiatry at Harvard Medical School.  In these positions I have taught and lectured on forensic psychiatry for diverse audiences, including law students, practicing attorneys, law enforcement officers, psychiatry residents, forensic psychiatry fellows, and practicing forensic psychiatrists and psychologists.

I am a Past President of the American Academy of Psychiatry and the Law, a Distinguished Life Fellow of the American Psychiatric Association, and a Fellow of the American Academy of Forensic Sciences.  I was a member of the National Academy of Sciences Committee on Trauma Research.  I have served on the editorial boards of the *Bulletin of the American Academy of Psychiatry and the Law*, the *Journal of Forensic Sciences*, *Behavioral Sciences and the Law*, the *Journal of Threat Assessment and Management*, and other professional publications.

I have testified as an expert witness in forensic psychiatry on hundreds of occasions, including testimony in criminal matters in federal courts throughout the U.S. and the trial courts of nearly every state.  Cases in which I have testified since April 1990 are listed in my CV (see pages 21-34). A few of the better known cases in which I have been retained as an expert are those involving John Hinckley (attempted assassination of President Reagan), Walter Leroy Moody, Jr. (mail bombs killing U.S. Circuit Court Judge Robert Vance of the 11th Circuit Court of Appeals in Birmingham and a civil rights lawyer in Savannah, GA), Jeffrey Dahmer (sexual serial killings in Ohio and Wisconsin), Arthur Shawcross (sexual serial killings around Rochester, New York), Joel Rifkin (serial killings around New York City and Long Island), John DuPont (killing of Olympic wrestler David Schultz), Colin Ferguson (mass murder on the Long Island Railroad), Theodore Kaczynski (the Unabomber), Heriberto Seda (the New York Zodiac serial killer), William Tager (murder of NBC stage hand outside the "Today" show), Charles Ng (sexual serial murders in California), Russell E. Weston (U.S. Capitol shootings), Cary Anthony Stayner (sexual homicides of tourists in Yosemite), John Allen Muhammad and John Lee Malvo (serial sniper murders in the area of Washington, D.C., and elsewhere), Jared Loughner (murder of Judge John Roll, attempted assassination of Congresswoman Gabrielle Giffords, and other crimes in Tucson, AZ), Gilberto Valle, III (the "Cannibal Cop"), Dzhokhar Tsarnaev (Boston Marathon Bombing), and Dylann Roof (mass murder in Charleston).  I have also been retained as a consultant by the F.B.I., the C.I.A., the D.E.A., the U.S. Marshal's Service, and the I.R.S.

2

Approximately 75-80 percent of my work in criminal cases has been on behalf of prosecutors and other law enforcement officials.  Since 1982, I have served as a consultant in various capacities—including lecturing, training, research collaboration, and case consultation—to the F.B.I. Academy's Behavioral Science Unit, Behavior Analysis Units, and National Center for the Analysis of Violent Crime, and I am a member of the New York State Police Forensic Science Unit.

In the development of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, I served on the Advisory Committee on the Paraphilias in the preparation of *DSM-III-R*, playing a significant role in drafting the description of sexual sadism, and as an adviser for the sexual disorders section of the *DSM-IV* and *DSM-IV-TR*.  I have authored more than 100 articles and book chapters and lectured internationally on topics that include forensic psychiatry, the paraphilias, sexual sadism, and sexual bondage, and have made significant original contributions to the understanding of each of these topics, all of which are relevant to this case.

**The Medical Understanding of "BDSM" Sexual Behaviors**

A cluster of sexual behaviors has become known in the commercial sex industry and among those who practice these behaviors with consenting partners as "BDSM" (sometimes described as an acronym for "bondage, domination, sadism, and masochism" or "bondage, domination, slave, master").  In general, these behaviors consist of negotiated, scripted interactions between two or more persons in which one takes the role of the "dominant," "Master," or "top" (if male, or the "Dominatrix" or "Mistress" if female) and enacts domineering, controlling, humiliating, and painful activities upon another, who is known as the "submissive," "Slave," or "bottom."  One or both of these participants may be sexually stimulated by these interactions, depending on the individuals' erotic responsiveness to the partner and to the particular activities enacted.

For heterosexual men taking the dominant role for their own sexual stimulation and gratification, the preferred range of activities with consenting women typically includes, without limitation, vaginal, oral, and anal intercourse; humiliation (e.g., yelling, insulting, or having the partner wear a dog collar or act as a footrest or table); insertion of fists, arms, hands or foreign objects (e.g., dildos, catheters, knives, and guns) into the partner's vagina or anus; administration of pain (e.g., hot wax, clothes pins, clamps, fire, electrical current, spanking, caning, whipping, branding, piercing); bondage and restraint (tying, handcuffs, ankle cuffs, chains, blindfolds, gags, plastic wrap, mummification, dog cages, torture racks, etc.); nonlethal asphyxiation by manual or ligature strangulation or by hanging or suffocation); the use of costumes and props, typically made of black leather; and more.  The ways in which the submissive partner is to be harmed and tortured in the dominant male's fantasies and enactments are limited only by

3

the imagination of the fantasizer and the consent of the submissive partner, and include countless techniques for producing pain, suffering, control, and fear.[1]

When these behaviors and the responses to them in the form of submission, resistance, distress, suffering, protest, crying, screaming, or other responses are sexually arousing to a person inflicting them upon another person, the person who is aroused by inflicting them on another is considered a sexual sadist, i.e., one whose erotic responsiveness includes arousal to sexually sadistic images and activities.

