John G. Balestriere
Jillian L. McNeil
Brian L. Grossman
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (646) 912-8463
Facsimile:     (212) 208-2613
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON,** and **LAUREN FULLER,**<br><br>                        Plaintiffs,<br><br>        – against –<br><br>**HOWARD RUBIN, JENNIFER POWERS,** and the **DOE COMPANY.**<br><br>                        Defendants. | Case No.: 1:17-cv-06404 (BMC)(SMG)<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**<br><br><br>**ORAL ARGUMENT REQUESTED** |

---

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................3

ARGUMENT ..................................................................................................12

I.   MANY OF DEFENDANTS' AFFIRMATIVE DEFENSES MUST BE
     DISMISSED AS THEY HAVE ALREADY BEEN DECIDED ...............................12

     A.   Defendants' Statute of Limitations and Laches Affirmative Defenses Must Be
          Dismissed as this Court has Already Determined that Plaintiffs Brought Their
          Remaining Claims within the Statute of Limitations and Plaintiffs Did Not
          Sleep on Their Rights .........................................................................13

     B.   Defendants' Settlement and Release Affirmative Defenses Must Be Dismissed
          as None of the Remaining Plaintiffs Signed Any Settlement or Release............15

     C.   Defendants' Improper Venue Affirmative Defenses Must Be Dismissed as
          This Court Already Determined that the Eastern District of New York is A
          Proper Venue .......................................................................................16

     D.   Regardless of the Airports Used by Plaintiffs Fuller and Peterson, This Court
          Has Pendent Venue Over Their Claims ..................................................16

     E.   Defendants' Affirmative Defenses of Failure to State a Claim and Frivolous
          Claims Have Already Been Decided by the Court and Therefore Must be
          Dismissed ...........................................................................................17

     F.   Defendants' Breach of Contract Affirmative Defenses Must Be Dismissed as
          the Contract is Void as Against Public Policy ....................................18

     G.   Defendant Rubin's Contribution Affirmative Defense Must Be Dismissed as
          Contribution is Not a Valid Affirmative Defense for the TVPA ........................19

II.  ALL OF DEFENDANT POWERS'S COUNTERCLAIMS MUST BE
     DISMISSED ........................................................................................19

     A.   Defendant Powers's Breach of Contract Counterclaim Must Be Dismissed as
          the Contract is Void as Against Public Policy, the Plaintiffs Were Not Aware
          What They Were Signing, and Powers is Not a Party to the Contract................19

          1.   The Contract Defendant Powers Seeks to Enforce is Void as Against
               Public Policy as it is a Contract for Prostitution ...........................20

          2.   Plaintiffs Were Not Aware of What They Were Signing When They
               Signed the NDA ........................................................................21

3.   Powers Cannot Enforce a Contract to Which She Was Not a Party, Nor a Third-Party Beneficiary .................................................................................22

B.   Defendant Powers's Contribution Counterclaim Must Be Dismissed as Plaintiffs Hallman and Lawson Have Nothing to do With the Tort Claims Against Hathaway, Peterson, Fuller, and Speight .................................................23

CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
447 F.Supp.2d 329 (S.D.N.Y. 2006)..................................................................... 21

*Bermudez v. City of New York*,
No. 1:10-CV-1162 (ALC), 2015 WL 1500235 (S.D.N.Y. Mar. 31, 2015) ............ 17

*Bernard L. Madoff Inv. Sec. LLC*,
721 F.3d 54 (2d Cir. 2013)................................................................................... 19

*City of New York v. Cyco.Net, Inc.*,
383 F.Supp.2d 526 (S.D.N.Y. 2005)..................................................................... 16

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996)................................................................................... 14

*DiCola v. SwissRe Holding (North America), Inc.*,
996 F.2d 30 (2d Cir. 1993)............................................................................. 12, 15

*Doe v. New York*,
No. 10 CV 1792(RJD)(VVP), 2012 WL 4503409 (E.D.N.Y. Sept. 28, 2012)........ 17

*F.D.I.C. v. Giammettei*,
34 F.3d 51 (2d Cir. 1994)............................................................................... 12, 15

*Ikelionwu v. United States*,
150 F.3d 233 (2d Cir. 1998)................................................................................. 14

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*,
No. 01 Civ. 6600(RLC), 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) ................ 13

*Lehman Bros., Inc. v. Wu*,
294 F.Supp.2d 504 (S.D.N.Y. 2003)..................................................................... 19

*Mandarin Trading Ltd. v. Wildenstein*,
16 N.Y.3d 173 (2011) ......................................................................................... 22

*Miller & Wrubel, P.C. v. Todtman, Nachamie, Spizz & Johns, P.C.*,
106 A.D.3d 446 (1st Dep't 2013) ........................................................................ 22

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO,*
451 U.S. 77 (1981).................................................................................... 19

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
572 U.S. 663 (2014).................................................................................. 14

*Premium Mortg. Corp. v. Equifax, Inc.,*
583 F.3d 103 (2d Cir. 2009)...................................................................... 22

*Prince of Peace Enter., Inc. v. Top Quality Food Mkt., LLC,*
760 F.Supp.2d 384 (S.D.N.Y. 2011).......................................................... 21

*Reid v. IBM Corp.,*
No. 95 Civ. 1755(MBM), 1997 WL 357969 (S.D.N.Y. June 26, 1997) .................. 21

*Servaas, Inc. v. Republic of Iraq,*
No. Civ.. 1862(RMB)(RLE), 2012 WL 335654 (S.D.N.Y. Feb. 1, 2012) ................ 13

*SI Venture Holdings, LLC v. Caitlin Specialty Ins.,*
118 F.Supp.3d 548 (S.D.N.Y. 2015)...................................................... 18, 20

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,*
241 F.3d 135 (2d Cir. 2001)...................................................................... 21

*United States v. Quintieri,*
306 F.3d 1217 (2d Cir. 2002)............................................................... 12, 16

*Vazquez v. City of New York,*
No. 10–CV–6277 (JMF), 2014 WL 4388497 (S.D.N.Y. Sept. 5, 2014) ................ 17

**Statutes**

18 U.S.C. § 1591(a) .................................................................................. 18

18 U.S.C § 1595(c)(1)................................................................................ 14

18 U.S.C. § 1595 ...................................................................................... 19

28 U.S.C. § 1391(b)(2) ............................................................................. 16

New York Penal Law § 230.00.............................................................. 18, 20

New York Penal Law § 230.02(1)(a)....................................................... 18, 20

**Other Authorities**

Restatement (Second) of Contracts § 16.......................................................................................... 21

**Rules**

CPLR 215............................................................................................................................................ 14

## PRELIMINARY STATEMENT[1]

Plaintiffs bring this lawsuit against Defendants Howard Rubin and Jennifer Powers for violations of the Trafficking Victims Protection Act ("TVPA"), intentional infliction of emotional distress, assault, battery, and false imprisonment resulting from Defendants' human trafficking venture that brought women from all over the United States to New York City for Rubin to drug, beat, and rape.

