John G. Balestriere
Jillian L. McNeil
Brian L. Grossman
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (646) 912-8463
Facsimile:      (212) 208-2613
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON,** and **LAUREN FULLER,**<br><br>                              Plaintiffs,<br><br>– against –<br><br>**HOWARD RUBIN, JENNIFER POWERS,** and the **DOE COMPANY.**<br><br>                              Defendants. | Case No.: 1:17-cv-06404 (BMC)(SMG)<br><br>**PLAINTIFFS' 56.1 STATEMENT OF UNDISPUTED FACTS** |

Pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rules") and Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Hillary Lawson ("Lawson"), Kristina Hallman ("Hallman"), Moira Hathaway ("Hathaway"), Macey Speight ("Speight"), Rosemarie Peterson ("Peterson"), and Lauren Fuller ("Fuller"), submit the following statement of undisputed, material facts as to which they contend there are no genuine issues to be tried:

1. Starting in approximately 2009 or 2010, Defendants Rubin and Powers began their human trafficking venture by inviting women from across the United States to travel to New York to meet Defendant Rubin. (Deposition Transcript of Moira Hathaway, September 20, 2018, Exhibit A[1] ("Hathaway Dep.") at 36:17–21.)

2. In the early years of this venture, Rubin would meet the women at hotel rooms across New York City. (Deposition Transcript of Howard Rubin, October 25, 2018, Exhibit B ("Rubin Dep.") at 103:3–9, 116:6–14; Deposition Transcript of Jennifer Powers, October 16, 2018, Exhibit C ("Powers Dep.") at 98:15–99:13.)

3. Later in the venture, Rubin began renting an apartment at ▓▓▓▓▓▓▓▓▓▓▓▓, where he converted the second bedroom to a Bondage, Domination, Sadism and Masochism ("BDSM") dungeon. (Rubin Dep., Exhibit B at 100:5–101:13; Powers Dep., Exhibit C at 140:8–16; Deposition Transcript of Stephanie Shon, October 10, 2018, Exhibit D ("Shon Dep.") at 56:15–57:2.)

4. Once in New York, the women would typically meet with Powers, who would present them with a document purporting to be a non-disclosure agreement ("NDA"). (Powers Dep., Exhibit C at 115:14–119:5.)

5. After Powers had the women sign the document, Rubin would meet with the women, generally get them intoxicated or provide them narcotics, and then beat and rape them. (*See e.g.,* Hallman Dep. at 143:12-24; Lawson Dep. at 83:5-9; 86:2-24; 88:18-89:8; Peterson Dep. at 259:19-260:16; Speight Dep. at 57:17-58:7; Fuller Dep. at 115:17–23 (regarding Fuller's drinking on the day of the assault); *Id.* at 143:9-146:17 (Rubin sexually assaulting Fuller with an object after Fuller said the safe word).

---

[1] All exhibits are attached to the Declaration of Brian L. Grossman in Support of Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses and Counterclaims.

6. The NDA was drafted by ███████████████████████████. (Rubin Dep., Exhibit B at 185:5–13; Powers Dep., Exhibit C at 82:3–19.)

7. After Rubin hired former-Defendant Yifat Schnur ("Schnur"), Rubin had Schnur review the NDA to ensure it was adequate. (Rubin Dep., Exhibit B at 194:3–195:23.)

8. Schnur did not end up making any changes to the NDA. (Rubin Dep., Exhibit B at 194:15–196:17.)

9. The NDA stated, in part, that "[i]n return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original) (*See* Hallman Nondisclosure Agreement, August 22, 2016, Exhibit J ("Hallman NDA"); Hathaway Nondisclosure Agreement, January 21, 2015, Exhibit K ("Hathaway NDA"); Lawson Nondisclosure Agreement, August 22, 2016, Exhibit L ("Lawson NDA"); Peterson Nondisclosure Agreement, September 25, 2014, Exhibit M ("Peterson NDA"); Fuller Nondisclosure Agreement, March 7, 2016, Exhibit N ("Fuller NDA"); and Speight Nondisclosure Agreement, October 12, 2015, Exhibit O ("Speight NDA") (each an "NDA", collectively the "NDAs").)

10. Defendants had the Plaintiffs sign the NDAs prior to "any physical sexual interaction." (Rubin Dep., Exhibit B at 182:3–20.)

11. Powers, not Rubin, typically had the victims of the venture sign the NDAs. (Powers Dep., Exhibit C at 116:18–118:25.)

