**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

HILLARY LAWSON, KRISTINA HALLMAN,
STEPHANIE CALDWELL, MOIRA
HATHAWAY, MACEY SPEIGHT, ROSEMARIE
PETERSON and LAUREN FULLER,

*Plaintiffs*,

-*against*-

HOWARD RUBIN, JENNIFER POWERS, and
the DOE COMPANY,

*Defendants*.

Case No.: 1:17-CV-06404
(BMC)(SMG)

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HOWARD RUBIN'S**
**MOTION FOR SUMMARY JUDGMENT**</u>

Edward A. McDonald
Benjamin E. Rosenberg
Michael J. Gilbert
Benjamin M. Rose
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Defendant Howard Rubin*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................. 2

I.   HILLARY LAWSON AND KRISTINA HALLMAN ........................ 2

    A.   Hallman and Lawson Are Introduced to Rubin ........................... 3

    B.   Hallman and Lawson's August 22, 2016 Encounter with Rubin ........... 4

    C.   Hallman's September 24, 2016 Encounter with Rubin (and Caldwell) ........... 6

        1.   The immediate recruitment of Caldwell and Caldwell's initial meeting with Rubin on August 24, 2016 ................................ 6

        2.   Hallman's recruitment of Caldwell in September 2016 ................ 7

        3.   Hallman's second encounter with Rubin (and Caldwell) on September 24, 2016 ................................................................ 8

    D.   Lawson's Second Encounter with Rubin on December 21, 2016 ........ 8

    E.   Neither Hallman Nor Lawson Suffered Harm from Their Encounters with Rubin ................................................................................ 9

        1.   Hallman ............................................................................... 9

        2.   Lawson ................................................................................ 11

    F.   Hallman and Lawson Recruit Others to Meet with Rubin ................ 12

        1.   Lawson recruits her friend, ███████ ........................... 13

        2.   Hallman recruits numerous women ...................................... 13

    G.   Hallman's and Lawson's Continued Efforts to See Rubin Again .......... 14

II.  MOIRA HATHAWAY ...................................................................... 16

    A.   Hathaway's Introduction to Rubin ............................................. 17

    B.   Hathaway's Ongoing Relationship with Rubin ........................... 17

    C.   Hathaway Suffered No Harm from Her Encounters with Rubin ........ 19

III. MACEY SPEIGHT ......................................................................... 19

    A.   Speight's Introduction to Rubin ................................................ 20

    B.   Speight's Relationship with Rubin ............................................. 20

    C.   Speight's Continuing Encounters with Rubin ............................. 21

    D.   Speight's Conduct after Her Last Physical Encounter with Rubin ...... 22

    E.   Speight Suffered No Harm from Her Encounters with Rubin ........... 24

IV.  ROSEMARIE PETERSON ............................................................. 25

i

# TABLE OF CONTENTS
(continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| A. | Peterson's Introduction to Rubin | .......................................................... | 25 |
| B. | Peterson Solicits Further Encounters with Rubin | ............................... | 26 |
| C. | Peterson's Encounters with Rubin in 2014 | ........................................ | 28 |
| D. | Peterson's Ongoing Relationship with Rubin after Her Last Encounter | ............ | 30 |
| E. | Peterson Suffered No Harm from Her Encounters with Rubin | ........................ | 31 |

V. LAUREN FULLER ................................................................................ 33

| A. | Fuller's Friend, ███████████, Tells Her about Rubin | ................................. | 33 |
| B. | ███████ Solicits Fuller to Have an Encounter with Rubin | ................................. | 33 |
| C. | Fuller Uses the Safe Word, and Rubin Stops Having Sex with Her | .................. | 34 |
| D. | Fuller Suffered No Harm from Her Encounter with Rubin | ................................. | 35 |

PROCEDURAL HISTORY ................................................................................ 36

LEGAL STANDARD FOR SUMMARY JUDGMENT ............................................. 41

ARGUMENT ................................................................................................ 43

PLAINTIFFS' CONSENT TO THEIR ENCOUNTERS WITH RUBIN DOOMS EACH OF THEIR CLAIMS ....................................................................... 43

CONCLUSION ............................................................................................ 49

## TABLE OF AUTHORITIES

CASES

*Arrington v. Liz Claiborne, Inc.*,
    260 A.D.2d 267 (1st Dep't 1999) ........................................................41

*Babino v. Gesualdi*,
    278 F. Supp. 3d 562 (E.D.N.Y. 2017), *aff'd*, 744 F. App'x 30 (2d Cir. 2018)......................42

*Cajamarca v. Regal Entm't Grp.*,
    No. 103027/12, 2013 N.Y. Misc. LEXIS 4851 (Sup. Ct. N.Y. Cty. Oct. 17,
    2013) ...................................................................................40

*Caltabiano v. BSB Bank & Trust Co.*,
    387 F. Supp. 2d 135 (E.D.N.Y. 2005) ...................................................41

*Cecora v. De La Hoya*,
    No. 112787/11, 2012 N.Y. Misc. LEXIS 1582 (Sup. Ct. N.Y. Cty. Mar. 30,
    2012), *aff'd*, 965 N.Y.S.2d 464 (1st Dep't 2013) ...........................................45, 49

*Cheeseboro v. Little Richie Bus Serv., Inc.*,
    254 F. Supp. 3d 485, 492 (E.D.N.Y. 2017), *aff'd*, 722 F. App'x 107 (2d Cir.
    2018), *cert. denied*, No. 18-5664, 2019 WL 113228 (Jan. 7, 2019).......................42

*Coopersmith v. Gold*,
    568 N.Y.S.2d 250 (3d Dep't 1991)........................................................40

*Costello v. St. Francis Hosp.*,
    258 F. Supp. 2d 144 (E.D.N.Y. 2003) ...................................................42

*Dawes v. Coughlin*,
    964 F. Supp. 652 (N.D.N.Y. 1997), *aff'd*, 159 F.3d 1346 (2d Cir. 1998) ..............44

*Droutman v. New York Blood Ctr., Inc.*,
    No. 03-CV-5384, 2005 U.S. Dist. LEXIS 42951 (E.D.N.Y. July 27, 2005)..........43

*Fiedler v. Incandela*,
    222 F. Supp. 3d 141, 154 (E.D.N.Y. 2017) ...............................................42

*Higgins v. Hamilton*,
    794 N.Y.S.2d 421 (2d Dep't 2005)........................................................40

*Hinz v. Vill. of Perry*,
    No. 13-CV-6302, 2015 U.S. Dist. LEXIS 80661 (W.D.N.Y. June 22, 2015),
    *aff'd*, 667 F. App'x 3 (2d Cir. 2016)......................................................42

*Howell v. New York Post Co.*,
  81 N.Y.2d 115 (1993) ......................................................................................................41

*Incitti v. Skinner*,
  No. 88-CV-601, 1994 U.S. Dist. LEXIS 13997 (N.D.N.Y. Sept. 14, 1994) ..........................41

*Jeffreys v. City of N.Y.*,
  426 F.3d 549 (2d Cir. 2005)...............................................................................................44

*Jencsik v. Shanley*,
  No. 151365/12, 2013 N.Y. Misc. LEXIS 6118 (Sup. Ct. N.Y. Cty. Dec. 24,
  2013) .................................................................................................................................41

*Jones v. Bay Shore Union Free Sch. Dist.*,
  170 F. Supp. 3d 420, 420 (E.D.N.Y.), *aff'd*, 666 F. App'x 92 (2d Cir. 2016),
  *cert. denied*, 137 S. Ct. 2135 (2017) ...................................................................................42

*Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*,
  83 F. Supp. 2d 384 (S.D.N.Y. 2000)....................................................................................43

*Manko v. Volynsky*,
  No. 95 Civ. 2585, 1996 U.S. Dist. LEXIS 6328 (S.D.N.Y. May 9, 1996)..............................40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...........................................................................................................42

*Petrunti v. Cablevision*,
  No. 08-CV-2277, 2009 U.S. Dist. LEXIS 121370 (E.D.N.Y. Dec. 30, 2009) ........................43

*Robinson v. Town of Colonie*,
  878 F. Supp. 387 (N.D.N.Y. 1995)......................................................................................49

*Rockland Vending Corp. v. Creen*,
  No. 07-CV-6268, 2009 U.S. Dist. LEXIS 68323 (S.D.N.Y. Aug. 4, 2009) ...........................49

*Sabatowski v. Fisher Price Toys*,
  763 F. Supp. 705 (W.D.N.Y. 1991) .....................................................................................49

*Sanders v. Rosen*,
  605 N.Y.S.2d 805 (Sup. Ct. N.Y. Cty. 1993) .......................................................................40

*Slue v. N.Y.U. Med. Ctr.*,
  409 F. Supp. 2d 349 (S.D.N.Y. 2006)...................................................................................49

*United States v. Marcus*,
  628 F.3d 36 (2d Cir. 2010)..................................................................................................40

iv

*United States v. Robinson*,
  702 F.3d 22 (2d Cir. 2012)............................................................................................45

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000)............................................................................................42

*Wende C. v. United Methodist Church*,
  4 N.Y.3d 293 (2005) ...............................................................................................40, 45

**STATUTES/RULES**

18 U.S.C. § 1591..............................................................................................................39

18 U.S.C. § 1591(a) ....................................................................................................39, 40

15 U.S.C. § 1591(a)(2).....................................................................................................45

18 U.S.C. § 1595..............................................................................................................40

Fed. Rules Civ. P. 56(a)....................................................................................................41

Defendant Howard Rubin submits this memorandum of law in support of his motion for summary judgment on all remaining causes of action in the Second Amended Complaint ("SAC"), and incorporates by reference the arguments made in Defendant Powers' motion for summary judgment.  Discovery has established there are no genuine disputes as to any material facts, and all of Plaintiffs' claims are meritless.

## Introduction

The documentary discovery, consisting primarily of Plaintiffs' own electronic communications, and the deposition testimony of every Plaintiff, establish beyond any question that every claim of every Plaintiff is devoid of merit.  The record shows that each Plaintiff consensually engaged in BDSM, or rough sex, with Mr. Rubin for money, and that not one was forced, tricked, or deceived into doing so.  The Complaint, the Amended Complaint, and the SAC are shameful:  not only do they include critical allegations that discovery has shown to be demonstrably false, but they amount to nothing more than malicious attempts to extort Mr. Rubin into settlement to avoid humiliation.  Plaintiffs' claims that they were victims of sex trafficking and tortious conduct must be dismissed.

The record shows:  (1) Plaintiffs understood they were meeting Rubin to engage in rough sex for money; (2) Rubin was "upfront" with the women, forthrightly explaining in detail the nature of the encounters, and providing "safe words" to terminate any encounter; (3) following their meetings with Rubin, each Plaintiff, with one exception, repeatedly expressed that she had enjoyed her time with him, and wished to engage in BDSM sex with him again; (4) no Plaintiff indicated in any way – either to Defendants or anyone else – that she had been raped, assaulted, battered, falsely imprisoned, traumatized or seriously injured; (5) several Plaintiffs aggressively and explicitly solicited Rubin to engage again in rough sex; (6) three Plaintiffs encouraged close

friends to have rough sex with Rubin; and (7) all but one Plaintiff returned for multiple visits with Rubin, over a period of months or, as to some, years.

Each Plaintiff signed a "Confidentiality Agreement and Release" ("Release") attesting to her consent. The second paragraph of the document states unambiguously that the parties would engage in potentially injurious rough sex for which the women would be paid:

> In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person.

Despite dramatic claims in the pleadings that they had been drugged or intoxicated before their encounters with Rubin, in their depositions, not one Plaintiff described a single time Rubin forced them to take drugs or alcohol; nor did any Plaintiff testify that she had been coerced or tricked into her encounters with Rubin.

Although the SAC alleges that each Plaintiff was injured so badly during interactions with Rubin that hospitalization was required, not a single Plaintiff produced a page of medical records documenting any alleged injuries. The claims in the SAC about emotional trauma, depression, and the need for prescription medicine were similarly not supported by any evidence produced in discovery.

Consensual BDSM sexual activity between adults does not give rise to a human trafficking claim, nor does it give rise to any state tort claim. This Court should grant summary judgment for Rubin on every claim of every Plaintiff.

## Statement of Undisputed Facts

### I.   HILLARY LAWSON AND KRISTINA HALLMAN

Plaintiffs Kristina Hallman and Hillary Lawson, along with former plaintiff Stephanie Caldwell, initiated this litigation. Dkt. No. 1. Hallman and Lawson are long-time friends who, during the relevant period, earned a living by posting pictures and videos of themselves, typically

2

in provocative outfits and poses, on Instagram and Snapchat, or by modelling.  Declaration of

Benjamin M. Rose ("Ex." or "Decl.") Exs. 1, Hallman Dep. at 32:9-33:14; 2, Lawson Dep. at

33:9-34:11; *see, e.g.*, Exs. 3-12; Def. Rubin's 56.1 Statement ("56.1") ¶1.

     Hallman and Lawson took part in a paid sexual encounter with Rubin in August 2016;

Hallman did so again with Caldwell in September 2016; and Lawson did so in December 2016.

