# EXHIBIT 43

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x

HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON, AND LAUREN FULLER,

Case No.: 1:17-cv-06404

Plaintiffs,

-against-

HOWARD RUBIN, JENNIFER POWERS, and the DOE COMPANY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Oral deposition of [REDACTED] taken pursuant to notice, was held at the law offices of DECHERT LLP, 1095 Avenue of the Americas, New York, New York, commencing October 23, 2018, 11:45 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221





[redacted] - Confidential

[redacted].

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted].

[redacted] - Confidential

Q. What did you know about [redacted]

A. I didn't know much. I just knew who she was, she was from Atlanta.

Q. Do you know what she did for a living?

A. I think she did something with -- I think she worked for an attorney, I'm not sure who.

Q. Did you develop a relationship with her?

A. We were friends at one point.

Q. The next paragraph says, [redacted] told Speight about Rubin and that Rubin, at the time, was looking to spend time with beautiful women. [redacted] explained to Speight that Rubin would fly Speight to New York and Speight would have a nice place to stay during her trip there. [redacted] also said Rubin was really nice.

What else did she say, if anything?

A. That's about it.

Q. So you were told that this man, Mr. Rubin, in New York, wanted to spend time with

MAGNA LEGAL SERVICES

[REDACTED] - Confidential

beautiful women, correct?
A. Yes.
Q. What did you understand by the words, spend time?
A. Have companionship, be friends, have a relationship.
Q. A sexual relationship?
A. I'm sure that would occur, yes.
Q. Why were you sure of that before you met him?
A. I mean, I just thought that's why we were meeting, because he wanted, like, a dating style relationship with younger, beautiful woman.
Q. You considered yourself to be a beautiful woman?
A. Yes.
Q. So [REDACTED] this is somebody you didn't know much about?
A. No.
Q. How old were you in 2015?
A. Twenty-two or 23.
Q. You were a 22 year old woman and somebody you didn't know much about was

[REDACTED] - Confidential

suggesting that you go to New York and meet with a man you never met before?
A. Yeah.
Q. Did you ask any questions about him?
A. Not a lot.
Q. Did you know how old he was?
A. I think so.
Q. Did you know what he did for a living?
A. No.
Q. Isn't it a fact that you were supposed to get paid for your visit to Mr. Rubin?
A. Yes.
Q. And she explained that he would fly you to New York and you would have a nice place to stay during your trip there.
Did you ask anything about the place?
A. No, she told me it was in New York, a nice condo.
Q. Had you ever been to New York before?

[REDACTED] - Confidential

A. One time.
Q. When was that?
A. I can't remember the year exactly. I think maybe 2013 or '14.
Q. What was the occasion on which you were in New York?
A. I was just here on vacation.
Q. With whom?
A. With my boyfriend.
Q. And she told you that Mr. Rubin was really nice, correct?
A. Yes.
Q. What else did she say?
A. That's all.
Q. Did she tell you he was interested in rough sex?
A. Not to the extent of what happened.
Q. To what extent did she tell you about it?
A. She said like rough, playful sex.
Q. I'm sorry?
A. Rough, playful sex.
Q. So you knew before you came here, the first time you met Mr. Rubin, that he was

[REDACTED] - Confidential

interested in having rough, playful sex with you?
A. Yes.
Q. You knew he was going to be paying you money?
A. Yes.
Q. This is before you came to New York the first time to see Mr. Rubin?
A. Yes.
Q. Did she say how much money you would be paid?
A. I think there was a figure, but it depended on, you know, what happened, if I even wanted to continue to have a relationship with him or if we even liked each other.
Q. It was going to be $5,000 if you had sex, right?
A. Yes.
Q. The next paragraph is paragraph 252. [REDACTED] introduced Speight to Rubin and Speight, believing [REDACTED] portrayal of Rubin's, character flew to New York, is that correct?

MAGNA LEGAL SERVICES



Page 46

- Confidential

Page 48

- Confidential

.

Page 47

- Confidential

Page 49

- Confidential

That's completely wrong, correct?
A. I'm not sure if that's wrong.
Q. So it could have been -- you just flew up here, Jen Powers made reservations for you for a flight on October 12, 2015 and you didn't meet Mr. Rubin that day?
A. I think I did meet him -- yes, I did.
Q. You signed a nondisclosure agreement when you came up then?
A. Yes.
Q. So it wasn't in March of 2016, but, rather, in October of 2015 that you signed the nondisclosure agreement, correct?
A. Yeah.
Q. I'm not trying to trick you.
Take a look at the exhibit, where it says, Confidentiality Agreement, and turn it over to the second page.
A. To my knowledge, I thought that was the first time I went, I thought that was the date. I never had a copy of this. I didn't have anything in my records.
Q. What is the date?

MAGNA LEGAL SERVICES



Page 50

- Confidential

Page 52

- Confidential

Page 51

- Confidential

Page 53

- Confidential

A. Yeah.
Q. Exhibit 2, and it's entitled or captioned the -- it's entitled Confidentiality Agreement and Release and it says, I,
That's your name, correct?
A. Yes.
Q. Is that your handwriting?
A. Yes.
Q. I am over the age of 21.
That was true, you were over the age of 21, right?
A. Uh-huh, yes.
Q. And able to read and write English?
A. Yes.
Q. That's true, correct?
A. Yes.
Q. I am not under the influence of drugs or alcohol?
A. I was definitely under the influence of alcohol.
Q. How do you know that?
A. Because I was served alcohol with Jennifer and Rubin.



[redacted] - Confidential

Q. Where was that?

A. At the penthouse.

Q. But you don't even remember what day it was?

A. I remember every time, there was alcohol, there was lots of alcohol.

Q. But you don't remember whether it was in the penthouse or [redacted], correct?

A. I don't think I remember exactly where we were. We were so many different places all together, I don't know. There was alcohol everywhere we were.

Q. Where were the places that you went to with Mr. Rubin during the course of your relationship with him, other than the penthouse?

A. Restaurants around the area.

Q. Where?

A. I don't remember the names.

Q. Anywhere else, other than restaurants?

A. No.

Q. So you don't know, as you sit here

[redacted] - Confidential

today, whether you were under the influence --

A. I know I was under the influence of alcohol, because if it was the first time I met them, there was alcohol involved on the plane ride, there was alcohol involved, as soon as I walked in the door, everywhere.

Q. How much alcohol did you have on the plane ride?

A. I can't remember.

Q. You were nervous, right, coming to New York?

A. Yes.

Q. You were 23 years old?

A. Yes.

Q. This is the second time coming to New York?

A. Yes.

Q. You are coming to a big penthouse in Manhattan to have sex with a man?

A. They encouraged me to drink.

Q. Who encouraged you to drink?

A. Howard Rubin and [redacted]

Q. When did you speak to Mr. Rubin to

[redacted] - Confidential

[redacted]

[redacted] - Confidential

Q. Would he pour the alcohol into your mouth?

A. I don't think it was quite like that.

Q. Did he threaten you and tell you he was going to do anything to you if you didn't drink?

A. No.

Q. With those WhatsApp messages that you said that you with -- conversations that you had with Mr. Rubin, did you turn them over to your lawyer?

A. Yes, I gave everything.

Q. You are sure?

A. Yes.

Q. So in this document, you said that you were not under the influence of drugs or alcohol, that's what you said in this document that you signed, correct?

A. Yeah, I was -- there was not even time to read this. It was sort of signing it while we are out partying.

Q. I thought you were in the penthouse.

MAGNA LEGAL SERVICES

[REDACTED] - Confidential

A. There was tons of alcohol in the penthouse.

Q. You said there wasn't much time to read the document when you were out partying?

A. Out partying in the penthouse, that's out to me. I am away from my home.

Q. Was there enough time for you to initial every paragraph of the document?

A. I guess.

Q. Don't guess. Take a look at the document.

A. I said yes.

Q. I thought you said I guess, I'm sorry.

That's your initials that appear starting at the third paragraph of the document, correct?

A. Yes.

Q. And you initial every paragraph in the document, correct?

A. Yes.

Q. And you signed the document with your signature at the bottom of the second page, correct?

[REDACTED] - Confidential

A. Yes.

Q. And what's the date?

A. 10/12/15.

Q. Then you printed your name, correct?

A. Yeah. This looks different, though. Do we not have the --

Q. How does the document look different from what you remember?

A. It just does.

Q. So it says, I'm signing this agreement of my own freewill.

Do you see that?

A. Yes.

Q. Did you sign it? Did you attest to that?

A. Yes.

Q. It says, Because I want to engage in the activities described below with Howard Rubin in return for a fee that I have agreed to.

Do you see that?

A. Yes.

Q. You have no trouble reading and

[REDACTED] - Confidential

understanding those words, do you?

A. No.

Q. You signed your name at the bottom indicating you had read and understood the words, correct?

A. Yes.

Q. And the next paragraph, it says, In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with Rubin.

Do you see that? Is that true?

A. Yes.

Q. Including sadomasochistic SM activity that can hazardous and, on occasion, cause injury to my person.

Do you understand what those words mean?

A. Yes.

Q. Did you understand those words in 2015?

A. I don't think I knew.

Q. You don't think you knew, what?

A. I don't think I knew what that meant.

[REDACTED] - Confidential

Q. You didn't know what hazardous and, on occasion, cause injury to my person meant?

A. I mean, the -- no.

Q. I'm sorry?

A. No.

Q. No, what?

A. I don't understand the sadomasochistic, all this sexual, I didn't know what this meant exactly.

Q. Well, you knew what sexual activity was?

A. Of course, yes.

Q. You knew what can be hazardous and, on occasion, cause injury to my person, you know what those words mean?

A. Yes.

Q. So you are signing a document here that says you voluntarily agreed to engage in sexual activity, including S&M activity that can be hazardous and, on occasion, cause injury to my person.

You see that, right?

