John G. Balestriere
Brian L. Grossman
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON,** and **LAUREN FULLER,**<br><br>                            Plaintiffs,<br><br>            – against –<br><br>**HOWARD RUBIN, JENNIFER POWERS,** and the **DOE COMPANY,**<br><br>                            Defendants. | Case No.: 1:17-cv-06404 (BMC) (SMG)<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT POWERS'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 5

LEGAL STANDARD................................................................................................................ 10

ARGUMENT ............................................................................................................................. 10

I.   THERE ARE SUBSTANTIAL QUESTIONS OF FACT WARRANTING DENIAL OF
     THE POWERS MOTION ................................................................................................10

II.  THE EVIDENCE SHOWS THAT POWERS WAS AN ESSENTIAL PARTICIPANT
     IN RUBIN'S TRAFFICKING VENTURE......................................................................11

     A.   Powers Recruited, Enticed, Harbored, Transported, Provided, or Maintained at
          Least Plaintiffs Hallman, Lawson, Speight, and Hathaway on a Number of
          Occasions, and Paid Plaintiff Fuller When She Met Rubin ....................................... 12

          1.   Powers Transported Hallman from Florida to New York, Harbored Hallman in
               the Venture's Penthouse Apartment, Had Hallman Sign a Non-Disclosure
               Agreement, Paid Hallman, and Threatened to Sue Hallman for Violation of the
               Non-Disclosure Agreement Between August 2016 and August 2017 ................ 12

          2.   Powers Transported Lawson from Florida to New York, Harbored Lawson in
               the Venture's Penthouse Apartment, Had Lawson Sign a Non-Disclosure
               Agreement, and Paid Lawson on Two Occasions: Once in August 2016, and
               Again in December 2016.................................................................................... 13

          3.   Powers Transported Speight from Georgia to New York, Harbored Speight in
               the Venture's Penthouse Apartment, Had Speight Sign a Non-Disclosure
               Agreement, and Paid Speight on a Number of Occasions Between November
               2015 and July 2017............................................................................................ 14

          4.   Powers Transported Hathaway from Illinois to New York, Harbored Hathaway
               in the Venture's Penthouse Apartment, Had Hathaway Sign a Non-Disclosure
               Agreement, and Paid Hathaway on a Number of Occasions Between Early 2011
               and June 2017 ..................................................................................................... 15

          5.   On Behalf of Rubin's Sex Trafficking Venture, Powers Paid Plaintiff Fuller in
               2016 .................................................................................................................... 16

ii

6.  Rubin and His Associates Recruited, Enticed, Harbored, Transported, Provided, Maintained, and Patronized Peterson .................................................. 17

7.  Powers Recruited, Harbored, and Transported Other Victims for Rubin Over the Last Decade in Addition to the Plaintiffs ...................................................... 17

B.  It Is Undisputed that Rubin and Powers Acted in Interstate Commerce ................... 18

C.  Powers Benefitted Financially from Participating in Rubin's Sex Trafficking Venture, Which Engaged in the Soliciting, Harboring, and Transportation of Five Plaintiffs with Claims Against Powers ...................................................... 20

D.  Powers Knew or Had Reason to Know that Rubin Would Use Threats of Force, Force, and Coercion to Cause Plaintiffs to Engage in Commercial Sex ................... 21

1.  Powers was Aware that Rubin Threatened Harm and Actually Harmed the Plaintiffs ...................................................................................................... 21

2.  Powers Purchased and Placed the Furniture and Items that Rubin Used to Physically Restrain the Plaintiffs in the Penthouse ............................................. 22

3.  Powers Threatened Most Plaintiffs with Legal Process, Which is Coercion Under the TVPA ............................................................................................ 23

4.  Powers Assisted Rubin in Coercing Plaintiffs Through Emotional, Psychological, and Financial Means .................................................................. 26

III.  EVIDENCE SHOWS THAT POWERS INTENDED TO CAUSE EMOTIONAL DISTRESS TO PLAINTIFFS WARRANTING DENIAL OF THE POWERS MOTION ...................................................................................................................27

CONCLUSION......................................................................................................... 29

# **TABLE OF AUTHORITIES**

**Cases**

*Abramson v. Pataki*,
    278 F.3d 93 (2d Cir. 2002) ............................................................................................ 10

*Anderson v. Hertz Corp.*,
    507 F. Supp. 2d 320 (S.D.N.Y. 2007) ........................................................................... 10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................................... 10

*Ann-Par Sanitation, Inc. v. Town of Brookhaven*,
    23 A.D.3d 380 (2d Dep't 2005) ..................................................................................... 25

*City of Rye v. Public Serv. Mut. Ins. Co.*,
    34 N.Y.2d 470 (1974) ..................................................................................................... 25

*Curiano v. Suozzi*,
    63 N.Y.2d 113 (1984) ..................................................................................................... 23

*Greenaway v. County of Nassau*,
    97 F. Supp. 3d 225 (E.D.N.Y. 2015) ............................................................................. 27

*Klein v. Metropolitan Child Servs., Inc.*,
    100 A.D.3d 708 (2d Dep't 2012) .................................................................................... 27

*SI Venture Holdings, LLC v. Caitlin Specialty Ins.*,
    118 F. Supp. 3d 548 (S.D.N.Y. 2015) ........................................................................... 24

*Truck Rent–A–Center v. Puritan Farms 2nd*,
    41 N.Y.2d 420 (1977) ..................................................................................................... 25

*United States v. Farrish*,
    122 F.3d 146 (2d Cir. 1997) ........................................................................................... 18

*United States v. Isaac*,
    14 F. App'x 81 (2d Cir. 2001) ....................................................................................... 18

*United States v. Le*,
    902 F.3d 104, (2d Cir. 2018) .......................................................................................... 18

*United States v. Walker*,
    262 F. App'x 303 (2d Cir. 2008) .............................................................................. 23, 24

*United States v. Williams*,
   714 F. App'x 917 (11th Cir. 2017) ................................................................. 21, 26

**Statutes**

18 U.S.C. § 1591 ......................................................................................... 11, 12, 21, 23

18 U.S.C. § 1595(a) ................................................................................................... 12

N.Y. Penal Law § 230.00 .......................................................................................... 25

N.Y. Penal Law § 230.02(1)(a) .................................................................................. 25

**Rules**

Fed. R. Civ. P. 56(a). ................................................................................................ 10

## PRELIMINARY STATEMENT[1]

The Court should deny Defendant Jennifer Powers's Motion for Summary Judgment (Dkt. No. 233, the "Powers Motion") seeking judgment on Plaintiffs' human trafficking and intentional infliction of emotional distress causes of action. Plaintiffs' claims arise from Powers's essential role in assisting her Co-Defendant Howard Rubin in trafficking Plaintiffs to bring them to New York for Rubin to assault and rape. And the evidence shows that Powers was, in fact, Rubin's loyal lieutenant in his human trafficking venture to assault and rape women from around the United States.

### *Powers Ran Rubin's Human Trafficking Venture*

Powers directed Rubin's venture and, without her, there would almost certainly have been no venture, nor trafficked victims like Plaintiffs and others. Powers knew exactly what she was doing and was paid handsomely for it. In January 2016 Powers messaged Rubin "You beat a hot girl and got laid! What's there to be upset about!!" At that time Rubin was paying Powers $15,000 a month. Powers recruited, enticed, harbored, transported, provided, or maintained the Plaintiffs in this action on a number of occasions dating back to at least 2011. Powers's self-serving assertions that she did not know what she was doing is contradicted by documentary evidence and Plaintiffs' testimony. The conflicting testimony alone warrants denial of the Powers Motion.