Sexual sadism has been a recognized phenomenon since the term was introduced by the renowned Austrian psychiatrist Richard von Krafft-Ebing in the now famous book, *Psychopathia Sexualis*, which has been published and republished in countless editions since its first appearance in 1886.  Krafft-Ebing named the condition, which he described in detail and through a series

---

[1]   Many websites cater to this population of men with specialized pornography.  For example, the alt.com website, with which I became familiar through the criminal investigation of a man associated with the founder of the site, bills itself as an "Adult Personals, BDSM, Leather & Fetish Community."  Two of the slogans on the home page are "The tighter, the better" and "Beauty is pain."  Membership is free.  The website offers photographs, videos, webcam performances, and anonymous blogs, chats, and e-mails.  Search categories on the website include:  Anything; 24/7 (Total Power Exchange); Age Play; Anal Sex; Asphxiophilia (Breath Play); Biting; Blindfolds; Blood; Bondage; Branding; Breasts/Nipple Torture, Clamps, etc.; Collar and Leash/Lead; Confinement/Caging; Cupping (Suction of the Skin); Dildos (Handheld & Strap-ons); Discipline; Domination; Exhibitionism/Sex in Public; Fire Play; Fisting; Gangbangs; Handcuffs/Shackles; Humiliation; Knife Play; Master/Slave; Needle Play; Oral Sex; Pain; Piercings; Sensory Deprivation; Spanking/Paddling; and Whips.  Similar materials formerly appeared on the insex.com website, which now provides a link to insexarchives.com, "a rotating archive of the former INSEX library."  According to a page entitled "About InsexArchives," insex.com was sold to a company in the Netherlands because of pressure from the U.S. Government and "the religious right," and from 1997 to 2005, insex.com provided a "world reknowned compendium of BDSM techniques" providing a "surreal collection of over 500 movies, 90,000 high resolution pictures, 5,000 video clips, live performances, and imaginative BDSM writing."  Source:  http://www.insexarchives.com/blog/about/, downloaded 11/5/18.  The names of a few of the countless other websites catering to an interest in BDSM pornography reflect the themes described above: infernalrestraints.com, devicebondage.com, hardtied.com, hogtied.com, devicebondage.com, sexandsubmission.com, thetrainingofo.com, whippedass.com, fuckedandbound.com, bondagebob.net, bdsm.xxx, bondagepornvideos.xxx, extremebdsm.xxx, and torturegalaxy.com.

of case histories, after the Marquis de Sade, whose novels described individuals taking pleasure in the humiliation and torture of others. Krafft-Ebing saw the essence of sexual sadism as "the association of lust and cruelty,"[2] and one of his most profound observations was that sexual sadists may seek to enact their torture fantasies when "inhibitory moral counter-presentations fail to act."[3]  In more modern language, he understood that not all sexual sadists seek to act on their desires and that a temporary or permanent lack of moral inhibitions was at the heart of why some men acted on their sexual sadism even without the consent of the other.

Krafft-Ebing's observations and theories include some that have stood the test of time, some that remain viable but untested hypotheses, and some that are today regarded as archaic.  For example, he believed that the condition was more prevalent in men than women, and this observation has held true.  He believed the condition reflected a kind of hypermasculinity in which man's evolutionary need for greater aggression than woman was fused with feelings of lust, a point of view often repeated even today but not yet scientifically testable.  Like many from his era, however, Krafft-Ebing also believed that excessive masturbation in youth produced sexual aberrations in adulthood and that the use of alcohol and drugs and other bad habits could produce progressive deterioration within a family from one generation to the next (the theory of degeneration).  He wrote:

> Sadistic acts vary in monstrousness according to the power exercised by the perverse instinct over the individual thus afflicted, and in accordance with the strength of opposing ideas that may be present, which nearly always are more or less weakened by original ethical defects, hereditary degeneracy, or moral insanity.[4]  Thus there arises a long series of forms which begins with capital crime and ends with paltry acts affording merely symbolic satisfaction to the perverse desires of the sadistic individual.[5]

In the years since Krafft-Ebing first described and named the varieties of unusual sexual interest, such interests have been known as sexual anomalies, perversions, sexual deviations, sexual variations, and paraphilias. Today, American psychiatry uses the term "paraphilia" to encompass a specific group of unusual sexual preferences, and the paraphilia known as sexual sadism is defined in the *Diagnostic and Statistical Manual of Mental*

---

[2]   von Krafft-Ebing R (Klaf FS, trans.):  *Psychopathia Sexualis:  A Medico-Forensic Study*.  New York:  Stein & Day, 1965, at 34.