Defendant Rubin asserts twenty-seven affirmative defenses, many of which are not applicable to Plaintiffs' causes of action. Defendant Powers asserts twenty-six affirmative defenses, many of which are not applicable for the same reasons Rubin's affirmative defenses are not applicable, as well as counterclaims for breach of a void contract and contribution against two Plaintiffs—Plaintiffs Hallman and Lawson—because Rubin drugged, beat, and raped them together. Plaintiffs move for summary judgment on certain of Defendants' affirmative defenses and all of Powers's counterclaims.

Both Defendants' statue of limitations and laches defenses must be dismissed as this Court has already ruled that Plaintiffs timely brought this action as to the remaining claims. Indeed, in the Court's Motion to Dismiss Decision and Order, dated April 29, 2018, (Dkt. No. 105) (the "MTD Order"), the Court dismissed many of the state-law claims as outside the one-year statute of limitations, but also permitted the timely state law claims to move into discovery. Similarly, the Court upheld Plaintiffs' TVPA claim as having been brought timely under the statute's ten-year statute of limitations. Furthermore, Defendants' laches affirmative defense should be dismissed as Defendants' goal throughout their human trafficking venture was to prevent victims from coming

---

[1] All terms are as defined in Plaintiffs' Amended Complaint (Dkt. No. 66) and in Plaintiffs' MTD Opposition (Dkt. No. 84) unless otherwise defined herein. Plaintiffs provide some definitions for the Court's convenience.

forward; Defendants cannot now claim that the result they were seeking—preventing victims from speaking with authorities or attorneys—bars such victims from bringing their claims.

Like Defendants' statute of limitations affirmative defense, Defendants' improper venue affirmative defenses must also be dismissed. Indeed, Defendants litigated the propriety of venue in their motions to dismiss and this Court determined that the venue was proper due to Plaintiffs' travel into and out of the Eastern District of New York, which discovery confirmed. Venue is proper here.

Defendants' affirmative defenses of settlement and release must be dismissed as none of the current Plaintiffs signed a settlement agreement with either of the Defendants. Defendants' breach of contract affirmative defenses and counterclaims should also be dismissed as the documents Plaintiffs allegedly signed are void as against public policy and were signed through means of coercion. The document Defendants rely upon—titled "Confidentiality Agreement and Release"—is a contract for prostitution on its face, and, thus, void as against public policy. It specifically provides, "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original). Indeed, pursuant to New York Penal Law § 230.00 "[a] person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee." The document falls squarely within New York Penal Law § 230.00. However, even if this contract was not void as against public policy, it would still be void as Plaintiffs signed any documents while inebriated by alcohol, drugs, or both.

Like Powers's breach of contract affirmative defense and counterclaim, Defendants' affirmative defenses and counterclaims of contribution must also be dismissed. Defendants assert that Plaintiffs Hallman and Lawson contributed to the Plaintiffs' damages, but the evidence shows

that simply is not true. In regards to one another, Hallman and Lawson first travelled to New York, and met Defendants, together, without knowing what was going to occur. As such, neither Plaintiff Hallman nor Lawson contributed to the others' injuries. And, neither Plaintiff Hallman nor Lawson ever met any of the remaining Plaintiffs—all of whom were introduced to the Defendants before Hallman and Lawson—such that neither Hallman nor Lawson could have contributed to any other Plaintiffs' injuries. Defendants' affirmative defenses of statute of limitations (Powers's fourth affirmative defense; Rubin's fourth affirmative defense), laches (Powers's fifth affirmative defense; Rubin's fifth affirmative defense), settlement and release (Powers's tenth affirmative defense; Rubin's eleventh affirmative defense), improper venue (Powers's twenty-second affirmative defense; Rubin's twenty-third affirmative defense), breach of contract (Powers's twenty-third affirmative defense), and contribution (Rubin's eighteenth affirmative defense), must all be dismissed, and judgment must be entered for Plaintiffs on Powers's counterclaims for breach of contract and contribution

## **STATEMENT OF FACTS**

*Rubin and Powers Engage in a Human Trafficking Scheme, Resulting in the Rape and Assault of Plaintiffs—and Likely Many Others—Over a Decade*

Starting in approximately 2009 or 2010, Defendants Rubin and Powers began their human trafficking venture by inviting women from across the United States to travel to New York to meet Rubin. (Plaintiffs' 56.1 Statement of Undisputed Facts, ("P's 56.1 Statement") at ¶ 1; Deposition Transcript of Moira Hathaway, September 20, 2018, Exhibit A[2] ("Hathaway Dep.") at 36:17–21.) In the early years of this venture, Rubin would meet the women at hotel rooms across New York City. (P's 56.1 Statement at ¶ 2; Deposition Transcript of Howard Rubin, October 25, 2018,

---

[2] All exhibits are attached to the Declaration of Brian L. Grossman in Support of Plaintiffs' Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses and Counterclaims.

Exhibit B ("Rubin Dep.") at 103:3–9, 116:6–14; Deposition Transcript of Jennifer Powers, October 16, 2018, Exhibit C ("Powers Dep.") at 98:13–99:13.) However, later on in the venture, Rubin began renting an apartment at ███████ Street, where he converted the second bedroom to a Bondage, Domination, Sadism and Masochism ("BDSM") dungeon. (P's 56.1 Statement at ¶ 3; Rubin Dep., Exhibit B at 100:5–101:13; Powers Dep., Exhibit C at 140:8–16; Deposition Transcript of Stephanie Shon, October 10, 2018, Exhibit D ("Shon Dep.") at 56:15–57:2. Once in New York, the women would typically meet with Powers, who would present them with a document purporting to be a non-disclosure agreement. (P's 56.1 Statement at ¶ 4; (Powers Dep., Exhibit C at 115:14–119:5.) After Powers had the women sign the document Rubin would meet with the women, generally get them intoxicated or provide them narcotics, and then beat and rape them. (Plaintiff's 56.1 Statement at ¶ 5; *see, e.g.,* Hallman Dep. at 143:12-24 (discussing Rubin raping Hallman and punching her in the head); Lawson Dep. at 83:5-9 (discussing Rubin providing drinks at the apartment); Lawson Dep. at 86:2-24; 88:18-89:8 (discussing Rubin "smack[ing]" Lawson in the face); Peterson Dep. at 259:19-260:16 (discussing injuries to Peterson's body and discussing how Rubin would not stop when asked); Speight Dep. at 57:17-58:7 (Speight discussing being drunk at the time she signed the NDA"); Fuller Dep. at 115:17–23 (regarding Fuller's drinking on the day of the assault); *Id.* at 143:9-146:17 (Rubin sexually assaulting fuller with an object after Fuller said the safe word); *see also* SAC at ¶¶ 125–130 (regarding Plaintiff Hathaway waking up after becoming unconscious after Rubin served her a glass of wine).) Seven women have come forward to sue Rubin and Powers in the Eastern District of New York. After this action began, another woman brought suit on January 9, 2018, in New York County Supreme Court. (*See Parker v. Rubin*, Index No.: 650126/2018.)  Virtually all Plaintiffs have indicated that they believe that there are other women who Rubin and Powers victimized over the years.