12. Plaintiff Hathaway first met Rubin in 2009 or 2010 (Rubin Dep., Exhibit B at 198:16–18; Hathaway Dep., Exhibit A at 36:17–21.)

13. Hathaway and Rubin began seeing each other in hotel rooms in New York City in a consensual relationship. (Hathaway Dep., Exhibit A at 73:9–23; 76:16–78:2; 85:8–18.)

3

14. Rubin paid for Hathaway to be flown into and out of LaGuardia and Newark Airports (Jennifer Powers Production Bates Nos. JP_0000668–JP_0000670, May 16, 2015, Exhibit P, ("Hathaway Itinerary."); Hathaway Dep., Exhibit A at 90:10–91:8.)

15. Hathaway met with Rubin on or about January 21, 2015. (Hathaway NDA, Exhibit K.)

16. Hathaway last saw Rubin in 2017. (Hathaway Dep., Exhibit A at 121:21–25.)

17. Plaintiff Peterson first met Rubin in 2011 when a woman named ▇▇▇ booked her to travel from California to New York to meet Rubin, at Rubin's request. (Peterson Dep., Exhibit G at 44:3–46:8; 60:7–16; 61:10–63:13.)

18. The first time Peterson met Rubin was at a hotel in New York City with two other women. (Peterson Dep., Exhibit G at 103:2–11.)

19. During that first encounter, Peterson was nervous and Rubin instructed one of the other women to crush up a pill and put the pill in Peterson's drink to calm her down. (Peterson Dep., Exhibit G at 105:16–107:6.)

20. After Peterson took the drugs, she became more nervous and ultimately left the hotel room. (Peterson Dep., Exhibit G at 111:12–112:12.)

21. Peterson did not see Rubin again until years later when she coincidentally ran into him at a restaurant in New York City. (Peterson Dep., Exhibit G at 147:17–148:22.)

22. Peterson and Rubin had a non-sexual relationship after that chance encounter for a period of time. (Peterson Dep., Exhibit G at 153:18–154:19; 172:16–20.)

23. But that relationship changed when Peterson met with Rubin on September 25, 2014. (Peterson Dep., Exhibit G at 234:20–235:22; Peterson NDA, Exhibit M.)

24. For at least three years, Rubin continued to provide Peterson oxycodone and would use the meeting as an excuse to beat and rape her, creating a cycle whereby Peterson would come to Rubin for oxycodone and Rubin would beat and rape Peterson causing her to want more oxycodone to deal with the pain. (Peterson Dep., Exhibit G at 283:9–284:25; 286:5–289:7.)

25. Plaintiff Fuller first met Rubin on March 7, 2016, after her friend ▬▬▬— who was a recruiter for Rubin—convinced her to travel to New York to meet Rubin. (Fuller Dep., Exhibit I at 76:16–77:23; Fuller NDA, Exhibit N.)

26. Upon arriving in New York City, ▬▬ and Fuller drank all day before Rubin arrived at the apartment and presented Fuller with an NDA to sign. (Fuller Dep., Exhibit I at 107:16–110:21; 113:9–22; 115:4–116:11; Fuller NDA, Exhibit N.)

27. After he provided the NDA, Rubin brought Fuller into his dungeon. (Fuller Dep., Exhibit I at 119:5–121:23; 129:15–130:22.)

28. Fuller asked Rubin to stop and said the safe word almost immediately upon Rubin beginning his BDSM activities. (Fuller Dep., Exhibit I at 143:9–146:17.)

29. Plaintiffs' expert, Park Dietz, opined that "it is preferable that the submissive choose her own safe word that she is unlikely to forget when needed" (Expert Report of Park Dietz, November 5, 2018, Exhibit Q, at 17), but Rubin decided which safe words would be used. (Rubin Dep., Exhibit B, at 85:12–15.)

30. Despite Fuller using the safe word, Rubin did not stop, and instead penetrated Fuller with an object, and did not allow Fuller to leave the dungeon until after she asked him to stop numerous times. (Fuller Dep., Exhibit I 143:9–146:17.)

31. Plaintiff Speight first met Rubin in 2015. (Speight Dep., Exhibit H at 47:23–49:16.)

32. Speight was introduced to Rubin by former Defendant—and Rubin recruiter—Stephanie Shon ("Shon"), who Speight met in Atlanta, Georgia. (Speight Dep., Exhibit H at 36:7–9; 41:21–42:2.)