Each of these encounters was entirely consensual, and the women were informed, prior to

meeting Rubin, that the purpose of the encounters was to engage in BDSM sex with Rubin.

**A.**     **Hallman and Lawson Are Introduced to Rubin**

     Hallman and Lawson were introduced to Rubin by ███████████, a former BDSM

partner of Rubin's and an acquaintance of Hallman and Lawson's.  Exs. 13, ███ Dep. at 32:23-

34:2; 1, Hallman Dep. at 61:12-19; 56.1 ¶2.  ███ contacted Hallman after seeing a BDSM-style

picture Hallman had posted on social media and asked if Hallman was interested in BDSM.  Ex.

13, ███ Dep. at 33:4-10.  Hallman confirmed she was, and brought Lawson into the

conversation.  *Id.* at 32:23-34:2.

     ███ described Rubin to the two women and told them "exactly what the situation was,

that [Rubin] liked BDSM, that he engaged in things like ████████████."  *Id.* at 121:5-16.

Hallman and Lawson together expressed interest in meeting Rubin, telling ███ that "they had

done things like that in the past and were fully aware of exactly what the situation was, what the

arrangement was.  And that they were coming up to meet with Howie for engagements including

BDSM."  *Id.*; *see also id.* at 33:4-34:2.

     After speaking with ███, Hallman and Lawson agreed to travel to New York to meet

Rubin.  Exs. 2, Lawson Dep. at 48:16-20; 1, Hallman Dep. at 70:24-72:16; 56.1 ¶3.  On

August 17, 2016, ███ started a group text chat among herself, Hallman, Lawson, and Rubin.

Exs. 13, ███ Dep. at 51:5-7; 14 at 203534; 56.1 ¶4.  Rubin texted both women:  "Do u girls

know what ur in for?? 😺," to which Hallman responded (to Rubin, Lawson, and ███) "███ told us the basics but we are definitely excited about this."  Ex. 14 at 203534; 56.1 ¶5.  Rubin then texted all three women:  "Its total BDSM.  Most girls love it and come back for more, but I just like to be upfront about everything."  *Id.* at 203533; 56.1 ¶6.  Both Hallman and Lawson responded by sending approving emojis and engaging in flirtatious banter with Rubin over the next few days, including responding "Yes sir" to Rubin's request for "some sexy pics of urselves."  *See id.* at 203531-33; 56.1 ¶7.

On August 21, 2016, the day before Hallman and Lawson were to fly to New York, ███ messaged the group chat to provide logistical information.  *Id.*; Ex. 13, ███ Dep. 120:2-24; 56.1 ¶8.  Rubin then messaged to say "can't wait to ███ you tomorrow"; Lawson responded, "sounds good to me 🍩"; and each woman stated that she was "excited" for the encounter.  Ex. 14 at 203531-33; 56.1 ¶9.  Both women understood they would be paid for their meeting and Rubin would pay for their travel expenses.  Exs. 2, Lawson Dep. 51:11-52:18; 1, Hallman Dep. at 67:16-25; 15 (August 2016 texts between Rubin's assistant, Jennifer Powers, and Lawson); 56.1 ¶10.

**B.**   **Hallman and Lawson's August 22, 2016 Encounter with Rubin**

Hallman and Lawson arrived on August 22, 2016, and met Jennifer Powers at the Manhattan apartment Rubin rented (the "Apartment").  Exs. 14; 1, Hallman Dep. at 99:3-101:5, 105:4-12; 2, Lawson Dep. at 71:6-8; 56.1 ¶11.  Powers gave Hallman and Lawson each a copy of the Release to sign.  Exs. 16-17; 1, Hallman Dep. at 105:25-106:10, 108:14-109:21; 2, Lawson Dep. at 71:9-74:15; 56.1 ¶12.  In addition to the first lines of the Release (quoted above), which state that the anticipated sexual encounter involves potentially hazardous sado-masochistic activity and that the signatory is being paid for the activity, the Release states that

4

My participation in the Activities is done knowingly.  I freely assume all associated risks.  I acknowledge and agree that participation in these Activities carries with it certain inherent risks that cannot be eliminated completely.

Exs. 16-17; 56.1 ¶13.  Hallman and Lawson each signed the Release.  *See id.*; Exs. 18 at 3; 1, Hallman Dep. at 108:14-109:21; 19, Powers Dep. at 120:21-122:7; 56.1 ¶14.

Hallman and Lawson then met Rubin for drinks and dinner at the rooftop of the Viceroy Hotel.  Exs. 1, Hallman Dep. at 124:22-125:14; 2, Lawson Dep. at 76:6-8; 56.1 ¶15.  Thereafter, the three returned to the Apartment.  Exs. 1, Hallman Dep. at 128:14-18; 2, Lawson Dep. at 79:4-12; 56.1 ¶16.  Lawson testified that she and Hallman changed into black leather outfits, after which the two women and Rubin entered a room with red walls; once there, Rubin ███████████ ████████████████████████████████████████████████████████.  Ex. 2, Lawson Dep. at 79:9-81:3, 85:21-89:5; 56.1 ¶17.  Lawson could not recall anything else about this encounter.  *Id.* at 88:25-89:5; 56.1 ¶17.  Hallman testified that Rubin ███████████████████████ ████████████████████████████████████████████████████.  Ex. 1, Hallman Dep. at 134:3-137:16, 140:17-143:11; 56.1 ¶18.  After the encounter, Rubin paid each woman $5,000 and left the Apartment.  *Id.* at 135:6-9; Ex. 2, Lawson Dep. at 86:13-18, 89:9-90:10; 56.1 ¶19.

Hallman and Lawson stayed the night at the Apartment, Exs. 1, Hallman Dep. at 145:24-147:20; 2, Lawson Dep. at 89:9-16; 56.1 ¶20, returning the next day to Florida, Exs. 1, Hallman Dep. at 172:16-19; 2, Lawson Dep. at 94:2-12; 56.1 ¶20.  Before leaving the Apartment, Hallman left the following note:



Ex. 20; 56.1 ¶21.

Later that morning, Lawson and Powers texted about the prior night's sexual encounter:

9:25 AM: [Powers] H[owie] said he had a terrific time, see you again soon! XO
11:32 AM: [Lawson]: awesome ! Can't wait 😺 I was hoping he liked me lol
11:43 AM: [Powers] Who wouldn't!! ❤
2:45 PM: [Lawson]: ❤❤

Ex. 15 at 2-3; 56.1 ¶22.  Lawson also texted Rubin that same day, telling him "Yes so much pain lol but fun fun fun and had a great time just hanging out w you as well!  Although ███████ ███████████." Ex. 14 at 203530; 56.1 ¶23.  Hallman also texted Powers: "I'm great," "last night was unreal crazy wild fun stuff," "Oh wow," "Would do that anytime again lol," and "Soooo much fun."  Ex. 21 at 1-2; 56.1 ¶24.

**C.**   **Hallman's September 24, 2016 Encounter with Rubin (and Caldwell)**

    1.   The immediate recruitment of Caldwell and Caldwell's initial meeting with Rubin on August 24, 2016

Almost immediately after returning from their first encounter with Rubin, Hallman and Lawson recruited Hallman's friend, Caldwell, to have consensual BDSM sex with Rubin.  Exs.

1, Hallman Dep. at 181:11-22, 183:22-184:5; *see* 15 at 3; 56.1 ¶25.  Caldwell met Rubin in New

York on August 24, 2016; however, they did not have sex.  *See* Ex. 14 at 203424; 56.1 ¶26.

After Rubin and Caldwell's initial meeting, both Hallman and Lawson separately texted

Rubin and Powers.  *See id.* (Hallman to Rubin:  "[Caldwell] knew what she was in for."); Ex. 15

at 3 (Lawson to Powers:  "I told her on speaker phone w [Hallman] what to expect lol so she

knew."); 56.1 ¶¶27-28.  Lawson also texted Powers:  "[G]uess it's not for everyone," and "I

would do it again it was quite the experience lol."  Ex. 15 at 3; 56.1 ¶29

> 2.    Hallman's recruitment of Caldwell in September 2016

Hallman continued to send sexually suggestive messages to Rubin, culminating in a plan

for her to return to New York with Caldwell to engage in BDSM sex with Rubin:

- On September 10, 2016, Hallman sent two unsolicited nude photos to Rubin, to which
  Rubin responded by saying, "███████████████████," and to which
  Hallman replied "yes sir."  Ex. 14 at 203423-24; 56.1 ¶30.

- On September 12, 2016, Rubin said, "████████████████████████";
  Hallman responded, "████████████████████"  *Id.*; 56.1 ¶31.

- On September 19, 2016, Rubin texted Hallman to ask if she wanted to visit New York
  that week.  *Id.* at 203422; 56.1 ¶32.  Hallman responded immediately with:  "Can u have
  jenn book the flight baby."  *Id.*; 56.1 ¶33.  The two then discussed in text whether
  Caldwell should come as well, with Hallman reassuring Rubin that "[Caldwell] was just a
  little nervous" and "[Hallman] know[s] how to make her feel comfortable."  *Id.* at
  203421; 56.1 ¶34.  Again, Rubin made clear that he wished to engage in BDSM sex,
  texting "████████████████"  *Id.*; 56.1 ¶35.  Hallman responded with the following:

"So let's do just that H😺," "[Caldwell] & I say Puuuuuurrrrfect😺,"and "🫘 🫘." *Id.*; 56.1 ¶36.

3.   <u>Hallman's second encounter with Rubin (and Caldwell) on September 24, 2016</u>

On September 24, 2016, Hallman and Caldwell met Rubin in New York.  The three went out to dinner and then engaged in a BDSM sexual encounter in the Apartment.[1]  *See* Ex. 14 at 203417-18; 56.1 ¶37.  Before leaving the Apartment, Hallman and Caldwell each left a note for Rubin in the Apartment, which stated:



Exs. 23-24; 56.1 ¶¶38-39.

The next day, in response to a text from Rubin, Hallman wrote:  "It was an emotional roller coaster of Fun!!!!  I love getting wild n crazy with u."  Ex. 14 at 203417-18; 56.1 ¶40.  Hallman also offered to find additional women with whom she and Rubin could engage in further BDSM encounters, noting "Yes I know a lot of girls . . . The types of girls u like too baby 🔥."  *Id.*; 56.1 ¶41.

**D.   <u>Lawson's Second Encounter with Rubin on December 21, 2016</u>**

Lawson met with Rubin again in December 2016.  As set forth above, before this visit, Lawson had:  (1) already engaged in a BDSM sexual encounter with Rubin; (2) texted Rubin that

---

[1]   Hallman testified that she does not recall having a sexual encounter with Rubin when she visited him on September 24, 2016, Ex. 1, Hallman Dep. at 214:23-215:16, and Rubin was not asked at his deposition about what had transpired during this encounter, *see generally* Ex. 22, Rubin Dep.

same day she had a "great time" and "so much pain" was "fun fun fun," Ex. 14 at 203530; (3) texted Powers that she "was hoping [Rubin] liked [her]" and "would do it again," Ex. 15 at 2-3; (4) attempted to set up her close friend, ███████████, with Rubin, (*see infra* at 13); (5) texted Powers about Caldwell's and Hallman's satisfying BDSM experiences with Rubin, *see* Ex. 15 at 3; and (6) expected to receive $5,000 for her second visit, Ex. 2, Lawson Dep. at 137:6-23.  56.1 ¶¶42-47.  Shortly before the visit, Hallman sent Rubin a text message that stated: "[Lawson] can't wait to see you again, she's excited & ready to get ███████ . . . [Lawson] is fun as u know babes."  Ex. 14 at 203391; 56.1 ¶48.

Lawson testified that during the December encounter, she and Rubin watched a ██████████████████████and then engaged in BDSM sex.  *See* Ex. 2, Lawson Dep. at 140:14-144:14.  Although Lawson testified that the sexual encounter was unpleasant, and that she viewed it as nonconsensual, *see id.* at 166:17-169:23, she also testified that she did not recall asking Rubin to stop what he was doing, *see id.* at 142:4-9, 166:17-169:23; 56.1 ¶49.  Lawson's only contemporaneous, documented comment was immediately after the encounter with Rubin, when Lawson texted Powers, "Hey, just finished with Howie ☺ [] He said you would PayPal me," Ex. 15; 56.1 ¶50, after which Powers sent $5,000 to Lawson, Exs. 26 at 3; 2, Lawson Dep. at 339:6-12; 56.1 ¶50.  Later the same day, Hallman texted Rubin to say, "Well that went good I heard ☺."  Ex. 14 at 203391; 56.1 ¶51.

**E.     Neither Hallman Nor Lawson Suffered Harm from Their Encounters with Rubin**

    1.     Hallman

In the SAC, Hallman alleges she suffered physical injuries from her encounters with Rubin, including a broken rib, injuries to her breast, "head trauma, facial bruising, and headaches."  Dkt. No. 161 ("SAC") ¶¶477-80.  She also alleges that, as a result of her encounters

9

with Rubin, she suffers from "depression, anxiety, and an inability to sleep," for which she was prescribed sleeping pills, anti-anxiety medication, and anti-depressants. *Id.* ¶¶481-82.