A. Yes.

Q. You understand that means that the

[redacted] - Confidential

-- what does the word hazardous mean?
A. Dangerous.
Q. And what about cause injury to my person, what does that mean?
A. It could hurt me.
Q. You knew that you were coming for rough sex, that's what you were told by [redacted] -- let me finish the question -- [redacted] told you to expect rough sex?
A. Yeah.
Q. It says, The activity in question may be undertaken on this date, dates prior to this date and dates in the future. This agreement is intended to cover each of the dates in question and a new agreement is not required for each subsequent date.
You understood what those words meant, correct?
A. Yes.
Q. And then the next paragraph to which you have your initials connected at the end of the paragraph, it says, Mutual release. It says, I understand participation

[redacted] - Confidential

in the activities described above is potentially hazardous.
Once again that means dangerous, correct?
A. Yes.
Q. My participation in the activities is done knowingly, correct?
A. Yes.
Q. So you were being told what could happen, correct?
A. To some extent, yes.
Q. It says, I freely assume all associated risks.
You understand what the word risk means, right?
A. Yes.
Q. It meant that it was a risk that you could get hurt, correct?
A. Yes.
Q. That's what you understood when you signed the document?
A. Yeah.
Q. It goes on to say that you acknowledge and agree that participation in

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted]

MAGNA LEGAL SERVICES



Page 70

- Confidential

Page 71

- Confidential

Page 72

- Confidential

A. Yes.
Q. You said you would never see him again, right?
A. Yeah, I think I said that, I can't remember the conversation.
Q. Do you remember on the very last line, at 10:02 p.m., you say, By the way, will you please send me your PayPal -- excuse me. Do you remember Jen Powers saying to you, Would you please send me your PayPal, Addy?
A. I don't remember, I don't remember this conversation.
Q. Did anything happen that night, were you injured in any way that night?
A. I can't remember. There was a lot of alcohol.
Q. So you don't remember whether you were injured that night, correct?
A. Correct.
Q. Take a look at the Exhibit 4. You see this is a document dated Tuesday, October 13th.
A. Okay.

Page 73

- Confidential

Q. Going down, it says you sent a payment, Dear Jennifer Powers, You sent a payment for $1,000 to
Do you recall that you were paid $1,000 for the -- for your first visit with Mr. Rubin?
A. I can't remember exactly.
Q. Does this reflect that you were?
A. It does reflect.
Q. Do you have any reason to believe you weren't paid $1,000 by Mr. Rubin?
A. No, I don't have any reason to believe that.
Q. On your first visit with Mr. Rubin, a was used, right?
A. I think so.
Q. Do you recall that there was rough sex?
A. Yeah, there was some rough sex.
Q. But you weren't injured in any way?
A. No, I don't think so.
Q. You weren't physically harmed?
A. I can't remember.
Q. What about psychological trauma,



Page 74

[REDACTED] - Confidential

did you suffer any psychological trauma in your first visit with Mr. Rubin?
A. Yes.
Q. What was that psychological trauma?
A. I mean mental abuse, name calling.
Q. He called you a name?
A. Yeah.
Q. Do you think that justifies $9 million in damages?
A. I'm not sure what you are asking me.
Q. You said he called you names and I'm asking whether you were harmed by that?
A. Yeah.
Q. Do you understand that?
A. Yeah, I was harmed by that.
Q. What name did he call you?
A. There was tons of names.
Q. Let's focus on this particular visit.
A. I don't remember.
Q. You don't remember.
By the way, no one forced you to come to see Mr. Rubin, right?

Page 75

[REDACTED] - Confidential

A. No.
Q. You came of your own accord?
A. Yes.
Q. No one tricked you to come see Mr. Rubin?
A. No.
Q. Isn't it a fact that the next time you saw Mr. Rubin was on November 13, 2015?
A. I can't remember that date.
Q. But in your complaint, you say the first time you saw him was in March of 2016, right?
A. Yes.
Q. Take a look at Exhibit No. 5.
(Speight Exhibit 5, Delta Airlines document, marked for identification.)
Q. This is a Delta Airlines document and it says, From Jennifer Powers, Friday, November 13, 2015 at 3:00 a.m., your flight receipt for [REDACTED] [REDACTED] 13 November '15 and that flight was booked for Friday, November 13th from Atlanta, Georgia to LaGuardia Airport.
Does that refresh your recollection

Page 76

[REDACTED] - Confidential

[REDACTED]

Page 77

[REDACTED] - Confidential

[REDACTED]

MAGNA LEGAL SERVICES

[redacted] - Confidential

the rudest man you had ever seen or ever encountered, right?
A. I can't remember what I said.
Q. Did you think he was a rude man?
A. Yeah, I think he is a rude man, yes.
Q. I'm sorry. I just want to go back to the Exhibit 3.
Take a look on page 2. The date is October 13, 2015 and it's [redacted] and the third line, not halfway through the line, it says, Even though I know him and I will never meet him again, I just wanted to tell you that, I had a great experience and I am so glad I met you, smiley face.
Isn't it a fact that you said that to Jen Powers?
A. I can't remember any of our conversations.
Q. You don't remember saying you had a great experience with Mr. Rubin?
A. No, I don't remember that.
Q. You see the words that are attributed to you, [redacted]?

[redacted] - Confidential

A. I can read them right here, yes.
Q. It says you had a great experience?
A. That's what I'm reading right here.
Q. Do you have any reason to believe that you didn't tell Jen Powers that you had a great experience with Mr. Rubin the first time you met him?
A. I can't remember anything right now.
Q. Do you have any reason to believe you didn't say that?
A. I don't know.
Q. You don't deny you said it, do you?
A. I don't know.
Q. Is it possible that you said that you had a great experience with Mr. Rubin?
A. I'm not sure.
Q. You are not sure whether you said it or you are not sure whether you did?
A. Both.
Q. Going back to the November encounter with Mr. Rubin. So the first time you met him was in October of 2015, correct?
A. I can't remember.

[redacted] - Confidential

Q. But you thought maybe you would never see him again, right?
A. I can't remember exactly.
Q. But you got paid $1,000 for that visit, right?
A. I did get that money from Jennifer Powers, yes.
Q. But there came a time when you visited him a second time, correct?
A. Correct.
Q. And you knew that when you were going to be visiting him, that you were going to be having sex with him, correct?
A. Yes.
Q. You knew you were going to be getting paid?
A. Yes.
Q. You knew the sex was going to be rough sex?
A. I knew it would be rougher than normal sex.
Q. And going down to November 12, 2015, at 7:10, it says, You will be departing somewhere around 9:00 or 11:00 a.m. and you

[redacted] - Confidential

say, [redacted] Okay, awesome, smiley face, correct?
A. I see what it says right here. I can't remember this conversation.
Q. Were you looking forward to your second visit with Mr. Rubin?
A. I can't remember.
Q. You remember that he didn't force you to come up to New York the second time?
A. Right.
Q. He didn't trick you?
A. No.
Q. You came because you wanted to come up because you were going to get paid, correct?
A. Yeah.
Q. You were hoping things would go better than the last time when you got only $1,000, right?
A. I can't remember, but -- I can't remember.
Q. Why is it you can't remember?
A. There are just some details I can't remember.

MAGNA LEGAL SERVICES



[redacted] - Confidential

Q. You are suing these two people. You see Jen Powers here, you met her?
A. Yes.
Q. You see her here?
A. Yes, I see her.
Q. You see Howard Rubin?
A. I see him.
Q. You are suing them for $9 million plus, correct?
A. Correct.
Q. You don't remember your conversations with them?
A. I remember some of the conversations, not everything, not all the details. This isn't the only conversation we've had.
Q. I know it's not the only conversation you had. We will get into a lot of them.
Go over to the next page. Page 3 at 7:30 a.m., [redacted] says, Yes, on my way to the airport now.
Does that reflect that on the 13th of November 2015, that you were in route to

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted]

[redacted] - Confidential

God. And after 1:04, the next communication is almost nine hours later, at 9:56 p.m.
Do you see that?
A. I'm reading it, yeah.
Q. Then it says, Hey, I hope all is good over there. Keep me posted on everything you need, XX.
Do you see that?
A. I see it.
Q. Do you recall on the afternoon and into the evening of November 13, 2015, you had a sexual encounter with Mr. Rubin?
A. I don't remember the exact time or date, I don't remember.
Q. Then the next item says, at 10:35, [redacted] Everything was amazing. I'm going to bed early for my flight, smiley face.
Do you remember having a sexual encounter with Mr. Rubin and telling Jen Powers after it, that everything was amazing?
A. I don't remember our conversation.
Q. Well, do you remember there came a time that you had a satisfying sexual

MAGNA LEGAL SERVICES

- Confidential

encounter with Mr. Rubin for the first time?

A. I don't remember.

Q. Is it fair to say that the first time you had a sexual encounter with him, ?

A. I think so.

Q. And you only got $1,000, right?

A. Right.

Q. So this time, you got $5,000. Take a look at the next exhibit, PayPal exhibit that shows you got $5,000.

(Speight Exhibit 7, PayPal document, marked for identification.)

Q. Do you recall that you got $5,000 from Ms. Powers on Monday, the 16th?

A. I remember getting a payment, I don't remember the exact date.

Q. You didn't have any complaints about your second encounter with Mr. Rubin, correct?

A. I don't think so.

Q. Isn't it a fact that you said that everything was amazing?

A. I can't remember what I said.

- Confidential

- Confidential

A. I don't think I did.

Q. In fact, he didn't cause any injuries to you, right?

A. I can't remember exactly that day.

Q. Did anything happen that day that gave you reason to sue Mr. Rubin for what happened?

A. I'm not sure. I don't think that day.

Q. Please take a look at the next exhibit, Exhibit 8, Delta document.

(Speight Exhibit 8, Delta Airlines document, marked for identification.)

Q. Does this refresh your recollection that the next time you saw Mr. Rubin was on Tuesday, January 5, 2016?

A. Yeah. I can't remember the exact dates, but, yes, I see it here.

Q. And there is a return flight for the next day, January 6, 2016, right?

A. Yes.

Q. By the way, the ticket amount for the roundtrip ticket is on the top of the next page, the third line on the next page,

- Confidential

$1,863, correct?

A. That's what it says.

Q. It's a significant amount of money, isn't it, for an airline ticket from Atlanta to New York?

A. I guess, I don't know.

Q. Did you fly first class this time?

A. Yeah. What are you asking me?

Q. Did you fly first class yesterday?

A. No.

Q. Please take a look at Exhibit 9.

(Speight Exhibit 9, Delta Airlines document, marked for identification.)

Q. The ticket was for January 5th to New York and the top of page 4 of the Jennifer Powers text messages, starting at the top, it's January 3, 2016, 10:24 p.m. Hey, Miss I'm here to book your flight to New York Tuesday. Hey, Jen, smiley face. Okay. I assume you will be flying from Atlanta. Yes, I will be back in touch regarding confirmation. And you say, Okay, smiley face.

No one was forcing you to come to

MAGNA LEGAL SERVICES



[redacted] - Confidential
New York on this occasion, right?
A. No.
Q. No one was deceiving you to get you to come to New York on this occasion?
A. No.
Q. You were coming to New York of your own free will to see Mr. Rubin to have sex with him in return for money, correct?
A. Yeah.
Q. And nothing that happened in the first two encounters that you had with Mr. Rubin prevented you from willing to come visit him a third time?
A. No, I don't think so.
Q. And, in fact, the last time you visited him, you told Jen Powers it was amazing, correct?
A. I'm not sure.
Q. In any case, Mr. Rubin invited you to visit him in early January of 2016 and you accepted, right?
A. Yes, I'm not sure.
Q. Take a look at the next exhibit, Exhibit 10.