### *Powers's Coordinated, Planned, and Paid for Plaintiffs' Trips*

Powers coordinated the travel, arrival, and payment of the Plaintiffs on at least 20 occasions. This coordination included Powers asking Plaintiffs for their personal information so that Powers could arrange for their flights (*see e,g.*, Jennifer Powers' Rule 56.1 Statement of

---

[1] All terms are as defined in Plaintiffs' Second Amended Complaint (Dkt. No. 161) and in Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses and Counterclaims (Dkt. No. 234-1) unless otherwise defined herein. Plaintiffs provide some definitions for the Court's convenience.

1

Undisputed Material Facts, Dkt. No. 233–2 ("Powers 56.1"), ¶¶ 8, 100, 152); booking flights for Plaintiffs with Rubin's money to New York from Florida, Georgia, and Illinois (*see e,g.*, Powers 56.1, ¶¶ 19, 40, 57, 108, 158, 178, 188, 195, 219, 234, 246, 269, 279); coordinating car services from the airport to Rubin's Penthouse (*see e,g.*, Powers 56.1, ¶¶ 105); coordinating with the concierge at Rubin's Penthouse to give Plaintiffs a key when they arrived (*see e,g.*, Powers 56.1, ¶¶ 21, 39, 197, 207, 220, 235, 247, 258, 270, 280, 355); having Plaintiffs sign non-disclosure agreements ("NDAs") when they arrived (Powers often being physically present) (*see e,g.*, Powers 56.1, ¶¶ 22–23, 111–112, 161–162, 322–323); sending Plaintiffs to Rubin to meet with him at a restaurant or bar (*see e,g.*, Powers 56.1, ¶¶ 43, 167, 343, 383); and paying Plaintiffs following Rubin's assault. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) And Powers harbored Plaintiffs by providing them with a place to stay in New York: the Penthouse where Rubin would rape and sexually assault them. (*See e,g.*, Powers 56.1, ¶¶ 21, 39, 197, 207, 220, 235, 247, 258, 270, 280, 355.) There is no dispute that Powers' conduct meets all elements of the TVPA claim, warranting denial of her Motion.

*Powers Paid Plaintiff Fuller for Commercial Sex Acts*

Unlike the other Plaintiffs in this litigation, Powers did not book Fuller's flights to and from New York or provide Fuller with the NDA to sign. Instead, Powers performed the most crucial task in furtherance of Rubin's venture: while Powers herself was being paid thousands of dollars a month, she paid Fuller for her commercial sex act. This payment on its own is enough to maintain human trafficking claims against Powers.

*Powers Financially Benefitted from the Sex Trafficking Venture and Knew Key Details*

Ignoring evidence, Defendant Powers contends that she "was in the same posture as [one-time Defendant] Ms. Shon: Ms. Powers was not present for any of the alleged assaults, was not

told about any assaults, was not told that any of the [P]laintiffs were afraid of Mr. Rubin, and there is no other evidence suggesting knowledge or reckless disregard of any such assaults." The evidence shows that this simply is not true. Powers was intimately involved in the day-to-day operations of the sex trafficking venture, admitting that Rubin initially paid her $120,000 a year as his assistant, and later even gave her a raise to $180,000 a year in 2014. Powers earned over a million dollars from the venture for doing things such as arranging travel, making dinner reservations, paying victims, having victims sign the NDAs, and, in Powers's words, "keeping organized."

The evidence also shows that Powers was aware that Rubin engaged in coercive conduct, such that they both are liable to Plaintiffs for the TVPA claims. Powers was aware of the commercial nature of the transactions as she paid for the transactions herself. Powers was also aware that Rubin would give the Plaintiffs alcohol or drugs before engaging in any sexual conduct with them (which alone could undermine any consent Powers claims Plaintiffs provided to Rubin for his rapes and assaults). For example, referencing Plaintiff Speight, Powers texted her "You took vicodein [sic] and you were begging for more !!!!!!!!! Do you remember speaking to me?"[2] Powers also purchased equipment for Rubin to use to restrain the Plaintiffs and put that equipment in the Penthouse. Moreover, despite Powers being aware that the victims would be required to sign an NDA upon arriving in New York and before meeting with Rubin, Powers never provided the NDA to Plaintiffs in advance—despite contacting them to set up flights to New York and other

---

[2] Indeed, Defendant Powers perjured herself at her deposition when asked "Are you aware of any drug use that took place in the apartment anywhere?" by answering "Not that I was aware of," further undermining her credibility upon which she rests, inappropriately, in seeking judgment in her favor. (Plaintiffs' Counter to Jennifer Powers's 56.1 Statement of Undisputed Facts ("Counter Powers 56.1"), ¶ 30; Deposition of Jennifer Powers ("Powers Dep."), attached to the Declaration of John G. Balestriere in Opposition to Defendants' Motions for Summary Judgment ("Balestriere Decl."), Exhibit A, 191:15–18.)

All exhibits are attached to the Balestriere Decl., filed simultaneously with these papers unless otherwise noted. All exhibits to the Balestriere Decl. are referred to herein as "Ex. X."

logistics—and did not even tell Plaintiffs to expect the NDA.

Further proof that Powers knew that Rubin was engaged in misconduct, Powers used the NDAs to scare Plaintiffs into not disclosing the assaults and rapes Rubin committed. Another one of Powers's duties was even consoling women after Rubin's attacks after she learned about how they were injured (again showing her knowledge of Rubin's assaults)—making it less likely that they would make the venture public. Powers knew that the venture's victims were injured and pressured not to discuss Rubin's assaults and rapes. Powers's high compensation for basic organization work, her misuse of unenforceable NDAs, and her attempts to prevent Plaintiffs' injuries from being disclosed all at least raise a question of fact regarding Powers's awareness of the misconduct Rubin was engaged in, warranting denial of her Motion.

*Powers Intentionally Inflicted Emotional Distress Upon the Plaintiffs*

The evidence shows that Powers had Plaintiffs sign the NDA without any explanation regarding the violent acts that would be committed against them. By doing this, Powers intentionally caused the Plaintiffs emotional distress sufficient to deny her Motion. Powers not only knew what type of physical harm Rubin could—and in fact did—inflict, she was so familiar with such sexual violence, and how to treat it, that she was able to send at least former Plaintiff Caldwell "some stuff that [Powers] found to be helpful" based on her knowledge of either her own, or other victim's, prior injuries from sexual violence.

For these reasons, and for all arguments made in Plaintiffs' Memorandum of Law in Opposition to Defendant Rubin's Motion for Summary Judgment, which Plaintiffs adopt fully by reference here, the Powers Motion should be denied, and this case should proceed to trial.

## STATEMENT OF FACTS

*Powers's Role as Rubin's "Assistant"*

Powers was Rubin's assistant from 2011 until 2017. (Counter Powers 56.1, ¶ 1; Powers

Dep., Ex. A, 29:2–20, 32:10–18.) As Rubin's assistant, Powers duties included gift shopping,

making reservations, any day-to-day tasks, booking flights for victims (including Plaintiffs), and

paying victims (including Plaintiffs). (Counter Powers 56.1, ¶ 2; Powers Dep., Ex. A, 29:19–30:6.,

39:3–9, 90:3–13.) Powers purchased Rubin's bondage equipment and put it in the Penthouse.

(Counter Powers 56.1, ¶ 3; Powers Dep., Ex. A, 144:13–21, 146:13–21.) Rubin would tell Powers

how much money to send victims, including Plaintiffs. (Counter Powers 56.1, ¶ 4; Powers Dep.,

Ex. A, 194:9–14.) All of the money that Powers used to book flights and pay victims, including

Plaintiffs, came from Rubin. (Counter Powers 56.1, ¶ 5; Powers Dep., Ex. A, 73:10–17.) Powers

booked flights for victims, including Plaintiffs, to and from New York to meet Rubin (Counter

Powers 56.1, ¶ 6; Powers Dep., Ex. A, 39:3–9), provided victims, including Plaintiffs, an apartment

to stay in while in New York (Counter Powers 56.1, ¶ 7; Declaration of Jolène F. Lavigne-Albert

in Support of Jennifer Powers' Motion for Summary Judgment, (Dkt. No. 233-3) ("JLA Decl.")