[3]   Ibid, at 34.

[4]   The term "moral insanity" is an archaic concept that has been replaced with the current concepts of "antisocial personality disorder" or "psychopathy."

[5]   von Krafft-Ebing R (Klaf FS, trans.):  *Psychopathia Sexualis:  A Medico-Forensic Study*.  New York:  Stein & Day, 1965, at 56-57.

*Disorders.*[6]  To be diagnosed with Sexual Sadism Disorder under *DSM-5*, two criteria must be met:

> A. Over a period of at least 6 months, recurrent and intense sexual arousal from the physical or psychological suffering of another person, as manifested by fantasies, urges, or behaviors.
> B. The individual has acted on these sexual urges with a nonconsenting person, or the sexual urges or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.[7]

If criterion B is not met, the individual is described as having the paraphilia of sexual sadism or sexually sadistic interest rather than a diagnosis of Sexual Sadism Disorder.[8]

In conducting research on sexually sadistic offenders, my colleagues and I devised an operational definition of sexual sadism for forensic and research purposes:  An enduring pattern of sexual arousal in response to any of the following forms of "sadistic imagery":  inducing pain, humiliation, suffering, or fear in the real or imagined partner; engaging in torture, mutilation, or incapacitation of the partner; or use of restraints, gags, blindfolds, captivity, domination, forced servitude, spanking, beating, whipping, twisting, biting, scratching, piercing, cutting, clamping, foreign object insertion, fisting, burning, electric shock, choking, strangulation, suffocation, or other painful, incapacitating, or dangerous activities.[9]

For forensic and research purposes, we recommended against reliance on self-serving, self-reports, and instead recommended reliance on the subject's "secret products" and possessions as evidence of arousal pattern and fantasies, of which the most commonly discoverable are:

- Written products (e.g., diaries, letters, notes)
- Graphic products (e.g., photos, sketches, drawings, paintings)
- Dramaturgical products (e.g., scenarios sought with sexual partners, scripts, videotapes, films)
- Criminal products (e.g., audio recordings of offenses; photographs of offenses; videos of offenses; investigative crime scene photographs; autopsy photographs; autopsy reports; victim statements; witness or

---

[6]  American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  American Psychiatric Association:  Arlington, VA:  American Psychiatric Association, 2013.

[7]  Ibid, at 695.

[8]  Ibid, at 685-686 and 697.

[9]  Dietz PE:  "Sadism and Sexual Offenses," presented at "The State of Forensic Psychiatry," a Joint Conference of the American Academy of Psychiatry and the Law, The Institute of Psychiatry, and the Royal College of Psychiatrists, London, England, October 1986.

accomplice statements; and weapons and paraphernalia used in offenses)
- Other possessions (e.g., books, magazines, clippings from newspapers and elsewhere, photographs, films, weapons, restraint equipment, torture equipment, photographic equipment, and dolls or other effigies)[10]

Where the subject can be interviewed, some of the important areas of questioning concern early sexual experiences; experiences with prostitutes; masturbatory fantasies; coital fantasies; preferences in "sexy" magazines, photographs, films, and books; and accounts of offenses.[11]

Our formulation was used in a series of peer-reviewed publications[12] and helped inform the description of Sexual Sadism in *DSM-IV-TR*:

> The paraphilic focus of Sexual Sadism involves acts (real, not simulated) in which the individual derives sexual excitement from the psychological or physical suffering (including humiliation) of the victim. Some individuals with this Paraphilia are bothered by their sadistic fantasies, which may be invoked during sexual activity but not otherwise acted on; in such cases the sadistic fantasies usually involve having complete control over the victim, who is terrified by anticipation of the impending sadistic act.  Others act on the sadistic sexual urges with a consenting partner (who may have Sexual Masochism) who willingly suffers pain or humiliation. Still others with Sexual Sadism act on their sadistic sexual urges with nonconsenting victims.  In all of these cases, it is the suffering of the victim that is sexually arousing. Sadistic fantasies or acts may involve activities that indicate the dominance of the person over the victim (e.g., forcing the victim to crawl or keeping the victim in a cage).  They may also involve restraint, blindfolding, paddling, spanking, whipping, pinching, beating, burning, electrical shocks, rape, cutting, stabbing, strangulation, torture, mutilation, or killing.  Sadistic sexual fantasies are likely to have been present in childhood.  The age at onset of sadistic activities is variable, but is commonly by early adulthood.  Sexual Sadism is usually chronic.  When Sexual Sadism is practiced with

---

[10]  Ibid.

[11]  Ibid.