*The Uniform Non-Disclosure Agreements*

The non-disclosure agreements were drafted by ███████████████████████ ████████ (P's 56.1 Statement at ¶ 6; Rubin Dep., Exhibit B at 185:5–13; Powers Dep., Exhibit C at 82:3–19.) However, after Rubin hired former-Defendant Yifat Schnur ("Schnur"), Rubin had Schnur review the agreement to ensure it was adequate. (P's 56.1 Statement at ¶ 7; Rubin Dep., Exhibit B at 194:3–195:23.) Notwithstanding that the agreement purported to permit Rubin to engage in a crime, Schnur did not end up making any changes to the NDA. (P's 56.1 Statement at 8; Rubin Dep., Exhibit B at 194:15–196:17.) The NDA stated, in part, that "[i]n return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original) (P's 56.1 Statement at ¶ 9; *See* Hallman Nondisclosure Agreement, August 22, 2016, Exhibit J ("Hallman NDA"); Hathaway Nondisclosure Agreement, January 21, 2015, Exhibit K ("Hathaway NDA"); Lawson Nondisclosure Agreement,  August 22, 2016, Exhibit L ("Lawson NDA"); Peterson Nondisclosure Agreement,  September 25, 2014, Exhibit M ("Peterson NDA"); Fuller Nondisclosure Agreement, March 7, 2016, Exhibit N ("Fuller NDA"); and Speight Nondisclosure Agreement, October 12, 2015, Exhibit O ("Speight NDA") (each an "NDA", collectively the "NDAs").) Defendants had the Plaintiffs sign the NDAs prior to "any physical sexual interaction." (P's 56.1 Statement at ¶ 10; Rubin Dep., Exhibit B at 182:3–20.) Powers, not Rubin, typically had the victims of the venture sign the NDAs. (P's 56.1 Statement at ¶ 11; Powers Dep., Exhibit C at 116:18–118:25.)

*Plaintiff Hathaway*

Plaintiff Hathaway first met Rubin in 2009 or 2010 (P's 56.1 Statement at ¶ 12; Rubin Dep., Exhibit B at 198:16–18; Hathaway Dep., Exhibit A at 36:17–21.) Hathaway and Rubin began seeing each other in hotel rooms in New York City in a consensual relationship. (P's 56.1

Statement at ¶ 13; Hathaway Dep., Exhibit A at 73:9–23; 76:16–78:2; 85:8–18.) Rubin paid for Hathaway to be flown into and out of LaGuardia and Newark Airports (P's 56.1 Statement at ¶ 14; Jennifer Powers Production Bates Nos. JP_0000668–JP_0000670, May 16, 2015, Exhibit P, ("Hathaway Itinerary."); Hathaway Dep., Exhibit A at 90:10–91:8.) In or around early 2011, Hathaway was introduced to Powers and told that Powers would be handling Hathaway's travel arrangements. (SAC at ¶ 96.)[3] Hathaway allegedly signed an NDA on January 21, 2015. (P's 56.1 Statement at ¶ 15; Hathaway NDA, Exhibit K.) This relationship continued for a number of years. (SAC at ¶ 20.) However, as time went on, Rubin's behavior escalated to the point that Hathaway no longer consented to Rubin's actions. (SAC at ¶¶ 108–109.) Indeed, on one occasion Rubin shoved a pool cue into Hathaway's vagina without her consent. (SAC at ¶¶ 111–112.) On another occasion he used a glass dildo on Hathaway without her consent, causing her to bleed. (SAC at ¶¶ 119–120.) After Rubin penetrated Hathaway with a pool cue without her consent, Hathaway protested, causing Rubin to leave the room (SAC at ¶¶ 112–114.) Rubin returned with ropes that he used to tie Hathaway up and drag her to his dungeon. (SAC at ¶¶ 112–114.) Hathaway last saw Rubin in 2017. (P's 56.1 Statement at ¶ 16; Hathaway Dep., Exhibit A at 121:21–25.)

*Plaintiff Peterson*

Plaintiff Peterson first met Rubin in 2011 when a woman named ██████ booked her to travel from California to New York to meet Rubin, at Rubin's request. (P's 56.1 Statement at ¶ 17; Peterson Dep., Exhibit G at 44:3–46:8; 60:7–16; 61:10–63:13.) The first time Peterson met Rubin was at a hotel in New York City with two other women. (P's 56.1 Statement at ¶ 18; Peterson Dep., Exhibit G at 103:2–11.) During that first encounter, Peterson was nervous and Rubin

---

[3] Plaintiffs cite to the Second Amended Complaint, Dated August 17, 2018, Dkt. No. 161 ("SAC") for Plaintiff Hathaway as Defendants deposed Hathaway for less than three hours, as opposed to the full seven-hour depositions that Defendants conducted of the other Plaintiffs, and declined to ask Hathaway any substantive questions about her encounters.

6

instructed one of the other women to crush up a pill and put the pill in Peterson's drink to calm her down. (P's 56.1 Statement at ¶ 19; Peterson Dep., Exhibit G at 105:16–107:6.) However, after Peterson took the drugs, she became more nervous and ultimately left the hotel room. (P's 56.1 Statement at ¶ 20; Peterson Dep., Exhibit G at 111:12–24.) Peterson did not see Rubin again until years later when she coincidentally ran into him at a restaurant in New York City. (P's 56.1 Statement at ¶ 21; Peterson Dep., Exhibit G at 147:15–148:17.)

Peterson and Rubin had a non-sexual relationship after that chance encounter. (P's 56.1 Statement at ¶ 22; Peterson Dep., Exhibit G at 153:18–154:19; 172:16–20; SAC at ¶166.) But that relationship changed when Peterson met with Rubin and allegedly signed the NDA on September 25, 2014. (P's 56.1 Statement at ¶ 23; Peterson Dep., Exhibit G at 234:20–235:22; Peterson NDA, Exhibit M.) This was after Rubin stopped having a sexual relationship with one of Peterson's friends, at which point Rubin asked Peterson to get drinks with him. (SAC at ¶ 171.)[4] Peterson lost consciousness while drinking with Rubin and regained consciousness in Rubin's apartment where Rubin then brought her to his dungeon and gave her oxycodone. (SAC at ¶¶ 171–174.) For at least three years, Rubin continued to provide Peterson oxycodone and would use the meeting as an excuse to beat and rape her, creating a cycle whereby Peterson would come to Rubin for oxycodone and Rubin would beat and rape Peterson causing her to want more oxycodone to deal with the pain. (P's 56.1 Statement at ¶ 24; Peterson Dep., Exhibit G at 283:9–284:25; 286:5–287:6.) Peterson was so incapacitated on these occasions that she was unable to consent to any sexual activity. (SAC at ¶¶ 176, 184.)

---

[4] Plaintiffs cite to the Second Amended Complaint for some of Plaintiff Peterson's facts as Defendants declined to ask Peterson about certain allegations and claims she made in the Second Amended Complaint.

*Plaintiff Fuller*

Plaintiff Fuller first met Rubin on March 7, 2016, after her friend ███████—who was a recruiter for Rubin—convinced her to travel to New York to meet Rubin. (P's 56.1 Statement at ¶ 25; Fuller Dep., Exhibit I at 76:16–77:23.) Upon arriving in New York City, ██████ and Fuller drank all day before Rubin arrived at the apartment and presented Fuller with an NDA to sign. (P's 56.1 Statement at ¶ 26; Fuller Dep., Exhibit I at 107:16–110:21; 113:9–22; 115:4–116:11; Fuller NDA, Exhibit N.) After Rubin provided the NDA to Fuller and Fuller allegedly signed the NDA, Rubin brought her into his dungeon. (P's 56.1 Statement at ¶ 27; Fuller Dep., Exhibit I at 119:5–121:23; 129:15–130:22.) However, Fuller asked Rubin to stop and said the safe word[5] almost immediately upon Rubin beginning his BDSM activities. (P's 56.1 Statement at ¶ 28; Fuller Dep., Exhibit I at 143:9–146:17.) Despite Fuller using the safe word, Rubin did not stop, and instead penetrated Fuller with an object, and did not allow Fuller to leave the dungeon until after she asked him to stop numerous times. (P's 56.1 Statement at ¶ 30; Fuller Dep., Exhibit I 143:9–16.)