33. Powers booked Speight's flight into and out of LaGuardia Airport. (Speight Dep., Exhibit H at 48:14–19.)

34. Speight met with Rubin on or about October 12, 2015. (Speight Dep., Exhibit H at 49:4–50:2; Speight NDA, Exhibit O.)

35. Speight travelled to New York City approximately a dozen times to meet with Rubin. (Speight Dep., Exhibit H at 187:18–23.)

36. On at least a few of those occasions, Speight was injured. (Speight Dep., Exhibit H at 94:23-95:3.)

37. Plaintiff Lawson first met Rubin in 2016. (Lawson Dep., Exhibit F at 62:15-63:17.)

38. Stephanie Shon contacted Lawson on Instagram and both Shon and Jennifer Powers asked Lawson if she wanted to make money to take fetish style photographs. (Lawson Dep., Exhibit F at 42:4–13; 45:3–20; 51:11-13; 347:14-22.)

39. Lawson initially declined but later accepted after learning that her friend, Plaintiff Hallman, had also been contacted by Shon with the same proposition. (Hallman Dep., Exhibit E at 67:16–69:5; 70:21–71:12.)

40. Hallman and Lawson determined that they would travel to New York together to meet Rubin. (Hallman Dep., Exhibit E at 70:21–71:12.)

41. Powers booked Lawson's flight into and out of John F. Kennedy Airport. (Lawson Dep., Exhibit F at 286:5–12; Lawson Flight Itinerary, August 18, 2016, Exhibit R ("Lawson Itinerary").)

6

42. Lawson met with Rubin on or about August 22, 2016. (Lawson NDA, Exhibit L.)

43. Lawson was beaten and raped by Rubin after Rubin gave her alcohol. (Lawson Dep., Exhibit F at 83:5–9; 87:8–88:24.)

44. Lawson returned to New York City a few months later. (Lawson Dep., Exhibit F at 133:8–136:11.)

45. Rubin assuaged Lawson's fears when Rubin asked to meet Lawson in the middle of the day for lunch, and treated Lawson very nicely. (Lawson Dep., Exhibit F at 134:16–136:19.)

46. But when Lawson returned to the apartment, Rubin acted even more egregiously than he had on Lawson's first meeting, leading to Rubin inserting a cattle prod into Lawson's vagina without Lawson's consent, amongst other acts of assault and rape. (Lawson Dep., Exhibit F at 166:17–22.)

47. Plaintiff Hallman first met Rubin in August 2016. (Hallman Dep., Exhibit E at 79:22-80:25.)

48. Stephanie Shon contacted Hallman on Instagram and asked Hallman if she wanted to make money to take fetish style photographs. (Hallman Dep., Exhibit E at 61:7–25; 81:2–21.)

49. Hallman initially declined but later accepted after learning that her friend, Plaintiff Lawson, had also been contacted by Shon with the same proposition. (Hallman Dep., Exhibit E at 67:16–69:5; 70:21–71:12.)

50. Powers booked Hallman's flight into and out of LaGuardia Airport. (Hallman Dep., Exhibit E at 74:19–75:24; 99:3–14; Hallman Flight Itinerary, August 18, 2016, Exhibit S ("Hallman Itinerary").)

51. Hallman met with Rubin on or about August 22, 2016. (Hallman Dep., Exhibit E at 106:4–107:10; Hallman NDA, Exhibit J.)

52. Hallman did not believe that the reason for her visit with Rubin was to have sex for money. (Hallman Dep., Exhibit E at 76:13–21; 84:23–85:6.)

53. Rubin tied Hallman and Lawson up with black tape or rope and, when Hallman protested, Rubin hit her in the face. (Hallman Dep., Exhibit E at 135:12–136:7.)

54. While Hallman was tied up, and unable to consent, Rubin engaged in sexual intercourse with her. (Hallman Dep., Exhibit E at 135:12–136:7.)

55. Hallman returned to New York to meet Rubin on two other occasions: once with former-Plaintiff Caldwell (Hallman Dep., Exhibit E at 198:25–199:13) and once with a woman named ▮▮▮▮▮▮▮▮. (Hallman Dep., Exhibit E at 220:23–221:7.)

56. On the first of these two occasions, Rubin again assaulted and raped Plaintiff Hallman, including punching Hallman in the head so hard that she lost consciousness. (Hallman Dep., Exhibit E at 143:12–24.)

57. When Hallman returned with ▮▮▮▮ Hallman was so fearful of Rubin that she became sick and required hospitalization. (Hallman Dep., Exhibit E at 228:3-24.)