There is no evidence of these alleged injuries.  Hallman claimed in her deposition that she saw her general doctor, ███████████, for her rib injury in August 2016 – only days after her first encounter with Rubin.  Ex. 1, Hallman Dep. at 151:19-152:25, 153:13-155:9.  But ███████████records belie this testimony.  ███████████records list each time Hallman had an in-person or telephonic consultation with him, and they show that the first communication between Hallman and ███████████ after the August 22, 2016, encounter with Rubin was a phone call on November 12, 2016, that had nothing to do with her rib.  *See* Ex. 27 at 6, 12; 56.1 ¶52.  Hallman did not have an in-person visit with ███████████ until February 8, 2017, and ███████████ notes show the visit was not for any physical injury.  *Id.* at 6; 56.1 ¶53.

As to alleged psychological impairments (anxiety, depression, and difficulty sleeping), once again the documentary record refutes Hallman's claims.  ███████████ records of Hallman's November 12, 2016, and February 8, 2017, communications show Hallman discussed her anxiety with ███████████ on those dates.  *Id.*; 56.1 ¶54.  Rather than indicating that Hallman's anxiety was caused by Rubin, ███████████ records reveal Hallman was diagnosed with ███████████████████████████ at least six months before her first encounter with Rubin.  *Id.* at 14; *see also* Ex. 1, Hallman Dep. at 309:11-311:21; 56.1 ¶54.  There is also no reference to depression in ███████████medical records.  *See generally* Ex. 27; 56.1 ¶55.

The records from a psychologist, ██████████████, also belie Hallman's claims. Hallman began seeing ██████████ in December 2017.[2]  Ex. 1, Hallman Dep. at 313:6-12; 56.1 ¶56.  Although ██████████ records indicate that she diagnosed Hallman as having ██████████ ██████████████████████████████ *see generally* Ex. 28; 56.1 ¶56, Hallman admitted that these diagnoses were not based on any issues related to Rubin, but related to "personal things," specifically a pending criminal case against her, family problems, and the death of her father, Ex. 1, Hallman Dep. at 314:3-315:3; 56.1 ¶57.  Indeed, Hallman told Lawson over numerous texts in 2017 that she attributes her depression, low self-esteem, and trust issues to her family problems and long history of bad relationships.  *See, e.g.*, Ex. 29 at 198809, 198827-28, 199049-52; 56.1 ¶58.

2.  <u>Lawson</u>

The SAC alleges that Lawson suffered physical injuries from her encounters with Rubin, including bruising on various parts of her body, tears and trauma to her vagina, and capsulation of her left breast.  SAC ¶¶460-63.  The SAC further alleges that after her last encounter with Rubin, Lawson began to suffer from "depression, inability to sleep, and anxiety," and she "began seeing a doctor who is now treating her with sleeping pills and anti-depressants."  *Id.* ¶464.

The evidence belies these assertions.  Lawson admitted she did not see a doctor for any of her alleged physical injuries, Ex. 2, Lawson Dep. at 187:3-5, 189:6-22; 56.1 ¶59,[3] photographs of Lawson following her encounters with Rubin show no bruising, Exs. 8-11, 30; 56.1 ¶61, and her

---

[2]   Hallman began seeing Dr. ██████████ pursuant to a New York City Criminal Court order, which was issued in the case arising out of the fight alleged in Paragraphs 436 and 437 of the SAC.  *See* Ex. 1, Hallman Dep. at 313:6-12; 56.1 ¶56.

[3]   Lawson testified that the only opinion she obtained relating to her "capsulated" breast was from an unnamed beautician, at an unknown time, who gave Lawson a facial.  Ex. 2, Lawson Dep. at 187:3-24; 56.1 ¶60.

texts do not discuss or reflect that she suffered any trauma from her encounters with Rubin, *see* Exs. 15, 25, 14 at 203530; 56.1 ¶62.  To the contrary, Lawson excitedly posted on social media about an important modeling event in which she took part only a few weeks after her second encounter with Rubin, Exs. 31-32; 56.1 ¶63, followed by a vacation with her boyfriend, Ex. 2, Lawson Dep. at 197:5-12; 56.1 ¶64.

As to Lawson's alleged psychological injuries, Lawson testified that a ▮▮▮▮▮▮▮ diagnosed her with insomnia, anxiety, and PTSD.  Ex. 2, Lawson Dep. at 200:12-18. ▮▮▮▮▮▮▮ records show, however, that Lawson did not see ▮▮▮▮▮▮▮ until June 2017, and they do not include any diagnoses of insomnia, anxiety, or PTSD.  *See* Ex. 34 at 20; 56.1 ¶¶65-66.  The records establish that when Lawson complained to ▮▮▮▮▮▮▮ in June 2017 of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, she attributed her difficulties to family problems, relationship problems, the death of her mother and other family members, and various obligations and responsibilities.  *Id.* at 9-20; 56.1 ¶67.  Indeed, Lawson often communicated the same to Hallman.  *See, e.g.*, Exs. 35, 29 at 198778, 199087-88; 56.1 ¶68.  The medical records also indicate that Lawson took ▮▮▮▮▮ (a medication for depression and anxiety) when she was 15 years old (Lawson was 34 when she met Rubin) and ▮▮▮▮▮▮▮▮▮▮.  Exs. 34 at 20; 15 at 1; 56.1 ¶69.

Lawson first complained to ▮▮▮▮▮ about stress related to her "case in NY," and "re-living issues at times from '16," in March 2018 – a month after Defendants' discovery requests for medical records.  *See* Exs. 36 at 9-10; 34 at 8-9; 56.1 ¶70.

**F.   Hallman and Lawson Recruit Others to Meet with Rubin**

Hallman's and Lawson's documented efforts to recruit their friends to have BDSM sex with Rubin, and to meet with Rubin again, also show that their encounters with Rubin were consensual.

12

1.  <u>Lawson recruits her friend, █████████</u>

On August 24, 2016, two days after her first BDSM encounter with Rubin, Lawson

texted Powers to arrange for one of Lawson's "best friends," ██████████, to engage in a

similar BDSM encounter with Rubin.  Ex. 15 at 3; 56.1 ¶71.  Lawson sent Powers a screenshot

of ██████ Instagram page, and described ██████ as the girlfriend she "had told howie about."

*Id.*; 56.1 ¶72.  Powers asked Lawson, "Do you think she would be cool with everything that goes

down," and Lawson responded, "[yes] for sure already spoke to her," adding that █████ "has a

wild side lol."  *Id.*; 56.1 ¶73.  There is no record that Rubin ever communicated with or met █████

█████.

2.  <u>Hallman recruits numerous women</u>

From September 2016 through August 2017, Hallman sought to introduce at least 16

women to Rubin, several of whom he met.  *See* Ex. 14 at 203366-425; 56.1 ¶74.  Hallman

received a $2,000 "finder's fee" when Rubin had an encounter with one woman.  *Id.* at 203396;

56.1 ¶75.[4]

Hallman's correspondence with Rubin about a woman named ██████████

demonstrates how explicit Hallman and Rubin were that the encounters with women would

involve BDSM.  On May 29, 2017, Hallman sent Rubin photographs of ███████████,

another friend of hers.  *Id.* at 203371; 56.1 ¶79.  Rubin was interested in meeting her, and asked

Hallman if "████████████████"  *Id.*; 56.1 ¶80.  After ██████ expressed interest in

---

[4]      When there was reason to believe that a woman would not be comfortable in a BDSM
relationship, Rubin declined to meet the woman.  Thus, for example, on August 7, 2017, when
Hallman described a woman whom she would recommend to Rubin, Rubin asked "She knows
what's going to happen to her??" and said "But let her know she's going to be beaten and
bruised!"  Ex. 14 at 203363-64; 56.1 ¶76.  Hallman told Rubin "she's kinda nervous" and "she's
been in an abusive relationship before and she's scared to do it alone lol."  *Id.*; 56.1 ¶77.  Rubin
responded "I like to be physically, verbally, and mentally abusive, so I don't think this is the right
thing for her!"  *Id.*; 56.1¶78.  Rubin refused to meet with the woman.  *Id.*; 56.1 ¶78.

13

meeting, Rubin instructed Hallman to "Explain everything in detail!!!" *Id.* at 203370; 56.1 ¶81. Hallman agreed, saying "I will explain it all 500%." *Id.*; 56.1 ¶82.

Meanwhile, Hallman was also texting ████ to describe what the encounter would entail.  Hallman was clear with ████, explaining that "It's kinda crazy stuff very much ██████████," " ██████████," "u have to sign an nda," "I've done it a bunch of times," and "so has [Lawson]."  Ex. 29 at 199489-90; 56.1 ¶83.

When ████ expressed nervousness, Hallman sought to reassure her by describing her own encounters with Rubin as "You got nothing to worry about lol he's a little nothing size guy lol," "to be honest I think it's hot af [as fuck] and sexy," "it gives me ideas for ████ lol." *Id.* at 199485; 56.1 ¶84.  Rubin and ████ ultimately did engage in consensual BDSM encounters, and Hallman was paid $2,000 for recruiting ████.  *See* Ex. 14 at 203370; 56.1 ¶85.

## G.     **Hallman's and Lawson's Continued Efforts to See Rubin Again**

Although their last sexual encounters with Rubin took place on September 24, 2016 (Hallman) and December 20, 2016 (Lawson), they continued to solicit Rubin as late as July 22, 2017 – less than four months before filing this suit.

- On December 27, 2016, Hallman sent Rubin photos of her wearing ████████ ██████████.  *Id.* at 203387; 56.1 ¶86.

- On December 30, 2016, she sent him a nude photo of herself with Caldwell.  *Id.* at 203386; 56.1 ¶87.

- On January 18, 2017, she sent him a series of photos of four nude women on a staircase, including both herself and Lawson, with Hallman displaying ████████

14

████. *Id.* at 203384-85; 56.1 ¶88.  That same day she sent a further series of scantily clad photos of herself.  *Id.* at 203382-84; 56.1 ¶89.

- She also sent nude and nearly-nude photos of herself to Rubin on January 12, 2017, January 24, 2017, and January 29, 2017.  *Id.* at 203381-82; 56.1 ¶90.

- Near the end of March 2017, Hallman sought to see Rubin while he was in Miami.  *Id.* at 203379; 56.1 ¶91.  Rubin told Hallman that he was with friends and asked if Hallman would like to "at least have drinks," and if she could bring friends.  *Id.*; 56.1 ¶92. Hallman immediately agreed and sent Rubin numerous scantily clad photos of the friends she intended to bring.  *Id.* at 203377-78; 56.1 ¶93.  The group then met, had drinks, and parted without any sexual activity occurring.  Ex. 1, Hallman Dep. at 285:12-21, 287:5-288:2; 56.1 ¶94.  Hallman texted Rubin the following day "Thank you for having us H." Ex. 14 at 203376; 56.1 ¶95.

- After March 2017, Hallman continued to engage in sexual communications with Rubin. On April 12, 2017, Rubin sent Hallman a photograph of a woman ████████ ████████.  *Id.* at 203374; 56.1 ¶96.  Hallman immediately responded, "Is that what we are are gonna do to [Caldwell].?"  *Id.*; 56.1¶97.  And on April 21, 2017, Hallman sent additional nude photos of herself to Rubin.  *Id.* at 203373; 56.1 ¶98.

- On May 27, 2017, despite the allegations in the SAC that Hallman was afraid of Rubin because he "knew her address, phone number, date of birth, and how to find her if he wanted to hurt her," SAC ¶359, Hallman texted Rubin, asking if he would co-sign a lease for an apartment, Ex. 14. at 203371-72; 56.1 ¶99.  When Rubin responded "Babe, I can't really co-sign," Hallman asked if he could "at least put the place in [Rubin's] name or [Powers's] name."  *Id.* at 203371; 56.1 ¶100.



- On July 18, 2017, Hallman texted Rubin to tell him she and Lawson were in New York, and over the next few days, the two tried to arrange another BDSM encounter with Rubin. *See id.* at 203368-69, 201890-91; 56.1 ¶101. Rubin noted that " ███████ ███████████████████," and asked " ████████████"; Hallman responded, " ████████████" and ████████████. *Id.*; 56.1 ¶102-03. When Rubin asked Hallman to send him photos of Lawson, Lawson immediately texted Hallman sexually provocative photos and videos of herself to send to Rubin to encourage him to meet with them. Ex. 37; 56.1 ¶104.[5]

- On August 3, 2017, Lawson texted Hallman to schedule " █████" for their upcoming trip to New York, saying: "Well I gotta see my one █████ on the 10[th] early I could always[s] fly to NYC if that █████ wanted to █████████ [] Or if howie wants to █████ lol"; Hallman responds: "Yes yes do that [] Yesssssiii please." Ex. 38; 56.1 ¶107.

Despite Hallman's and Lawson's efforts, Rubin never had sexual relations with either woman again after their last encounters in September 2016 and December 2016.