[redacted] - Confidential
(Speight Exhibit 10, document, marked for identification.)
Q. This is a document that's dated January 7, 2016 and says you sent $5,000 to [redacted] and you were charged a fee of $145.30.
Does that refresh your recollection that you were paid $5,000 on January 7, 2016 for having sex with Mr. Rubin on the --
A. I was sent money, yes.
Q. $5,000, that's what the going rate was for having sex with Mr. Rubin was?
A. That's what Jennifer paid me.
Q. That's what you expected, correct?
A. I did expect $5,000.
Q. So on January 4th, going back to Exhibit 9, January 4, 2016 at 1:57, Jen says, Hey, did you get that flight info I mailed you? And you said, Yes, I did. Oh, okay, I had no idea. [redacted] Thank you, smiley face. You got it.
Then the next day, it goes over to the next day, January 5, 2016, at 1:40, [redacted] says, What floor is the condo? I keep

[redacted] - Confidential
screwing up, LOL. And Jen responds, Ha-ha, [redacted].
Isn't that the floor and the apartment number, [redacted], on which Mr. Rubin's apartment was located?
A. Yeah, I can't remember the exact number.
Q. Does this refresh your recollection that you arrived for an encounter with Mr. Rubin on January 5th?
A. Yes.
Q. Then the next day, at 11:54 a.m., that's in the morning, Jen says, Hey, did you make it to the airport? And [redacted] says, Hey, Jen, smiley face, yes, I'm here now. And she says, Is everything good with you? And then she says, Great. You say, Yes, we had an awesome time, smiley face. And then Jen responds, He said he had a wonderful time with you. I'm happy y'all did and also, he went home before 2:00 a.m. And then you say, at 11:55, ha-ha, yes, it was amazing.
So you told her again it was amazing when you were with Mr. Rubin,

[redacted] - Confidential
correct?
A. I think so.
Q. So you had a sexual encounter with him on the evening and afternoon of January 5, 2016, right?
A. Yeah, I think so.
Q. Was there rough sex involved?
A. I can't remember the specific time.
Q. But the third time you were up here, that's reflected in the PayPal document, the Delta Airlines record and the text messages, that reflects that you were in New York to have a sexual encounter with him on the 16th -- on the 6th of January or the 5th of January?
A. I am not sure.
Q. You are not sure of the date?
A. I am not sure.
Q. Do these records reflect you traveled to New York on the 5th of January and you went back to Atlanta on the 6th of January?
A. Yeah, the plane ticket does show that.

MAGNA LEGAL SERVICES



[redacted] - Confidential

Q. Was there any other reason for you to come to New York, other than to have sex with Mr. Rubin for $5,000?

A. It was just to visit him, yeah, just to visit him.

Q. To have sex for $5,000?

A. Yeah, to have sex.

Q. And nothing happened that day to injure you physically in any way, right?

A. I can't remember on this day.

Q. You didn't complain to Jennifer Powers about anything that happened to you, you said that you had an awesome time, correct?

A. I think so.

Q. And on this occasion, nothing happened to harm you psychologically in any way, correct?

A. I'm not sure about this day.

Q. You keep coming back, don't you?

A. Yeah, I came back.

Q. So if you were injured or harmed in any way, you wouldn't be coming back, would you?

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted]

[redacted] - Confidential

the note.

Q. Exhibit 11.

(Speight Exhibit 11, Delta Airlines document, marked for identification.)

(Speight Exhibit 12, Delta Airlines document, marked for identification.)

Q. So Exhibit 11 is a Delta Airlines document that reflects that Jen Powers, on January 26, 2016, at 12:16 a.m., purchased for [redacted] roundtrip tickets from Atlanta to New York and back for Wednesday, January 27th, Atlanta to New York and the return is on January 28th.

Do you see that?

A. Yes.

Q. Does that refresh your recollection that you visited Mr. Rubin on January 27th and you left to go back to Atlanta on the 28th?

A. I think so.

Q. Can you take a look at the next document. This is a document that says, From the Concierge Desk at the Metropolitan Tower.

Metropolitan Tower is Mr. Rubin's

Page 98

1    ███████ - Confidential
2    apartment, do you recall that?
3        A.  I think so.
4        Q.  Do you recall that we went through
5    a previous email on either your first or
6    second visit and you asked Jen Powers, what
7    is the name of the apartment and she said,
8    Metropolitan Tower?
9        A.  I can't remember that conversation.
10       Q.  In any event, it's an email from
11   Jennifer Powers and -- the email is from the
12   concierge desk to Jennifer Powers.  It says,
13   Thank you, Jen.  Have a great day.  And Jen
14   Powers has said, on Wednesday, January 27,
15   2016, ███████ will be arriving today in
16   an hour or so.  Please allow her a key when
17   she gets there, Thanks guys, Jen.
18       Do you see that?
19       A.  I see that.
20       Q.  Does that refresh your recollection
21   you visited Mr. Rubin on January 27, 2016?
22       A.  I can't exactly remember that day.
23       Q.  Do you recall that sometime in late
24   January 2016, that you came to New York for a
25   sexual encounter with him?

Page 99

1    ███████ - Confidential
2        A.  I can't remember the exact dates.
3    I don't know.
4        Q.  I'm not asking you for the exact
5    dates.
6        Do you have the PayPal document?
7        (Speight Exhibit 13, PayPal
8        document, marked for identification.)
9        Q.  You see that on January 29th, on
10   Friday, that it's two days after January
11   27th, you received a $5,000 payment by way of
12   an order given to PayPal by Jennifer Powers.
13       Do you see that?
14       A.  Yeah, I see what this says.
15       Q.  Does that give you reason to
16   believe that you visited Mr. Rubin on January
17   27, 2016 for a sexual encounter for a fee of
18   $5,000?
19       A.  I'm not saying it doesn't.
20       Q.  Finally, take a look at the text
21   message document.
22       (Speight Exhibit 14, text message
23       excerpt, marked for identification.)
24       Q.  This is page 5 of the Powers text
25   messages.  Starting about six, seven lines

Page 100

1    ███████ - Confidential
2    from the top, it says, January 25, 2016 at
3    2:19 p.m., Hi, Sweetheart, I'm here to book
4    you to New York on Wednesday.  And then you
5    respond at 8:47, Hey, Jen, I'm sorry, I was
6    at school until 7:30.  Hey, there you are.
7    No worries.  And then she says, Can you come?
8    And you say, Yes.
9        So, obviously, you weren't
10   protesting or complaining about having to
11   meet with Mr. Rubin, right?
12       A.  I don't think so.
13       Q.  You went to visit Mr. Rubin of your
14   own accord, with your own freewill, right?
15       A.  Yeah, I think so.
16       Q.  And on January 25th at 11:32 p.m.,
17   you say, Did you get my video?
18       What did you mean by that?
19       A.  I don't know.
20       Q.  You say, Whoops, meant to send that
21   to Howie, LOL, sorry, and the response is, I
22   didn't get your video.
23       Do you remember sending video
24   messages to Mr. Rubin?
25       A.  I can't remember.

Page 101

1    ███████ - Confidential
2    ███████████





[redacted] - Confidential
someone a video of yourself [redacted]?
A. I can't remember.
Q. Does that strike you as something that's unusual?
A. I'm not saying it's unusual.
Q. Going down to 1/27 at 10:50 am, it says, The concierge is expecting you. They will give you a key when you arrive. And then at 11:51, [redacted] says, K, thank you.
I assume K means okay?
A. I guess, I'm not sure.
Q. Then it jumps ahead, the next item is at 7:26 and it's [redacted] to Jen Powers, What is the password for the Seamless ordering food account? Howie just told me when he left, but I forgot. And then she gives you the password.
Do you recall that Howie left around 7:26 or 7:30 that evening after having a sexual encounter with you?
A. I can't remember.
Q. The next day, at 5:03 p.m., you say, it says, [redacted] Hey, Jen, has Howie mentioned PayPal to you? And at 5:04, she

[redacted] - Confidential
says, No, not yet. Let me check in with him. You say, Okay. And she says the next day, at 12:11, Hey, Sweetheart, $5,000 coming your way. And you say, Thank you, Jen.
We already saw the PayPal, so you got paid $5,000 for that visit to Mr. Rubin on the 26th of January, right -- excuse me, the 27th of January?
A. What are you asking me?
Q. You had a sexual encounter with Mr. Rubin on the 27th of January for which you were paid $5,000?
A. I can't remember the specific dates.
Q. But do you think -- do these documents refresh your recollection that you did, in fact, have a sexual encounter with him around the time that are reflected in these documents?
A. I could have, I can't remember.
Q. In fact, there is no discussion of any sex that you had with Mr. Rubin that day, right, in this document? I will represent to you that there is no discussion of any sexual

[redacted] - Confidential
activity. But the fact that you were paid $5,000, does that reflect that you were, in fact, engaged in sex with Mr. Rubin on the 27th of January?
A. I don't know.
Q. What else was he paying you $5,000 for when you came to New York?
A. I mean, I can't remember this date, I don't remember the date.
Q. But the document --
A. I can't remember what happened on this date.
Q. So you have no reason to believe then that you were injured in any way?
A. I just can't remember the specific date.
Q. You have no recollection of having your face injured that day?
A. I remember having my face injured, I can't remember what date.
Q. There is nothing, there is no complaint to Jen Powers or anybody else reflected in the text messages that you were complaining about being injured in any way,

[redacted] - Confidential
right?
A. On this piece of paper, I'm just reading what this says.
Q. But were you injured by Mr. Rubin in late January 2016?
A. I'm not sure the exact month about the injuries.
Q. We will get into the days. Maybe you will be able to tell us the days in which you were injured, but there is nothing to indicate that you were injured on the 26th or the 27th of January 2016, right?
A. I don't know.
Q. You have no basis for filing a lawsuit against him if you can't remember whether you were injured on that day, right?
A. I remember being injured.
Q. But you have no recollection of anything happening to you on January 26th or January 27th, when you were paid $5,000 from Mr. Rubin?
A. I can't remember, I'm not sure.
Q. Well, let's get to the day you told us has been etched in your mind, and that is

MAGNA LEGAL SERVICES



[redacted] - Confidential
[redacted]

[redacted] - Confidential
[redacted] I [redacted]

[redacted] - Confidential
Howie gave me drugs, you said you were sorry, right?
A. I just told her I don't remember speaking to her, I'm sorry.
Q. Do you remember saying at 10:24 a.m., this is on the 26th, the next day, [redacted]? Do you remember saying that?
A. I can't remember exactly saying that.
Q. Howard Rubin didn't force you to [redacted], correct?
A. I'm not sure what happened this day during [redacted].
Q. At 10:47 a.m., you say to Ms. Powers, It's my fault, I am so sorry, correct?
A. I'm not sure.
Q. You didn't say it was Howard Rubin's fault you [redacted]?
A. I'm not sure.
Q. Going down to the next item, at 10:50 a.m., Jen says, It's not your fault, [redacted]

[redacted] - Confidential
[redacted] Isn't it a fact that's what she said to you?
A. I don't remember that.
Q. Well, isn't it a fact that Howard Rubin did not force you [redacted] that day?
A. I don't know, I don't know if he did or didn't.
Q. Had you ever taken [redacted] before?
A. No.
Q. Going over to the next page, on the 28th, the third item, it says, Hey, [redacted] I sent you a PayPal for $1,000. Let me know when you get it. And then you say, I got it. Thanks, Jen.
So isn't it a fact that even though you were [redacted], you still got paid $1,000?