Exs. 17, 36, 39, 41, 43, 46, 48, 50, 52, 54, 62), had victims, including Plaintiffs, sign non-disclosure

and release agreements (Counter Powers 56.1, ¶ 8; Powers Dep., Ex. A, 116:25–117:18), and paid

victims, including Plaintiffs, after Rubin sexually assaulted and raped them. (Counter Powers 56.1

¶ 11; Powers Dep., Ex. A, 97:3–22; Joint Stipulation Regarding Payments Made by Defendants to

Plaintiffs, JLA Decl., Ex. 3, ¶ 5.)

Powers booked flights for victims beyond just the Plaintiffs. (Counter Powers 56.1, ¶ 9;

Powers Dep., Ex. A, 85:7–12, 95:7–12, 95:21–96:10, 96:18–24.) Between 2011 and 2015, Powers

booked flights for between 10 and 30 women to travel to New York to meet Rubin. (Counter

Powers 56.1, ¶ 10; Powers Dep., Ex. A, 92:25–93:21.) Powers also paid those victims between $1,000 and $5,000 per encounter on behalf of Rubin. (Counter Powers 56.1, ¶ 11; Powers Dep., Ex. A, 97:3–22; Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Powers believed that if Rubin asked Powers to send $5,000 to a victim, including Plaintiffs, that meant that Rubin had sexual intercourse with the victim. (Counter Powers 56.1, ¶ 12; Powers Dep., Ex. A, 194:22–195:3.) Between 2011 and 2014, Powers was paid $10,000 a month, or $120,000 a year, for her work as Rubin's assistant. (Counter Powers 56.1, ¶ 13; Powers Dep., Ex. A, 32:2–4.) In 2014, Powers's pay increased to $15,000 a month, or $180,000 a year, for her role as Rubin's lieutenant. (Counter Powers 56.1, ¶ 14; Powers Dep., Ex. A, 33:12–18.) In late 2017, Powers stopped working for Rubin because of "this lawsuit" as "there was nothing left to do" once the Original Plaintiffs file the Initial Complaint and Rubin's human trafficking venture was made public. (Counter Powers 56.1, ¶ 15; Powers Dep., Ex. A, 32:19–33:2.)

*Powers Transported, Harbored, and Paid Hallman*

Powers booked Hallman's flights to travel from Florida to New York on August 22, 2016, September 24, 2016, and October 19, 2016. (Powers 56.1, ¶¶ 19, 40, 57.) Powers gave Hallman access to the Penthouse apartment that Rubin rented for his encounters with women, including Plaintiffs. (Powers 56.1, ¶¶ 21, 39.) On August 22, 2016, Powers had Hallman sign a non-disclosure agreement. (Powers 56.1, ¶¶ 22–23.) Powers paid Hallman a total of $13,000 between August of 2016 and August of 2017. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) On August 14, 2017, Powers told Hallman that Hallman had violated the non-disclosure agreement. (Counter Powers 56.1, ¶ 16; Epiq Production, Ex. B, Line 557.)

*Powers Transported, Harbored, and Paid Lawson*

Powers booked Lawson's flights from Florida to New York on August 22, 2016. (Powers 56.1, ¶ 108.) Powers gave Lawson access to the Penthouse apartment that Rubin rented for his encounters with women, including Plaintiffs. (Counter Powers 56.1, ¶ 17; Deposition of Hillary Lawson ("Lawson Dep."), Ex. C, 93:13-15.) On August 22, 2016, Powers had Lawson sign a non-disclosure agreement. (Powers 56.1, ¶¶ 111–112.) Powers paid Lawson a total of $10,000 between August of 2016 and December of 2016. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.)

*Powers Transported, Harbored, and Paid Hathaway*

Powers booked a flight for Hathaway to travel from Illinois to New York on May 20, 2015.[3] (Powers 56.1 ¶ 328.) Powers coordinated travel with Hathaway on September 8, 2015, September 29, 2015, November 6, 2015, January 13, 2016, May 5, 2016, and June 11, 2017. (JLA Decl., Exs. 59, 1, 3, 4, 6, 7; Hathaway-Powers WhatsApp Chat, Part 2, JLA Decl., Ex. 60.) Powers gave Hathaway access to the Penthouse apartment that Rubin rented for his encounters with women, including Plaintiffs. (Powers 56.1, ¶ 355.) On January 21, 2015, Powers had Hathaway sign a non-disclosure agreement. (Powers 56.1, ¶¶ 322–323.) Powers paid Hathaway $23,500 between October of 2015 and June of 2017. Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) However, prior to Powers paying Hathaway, Rubin paid Hathaway a total of $17,000. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.)

---

[3] Hathaway never used this flight.

*Powers Transported, Harbored, and Paid Speight*

Powers booked flights for Speight to travel from Georgia to New York on October 12, 2015, November 13, 2015, January 5, 2016, January 27, 2016, August 2, 2016, September 27, 2016, November 21, 2016, January 30, 2017, May 24, 2017, and July 25, 2017. (Powers 56.1, ¶¶ 158, 178, 188, 195, 219, 234, 246, 269, 279.) Powers gave Speight access to the Penthouse apartment that Rubin rented for his encounters with women, including Plaintiffs. (Powers 56.1, ¶¶ 197, 207, 220, 235, 247, 258, 270, 280.) On October 12, 2015, Powers had Speight sign a non-disclosure agreement. (Powers 56.1, ¶¶ 161–162.) Powers paid Speight a total of $47,400 between November 2015 and July 2017. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.)

*Powers Paid Fuller*

██████████, another of Rubin's workers in the trafficking venture, contacted and recruited Fuller. (Counter Powers 56.1, ¶ 18; Deposition of Lauren Fuller ("Fuller Dep."), Ex. D, 76:16–20.) ██████ assisted Fuller on booking her travel from Las Vegas to New York to meet Rubin. (Powers 56.1, ¶ 367; Counter Powers 56.1, ¶ 19; Fuller Dep., Ex. D, 91:15–19.) Defendant Rubin and ██████ had Fuller sign the non-disclosure agreement, and not Powers. (Counter Powers 56.1, ¶ 21; Fuller Dep., Ex. D, 113:9–22.) Powers paid Fuller after her encounter with Rubin. (Powers 56.1, ¶ 374.)

*Powers's Knowledge of Rubin's Sexual Assaults and Rapes of Plaintiffs*

The NDA that Powers had the Plaintiffs sign purported to provide that "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person." (*See* Powers 56.1, ¶ 162.) Powers purchased Rubin's bondage equipment and put it

in the Penthouse. (Counter Powers 56.1, ¶ 23; Powers Dep., Ex. A, 144:13–21 ("Q. Now, the sex toys, the BDSM objects and so forth that were in the second bedroom, how did they get in there? A. I put them there. Q. So did you make the purchases? A. Yes, sir, I did."), 146:13–21 (Powers "bought certain restraints").)

The BDSM furniture that Powers purchased for Rubin's dungeon had restraints on it. (Counter Powers 56.1, ¶ 24; Powers Dep., Ex. A, 147:3–13 ("One example would be a cross that has restraints on the top"), 148:4–14 ("in the very beginning we had a big bed in there, with, it was a BDSM bed, and it had a canopy type thing with restraints along the top and along the side"), 153:16–18 ("Q. Did the gyno chair actually have restraints on it or not? A. I believe so"), 154:8–14 ("Q. The queen's chair, the restraints were in two places, is that correct, for the legs and then hands above the head? A. I believe so. They were all along the back side of the chair. And on the bottom on the legs as well"), 161:22–24 ("Q. The upside down U, did that have restraints on it? A. Yes").) Powers thought that a woman could pull her hands out of the restraints, but also admitted that she was never present when Rubin engaged in BDSM activity. (Counter Powers 56.1, ¶ 25; Powers Dep., Ex. A, 163:24–164:4, 190:9–17; Powers 56.1, ¶ 385.)