[12]  Dietz PE, Hazelwood RR, Warren J:  The sexually sadistic criminal and his offenses.  *Bull Am Acad Psychiatry Law* 18:163-178, 1990; Hazelwood RR, Dietz PE, Warren J:  The criminal sexual sadist.  *FBI Law Enforcement Bulletin* 61(2):12-20, February 1992; Hazelwood R, Warren J, Dietz P:  Compliant victims of the sexual sadist.  *Australian Family Physician* 22:474-479, 1993; Warren J, Hazelwood RR, Dietz PE:  The sexually sadistic serial killer.  *Journal of Forensic Sciences* 41:970-974, 1996.

nonconsenting partners, the activity is likely to be repeated until the person with Sexual Sadism is apprehended.  Some individuals with Sexual Sadism may engage in sadistic acts for many years without a need to increase the potential for inflicting serious physical damage.  Usually, however, the severity of the sadistic acts increases over time.  When Sexual Sadism is severe, and especially when it is associated with Antisocial Personality Disorder, individuals with Sexual Sadism may seriously injure or kill their victims.[13]

Men who are sexual sadists discover this desire in the same way that some men discover that they are fetishists, masochists, or pedophiles.  They do not choose to become sexual sadists, so the idea that this is a "lifestyle" is misleading to the extent it suggests that the preference in chosen.  All that is chosen is the ways in which, at various times, the desire for sadistic sexual activity will be denied or admitted, suppressed or indulged.  To a considerable extent, it can be said that sexual sadists choose the ways in which they will cope with their persistent desire.  Among these coping strategies are:

- Suppression of the thoughts and urges, often accompanied by sexual frustration or impotence
- Confining the thoughts to fantasy during masturbation or sexual activity with a partner
- Enacting mild, symbolic, and socially acceptable sadistic activities with a consenting partner, who may or may not enjoy some or all of the activities
- Use of sexually sadistic pornography for arousal during masturbation or in association with sex with a partner
- Phone sex with a partner who plays the role of a "submissive" or "slave" for a fee
- Participation in the BDSM subculture, abiding by its rules under penalty of ostracism and expulsion
- Paying a partner to submit to pre-determined sadistic acts at commercial B&D parlors, strip clubs, or brothels, which may or may not include touching or overt sexual activity
- Paying an independent or pimp-controlled "submissive" or prostitute to submit to sadistic acts and/or overt sexual activities, either at a location she maintains or through "outcall" services
- Pressuring a sexual partner into submitting to sadistic abuse, under threat of abandonment, rejection, or replacement
- Pressuring a sexual partner into submitting to sadistic abuse through a pattern of social isolation; psychological, physical, and sexual abuse

---

[13] American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed., Text Revision.  American Psychiatric Association:  Washington, D.C.:  American Psychiatric Association, 2000, at 573-574.

that crushes the partner's self-esteem and sense of autonomy; and ensuring the partner remains dependent on him in as many ways as possible

- Exploitation of vulnerable people (poor, young, intoxicated, addicted, mentally retarded, emotional unstable, drugged, or otherwise impaired)
- Committing sexually sadistic assaults against strangers, prostitutes, or drug addicts who may be permitted to live or may be killed
- Kidnapping a victim to hold captive and train as a sex slave, killing those who prove noncompliant

Among the factors that make it more likely that a sexual sadist will indulge himself to the detriment of others are:

- Lack of moral inhibitions
- Disrespect for authority
- Recklessness and irresponsibility
- Participation in a deviant subculture (e.g., biker gangs, drug circles, or other groups that revel in their outlaw status)
- Use of alcohol or other drugs
- Inability to recruit willing partners due to lack of money, transportation, social skill, physical attractiveness, or charisma
- Personality disorder, particularly antisocial and narcissistic personality disorders (a combination of which traits is known as psychopathy)
- Psychotic mental illness

Nothing inherent in the condition of sexual sadism has any impact on an individual's capacity to distinguish resistance from consent, to know the difference between right and wrong, or to control which of the above coping techniques he chooses to use. Comorbid psychiatric disorders can conceivably affect these capacities, but are unlikely to do so short of self-induced intoxication or psychotic mental illness.

The distinction between consenting BDSM activities and criminal sadistic acts does not lie in the particular acts committed or in the degree of pain inflicted; it lies in the means by which consent is negotiated for each particular act and the degree of control over the acts that is afforded the "submissive." In the BDSM subculture, every "scene" is negotiated, and the "submissive" has complete veto power both during the advance planning and through the use of a "safe word" or gesture at any time during the scene. Criminal sadistic acts may or may not involve abduction, kidnapping, prolonged captivity, rape, torture, mutilation, and murder,[14] but they always involve acts with a victim who has not competently consented to each act.