*Plaintiff Speight*

Plaintiff Speight first met Rubin in 2015. (P's 56.1 Statement at ¶ 31; Speight Dep., Exhibit H at 47:23–49:16.) Speight was introduced to Rubin by former Defendant—and Rubin recruiter—Stephanie Shon ("Shon"), who Speight met in Atlanta, Georgia. (P's 56.1 Statement at ¶ 32; Speight Dep., Exhibit H at 36:7–9; 41:21–42:2.) Powers booked Speight's flight into and out of LaGuardia Airport. (P's 56.1 Statement at ¶ 33; Speight Dep., Exhibit H at 48:14–19.) Speight allegedly signed an NDA on October 12, 2015. (P's 56.1 Statement at ¶ 34; Speight Dep., Exhibit H at 49:4–50:2; Speight NDA, Exhibit O.) Speight travelled to New York City approximately a

---

[5] Indeed, Plaintiffs' expert, Park Dietz, opined that "it is preferable that the submissive choose her own safe word that she is unlikely to forget when needed" (Expert Report of Park Dietz, November 5, 2018, Exhibit Q, at 17), but Rubin decided which safe words would be used. (Rubin Dep., Exhibit B, at 85:12–15.)

dozen times to meet with Rubin. (P's 56.1 Statement at ¶ 35; Speight Dep., Exhibit H at 187:18–23.) On at least a few of those occasions, Speight was injured. (P's 56.1 Statement at ¶ 36; Speight Dep. 94:23-95:3 ("I definitely was injured a few times during some encounters").)

*Plaintiff Lawson*

Plaintiff Lawson first met Rubin in 2016. (P's 56.1 Statement at ¶ 37; Lawson Dep., Exhibit F at 62:15-63:17.) Stephanie Shon contacted Lawson on Instagram and both Shon and Powers asked Lawson if she wanted to make money to take fetish style photographs. (P's 56.1 Statement at ¶ 38; Lawson Dep., Exhibit F at 40:3–10; 42:4–13; 45:3–20.) Lawson initially declined, but later accepted after learning that her friend, Plaintiff Hallman, had also been contacted by Shon with the same proposition. (P's 56.1 Statement at ¶ 39; Hallman Dep., Exhibit E at 67:16–69:5; 70:21–71:12.) Hallman and Lawson determined that they would travel to New York together to meet Rubin. (P's 56.1 Statement at ¶ 40; Hallman Dep., Exhibit E at 70:21–71:12.) Powers booked Lawson's flight into and out of John F. Kennedy Airport. (P's 56.1 Statement at ¶ 41; Lawson Dep., Exhibit F at 286:5–12; Lawson Flight Itinerary, August 18, 2016, Exhibit R ("Lawson Itinerary").) Lawson allegedly signed an NDA on August 22, 2016. (P's 56.1 Statement at ¶ 42; Lawson NDA, Exhibit L.) Lawson was beaten and raped by Rubin after Rubin gave her alcohol. (P's 56.1 Statement at ¶ 43; Lawson Dep., Exhibit F at 83:5–9; 87:8–88:24.) However, Lawson returned to New York City a few months later. (P's 56.1 Statement at ¶ 44; Lawson Dep., Exhibit F at 133:8–136:11.) Rubin assuaged Lawson's fears further when Rubin asked to meet Lawson in the middle of the day for lunch, and treated Lawson very nicely.. (P's 56.1 Statement at ¶ 45; Lawson Dep., Exhibit F at 134:16–136:19.) But when Lawson returned to the apartment, Rubin acted even more egregiously than he had on Lawson's first meeting, leading to Rubin inserting a

cattle prod into Lawson's vagina without Lawson's consent, amongst other acts of assault and rape. (P's 56.1 Statement at ¶ 46; Lawson Dep., Exhibit F at 166:17–22.)

*Plaintiff Hallman*

Plaintiff Hallman first met Rubin in August 2016. (P's 56.1 Statement at ¶ 47; Hallman Dep., Exhibit E at 19:22-80:25.) Stephanie Shon contacted Hallman on Instagram and asked Hallman if she wanted to make money to take fetish style photographs. (P's 56.1 Statement at ¶ 48; Hallman Dep., Exhibit E at 61:7–25; 81:2–21.) Hallman initially declined but later accepted after learning that her friend, Plaintiff Lawson, had also been contacted by Shon with the same proposition. (P's 56.1 Statement at ¶ 49; Hallman Dep., Exhibit E at 67:16–69:5; 70:21–71:12.) Hallman and Lawson determined that they would travel to New York together to meet Rubin. (P's 56.1 Statement at ¶ 40; Hallman Dep., Exhibit E at 70:21–71:12.) Powers booked Hallman's flight into and out of LaGuardia Airport. (P's 56.1 Statement at ¶ 50; Hallman Dep., Exhibit E at 74:19–75:24; 99:3–14; Hallman Flight Itinerary, August 18, 2016, Exhibit S ("Hallman Itinerary").) Hallman allegedly signed an NDA on August 22, 2016. (P's 56.1 Statement at ¶ 51; Hallman Dep., Exhibit E at 106:4–107:10; Hallman NDA, Exhibit J.) Hallman did not believe that the reason for her visit with Rubin was to have sex for money. (P's 56.1 Statement at ¶ 52; Hallman Dep., Exhibit E at 76:13–21; 84:23–85:6.) However, after signing the NDA, Rubin tied Hallman and Lawson up with black tape or rope and, when Hallman protested, Rubin smacked her in the face. (P's 56.1 Statement at ¶ 53; Hallman Dep., Exhibit E at 135:12–136:7.) While Hallman was tied up, and unable to consent, Rubin engaged in sexual intercourse with her. (P's 56.1 Statement at ¶ 54; Hallman Dep., Exhibit E at 135:12–136:7.) Hallman returned to New York to meet Rubin on two other occasions: once with former-Plaintiff Caldwell, and once with a woman named ███████.

(P's 56.1 Statement at ¶ 55; Hallman Dep., Exhibit E at 198:25–199:13.)[6] On the first of these two occasions, Rubin again assaulted and raped Plaintiff Hallman, including punching Hallman in the head so that she lost consciousness. (P's 56.1 Statement at ¶ 56; Hallman Dep., Exhibit E at 143:12–24.) When Hallman returned with ▮▮▮, Hallman was so fearful of Rubin that she became sick and required hospitalization. (P's 56.1 Statement at ¶ 57; Hallman Dep., Exhibit E at 228:3-24.)