58. Hallman and Lawson were presented with the NDAs on August 22, 2016, which was their first meeting with Rubin. (Lawson NDA, Exhibit L; Hallman NDA, Exhibit J.)

59. No present claim is based on misconduct which took place prior to November 2, 2007 (ten years before the filing of the Complaint)—or before February 20, 2008 (ten years from the filing of the Amended Complaint). (Hallman Dep., Exhibit E at 77:3-11; Lawson Dep., Exhibit F at 65:11–15; Peterson Dep., Exhibit G at 57:20–24; Hathaway Dep., Exhibit A at 36:17–21; Speight Dep., Exhibit H at 48:14–19; Fuller Dep., Exhibit I at 90:12-19.)

60. Former Plaintiff Caldwell entered into an additional agreement with Rubin entitled "General Release Agreement" on October 4, 2016. (Rubin Production Bates Nos. HR000082–HR000085, October 4, 2016, Exhibit T.)

61. Rubin or Powers showed the NDAs to women that came to his apartment prior to "any physical sexual interaction." (Rubin Dep., Exhibit B at 182:3–20; *see also* Powers Dep., Exhibit C at 116:18–118:25.)

62. Most (if not all) Plaintiffs flew through airports located in Queens County, New York. (Hallman Itinerary, Exhibit S; Hathaway Itinerary, Exhibit P; Lawson Itinerary, Exhibit R; Speight Flight Itinerary, October 11, 2015, Exhibit U.)

63. The NDAs contain provisions stating:

> In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person. *The activity in question may be undertaken on this date, dates prior to this date and on dates in the future. This Agreement is intended to cover each of the dates in question and a new agreement is not required for each subsequent date*. (NDAs, Exhibits J, K, L, M, N, and O (emphasis added).)

64. The NDAs do not contain opt-out provisions. (*See generally* NDAs, Exhibits J, K, L, M, N, and O.)

65. Certain Plaintiffs were either drinking, on drugs, or both when they were provided the NDA. (*See, e.g.,* Fuller Dep., Exhibit I at 113:9 – 22; 115:17–23; Speight Dep., Exhibit H at 54:24-55:8; 57:17-58:7.)

66. Other than Rubin, only Plaintiffs are mentioned by name in the NDAs. (*See* NDAs, Exhibits J, K, L, M, N, and O.)

67. While Powers had all of the Plaintiffs but Fuller sign the NDAs, the NDAs do not name or otherwise mention Powers. (*See* NDAs, Exhibits J, K, L, M, N, and O.)

9

68.     None of the agreements refer to Powers by name, let alone confer a benefit or performance directly to Powers. (*Id*.)

69.     Plaintiff Lawson did not know the other Plaintiffs and had not spoken to the other Plaintiffs—aside from Plaintiff Hallman—about Rubin or this case. (Lawson Dep., Exhibit F at 343:24–344:2 ("Q. Do you know the real names of all the other plaintiffs in this case? A. No."), 345:22–346:5 ("Q. And now, have you ever had any electronic communications with [Speight]? A. No. Q. Do you know who [Speight] is? A. I've heard that name before. I know she's a model but, no. Q. Have you ever met her? A. No."), 346:6–347:6 ("Q. Have you had any electronic communications with [Fuller]? A. Not in a very long time. Q. 'Very long time,' what do you mean by that? A. Years. Q. Like before 2016? A. I don't want to guess, but if I was to guess, I would say yes. But I don't want to guess."), 347:7–9 ("Q. Have you ever communicated electronically with [Hathaway]? A. I don't know that person."), 347:10–13 ("Q. And we just talked about it, but do you know who [Peterson] is? Is that name familiar to you? A. No.").)

70.     Plaintiff Hallman met Defendants for the first time after Plaintiffs Hathaway, Speight, Fuller, and Peterson met Defendants. (*Compare* Hallman Dep., Exhibit E at 77:3-11, *with* Peterson Dep., Exhibit G at 57:20–24, Hathaway Dep., Exhibit A, at 36:17–21, Speight Dep., Exhibit H at 48:14–19, and Fuller Dep., Exhibit I at 90:12-19.)

10

Dated: New York, New York
   February 13, 2019

                /s/ Brian L. Grossman
                John G. Balestriere
                Jillian L. McNeil
                Brian L. Grossman
                **BALESTRIERE FARIELLO**
                225 Broadway, 29th Floor
                New York, New York 10007
                Telephone: (646) 912-8462
                Facsimile: (212) 208-2613
                brian.grossman@balestrierefariello.com
                *Attorneys for Plaintiffs*