## II.   MOIRA HATHAWAY

Plaintiff Moira Hathaway engaged in a lengthy BDSM relationship with Rubin, beginning in approximately 2010 and continuing until 2017. Hathaway's own testimony and

---

[5]    Rubin asked Hallman to send him photos of Lawson on July 21, 2017 at 6:36:47 p.m. Ex. 37; 56.1 ¶105. One minute later (6:37:57 p.m.), Lawson texted a sexually provocative photo (file name: IMG_2104.JPG) to Hallman, and two minutes later (6:39:17 p.m.), Lawson texted a sexually provocative video (file name: IMG_2138.mp4.mov) to Hallman, and Hallman immediately sent the picture and video to Rubin (6:40:51 p.m. and 6:40:15 p.m., respectively). Exs. 37, 33-A–D; Decl. ¶45; 56.1 ¶106.

documents establish that this relationship was consensual, and that she was not forced, defrauded, or coerced into engaging in sex with Rubin.

**A.**     <u>**Hathaway's Introduction to Rubin**</u>

Hathaway was introduced to Rubin in 2009 or 2010 by ████████████████ whom Rubin paid to introduce him to women for consensual BDSM sex.  Ex. 22, Rubin Dep. at 137:4-21, 198:16-199:8; *see* Ex. 39, Hathaway Dep. at 61:16-62:22, 64:14-19; 56.1 ¶108.  ████ contacted Hathaway through a message on the website Model Mayhem, and Hathaway agreed to meet with Rubin "because [she] wanted to."  Ex. 39, Hathaway Dep. at 61:16-62:22, 65:25-66:1; 56.1 ¶109.  Hathaway traveled from Chicago and met Rubin at a New York restaurant where they "had a great time."  *Id.* at 71:24-72:3; 56.1 ¶110.

After the restaurant, Rubin and Hathaway went to a hotel where they had a bottle of wine and consensual sex.  *Id.* at 72:9-13, 76:16-77:3, 77:23-78:2; 56.1 ¶111.  Hathaway testified that "we had a great time and we agreed we wanted to see each other again."  *Id.* at 76:22-77:3; 56.1 ¶112.  The next morning, Rubin came back to the hotel to engage in a sexual "role-play type scene" in which he pretended to break into Hathaway's room and tie her up while she was sleeping.  *Id.* at 78:6-79:10; 56.1 ¶113.  Hathaway testified that she consented to Rubin binding her, and again engaged in consensual sexual intercourse during their role play.  *Id.* at 79:9-20; 56.1 ¶114.  Prior to Hathaway's flight home, Rubin paid her $5,000 in cash.  *Id.* at 79:21-80:21; 56.1 ¶115.

**B.**     <u>**Hathaway's Ongoing Relationship with Rubin**</u>

After returning to Chicago, Hathaway remained in communication with Rubin, and they carried on a seven-year consensual sexual relationship that involved bondage and rough sex, for which Hathaway was generally paid.  *Id.* at 81:9-19, 85:8-87:18, 89:20-90:20; 56.1 ¶116.

17

Hathaway signed the Release on January 21, 2015. *Id.* at 101:5-12; Ex. 40; 56.1 ¶117. She testified that she associated the document with a similar document from the movie *Fifty Shades of Grey*, and that her signing indicated her agreement to continue participating in sadomasochistic sex with Rubin, which she understood involved such things as restraints, whipping, and rough sex. Ex. 39, Hathaway Dep. at 92:14-100:15, 94:9-24, 99:9-100:3; 56.1 ¶118. Hathaway also testified that, irrespective of the Release, the nature of her relationship with Rubin was that she "had agreed to get paid by Mr. Rubin to engage in sadomasochistic activity with him," and acknowledged that she did so voluntarily. *Id.* at 100:16-24, 129:3-130:19, 138:21-139:13; 56.1 ¶119.

Hathaway last saw Rubin in June 2017, but she had minimal recollection of their encounter, testifying only that "we didn't end like on a good term. I don't remember the exact details of everything." *Id.* at 148:6-12, 148:13-17; 56.1 ¶120. When asked to elaborate, she simply testified, "We just did not get along I would say." *Id.* at 148:18-21; 56.1 ¶120. And when asked why the two did not "get along," she responded, "I don't remember." *Id.* at 148:22-23; 56.1 ¶120. Hathaway never testified that her relationship with Rubin was anything but consensual or that her sexual encounters with him were anything but voluntary.

From the day Hathaway signed the Release in 2015 to the last time she saw Rubin in the summer of 2017, Hathaway voluntarily traveled to New York to engage in BDSM sex with Rubin for money at least eleven times. *See* Ex. 26 at 2-3; 56.1 ¶121. In addition, Hathaway continued to solicit Rubin to engage in BDSM encounters even after her final 2017 meeting. On September 26, 2017, she texted Rubin: "Hey sexy! Im in town tomorrow am to sat am if your around, would love to see you 😊 I'm coming for my gfs bday . . . ███████ ██████." Ex. 41; 56.1 ¶122. On October 4, 2017, she texted him again, this time saying that



she would "███████████████████████████.  It's been too long.

( . ) ( . ) ███████████████ 🐱☺."  *Id.*; 56.1 ¶123.

## C.  Hathaway Suffered No Harm from Her Encounters with Rubin

The SAC alleges that Hathaway required hospitalization for injuries suffered at Rubin's hands and that she has been prescribed ████ for anxiety and insomnia issues resulting from her relationship with Rubin.  SAC ¶¶3, 148.  The evidence puts the lie to these allegations.  Hathaway produced no medical records whatsoever, Decl. ¶118; 56.1 ¶124, and although, through counsel, she indicated that she had been treated by a ██████████████, in response to a subpoena, ████████ averred that he has no medical records related to Hathaway.  Ex. 42 ¶¶4-5; 56.1 ¶125.  Moreover, Hathaway never sought medical treatment related to her encounters with Mr. Rubin, except that "for like a month period of time, [her] doctor prescribed ████████ because [she] couldn't sleep, but that was it."  Ex. 39, Hathaway Dep. at 149:19-25; 56.1 ¶126.  Hathaway testified ████████ prescribed ████ to help her sleep, but she does not remember when this occurred.  *Id.* at 150:2-11, 151:14-19; 56.1 ¶127.  She said she took a photograph of her prescription and sent it to her lawyers in this case.  *Id.* at 150:2-8.  Hathaway and her lawyers have failed to produce that photograph.  *See* Decl. ¶119; 56.1 ¶128.

## III.  MACEY SPEIGHT

Plaintiff Macey Speight engaged in a consensual BDSM relationship with Rubin from October 2015 until July of 2017, and she thereafter continued to text Rubin sexual messages and images through February 21, 2018 – the day *after* she joined this lawsuit.  Speight's testimony and electronic communications show that she knew, before ever meeting Rubin, that her visits were for BDSM sex for money, and that she consented to those encounters.

A.   **Speight's Introduction to Rubin**

Speight was introduced to Rubin by a friend, ███, who said Rubin was interested in flying beautiful women to New York in order to engage in rough sex in exchange for money. Ex. 43, Speight Dep. at 37:2-13, 37:14-40:23; 56.1 ¶129.  Speight told ███ that she was familiar with BDSM sex, knew what to expect, and was excited to meet Rubin.  Ex. 13, ███ Dep. at 83:15-84:4; 56.1 ¶130.  ███ told Speight that she would have to sign the Release if she wanted a relationship with Rubin.  *Id.* at 87:7-14; 56.1 ¶131.  Speight confirmed at her deposition that she knew that she would be paid $5,000 for engaging in rough sex with Rubin. Ex. 43, Speight Dep. at 40:24-41:20; 56.1 ¶132.

B.   **Speight's Relationship with Rubin**

Speight first traveled to New York to visit Rubin on October 12, 2015.  *Id.* at 49:3-16; 56.1 ¶133.  She admitted that she traveled to see him voluntarily, and that she was not forced or tricked into doing so.  *Id.* at 74:24-75:7; 56.1 ¶134.  She met with Powers at the Apartment and signed the Release; Rubin was not present.  Exs. 19, Powers Dep. at 116:22-117:4, 119:20-24; 44; 56.1 ¶135.  Speight spent approximately ten to fifteen minutes going through the Release, signed it, and asked no questions about it.[6]  Ex. 19, Powers Dep. at 123:21-124:2, 252:5-24; 56.1 ¶136.  Speight admitted she understood that by signing the document, she attested that she was signing it of her own free will, she wanted to engage in the described activities in exchange for a fee, she had voluntarily agreed to participate in sexual activity with Rubin, and the sexual

---

[6]     Speight testified that she was under the influence of alcohol when she signed the Release, and that she had no time to review it because she was "out partying" when she signed it.  Ex. 43, Speight Dep. at 53:19-22, 57:17-23.  However, Speight also testified that nobody forced her to sign the Release, *id.* at 287:10-11; 56.1 ¶137, that she may have been provided additional time to review it if she had asked, *id.* at 287:19-288:7; 56.1 ¶138, and that by "out partying" she simply meant that she was "away from my home," *id.* at 58:4-7.  She insisted when she signed the document, she must have been under the influence of alcohol only because there was alcohol "everywhere."  *Id.* at 54:25-55:11.

activity in question could be "dangerous" and "could hurt me." Ex. 43, Speight Dep. at 58:16-63:23; 56.1 ¶139.

After signing the Release, Speight had sex with Rubin, and was paid $1,000. *Id.* at 73:2-22; Ex. 22, Rubin Dep. at 220:12-17; 56.1 ¶140. Speight later texted Powers that "[Speight] had a great experience." Ex. 45; 56.1 ¶141. During her deposition, Speight refused to explain this text, stating simply that "I can't remember anything right now." Ex. 43, Speight Dep. at 78:10-79:21.

**C.     Speight's Continuing Encounters with Rubin**

On November 10, 2015, Speight texted Powers, "I just confirmed that I am seeing Howie Friday." Ex. 45; 56.1 ¶142. The Friday following November 10, 2015, was November 13, 2015. 56.1 ¶142. As with her first visit, she knew that she was going to engage in rough sex with Rubin in exchange for money, she was not forced or tricked into coming, and she came because she wanted to be paid. Ex. 43, Speight Dep. at 81:9-82:17; 56.1 ¶143. Speight and Rubin engaged in BDSM sex on November 13, 2015, for which Speight was paid $5,000. *Id.* at 85:11-15, 86:4-18; 56.1 ¶144. Speight had no complaints, *id.* at 86:19-22; 56.1 ¶145, and afterwards, she texted Powers to say "everything was amazing" and "I'm so glad [Rubin] had a great time! I did too!  He is awesome," Ex. 46; 56.1 ¶146.

Speight visited Rubin again on January 5, 2016. She testified she came with the intention of having sex with Rubin for money, she was not forced or deceived into doing so, and she received $5,000. Ex. 43, Speight Dep. at 88:15-22, 89:25-90:10, 91:4-16; 56.1 ¶147. After this encounter, she texted Powers:  "we had an awesome time!! ☺" and "it was amazing!" Ex. 47; 56.1 ¶148.

Speight continued to visit Rubin routinely to engage in consensual BDSM sex in exchange for money.  She did so on January 27, 2016, April 25, 2016, June 28, 2016, August 4,

2016, September 27, 2016, November 21, 2016, January 30, 2017, May 24, 2017, and July 25, 2017 – for a total of 12 encounters over a 22-month period – and was paid for each encounter. *See* Exs. 26 at 2-3; 48-79; 56.1 ¶149.  Speight had no recollection of any of these encounters. Ex. 43, Speight Dep. at 97:8-100:15, 103:11-21, 131:25-13, 131:25-136:17, 141:2-146:25, 148:25-154:18, 156:6-161:13, 166:6-174:4, 174:18-180:8, 181:25-186:21, 196:19-15, 200:20-209:21; 56.1 ¶150.  Speight also made plans to see Rubin on two other occasions, but either missed her flight or otherwise did not make the trip, *see* Exs. 80-81; 56.1 ¶151, and occasionally saw Rubin without engaging in sex acts, *see, e.g.*, Exs. 43, Speight Dep. at 143:17-22; 78; 56.1 ¶152.

**D.      Speight's Conduct after Her Last Physical Encounter with Rubin**

Speight testified generally that despite her lack of any specific recollection, her last encounter with Rubin was "so bad, there was no way [she] could come back," and she accordingly discontinued seeing Rubin.  Ex. 43, Speight Dep. at 180:17-181:8.  This testimony is belied by voluminous documentary evidence showing that she tried assiduously to see Rubin again.

After Rubin and Speight's final encounter on July 25, 2017, the next morning, Speight texted Rubin to say "On plane see you next time."  Ex. 78 at 436; 56.1 ¶153.  Rubin then asked "How ru feeling?," to which Speight replied "I'm feeling good : )."  *Id.* at 437; 56.1 ¶153.

Speight repeatedly solicited Rubin to engage in BDSM sex, engaged in sexually explicit messaging, and reaffirmed the consensual nature of their relationship with Rubin.

- On August 12, 2017, Speight texted Rubin "I want to play ███████████… I so love when we do that… I want to be ████████████████." *Id.*; 56.1 ¶154. Speight then continued to spin an explicit pornographic fantasy to Rubin.[7]

- On August 21, 2017, Speight texted "Howie you want to ████████████," and reassured Rubin that she could be bruised despite upcoming plastic surgery to enhance her buttocks. Ex. 82 at 438; 56.1 ¶156.