MAGNA Legal Services



[redacted] - Confidential

A. I can't remember.

Q. So you don't remember whether you had any damage done to you in April of 2016 by Mr. Rubin, right?

A. I can't remember the dates.

Q. Is it fair to say you got no bruises on the 25th of April?

A. I can't remember the date.

Q. Is it fair to say you got no injuries?

A. No, not true.

Q. I'm sorry?

A. Not true.

Q. On the 25th of April, you had injuries?

A. I can't remember, I can't remember that date.

Q. So you have no recollection of any encounter with Mr. Rubin on the 25th of April 2016?

A. I can't remember a specific date.

Q. Were you treated by any doctor after that day?

A. I'm not sure.

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted]

[redacted] - Confidential

[redacted]r

MAGNA LEGAL SERVICES

Page 130

- Confidential

Page 131

- Confidential

Do you remember --
A. I don't remember any of this.
Q. You don't remember missing a flight?
A. No.
Q. She said, Once again, a little honesty is all we ask.
Do you remember Jen saying that to you?
A. I do not.
Q. That's not something that would be seered or etched into your mind?
A. I don't remember this conversation.
Q. Do you recall ever blowing off Mr. Rubin on an occasion for which you were to travel to New York to meet with him for a sexual encounter?
A. I think I have missed one of our scheduled meetings. I don't remember when, what exact date.
Q. Could this have been it or one of them?
A. Again, I don't know.
Q. June 28, 2016.

Page 132

- Confidential

(Speight Exhibit 25, Delta Airlines document, marked for identification.)
(Speight Exhibit 26, Delta Airlines document, marked for identification.)
Q. Do you see the Delta record reflecting a ticket for you to travel to New York on June 28th and to return to Atlanta on June 29, 2016, and then also the document from the concierge's desk. It says that you will be arriving in the morning on July 28th.
Does that refresh your recollection that you traveled to New York on July 28th for a sexual encounter with --
MR. GROSSMAN: Objection, June. I think you said July.
Q. June 28, 2016.
A. I have no idea. This doesn't make sense. It says June and then July here, I don't know.
Q. Well, take a look at the Jennifer Powers -- the concierge document, and it says from Jennifer Powers, Monday June 27, 2016 and then it says, her message is that you will be arriving on Tuesday, July 28th.

Page 133

- Confidential

Now, the documents from Delta Airlines reflect that the trip was on the 28th and 29th, so is it possible, I suggest to you, that the entry, July 28th, is a typographical error and that this was meant to apply to June 28th, which was the Tuesday?
A. It could, possibly, but I don't know.
Q. In any event, let's look at the text message record.
(Speight Exhibit 27, text message excerpt, marked for identification.)
Q. Just passed the middle of the page, June 27, 2016, 4:52 p.m.
MR. GROSSMAN: The witness is wondering if this is the same as Exhibit 24.
MS. McCLELLAN: It's a chain. The beginning is the same, however, the end is different.
Q. June 27, 2016, 4:52 p.m. Can you please let me know when you land tomorrow, keep me posted on everything.
Do you recall Jen Powers saying





[redacted] - Confidential
that to you?
A. I don't know. I can't even see where you are.
Q. If you can't, just tell me and I will give you time to get there.
6/27, past the middle of the page on page 8.
A. Okay. Here you go.
Q. 4:52 p.m. Could you please let me know when you land tomorrow, keep me posted on everything. You say, Yes, I will. And she says, Thanks, Little Mama.
Do you recall that?
A. I don't remember the exact date of the conversation.
Q. Do you recall that she was concerned about the fact that you had missed the flight on June 2nd and that she wanted to be kept posted on everything on the June 27th trip?
A. I don't specifically remember, I'm just looking at it right here.
Q. And then, in fact, what happens the next day is you keep her posted, isn't that a

[redacted] - Confidential
fact?
Let me see if I can take it one item at a time. At 9:22 a.m., [redacted] writes, Boarding plane, smiley face. The response is, Awesome, let me know when you land. 12:07 p.m., [redacted] -- at 12:07 p.m., [redacted] says, Landed. The response from Jen is, Great, the condo is expecting you. [redacted] says, What is that address again? [redacted]
How many times had you been there at this point?
A. I don't know, I can't remember.
Q. Then at 6/28, at 2:52 p.m., H is headed over. Have a good afternoon. [redacted] [redacted]K, thanks Jen, smiley face, you, too. Thanks, smiley face.
Do you recall that, that you arrived at the condo or the penthouse on the afternoon of 6/28/16?
A. I can't remember.
Q. Maybe this will refresh your recollection. 6:34, second to last item on the page, [redacted] you write, [redacted]

[redacted] - Confidential
[redacted] date of birth, [redacted]/92.
Who was [redacted]?
A. [redacted] is a girl that was my friend.
Q. How did you know her?
A. We went to the same college.
Q. Which one?
A. [redacted]
Q. And did she also make it a practice to accept money from men in return for sex?
A. I have no idea.
Q. Weren't you present at the apartment that night when she showed up for sex?
A. She wasn't there to hang out with Howie, I remember that specifically.
Q. What was she there for?
A. I think just to hang out with me.
Q. She was going --
A. All I remember is her.
Q. Were you doing a threesome?
A. No.
Q. Was somebody else there?
A. I can't remember if there was

[redacted] - Confidential
[redacted]

MAGNA LEGAL SERVICES



Page 138

- Confidential

?

Page 140

- Confidential

Page 139

- Confidential

Page 141

- Confidential

Q. And when you proposed to that she come to New York to meet with you and Mr. Rubin, did you say that she was going to be compensated for that trip?

A. I don't remember.

Q. You don't remember.

Do you recall speaking to her and hearing her say, why should I come to New York?

A. I don't exactly remember what I said to her.

Q. I'm trying to bring out this is something that was an unusual event.

Was it an unusual event for you to do something like that, to invite a friend of yours to come in the evening to visit New York and then to leave first thing the next morning?

A. It's not unusual to me.

Q. Have you ever done something like that before?

A. No.

Q. So this didn't strike you as being unusual, it didn't stick out in your mind?

MAGNA LEGAL SERVICES

[redacted] - Confidential
A. No.
Q. Do you consider her a good friend?
A. We don't talk anymore.
Q. Why is that?
A. We just had some disagreements about some stuff.
Q. But at the time that you invited her to come to New York, you were still a friend of hers, right?
A. Yes.
Q. You wouldn't expose her to anything dangerous or hazardous to her well-being, correct?
A. Not of my knowledge, I wouldn't.
Q. You were asking her to come up and meet with Mr. Rubin, right?
A. I guess, I remember [redacted] being in New York with me one time.
Q. But you arranged for her to fly to New York to meet you to be with you, correct?
A. I'm not sure.
Q. Go to 11:44 p.m. on 6/28.
A. Okay.
Q. Jen raises the question, Did your

[redacted] - Confidential
friend land? And you respond, Yep.
That means yes, right?
A. Yeah, I guess so.
Q. So she is there at 3:57 in the morning, correct?
A. I guess, I can't remember that.
Q. At 11:14 a.m., Jen says, And H just told me you are staying until tomorrow. Is this true? You say, Just until this evening, until about 7:00 because I had to change my flight.
Do you recall that you stayed over for a while, stayed until 7:00 that night?
A. I don't remember that at all. I mean -- I don't remember.
Q. What do you remember about her visit to the penthouse?
A. I remember her inside the penthouse, we were all drinking wine and then that's it. I was very intoxicated, to almost the point of blacking out, so I don't know.
Q. So you don't have any recollection of suffering any injuries that night, right?
A. I don't know.

[redacted] - Confidential
Q. Was your face injured in any way that night?
A. I can't recall.
Q. Was your body injured in any way that night?
A. I don't think I can remember that.
Q. Going to the next day, at 6:30, June 30th at 5:56 p.m., [redacted] says, Hey, Jen, When I get my PayPal, is it going to include [redacted] portion, as well? And then going on, at 6:30, Jen says, Does [redacted] have a PayPal? And you say, [redacted] has her own PayPal, it's [redacted] I will shoot y'all the PayPals tonight.
Does that refresh your recollection that [redacted] got paid for the sexual encounters you had at Mr. Rubin's penthouse that night?
A. I'm not sure, I don't know, I can't remember this, specific of her being paid.
Q. You asked for her to get paid, correct?
A. I don't know, I can't remember.
Q. Do you deny that you reached out to

[redacted] - Confidential
Jen Powers and asked her about getting [redacted] paid, either through your PayPal or her own PayPal?
A. I'm not denying, I just can't remember this conversation, this specific exchange.
Q. This is a little over two years ago, right?
A. Yeah.
Q. How many times have you been with [redacted] to New York?
A. Just this once.
Q. And nothing sticks out about it?
A. No.
Q. So no one forced you to visit Mr. Rubin in June 2016, right?
A. No.
Q. And no one forced you or coerced you to bring [redacted] to New York on that day, right?
A. No.
Q. No one tricked you or deceived you into coming to New York that day?
A. I don't know.

MAGNA LEGAL SERVICES

- Confidential

Q. You don't know, you've been coming to Mr. Rubin's apartment over and over and over again going back to 2015, to October 2015, correct?

A. Yeah, I've been there several times.

Q. So there was no need to trick you or deceive you to come to visit Mr. Rubin to come have sex with him in New York, right?

A. I don't know.

Q. You don't know whether you were deceived or -- let me withdraw that question.

You don't know whether you were deceived or tricked into coming to New York?