In April of 2016 Powers messaged Rubin, "I'm very disappointed . . . nothing is fun or 'funny' anymore. No one can drink for 6 hours straight...then take 2 vicodins, you were egging her on." (Counter Powers 56.1, ¶ 26; Excerpts of the WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000034.) In July of 2017, Powers messaged Rubin: "[Hallman] is too close for comfort...she was a basket case and the root of all of our problems. She also knows about [Caldwell] and *what we paid to 'remedy' the situation*." (Counter Powers 56.1, ¶ 27; Excerpts of the WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000002 (emphasis added).) Following former Plaintiff Caldwell's encounter with Rubin, Hallman sent Powers a picture of Caldwell's

breasts, to which Powers responded by asking for Caldwell's address to send her some things that would help with the bruising. (Counter Powers 56.1, ¶ 28; Kristina Hallman- Jennifer Powers WhatsApp Chat, JLA Decl., Ex. 10, 3.) Powers was aware that Plaintiffs used drugs when they met with Rubin, and "smelt weed" in the apartment. (Text Messages Between Speight and Powers, JLA Decl., Ex. 29, 7; Text Messages Between Rubin and Powers, JLA Decl., Ex. 6, JP_0000076, JP_0000072; Powers Dep., Ex. XX, 191:22–192:13.)

## LEGAL STANDARD

Summary judgment is inappropriate if there exists a "genuine dispute as to any material fact." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' when it 'might affect the outcome of the suit under the governing law.'" *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 326 (S.D.N.Y. 2007), *aff'd*, 303 F. App'x 946 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted). At the summary judgment stage, "the judge's function is not himself to weigh the evidence to determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## ARGUMENT

### I.   THERE ARE SUBSTANTIAL QUESTIONS OF FACT WARRANTING DENIAL OF THE POWERS MOTION

There are, at best for Powers, substantial questions of fact warranting denial of her Motion. Powers bases her request that this Court rule dispositively in her favor on her assertion "that evidence shows *clearly* that Ms. Powers *never* had *any reason* to believe that any of the plaintiffs

were assaulted or that they were coerced, forced or defrauded into engaging in commercial sex acts with Mr. Rubin." (Memorandum of Law in Support of Jennifer Powers' Motion for Summary Judgment, Dkt. No. 233–1 (the "Powers MOL"), 1 (emphasis added).) Powers' own words show this to be false. Simply as an example, in January of 2016, Powers messaged Rubin: "You beat a hot girl and got laid! What's there to be upset about!!" (Counter Powers 56.1, ¶ 29; Excerpts of WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000025–JP_0000026.) This message alone creates a question of fact and is enough to deny the Powers' Motion. And the over million dollars Rubin paid Powers for purportedly simply "organizing," as well as all of Powers interactions with Plaintiffs after they were injured further gives ample "reason to believe that the plaintiffs were assaulted . . . and coerced." (Powers MOL, 1.) All the questions of fact raised by the conflicting testimony, significant compensation for Powers, and her post-rape interactions with Plaintiffs, including evidence discussed further below, makes plain that there is at least a question of fact as to Powers's knowledge of what the human trafficking venture was all about, warranting denial of the Powers Motion.

## II.  THE EVIDENCE SHOWS THAT POWERS WAS AN ESSENTIAL PARTICIPANT IN RUBIN'S TRAFFICKING VENTURE

The evidence shows that Powers was an active, knowing, crucial participant in the sex trafficking venture. A defendant is liable under the Trafficking Victims Protection Act (the "TVPA") if she "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" the above acts when she knows "that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). A defendant coerces a victim when she uses "(A) threats of serious harm to or physical

11

restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). Victims of TVPA violations may bring a lawsuit against a perpetrator. 18 U.S.C. § 1595(a). Relying on the evidence adduced in discovery alone a jury could find that Powers is liable to all Plaintiffs for their TVPA claims.

> **A. Powers Recruited, Enticed, Harbored, Transported, Provided, or Maintained at Least Plaintiffs Hallman, Lawson, Speight, and Hathaway on a Number of Occasions, and Paid Plaintiff Fuller When She Met Rubin**

Powers recruited, enticed, harbored, transported, provided, or maintained at least Plaintiffs Hallman, Lawson, Speight, and Hathaway on a number of occasions, and paid Plaintiff Fuller when she met Rubin. A defendant is liable for violation of the TVPA when she recruits, entices, harbors, transports, provides, or maintains a victim and knows "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). The evidence shows Powers is liable to at least five Plaintiffs under the TVPA.

> **1. Powers Transported Hallman from Florida to New York, Harbored Hallman in the Venture's Penthouse Apartment, Had Hallman Sign a Non-Disclosure Agreement, Paid Hallman, and Threatened to Sue Hallman for Violation of the Non-Disclosure Agreement Between August 2016 and August 2017**

In August of 2016, Rubin's associate Stephanie Shon recruited Hallman. (Rubin 56.1, ¶¶ 2–4.) Shortly thereafter, Rubin's associate and co-defendant Powers continued to recruit and transported Hallman by purchasing and arranging her flight to New York. (Powers 56.1, ¶¶ 11, 19.) Powers booked Hallman's flights to travel from Florida to New York on August 22, 2016, September 24, 2016, and October 19, 2016. (Powers 56.1, ¶¶ 19, 40, 57.) Powers gave Hallman access to the Penthouse apartment that Powers and Rubin used in their sex-trafficking venture. (Powers 56.1, ¶¶ 21, 39.) Powers had Hallman sign an NDA in relation to the sex trafficking

venture's crimes against Hallman. (Powers 56.1, ¶¶ 22–23.) Rubin and Powers maintained and harbored Hallman on August 22, 2016, by allowing her to stay the night in Rubin's apartment. (Rubin 56.1, ¶ 20.) Rubin then patronized Hallman that night when he caused her to engage in commercial sex. (Rubin 56.1 Statement, ¶¶ 17–19.) Rubin threw money at Hallman when he was done with her. (Powers 56.1, ¶¶ 22–24, 111–113; Counter Powers 56.1, ¶ 31; Lawson Dep., Ex. C, 89:9–15.) Rubin and Powers (not Shon) repeated this conduct with regards to Hallman's September 24, 2016 encounter with Rubin (Rubin 56.1, ¶ 37; Powers 56.1, ¶ 50.) Powers paid Hallman a total of $13,000 between August of 2016 and August of 2017. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Powers threatened Hallman on August 14, 2017, that Hallman had violated the NDA by revealing to her then criminal defense attorney that Rubin had beat and raped her. (Counter Powers 56.1, ¶ 32; Epiq Production, Ex. B, Line 557.) Powers transported, harbored, had Hallman sign an NDA, paid, and threatened to sue Hallman for violation of the NDA between August 2016 and August 2017, all in furtherance of the sex trafficking venture.

### 2. Powers Transported Lawson from Florida to New York, Harbored Lawson in the Venture's Penthouse Apartment, Had Lawson Sign a Non-Disclosure Agreement, and Paid Lawson on Two Occasions: Once in August 2016, and Again in December 2016

In August of 2016, Rubin's associate Stephanie Shon recruited Lawson. (Rubin 56.1, ¶¶ 2–4.) Shortly thereafter, Rubin's associate and co-defendant Powers continued to recruit and transported Lawson by purchasing and arranging her flight to New York. (Powers 56.1, ¶¶ 100, 108.) Powers booked Lawson's flights from Florida to New York on August 22, 2016. (Powers 56.1, ¶ 108.) Powers gave Lawson access to the Penthouse apartment that Powers and Rubin used in their sex-trafficking venture. (Counter Powers 56.1, ¶ 17; Lawson Dep., Ex. C, 93:13-15.) Powers had Lawson sign a non-disclosure agreement in relation to the sex trafficking venture's

13

crimes against Lawson. (Powers 56.1, ¶¶ 111–112.) Rubin and Powers maintained and harbored

Lawson on August 22, 2016, by allowing her to stay the night in Rubin's apartment. (Rubin 56.1,

¶ 20.) Rubin then patronized Lawson that night when he caused her to engage in commercial sex.