---

[14] For examples, see the sources cited in footnote 11 and Bloch I: *The Sexual Life of Our Time: In Its Relations to Modern Civilization*. New York: Allied Book Company, 1928; Stekel W: *Sadism and Masochism: The Psychology of Hatred and Cruelty*. New York: Horace Liveright,

**Norms and Safety Rules of the BDSM Subculture**

At the time of the events underlying this litigation, the norms and safety rules for BDSM activities were widely available on countless web sites, in BDSM manuals, and elsewhere.  Central points in the norms of the subculture are that every act be "safe, sane, and consensual," where consent requires that competent adults agree on the elements of each "scene," agree on the use of safe words and gestures that are always respected, and afford the submissive party control over the actions of the dominant party.  This section of this report provides some examples of widely promulgated rules known to any participant in the BDSM subculture in North America.

The website of STL3, Inc. (formerly known as St. Louis Leather and Lace),[15] for example, provides a description of what has become the universal code of the BSDM subculture:

> Let there be no doubt that STL3 is dedicated to the principals of *"Safe, Sane, and Consensual"* in the lifestyle!  Our definition of these principals are as follows:
>
> - <u>SAFE</u>:  All players have taken the necessary precautions to prevent psychological and physical damage to themselves, including the transmission of disease.
> - <u>SANE</u>:  All players are in full possession of their mental faculties and are fully aware of the risks involved in the play they intend.
> - <u>CONSENSUAL</u>:  All players fully understand the potential risks of their intended play and have consented to the activities.  This consent can be withdrawn or modified by any player at any time.[16]

As one how-to manual states, "Any activity that does not meet these criteria is denounced by responsible members of the S/M community.  And those people who violate this credo are shunned and avoided by others in the community."[17]

---

1929; Berg K:  *The Sadist*.  New York:  Medical Press of New York, 1954; Masters REL, Lea E:  *Sex Crimes in History:  Evolving Concepts of Sadism, Lust-Murder, and Necrophila—From Ancient to Modern Times*.  New York: Julian Press, 1963; Woodward LT:  Sadism.  New York:  Lancer Books, 1964.

[15]  http://stl3.com/, downloaded 10/7/11 and 11/5/18.

[16]  http://stl3.com/mission/, downloaded 10/7/11 and 11/5/18.

[17]  Bannon R:  *Learning the Ropes:  A Basic Guide to Safe and Fun S/M Lovemaking*.  Los Angeles:  Daedalus Publishing Company, 1992, at 23.

The National Coalition for Sexual Freedom promulgates guidelines and principles to help distinguish abuse from consensual BDSM activity:

> The following Principles and Guidelines are intended to help law enforcement and social services professionals understand the difference between abusive relationships vs. consensual sadomasochism (SM).  SM includes a broad and complex group of behaviors between consenting adults involving the consensual exchange of power, and the giving and receiving of intense erotic sensation and/or mental discipline.
>
> SM includes: "intimate activities within the scope of informed consent that is freely given."
>
> Abuse is: "Physical, sexual or emotional acts inflicted on a person without their informed and freely given consent."
>
> **Principles**
>
> The SM-Leather-Fetish communities recognize the phrase "Safe, Sane, Consensual" as the best brief summary of principles guiding SM practices:
>
> **Safe** is being knowledgeable about the techniques and safety concerns involved in what you are doing, and acting in accordance with that knowledge.
>
> **Sane** is knowing the difference between fantasy and reality, and acting in accordance with that knowledge.
>
> **Consensual** is respecting the limits imposed by each participant at all times.  One of the recognized ways to maintain limits is through a "safeword" which ensures that each participant can end his/her participation with a word or gesture.
>
> **Guidelines**
>
> Informed consent must be judged by balancing the following criteria for each encounter at the time the acts occurred:
>
> a) Was informed consent expressly denied or withdrawn?
> b) Were there factors that negated the informed consent?
> c) What is the relationship of the participants?
> d) What was the nature of the activity?
> e) What was the intent of the accused abuser?
>
> Whether an individual's role is top/dominant or bottom/

11

submissive, they could be suffering abuse if they answer no to any of the following questions:

1. Are your needs and limits respected?
2. Is your relationship built on honesty, trust, and respect?
3. Are you able to express feelings of guilt or jealousy or unhappiness?
4. Can you function in everyday life?
5. Can you refuse to do illegal activities?
6. Can you insist on safe sex practices?
7. Can you choose to interact freely with others outside of your relationship?
8. Can you leave the situation without fearing that you will be harmed, or fearing the other participant(s) will harm themselves?
9. Can you choose to exercise self-determination with money, employment, and life decisions?
10. Do you feel free to discuss your practices and feelings with anyone you choose?

These guidelines were created by activists and leaders at the Leather Leadership Conference in 1998.[18]

One of the most highly regarded how-to manuals in the BSDM subculture, judging from the reliance on it by other authors, conveys similar norms, quoted here at length because they are so clear and thoughtful:

The first thing to understand is that SM is entirely *consensual*. Either party, but especially the submissive, always has the absolute right to slow down, change, or completely stop the activity *for any reason whatsoever*.

The second thing to understand is that SM has *limits*. The basic limit is that, even with consent, the "dominant" will not intentionally do anything beyond the ability of the submissive's body (and mind) to self-heal. Also, even with consent—or, indeed, the desire for it—the submissive should not and legally may not be killed, severely damaged, or recklessly endangered.