*Plaintiffs Lawson and Hallman Timely Initiate this Action in the Eastern District of New York*

Plaintiffs Lawson and Hallman, and former Plaintiff Caldwell—who declined to prosecute her claims and was dismissed from the action on December 4, 2018—initiated this action on November 2, 2017. (Complaint, dated November 2, 2017, Dkt. No. 1 "Complaint".) Hallman and Lawson allegedly signed NDAs on August 22, 2016, evidencing their first meeting with Rubin. (P's 56.1 Statement at ¶ 58.) Hallman and Lawson pleaded claims under the TVPA, the Racketeering Influenced Corrupt Organizations Act ("RICO"), assault, battery, false imprisonment, and intentional infliction of emotional distress. (Complaint at 45–46, 50–61.) In the meantime, Julie Parker[7] sued in New York State Supreme Court, New York County, on January 9, 2018, and a motion to dismiss, still pending, was fully briefed in her lawsuit by August 22, 2018. (*See Parker v. Rubin*, Index No.: 650126/2018.)

*Plaintiffs Hathaway, Peterson, Fuller and Speight Timely Join the Action*

On February 20, 2018, Plaintiffs, Hathaway, Peterson, Fuller, and Speight joined the action by way of the first Amended Complaint. (Amended Complaint, dated February 20, 2018, Dkt. No.

---

[6] Indeed, former-Plaintiff Caldwell was beaten and raped by Rubin after traveling to New York City to meet him as well. (SAC at ¶¶ 358–424.) Caldwell was beaten so badly that Rubin flipped one of Caldwell's breast implants. (SAC at ¶ 405.)

[7] Julie Parker is a pseudonym.

66 ("Amended Complaint".) Hathaway, Peterson, Fuller, and Speight brought the same causes of action as Hallman and Lawson. (Amended Complaint at ¶ 105–106.) The Court dismissed Plaintiffs' RICO claim and any state law claims occurring outside of the statute of limitations on April 29, 2018. (Amended Complaint at ¶ 105–106; MTD Order at 43.)

## ARGUMENT

### I.   MANY OF DEFENDANTS' AFFIRMATIVE DEFENSES MUST BE DISMISSED AS THEY HAVE ALREADY BEEN DECIDED

Many of the Defendants' affirmative defenses must be dismissed as previously determined in the MTD Order. Where, as here, a court has made a decision on an issue, "that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). Furthermore, "[w]here a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (N. Am.), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)).

Despite the Court already dismissing many of Defendants' affirmative defenses in its April 29, 2018 MTD Order, Defendants re-pleaded them in their Answers dated September 6, 2018 (as to Rubin), and September 7, 2018 (as to Powers). (*Compare* MTD Order, *with* Answer to Second Amended Complaint and Counterclaim of Defendant Howard Rubin, dated September 6, 2018, Dkt. No. 168 ("Rubin Answer"), 50–55, and Answer to Second Amended Complaint, Counterclaim, and Third Party Complaint of Defendant Jennifer Powers, dated September 7, 2018, Dkt. No. 170 ("Powers Answer"), 57–60.) Furthermore, many of Rubin's twenty-seven affirmative defenses and Powers's twenty-six affirmative defenses are not applicable to Plaintiffs' claims and

12

should be dismissed. (*Compare* Rubin Answer, 50–55 and Powers Answer, 57–60, *with Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600(RLC), 2005 WL 3370542, at *6 (S.D.N.Y. Dec. 12, 2005) (dismissing affirmative defenses where party "included in their pleadings an everything-but-the-kitchen-sink list of affirmative defenses that they do not even attempt to support") and *Servaas, Inc. v. Republic of Iraq*, No. Civ.. 1862(RMB)(RLE), 2012 WL 335654, at *4 n.4 (S.D.N.Y. Feb. 1, 2012), *aff'd*, 540 F. App'x 38 (2d Cir. 2013).) Defendants cannot support a majority of their affirmative defenses, which were included as an "everything-but-the-kitchen-sink list." *See Internet Law Library*, 2005 WL 3370542 at *6. Of Rubin's 27 affirmative defenses and Powers's 26 affirmative defense, the Court should dismiss Defendants' affirmative defenses that this Court has previously decided (two defenses), as well as Defendants' affirmative defenses that are not applicable to Plaintiffs' claims (four defenses), leaving 21 of Rubin's defenses and 20 of Powers's defenses which the evidence at trial will show do not apply, but which are not appropriate for resolution on a motion for summary judgment.[8]

### A. Defendants' Statute of Limitations and Laches Affirmative Defenses Must Be Dismissed as this Court has Already Determined that Plaintiffs Brought Their Remaining Claims within the Statute of Limitations and Plaintiffs Did Not Sleep on Their Rights

Defendants' statute of limitations and laches affirmative defenses must be dismissed as this Court has already determined that Plaintiffs brought their claims within the statute of limitations

---

[8] Defendants' affirmative defense of failure to state a claim does not apply, as this Court has already stated that Plaintiffs properly pleaded claims for violation of the TVPA, assault, battery, false imprisonment, and intentional infliction of emotion distress in its MTD Order. Defendants' defenses of consent, acquiescence, privilege, assumption of risk, ratification, waiver/estoppel, failure to mitigate, no causation, speculative damages, comparative fault, misrepresentation, set-off, frivolous claims, and intervening or superseding cause all will fail, as Plaintiffs did not agree to the conduct that occurred, and were not aware of what conduct would occur prior to it occurring. Defendants' defenses of unclean hands, no damages, good faith, and misrepresentation all will fail, as Plaintiffs have done nothing wrong but were nonetheless both physically and monetarily injured by Rubin's attacks and as a result of Powers's transportation of Plaintiffs to New York. Defendants' failure to join necessary parties affirmative defenses fail as Defendants have failed to demonstrate that there are any other individuals responsible for Defendants' violations of the TVPA and state law torts. Finally, Defendants' spoliation defense will fail as Plaintiffs—unlike Defendants—did not destroy any evidence prior to bringing this lawsuit (*see* Plaintiffs' Motion for Spoliation Sanctions, November 29, 2018, Dkt. No. 210 and Electronic Order Granting in Part and Denying in Part Spoliation Motion, December 2, 2018.)

and Plaintiffs did not delay in bringing their claims. The statute of limitations to bring claims pursuant to the TVPA is ten years. 18 U.S.C § 1595(c)(1). The statute of limitations for intentional torts in New York is one year. CPLR § 215. In order to properly plead laches as an affirmative defense, a defendant must plead: "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998). However, "in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014). Furthermore, even if no statute of limitations is enacted by Congress for a particular offense, "analogous statutes of limitation remain an important determinant in the application of a laches defense." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). In its MTD Order, the Court determined that "Lawson's interaction with Rubin in late December 2016, Hathaway's interaction with Rubin in June 2017, and Peterson's interaction with Rubin in the summer of 2017" all fell within the one-year statute of limitations for intentional torts. (MTD Order at 35.) There has been no testimony, or other evidence, that would alter this decision, such that Lawson, Hathaway, and Peterson's state law claims should remain.