- On August 29, 2017, Speight texted Rubin "████████████████████████████ ████████████████████." *Id.* at 443; 56.1 ¶157. That same day, Speight herself booked a plane ticket to visit Rubin. *Id.*; 56.1 ¶158. Rubin was ultimately unable to see her and reimbursed her for the cost of the ticket. *Id.* at 444; Ex. 83; 56.1 ¶159.

- On September 21, 2017, Speight texted Rubin, asking him to buy her a car for her birthday and saying "Howie I know your full of suprises ☺ your like a gaurdian angel/genie ☺ hehe." Ex. 84 at 444; 56.1 ¶160. The next day, Speight asked Rubin to pay for her to travel to Los Angeles for her birthday. *Id.*; 56.1 ¶161. Rubin explained that he would not buy her a car or pay for her trip. *Id.*; 56.1 ¶162.

- On October 13, 2017, Speight texted Rubin an extremely explicit video of her ███████ ████████████. *Id.* at 450, 84-A; 56.1 ¶163.

---

[7]     She wrote, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.*; 56.1 ¶155.

- On November 11, 2017, apparently having heard that the first complaint in this lawsuit had been filed, Speight texted Powers to say "Jenn what is going on?  I'm so worried about everyone" and offered to testify on Rubin's behalf that all of her encounters with Rubin were consensual ("If y'all need me to do anything to help like testify that we agreed to everything happening I will."). Ex. 85 at 1-2; 56.1 ¶164.  Speight also asked, "Is all this going to stop Howie from seeing us?"  *Id.* at 2; 56.1 ¶165.

- On February 21, 2018, the day after Speight filed suit, she texted Rubin a photo of herself ███████████████████████, and said "Howie!!!," "I'm yours lol," and "███████████████████████" Ex. 86 at 451; Dkt. 66; 56.1 ¶166.

**E.**    **Speight Suffered No Harm from Her Encounters with Rubin**

The SAC alleges that Speight required hospitalization for injuries Rubin caused and that Rubin "dislodged" one of her "facial injections" and "popped her breast implant."  SAC ¶¶3, 285, 287.  Discovery disproves each of these assertions.

- Speight has not produced any medical records of hospitalization, nor has she identified any hospital where Rubin could seek such records.  Decl. ¶120; 56.1 ¶167.

- Speight testified she could not recall any encounter in which such injuries occurred.  Ex. 43, Speight Dep. at 72:19-21, 73:21-24, 88:3-5, 94:9-11, 104:14-21, 105:5-8, 126:10-18, 143:23-144:7, 148:18-22, 154:4-7, 161:6-8. 174:11-14, 179:22-25, 186:14-21; 56.1 ¶168.

- Speight testified that she was treated by two doctors, ███████████████ and ███████████████, for her alleged injuries, *id.* at 190:2-5, but she produced no medical records related to such treatment by either doctor, Decl. ¶121; 56.1 ¶169.

- The medical records Rubin obtained from ███████████, Speight's plastic surgeon, show only that Speight received ███████████████ in 2011 and January 2015 – before she

24

ever met Rubin.  Ex. 87 at 33-39, 49-57; 56.1 ¶170.  The records do not reflect any treatment to her breasts during or after her relationship with Rubin.  *Id.*

- With respect to Speight's alleged "dislodged" facial injection, ███████ records show only that in February 2018 – many months after her final encounter with Rubin – Speight had a "spider bite" that was diagnosed as a staph infection and cleared up with an antibiotic prescription.  Exs. 87 at 6, 22; 43, Speight Dep. at 191:3-15; 56.1 ¶171.

The SAC further alleges that Speight suffered "emotional injuries" and "extreme emotional trauma."  SAC 161¶¶ 3, 288.  But Speight produced no medical records reflecting any psychological or psychiatric treatment, Decl. ¶122; 56.1 ¶172, and when asked at her deposition about any psychological or psychiatric care she may have received, Speight testified that she had one phone call with a woman named Patricia; she did not know Patricia's last name or if Patricia was a psychologist or psychiatrist, Ex. 43, Speight Dep. at 191:25-192:11; 56.1 ¶173.

## IV.   ROSEMARIE PETERSON

Plaintiff Rosemarie Peterson engaged in a series of consensual BDSM sexual encounters with Rubin from September 2011 to October 2014.  The evidence shows that, at the time, Peterson was fully aware that the purpose of her meetings with Rubin was to engage in BDSM sex for money, and that Rubin informed Peterson what their meetings would entail.  The undisputed evidence also makes clear that Peterson consented to engage in these BDSM encounters and, following her last sexual encounter with Rubin in October 2014, repeatedly solicited him to engage in BDSM sex with her.

### A.   **Peterson's Introduction to Rubin**

Peterson was introduced to Rubin by ███████ in 2011.  Exs. 22, Rubin Dep. at 146:16-18, 203:20-21; 88; 56.1 ¶174.  On September 21, 2011, Peterson emailed Rubin to say "███ asked me to email you regarding fridays appt ;) ████████████████

25

. . looking forward to meeting you xoxoxo." Ex. 88; 56.1 ¶175. Rubin emailed in response, providing a clear description of precisely what their appointment would entail:



Ex. 89; 56.1 ¶176. Rubin also told Peterson that "it would be 5k and i'll take care of ███ commission." *Id.*; 56.1 ¶177. In response, Peterson wrote "im so game!! I love being dominated im a scorpio at heart ;) call me when you can xoxoox." Exs. 90, Peterson Dep. at 89:8-18; 91; 56.1 ¶178. Further email exchanges included Peterson saying that she was "super excited." Ex. 92; 56.1 ¶179.

On September 23, 2011, Peterson met Rubin in a hotel room, with other women present. Ex. 90, Peterson Dep. at 102:8-103:11; 56.1 ¶180. Peterson and Rubin engaged in preliminary sexual acts, including spanking, but Peterson left before having intercourse. *Id.* at 111:12-112:9; Ex. 22, Rubin Dep. at 211:24-212:2; 56.1 ¶181. Peterson testified she did not have sex with Rubin, she was not injured, and she was free to – and did – leave when she chose to do so. Ex. 90, Peterson Dep. at 114:17-115:11; 56.1 ¶182.

**B.     Peterson Solicits Further Encounters with Rubin**

Peterson and Rubin had no further communication until an August 4, 2013, email from Peterson in which she asked to see Rubin because she "would really like to try it again." Ex. 93 at 56059; 56.1 ¶183. She also asked if she could bring her "best friend" who she said was "███ ███████████████████." *Id.*; 56.1 ¶184. Peterson explained that she had left

early on her prior visit "because [she] ran out of pain killers and was afraid [she] wouldn't be able to go through with the evening," but added, "██████████████████████████ ██████████████████████████████████ I would love to do It again this time with you." *Id.*; 56.1 ¶185.  In response, Rubin again explained, in vivid detail, what an encounter would entail:



*Id.* at 56058; 56.1 ¶186.  He also expressed skepticism that Peterson would be interested, explaining that while some women love and are sexually aroused by BDSM sex, "I'm guessing its probably too intense for you" and "I'm just guessing its still not ur thing." *Id.*; 56.1 ¶187. The correspondence concluded without Rubin and Peterson agreeing to meet.  Ex. 90, Peterson Dep. at 145:11-24; 56.1 ¶188.

Ten months later, on May 15, 2014, Peterson emailed Rubin wishing him happy birthday, signing the email with "hugs and kisses." *Id.* at 153:18-154:2; Ex. 94; 56.1 ¶189.  They then exchanged further email pleasantries.  *See* Ex. 94; 56.1 ¶189.

On June 3, 2014, Rubin initiated a text conversation with Peterson.  Ex. 95 at 423; 56.1 ¶190.  Peterson responded by asking about Rubin's birthday and immediately soliciting Rubin to engage in BDSM sex.  *Id.*; 56.1 ¶191.  Peterson said, "I'm willing to be submissive," and asked that Rubin "please re consider [her] ☺."  *Id.*; 56.1 ¶192.  Rubin again expressed reluctance about meeting Peterson, explaining that his encounters with others had "gotten very rough" since they last met, and sending Peterson photos illustrating what an encounter with him would entail.  *Id.* at 423-24; 56.1 ¶193.  Rubin also said: "██████████████████████████

27

███████████████," *id.* at 424; 56.1 ¶194, and "Its really painful, but lots of girls enjoy

that," *id.* at 425; 56.1 ¶194.

Peterson repeatedly reassured Rubin that she was willing and able to engage in the

BDSM that Rubin described, noting that "Pain can be fun." *Id.* at 423-25; 56.1 ¶195.  She texted

Rubin:  "Ill do whatever it takes," "I need it badly," "I really wanna do this," "Please I'm

begging u," and "Lets do it seriously." *Id.* at 424-25; 56.1 ¶196.  Rubin finally agreed, almost

three years after their first encounter, to meet Peterson. *Id.* at 426-27; 56.1 ¶197.

**C.     Peterson's Encounters with Rubin in 2014**

On June 5, 2014, Peterson engaged in a sexual encounter with Rubin and another woman,

███████████.  Ex. 90, Peterson Dep. at 192:13-193:15; 56.1 ¶198.  Peterson testified that

she has no particular recollection of this encounter, but she knows that she was not injured

during it. *Id.* at 190:25-193:4, 211:18-212:18; 56.1 ¶199.  The same day as the encounter,

Peterson texted Rubin, "Thank you Howie !!  I had a good time . . . I love [████████] to pieces we

must do it again :)." Ex. 95 at 429; 56.1 ¶200.  The next afternoon, Peterson texted Rubin, "I feel

great." *Id.*; 56.1 ¶201.  Peterson became friends with ██████ after this encounter, and

corresponded with ██████ to enlist her help in convincing Rubin to engage in BDSM sex with

her more frequently.  Exs. 90, Peterson Dep. at 193:13-15; 96; 56.1 ¶202.  ██████ testified that

Peterson, Rubin, and ██████ had a conversation before their encounter in which Rubin

explained that "It was going to be … like Fifty Shades of Grey.  It was like, like hitting, paddling

and stuff like that," and that Peterson consented.  Ex. 97, ██████ Dep. at 41:24-44:5; 56.1 ¶203.

Peterson thereafter continued to pursue Rubin for paid BDSM encounters.  On June 16,

2014, she texted Rubin "please if u are looking to get together let me know ████████████

████████████" Ex. 95 at 430; 56.1 ¶204.  Yet again Rubin expressed his

reservations because he did not believe Peterson enjoyed BDSM sex. *Id.*; 56.1 ¶205.  But

Peterson begged to see Rubin, texting "please reconsider me," "I would do anything," "████████ ████████████████████████████," and "Ill scream kick yell whatever it doesn't matter I know it's really intense but I can handle it." *Id.*; 56.1 ¶206.

On June 25, 2014, Peterson texted Rubin again asking Rubin to see her, saying "ill do whatever." *Id.* at 432; 56.1 ¶207.  On June 30, 2014, Rubin, Peterson, and ██████, engaged in a consensual BDSM sexual encounter. Exs. 90, Peterson Dep. at 224:2-15, 225:8-226:10; 95 at 433-34; 56.1 ¶208.  After leaving, Peterson texted Rubin, "I'm happy you enjoyed it n I had fun too!!," "I'm so happy !" and "I love u guys u guys are a lot of fun." Ex. 95 at 434; 56.1 ¶209. Peterson admitted that she was not injured during this encounter.  Ex. 90, Peterson Dep. at 224:10-18; 56.1 ¶210.

On September 25, 2014, Peterson signed the Release.  *Id.* at 234:20-236:17; Ex. 98; 56.1 ¶211.

During October 2014, Rubin visited a strip club with Peterson, ██████, and other women. Ex. 22, Rubin Dep. at 209:5-15; 56.1 ¶212.  Peterson regarded ██████ and at least one of the other women as friends of hers. Ex. 90, Peterson Dep. at 252:16-253:5; 56.1 ¶213. Peterson did not recall having sex with Rubin, but testified "[Rubin] put his hands on me . . . in a way that was not to my liking, and it was rather aggressive." *Id.* at 255:7-9, 23-25; 56.1 ¶214. Peterson testified, even though two friends were only "several feet" away, *id.* at 256:15-20, she did not ask them for help or to have Rubin stop the encounter, *id.* at 258:19-21.  56.1 ¶215. Rubin testified that ████████████████████████████ in front of the other women at the club, Ex. 22, Rubin Dep. at 209:5-25, while ██████ testified that she did not recall Rubin hitting Peterson or Peterson being nude in the club, Ex. 97, ██████ Dep. at 62:11-63:5.

On November 5, 2014, Peterson emailed Rubin to tell him it was ██████████, to "thank [Rubin] again for the other day," and to apologize for not being in touch because she was in the hospital for "a procedure."  Ex. 99; 56.1 ¶216.  (Peterson produced no records regarding any medical procedure in 2014.)  Rubin responded by ████████████████████, wishing her well in her procedure, and telling her that the "day at the strip club was actually the most wild time I think I've ever had!"  *Id.*; 56.1 ¶217.

D.    <u>**Peterson's Ongoing Relationship with Rubin after Her Last Encounter**</u>

Peterson and Rubin never engaged in sexual activity after the strip club encounter of October 2014.  However, for years, Peterson continued to solicit Rubin, sometimes to ask for money and sometimes to engage in BDSM activities.