A. I'm not sure.

Q. You came to New York to have sex with Mr. Rubin for $5,000, wasn't that the reason you were coming here?

A. Yes.

Q. There is no trickery involved, correct?

A. I didn't say there was. I just don't know exactly all the details and these dates.

- Confidential

Q. Your lawyers said, on your behalf, that you were deceived into coming into New York to meet with Mr. Rubin.

Are you aware of that, in the complaint you meticulously reviewed?

A. Yes.

Q. And they also said you were coerced into coming to New York to meet with Mr. Rubin.

Do you remember that from the complaint?

A. I don't know.

Q. In fact, you were never coerced or deceived into coming to New York by Mr. Rubin or anybody else when you were going to see Mr. Rubin, right?

A. I don't know what you are talking about.

Q. I'm asking about the complaint. The complaint says that you were deceived and tricked to come to New York to meet Mr. Rubin and I'm asking you, isn't it a fact that you were not tricked or deceived or coerced or forced or threatened to come to New York to

ecord read.)

A. What I wrote in my complaint is what happened, is what happened.

Q. What does the complaint say?

A. I was tricked, I was told one thing, other things happened, it's all true.

Q. What were you told? You already testified that told you that you would come to New York for rough sex with Mr. Rubin for $5,000. You testified to that earlier today, correct?

A. Yes.

Q. Now, on the occasion that you were with , were you injured in any way?

A. I can't remember if it was that specific date.

(Speight Exhibit 28, document, marked for identification.)

Q. August 4, 2016, let me show you the

- Confidential

concierge document and the airline document.

(Speight Exhibit 29, Delta Airlines document, marked for identification.)

(Speight Exhibit 30, concierge desk document, marked for identification.)

(Speight Exhibit 31, PayPal document, marked for identification.)

Q. I will try to move through this quickly.

The Delta document shows a trip to New York on August 2nd from Atlanta and return flight on August 3rd from LaGuardia.

Concierge document says that you will be arriving on August 2nd at about 4:00 and there is a PayPal document dated August 6th for $5,000 from Jen Powers arranging for such a payment to you.

Does that refresh your recollection that you met with Mr. Rubin on the 2nd or 3rd of August 2016?

A. Yeah, I don't remember specifically the dates, but this does show I was paid on that day.

Q. You were paid $5,000, which was the

MAGNA LEGAL SERVICES

Page 150

[redacted] - Confidential
going rate for a successful sexual encounter with Mr. Rubin, correct?
A. Yes.
Q. Going to the Jen Powers text, which I haven't given to you yet.
(Speight Exhibit 32, text message excerpt, marked for identification.)
Q. Directing your attention to the fourth line on the page 10 of the Jen Powers text documents, 8/2, at 10:17 a.m., Jen says, Have a good flight. And at 2:39, [redacted] says, Just landed, I need to take a shower and get ready at the condo, is that okay? Then at 2:40, you say, It won't take long. And Jen responds, Of course, I don't think Howard will be over until 6:30 or 7:00, maybe closer to 8:00. The point is, you have time. Concierge is expecting you.
Does that refresh your recollection that you did, in fact, arrive at the condo in the afternoon of August 2, 2016?
A. I don't remember the specific time or date, but I'm reading this here, what it says.

Page 151

[redacted] - Confidential
Q. Do you remember that there was an occasion when you were supposed to meet Mr. Rubin on a particular day and then, going to 8:05 p.m. Jen says, Yes, but the plans are changing. Not too sure what is going to happen yet. It's not your fault. Hey. And then, at 11:07, she says, Howie will see you at 4:00 tomorrow. I will change your departing flight now. And you respond, Okay, smiley face. Thank you, Jen.
Do you recall that?
A. I don't remember this conversation.
Q. Do you recall that there was an occasion which you came to see Mr. Rubin and you arrived in the afternoon and you weren't informed until sometime later in the evening that he wouldn't be seeing you that night, he would be seeing you the next day?
A. I don't remember.
Q. Directing your attention to 11:57, Jen says, XO.
Do you understand that to mean kiss and hugs?
A. Yes.

Page 152

[redacted] - Confidential
Q. Good night. Sorry the plans changed today.
That doesn't refresh your recollection that you spent the night there by yourself?
A. No, I don't remember this.
Q. Do you remember going out that night anywhere in the City by yourself?
A. No.
Q. Did you have any friends in the City you could have called and hung out and partied or something?
A. No.
Q. Directing your attention to 10:19 on the 3rd of August, the next morning. Jen says she finally spoke to someone at Delta who allowed her to change your flight. You will fly out at noon tomorrow.
Do you recall spending an extra day in New York because Mr. Rubin had been unavailable the previous day?
A. I don't remember that.
Q. Do you recall that at 12:38, that afternoon, you say to Jen, Haven't heard from

Page 153

[redacted] - Confidential
Howie all day. All set for 4:00? And she says, Absolutely. And at 12:36, you say, I think I left something in the condo. Do you know what time the mask will be by today? Then she says, Maid. And you talk about the maid.
Do you recall this?
A. I don't remember this.
Q. Do you recall that Mr. Rubin did arrive that day and you did have sex with him that afternoon on August 4th?
A. I'm not sure.
Q. Going down to the last three lines on page 10, 9:15 on August 6th, you say, Hey, Jen, did I receive PayPal? And she says, Hey, there, not yet, but let me confirm and send you. Did you receive the PayPal, do you recall?
You got the PayPal because I showed you the exhibit.
Do you recall getting the PayPal?
A. I don't remember.
Q. The record reflects in early August, you got $5,000 from Mr. Rubin through

MAGNA LEGAL SERVICES

[REDACTED] - Confidential

Jen Powers, correct?

A. I did read that in the paper, yeah.

Q. Do you recall suffering any injuries on that occasion?

A. Again, I don't know the specific dates.

Q. Do you recall suffering any psychological harm on that date on August 4, 2016?

A. I'm not sure.

Q. Of course, you weren't forced or coerced or threatened to come to New York on that occasion, were you?

A. I don't know.

Q. When were you ever threatened to come to New York?

A. I don't know.

Q. Isn't it a fact that no one ever threatened you into coming to New York?

A. No.

Q. No, it's not a fact?

A. That's not what I said.

Q. Are you saying you were not threatened ever to come to New York by Mr.

[REDACTED] - Confidential

Rubin or anyone acting on his behalf?

A. Yes, I have definitely been threatened about coming to New York.

Q. Who threatened you?

A. [REDACTED] used to threaten me about it, telling me, like I have to owe her money if I don't go. It was this huge twisted scheme.

Q. She had nothing to do with Mr. Rubin.

A. Yes, she did.

Q. What did she have to do with Mr. Rubin?

A. She is the one who introduced me to him.

Q. So what happened after that, you stopped talking to her, right?

A. At one point, I did. I can't remember when I stopped talking to her.

Q. Did Mr. Rubin ever threaten you to come to New York?

A. I can't remember right now.

Q. Did he ever coerce you in any way to make you come to New York?

[REDACTED] - Confidential

A. I can't remember.

Q. Did he ever trick you or deceive you to get you to come to New York?

A. I can't remember.

Q. September 27, 2016.

(Speight Exhibit 33, document, marked for identification.)

(Speight Exhibit 34, document, marked for identification.)

(Speight Exhibit 35, document, marked for identification.)

Q. Rather than go through a lot of questions on these documents, I will direct your attention to the Delta document that reflects a roundtrip Atlanta to New York and back Tuesday, September 27th to Wednesday, September 28, 2016. A concierge record showing that you were expected to arrive on the 27th of September and a PayPal document reflecting that you received $5,000 on September 28.

Do those documents refresh your recollection that you visited with Mr. Rubin for a sexual encounter on September 27, 2016?

[REDACTED] - Confidential

A. Yeah, I see my flight info and the payment. I don't remember the specific encounter.

Q. So let's go to the text document.

(Speight Exhibit 36, text message excerpt, marked for identification.)

Q. Five lines from the top on the 26th of September [REDACTED] says, Hey Jen, Howie told me to text you to book a flight for tomorrow, smile. He told me he would see me from 7:00 to midnight. And then Jen says, Awesome, I will get you hooked up in a bit. You say, Thanks so much, smiley face.

Do you recall you made contact with Jen to get you a flight to New York for the next day?

A. I don't remember this specific conversation.

Q. Going down to 9/27, at 11:36 a.m., you say, Thank you, smiley face -- thank you, and it's a face.

Do you know what that face means?

A. I don't know.

Q. Then at 6:46 p.m. you text Jen and

MAGNA LEGAL SERVICES

█████ - Confidential

say, There is water leaking out of the refrigerator. I'm getting it up. I'm not sure what's wrong with it. Oh, my God, the doors are shut all the way. You say, I opened both doors and shut them, I wiped up the floor and only a little bit more water came down since I texted you last. I cleaned it up.

Do you remember being in Mr. Rubin's apartment and having a flood because of a problem with the freezer or refrigerator?

A. I do not remember that.

Q. Then it goes on and at 9/27/ 16, at 7:48 p.m., it says, I am.

And then the next entry is for the next morning, at 9/28, at 10:56 a.m. and Jen says, Hey, █████ I hope you all had a good night. And you respond, at the same time, █████ We had a great time. Howie got me some cute stuff for my birthday. And Jen says, He is so sweet, he is thoughtful like that?

Do you recall him buying some cute

█████ - Confidential

stuff for your birthday?

A. I remember he bought me a necklace.

Q. What kind of necklace?

A. I'm not sure, it was some kind of silver, something like that.

Q. Was it expensive?

A. I have no idea the price.

Q. Do you still wear it?

A. No.

Q. What did you do with it?

A. Threw it away.

Q. Did you get it priced before you threw it away?

A. No.

Q. Didn't you think there was a chance it was really valuable?

A. It could have been.

Q. Isn't it a fact that you had sex for $5,000 with Mr. Rubin on that occasion, on the 27th and 28th of September 2016?

A. I can't remember specifically having sex with him that day.

Q. But you got the $5,000, right?

A. I can't remember. I'm just looking

█████ - Confidential

at these papers.

Q. Do you think the PayPal record is incorrect?

A. No, I didn't say that. I just don't remember.

Q. How much money did Mr. Rubin pay you during the period of time you knew him?

A. I don't know.

Q. Thousands of dollars, correct?

A. Yeah.

Q. Certainly more than $50,000 correct?

A. I don't know, I didn't...

Q. You didn't, what?

A. I didn't count.

Q. But on that occasion when you accepted the $5,000 PayPal payment, no one had forced you to go New York to visit with Mr. Rubin, right?