(Rubin 56.1, ¶¶ 17–19.) Rubin threw money at Lawson when he was done with her. (Counter

Powers 56.1, ¶ 31; Lawson Dep., Ex. C, 89:9–15.)  Rubin and Powers (not Shon) repeated this

conduct with regards to Lawson's December 21, 2016 encounter (Rubin 56.1, ¶ 48; Powers 56.1,

¶ 134). Powers paid Lawson a total of $5,000 between August of 2016 and December of 2016.

(Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.)

Powers transported, harbored, had Lawson sign a non-disclosure agreement, and paid Lawson

between August 2016 and December 2016, all in furtherance of the sex trafficking venture.

### 3. Powers Transported Speight from Georgia to New York, Harbored Speight in the Venture's Penthouse Apartment, Had Speight Sign a Non-Disclosure Agreement, and Paid Speight on a Number of Occasions Between November 2015 and July 2017

Speight was recruited by Rubin's associate Stephanie Shon. (Rubin 56.1, ¶ 129.) Powers

booked flights for Speight to travel to New York on October 12, 2015, November 13, 2015,

January 5, 2016, January 27, 2016, August 2, 2016, September 27, 2016, November 21, 2016,

January 30, 2017, May 24, 2017, and July 25, 2017. (Powers 56.1, ¶¶ 158, 178, 188, 195, 219,

234, 246, 269, 279.) Powers gave Speight access to the Penthouse apartment that Powers and

Rubin used in their sex-trafficking venture. (Powers 56.1, ¶¶ 197, 207, 220, 235, 247, 258, 270,

280.) Powers had Speight sign a non-disclosure agreement in relation to the sex trafficking

venture's crimes against Speight. (Powers 56.1, ¶¶ 161–162.) Rubin and Powers maintained and

harbored Speight by permitting her to stay at the apartment. (Powers 56.1, ¶¶ 197, 207, 220, 235,

247, 258, 270, 280, 284.) Rubin patronized Speight when he caused her to engage in commercial

sex (Rubin 56.1, ¶¶ 132, 140, 143, 144, 147, 149), and Powers aided Rubin in patronizing Speight

14

by arranging for her payment. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶¶ 173, 183, 190, 202, 215, 230, 242, 254, 264, 275, 282.) Powers paid Speight a total of $47,400 between November 2015 and July 2017. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Powers transported, harbored, had Speight sign a non-disclosure agreement, and paid Speight between November 2015 and July 2017, all in furtherance of the sex trafficking venture.

### 4. Powers Transported Hathaway from Illinois to New York, Harbored Hathaway in the Venture's Penthouse Apartment, Had Hathaway Sign a Non-Disclosure Agreement, and Paid Hathaway on a Number of Occasions Between Early 2011 and June 2017

Hathaway was recruited by Rubin's associate, ██████████, in 2009 or 2010. (Rubin 56.1, ¶ 108.) Rubin and Powers transported Hathaway from either Las Vegas or Chicago to New York. (Rubin 56.1, ¶ 110.) Powers booked a flight for Hathaway to travel to New York on May 20, 2015. (Powers 56.1 ¶ 328.) Powers coordinated travel with Hathaway on September 8, 2015, September 29, 2015, November 6, 2015, January 13, 2016, May 5, 2016, and June 11, 2017. (JLA Decl., Exs. 59, 1, 3, 4, 6, 7; Hathaway-Powers WhatsApp Chat, Part 2, JLA Decl., Ex. 60.) Rubin and Powers maintained and harbored Hathaway by permitting her to stay at the apartment or otherwise paying for her to stay in a hotel. (Powers 56.1, ¶¶ 351, 355; Counter Powers 56.1, ¶ 55; Deposition of Moira Hathaway ("Hathaway Dep."), Ex. F, 91:21–92:6.) Powers had Hathaway sign a non-disclosure agreement on January 21, 2015. (Powers 56.1, ¶¶ 322–323.) Rubin patronized Hathaway when he caused her to engage in commercial sex (Rubin 56.1, ¶¶ 111–115, 121), and Powers aided Rubin in patronizing Hathaway by arranging for her payment. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶¶ 320, 330, 339, 342, 344, 345.)  Powers paid Hathaway $23,500 between October of 2015 and June of 2017. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3,

¶ 5.) However, prior to Powers paying Hathaway, Rubin paid Hathaway a total of $17,000. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Powers transported, harbored, had Hathaway sign a non-disclosure agreement, and paid Hathaway between October 2015 and June 2017, all in furtherance of the sex trafficking venture.

### 5. On Behalf of Rubin's Sex Trafficking Venture, Powers Paid Plaintiff Fuller in 2016

Fuller was recruited by Rubin's associate ███████ (Rubin 56.1, ¶ 234.) ███████ assisted in transporting Fuller from Las Vegas to New York, and then to Florida, where Fuller was originally planning on traveling. (Rubin 56.1, ¶ 240; Counter Powers 56.1, ¶ 56; Fuller Dep., Ex. D, 91:15–19, 94:8–17.) Powers paid Plaintiff Fuller in 2016 on behalf of the sex trafficking venture and even though Powers did not book Fuller to travel to New York or have Fuller sign the non-disclosure agreement. ███████, another of Rubin's workers in the trafficking venture, contacted and recruited Fuller. (Counter Powers 56.1, ¶ 58 Fuller Dep., Ex. D, 76:16–20.) Defendant Rubin and ███████ had Fuller sign the non-disclosure agreement, and not Powers. (Counter Powers 56.1, ¶ 21; Fuller Dep., Ex. D, 113:9–22.) Rubin maintained and harbored Fuller by permitting her to stay at the apartment. (Rubin 56.1, ¶ 251.) Rubin patronized Fuller when he caused her to engage in commercial sex in March, 2016. (Rubin 56.1, ¶ 254.) Powers aided Rubin in patronizing Fuller by arranging for her payment. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶ 374.) Powers did pay Fuller after her encounter with Rubin. (Powers 56.1, ¶ 374.) Powers paid Plaintiff Fuller in 2016 in furtherance of the sex trafficking venture.

16

### 6. Rubin and His Associates Recruited, Enticed, Harbored, Transported, Provided, Maintained, and Patronized Peterson[4]

Peterson was recruited by Rubin's associate, ███████████, in 2011. (Rubin 56.1, ¶ 174.) Though Rubin did not have sex with Peterson in 2011, he did have her recruited for that purpose. (Rubin 56.1, ¶¶ 176, 181, 182.) Rubin and his associates transported Peterson from Los Angeles to New York. (Counter Powers 56.1, ¶ 60; Deposition of Rosemarie Peterson ("Peterson Dep."), Ex. G, 60:7–16.) On multiple occasions thereafter, primarily in 2014, Rubin patronized Peterson. (Rubin 56.1, ¶¶ 198–200, 208–209, 212–214.) Powers aided Rubin in patronizing Peterson by arranging for her payment. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Counter Powers 56.1, ¶ 61; Peterson Dep., Ex. G, 369:3–15, 374:19–375:8.)