The third thing to understand is that SM is done with *safety*. The dominant should always give the submissive a special word, commonly called a "safeword," or some readily communicable non-verbal signal, to use when the submissive *really* needs the

_____

[18] https://ncsfreedom.org/images/stories/pdfs/smvabuse.pdf, downloaded 10/07/11 and 11/5/18.

12

activity slowed, changed, or stopped.  The dominant must, by law, always respect and abide by this signal.

Other basic safety considerations include never engaging in SM when an participant is markedly tired, emotionally upset, or intoxicated, not introducing too many new things in a single session, never tying any body part so tightly that it begins to tingle or lose feeling, never (unless both of you are very experienced) striking so hard that you draw blood or leave large marks, and always staying as close to a bound person as you would to an infant left in your care.  The primary responsibility for knowing what can be done safely in a session rests with the dominant.

Participation in an SM session should be *negotiated* beforehand. . . . the people involved should spend "straight time" together after the SM encounter to discuss what went on and their feelings about it. . . .

## SM vs. Abuse

SM play differs from abuse in many of the same ways that a judo match differs from a mugging.  Consider the differences:

1.  SM play is always consensual . . . Abuse is not.
2.  SM players plan their activities to minimize the risks to one another's physical and emotional well-being.  Abusers do not.
3.  SM play is negotiated and agreed to ahead of time.  Abuse is not.
4.  SM play can enhance the relationship between the players.  Abuse cannot.
5.  SM play can be done in the presence of supportive others—even at parties given for this purpose.  Abuse needs isolation and secrecy.
6.  SM play has responsible, agreed-upon rules.  Abuse lacks such rules.
7.  SM play may be requested, and even eagerly, by the submissive.  Nobody overtly asks for abuse—although self-destructive people may sometimes attempt to provoke it.
8.  SM is done for the consensual erotic pleasure and/or personal growth of both or all participants.  Abuse is not.
9.  SM play can be stopped in an instant, at any time, and for any reason when the submissive uses a safeword.  The victim cannot stop their abuser in that way.
10.  In SM play, the dominant always keeps their emotions under control.  An abuser's emotions are out of control.
11.  After SM play, the submissive often feels grateful toward the dominant.  A victim never feels grateful for abuse.

13

12.  SM players do not feel that they have the intrinsic right, by virtue of their gender, income, or other external factors, to control the behavior of their partners.  Abusers often do.

Warning signals.  The more of the following that are present in your relationships, the more likely that it will become, or is already, abusive:

--Excessive alcohol or drug usage.
--Isolation, decreased contact with friends or family members . . .
--Unemployment and/or severe money problems.
--Strong feelings of jealousy or possessiveness.  Unwarranted suspicions of flirting or arranging secret meetings.
--A history of violent confrontations with friends, family members, co-workers, and others.
--A family history of being battered or other violence. . . .
--Dealing with relationship problems by issuing threats or ultimatums . . .
--Non-negotiated, hurtful verbal abuse taking place on an uncomfortably frequent basis . . .[19]

The glossary of a popular, mainstream[20] guidebook offers these definitions of common terms:

*Safe, Sane, and Consensual*:  The fundamental ethical standard of kinky sex.  It means that all activity between adults should be "safe" (no form of pain or stimulation that causes harm), "sane" (with respect for both body and mind), and "consensual" (all partners involved are adults who are able to give informed consent).[21]

\*       \*       \*

*Safe Word*:  Also called stop word, stop code, safety code.  This is a word or expression that partners agree upon which gives the bottom the right to stop the action.  A "safe gesture" is used if the submissive or bottom is gagged or otherwise incapable of speaking.[22]

\*       \*       \*

---

[19] Wiseman J:  *SM 101:  A Realistic Introduction*, 2nd ed.  Eugene, OR: Greenery Press, 1998, at 40-42.

[20] That it is popular and mainstream is evidenced by it being published by a division of Simon & Schuster and reissued through several paperback printings

[21] Brame GG:  *Come Hither:  A Commonsense Guide to Kinky Sex*.  New York:  Fireside, 2000, att 318.

[22] Ibid, at 318.

*Limits*:  The basic set of physical or other limits that the bottom sets during negotiation.  For example, if a bottom does not like anything more painful than erotic spanking, she may set a pain "limit" that rules out whippings and other intense stimuli. . . .[23]

*            *            *

*Negotiation*:  The art and science of reaching a clear, consensual agreement with your adult partner about the type of relationship you will have and the kinds of kinky things you will do together. The negotiation process lasts as long as the couple needs to hammer these things out—it could be days, weeks, months, or even years. . . .[24]

*            *            *

*Slave Contract*:  A document written cooperatively by the dominant and the submissive in which the negotiated terms of their relationship are set out in clear language. . . .[25]

These fundamentals are expressed nearly universally in writings about BDSM,[26] and many publications address the safety of the instruments and techniques used by the defendants:

For safety reasons many D&Sers object to the introduction of electricity in erotic play.  The risks are obvious:  High voltage to the body will cause a fatal shock, and electricity—even of a low voltage—applied to the torso may interfere with normal heartbeat or cause a heart attack. . . .[27]

*            *            *

[W]e believe that actually *depriving* someone of air is too risky an activity for SM play.  No one can know in advance whether or how quickly someone deprived of air can go into cardiac arrest . . .[28]

*            *            *

---

[23]  Ibid, at 314.