Furthermore, no present claim is based on misconduct which took place prior to November 2, 2007 (ten years before the filing of the Complaint)—or before February 20, 2008 (ten years from the filing of the Amended Complaint)—such that Defendants' statute of limitations affirmative defenses should be dismissed in their entirety as to the TVPA. (*Compare* 18 USC § 1595(c)(1) (providing a statute of limitations from "10 years after the cause of action arose" under the TVPA), *with* P's 56.1 Statement at ¶ 59; Hallman Dep., Exhibit E at 77:3-11 (meeting with Rubin, Hallman, and Lawson in August of 2016), Lawson Dep., Exhibit F at 65:11–15 (same), Peterson Dep., Exhibit G at 57:20–24 (Peterson's first meeting with Rubin in 2011), Hathaway

14

Dep., Exhibit A at 36:17–21 (Hathaway meeting Rubin for the first time in 2009 or 2010), Speight Dep., Exhibit H at 48:14–19 (first time Speight met Rubin was in 2015), and Fuller Dep., Exhibit I at 90:12-19 (Fuller first meeting Rubin in 2016).) All of Plaintiffs' claims fall within the ten-year statute of limitations for TVPA claims, such that Defendants' statute of limitations and laches affirmative defenses must be dismissed as to the TVPA.

## B. Defendants' Settlement and Release Affirmative Defenses Must Be Dismissed as None of the Remaining Plaintiffs Signed Any Settlement or Release

Defendants' settlement and release affirmative defenses must be dismissed as none of the remaining Plaintiffs signed any settlement or release. "[A] plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" *Giammettei*, 34 F.3d at 54 (quoting *DiCola* 996 F.2d at 32). Defendants have failed to produce any evidence that the remaining Plaintiffs purposely signed any settlement or release. Indeed, the only purported release provided was for former-Plaintiff Caldwell. (P's 56.1 Statement at ¶ 60; Rubin Production Bates Nos. HR000082–HR000085, October 4, 2016, Exhibit T.) The only agreements Defendants produced as to the remaining Plaintiffs were the NDAs. (P's 56.1 Statement at ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, and O.) Defendants cannot utilize the NDAs as a settlement and release of Plaintiffs' claims as the NDAs were signed prior to "any physical sexual interaction." (P's 56.1 Statement at ¶ 61; Rubin Dep., Exhibit B at 182:3–20; *see also* Powers Dep., Exhibit C at 116:18–118:25.) Since Defendants have produced no documents, nor elicited any testimony, that Plaintiffs settled or released any claims after they were beaten and raped, the Settlement and Release affirmative defenses must be dismissed.

### C. Defendants' Improper Venue Affirmative Defenses Must Be Dismissed as This Court Already Determined that the Eastern District of New York is A Proper Venue

Defendants' improper venue affirmative defenses must be dismissed as this Court already determined that venue in the Eastern District of New York is proper. Where, as here, a court has made a decision on an issue, "that decision should generally be adhered to by that court in subsequent stages in the same case." *Quintieri*, 306 F.3d at 1225. An action may be brought in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). But venue does not require that a majority of the claims took place in that judicial district. *See City of New York v. Cyco.Net, Inc.*, 383 F.Supp.2d 526, 543 (S.D.N.Y. 2005). This Court previously determined that it is a proper venue for the TVPA claims under the general federal venue statute because "[P]laintiffs' flights into the district are a material part of the . . . substantive trafficking claims." (MTD Order at 16 (citing 28 U.S.C. § 1391(b)(2)).) Evidence produced in discovery confirmed that most (if not all) Plaintiffs flew into or out of Airports located in the Eastern District. (*See* P's 56.1 Statement ¶ 62; Hallman Itinerary, Exhibit S (receipt for flight into and out of LaGuardia Airport sent by Powers); Hathaway Itinerary, Exhibit P (receipt for flight into and out of John F. Kennedy Airport sent by Powers); Lawson Itinerary, Exhibit R (receipt for flight into and out of John F. Kennedy Airport sent by Powers); Speight Flight Itinerary, October 11, 2015, Exhibit U (receipt for flight into and out of LaGuardia Airport sent by Powers). Defendants' affirmative defenses of improper venue must be dismissed.

### D. Regardless of the Airports Used by Plaintiffs Fuller and Peterson, This Court Has Pendent Venue Over Their Claims

This Court has pendant venue over Fuller and Peterson's claims regardless of the airports they flew into, and thus Defendants' affirmative defenses of improper venue must be dismissed. Venue is proper wherever significant events took place in relation to all of the plaintiffs' claims

and not for each plaintiff. *Doe v. New York*, No. 10 CV 1792(RJD)(VVP), 2012 WL 4503409, at *5 (E.D.N.Y. Sept. 28, 2012) (finding pendent venue in the Eastern District to be proper where one plaintiff's allegations arose in the Eastern District but the other plaintiff's allegation arose outside of the Eastern District). Here, four of the six Plaintiffs—at a minimum—have claims that are properly brought in the Eastern District due to their flights into and out of the district. (*See supra* Section I(C).) The two remaining Plaintiffs, Fuller and Peterson, do not recall which airports they flew into or out of, nor do they have flight records—nor do the Defendants who made the flight arrangements—but helpfully for their defense—have not produced records of these flights. However, because the Eastern District is the proper venue for at least four of the six Plaintiffs, this Court has pendant venue here over claims asserted by Fuller and Peterson, and should dismiss Defendants' venue affirmative defense.

### E. Defendants' Affirmative Defenses of Failure to State a Claim and Frivolous Claims Have Already Been Decided by the Court and Therefore Must be Dismissed

The Court has already determined that Plaintiffs properly stated a claim and that Plaintiffs' claims were not frivolous, warranting dismissal of those affirmative defenses. On summary judgment a party's "claims are precluded by law of the case" where the party previously made the same arguments on a motion to dismiss and no evidence can be cited to warrant revisiting that ruling. *Bermudez v. City of New York*, No. 1:10-CV-1162 (ALC), 2015 WL 1500235, at *9 (S.D.N.Y. Mar. 31, 2015); *see also Vazquez v. City of New York*, No. 10–CV–6277 (JMF), 2014 WL 4388497, at *9 (S.D.N.Y. Sept. 5, 2014) (denying summary judgment where the court already ruled on same issue at the motion to dismiss stage and no evidence warranted revisiting that ruling). The Court previously determined that the Plaintiffs stated non-frivolous claims for violation of the TVPA and the common law claims that fell within one year of the filing of the Complaint. (MTD Order at 28–31 (as to the TVPA claims against Rubin), 34–39 (as to the common-law claims

against Rubin), 39–41 (as to the TVPA claims against Powers), 41–43 (as to the common-law claims against Powers).) Indeed, Defendants argued that Plaintiffs failed to state a claim under the TVPA. (Memorandum of Law in Support of Motion to Dismiss of Defendant Howard Rubin, dated February 9, 2018, Dkt. No. 61–1, 20 ("the fourth, ninth, and fourteenth causes of action which allege violations of the human trafficking law, 18 U.S.C. § 1591(a), must be dismissed because venue is not proper in this court, and they fail to state a claim"); Memorandum of Law in Support of Jennifer Powers' Motion to Dismiss, dated February 12, 2018, Dkt. No. 64–1, 17 ("Because the Complaint is devoid of any plausible factual allegation that Ms. Powers either coerced any of the plaintiffs, or was aware that they were allegedly coerced by Mr. Rubin, this allegation cannot survive under *Twombly*").) The Court previously denied Defendants' motions claiming that Plaintiffs failed to state a claim and that Plaintiffs' claims were frivolous, and no evidence produced in discovery warrants the Court revisiting that decision.