- In May 2015, Peterson texted Rubin, asking to discuss an unspecified issue, saying "I adore you I think very highly of you."  Ex. 100; 56.1 ¶218.

- In July 2015, Peterson texted Rubin to say ████████████████████████ ████████████████████.  Ex. 101 at 521-25; 56.1 ¶219.  Peterson then pleaded for another sexual encounter:  "Please I'm begging u," "Please h please see me [] Im begging you please," "Please h I really need to see you please," and "████████████████████████████████."  *Id.* at 526-32; 56.1 ¶220.  Rubin was sympathetic, but did not agree to engage in a sexual encounter.  *Id.*; *see* Ex. 90, Peterson Dep. at 269:21-270:2; 56.1 ¶221.

- In January 2016 and again in December 2016, Rubin and Peterson had dinner, but did not engage in any sexual activity.  Ex. 22, Rubin Dep. at 207:12-209:4; 56.1 ¶222.

- On January 6, 2017, Peterson stated, "I really would like to see you ████████████ ██████ as I know I absolutely can both from my previous relationship and in general,"

"And could really use a nice time and I really think u would enjoy yourself a lot."  Ex. 96 at 79994, 79996; 56.1 ¶223.

- On June 8, 2017, Peterson texted Rubin, asking to see him because her father had recently "passed away" of a massive heart attack.  Ex. 96 at 80036; 56.1 ¶224.  (On September 27, 2018, Peterson testified that her father is alive and she lives with him.  Ex. 90, Peterson Dep. at 23:6-13, 344:22-24; 56.1 ¶225.)

- On June 13, 2017, Peterson visited Rubin at the Apartment.  Ex. 90, Peterson Dep. at 281:25-282:9; 56.1 ¶226.  This was the last time they saw each other.  Ex. 22, Rubin Dep. at 206:7-207:7; 56.1 ¶226.  Rubin realized that Peterson was suffering from heroin addiction and no sexual activity occurred.  Exs. 90, Peterson Dep. at 281:25-282:13 (at 282:  no sexual activity occurred); 22, Rubin Dep. at 206:7-25; 56.1 ¶227.

**E.**   **Peterson Suffered No Harm from Her Encounters with Rubin**

The SAC alleges that Peterson was injured by Rubin because he forced her to take oxycodone during their encounters, which caused her to become addicted to the drug.  SAC ¶214.  According to the SAC, Rubin's "game" with Peterson was "every time Peterson would go to Rubin, he would give her oxycodone and beat her so badly that she would need more the morning following the beatings.  As the addiction grew worse, Rubin would take more and more advantage of Peterson and used her addiction to his advantage and forcing Peterson to come back to him for more drugs."  *Id.* ¶¶189, 215.  In addition, Peterson claims that she "sustained damage to her Bio Gel implants due to Rubin's use of force," which caused her to suffer frequent infections requiring "treatment with antibiotics and costly doctors' visits."  *Id.* ¶216.

Peterson's testimony and medical records conclusively show that these allegations are lies.

31

First, Peterson, flatly contradicting the SAC, testified that Rubin never forced her to take drugs, and offered no testimony that Rubin ever supplied her with drugs. Ex. 90, Peterson Dep. at 306:7-307:13; 56.1 ¶228.[8]

Second, Peterson testified she became addicted to oxycodone in the summer of 2014 as a result of injuries Rubin caused to her buttocks. Ex. 90, Peterson Dep. at 283:9-284:25. However, according to ███████████████████ records, Peterson's drug addiction began in 2013. Exs. 102; see 90, Peterson Dep. at 290:5-16, 308:25-309:18, 310:4-7; 56.1 ¶230. Rubin is not liable for Peterson's preexisting drug addiction. In any event, Peterson's claim that Rubin injured her buttocks is wrong. Medical records show that in April 2015, nearly six months after her last encounter with Rubin, Peterson received treatment for cellulitis, a bacterial skin infection, attributed to prior buttocks injections. Ex. 103 at 6; 56.1 ¶231.

Third, Peterson testified she was hospitalized for the damage to her Bio Gel implants in November 2014, due to an injury she suffered at Rubin's hands at the October strip club encounter. Ex. 90, Peterson Dep. at 264:12-25. Peterson further testified that she was treated only once at a hospital for this alleged injury. Id. at 316:4-317:2. Medical records establish this sole visit was to ███████████████ on April 21-22, 2015, for the cellulitis described above, nearly six months after her last encounter with Rubin. Id. at 316:12-317:12; Ex. 103 at 6; 56.1 ¶232. Peterson, experiencing pain for the prior five days, entered the hospital, was treated with anti-biotics, and left the hospital the same day experiencing no pain. Ex. 103 at 6, 15-16, 20; 56.1 ¶233.

---

[8]     Peterson testified that during her 2011 encounter with Rubin, he introduced her to a woman who somehow hooked Peterson on drugs. Id. at 106:10-107:9; 107:12-108:8, 305:17-306:6. Even if true, of course, Rubin cannot be responsible for another person introducing Peterson to drugs. In any event, ██████████ medical records indicate that Peterson's addiction to drugs began well after Rubin's 2011 encounter with Peterson and before their June 2014 BDSM encounter. See Exs. 102; see also 90, Peterson Dep. at 290:5-16, 308:25-309:18, 310:4-7; 56.1 ¶229.

## V.      LAUREN FULLER

Plaintiff Lauren Fuller had a single encounter with Rubin, in March 2016.

### A.      **Fuller's Friend, ███████████, Tells Her about Rubin**

Fuller was introduced to Rubin by ███████████, a mutual friend.  Ex. 104, Fuller Dep. at 73:15-75:22, 96:5-8; 56.1 ¶234.  ███████ had a preexisting BDSM sexual relationship with Rubin.  Ex. 105, ███████ Dep. at 23:5-12, 26:2-13; 56.1 ¶235.  ███████ had previously referred Fuller to ██████████████████████████████████████████.  *Id.* at 74:4-19; Ex. 106 at 560-564, 570-77; 56.1 ¶236.

███████ had told Fuller about the "dungeon" in Rubin's Apartment (the "dungeon" was the room in which he kept sex toys and had sexual encounters), and about ███████ and Rubin engaging in BDSM sex together.  Ex. 105, ███████ Dep. at 75:16-76:19; 56.1 ¶237.  Fuller confirmed that she had spoken with ███████ about Rubin, but purported to have no recollection of those conversations – beyond recalling that ███████ had told her that Rubin could be "a little rough with people."  Ex. 104, Fuller Dep. at 73:15-75:22, 97:2-11; 56.1 ¶238.  Fuller understood that to mean Rubin might have been verbally or physically "rough."  *Id.* at 98:5-10; 56.1 ¶239.

### B.      **███████ Solicits Fuller to Have an Encounter with Rubin**

On March 6, 2016, ███████ texted Fuller to ask if she was "free Tuesday in NYC," Fuller responded she was in Las Vegas, and ███████ said "Darn I had a big ███.  Kinda.  For 5."  Ex. 106 at 577; 56.1 ¶240.  Fuller offered to return to New York, where she lived, for the "███;"  *Id.*; Ex. 104, Fuller Dep. at 22:2-5; 56.1 ¶241.  ███████ said that she would "confirm" and arrange the flights "if he says yes.  And it will be 5k.  It's a little different.  This is the guy that has a dungeon."  Ex. 106 at 578; 56.1 ¶242.

That night, Fuller, who booked her own flight, flew to New York and went to the Apartment, where she met ███████.  Ex. 104, Fuller Dep. at 106:8-14; 56.1 ¶243.  The two

women remained in the Apartment without anyone else present for a period during which they ate, drank alcohol, and used marijuana and cocaine.  *Id.* at 107:10-110:4, 111:9-17, 115:12-16; 56.1 ¶244.  Rubin eventually arrived, and Fuller signed the Release.  *Id.* at 113:12-22; Ex. 107; 56.1 ¶245.  Rubin also provided Fuller with safe words.  Ex. 104, Fuller Dep. at 145:7-22; 56.1 ¶246.

### C.      Fuller Uses the Safe Word, and Rubin Stops Having Sex with Her

At some point, Rubin, Fuller, and ████████ began to engage in BDSM sexual activity, during the course of which Fuller ████████████████.  *Id.* at 134:14-137:21; 56.1 ¶247.  Fuller testified that she does not believe she objected to being bound or hit.  *Id.* at 138:3-140:5; 56.1 ¶248.  She further testified that although she was gagged at some point, she was able to make sounds even when gagged.  *Id.* at 148:20-150:12; 56.1 ¶249.  Fuller also testified that when she used the safe word Rubin stopped all sexual activity:  "I remember after using the safe word, I was unbound and I was able to freely walk out."  *Id.* at 150:17-151:10; 56.1 ¶250.

Fuller spent the night in the Apartment even though she lived in New York City and could have gone home.  *Id.* at 151:11-153:25, 156:12-21; 56.1 ¶251.  She testified she was upset with Rubin because she was "looking maybe to be consoled a little bit," and Rubin did not "effectively" console her before he left.  *Id.* at 154:16-155:8; 56.1 ¶252.  Fuller did not thereafter seek police or medical attention.  *Id.* at 158:18-160:25, 162:9-16; 56.1 ¶253.

Rubin paid Fuller and ████████ for their encounter, with Fuller receiving $2,500.  Exs. 26 at 2; 108; 56.1 ¶254.  Fuller later texted ████████ that she "felt bad" and "had bruises everywhere," but when ████████ apologized about Fuller only getting paid $2,500, Fuller responded "I mean it happens ████ don't worry about it."  Ex. 106 at 579-80; 56.1 ¶255.  Fuller never saw Rubin again.

34

**D.    Fuller Suffered No Harm from Her Encounter with Rubin**

The SAC alleges that Fuller suffered both physical and emotional injuries as a result of her encounter with Rubin, including "a contusion about the size of a football on the back of her leg, bruising on her backside and all over her body," "extensive tearing to her vagina, requiring treatment with antiseptic," and "extensive emotional and mental trauma which has required treatment."  SAC ¶¶245-48.  Fuller presented no evidence to support these claims.

Fuller testified that she did not recall whether she was injured at all in her encounter with Rubin.  Ex. 104, Fuller Dep. at 157:18-20, 159:12-162:12; 56.1 ¶256.  Fuller also testified that, contrary to the allegations in the SAC, she never sought or received treatment for any of the alleged physical or emotional injuries supposedly caused by Rubin.  *Id.* at 158:18-21, 159:5-7, 166:17167:8; 56.1 ¶257.  Fuller did not produce any medical records or other evidence documenting the injuries or treatments alleged in the SAC, and when Defendants requested consent forms to allow Rubin to obtain records from the medical providers who treated Fuller's alleged injuries, Plaintiffs' counsel stated that Fuller did not receive any such treatment.  Ex. 109; Decl. ¶123; 56.1 ¶¶258-59.

Fuller testified that she spoke to "[p]eople that do provide therapy and emotional support kind of," because talking about the present action "brought up old memories, old wounds, and [she] became very bothered by them."  Ex. 104, Fuller Dep. 169:3-15.  This testimony appears to refer to the fact that Fuller voluntarily texted at least eight different people, including her landlord, to talk about her claims in this case and the millions of dollars she expected to receive from it.  *See* Ex. 110 at 198465, 198471-76, 198488, 198501; 56.1 ¶260.  When Fuller was confronted with some of these conversations, she claimed she could not recall them and could not confirm whether she was talking about this case – despite never being involved in any other lawsuit.  Ex. 104, Fuller Dep. at 173:4-178:10.

**Procedural History**

Plaintiffs Hallman and Lawson, and former plaintiff Caldwell, filed the initial complaint on November 2, 2017, alleging RICO violations, RICO conspiracy, violations of the Computer Fraud and Abuse Act, violations of the TVPA, and various state tort claims against Rubin, Powers, and three other defendants, along with alleged Doe defendants. Dkt. No. 1. All Defendants filed motions to dismiss on February 9, 2018. Dkt. Nos. 59, 61, 63, 64, 65. Plaintiffs filed the Amended Complaint on February 20, 2018, adding four new Plaintiffs, Hathaway, Speight, Peterson, and Fuller. Dkt. No. 66.

Each Plaintiff described her alleged sexual encounters with Rubin. Each alleged that she did not anticipate that the encounters would involve BDSM or even sexual activity,[9] that some or all of these encounters were nonconsensual,[10] that each Plaintiff "required hospitalization and experienced extreme emotional trauma" as a result of her encounter(s) with Rubin,[11] and that each Plaintiff was afraid of Rubin.[12] On March 6 and 7, 2018, each Defendant filed supplemental memoranda of law in support of their motions to dismiss to address the claims brought by the newly-added Plaintiffs. Dkt. Nos. 74, 76, 77, 79, 82.

On April 29, 2018, the Court issued a Memorandum Decision & Order dismissing all counts brought against former defendants Yifat Schnur, Stephanie Shon, and Blue Icarus, LLC. Dkt. No. 105 ("Order") at 43. The Court also dismissed the RICO, RICO conspiracy, and computer hacking claims against all Defendants, dismissed the human trafficking claim brought

---

[9]     *See, e.g.*, Dkt. No. 66 ¶¶94-95, 170, 233, 263, 305-06, 324, 374, 389; *see also id.* ¶2.