A. I don't think so, I can't remember.

Q. You said you had a great time with Mr. Rubin, right?

A. Yeah, I'm reading it right here. I don't remember this conversation.

█████ - Confidential

Q. Do you deny that you had a great time with Mr. Rubin on that occasion?

A. I don't know, I can't remember this.

Q. You don't remember him causing any injury to you, do you?

A. I can't remember on this day.

Q. Well, is there anything that you recall on that date that gave you reason to sue Mr. Rubin?

A. I don't know, I can't remember if it was this day.

Q. By the way, do you recall meeting with Mr. Rubin in Atlanta at any time?

A. Yes.

Q. Can you tell us what you remember?

A. Going to a basketball game.

Q. Where was the game?

A. In Atlanta.

Q. The Atlanta Hawks were playing?

A. Yeah.

Q. Who else was present when you went to the game?

A. Some other girls, I don't remember

MAGNA LEGAL SERVICES

[redacted]- Confidential
sure what girls were there.
Q. How many girls went with you?
A. Again, I don't know, I don't remember, I don't know.
(Speight Exhibit 37, Delta Airlines document, marked for identification.)
(Speight Exhibit 38, concierge desk document, marked for identification.)
(Speight Exhibit 39, PayPal document, marked for identification.)
Q. So the Delta document shows a roundtrip, November 21st, from Atlanta to New York and return, November 22nd Newark to Atlanta, then there is a concierge document that says, [redacted] and something is blacked out, Will be arriving today. Please give them a key when they arrive. Thank you so much, Jennifer. That's for November 21st. Then there is a PayPal document that shows you got $5,000 from Jen Powers on the Thursday, the 24th of November 2016.
Does this refresh your recollection that you had a sexual encounter with Mr. Rubin on the 21st of November?

[redacted] [redacted]- Confidential
A. I don't remember the sexual encounter on these days, but I'm just looking and reading these papers. The Delta information, I don't remember.
Q. Does the receipt of the $5,000 from PayPal lead you to believe that you did have a sexual encounter with him?
A. Yeah.
Q. Going to the text message document.
(Speight Exhibit 40, text message excerpt, marked for identification.)
Q. On page 12, the morning of November 20, 2016, [redacted] says, Howie asked me if I could fly up this Monday, smiley face. Can you help me with my flight? Jen says, Hey there. I need to get the good word from H before I do anything, but I will be back in touch.
Do you recall Jen Powers saying that to you?
A. I don't remember our conversation here.
Q. Going to 9:27 p.m., Jen says, I just emailed you the Delta itinerary, but

[redacted]- Confidential
here it is so you have it in two places. There is an image. Going over to the next page, at 10:06 a.m., you say that you are arriving at 1:24, smiley face, boarding now. And then at 2:17, you arrived at the condo.
Does that reflect that you arrived at the condo on the November 21st of 2016?
A. I don't remember this conversation.
Q. So going down to 5:36 p.m., on the 21st, same day, Jen says, What's up, Mamma, H is on his way there. You give a smiley face.
What does that indicate to you when you put the smiley face on there?
A. I'm not sure what I meant by that.
Q. It usually means you are happy, isn't that what a smiley face means?
A. Usually, some people.
Q. Going back just above the middle of the page, the 2:17 p.m. You arrived at the condo at 2:17, isn't that what it says?
A. That's what it says right here.
Q. Going down to 5:36 p.m., it says, Howie is on his way.
Would that lead you to believe you

[redacted]- Confidential
were alone in the condo for more than three hours?
A. Maybe, I can't remember exactly.
Q. Do you remember being by yourself and drinking?
A. That happened several times. I don't know specifically the dates.
Q. That you were alone in the condo?
A. Yeah, I don't remember.
Q. Was there something that compelled you to drink when you were alone in the condo?
A. Either Howie telling me to or I don't know, I guess I just drink something.
Q. You were by yourself in the condominium, correct?
A. I guess.
Q. So Mr. Rubin couldn't force you to drink any alcohol when you were by yourself in the condo, right?
A. No.
Q. So Jen says at 5:36, H is on his way there. At 5:37, you say smiley face. And the next entry is for the next day,

MAGNA LEGAL SERVICES



[redacted] - Confidential

11/22, at 2:32 in the morning and [redacted] says to Jen, Howie was happy tonight, right? I was very drunk when he came over.

Isn't it a fact that you were drunk before he arrived?

A. It's possible, yes.

Q. He wasn't forcing you to drink because he wasn't there, right?

A. I mean, I'm not saying this specific day.

Q. It says, the 21st, and then you say on the 22nd, I was very drunk when he came over?

A. I'm not saying he forced me to drink this day.

Q. And, in fact, Mr. Rubin was upset, angry when he found you to be intoxicated when he arrived at the condo?

A. I don't remember that.

Q. Going to page 14, at 9:52 a.m. on the next day, the 23rd, you say, Did Howie give you any word of my PayPal? And then Jen responds, Not completely, by later today for sure.

[redacted] - Confidential

And so you were seeking to get paid for the time that you had spent with Mr. Rubin on the 21st into the 22nd, right?

A. Probably, I can't remember.

Q. If you didn't get paid right away, you would call up or send a text to Jen asking for your money, didn't you?

A. Possibly.

Q. The $5,000 is important to you?

A. Yeah, it made a difference.

Q. You weren't making any money in November 2016, were you?

A. I can't remember what I was doing for work at that time.

Q. It's only two years ago, not even two years ago, it's 23 months ago.

A. I can't remember.

Q. You can't remember what you were doing 23 months ago.

Were you [redacted]?

A. Possibly.

Q. You were [redacted]?

[redacted] - Confidential

A. I don't know.

Q. Where were you living at that time?

A. In my own apartment.

Q. You weren't living with your father, [redacted], I guess?

A. No.

Q. On the 24th, at 10:17 a.m., [redacted] to Jen, Do I still get my PayPal? And Jen responds, Oh, my God, yes. Baby has a fever, so just sent.

So you got your $5,000, which is 39, Exhibit 39, which you already looked at.

So you had sex with Mr. Rubin then on the 21st of November 2016, right?

A. I can't remember having sex with him on that exact day.

Q. Why else would he pay you $5,000?

A. To have sex with him.

Q. He never paid you $5,000 that exact amount for anything else, other than having sex, correct?

A. No.

Q. He gave you gifts from time to time, correct?

[redacted] - Confidential

A. I only got one gift on my birthday.

Q. What about, didn't he send you money occasionally, having nothing to do with whether you visited him or not?

A. I think so. I can't exactly remember how much or when.

Q. He paid for your trip to the Maldives, right?

A. He did pay for that.

Q. So on the 21st when you were with him, do you recall you had a rough sexual encounter with him?

A. I can't remember the date.

Q. Do you remember having -- do you remember having any sexual encounters with him that were not rough?

A. Maybe in the beginning, when we first met.

Q. But [redacted] [redacted] told you at the outset that you were to expect rough sex with him, correct?

A. Yes, she wasn't specific, she just said rough sex.

Q. So you weren't forced or tricked

[redacted] - Confidential

into going to the New York in November of 2016 to meet with Mr. Rubin, right?

A. I don't know, I can't recall.

Q. Did he ever force you or trick you to come to New York to have sex with him?

A. Yes.

Q. He did. What did he do to force you or trick you to have sex with him?

A. I can't remember right now.

Q. And, in fact, you weren't injured in November 2016 in any way at all by Mr. Rubin, right?

A. I actually -- I don't know.

Q. You never complained to Jen Powers that he had injured you in any way, right?

A. I don't think I complained to her.

Q. January 30, 2017.

MR. GROSSMAN: Just for the record, this document has like three page 13s and two page 14s. Just in case, I'm assuming they are all the same, so the record has that clear.

MS. McCLELLAN: It's the same.

(Speight Exhibit 41, Delta Airlines

[redacted] - Confidential

document, marked for identification.)

(Speight Exhibit 42, concierge desk document, marked for identification.)

(Speight Exhibit 43, PayPal document, marked for identification.)

Q. So looking at the Delta document, arriving January 30, 2017, leaving for Atlanta January 31, 2017; concierge document saying you would arrive on the 30th of January; and the $5,000 PayPal document dated January 31st reflecting a payment to you from Jen Powers of $5,000.

Is it fair to say that establishes that you had a sexual encounter with Mr. Rubin on Monday, January 30, 2017?

A. Yes, it definitely shows I visited him.

Q. And you got paid?

A. Yeah.

(Speight Exhibit 44, text message excerpt, marked for identification.)

Q. So take a look at the Powers text message document, page 15 at -- before we get to the January 27th trip, take a look at the

[redacted] - Confidential

third item, December 11, 2016, 5:43 p.m., [redacted] I'm flying home from Dallas. I was in a TV pageant, smiley face. Whenever you have a few minutes, can we talk on the phone.

When did you move to Dallas?

A. I never moved to Dallas.

Q. It says -- I'm sorry, I misread that, I apologize. It says, I'm flying home from Dallas.

You were visiting [redacted] in Dallas, right?

A. I was actually there for a pageant.

Q. What does [redacted] pageant mean?

A. [redacted].

Q. What kind of pageant was that?

A. A swimsuit contest.

Q. I thought had you bruises all over your body?

A. I did get bruises over my body.

Q. But not at that period of time, right?

A. No.

Q. There was nothing to prevent you

[redacted] - Confidential

from appearing in a swimsuit pageant in December 2016, right?

A. No, I did go to a pageant.

Q. Going down to January 27, 2017, 8:21 p.m., Hi, [redacted] I just got word you are headed to New York on Monday. Are you able to depart Atlanta Monday, late morning?

This reflects Jen Powers was making arrangements for you to fly to New York, right?

A. Yes.

Q. Going down to January 29th, 3:25 p.m., Jen says, Did you get your itinerary? And you respond, Yes, I did. Thank you so much. Then at 3:25, she says, Okay, great. Concierge will be expecting you tomorrow, hugs and kisses. And then the next day, at 10:18, you say you boarded the plane, 10:26, awesome. Safe flight. Then there is nothing until 9:55 p.m., Several hours later. And you say, Hey, Jen, what is the WiFi password? And she responds, It's on a paper on the coffee table or on the dresser, a laminated information sheet.

MAGNA LEGAL SERVICES

[redacted] - Confidential

And the next day, at 9:49 a.m., [redacted] says, Flying back home. And you then inquire, Did Howie say anything about how it was? And Jen says, He said he had a great time. I'm glad you made your flight. Then [redacted] says, Hi, Jen. Has Howie given you the word on my PayPal? She said, I sent it already. Did you not get it? You say, Yes, I just looked at it now, LOL?