### 7. Powers Recruited, Harbored, and Transported Other Victims for Rubin Over the Last Decade in Addition to the Plaintiffs

Powers recruited, harbored, and transported other victims for Rubin over the last decade in addition to the Plaintiffs. Powers booked flights for at least ███████████ ████████████████████████████████████████████ ███████████ in addition to the Plaintiffs and former Plaintiff Caldwell. (Counter Powers 56.1, ¶ 62; Powers Dep., Ex. A, 85:7–12, 95:7–12., 95:21–96:10, 96:18–24.) Indeed, between 2011 and 2015, Powers booked flights for between 10 and 30 women to travel to New York to meet Rubin. (Counter Powers 56.1, ¶ 10; Powers Dep., Ex. A, 92:25–93:21.) Powers also paid those women between $1,000 and $5,000 per encounter on behalf of Rubin. (Counter Powers 56.1, ¶ 11; Powers Dep.,

---

[4] While Plaintiff Peterson has no remaining claims against Defendant Powers, Plaintiffs provide the same details with regard to her here for the Court's convenience.

[5] At her deposition, Powers listed only these individuals, notwithstanding admitting to making arrangements for two dozen more individuals over the years. Powers only referenced individuals that had already come up in this litigation previously. But at the same Powers deposition claimed that she could not remember any other women's names. (Powers Dep., Ex. A ,96:18–24.)

Ex. A, 97:3–22.) Powers paid a multitude of women over the last decade in furtherance of the sex trafficking venture.

### B.  It Is Undisputed that Rubin and Powers Acted in Interstate Commerce

Similarly, there is no question that Rubin and Powers acted in a manner which affected interstate commerce.

*Hallman and Lawson:* For each of their interactions with Rubin, Hallman and Lawson were transported from their home state of Florida to New York. (Rubin 56.1, ¶ 20; Powers 56.1, ¶¶ 19, 40, 57, 108.) This alone is sufficient to establish the interstate commerce prong of the TVPA claim. *See United States v. Isaac*, 14 F. App'x 81, 83 (2d Cir. 2001) (finding "taxi business was engaged in interstate commerce" because it was "making regular trips to the Newark, New Jersey airport" from New York); *see also United States v. Farrish*, 122 F.3d 146, 148–49 (2d Cir. 1997) (holding that very slight effects, potential effects, or subtle effects on interstate commerce are sufficient to satisfy the interstate commerce requirement of the Hobbs Act). However, Rubin and his associates conduct went beyond this. Rubin and his associates paid Hallman and Lawson through PayPal, and communicated with them through several Internet-based platforms, like Instagram, and WhatsApp. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶¶ 5, 10, 99.) Each of these is also sufficient to show that Rubin's conduct affected interstate commerce. *United States v. Le*, 902 F.3d 104, 119 (2d Cir. 2018), *cert. denied*, No. 18-7385, 2019 WL 188295 (U.S. Feb. 25, 2019) (the Internet is "an instrumentality of interstate commerce").

*Hathaway:* For each of her interactions with Rubin, Hathaway was transported from either Las Vegas or Chicago. (JLA Decl., Exs. 59, 1, 3, 4, 6, 7; Hathaway-Powers WhatsApp Chat, Part 2, JLA Decl., Ex. 60.) Rubin and his associates paid Hathaway through bank wires and PayPal, as well as communicated with Hathaway through Internet-based platforms, like Instagram and

WhatsApp. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶¶ 5, 340.) Each of these is sufficient to show that Defendants' conduct affected interstate commerce.

*Peterson:* For her first encounter with Rubin, Peterson was transported from Los Angeles to New York. (Counter Powers 56.1, ¶ 60; Peterson Dep., Ex. G, 60:7–16.) Rubin and his associates paid Peterson through PayPal and communicated with Peterson through Internet-based platforms, like Instagram and WhatsApp. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Counter Powers 56.1, ¶ 64; Peterson Dep., Ex. G, 61:10–62:12.) Each of these is sufficient to show that Defendants' conduct affected interstate commerce.

*Speight:* For each encounter with Rubin, Speight was transported from Atlanta to New York. (Powers 56.1, ¶¶ 158, 178, 188, 195, 219, 234, 246, 269, 279.) Rubin and his associates paid Speight through PayPal, and communicated with Speight through Internet-based platforms, like Instagram and WhatsApp. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5; Powers 56.1, ¶¶ 146, 148.) Each of these is also sufficient to show that Rubin's conduct affected interstate commerce.

*Fuller:* For her one encounter with Rubin, Fuller was transported from Las Vegas to New York. (Counter Powers 56.1, ¶ 65; Fuller Dep., Ex. D, 76:16–20.) Fuller then returned to Florida. (Counter Powers 56.1, ¶ 65; Fuller Dep., Ex. D, 94:8–17.) Rubin and his associates paid Fuller through PayPal, and communicated with Fuller through Internet-based platforms, like Instagram and WhatsApp. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Each of these is also sufficient to show that Defendants' conduct affected interstate commerce.

**C. Powers Benefitted Financially from Participating in Rubin's Sex Trafficking Venture, Which Engaged in the Soliciting, Harboring, and Transportation of Five Plaintiffs with Claims Against Powers**

Powers benefitted financially from participating in Rubin's sex trafficking venture, which engaged in the soliciting, harboring, and transportation of all five Plaintiffs with claims against Powers. A defendant is liable for violations of the TVPA when she "benefits, financially or by receiving anything of value, from participation in a venture." 18 U.S.C. § 1591(a). Powers financially benefitted for her active participation in the sex trafficking venture by receiving an annual salary of $120,000 a year between 2011 and 2014, and $180,000 a year between 2014 and 2017, as Rubin's "assistant." (Counter Powers 56.1, ¶ 13–15; Powers Dep., Ex. A, 33:3–18.)

Further proof of the illicit nature of the venture — and that Powers knew the venture was wrong — was that she did not know if she reported this income on her tax returns. (Counter Powers 56.1, ¶ 66; Powers Dep., Ex. A, 31:21–23 ("Q. Did you report that as income on your tax returns? A. I don't know.").) Rubin paid Powers more than one million dollars to solicit, harbor, and transport victims to New York for Rubin, and to pay Plaintiffs. (Counter Powers 56.1, ¶ 14; Powers Dep., Ex. XX, 33:12–18), Powers assisted the sex trafficking venture by booking victims flights to and from New York to meet Rubin (Counter Powers 56.1, ¶ 6; Powers Dep., Ex. A, 39:3–9), providing victims an apartment to stay in while in New York (JLA Decl., Exs. 17, 36, 39, 41, 43, 46, 48, 50, 52, 54, 62), having the Plaintiffs sign unenforceable NDAs (which pressured the Plaintiffs) (Counter Powers 56.1, ¶ 8; Powers Dep., Ex. A, 116:25–117:18), and paying the Plaintiffs after the encounters (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5). There is substantial evidence of Powers's active, knowing participation in the sex trafficking venture requiring that her Motion be denied.

Only when Rubin's human trafficking venture was made public, and there was no way that Rubin could any longer recruit victims, did Powers no longer receive payment:

> Q. Why did you stop working for him?
> A. Well, this lawsuit was a big part of it.
> Q. Can you explain what you mean by that?
> A. Right, there was nothing -- there was nothing left to do.

(Counter Powers 56.1, ¶ 15; Powers Dep., Ex. A, 32:15–33:2.) The evidence shows both that Powers financially benefited from the sex trafficking venture and knowing that the once hidden venture was engaged in wrongdoing, making her liable and warranting denial of her Motion.

### D. Powers Knew or Had Reason to Know that Rubin Would Use Threats of Force, Force, and Coercion to Cause Plaintiffs to Engage in Commercial Sex

The evidence shows that Powers knew or had reason to know that Rubin would use threats of force, actual force, and coercion to cause Plaintiffs to engage in commercial sex acts such that she does not deserve judgment on any claims. A defendant coerces a victim when she uses "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). Because the evidence shows that Powers was aware that Rubin used physical restraints and physically harmed the victims, and because Powers herself threatened legal process against at least one Plaintiff, the Powers Motion should be denied.