[24]  Ibid, at 315.

[25]  Ibid, at 320.

[26]  See, e.g., Henkin WA, Holiday S:  *Consensual Sadomasochism:  How to Talk about It and How to Do It Safely*, 2nd Ed.  Los Angeles:  Daedalus Publishing Company, 1996; Wiseman J:  *SM 101:  A Realistic Introduction*, 2nd ed.  Eugene, OR:  Greenery Press, 1998; Brame GG, Brame WD, Jacobs J: *Different Loving:  An Exploration of the World of Sexual Dominance and Submission*.  New York:  Villard Books, 1993; and Bannon R:  *Learning the Ropes:  A Basic Guide to Safe and Fun S/M Lovemaking*.  Los Angeles:  Daedalus Publishing Company, 1992.

[27]  Brame GG, Brame WD, Jacobs J: *Different Loving:  An Exploration of the World of Sexual Dominance and Submission*.  New York:  Villard Books, 1993, at 285.

[28]  Ibid, at 211.

15

Anytime anyone gets tied up there has to be a quick way of getting that person free should an emergency develop.[29]

\*        \*        \*

Clothespins or metal nipple clamps . . . you should never leave the clamps on long enough for the nipple or skin to turn purple. Purple = bad. . . . alleviate the clamp or suction device before it gets to that point.[30]

\*        \*        \*

Things to Remember About Safety:

- Consent is paramount.  We don't coerce someone into play.
- Never leave anyone alone in bondage EVER.
- No drinking or drugs while playing.
- Make sure any toy to be inserted is smooth and rounded.
- Know who you are playing with and their sexual health[31]

## Deviations from BDSM Norms and Safety Rules Described in Howard Rubin's Deposition

In this section, I address seven ways in which Mr. Rubin's testimony suggests a deviation from the norms and safety rules of the BDSM subculture.

<u>Inadequate Advance Negotiation of Each and Every Act</u>

Asked at deposition what he meant by "consensual," Mr. Rubin testified, "That the women [sic] has agreed to the type of activity, BDSM activity, that we're going to engage in."[32]  A blanket consent to "BDSM activity" would be inadequate, as each proposed aspect of a "scene" should be discussed and consented to in advance of the start of "play."

Mr. Rubin testified that his discussion of "what activity might take place" in advance of the start of a BDSM session with a woman could be as brief as "[a] few minutes."[33]  A few minutes would be insufficient time to fully describe, disclose, and obtain consent for each aspect of a scene involving bondage, use of implements, and sexual contact.

---

[29] Morpheus:  *How to Be Kinky:  A Beginner's Guide to BDSM*.  Canada: Green Candy Press, 2008, at 180.

[30] Ibid, at 192-193.

[31] Ibid, at 191.

[32] Deposition of Howard Rubin, 10/25/18, p. 72.

[33] Ibid, pp. 72-73.

16

Absence of a Predetermined Safe Gesture

Mr. Rubin testified that he decided on the use of the safe words "yellow light" and "red light" and "always" used them.[34]  While this is not necessarily a deviation from BDSM norms, it is preferable that the submissive choose her own safe word that she is unlikely to forget when needed.

Mr. Rubin testified that he did not understand questions designed to elicit testimony about pre-agreed safe gestures,[35] and when questioned about how a submissive wearing a ball gag could convey she wanted him to stop, he claimed he applied ball gags so loosely that the submissive could still speak.[36]  A ball gag applied snuggly enough to stay in place during a scene prevents articulation of vowels and consonants by restraining movement of the tongue and lips.

Effort to Deter Disclosure

Mr. Rubin testified that the items kept in the safe at the apartment where he engaged in BDSM activities with the plaintiffs included "blank ND—blank consent agreements,"[37] though Mr. McDonald later objected to the assertion that Mr. Rubin had characterized them as nondisclosure agreements.[38]  In subsequent testimony, Mr. Rubin acknowledged that he sought a nondisclosure agreement.  Asked what prompted him to get a form in the fall of 2014, he responded:

> A couple of things; one, is I had been extorted by a couple of
> women who threatened to go public that I had seen in the past,
> and I came to settlement agreements with them, and I had also
> seen online a NDA form that Justin Bieber had used for women
> that visited him, and that gave me the idea that I needed or
> wanted an NDA release form to use for myself.[39]

A nondisclosure agreement prohibiting a submissive from discussing BDSM activity with others increases the risk of abuse.