**F.   Defendants' Breach of Contract Affirmative Defenses Must Be Dismissed as the Contract is Void as Against Public Policy**

Defendants' breach of contract affirmative defenses must be dismissed, since, as Plaintiffs will discuss in more detail in section II(A), the contract is void as against public policy. A contract is void if it directly violates a statutory prohibition. *SI Venture Holdings, LLC v. Caitlin Specialty Ins.*, 118 F.Supp.3d 548, 551 (S.D.N.Y. 2015). "A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee." New York Penal Law § 230.00; *see also* 230.02(1)(a). The contract Defendants had Plaintiffs sign stated: "[i]n return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original) (P's 56.1 Statement at ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, and O.) The NDAs are void as they specifically articulate a violation of the New York Penal Law, warranting dismissal of Defendants' breach of contract defenses.

### G. Defendant Rubin's Contribution Affirmative Defense Must Be Dismissed as Contribution is Not a Valid Affirmative Defense for the TVPA

Rubin's contribution affirmative defense—and Powers's contribution counterclaim—must be dismissed as contribution is not a valid defense to violations of the TVPA, as Plaintiffs will discuss in further in section II(B). "Whether contribution is available in connection with a federal statutory scheme is a question governed solely by federal law." *Lehman Bros., Inc. v. Wu*, 294 F.Supp.2d 504, 505 n.1 (S.D.N.Y. 2003). It is settled in the Second Circuit "that there is no claim for contribution unless the operative federal statute provides one." *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 65 (2d Cir. 2013) (finding no right to contribution under the Securities Investor Protection Act); *see also Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 77 (1981) (finding no right to contribution under either the Equal Pay Act or Title VII). Likewise, those who are not members of the class a statute is intended to protect, may not bring a contribution claim associated with that statute. (*Id*.) There is nothing in the TVPA which expressly provides a right to contribution. *See* 18 U.S.C. § 1595. Nor are Rubin and Powers, as perpetrators, and not victims, of sex trafficking, of the class of individuals the TVPA was created to protect. (*Id*.) Thus, to the extent Rubin and Powers seek any contribution from Hallman and Lawson for Defendants' violation of the TVPA (let alone the "full" contribution they claim (Powers Answer, 72–73)), their contribution Counterclaims must be dismissed.

## II.   ALL OF DEFENDANT POWERS'S COUNTERCLAIMS MUST BE DISMISSED

### A. Defendant Powers's Breach of Contract Counterclaim Must Be Dismissed as the Contract is Void as Against Public Policy, the Plaintiffs Were Not Aware What They Were Signing, and Powers is Not a Party to the Contract

Powers's breach of contract counterclaim fails as the contract is void as against public policy, the Plaintiffs were not aware of what they were signing, and Powers is not a party to the contract.

19

**1.  The Contract Defendant Powers Seeks to Enforce is Void as Against Public Policy as it is a Contract for Prostitution**

Powers cannot enforce the NDA as it is—on its face—a contract for prostitution. A contract is void if it directly violates a statutory prohibition. *SI Venture Holdings, LLC,* 118 F.Supp.3d at 551 (S.D.N.Y. 2015) (denying to void insurance contract where insured was required to wait for "insurer's prior consent in order to obtain coverage for funds expended for environmental clean-up"). "A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee." New York Penal Law § 230.00; *see also* 230.02(1)(a). the contract Defendants had Plaintiffs sign stated: "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original) (P's 56.1 Statement at ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, and O.) Indeed, the Court already touched on this issue in its MTD Order, where it said, "the non-disclosure agreements may be unenforceable as contrary to public policy against prostitution . . . ." (MTD Order at 37 n.19.) However, the Court determined that it "need not resolve these issues to conclude that Rubin and Powers" could not prevail on their motions to dismiss. (*Id*.) The NDAs were drafted to attempt to give Rubin this ever-lasting power by stating:

> In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person. *The activity in question may be undertaken on this date, dates prior to this date and on dates in the future. This Agreement is intended to cover each of the dates in question and a new agreement is not required for each subsequent date.*

(P's 56.1 Statement at ¶ 63; NDAs, Exhibits J, K, L, M, N, and O (emphasis added).) Moreover, nowhere in the NDAs are there any opt-out provisions, meaning that Rubin intended that, once this contract was signed, there was no way Plaintiffs could revoke permission for Rubin to "engage in sexual activity" with them. (P's 56.1 Statement at ¶ 64; *see generally* NDAs, Exhibits J, K, L,

M, N, and O.) The NDA cannot be enforced as it is a contract contrary to public policy against prostitution such that Powers's counterclaim of breach of contract must be dismissed.

### 2. Plaintiffs Were Not Aware of What They Were Signing When They Signed the NDA

Even if the Court does not deem the NDA to be void—which it is—the Court should refuse to enforce the NDA as Plaintiffs were unaware of what they were signing and did not form a contract. Indeed, "[a] contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001). Where there is no meeting of the minds, there is no contract. *Prince of Peace Enter., Inc. v. Top Quality Food Mkt., LLC*, 760 F.Supp.2d 384, 397 (S.D.N.Y. 2011) (citing *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F.Supp.2d 329, 337 (S.D.N.Y. 2006)). A party cannot enter into an agreement when they are intoxicated and the counter party has reason to know they are intoxicated. *Reid v. IBM Corp.*, No. 95 Civ. 1755(MBM), 1997 WL 357969, at *9 (S.D.N.Y. June 26, 1997) (quoting Restatement (Second) of Contracts § 16.) Plaintiffs—who were unaware of what they were signing and who were severely under the influence of drugs and or alcohol when they allegedly signed the NDA—did not assent to the contract, and the NDA is unenforceable.

Indeed, certain Plaintiffs were either drinking, on drugs—or both—when they were provided the NDA. (P's 56.1 Statement at ¶ 65; Fuller Dep., Exhibit I at 115:17–23 ("Q. And that was after you had been drinking and ███████████████████, correct? A. Yes."); *Id.* at 113:0-22 (discussing Rubin providing the NDA); Speight Dep., Exhibit H at 54:24-55:8 ("Q. So you don't know, as you sit here today, whether you were under the influence -- A. I know I was under the influence of alcohol, because if it was the first time, I met them, there was alcohol involved on the plane ride, there was alcohol involved, as soon as I walked in the door,

everywhere"); *Id.* at 57:17-58:7 ("Q. So in this document, you said that you were not under the influence of drugs or alcohol . . . correct? A. Yeah, I was – there was not even time to read this. It was sort of signing it while we are out partying . . . . There was tons of alcohol in the penthouse.) The Court confirmed this conclusion, in dicta, noting that it was possible that the NDA was potentially unenforceable "because there was no meeting of the minds as to the extent of violence and potential injury involved." (MTD Order at 37 n.19.) Plaintiffs, who did not understand the terms of the NDA, and who allegedly signed such document while inebriated, did not assent to the terms of the NDA, such that the NDA is unenforceable.