[10]    *See, e.g.*, *id.* ¶¶128, 159, 207, 243, 246, 278-79, 285, 352, 358, 359, 410.

[11]    *Id.* ¶3.

[12]    *See, e.g.*, *id.* ¶¶135, 248, 297, 370, 422, 461.

by Fuller, dismissed the state-law tort claims against Rubin by Hallman, Caldwell, Speight, and

Fuller, and dismissed certain state-law tort claims against Powers.  *Id.*

     With respect to the human trafficking claims, the Court noted that "plaintiffs Hallman,

Speight, Lawson, and Peterson all allege that they traveled to New York with the understanding

that they were simply spending time with Rubin, having dinner with him, engaging in fetish play,

or taking fetish photos," and that Caldwell and Hathaway further alleged that they were coerced

or forced into sex with Rubin.  *Id.* at 29-30.  Accordingly, the Plaintiffs' allegations were that

they "travelled willingly to New York City, but not to engage in commercial sex with Rubin and

only engaged in commercial sex because they were overpowered by Rubin or sedated past the

ability to consent with alcohol or drugs."  *Id*. at 31.  The Court acknowledged that "evidence

produced in discovery may eventually" contradict these allegations, but concluded that the

Amended Complaint contained sufficient allegations to survive a motion to dismiss.  *Id.* at 30.

     The Court declined to dismiss the state tort claims that arose from conduct within the

applicable limitations period.  *Id.* at 43.  The Court recognized Rubin's argument that each

Plaintiff consented to each of her sexual encounters with him, and noted that consent would

defeat each of the state law tort claims.  *Id*. at 36.  Nevertheless, the Court concluded that such

claims survived a motion to dismiss because the Amended Complaint contained detailed

allegations asserting a lack of consent.  *Id*. at 36-37.  The Court further noted that while the

defendants provided text messages with Plaintiffs demonstrating consent, those messages were

"not properly before the Court on a motion to dismiss," although they might "provide evidence

of consent on summary judgment."  *Id*. at 38 n.20.

     On August 17, 2018, Plaintiffs filed the SAC, which re-introduced Fuller's human

trafficking claim and Speight's state-law tort claims.  *See* SAC ¶¶535-39, 580-99.  The SAC also

removed or modified certain allegations related to claims that were dismissed by the April 29, 2018 order, but is otherwise substantially similar to the Amended Complaint.  *See generally* SAC.  Caldwell, who chose not to pursue her claims, was dismissed from the case on December 4, 2018.  Dec. 4, 2018 Order.

Following the Court's ruling on the motion to dismiss, the filing of the SAC, and Caldwell's dismissal, Plaintiffs now allege seventeen causes of action against Rubin for human trafficking, in violation of 18 U.S.C. §§ 1591 and 1595, assault, battery, false imprisonment, and intentional infliction of emotional harm.  The Plaintiffs asserting the causes of action, and the events[13] from which the causes of action allegedly arise, are as follows:

|  | TVPA | Assault | Battery | False Imprisonment | Intentional Infliction of Emotional Harm |
|---|---|---|---|---|---|
| Hallman | **Cause of Action 1** Arising from encounters on 8/23/16 and 9/24/16 | None | None | None | None |
| Lawson | **CoA 1**  Arising from encounters on 8/23/16 and 12/20/16 | **CoA 14** Arising from encounter on 12/20/16 | **CoA 15** Arising from encounter on 12/20/16 | **CoA 16** Arising from encounter on 12/20/16 | **CoA 17** Arising from encounter on 12/20/16 |
| Hathaway | **CoA 1** Arising from encounters during the period 2015 through June 2017 | **CoA 2** Arising from encounters on "a number of occasions," but specifically referring to an encounter on 6/12/17 | **CoA 3** Arising from an encounter on 6/12/17 | **CoA 4** Arising from encounters on "a multiple occasions, including" 6/12/17 | **CoA 5** Arising from an encounter on 6/12/17 |

---

[13]     The chart refers to the dates of encounters as alleged in the SAC, but discovery has shown that certain of these encounters appear to have taken place on slightly different dates:  Lawson's alleged encounter with Rubin on December 20, 2016, actually occurred on December 21, 2016. Peterson's alleged encounter with Rubin in July 2017, actually occurred on June 13, 2017. Speight's alleged encounters with Rubin on November 24, 2016, January 31, 2017, and May 26, 2017, actually occurred on November 22, 2016, January 30, 2017, and May 24, 2017, respectively.

| Peterson | **CoA 1**<br>Arising from encounter in May or June 2011 | **CoA 6**<br>Arising from encounters in July 2017 | **CoA 7**<br>Arising from encounters in July 2017 | **CoA 8**<br>Arising from encounters in July 2017 | **CoA 9**<br>Arising from encounters in July 2017 |
|---|---|---|---|---|---|
| Speight | **CoA 1**<br>Arising from (actual and attempted) encounters during the period April 2016 through February 7, 2018 | **CoA 10**<br>Arising from encounters on 11/24/16, 1/31/17, and 5/26/17 | **CoA 11**<br>Arising from encounters on 11/24/16, 1/31/17, and 5/26/17 | **CoA 12**<br>Arising from encounters on 11/24/16, 1/31/17, and 5/26/17 | **CoA 13**<br>Arising from encounters on 11/24/16, 1/31/17, and 5/26/17 |
| Fuller | **CoA 1**<br>Arising from encounter on March 7, 2016 | None | None | None | None |

The elements of each of these causes of action are as follows:

***Human Trafficking***:  Title 18, United States Code § 1591, makes it a crime for a person "in or affecting interstate . . . commerce," knowingly to recruit, solicit, or transport a person knowing, or in reckless disregard of the fact, that "means of force, threats of force, fraud [or] coercion" will be used to cause the person to engage in commercial sex.  Title 18 United States Code § 1595 provides a private cause of action for a victim of § 1591.  *See* 18 U.S.C. § 1591(a). To prevail on a cause of action for violation of § 1595, a plaintiff must demonstrate:

(1)     the defendant "recruit[ed], entice[ed], harbor[ed], transport[ed], provide[ed], obtain[ed], advertise[ed], maintain[ed], patronize[ed], or solicit[ed]" the plaintiff; or benefitted financially or received anything of value from participation in a venture which the defendant knew or should have known has violated § 1591(a),

(2)     the defendant knew or recklessly disregarded;

(3)     that force, fraud, or coercion would be used to cause the person to engage in a commercial sex act; and

(4)     the conduct was in or affected interstate commerce.

*See* 18 U.S.C. § 1591(a).  The Second Circuit has held that "consensual BDSM activities alone [cannot] constitute the basis for a conviction under [Section 1591]."  *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010).

**Battery**:  To prevail on a cause of action to recover damages for battery under New York State law, "a plaintiff must prove that ([1]) there was bodily contact, ([2]) the contact was offensive, i.e., wrongful under all of the circumstances, and ([3]) [the defendant had the] intent to make the contact without the plaintiff's consent."  *Higgins v. Hamilton*, 794 N.Y.S.2d 421, 422 (2d Dep't 2005).

Consent is a complete defense to sexual battery.  *See, e.g.*, *Wende C. v. United Methodist Church*, 4 N.Y.3d 293, 298 (2005); *Coopersmith v. Gold*, 568 N.Y.S.2d 250, 252 (3d Dep't 1991); *Manko v. Volynsky*, No. 95 Civ. 2585, 1996 U.S. Dist. LEXIS 6328, at *6 (S.D.N.Y. May 9, 1996); *Sanders v. Rosen*, 605 N.Y.S.2d 805, 812-13 (Sup. Ct. N.Y. Cty. 1993).

**Assault**:  "To recover on a claim of assault, the plaintiff must show that another person made an intentional attempt, displayed by violence or threatening gesture, to do injury to, or commit a battery upon, his or her person.'"  *Cajamarca v. Regal Entm't Grp.*, No. 103027/12, 2013 N.Y. Misc. LEXIS 4851, at **27-28 (Sup. Ct. N.Y. Cty. Oct. 17, 2013) (citing *Williams v. Port Auth. of N.Y. & N.J.*, 880 F. Supp. 980, 994 (E.D.N.Y. 1995)) (quotations omitted).  The plaintiff must offer "proof that there was conduct that placed plaintiff in imminent apprehension of harmful or offensive contact."  *Id.* at **27 (citing *Gould v. Rempel*, 951 N.Y.S.2d 677 (2d Dep't 2012); *Cotter v. Summit Sec. Servs., Inc.*, 788 N.Y.S.2d 153 (2d Dep't 2005); *Holtz v. Wildenstein & Co.*, 693 N.Y.S.2d 516 (1st Dep't 1999); *Charkhy v. Altman*, 678 N.Y.S.2d 40 (1st Dep't 1998)).

Consent is a defense to a charge of assault.  *See, e.g.*, *Jencsik v. Shanley,* No. 151365/12,

2013 N.Y. Misc. LEXIS 6118, at *8 (Sup. Ct. N.Y. Cty. Dec. 24, 2013) (consent bars recovery

for assault claims) (citing 14 N.Y. Prac, New York Law of Torts § 1:18); *Incitti v. Skinner,* No.

88-CV-601, 1994 U.S. Dist. LEXIS 13997, at *30 (N.D.N.Y. Sept. 14, 1994).

    ***Intentional Infliction of Emotional Distress***:  "The tort has four elements: (i) extreme

and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing,

severe emotional distress; (iii) a causal connection between the conduct and injury; and

(iv) severe emotional distress."  *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993).

> [T]he requirements of the rule are rigorous, and difficult to satisfy. . . . Liability
> has been found only where the conduct has been so outrageous in character, and
> so extreme in degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* at 122.  A claim for emotional distress requires a showing of an "actual

injury."  *Caltabiano v. BSB Bank & Trust Co.*, 387 F. Supp. 2d 135, 141-42 (E.D.N.Y. 2005)

(*citing Patrolmen's Benevolent Ass'n v. City of N.Y.*, 310 F.3d 43, 55 (2d Cir. 2002)).  "To

demonstrate an actual injury, a plaintiff generally cannot stand on his subjective testimony alone,

but must set forth other evidence that such an injury occurred, including supporting psychiatric

or medical records."  *Id.* at 142.

    ***False Imprisonment***:  On a claim of false imprisonment, "a plaintiff must show that (1)

defendant intended to confine them, (2) the plaintiff was conscious of the confinement, (3) the

plaintiff did not consent, and (4) the confinement was not otherwise privileged."  *Arrington v. Liz

Claiborne, Inc.*, 260 A.D.2d 267, 267 (1st Dep't 1999).

## <u>Legal Standard for Summary Judgment</u>

    Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  The Court views the evidence in the light most

favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587-88 (1986).

Once the movant has met its initial burden, the burden shifts to the non-moving party,

which "must come forward with specific facts showing that there is a genuine issue for

trial." *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 154 (E.D.N.Y. 2017); *see Weinstock v.

Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256).

Mere speculation as to the true nature of the facts or conclusory allegations or denials are

insufficient to prevent summary judgment.  *Jones v. Bay Shore Union Free Sch. Dist.*, 170 F.

Supp. 3d 420, 420 (E.D.N.Y.) (*citing Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986);

*Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)), *aff'd*, 666 F. App'x 92 (2d Cir. 2016), *cert.

denied*, 137 S. Ct. 2135 (2017); *see Babino v. Gesualdi*, 278 F. Supp. 3d 562, 582 (E.D.N.Y.

2017) ("If the nonmoving party submits evidence which is 'merely colorable,' legally sufficient

opposition to the motion for summary judgment is not met."), *aff'd*, 744 F. App'x 30 (2d Cir.

2018).

"A party cannot avoid summary judgment by claiming to be unable to remember facts

that are asserted and properly supported by the moving party." *Hinz v. Vill. of Perry*, No. 13-

CV-6302, 2015 U.S. Dist. LEXIS 80661, at *23-24 (W.D.N.Y. June 22, 2015), *aff'd*, 667 F.

App'x 3 (2d Cir. 2016); *see Cheeseboro v. Little Richie Bus Serv., Inc.*, 254 F. Supp. 3d 485, 492

(E.D.N.Y. 2017) ("In the face of . . . clear testimony, Plaintiff's failure to remember cannot

create an issue of fact sufficient to withstand summary judgment . . . ."), *aff'd*, 722 F. App'x 107

(2d Cir. 2018), *cert. denied*, No. 18-5664, 2019 WL 113228 (Jan. 7, 2019); *Costello v. St.

Francis Hosp.*, 258 F. Supp. 2d 144, 148 (E.D.N.Y. 2003) (issue of fact not created where

plaintiff repeatedly answered deposition questions "I don't recall" or "I don't remember");

*Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 389 (S.D.N.Y.