Isn't it a fact that you had a sexual encounter with Mr. Rubin on that occasion on January 30, 2017?

A. Yes.

Q. You were very concerned about whether Howie had a good time, correct, at 9:50 a.m., you ask Jen, Did Howie say anything about how it was? And Jen responds, Yes, he said he had a great time, right?

A. Yeah, it's hard to tell if it was ever a good or a bad thing.

Q. You usually get a pretty good indication of the amount of money you got paid?

A. I did get paid every time.

[redacted] - Confidential

Q. The time you [redacted], you only got $1,000, right?

A. That's right.

Q. When you were with [redacted], you only got $2,500?

A. Yeah, I don't remember why it was like that.

Q. But on this occasion, you got the full 5,000, right?

A. I guess so.

Q. Well, you have the document right over there. Counsel has it. Exhibit 43.

A. I see the transaction here.

Q. So you have no reason to believe that you didn't have sex with him on that occasion, right?

A. Yeah, I didn't say I didn't.

Q. And, of course, it would be rough sex, right?

A. Yes.

Q. On that occasion, you didn't have any harm or any injury to your face, right?

A. I can't remember if it was this day.

[redacted] - Confidential

Q. How about your breast?

A. My breasts were hurt almost every time.

Q. But you continued to come back, despite the fact that almost every time, your breasts were hurt?

A. I did come back.

Q. I guess it didn't hurt that much, right?

A. What are you asking me?

Q. The hurt that you had on your breasts were not enough, was not severe enough that it prevented you from coming back over and over and over and over again?

A. There were times it was very bad.

Q. Did you ever stop coming because it was so bad?

A. Yes.

Q. When was that?

A. I can't remember the exact date, but I definitely discontinued seeing him.

Q. Is it fair to say the last time you had a sexual encounter with him was the occasion on which you were injured, to the

[redacted] - Confidential

extent that you decided to discontinue your relationship with him, is that what you are saying?

A. Yeah, it was so bad, there was no way I could come back.

Q. You are sure about that?

A. Yeah.

Q. But even though you didn't come back, were you still persisting and asking him whether you could come back?

A. I don't know.

Q. Is it fair to say that you haunted him trying to get back into his good graces and coming back to get your $5,000?

A. No.

Q. Well, we have a lot of emails we can go through and see what you had to say to him.

A. Okay.

MR. GROSSMAN: Can we take a break now?

MR. McDONALD: Yes.

(Recess taken at 4:47 p.m.)

Q. May 24th, directing your attention

MAGNA LEGAL SERVICES

[REDACTED] - Confidential

to that day. We will show you the Delta record, the concierge record and the PayPal record.

(Speight Exhibit 45, Delta Airlines document, marked for identification.)

(Speight Exhibit 46, concierge desk document, marked for identification.)

(Speight Exhibit 47, PayPal document, marked for identification.)

Q. So you have in front of you three exhibits pertaining to a visit to Mr. Rubin on May 24, 2017, the Delta record that shows that you flew to -- that you had a ticket from New York -- from Atlanta to New York on May 24th, returning to Atlanta on the 25th; the concierge record that says that you will be arriving on the afternoon of May 24th; and the PayPal record from Friday, the 26th that shows a receipt of a $5,000 payment from Mr. Rubin paid by Jen Powers on Friday, the 26th.

Does that establish, to your satisfaction, that you had a sexual encounter with Mr. Rubin sometime just before Friday, May 26th, for which you were paid $5,000?

[REDACTED] - Confidential

A. Yes, I think so.

Q. Going to the text message.

(Speight Exhibit 48, text message excerpt, marked for identification.)

Q. On page 16, on the Jen Powers text message, which is Exhibit 48, going down a little more than two-thirds of the way down the page, on May 19, 2017 at 10:36, Jen says, Hi, schedule for next week. I will be booking you to come in Wednesday and depart on Thursday. You said, Yay, thank you very much, smiley face and a heart.

What does the presence of a heart signify to you?

A. I was just sending emojis.

Q. The smiley face, I think everyone understands, happiness, but what is the significance of the heart here?

A. I'm not sure what I meant.

Q. Isn't it you were expressing your affection to Ms. Powers and Mr. Rubin?

A. I'm not sure.

Q. At 7:21 p.m. on the 22nd of May, [REDACTED] Hey, Jen, everything still on for

[REDACTED] - Confidential

Wednesday? She says, Yes, Ma'am.

Is it fair to say that you were reaching out to Jen Powers asking whether everything is still on for Wednesday shows that you were eager to come to New York to meet with Mr. Rubin?

A. I'm reading the text here. I might have been, I'm not sure.

Q. You weren't resisting, that's for sure, right?

A. I don't think so.

Q. 5/24, [REDACTED] says on the third line down, I'm arriving at 12:43 now. And Jen says, Cool, keep me posted. And then going to 1:53 p.m., H will see you around 3:00, 3:30. [REDACTED] I'm not getting there until like almost 3:00. And 2:17, you say, Took so long today, frowny face. And then 3:32 p.m. you say, I'm here and ready.

The next entry is for the same day, 5/24 at 9:22 p.m. and it's [REDACTED] Hey there, what is the WiFi password? Is it the name [REDACTED]? And 9:24, It's on a sheet in the master bedroom, on a table in the living

[REDACTED] - Confidential

room. The next entry is 9:52 and it says, Hey, there. Can y'all send PayPal today? Hopefully, yes.

Does that reflect that along with the $5,000 payment from PayPal, that you had a sexual encounter with Mr. Rubin on 5/24, sometime before 9:22 p.m.?

A. Possibly, I can't remember.

Q. But you weren't complaining to Jen Powers or anybody else about any injuries that you got on that occasion, did you?

A. I don't know what I said to other people.

Q. Who were some of the other people you might have said something to?

A. I can't remember right now.

Q. You haven't had a chance to think about this case over the last, almost year now?

A. I've had some time to think about it.

Q. But there is no reason to believe that Mr. Rubin forced you in any way to have sex with him on that occasion, is there?

MAGNA LEGAL SERVICES



[redacted] - Confidential
A. I don't know on this occasion.
Q. When you went up and met with him in May of 2017, you knew exactly what to expect, correct?
A. Somewhat.
Q. You had been with him on 10 or 11 previous occasions, right?
A. Yes.
Q. So you knew what he was interested in and what you were going to be doing with him in order to earn $5,000, correct?
A. For the most part, yeah.
Q. And there is no reason to believe that on that occasion, you had any injuries to your face, is there?
A. I don't know on this specific day or occasion I saw him.
Q. I apologize for interrupting.
A. I'm just not sure on this specific occasion what injuries.
Q. Here we are on -- we are in May of 2017, and you haven't told us about any specific occasion in which you were ever injured by Mr. Rubin, isn't that a fact?

[redacted] - Confidential
[redacted]

[redacted] - Confidential
[redacted]

[redacted] - Confidential
[redacted].

[redacted] - Confidential
Q. By whom were you treated for the injuries that you supposedly suffered at the hand of Mr. Rubin?
A. Dr. [redacted] for one and Ms. [redacted]
Q. So in order to save time, I'm sure we will be taking a break. During the break, I have records here that we obtained from Dr. [redacted] from the plastic surgeon practice and I'm going to ask you if you will take a look at them during the break and if there is something in here that establishes that you were treated by anybody at that practice for any injuries that you sustained from Mr. Rubin, I would appreciate if you would show it to us.
A. Okay.
Q. How about [redacted], were you treated there for anything that was done by Mr. Rubin?
A. No.
Q. What's the name of the other doctors who treated you?
A. Dr. [redacted], Dr. [redacted].
Q. What did she treat you for?

[redacted] - Confidential
A. Dr. [redacted]?
Q. Other than [redacted] and maybe some Botox, what did she do for you?
A. She helped, one of the fillers in my cheeks were lodged out and it actually had a cut and caused an infection on my face. It was there for over the year.
Q. That wasn't the spider bite that you told them about?
A. I never told them I was abused.
Q. You said you had a spider bite, correct?
A. Yeah.
Q. Why couldn't you say you bumped into something?
A. I told her I wasn't sure what it was. I think I said it might be a spider bite, and she said, well, if you are not sure and we don't know, we will treat it.
Q. We are all ears if you come back and you show us in those records where you were seeking treatment by any doctor.
Did you ever go to a psychologist

[redacted] - Confidential
or a psychiatrist for anything Mr. Rubin did to you?
A. I talked to one woman over the phone. Her name was [redacted]. I can't remember her last name right now.
Q. It must have been pretty serious.
Was it a psychologist or a psychiatrist?
A. I'm not sure if she prescribed medication or not.
Q. It was so serious you had to call her on the telephone?
A. Yeah.
Q. You didn't bother to go in and visit her?
A. I felt comfortable, more comfortable talking on the phone.
Q. So that psychological damage that you suffered because of what Mr. Rubin did to you, how much do you think that's worth in compensation for you in this lawsuit?
A. I'm not sure right now.
Q. Did you have any medical fees that were resulting from that phone call you made

[redacted] - Confidential
[redacted]

MAGNA LEGAL SERVICES





Page 194

- Confidential

Page 195

- Confidential

Page 196

- Confidential

Q. Another pageant?

A. Yes.

Q. How would you be attired during the pageant?

A. We wore a swimsuit.

Q. A bikini swimsuit?

A. Yes.

Q. So there were no injuries to your body at that time in March of 2017 that would prevent you from appearing in a bikini in a beauty pageant in , right?

A. I don't think at that time.

Q. When did you have bruises that would prevent you from appearing in beauty pageants or or some other ?

A. I'm not sure right now.

Q. July 25, 2017.

(Speight Exhibit 49, Delta Airlines document, marked for identification.)

(Speight Exhibit 50, concierge desk document, marked for identification.)

(Speight Exhibit 51, PayPal document, marked for identification.)

Page 197

- Confidential

,

MAGNA LEGAL SERVICES



[redacted] - Confidential

[redacted]

?

[redacted]

[redacted] - Confidential

[redacted]

[redacted] - Confidential

A. I don't know.

Q. Did you go with [redacted]?

A. Yeah.

Q. You didn't tell Mr. Rubin you were going with [redacted], did you?

A. I don't think so.

Q. Then Mr. Rubin says, when you said, Now, the fun begins, he says, Oh, yes. Where are my pics? And you said, I will send them, I have some good ones.

Are these pictures of you in seductive poses?

A. Yeah. My name is misspelled on all of this.

Q. Does that lead you to believe that this conversation did not happen between you and Mr. Rubin?

A. I'm not sure.

Q. Going down to 7/23/17, 10:22 p.m., Mr. Rubin says, Come to New York, Tuesday, question mark? And you say, Yes, with a smiley face. And he says, I will have Jen set it up. You say, Okay, with a heart, correct?