#### 1. Powers was Aware that Rubin Threatened Harm and Actually Harmed the Plaintiffs

Powers was aware that Rubin used threats of serious harm against or actually seriously harmed Plaintiffs in the Penthouse. The Eleventh Circuit has found that where a defendant "used force in the form of physical violence against some victims in their sex-trafficking operation and that other victims knew about it . . . , a reasonable jury could have concluded that victims feared serious harm, in the form of physical injury, if they did not continue the prostitution." *United States v. Williams*, 714 F. App'x 917, 919 (11th Cir. 2017). Powers was aware of Rubin's physical

violence against the victims, who Powers herself arranged to come to the Penthouse, even reveling in it, telling Rubin on one occasion: "You *beat* a hot girl and got laid! What's there to be upset about!!" (Counter Powers 56.1, ¶ 29; Excerpts of the WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000025–JP_0000026 (emphasis added).) Powers was also aware of the extent of the injuries Rubin caused to Plaintiffs; on one occasion responding to a picture Plaintiff Hallman sent to her of former Plaintiff Caldwell's breasts after an encounter with Rubin: "[emoji][emoji][emoji] I know. Speaking to her now Thank you for being a good friend . . . She'll be OK, don't worry. [emoji] . . . Are you with [Caldwell] now? . . . I need her address, want to send her some stuff I've found to be helpful." (Kristina Hallman- Jennifer Powers WhatsApp Chat, JLA Decl., Ex. 10, 3.) The evidence shows that Powers knew what was going on, such that she does not deserve judgment in her favor.

### 2. Powers Purchased and Placed the Furniture and Items that Rubin Used to Physically Restrain the Plaintiffs in the Penthouse

Powers was not only aware that Rubin would physically restrain the Plaintiffs, Powers was the one that made it possible for Rubin to restrain the Plaintiffs. Powers purchased Rubin's bondage equipment and put it in the Penthouse. (Counter Powers 56.1, ¶ 23; Powers Dep., Ex. A, 144:13–21 ("Q. Now, the sex toys, the BDSM objects and so forth that were in the second bedroom, how did they get in there? A. I put them there. Q. So did you make the purchases? A. Yes, sir, I did."), 146:13–21 (Powers "bought certain restraints").) Powers testified that she believed that a woman could just pull her hands out of the restraints, but also testified that she was never there when Rubin engaged in BDSM activity such that she truly had no way of knowing whether a victim could, or could not, pull her hands out of the restraints. (Counter Powers 56.1, ¶ 25; Powers Dep., Ex. A, 163:24–164:4, 190:9–17; Powers 56.1, ¶ 385.) The evidence showing Powers's key involvement in restraint of the Plaintiffs makes her liable under the TVPA.

### 3. Powers Threatened Most Plaintiffs with Legal Process, Which is Coercion Under the TVPA

Powers also threatened most Plaintiffs—generally unsophisticated individuals who did not ordinarily have counsel—with legal process in the form of a lawsuit. Under the TVPA, "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2)(C). In the TVPA, "abuse or threatened abuse of law or legal process" also means the purpose of causing someone to "or refrain from taking some action." 18 U.S.C. § 1591(e)(1). The three elements of a claim for abuse of process are "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984). Process does not need to be issued, but rather just threatened. *See* 18 U.S.C. § 1591(e)(2)(C) ("the abuse or *threatened* abuse of law or the legal process") (emphasis added). It is a question for a jury as to whether a threat can be inferred from other statements made by a defendant. *United States v. Walker*, 262 F. App'x 303, 306 (2d Cir. 2008) ("While it is true that one could draw the inference from Osorio's later testimony that Walker's message to him was not threatening, it was equally reasonable for the jury to draw the inference that Walker did, in fact, threaten Osorio"). Powers's misuse of unenforceable contracts was coercive, making judgment in her favor inappropriate.

Powers threatened her abuse of process at the time she knew that the human trafficking venture might become public (and that she could lose her lieutenant job that had paid her a million dollars). On August 14, 2017—just five days before counsel for Plaintiffs called Yifat Schnur about this lawsuit—Powers threatened a baseless lawsuit by messaging Plaintiff Hallman and former Plaintiff Caldwell, threatening to enforce an unenforceable contract:[6]

[Hallman] and [Caldwell],

---

[6] A contract that "Defendants are not attempting to enforce" as they know such contract is unenforceable. (Rubin Motion, 43 n.14.)

The last few days have left me hurt and frustrated.

We are friends I have always taken care of you and been there for you and both of you have been ignoring me, standing me up, taking time away from my family to sit in a lobby by myself for hours on end and have been just plain rude and ungrateful by deliberately not answering my phone calls or returning my messages.

And when you have it's been hours later - which has resulted in a colossal waste of my time.

Being that I have always looked out for you - I had wanted to continue making sure your best interests are being protected and instead of being grateful and appreciative you both have been anything but.

*On that note, please keep in mind that both of you have violated the NDA agreement.*

(Counter Powers 56.1, ¶ 32; Epiq Production, Ex. B, Line 557 (emphasis added).) Powers's statement is a barely veiled threat that she and Rubin would (wrongfully) sue Plaintiff Hallman and former Plaintiff Caldwell in order to attempt to prevent them from Revealing the trafficking venture. (Counter Powers 56.1, ¶ 32; Epiq Production, Ex. B, Line 557 (emphasis added).) There is sufficient evidence for a jury to determine whether this veiled threat was in fact a threat. *See Walker*, 262 F. App'x at 306 (it is up to a jury to determine whether something is a threat). Indeed, Powers followed through with her threat, filing counterclaims in this Action alleging breach of contract. (Answer to Second Amended Complaint, Counterclaim, and Third Party Complaint of Defendant Jennifer Powers, (Dkt. No. 170).) This coercive behavior makes Powers liable under the TVPA.

The NDA Powers threatened to use was void as against public policy. A contract is void if it directly violates a statutory prohibition. *SI Venture Holdings, LLC v. Caitlin Specialty Ins.*, 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015). "A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee."

24

N.Y. Penal Law § 230.00; *see also* N.Y. Penal Law § 230.02(1)(a). The document Defendants had Plaintiffs sign stated: "[i]n return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) . . . ." (insertion in original) (Plaintiffs' Statement of Undisputed Facts (Dkt. No. 234-2) ("P's 56.1"), ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, O.) The NDAs are void as they specifically articulate a violation of the New York Penal Law, warranting dismissal of Defendants' breach of contract defenses. It was this voided document which Powers improperly used to threaten to sue Plaintiffs if they disclosed that they were victims of Defendants' crimes.

The NDA is also unenforceable as it contains a non-permissible penalty provision. "While the parties to a contract may agree as to the damages in the event of a breach, the imposition of penalties or forfeitures for a breach of contract is not permitted in the absence of statutory authority." *Ann-Par Sanitation, Inc. v. Town of Brookhaven*, 23 A.D.3d 380, 382 (2d Dep't 2005) (citing *Truck Rent–A–Center v. Puritan Farms 2nd*, 41 N.Y.2d 420, 424 (1977); *City of Rye v. Public Serv. Mut. Ins. Co.*, 34 N.Y.2d 470, 472–473 (1974)). Powers had Plaintiffs sign an NDA that contained a provision stating that Plaintiffs "agree that in the event [they] disclose Confidential Information covered by this Agreement, [they] will return to Rubin all monies previously received in connection with this Agreement, and will pay Rubin an additional **Five-Hundred Thousand (500,000.00)** as a penalty." (P's 56.1, ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, O (emphasis in original).) The NDA was unenforceable based on this penalty provision alone.