Inadequate Advance Negotiation of Consent Form

Consent agreements are consistent with BDSM norms, but only when the particulars therein are individually negotiated by competent participants in advance of "play."  This is not what Mr. Rubin testified he did, as when asked

---

[34]  Ibid, p. 85.
[35]  Ibid, pp. 85-88.
[36]  Ibid, pp. 98-99 and 218.
[37]  Ibid, p. 132.
[38]  Ibid, p. 182.
[39]  Ibid, p. 183.

17

about his participation in the discussion with women before they signed his form, he testified:

> For the most part, Jennifer Powers was present when women were signing the forms and I wasn't.  There were occasions when I was the one present.  For instance, for ██████████ it was myself . . .[40]

## Violation of Prohibition Against Use of Intoxicants

Mr. Rubin testified that ███████████ invited ████████████ o join ████ and him in "BDSM sex" at his apartment, that he believed ██████ had consumed alcohol that evening, that he began BDSM activity with ██████ but that she used a safe word, he stopped, she left, and he subsequently directed payment to her for $2,500.[41]

Mr. Rubin also testified that Ms. ████████ whom he paid on six or seven occasions, disclosed that she was addicted to heroin,[42] but it is unclear from his deposition whether this disclosure occurred before or after Mr. Rubin engaged in BDSM activity or sexual intercourse with her.

The use of alcohol or drugs during consensual BDSM activities is prohibited by the norms and safety rules of the BDSM subculture, as participants recognize that intoxicants impair the judgment of participants, endangering safety, and also impair capacity to negotiate and consent, to perceive pain or other warnings of injury, and to recall or use safe words or safe gestures.

## Failure to Obtain Medical History

Mr. Rubin testified that he did not ask Ms. ████████ or any of the plaintiffs if they had a medical condition before engaging in BDSM activities with them and that medical conditions were not discussed during pre-BDSM negotiations.[43]

The norms and safety rules of the BDSM subculture require that medical conditions be discussed and disclosed in advance of BDSM activity to prevent injury to those who may be particularly vulnerable because of breast, buttock, dental, facial or other implants, pre-existing trauma, cardiac disease, epileptiform disorders, other physical vulnerabilities, or mental disorder.

---

[40] Ibid, pp. 182-183.
[41] Ibid, pp. 217-218.
[42] Ibid, pp. 205-206.
[43] Ibid, pp. 218-219.

Lack of Sensitivity to the Pleasure of the Submissive

Mr. Rubin testified that when he engaged in BDSM play in the apartment, vaginal intercourse was involved "most times" and oral intercourse was involved "[a] lot."[44]

At no time in his deposition did he address any steps taken to ensure sensitivity to the pleasure of the submissive.  Instead, he apparently viewed these BDSM encounters as commercial sexual transactions and his partners as objects, which is not consistent with the norms of the BDSM subculture.

**Conclusions**

The widely shared and disseminated norms of the BDSM subculture are that each act must be "safe, sane, and consensual," that consent be negotiated for each scene, that techniques and limits must be negotiated in advance, that the dominant must be sensitive to the pleasure of the submissive, that the submissive must be provided control over each scene, that there be strict adherence to safety rules, and that injury must be avoided.  Any BDSM play that produced physical or psychological injury to a submissive requiring medical attention would be proof that the BDSM activities were not "safe, sane, and consensual."

Federal courts have considered cases in which men have had women sign bogus slave contracts and BDSM consent forms in an effort to immunize themselves against civil and criminal liability for negligent, grossly negligent, or criminal conduct,[45] and I have provided consultation to federal prosecutors in such cases.  In those instances, the men have treated the bogus contract[46] as though it provided blanket consent to anything forever, and they did not negotiate consent in advance for every act in every pre-arranged scene, ignored safe words, and engaged in unsafe, dangerous methods that injured the women.

Based on the testimony of Mr. Rubin, he deviated from the norms and safety rules of the BDSM subculture in his activities with plaintiffs in seven ways, each addressed above:

- Inadequate advance negotiation of each and every act
- Absence of a predetermined safe gesture
- Effort to deter disclosure

---

[44]  Ibid, p. 189.
[45]  See, e.g., US v. Marcus, 487 F. Supp. 2d 289 - Dist. Court, ED New York 2007; US v. Cook, Dist. Court, WD Missouri 2013; US v. Cook, 782 F. 3d 983 - Court of Appeals, 8th Circuit 2015
[46]  Even a website selling BDSM contract templates recognizes that they are not legally enforceable.  See:  https://bdsmcontracts.org/are-bdsm-contracts-legally-binding/, downloaded 11/5/18.

- Inadequate advance negotiation of consent form
- Violation of prohibition against use of intoxicants
- Failure to obtain medical history
- Lack of sensitivity to the pleasure of the submissive

Respectfully submitted,

Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences,
UCLA David Geffen School of Medicine
Distinguished Life Fellow, American Psychiatric Association
Fellow, American Academy of Forensic Sciences