### 3. Powers Cannot Enforce a Contract to Which She Was Not a Party, Nor a Third-Party Beneficiary

Powers is not a party to the NDA and therefore cannot seek to enforce it. An individual who does not sign a contract "lacks standing to enforce the agreement." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). Powers is also not a third party beneficiary to the agreement. To establish enforceable contract rights as a third-party beneficiary, a party has the heavy burden of showing "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for its benefit, and (3) that the benefit to it is sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to compensate it if the benefit is lost." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).  The heaviest weighed factor is "whether the contract clearly grants some benefit or performance directly to the third-party." *Id.*; *see also Miller & Wrubel, P.C. v. Todtman, Nachamie, Spizz & Johns, P.C.*, 106 A.D.3d 446, 446 (1st Dep't 2013) (without language identifying Plaintiff as intended third-party beneficiary, or language indicating plaintiff as third-party, Plaintiff was not a third-party beneficiary).  Other than Rubin, only Plaintiffs are mentioned by name in the NDAs.; Powers is not mentioned. (P's 56.1 Statement at ¶ 66; *See* NDAs, Exhibits J, K, L, M, N, and O.)

While Powers had all of the Plaintiffs but Fuller sign the NDAs, the NDAs do not name or otherwise mention Powers. (P's 56.1 Statement at ¶ 67; *See* NDAs, Exhibits J, K, L, M, N, and O.) None of the agreements refer to Powers by name, let alone confer a benefit or performance directly to Powers. (*Id.* ¶ 68.) At most, the agreements refer generally to Rubin's "friends" and "associates." (Powers Answer, Counterclaims ¶¶ 32-33, 38-39.) This is not enough to meet the heavy burden of demonstrating third party beneficiary status. Even if these clauses properly identified Powers as a beneficiary, the benefit of each provision would accrue to *Rubin*, not Powers, an unnamed third-party. Finally, as the agreements provide no benefit to Powers, there is certainly no "sufficiently immediate" benefit to establish a duty by Plaintiffs to compensate Powers. Powers may not avail herself of the benefit of contracts to which she was neither a party nor a third-party beneficiary.

### B.  Defendant Powers's Contribution Counterclaim Must Be Dismissed as Plaintiffs Hallman and Lawson Have Nothing to do With the Tort Claims Against Hathaway, Peterson, Fuller, and Speight

Powers's contribution counterclaim against Hallman and Lawson for Defendants' common law tort violations must also be dismissed as neither Hallman, nor Lawson, had anything to do with the remaining tort claims by Plaintiffs Hathaway, Peterson, Fuller, and Speight, nor did Hallman have anything to do with what remains of Plaintiff Lawson's tort claim. The Court dismissed all common law tort claims by Plaintiff Hallman, as well as all common law tort claims by Lawson prior to November 2, 2016, in its order on Defendants' motions to dismiss. (MTD Order at 43.) Thus, the only tort claims for which contribution may be pleaded[9] are those that survived the Court's MTD Order: those brought by Plaintiffs Hathaway, Peterson, Speight, and

---

[9] Plaintiffs previously filed a pre-motion conference letter for Plaintiffs' motion to dismiss Defendants' counterclaims. (Dkt. No. 139.) However, at the July 12, 2018, conference Plaintiffs withdrew their pending motion to dismiss in a compromise with the Defendants and in order to move the litigation through discovery after months of motion practice.

Lawson (for her December 2016 encounter only). (*Id*.). Powers's contribution counterclaim concerns the August and September 2016 encounters involving Hallman and Lawson, for which there are no common law claims remaining. (*See* Powers Counterclaim ¶¶ 60–69.)

Powers alleges that Hallman and Lawson may be liable under a theory of contribution to "any other Plaintiffs," but Powers makes no allegations whatsoever as to how Hallman and Lawson could be liable for the claims brought by Hathaway, Peterson, Fuller or Speight—with whom Hallman and Lawson never interacted. (Powers Counterclaims ¶ 72.) Indeed, Plaintiff Lawson did not know the other Plaintiffs and had not spoken to the other Plaintiffs—aside from Plaintiff Hallman—about Rubin or this case. (P's 56.1 Statement at ¶ 69 (Lawson Dep., Exhibit F at 343:24–344:2 ("Q. Do you know the real names of all the other plaintiffs in this case? A. No."), 345:22–346:5 ("Q. And now, have you ever had any electronic communications with [Speight]? A. No. Q. Do you know who [Speight] is? A. I've heard that name before. I know she's a model but, no. Q. Have you ever met her? A. No."), 346:6–347:6 ("Q. Have you had any electronic communications with [Fuller]? A. Not in a very long time. Q. 'Very long time,' what do you mean by that? A. Years. Q. Like before 2016? A. I don't want to guess, but if I was to guess, I would say yes. But I don't want to guess."), 347:7–9 ("Q. Have you ever communicated electronically with [Hathaway]? A. I don't know that person."), 347:10–13 ("Q. And we just talked about it, but do you know who [Peterson] is? Is that name familiar to you? A. No.").) Plaintiffs cannot be liable for contributing to the injuries of fellow victims when they had nothing to do with those victims whatsoever.

While Defendants never asked the same questions of Hallman, Hallman met Defendants for the first time after Plaintiffs Hathaway, Speight, Fuller, and Peterson met Defendants. (P's 56.1 Statement at ¶ 70; *Compare* Hallman Dep. 77:3-11 (discussing a meeting with Rubin for the first

time in August of 2016), and Peterson Dep. 57:20–24 (discussing Peterson's first meeting with Rubin in 2011), Hathaway Dep., 36:17–21 (discussing Hathaway meeting Rubin for the first time in 2009 or 2010), Speight Dep., 48:14–19 (discussing whether the first time Speight met Rubin was in 2015, and Fuller Dep., 90:12-19 (discussing Fuller being invited to meet Rubin for the first time in March 2016).)

Powers's contribution counterclaims against Hallman and Lawson must be dismissed as neither Hallman nor Lawson had anything to do with the remaining tort claims by Plaintiffs Hathaway, Peterson, Fuller, and Speight, nor did Hallman have anything to do with what remains of Plaintiff Lawson's tort claim.

## **CONCLUSION**

Defendants' affirmative defenses of statute of limitations, laches, settlement and release, improper venue, failure to state a claim, and breach of contract, as well Powers's counterclaims for breach of contract and contribution must all be dismissed. The Court already ruled on Defendants' statute of limitations, improper venue, and failure to state a claim defenses permitting Plaintiffs' TVPA claim and some of Plaintiffs' tort claims to proceed. Defendants' laches defenses must be dismissed as Plaintiffs brought their claims timely and did not sleep on their rights. Defendants settlement or release affirmative defense must be dismissed as none of the remaining Plaintiffs signed any settlement and release agreement. Defendants' breach of contract defenses and counterclaim must be dismissed as the contract to which Defendants cite is void as against public policy and, in any event, there was no meeting of the minds as to the contracts. Finally, Defendants' contribution defenses and counterclaim fails as Plaintiffs Hallman and Lawson cannot be held liable for contribution for acts that took place prior to their own involvement with the Defendants and Hallman cannot be liable for Lawson's state tort claim that falls outside of the statute of limitations.

Dated:  New York, New York
February 13, 2019

John G. Balestriere
Jillian L. McNeil
Brian L. Grossman
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:       (646) 912-8462
Facsimile:        (212) 208-2613
brian.grossman@balestrierefariello.com
*Attorneys for Plaintiffs*

26