2000) ("[Plaintiff's] failure of recollection does not suffice to raise an issue of fact in the face of

[defendant's] clear recollection."); *Droutman v. New York Blood Ctr., Inc*., No. 03-CV-5384,

2005 U.S. Dist. LEXIS 42951, at *4 n.2 (E.D.N.Y. July 27, 2005); *Petrunti v. Cablevision*, No.

08-CV-2277, 2009 U.S. Dist. LEXIS 121370, at **34-35 (E.D.N.Y. Dec. 30, 2009) ("Plaintiff's

lack of recollection is insufficient, however, to create a triable issue of fact.").

## <u>Argument</u>

### PLAINTIFFS' CONSENT TO THEIR ENCOUNTERS<br><u>WITH RUBIN DOOMS EACH OF THEIR CLAIMS</u>

Consent is central to each of Plaintiffs' claims against Rubin, and the evidence

demonstrates beyond a shadow of a doubt that each Plaintiff consented to each of her sexual

encounters with Rubin.  The evidence set forth in detail above establishes that:

- Each Plaintiff was informed before meeting Rubin her encounter would entail BDSM.

- Each Plaintiff signed the Release that stated the signatory was consenting to BDSM.[14]
  Although some of the Plaintiffs contend that they signed it hurriedly, or did not fully
  understand it, or (with regard to Speight and Fuller) that they were drunk, no one
  suggested that Rubin or Powers hurried her, drugged her before she signed, or otherwise
  forced her to do so.

---

[14]     Defendants are not attempting to enforce the Releases.  The Releases are relevant because they
are powerful evidence of each Plaintiff's knowledge and consent.  *See* Order at 35 n.18 ("The
agreement is some evidence of plaintiffs' knowledge of what kinds of sexual activities Rubin
expected, even if it is unenforceable.").

- Every Plaintiff but Fuller had repeat encounters with Rubin, and all of the state tort claims arise out of such "repeat" encounters.  It strains credulity to think that Plaintiffs did not know what to expect after their first encounter.

- Every Plaintiff but Fuller told Rubin or Powers that she had enjoyed her encounters with Rubin or testified that her encounters were consensual and enjoyable.  Hallman, Hathaway, Speight, and Peterson pursued Rubin, repeatedly soliciting him.

- When Fuller used the safe word, Rubin stopped the sexual encounter.

- Following their initial encounters with Rubin, Hallman, Lawson, and Peterson recruited, or attempted to recruit, their friends to have encounters with Rubin.

- No Plaintiff sought to leave the Apartment in which they had allegedly been assaulted, even after Rubin left, and even though they had the means (often the $5,000 that Rubin had paid them) to stay elsewhere (Peterson and Fuller lived in New York).

No Plaintiff can point to either competent testimony or documentary evidence to weigh against the overwhelming evidence that each Plaintiff knew that she would be engaging in rough sex acts during her visit, and consented to do so.  Plaintiffs accordingly cannot raise any disputed issue of material fact sufficient to withstand summary judgment.  *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("[W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that [plaintiff's] testimony – which was largely unsubstantiated by any other direct evidence – was so 'replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint."); *Dawes v. Coughlin*, 964 F. Supp. 652, 657 (N.D.N.Y. 1997) ("[P]laintiff's version of events … is beyond belief."), *aff'd*, 159 F.3d 1346 (2d Cir. 1998).

*Wende C.* is instructive.  In *Wende C.*, the New York Court of Appeals granted summary judgment and dismissed plaintiff's sexual battery claim on the grounds that the plaintiff could not satisfy her burden of proving her lack of consent to defendant's physical contact in the face of extrinsic evidence to the contrary.  4 N.Y.3d at 298.  The Court considered emails sent by the plaintiff to the defendant and others that characterized the parties' sexual relationship as consensual, and consequently granted the defendant's motion for summary judgment finding that "as a matter of law the sexual relationship between the parties was indeed consensual."  *Id.*  The overwhelming evidence establishes the same point here:  the Plaintiffs chose to engage in consensual BDSM for money.  They cannot claim foul.

*Cecora v. De La Hoya*, No. 112787/11, 2012 N.Y. Misc. LEXIS 1582 (Sup. Ct. N.Y. Cty. Mar. 30, 2012), *aff'd*, 965 N.Y.S.2d 464 (1st Dep't 2013), is also on point.  In that case, the plaintiff alleged causes of action for battery, assault, and false imprisonment based on her allegation that the defendant "began touching the Plaintiff and pulling her out of bed in order to have sex."  *Id*. at *5.  The court held that the plaintiff could not satisfy the element that defendant's touching offensive, or "wrongful under all the circumstances," in light of the facts that plaintiff invited others to engage in sex with her and the defendant, and remained in the hotel room where the assault had taken place after the defendant had left, awaiting his return:

> plaintiff engag[ed]/in consensual sexual intercourse with defendant, also involving unusual sexual activities; plaintiff invit[ed] her roommate to the hotel suite to engage in sexual activity with the defendant; and plaintiff remain[ed] in the hotel while waiting for the defendant to return the following morning after the alleged battery occurred

*Id*. at *6-7.

Even if there were not overwhelming evidence of Plaintiffs' consent, Plaintiffs' human trafficking claims would fail because to be liable for human trafficking, a defendant must *know* that plaintiff is the victim of force, fraud, or coercion.  15 U.S.C. § 1591(a)(2); *United States v.*

*Robinson*, 702 F.3d 22, 31-32 (2d Cir. 2012) (*mens rea* is a requirement for TVPA claims).  The evidence shows that Rubin's understanding at all times was that Plaintiffs were fully informed and willing participants in their sexual encounters.  *See, e.g.*, Ex. 22, Rubin Dep. at 71:21-74:12; 88:23-14, 182:15-183:5, 198:23-199:8, 203:22-204:7.  Given Rubin's precautions, the explicit information provided to Plaintiffs, and Plaintiffs' outward expressions of enthusiastic consent and satisfaction, there is simply no evidence that Rubin knew that any Plaintiff viewed her encounters as nonconsensual.

This Court has noted that the complaint alleges that each Plaintiff "only engaged in commercial sex because they were overpowered by Rubin or sedated past the ability to consent with alcohol or drugs."  *See* Order at 31.  Discovery in this case has conclusively demonstrated that neither of these allegations has any evidentiary support.

As to force and coercion, even though every Plaintiff was asked at her deposition to describe in detail everything that she could remember about her encounters with Rubin, not a single one testified that she had been compelled to do anything against her will.  Some of the Plaintiffs described simply not remembering anything about some or all of their encounters, *see, e.g.*, Exs. 1, Hallman Dep. at 214:10-215:16; 39, Hathaway Dep. at 134:21-24, 139:5-9, 148:6-23; 90, Peterson Dep. at 191:23-195:9; 43, Speight Dep. at 93:4-94:20, 102:19-105:14, while others admitted that no coercion was used, or alleged they had been coerced, but never provided any coherent factual account of such coercion, *see, e.g.*, Exs. 104, Fuller Dep. at 77:18-91:14, 97:2-98:10, 119:5-151:9; 1, Hallman Dep. at 70:21-71:7, 200:7-25; 2, Lawson Dep. at 42:4-48:20, 53:19-65:10, 67:8-19, 129:20-139:17; 90, Peterson Dep. at 89:8-98:7; 43, Speight 37:14-41:10, 80:9-81:17, 145:16-148:17, 155:21-156:5, 174:5-10.[15]  And, of course, that all of the

---

[15]   Indeed, Plaintiffs could not recall much at all about any of their encounters with Rubin.  There were 388 instances in Lawson's deposition in which she testified she could not "recall" or

Plaintiffs (but Fuller) saw Rubin repeatedly undermines their argument.  Fuller was the only Plaintiff who testified that she used the safe word to end the encounter, and her testimony establishes that after she did so, Rubin stopped.  *See supra* at 34-35.

The SAC makes drug-related allegations with respect to each Plaintiff.  None withstands the slightest scrutiny:

- Hallman and Lawson:  The SAC implies that Rubin drugged Hallman's and Lawson's drinks during their first encounter, SAC ¶¶328, 333, but Lawson's testimony about that encounter contained no description of any drugging, and Hallman testified only that "I felt a little dizzy … [b]ut we were drinking," and that she did not know whether Rubin had drugged her drink.  Exs. 39, Hallman Dep. at 138:23-140:6; 2, Lawson Dep. at 68:2-89:5.

- Speight:  The SAC alleges that, "[o]n multiple occasions, Rubin offered Speight pills at dinner or at the Penthouse" and that Speight took the pills because she "felt that she had little choice but to do what Rubin said."  SAC ¶280.  The SAC also alleges that, on one occasion, Rubin forced Speight to become intoxicated before their encounter.  *Id.* ¶¶263-67.  However, Speight testified that (1) she often drank alcohol in the Apartment before Rubin would arrive at the Apartment, Ex. 43, Speight Dep. at 169:5-22; and (2) with respect to the encounters in which she consumed drugs, she did not know or could not recall Rubin forcing her to take them, *id.* at 124:6-125:15, 207:23-25.

- Peterson:  The SAC alleges that Rubin "forced" Peterson to take drugs and supplied her with oxycodone so that she would become dependent on him.  *See* SAC ¶¶171-84, 187-

---

"remember" the answer to the question posed – 228 times for Hallman, 190 times for Speight, 141 times for Fuller, and 87 times for Peterson.

89.  But Peterson testified that Rubin *never* forced her to take drugs.  Ex. 90, Peterson Dep. at 306:7-307:13.  Incredibly, Peterson blames Rubin for her addiction because: (1) she met a fellow addict through Rubin; or (2) the injury to her buttocks supposedly caused by Rubin somehow caused her addiction.  *See id.* at 305:17-308:8.  Neither of these claims is sufficient to hold Rubin responsible for Peterson's drug addiction.

- <u>Hathaway</u>:  The SAC alleges that Hathaway was repeatedly drugged by Rubin during encounters in or around 2015, SAC ¶¶125-131, but Hathaway testified that she has no recollection of these encounters and that her relationship with Rubin was fully consensual at the time.

- <u>Fuller</u>:  The SAC alleges that Rubin provided Fuller with "alcohol and recreational drugs, such as cocaine" during her March 2016 encounter.  SAC ¶223.  But Fuller testified that she drank heavily and used drugs with ███ during the day of March 7, 2017, before she met Rubin.  Ex. 104, Fuller Dep. at 115:4-23.

The state law claims alleged by Plaintiffs Hallman, Lawson, Peterson and Speight are equally without merit.  None of Peterson's sexual encounters fall within the one-year statute of limitations.  The only time she saw Rubin within the statutory period was on June 13, 2017, but Peterson testified that Rubin did nothing to harm her and no sex took place.  *See* Ex. 90, Peterson Dep. at 281-25-282:13.

The false imprisonment claims (Hallman, Lawson, Peterson and Speight) are as frivolous as the others, as demonstrated by the fact that three of the women stayed the night at the Apartment after Rubin had left and did not ask or attempt to leave during or after her encounter. *See, e.g.*, Exs. 1, Hallman Dep. at 136:19-24, 155:10-16, 211:3-212:3, 215:17-23; 2, Lawson Dep. at 91:4-92:6, 166:17-169:23; 43, Speight Dep. at 91:17-93:7, 177:13-178:14, 293:10-296:6.

Their alleged "imprisonment" cannot have been involuntary.  *See, e.g.*, *Cecora*, 2012 N.Y. Misc. LEXIS 1582, at \*\*7-9; *Rockland Vending Corp. v. Creen*, No. 07-CV-6268, 2009 U.S. Dist. LEXIS 68323, at \*\*8-10 (S.D.N.Y. Aug. 4, 2009); *Robinson v. Town of Colonie*, 878 F. Supp. 387, 408 (N.D.N.Y. 1995).  The fourth woman (Peterson) never testified that she was held in the Apartment.

Finally, Plaintiffs' absolute inability to establish any harm proves that their causes of action are meritless.  As set forth above, despite the SAC's allegation that each Plaintiff "required hospitalization" on account of her interactions with Rubin, there are no medical records that show that Plaintiffs received any treatment for harm inflicted by Rubin.  The vague, undocumented, conclusory testimony that certain Plaintiffs felt emotionally harmed by their encounters with Rubin is not only insufficient as a matter of law, *see, e.g.*, *Slue v. N.Y.U. Med. Ctr.*, 409 F. Supp. 2d 349, 372 (S.D.N.Y. 2006) ("[Plaintiff] offers no concrete evidence regarding physical or behavioral symptoms of such distress.  [Plaintiff's] vague assertions are insufficient to amount to severe emotional distress."); *Sabatowski v. Fisher Price Toys*, 763 F. Supp. 705, 716-17 (W.D.N.Y. 1991), but is belied by the few records that Plaintiffs produced and by Plaintiffs' inability to provide any specific testimony about harm that any of them suffered.

## Conclusion

For the foregoing reasons, Defendant Rubin is entitled to summary judgment in his favor on each of the causes of action.

Date:   February 13, 2019                Respectfully submitted,
        New York, NY


                                         */s/ Edward A. McDonald*
                                         Edward A. McDonald
                                         Benjamin E. Rosenberg
                                         Michael J. Gilbert
                                         Benjamin M. Rose
                                         Dechert LLP
                                         1095 Avenue of the Americas
                                         New York, NY 10036
                                         Phone: (212) 698-3672
                                         Fax: (212) 698-3599

                                         *Attorneys for Howard Rubin*