[redacted] - Confidential

Is that, again, I will ask you, was that a show of affection for Mr. Rubin?

A. I have no idea.

Q. You don't have any understanding what the emoji heart signifies?

A. No, I don't remember texting that.

Q. Regardless of whether you remember texting it or not, the heart appears there.

What do you understand the heart emoji to signify?

A. I guess it could mean multiple things to different people.

Q. It certainly doesn't mean stop beating me up, correct?

A. I don't know.

Q. The heart usually means I love you, doesn't it?

A. I guess.

Q. Then at 2:17 p.m., on the 24th, Howard Rubin says, Confirm for tomorrow? You say, Yes, can't wait, again, the heart.

You were looking forward to it, correct?

A. I'm not sure about this

MAGNA LEGAL SERVICES





Page 202

[redacted] - Confidential
conversation.
Q. Do you remember him [redacted] in response to your question, do you want me to bring anything specific?
A. I don't remember.
[redacted]
Q. This was just a little more than a year ago.
A. I'm sorry, I don't remember.
[redacted].
Q. So going over to the next page, it's HR 000436 and 7/25/17 at 1:10 p.m. You say, Landed just a little behind. And then at 1:16, you say, In route now. And at 1:21, Mr. Rubin says, No worries, I will be over

Page 203

[redacted] - Confidential
around 4:00, 4:30.
Does that refresh your recollection that you came to see him on July 25, 2017?
A. I mean, I'm reading it here, I don't know.
Q. Then at 4:24 p.m., Mr. Rubin says, On the way. And you respond, Want me to do anything as you walk in? I have wine open. And Mr. Rubin says at 4:25, Let's talk. A bit curious to hear about the Maldives. And you said, Okay.
Do you recall that?
A. I think I remember him asking something about the Maldives.
Q. Did you tell him [redacted] was with you?
A. No.
Q. Why is that?
A. I don't know.
Q. That's at 4:25 p.m. and the next entry is at 7/26, the next day, at 18 minutes past midnight, 12:18 a.m. Howard Rubin says,
[redacted]

Page 204

[redacted] - Confidential
[redacted] And you said, at 12:30, Do you love me? And then you say, I'm not taking pills.
What do you mean by that?
A. There were drugs involved. When I saw him, he would give me pills occasionally. I don't know what they were.
Q. You took them?
A. I did take the pills.
Q. You said, I'm not talking pills, and by that, you meant you're not taking pills anymore, correct?
A. No, I'm not sure what I meant there. Probably because I would not remember anything about that, it would be, like, really out of control.
Q. What would be out of control?
A. It was just, like, I was on pills, it wasn't, like, being normal.
Q. Mr. Rubin says, [redacted]
Do you recall him saying that?
A. I think so.

Page 205

[redacted] - Confidential
Q. He is not hiding anything about [redacted] the last time he was with you, right?
A. It doesn't look like it.
Q. He is being upfront about the fact that you had a relationship which involved rough sex, right?
A. I think so.
Q. Mr. Rubin says, [redacted].
Do you recall him saying that to you?
A. I don't really remember this conversation I had with him.
Q. But you see he is not running away from saying that [redacted] right?
A. Right here, I can see what he is saying.
Q. He says, [redacted] And you don't respond, yeah, Howie, that was terrible when you [redacted], did you say anything like that?

MAGNA LEGAL SERVICES

[redacted] - Confidential
A. I don't know. This line of conversation here seems weird. I don't completely understand it, how I remember this conversation.
Q. This happened the next morning, right, this was not that evening, this was -- actually, it was the next afternoon, it was 12:36 a.m. and on the 26th and when he says, [redacted], you say to him, My face is fine, whatever. And Howie Rubin says, Okay.
That's what you said to him, right, that your face was fine?
A. I don't know. I'm just reading this right here. Like I said, I don't --
Q. You didn't complain to him about any problems with your face when he told you [redacted] you said it was fine?
A. Not right here, it doesn't look like it.
Q. You want to read the next thing you said to him? Do you want to read it out loud?

[redacted] [redacted] - Confidential
A. No.
Q. I will read it for you then. [redacted], [redacted]
Is that what you said to him?
A. I'm not sure what I said to him.
Q. You could have said that?
A. I don't know.
Q. Is that the way you talk?
A. If I was given pills and not who I was, I don't know, but this is all very confusing.
Q. Then Howie says to you, Sleep well, [redacted] And then you say, I don't need pills, at 12:36 a.m.
What kind of pills were you talking about, pain pills?
A. I don't know what these pills are.
Q. Then at 12:37, Howard Rubin says, I don't know what happened, nice dinner, though. And you say, I know what happened, the pills.
Mr. Rubin didn't force you to take the pills, did he?
A. I'm not sure.

[redacted] - Confidential
Q. Then Mr. Rubin goes on and says -- you say, I'm duck sober tipsy.
Do you know what that meant?
A. I don't know.
Q. Then he says, Painkillers supposedly? And you say, Yes. And then she says, I don't know need those. Then he says, Okay.
Isn't it a fact that he said painkillers, and you said, I don't need those, doesn't that mean you are not having any pain?
A. I don't know what this means.
Q. It goes on to say, at 12:40, Howard Rubin, Something strange tonight. And you say, I wish you fucked me before dinner, I don't know why you didn't. And then you say, I can't get fucked up -- I can't get that fucked up. I'm here to be with you.
So you are blaming yourself for getting fucked up, isn't that right?
A. I don't think so, I didn't see that as that. I don't even understand what exactly I meant right here.

[redacted] - Confidential
Q. Then you say, I can't get that fucked up, I'm here to be with you, tell me why I didn't, and then you say, you, and there are four stars.
What does that mean?
A. I have no idea.
Q. He says, Night, Babes, at 12:48 and at 1:06, you say to him, Do you still love me? And he says, Of course.
So you weren't complaining to him about any injury that you sustained at that time to your face, correct?
A. I mean, right here, it doesn't say I'm complaining.
Q. You are asking whether he loves you, right?
A. I'm not sure.
Q. But you wanted to continue your relationship with him, right?
A. I can't remember this day.
Q. Let's go to the next page.
MR. GROSSMAN: Can we take a break real quick?
(Recess.)

MAGNA LEGAL SERVICES

Page 286

- Confidential

Page 287

- Confidential

Q. That you were intoxicated, she never asked, right, but you never told her either, isn't that right?
A. I didn't know I was supposed to tell her.
Q. And she gave you this document and asked you to sign it, correct?
A. Yeah, she gave me a document.
Q. She didn't force you to sign it?
A. No.
Q. And she asked you to initial each paragraph, right?
A. Yes.
Q. And she asked you to read each paragraph, right?
A. It was pretty quick. We didn't go over it very...
Q. You could have gone over it in more detail if you wanted to?
A. Maybe.
Q. And she asked you if you had any questions, right, or if you understood everything?
A. I don't remember.

Page 288

- Confidential

Q. Did you tell her that you had any questions?
A. I don't remember.
Q. Did you ask her to explain any part of this to you?
A. I don't remember that.
Q. Do you know if you understood what you were signing?
A. I really don't think I did. I have no clue.
Q. But you knew it was an NDA, right? We established that with Mr. McDonald when he showed you those text messages you sent in 2018?
A. Yeah, I was aware of an NDA.
Q. Signing this document didn't cause you any injury, did it, you just signed a document, right?
A. I don't know.
Q. Now, isn't it true that you never told Ms. Powers any of these allegations you made against Mr. Rubin?
MR. GROSSMAN: Objection, vague.
Q. Isn't it true you never told Ms.

Page 289

- Confidential







Page 290

- Confidential

Page 292

- Confidential

Page 291

- Confidential

Page 293

- Confidential

Q. You never really said any negative things, right, to Ms. Powers about Mr. Rubin?
A. I'm not sure.
Q. There is nothing here, is there, other than your statement that he was rude the first time you saw him?
A. I'm just seeing what is written here on these papers.
Q. So moving along, isn't it true from the documents that Mr. McDonald showed you, that when you came to New York, you usually would be given a key to the penthouse by the concierge at the front desk?
A. Yeah.
Q. So that meant that you could come and go as you pleased from the penthouse?
A. Yeah, I was given a key to get inside.
Q. And you spent significant periods of time alone in the penthouse, isn't that right?
A. I was alone some.
Q. When you could have left whenever you wanted?

MAGNA LEGAL SERVICES

[redacted] - Confidential
A. I don't know.
Q. In fact, you had access, as these messages prove, you had access to WiFi internet in the penthouse, so you are able to text and email, isn't that correct?
A. There was supposed to be WiFi.
Q. You were able to use the WiFi, isn't that right?
A. I'm not sure if I did.
Q. But when you asked Ms. Powers for the password, she gave you the password, isn't that right?
A. I think so.
Q. And you were able to call Seamless and have food delivered, isn't that right?
MR. GROSSMAN: Objection.
Answer if you can.
A. I didn't eat food at the penthouse.
Q. Food that you called out and had delivered, right?
MR. GROSSMAN: Objection, misstates testimony.
You can answer if you can.
A. I'm not sure.

E. [redacted] - Confidential
MR. GROSSMAN: Counsel, can we take a break?
(Recess.)
Q. So can you turn to page 5 of Exhibit No. 60-A. Look at two-thirds of the way down, 1/27/16 at 7:26 p.m.
Do you see that?
A. At what time?
Q. 7:26 p.m.
A. Okay. Yes, I see it.
Q. You see where it says, What is the password for the Seamless ordering food account?
A. Yes.
Q. Then Jen tells you the password and you say, Thanks, Jen?
A. Yes, I see that.
Q. Does that refresh your recollection that you ordered takeout food to the penthouse?
A. Yes.
Q. That was brought by a delivery man that came to the door of the penthouse?
A. I don't know, I can't remember.

[redacted] - Confidential
Q. Someone brought you the food?
A. Yeah.
Q. Right after you had an encounter with Mr. Rubin, isn't that right?
A. I think so.
Q. So right after you had sex, rough sex with Mr. Rubin, somebody came to the apartment and brought you food, isn't that right?
A. I'm not sure.
Q. But I mean, that is what happened, you ordered Seamless and a delivery person came and brought you food?
A. I'm not sure if they came or I asked and I never ordered, I'm not sure.
Q. But, in any case, you were considering ordering food to the penthouse, right?
A. If I needed to eat, yes.
Q. So your injuries, if any, can't have been so severe that you were able to order food and eat and see a delivery person immediately after you saw Mr. Rubin, isn't that right?

[redacted] - Confidential
[redacted]