Powers confirmed her improper objective as to Plaintiff Hallman and former Plaintiff Caldwell violating the NDA. Just two days after telling them to "please keep in mind that both of you have violated the NDA agreement" on August 14, 2017, she messaged Hallman, "I'm not sure who's going to fund what you're doing with [Hallman's criminal defense lawyer for whom Rubin

was paying]." (Counter Powers 56.1, ¶ 36; Epiq Production, Ex. B, Lines 557, 32491.) Powers used the threat of violation of the NDA for the improper objective of preventing Plaintiffs from pursuing their legal rights against Rubin and Powers. Such abuse of process is coercive under the TVPA warranting denial of the Powers Motion.

### 4. Powers Assisted Rubin in Coercing Plaintiffs Through Emotional, Psychological, and Financial Means

Powers assisted Rubin in further coercing Plaintiffs through emotional, psychological, and financial means making her liable under the TVPA. A reasonable jury could conclude that Powers coerced "victims through emotional, psychological, and financial means" when she promised to "help the victims make money; take care of them; buy them food, clothing, and phones; provide them with marijuana; and pay for them to have their hair and nails done and to have whatever they needed." *Williams*, 714 F. App'x at 919. Powers paid Plaintiffs after their encounters with Rubin sums in the many thousands of dollars. (Joint Stipulation Regarding Payments Made by Defendants to Plaintiffs, JLA Decl., Ex. 3, ¶ 5.) Powers also sent at least Plaintiff Speight money to take care of her when she was stranded in Dallas and to help Speight go to a modeling event. (Powers 56.1, ¶¶ 291–294.) Powers provided Plaintiffs not only with housing, but food and even connection to the Internet while they were in New York. (Powers 56.1, ¶¶ 198, 260, 272; Counter Powers 56.1, ¶ 37; Excerpts of the WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000019, JP_0000042.) Powers also purchased the Plaintiffs gifts. (Counter Powers 56.1, ¶ 38; Powers Dep., Ex. A, 29:19–30:6.) She arranged for at least one Plaintiff to go to the spa one day that she was in New York. (Powers 56.1, ¶ 222.) The evidence shows that Powers likely provided drugs to Plaintiffs. (Speight-Powers WhatsApp Chart, Part 1, JLA Decl., Ex. 29, 7; Excerpts of the WhatsApp Chat between Howard Rubin and Jennifer Powers, JLA Decl., Ex. 6, JP_0000076; JP_0000072.) And Powers used the threat of the $500,000 penalty provision to make Plaintiffs

26

think that if they stopped coming to see Rubin, or told anyone about what happened to them, then Plaintiffs would owe Rubin and Powers half a million dollars, money Plaintiffs did not have. (P's 56.1 ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, O; Counter Powers 56.1, ¶ 32; Epiq Production, Ex. B, Line 557; Powers Dep., Ex. A, 117:8–18.) Powers did all of this in furtherance of her role in the human trafficking venture, both to bring victims to Rubin, and then to prevent those victims from making Rubin's sexual assaults and rapes public. The evidence shows that Powers knowingly coerced Plaintiffs through emotional psychological, and financial means such that the Powers Motion must be denied.

## III.   EVIDENCE SHOWS THAT POWERS INTENDED TO CAUSE EMOTIONAL DISTRESS TO PLAINTIFFS WARRANTING DENIAL OF THE POWERS MOTION

The evidence shows that Powers intended to cause emotional distress to the Plaintiffs, such that she does not deserve judgment on the intentional infliction of emotional distress claim. To prove such a claim, a plaintiff must demonstrate "(1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress." *Klein v. Metropolitan Child Servs., Inc.*, 100 A.D.3d 708, 710 (2d Dep't 2012). Powers's conclusion that a Plaintiff "must" have documentary medical evidence is incorrect. Powers cites to *Greenaway v. County of Nassau* to claim that "emotional injury must be (a) severe, and (b) documented by medical evidence." (Powers MOL, 32 (citing 97 F. Supp. 3d 225, 240 (E.D.N.Y. 2015)).) However, the Court in *Greenway* dismissed the plaintiff's intentional infliction of emotional distress claim only because the plaintiff did "not elaborate on [the intentional infliction of emotional distress claim] further, *or provide testimony* or documentation that this anxiety is 'severe.'" *Greenaway*, 97 F. Supp. 3d at 240 (emphasis added). That is not the case here as the Plaintiffs did elaborate, through testimony, and can testify further

at trial on direction examination, on the severity of their emotional distress, in addition to documentary evidence, such as photographs.

Powers's conduct was extreme and outrageous when she had Plaintiffs sign non-disclosure agreements that stated, "I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person," while knowing that the NDA did not fully articulate what would happen to the Plaintiffs. (P's 56.1 ¶ 9; Plaintiffs' NDAs, Exhibits J, K, L, M, N, O.)

Powers knew the true extent of what Rubin would be doing to the Plaintiffs and that it would cause injury more than just "on occasion" but either disregarded this or intended it happen to the Plaintiffs. (Counter Powers 56.1, ¶ 29; Excerpts of the WhatsApp Chat between Rubin and Powers, Ex. E, JP_0000025–JP_0000026 ("You beat a hot girl and got laid! What's there to be upset about!!"); Kristina Hallman- Jennifer Powers WhatsApp Chat, JLA Decl., Ex. 10, 3 ("She'll be OK, don't worry. [emoji] . . . Are you with [Caldwell] now? . . . I need her address, want to send her some stuff I've found to be helpful").)

Powers did not tell Plaintiffs what would actually happen to them because she was being paid by Rubin to further the sex trafficking venture, which resulted in Plaintiffs injuries. But had she told Plaintiffs the truth, Plaintiffs would not have partaken in the encounters, and Powers would no longer have a job paying her $180,000 a year. (*See e.g.* Counter Powers 56.1, ¶ 67; Powers Dep., Ex. A, 120:21–122:4 (Powers did not want to hit Hallman with "a ton of bricks" while signing the release and Lawson did not have any questions so Powers did not tell her anything extra); Counter Powers 56.1, ¶ 15; Powers Dep., Ex. A, 32:15–33:2 (Powers stopped working for Rubin after the filing of this lawsuit because "there was nothing left to do").)

As a result of Powers and Rubin's acts, it became difficult for Lawson to get jobs as she is

"not as confident as [she] used to be," due to her issues with sleep, anxiety, PTSD, and general loss of confidence. (Counter Powers 56.1, ¶ 39; Lawson Dep., Ex. C, 189:2–5, 206:3–11.) Hathaway ███████████████████████ as a result of the sex trafficking venture. (Counter Powers 56.1, ¶ 40; Hathaway Dep., Ex. F, 149:19–25.) Evidence shows that Powers intended to inflict emotional distress on Plaintiffs, such that the Powers Motion must be denied.

## CONCLUSION

In all the years Rubin has been engaging in his human trafficking venture he has had only one lieutenant—Powers—without whom there would be no trafficking of victims for Rubin to assault and rape. Powers transported and harbored Plaintiffs, had the Plaintiffs sign NDAs, paid the Plaintiffs following their encounters with Rubin, coerced them through improper threats of legal process, and helped Rubin keep the human trafficking venture secret. Powers was paid handsomely for running Rubin's venture to over a million dollars over time. Powers purchased and placed all of the BDSM equipment in the Penthouse for Rubin to use on the Plaintiffs. And Powers was aware of everything that would happen to the Plaintiffs, including Rubin's use of force and threats of force to make Plaintiffs engage in commercial sex acts, and the extent of the injuries Rubin would cause the Plaintiffs.

The Powers Motion should be denied and this case should be proceed to trial.

Dated: New York, New York
        March 6, 2019

By: _____
    John G. Balestriere
    Brian L. Grossman
    **BALESTRIERE FARIELLO**
    225 Broadway, 29th Floor
    New York, New York 10007
    Telephone:    (212) 374-5401
    john.balestriere@balestrierefariello.com
    *Attorneys for Plaintiffs*