John G. Balestriere
Jillian L. McNeil
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:      (212) 374-5401
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON,** and **LAUREN FULLER,**

                     Plaintiffs,

     – against –

**HOWARD RUBIN, JENNIFER POWERS,** and the **DOE COMPANY,**

                  Defendants.

---

Case No.: 1:17-cv-06404 (BMC) (SMG)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RUBIN'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 7

LEGAL STANDARD ......................................................................................................... 19

ARGUMENT ..................................................................................................................... 19

    I.   RUBIN FAILS TO SHOW THAT NO ISSUES OF MATERIAL FACT EXIST
        WITH REGARDS TO HIS CONSENT AFFIRMATIVE DEFENSE,
        WARRANTING DENIAL OF HIS MOTION ........................................................... 19

        A.  Whether a Victim Consented to Rape and Human Trafficking—if Legally
             Possible—Is A Fact-Intensive Issue Not Appropriate for Summary
             Judgment ......................................................................................................... 20

        B.  The Evidence Shows that Rubin Repeatedly Physically and Sexually
             Assaulted Plaintiffs Beyond Any Consent They Provided, Rendering
             Rubin's Consent Defense Meritless ...................................................... 23

        C.  Evidence of Prior or Subsequent Prostitution and Sexual Activity Is
             Irrelevant to the Issue of Consent ........................................................ 35

        D.  The TVPA Is a Remedial Statute, Focusing on Punishing the Perpetrators of
             the Sex Trafficking Scheme, Not Whether the Victims Purportedly
             Consented to Being Trafficked ............................................................. 37

        E.  As a Matter of Public Policy, a Person Cannot Consent to the Commission
             of a Crime That Causes Injury or Carries a Risk of Serious Harm, Like Rape
             or Sex Trafficking in Violation of the TVPA ....................................... 38

    II.  THERE ARE, AT A MINIMUM, MATERIAL QUESTIONS OF FACT
        REGARDING PLAINTIFFS' TVPA CLAIMS, REQUIRING DENIAL OF
        RUBIN'S MOTION ........................................................................................... 39

        A.  It Is Undisputed that Rubin and His Associates Recruited, Enticed,
             Harbored, Transported, Provided, Maintained, and Patronized Plaintiffs In
             Interstate Commerce .......................................................................... 40

B. Rubin Acted Knowing That He Would Use Means of Force, Threats of Force, and Coercion to Cause Plaintiffs to Engage in Certain Commercial Sex Acts ...................................................................................................... 40

III. THERE ARE, AT A MINIMUM, MATERIAL QUESTIONS OF FACT REGARDING HATHAWAY'S, LAWSON'S, AND SPEIGHT'S STATE LAW CLAIMS, WARRANTING DENIAL OF RUBIN'S MOTION ............................... 43

A. There Is at Least a Question of Fact Regarding Hallman's, Lawson's, and Speight's False Imprisonment Claims Regardless of Whether Certain Plaintiffs Were Free to Leave the Apartment on Certain Occasions ............... 43

B. Rubin Does Not Contest that He Committed the Remaining Torts of Assault, Battery, and Intentional Infliction of Emotional Distress, But, Rather, Relies Solely on His Consent Argument, Which Fails for the Reasons Stated Above ...................................................................................................... 44

IV. EACH PLAINTIFF WAS INJURED AS A RESULT OF DEFENDANTS' MISCONDUCT, AND IS ENTITLED TO COMPENSATORY AND PUNITIVE DAMAGES ........................................................................................................ 44

A. Hallman Was Injured as a Result of Defendants' Misconduct .......................... 45

B. Lawson Was Injured as a Result of Defendants' Misconduct ........................... 47

C. Hathaway Was Injured as a Result of Defendants' Misconduct ...................... 48

D. Peterson Was Injured as a Result of Defendants' Misconduct .......................... 49

E. Speight Was Injured as a Result of Defendants' Misconduct ........................... 49

F. Fuller Was Injured as a Result of Defendants' Misconduct .............................. 50

CONCLUSION ................................................................................................................ 50

## TABLE OF AUTHORITIES

**Cases**

*Am. Int'l. Group, Inc. v. London Am. Int'l. Co., Ltd.,*
   664 F.2d 348 (2d Cir. 1981) .................................................................................... 21

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................ 19

*Arnstein v. Porter,*
   154 F.2d 464 (2d Cir. 1946) .................................................................................... 21

*Clubside, Inc. v. Valentin,*
   468 F.3d 144 (2d Cir. 2006) .................................................................................... 21

*Empire Electronics Co., Inc. v. United States,*
   311 F.2d 175 (2d Cir. 1962) .................................................................................... 21

*Goff v. Clarke,*
   No. 98-2101, 2002 WL 126276 (Sup. Ct., Madison Cty., Jan. 22 2002) ................. 20

*Guion v. Associated Dry Goods Corp. (Lord & Taylor Div.),*
   56 A.D.2d 798 (1st Dep't 1977) ............................................................................. 45

*Hassan v. Marriott Corp.,*
   243 A.D.2d 406 (1st Dep't 1997) ........................................................................... 45

*In re Kalah O.,*
   154 A.D.3d 615 (1st Dep't 2017) ........................................................................... 20

*In re Khalil H.,*
   80 A.D.3d 83 (2d Dep't 2010) ................................................................................ 38

*Kajtazi v. Kajtazi,*
   488 F. Supp. 15 (E.D.N.Y.1978) ........................................................................... 43

*Kaytor v. Electric Boat Corp.,*
   609 F.3d 537 (2d Cir. 2010) .................................................................................... 22

*King v. Crossland Savings Bank,*
   111 F.3d 251 (2d Cir. 1997) .................................................................................... 43

*Landmark Land Co., Inc. v. Sprague,*
   701 F.2d 1065 (2d Cir. 1983) .................................................................................. 21

*Morales v. M. Alfonso Painting Corp.*,
  No. 11 Civ. 1263(NRB), 2013 WL 5289789 (S.D.N.Y. Sept. 19, 2013) ............................... 21

*N.C. Freed Co., Inc. v. Board of Governors of Fed. Reserve Sys.*,
  473 F.2d 1210 (2d Cir. 1973) ................................................................................................ 37

*Noble v. Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018) ......................................................................... 37, 39, 40

*Patrick v. LeFevre*,
  745 F.2d 153 (2d Cir. 1984) ................................................................................................. 21

*People v. Abdur-Razzaq*,
  60 Misc. 3d 631 (N.Y. Sup. Ct. Bronx Cty. 2018) ................................................................ 27

*People v. Jovanovic*,
  263 A.D.2d 182 (1st Dep't 1999) ..................................................................................... 23, 38

*People v. Liberta*,
  64 N.Y.2d 152 (1984) ................................................................................................. 6, 45, 46

*People v. Page*,
  166 A.D.2d 886, 886 (4th Dep't 1990) ............................................................................ 27, 33

*People v. Steinberg*,
  190 Misc. 413 (Magis. Ct. 1947) .......................................................................................... 19

*Peyton v. Rowe*,
  391 U.S. 54 (1968) ................................................................................................................ 39

*Proctor v. Leclair*,
  846 F.3d 597 (2d Cir. 2017) ................................................................................................. 22

*Quinn v. Syracuse Model Neighborhood Corp.*,
  613 F.2d 438 (2d Cir. 1980) ................................................................................................. 21

*Rana v. Islam*,
  210 F. Supp. 3d 508 (S.D.N.Y. 2016) ................................................................................... 45

*Raymond v. Marchand*,
  125 A.D.3d 835 (2d Dep't 2015) .......................................................................................... 45

*Rodgers v. City of Rochester*,
  No. 05-CV-6220T, 2007 WL 1557465 (W.D.N.Y. May 29, 2007) ......................................... 43

*Scalera v. Electrograph Sys., Inc.*,
   848 F. Supp. 2d 352 (E.D.N.Y. 2012) ................................................... 21

*Schering Corp. v. Home Ins. Co.*,
   712 F.2d 4 (2d Cir. 1983) ..................................................................... 21

*Shukla v. Sharma*,
   No. 07-CV-2972 (CBA)(CLP), 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) ......................... 45

*Tavares v. Amato*,
   954 F. Supp. 2d 79 (N.D.N.Y. 2013) ..................................................... 21

*United States v. Cephus*,
   684 F.3d 703 (7th Cir. 2012) ............................................................... 35

*United States v. Fields*,
   No. 8:13-cr-198-T-30TGW, 2013 WL 5278499 (M.D. Fla. Sept. 18, 2013) ......................... 31

*United States v. Gemma*,
   818 F.3d 23 (1st Cir. 2016) ................................................................ 35

*United States v. Griffith*,
   284 F.3d 338 (2d Cir. 2002) ............................................................... 41

*United States v. Marcus*,
   487 F. Supp. 2d 289 (E.D.N.Y. 2007) ............................................. 20, 23

*United States v. Marcus*,
   628 F.3d 36 (2d Cir. 2010) ................................................................ 24

*United States v. Rivera*,
   799 F.3d 180 (2d Cir. 2015) ........................................................ 35, 36

*United States v. Robinson*,
   702 F.3d 22 (2d Cir. 2012) ................................................................ 41

*United States v. Roy*,
   781 F.3d 416 (8th Cir. 2015) .............................................................. 35

*United States v. Sanchez*,
   635 F.2d 47 (2d Cir. 1980) ................................................................ 21

*United States v. Todd*,
   627 F.3d 329 (9th Cir. 2010) .............................................................. 40

*United States v. Valenzuela,*
    495 F. App'x 817 (9th Cir. 2012) .................................................................. 23, 35

*United States v. Williams,*
    564 F. App'x 568 (11th Cir. 2014) ........................................................................ 35

*Van Vooren v. Cook,*
    273 A.D. 88 (4th Dep't 1947) .......................................................................... 20, 23

*Warner v. Orange Cty. Dep't of Probation,*
    968 F. Supp. 917 (S.D.N.Y. 1997) ........................................................................ 20

**Statutes**

18 U.S.C. § 1591 ................................................................................................ passim

18 U.S.C. § 1595 ................................................................................ 37, 38, 39, 40

22 U.S.C. § 7101 ........................................................................................................ 37

N.Y. Penal Law § 130.00 ........................................................................................ 25

N.Y. Penal Law § 130.65 ........................................................................................ 25

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 19

## PRELIMINARY STATEMENT[1]

The Court should deny Defendant Rubin's Motion for Summary Judgment (Dkt. No. 231, the "Rubin Motion"). Rubin cannot prevail on his consent defense on summary judgment and there is at least a question of fact regarding elements of many claims, all of which must be put to a jury.

Rubin's Motion is based almost entirely on the issue of consent. But even were it legally possible to consent to rape, sexual assault, and human trafficking, consent is inherently a fact-intensive issue dependent on half a dozen victims' states of mind when they were being assaulted and raped; it cannot be resolved here on summary judgment. This is particularly true when, despite 84 pages of briefing by Rubin and his co-defendant, and nearly 200 exhibits, at no time can either Defendant point to any Plaintiff ever actually saying that she consented to the acts she complained of, including being raped while unconscious, or being physically assaulted to the point of lasting injury, or to being trafficked in interstate commerce in violation of a statute, which Congress passed focusing on the misconduct of the human trafficker, and not the state of mind of his victims.

Instead, the testimony, elicited and relied upon by Defendants, goes the other way, showing that Plaintiffs never did consent to their rapes, sexual assaults, or trafficking. (*See, e.g.,* Plaintiffs' Counter to Howard Rubin's 56.1 Statement of Undisputed Facts ("Counter Rubin 56.1"), ¶ 1; Deposition of Kristina Hallman ("Hallman Dep."), Ex. H,[2] 142:12–24, (Hallman describing the first time Rubin assaulted her when she was tied up, unable to walk, and in and out of consciousness, "Q. In the Complaint, you allege that Rubin penetrated you causing tears to your

---

[1] All terms are as defined in Plaintiffs' Second Amended Complaint (Dkt. No. 161) and in Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment as to Defendants' Affirmative Defenses and Counterclaims (Dkt. No. 234-1) unless otherwise defined herein. Plaintiffs provide some definitions for the Court's convenience.

[2] All exhibits are attached to the Declaration of John G. Balestriere in Opposition to Defendants' Motions for Summary Judgment (the "Balestriere Decl."), filed simultaneously with these papers. All exhibits to the Balestriere Decl. are referred to herein as "Ex. X."

vagina. Is that accurate? A. Yes. Q. You also allege that you were in and out of consciousness during this time. Is that accurate? A. Yes. Q. Do you know what caused you to go in and out of consciousness? A. When he started punching me in the back of my head."); Counter Rubin 56.1, ¶ 1; Deposition of Hillary Lawson ("Lawson Dep."), Ex. C, 169:19–23, (Lawson describing when Rubin assaulted her in December, 2016, "I was raped. I was raped and I was beat. I had a cattle prod used on my, inside of my vagina. I would pay someone $5,000 not to do that to my vagina, okay? Do you know what that feels like?"); Counter Rubin 56.1, ¶ 1; March 6, 2019, Affidavit of Moira Hathaway ("Hathaway Aff."),[3] Ex. I, ¶¶ 4–5, (describing a time in 2015 when Rubin "shoved a pool cue into [Hathaway's] vagina" without her consent and then "dragged [Hathaway] along the floor by ropes through the apartment to the Dungeon"); Counter Rubin 56.1, ¶ 1; Deposition of Macey Speight ("Speight Dep."), Ex. J, 221:2–21, (Speight describing how Rubin often exceeded any consent she had provided, "Q. [By reaching out to Rubin] you were consenting to having rough sex with him? A. No, not to the extent that some things happened. Q. Did you ever tell him that you didn't want to do certain things, that you would do some rough things with him? A. Yeah, there were sometimes where I told him to stop and . . . ." Rubin's counsel then interrupted Speight and prevented her from completing her answer); Counter Rubin 56.1, ¶ 1; Deposition of Rosemarie Peterson ("Peterson Dep."), Ex. G, 258:13–260:13, (Peterson describing how Rubin assaulted her in a strip club, causing injuries, and noting that she used the safe word, but that "Rubin never stopped, even if you used [the safe word][4] . . . . [H]e would always continue,

---

[3] Because Defendants asked Plaintiff Hathaway only limited questions at her deposition, Hathaway relies on her affidavit here.

[4] This is not permitted in the BDSM subculture. (Counter Rubin 56.1, ¶ 2; *see* November 5, 2018, Expert Report by Park Dietz (the "Dietz Report"), Ex., K, 9 ("In the BDSM subculture, every 'scene' is negotiated, and the 'submissive' has *complete veto power* both during the advance planning and through the use of a 'safe word' or gesture at any time during the scene."); *see also id.*, at 10 ("consent requires that competent adults . . . agree on the use of safe words and gestures *that are always respected*, and afford the submissive party control over the actions of the dominant party.") (emphasis added).)

even if you wanted to slow down."); Counter Rubin 56.1, ¶ 1; Deposition of Lauren Fuller (the "Fuller Dep."), Ex. D, 143:11-16; 145:25-146:4, (Fuller describing how she had to use a so-called "safe word" "several times," though Rubin would continue to assault her before finally stopping.).)

Since there is no statement by any Plaintiff where she says she consented (indeed, as noted, quite the opposite), Rubin instead selectively parses thousands of text messages—frequently taken out of context, and all sent before or after, *not* during, the sexual assaults and coercive misconduct—to depict Plaintiffs as prostitutes (which, even if true, is not relevant as prostitutes can be raped and trafficked, and such post-assault appeasing statements are consistent with how some rape victims act towards their perpetrators). Rubin focuses on this prostitute defense to attempt to argue that, as a matter of law, this Court should find that all Plaintiffs consented to each and every sex act or act of violence that he committed against them. But not only is there at least a question of fact regarding consent warranting denial of Rubin's Motion, the documents and testimony in evidence show that there is no dispute regarding many elements of Plaintiffs' claims. The evidence shows that Rubin and Powers together recruited, enticed, harbored, provided, maintained, and patronized all the Plaintiffs through interstate commerce and that Rubin exceeded the scope of any purported consent on one or several occasions in the case of each and every Plaintiff, beating and raping them.

Moreover, even if some of Plaintiffs had consented to certain acts of sex or violence at certain times (and Plaintiffs are not saying that they did), this would not mean that this Court could find as a matter of law that each Plaintiff consented to each complained-of act at all other times. Defendants' argument to the contrary is akin to the long outdated and maligned notion that a woman cannot be raped by her husband or partner if she has, at one time in the past, provided

3

consent.[5] That obsolete premise does not give Rubin any quarter here, especially on a motion for summary judgment. At a minimum, the evidence here shows that there are competing stories as to what occurred behind the closed doors of Rubin's dungeon—exactly the situation where summary judgment is not appropriate (and the reason why Plaintiffs chose not to move for summary judgment on their claims notwithstanding the overwhelming evidence of Rubin's and Powers's liability). The issue of consent belongs to a jury, where the credibility of Defendants and Plaintiffs may be weighed in person. The Court should deny Defendant Rubin's Motion.

In addition to showing that Plaintiffs did not consent to Rubin's rape and sex assaults, the evidence here shows that Rubin unquestionably violated the Trafficking Victims' Protection Act (18 U.S.C. § 1591, the "TVPA"), rendering summary judgment in Defendants' favor inappropriate. Even Rubin does not deny that he and his associates sought out each Plaintiff, brought each Plaintiff to New York, and then paid them for sexual conduct, causing each Plaintiff to engage in commercial sex. (18 U.S.C. § 1591(a)(1).) Whatever denials Rubin attempts to put forth, the evidence shows that Rubin knew he would, and proceeded to, use force, threats of force, and coercion—including, without limitation, rape, threatening serious harm, abusive legal process in the form of unenforceable liquidated damages provisions in the non-disclosure agreements Rubin and Powers provided to each Plaintiff (*see* Declaration of Benjamin M. Rose (Dkt. No.231-3, the "Rose Decl."), Exs. 16, 17, 40, 44, 98, and 107) (collectively, the "NDAs")), and rendering Plaintiffs' unconscious—to cause this to happen. The evidence shows that Rubin is liable for

_____

[5] Indeed, the Court has recognized this and similar issues in its previous orders. (*See* Order Denying Defendants' Motion to Vacate the Protective Order, Dkt. No. 35, at 4 (finding Defendants' argument regarding Plaintiffs' privacy concerns "offensive," noting that the fact that "plaintiffs are Playboy Playmates or bikini models and have voluntarily shared details of their sexual lives in other contexts has no bearing on whether they have a privacy interest in the details of their alleged rape,"); *see also* MTD Order, Dkt. No.105, at 30 ("That other plaintiffs met with Rubin more than once does not establish their consent on any given occasion."); *id.*, at 37 ("To the extent plaintiffs' signing of the non-disclosure agreement shows a general consent, that consent does not override their allegations in the complaint that they did not consent to these activities in December 2016, June 2017, and the summer of 2017.").)

violations of the TVPA, and, in any event, does not deserve judgment on such claim on a motion.

Similarly, the evidence here shows that Rubin assaulted, battered, falsely imprisoned, and intentionally inflicted emotional distress on at least Lawson, Hathaway, and Speight.[6] Rubin's false imprisonment argument—that three of the victims (not all of whom are the victims who have these claims) stayed at the apartment after they were assaulted by Rubin, and thus, as a matter of law, could not have been falsely imprisoned—does not show that no Plaintiff has a false imprisonment claim, nor that those Plaintiffs were not falsely imprisoned at another time. Indeed, each of the four Plaintiffs with state law claims testified under oath that she was restrained against her will at certain points, such that she was unable to escape Rubin. Rubin's only argument as to the remainder of the claims is consent.[7] He does not even attempt to argue that he did not assault and batter Plaintiffs, as the record unquestionably establishes that he did. He merely argues that he should not be liable for his attacks because—he alone says—all six Plaintiffs always consented to all of the complained-of abuse on every single occasion. Plaintiffs' testimony shows that this is not the case, and is sufficient to deny Rubin's Motion regarding the state law claims.

Finally, the extent to which Plaintiffs were injured as a result of Rubin's physical and sexual assaults is a question for the jury. Plaintiffs have provided ample testimony regarding their injuries. (See, e.g., Counter Rubin 56.1, ¶ 3; Hallman Dep., Ex. H, 154:4-7 ("I was punched in the back of the head. And I was smacked in the face and my face was shoved into the carpet so I had

---

[6] The remainder of Plaintiffs' tort claims were dismissed on statute of limitations grounds, not due to inadequate pleading. (See MTD Order, Dkt. No. 105, at 34-38.) Following her deposition, Plaintiff Peterson's memory was refreshed, and she acknowledges that she erred with regards to the timing of her interactions with Rubin. As her encounters with Rubin giving rise to her claims here terminated in 2015 at the latest, Peterson now declines to go forward with her tort claims.

[7] Defendants' incorrectly state that Plaintiffs "Hallman, Lawson, Peterson, and Speight" have state law claims. (Rubin's Memorandum of Law in Support of Motion for Summary Judgment (the "Rubin MOL"), at 48-49.) But, in fact, it is Plaintiffs *Hathaway*, Lawson, Peterson, and Speight who have state law claims, not Plaintiff Hallman. (See MTD Order, Dkt. No. 105, at 34-38; see also Second Amended Complaint, Dkt. No. 161.)

like rug burns on my forehead"); Counter Rubin 56.1, ¶ 3; Lawson Dep., Ex. C, 200:2-18 (describing how she "had issues sleeping" and was diagnosed with "anxiety, PTSD, insomnia"); Counter Rubin 56.1, ¶ 3; Hathaway Aff., Ex. I, ¶ 4-5 ("I did not consent to Rubin shoving a pool cue into my vagina, causing pain and tearing . . . . [I then] sustain[ed] friction burns across my body" when Rubin "dragged me along the floor by the ropes through the Penthouse to the Dungeon"); Counter Rubin 56.1, ¶ 3; Peterson Dep., Ex. G, 259:21-260:5 (describing her injuries following Rubin's assault at a strip club, "Did I have bruises, yes . . . . [M]y eye had been bruised from here to here, and I had, I believe it was my butt, my lower back and . . . I had marks on my body, yes"); Counter Rubin 56.1, ¶ 3; Speight Dep., Ex. J, 256:20–261:25, (describing the pain caused as a "[t]en" out of ten, confirming her answer four times, when Rubin hit her in the face, dislodging a facial injection which had to be repaired by a plastic surgeon); Rose Decl., Ex. 106, HR00079-80 (Fuller text messaging ███████ three days after Rubin assaulted her, noting "I had bruises everywhere . . . I still do.").) The weight and effect of official medical records, or, in some cases, the lack thereof, only goes to the credibility or weight of Plaintiffs' testimony.

Yet, that evidence hardly undermines Plaintiffs' testimony: Plaintiffs, like many sexual assault victims, feared further humiliation and emotional trauma if they reported their abuse, even to a doctor. *See People v. Liberta*, 64 N.Y.2d 152, 166 n.8 (1984) (due to the "stigma and other difficulties associated with a woman reporting a rape . . . rape remains a grossly under-reported crime").[8] Rubin's view that such evidence undermines Plaintiffs' credibility does not permit the Court to determine that there was no injury at the time the Plaintiffs say they were injured. Indeed, even if there was insufficient evidence of Plaintiffs' injuries—and there is sufficient evidence that

---

[8] *See also* Dewan, Sheila, "Why Women Can Take Years to Come Forward With Sexual Assault Allegations," *The New York Times* (Sept. 18, 2018), https://www.nytimes.com/2018/09/18/us/kavanaugh-christine-blasey-ford.html (last visited March 5, 2019).

a jury could rely on to find that all Plaintiffs were injured—the provision of the TVPA creating a private right of action for victims of human trafficking does not require physical injury.

Defendants have failed entirely to establish that no questions of material fact exist. The issues underlying Plaintiffs' claims are fact-intensive and are best suited for determination by a jury, which can be based on only the evidence adduced, to say nothing of all the testimony and evidence to be provided at trial, could find both Defendants liable for all claims. Rubin's Motion should be denied and the parties ordered to proceed to trial.

## STATEMENT OF FACTS

*Rubin and Powers Engage in a Human Trafficking Scheme, Resulting in the Rape and Assault of Plaintiffs—and Likely Many Others—Over a Decade*

Starting in approximately 2009 or 2010, Defendants Rubin and Powers began their human trafficking venture by inviting victims from across the United States to travel to New York to meet Rubin. (Counter Rubin 56.1, ¶ 4; Deposition Transcript of Hathaway (the "Hathaway Dep."), Ex. H, 36:17–21.) In the early years of this venture, Rubin would meet the victims at hotel rooms across New York City. (Counter Rubin 56.1, ¶ 5; Deposition of Rubin (the "Rubin Dep."), Ex. L, 103:3–9, 116:6–14; Deposition of Powers (the "Powers Dep."), Ex. A, 98:13–99:13.) However, later on in the venture, Rubin began renting an apartment at ███████████████ where he converted the second bedroom to a Bondage, Domination, Sadism and Masochism ("BDSM") dungeon. (Counter Rubin 56.1, ¶ 6; Rubin Dep., Ex. L, 100:5–101:13; Powers Dep., Ex. J, 140:8–16; Deposition of Shon (the "Shon Dep."), Ex. M, 56:15–57:2.) Once in New York, the victims would typically meet with Powers, who would present them with a document purporting to be a non-disclosure agreement. (Counter Rubin 56.1, ¶ 7; (Powers Dep., Ex. A, 115:14–119:5.) After Powers had the victims sign the document, Rubin would meet with the victims, generally get them intoxicated or provide them narcotics, and then beat and rape them. (*See, e.g.,* Counter Rubin 56.1,

7

¶ 8; Hallman Dep., Ex. H, 143:12-24 (discussing Rubin raping Hallman and punching her in the head); Counter Rubin 56.1, ¶ 8; Lawson Dep., Ex. C, 83:5-9 (discussing Rubin providing drinks at the apartment); *id.*, 86:2-24; 88:18-89:8 (discussing Rubin "smack[ing]" Lawson in the face); Counter Rubin 56.1, ¶ 8; Peterson Dep., Ex. G, 259:19-260:16 (discussing injuries to Peterson's body and discussing how Rubin would not stop when asked); Counter Rubin 56.1, ¶ 8; Speight Dep., Ex. J, 57:17-58:7 (Speight discussing being drunk at the time she signed the NDA); Counter Rubin 56.1, ¶ 8; Fuller Dep., Ex. D, 115:17–23 (regarding Fuller's drinking on the day of the assault); *id.*, 143:9-146:17 (Rubin sexually assaulting Fuller with an object after Fuller said the safe word); *see also* Counter Rubin 56.1, ¶ 8; Hathaway Aff., Ex. I, (regarding Plaintiff Hathaway waking up after becoming unconscious after Rubin served her a glass of wine).) Seven victims have come forward to sue Rubin and Powers in the Eastern District of New York. After this action began, another victim brought suit on January 9, 2018, in New York County Supreme Court. (*See Parker v. Rubin*, Index No.: 650126/2018.) Virtually all Plaintiffs have indicated that they believe that there are others whom Rubin and Powers victimized over the years.

*Plaintiff Hallman*

Rubin—with the help of his associates, including Defendant Powers and Stephanie Shon—recruited, enticed, harbored, transported, provided, maintained, and patronized Plaintiff Hallman on multiple occasions in 2016. (Powers Statement of Undisputed Material Facts (Dkt. No. 241, the "Powers 56.1 Statement"), ¶¶ 19, 40, and 57.) On each occasion, Hallman, who resided in Florida, travelled from out of state to New York. (Powers 56.1 Statement, ¶¶ 19, 40, and 57.) Powers arranged and paid for Hallman's flights from Florida on each occasion. (Powers 56.1 Statement, ¶¶ 19, 40, and 57.) After each encounter and on certain other occasions, Powers or Rubin paid Hallman via PayPal or in cash. (*See* Declaration of Jolène D. Lavigne-Albert (Dkt. No. 233-3, the

"JLA Decl.," Ex. 3, ¶ 5.)

  *see* Declaration of Benjamin M. Rose (Dkt. No.231-3, the "Rose Decl."

  Hallman first met Rubin on August 22, 2016. (Powers 56.1 Statement, ¶ 19.) Earlier that month, Rubin's associate, Stephanie Shon, recruited both Hallman and Lawson, contacting them through Instagram, and asked Hallman if she wanted to make money by taking fetish style photographs. (Powers 56.1 Statement, ¶ 8; Counter Rubin 56.1, ¶ 9; Lawson Dep., Ex. C, 34:13–36:9.) Hallman initially declined, but later accepted after learning that her friend, Plaintiff Lawson, had also been contacted by Shon with the same proposition. (Counter Rubin 56.1, ¶ 10; Hallman Dep., Ex. H, 68:5-23.) Shortly thereafter, Rubin's associate and co-defendant, Powers, continued to recruit and entice Hallman and Lawson, eventually purchasing and arranging Hallman's flight to New York from Florida. (Powers 56.1 Statement, ¶ 19.) Hallman did not believe that the reason for her visit with Rubin was to have sex for money. (Counter Rubin 56.1, ¶ 11; Hallman Dep., Ex. H, 76:16–19.)

  Upon her arrival at Rubin's Penthouse, Powers presented Hallman and Lawson with an NDA and requested that she sign it. (Powers 56.1 Statement, ¶¶ 22–24.) Hallman did so but did not understand what some of the terms included in the document meant. (Counter Rubin 56.1, ¶ 12; Hallman Dep., Ex. H, 106:11–15.) At the Penthouse, Rubin poured drinks for Hallman and Lawson and had them change into black outfits. (Counter Rubin 56.1, ¶ 13; Hallman Dep., Ex. H, 12–14.) Rubin then tied Hallman and Lawson up with black tape or rope. (Counter Rubin 56.1, ¶ 14; Hallman Dep., Ex. H, 135:20–23.) While Hallman was tied up, gagged, and unable to walk, Rubin raped her and punched her in the back of the head, causing Hallman to go in and out of consciousness. (Counter Rubin 56.1, ¶ 15; Hallman Dep., Ex. H, 142:12-24.) After she was raped and beaten, Hallman could not "remember anything but crying." (Counter Rubin 56.1, ¶ 16;

Hallman Dep., Ex. H, 146:6-21.)

Hallman returned to meet with Rubin again on September 24, 2016, this time with a second friend, former Plaintiff Stephanie Caldwell. (Powers 56.1 Statement, ¶ 39.) When she travelled to New York to meet with Rubin on this occasion, Hallman believed that the purpose of this trip was to have dinner and drinks with Rubin, which she and Caldwell did. (Counter Rubin 56.1, ¶ 17; Hallman Dep., Ex. H, 200:11-19.) Hallman and Caldwell became very intoxicated at dinner on this night. (Counter Rubin 56.1, ¶ 18; Hallman Dep., Ex. H, 213:20-25.) Hallman was, for a second time, bound, and sexually assaulted by Rubin. (Counter Rubin 56.1, ¶ 19; Photographs produced by Hallman regarding the September 24, 2016, encounter ("Hallman Photographs"), Ex. N.)

Hallman met with Rubin at his Penthouse for a final time on October 20, 2016. (Powers 56.1 Statement, ¶ 57.) But before Hallman even got on the plane, she became an emotional wreck, throwing up due to her nerves. (Counter Rubin 56.1, ¶ 20; Hallman Dep., Ex. H, 228:3-24.) Hallman's nervousness made her so sick, that, once she was in New York, she had to be hospitalized. (Counter Rubin 56.1, ¶ 21; Hallman Dep., Ex. H, 235:21 ("Q. At some point did you go to the hospital? A. Yes. Q. Who arranged for you to go to the hospital? A. I kept begging and screaming and crying in the bathtub and in the shower that I wanted to go to the ER and that that was the only thing that would help me, and [Powers] kept thinking of other – other ways . . . . Q. Ms. Powers suggested that she could arrange for a doctor to come to the apartment and assist you? A. Yes. But she never did it.").)

Hallman sustained physical and emotional injuries from her encounters with Rubin, including, without limitation, tears to her vagina (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 143:12-16), head trauma resulting in loss of consciousness (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 143:17-24), bruising and pain (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 144:5-

8), a broken rib (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 150:5-153:12), injury to her right breast, including swelling, hardening, and the development of scar tissue (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 15-20; 145:2-16), friction burns to her face (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 154:2-23), embarrassment (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 148:4-5; 150:3-4), trouble sleeping (Counter Rubin 56.1, ¶ 22; Hallman Dep., Ex. H, 308:8-11), and depression (*Id.*)

### *Plaintiff Lawson*

Rubin—with the help of his associates, including Defendant Powers and Stephanie Shon—recruited, enticed, harbored, transported, provided, maintained, and patronized Plaintiff Lawson on two occasions in 2016. (Powers 56.1 Statement, ¶¶, 100, 108; Counter Rubin 56.1, ¶ 23; Lawson Dep., Ex. C, 93:13-15; Rubin's Statement of Uncontested Facts (Dkt. No. 231-2, the "Rubin 56.1 Statement"), ¶¶ 17–19, 20.) On each occasion, Lawson, who resided in Florida, travelled from out of state to New York. (Powers 56.1 Statement, ¶¶ 108, 134.) Powers arranged and paid for Lawson's flights from Florida on each occasion. (Powers 56.1 Statement, ¶¶ 108, 134.) After the first encounter Rubin threw cash at Lawson. (Counter Rubin 56.1, ¶ 24; Lawson Dep., Ex. C, 89:9–15.) After the second encounter, Powers paid Lawson via PayPal. (JLA Decl. Ex., 3, ¶ 5.)

Lawson first met Rubin on August 22, 2016. (Counter Rubin 56.1, ¶ 25 Lawson Dep., Ex. C, 289.) Lawson was recruited and transported to New York in the same manner as Hallman, and signed a similar NDA. (*See* discussion *supra*.) After Rubin brought Lawson and Hallman into his dungeon, Rubin hit Lawson in the face multiple time after Lawson told him not, specifically as she had recently had fillers put in her cheeks that would be damaged. (Counter Rubin 56.1, ¶ 26; Lawson Dep., Ex. C, 86:2-25.) Rubin then forced Lawson—out of fear that he would turn his violence on her—to hit Hallman. (Counter Rubin 56.1, ¶ 27; Lawson Dep., Ex. C, 88:6–24.) Rubin

directed Lawson to hit Hallman, but Lawson did not want to hit her friend, and, instead, hit her own leg so that Rubin would think she was complying with his demands. (Counter Rubin 56.1, ¶ 28; Lawson Dep., Ex. C, 88:8-14.) When Rubin discovered Lawson was not doing as he demanded, he physically attacked Lawson. (Counter Rubin 56.1, ¶ 29; Lawson Dep., Ex. C, 21-24.) When Rubin was finished, Lawson and Hallman remained at the Penthouse together.

Lawson returned to meet with Rubin on December 21, 2016. (Rubin 56.1 Statement, ¶ 48.) Lawson felt reassured at this time that Rubin would not hurt her, and so she decided to come back. (Counter Rubin 56.1, ¶ 30; Lawson Dep., Ex. C, 134:16-136:19.) Lawson was nervous to see Rubin again, but Rubin assuaged those fears when he asked Lawson to simply meet him in the middle of the day for lunch. (Counter Rubin 56.1, ¶ 31; Lawson Dep., Ex. C, 134:16-136:19.) At that lunch, Rubin treated Lawson very nicely. (Counter Rubin 56.1, ¶ 32; *id*.) But when Lawson returned to the Penthouse with Rubin, Rubin became even more violent than he had on Lawson's first meeting. (Counter Rubin 56.1, ¶ 33; Lawson Dep., Ex. C, 166:17–22.) Rubin bound Lawson and sexually assaulted her with a device resembling a cattle prod. (Counter Rubin 56.1, ¶ 34; Lawson Dep., Ex. C, 144:10-24.) Rubin then continued to beat Lawson, causing sever bruising to her breasts, and raped her. (Counter Rubin 56.1, ¶ 35; Lawson Dep., Ex. C, 144:10-24.)

Lawson sustained physical and emotional injuries from her encounters with Rubin, including, without limitation, extensive bruising and pain in her breasts (Counter Rubin 56.1, ¶ 36; Lawson Dep., Ex. C, 121:5-15; Plaintiffs' written communications, Rose Decl., Ex. 14, Lawson–0203363–0203534; Photographs of Plaintiff Lawson's breasts following the December 21, 2016, encounter ("Lawson Photographs"), Ex. C,), electric shocks to her vagina (Counter Rubin 56.1, ¶ 36; Lawson Dep., Ex. C, 142:13-24; 169:19-23); extreme pain (*id.*, 166:20-167:9), a capsulated left breast (*id.*, at 185:19, 186:6-189:10), injury to her vagina (*id.*, at 185:21), bruising under her

eye and damages to cosmetic filler under her eye (*id*., at 185:23-25; 189-22), and insomnia, anxiety, and depression (*id.*, at 200:2-18; 205:14-25; Lawson Medical Records, Rose Decl., Ex. 34, 8-10, 12-20).)

*Plaintiff Hathaway*

Rubin—with the help of his associates, including Defendant Powers and ████████ recruited, enticed, harbored, transported, provided, maintained, and patronized Hathaway on multiple occasions between 2011 and 2017. (Rubin 56.1 Statement, ¶ 108, 110.) Hathaway, who at all times lived outside of New York, in either Las Vegas or Chicago, travelled from out of state to meet with Rubin. (Rubin 56.1 Statement, ¶ 110.) Rubin or his associates arranged and/or paid for or reimbursed Hathaway for her flights. (JLA Decl. Ex., 59, 1, 3, 4, 6, 7; JLA Decl., Ex. 60.) After any encounter, Rubin or Powers would then facilitate payment to Hathaway, whether by PayPal, wire transfer, or cash. (JLA Decl. Ex, 3, ¶ 5.)

While their relationship was initially consensual, Rubin's behavior changed and he grew more violent in 2015. (Counter Rubin 56.1, ¶ 37; Hathaway Aff., Ex. I, ¶¶ 2, 3.) On multiple occasions in 2015, 2016, and 2017, Rubin refused to stop when Hathaway asked him to, or otherwise acted without her consent. (Counter Rubin 56.1, ¶ 38; Hathaway Aff. Ex. I, ¶¶ 4, 16.) On one occasion in 2015, Rubin penetrated Hathaway with a pool cue without her consent, causing vaginal tears and pain. (Counter Rubin 56.1, ¶ 39; Hathaway Aff., Ex. I, ¶¶ 4, 5.) When Hathaway requested he stop, Rubin refused. (Counter Rubin 56.1, ¶ 40; Hathaway Aff., Ex. I, ¶¶ 4, 5.) Rubin then bound and dragged Hathaway through the apartment, causing friction burns over her body from the ropes and contact with the floor. (Counter Rubin 56.1, ¶ 41; Hathaway Aff., Ex. I, ¶ 5.) On another occasion, Rubin penetrated Hathaway against her will with a glass dildo without her permission, causing her to bleed from the forced insertion. (Counter Rubin 56.1, ¶ 42; Hathaway

13

Aff., Ex. I, ¶ 6.) Rubin whipped and hit Hathaway in the vagina, even as Hathaway protested. (Counter Rubin 56.1, ¶ 43; Hathaway Aff., Ex. I, ¶ 7.)

On multiple occasions, Hathaway was rendered unconscious, waking up in new locations in the apartment with no recollection of what had occurred. (Counter Rubin 56.1, ¶ 44; Hathaway Aff., Ex. I, ¶¶ 8–11.) On one occasion, after having wine and cheese with Rubin at about 4 p.m. (completely clothed), Hathaway, who had not had any other alcohol and had not taken any drugs or medications, lost consciousness. (Counter Rubin 56.1, ¶ 45; Hathaway Aff., Ex. I, ¶¶ 9, 10.) Hathaway woke up several hours later in the guestroom of the apartment, naked and sore all over her body. (Counter Rubin 56.1, ¶ 46; Hathaway Aff., Ex. I, ¶¶ 11, 12.) Upon inspection of the apartment, Hathaway saw that the Dungeon was in a state of disarray, with equipment and toys strewn about and knocked over. (Counter Rubin 56.1, ¶ 47; Hathaway Aff. Ex.IX, ¶¶ 12, 13.) On Hathaway's final encounter with Rubin, in 2017, Rubin bound and gagged Hathaway without her permission or consent and then attached clothespins to her breasts, causing intense pain. (Counter Rubin 56.1, ¶ 48; Hathaway Aff., Ex. I, ¶¶ 15, 16); *see also* Photographs of Plaintiff Hathaway's breasts following an encounter with Rubin ("Hathaway Photographs"), Ex. P.) Hathaway asked Rubin to stop but he refused. (Counter Rubin 56.1, ¶ 49; Hathaway Aff., Ex. I, ¶ 16.) Rubin then proceed to shock Hathaway with a long electric device resembling a cattle prod. (Counter Rubin 56.1, ¶ 50; Hathaway Aff., Ex. I, ¶¶ 17, 18.) When Rubin finished, he left Hathaway without saying another word. (Counter Rubin 56.1, ¶ 51; Hathaway Aff., Ex. I, ¶ 19.)

Hathaway sustained lasting injuries from her encounters with Rubin from 2015 forward. These include, without limitation, friction burns (Counter Rubin 56.1, ¶ 52; Hathaway Aff., Ex. I, ¶ 5), vaginal tears with bleeding (Counter Rubin 56.1, ¶ 52; Hathaway Aff., Ex. I, ¶ 6), bruising to her face and breasts (Counter Rubin 56.1, ¶ 52; Hathaway Aff., Ex. I, ¶¶ 5, 7), loss of consciousness

(Counter Rubin 56.1, ¶ 52; Hathaway Aff., Ex. I, ¶¶ 9–12), electric shocks to her body causing pain (Counter Rubin 56.1, ¶ 52; Hathaway Aff., Ex. I, ¶¶ 17–18), and emotional trauma resulting in anxiety and insomnia (Counter Rubin 56.1, ¶ 52; Hathaway Dep., Ex F, 149:19-25).

<em>Plaintiff Peterson</em>

Rubin—with the help of his associates, including Defendant Powers and ████████ recruited, enticed, harbored, transported, provided, maintained, and patronized Plaintiff Peterson on multiple occasions from 2011-2015. (Rubin 56.1 Statement, ¶¶ 174, 198–200, 208–209, 212– 214; Peterson Dep., Ex. G, 60:7–16.) On the first occasion, Plaintiff Peterson, who lived in Los Angeles at the time, travelled from out of state to New York. (Counter Rubin 56.1, ¶ 53; Peterson Dep., Ex. G, 60:7–16.) After each encounter and on certain other occasions, Powers or Rubin paid Peterson via PayPal or in cash. (Counter Rubin 56.1, ¶ 54; Peterson Dep., Ex. G, 369:3–15, 374:19–375:8.)

Peterson was introduced to Rubin in 2011 by a woman named ████████ (Rubin 56.1 Statement ¶ 174.) Rubin told Peterson he would pay Peterson $5,000 and "will take care of ████ commission." (Counter Rubin 56.1, ¶ 55; Peterson Dep., Ex. G, 78:2–21.) ████ told Peterson to "just say yes" to whatever Rubin asked of her. (Counter Rubin 56.1, ¶ 56; Peterson Dep., Ex. G, 58:22–59:5.) Peterson met Rubin, along with three other women (not Plaintiffs here), at the Mandarin Oriental hotel in New York. (Counter Rubin 56.1, ¶ 57; Peterson Dep., Ex. G, 60:22– 61:4.) When Peterson got to the hotel, there were sex toys on the bed. (Counter Rubin 56.1, ¶ 58; Peterson Dep., Ex. G, 102:19–23.) The sex toys on the bed made Peterson nervous so Rubin instructed another woman to give Peterson "something to take the edge off." (Counter Rubin 56.1, ¶ 59; Peterson Dep., Ex. G, 104:5–106:9.) The other woman crushed up a pill and put it in Peterson's drink, which Peterson drank. (Counter Rubin 56.1, ¶ 60; Peterson Dep., Ex. G, 106:3–

15

107:6.) After taking the pill, Peterson began to not feel well and became itchy and asked to leave the hotel room. (Counter Rubin 56.1, ¶ 61; Peterson Dep., Ex. G, 111:12–21.) Peterson did in fact leave the hotel room. (Counter Rubin 56.1, ¶ 62; Peterson Dep., Ex. G, 111:12–112:12.)

In 2014, Rubin brought Peterson to a strip club—either Rick's Cabaret or Cheetahs—and Rubin got a private room. (Counter Rubin 56.1, ¶ 63; Peterson Dep., Ex. G, 251:4–252:24.) While in the private room, Rubin had Peterson get completely naked and beat her. (Counter Rubin 56.1, ¶ 64; Peterson Dep., Ex. G, 251:4–252:2.) During the time that Peterson was naked and Rubin was beating her, waitresses were coming in and out of the room. (Counter Rubin 56.1, ¶ 65; Peterson Dep., Ex. G, 257:15–17.) During the beating, Peterson attempted to use the safe word but Rubin ignored her. (Counter Rubin 56.1, ¶ 66; Peterson Dep., Ex. G, 258:19–25.) Rubin, and everyone else in the private room, were removed from the club because of Rubin beating Peterson. (Counter Rubin 56.1, ¶ 67; Peterson Dep., Ex. G, 252:3–15.) As a result of Rubin's conduct, Peterson became addicted to OxyContin. (Counter Rubin 56.1, ¶ 68; Peterson Dep., Ex. G, 108:9–13.) Peterson also suffered physical injuries such as bruising to her eye, butt, lower back, and more. (Counter Rubin 56.1, ¶ 69; Peterson Dep., Ex. G, 259:19–260:5; Photographs of Plaintiff Peterson's eye following an assault by Rubin ("Peterson Photograph"), Ex. Q.)

*Plaintiff Speight*

Rubin—with the help of his associates, including Defendant Powers and Stephanie Shon—recruited, enticed, harbored, transported, provided, maintained, and patronized Plaintiff Speight on multiple occasions from 2015-2017. (Rubin 56.1 Statement, ¶ 129.) On each occasion, Speight, who resided in Georgia, travelled from out of state to New York. (Powers 56.1 Statement, ¶¶ 158, 178, 188, 195, 219, 234, 246, 269, and 279.) Powers arranged and paid for Speight's flights from Florida on each occasion. (Powers 56.1 Statement, ¶¶ 158, 178, 188, 195, 219, 234, 246, 269, and

16

279.) After each encounter and on certain other occasions, Powers or Rubin paid Speight via PayPal or in cash. (Powers 56.1 Statement, ¶¶ 173, 183, 190, 202, 215, 230, 242, 254, 264, 275, 282; JLA Decl., Ex. 3, ¶ 5.)

Speight first met Rubin in October of 2015. (Rubin 56.1 Statement, ¶ 133.) Speight traveled to New York approximately a dozen times. (Powers 56.1 Statement, ¶ 145.) In her deposition, Speight confirmed that the allegations regarding her relationship with Rubin were true. (Counter Rubin 56.1, ¶ 70; Speight Dep., Ex. J, 30.)[9] In the Complaint, Speight alleges that Rubin whipped her without her consent (Complaint ¶ 273); penetrated her with foreign objects against her protestations (*id.* ¶ 272); and engaged in some sort of sexual activity with Speight when she was so intoxicated as to be rendered unconscious (*id.* ¶¶ 266-67.) Speight later testified that she sustained scars from when Rubin whipped her without her consent. (Counter Rubin 56.1, ¶ 72; Speight Dep., Ex. J, 256:25-257:5 ("A. I have scars on my arms. Q. From being whipped by Mr. Rubin? A. Yes.").) While Speight had difficulty differentiating what injury occurred on which occasion, she was "definitely was injured a few times during some encounters." (Counter Rubin 56.1, ¶ 73; Speight Dep., Ex. J, 94:23–95:3.) On multiple occasions, Rubin exceeded Speight's consent. (Counter Rubin 56.1, ¶ 74; *see, e.g,* Speight Dep., Ex. J, 220:25-221:5 ("You alleged that you did not consent to having rough sex with Mr. Rubin, isn't that right? A. Not to the extent of what happened sometimes.) On one occasion, Rubin beat Speight in the face, causing damage to her cosmetic fillers. Speight last saw Rubin on July 25, 2017. (Rubin 56.1 Statement, ¶ 153.)

Speight sustained physical and emotional injuries from her encounters with Rubin,

---

[9] As she was deposed in a room filed with six of Rubin's and Powers's lawyers at Rubin's lawyers' office, as well as Rubin and Powers themselves, Speight was plainly confused with regards to the dates upon which certain acts occurred, but verified that the substance of her allegations was accurate. Defendants did not question Speight with regards to being whipped or rendered unconscious, beyond questions regarding her claimed injuries. (Rubin Counter 56.1, ¶ 71; Speight Dep., Ex. J, 256-257.)

including without limitation, bruising to her face, breasts, and buttocks (Counter Rubin 56.1, ¶ 75; Speight Dep., Ex. J, 34:13-14; Photographs of Plaintiff Speight's buttocks and breasts following assaults by Rubin ("Speight Photographs"), Ex. R); damage to her facial injections (Counter Rubin 56.1, ¶ 75; Speight Dep., Ex. J, 256:20–261:25); scarring across her arms from being whipped by Rubin (Counter Rubin 56.1, ¶ 75; Speight Dep., Ex. J, 256:20-257:5); and psychological trauma and "mental abuse" (Counter Rubin 56.1, ¶ 75; Speight Dep., Ex. J, 73:25-74:19; 95:22-96:9).

*Plaintiff Fuller*

Rubin—with the help of his associates, including Defendant Powers and ███████ recruited, enticed, harbored, transported, provided, maintained, and patronized Plaintiff Fuller on one occasion in March 2016. (Rubin 56.1 Statement, ¶ 234.) Fuller, who was in Las Vegas at the time she was recruited, travelled from out of state to New York. (Rubin 56.1 Statement, ¶ 240; Fuller Dep., Ex. D, 91:15–19, 94:8–17.) Fuller returned to Florida after the encounter. (Counter Rubin 56.1, ¶ 76; Fuller Dep., Ex. D, 156:11–157:7.) After her encounter, Powers paid Fuller via PayPal. (Powers 56.1 Statement, ¶ 374.)

Fuller met Rubin on only one occasion, on March 7, 2016, after her friend ███████ who was a recruiter for Rubin—convinced her to travel to New York to meet Rubin. (Rubin 56.1 Statement, ¶ 234.) When she agreed to travel from Las Vegas to New York, Fuller did not understand that she would be asked to spend the night with Rubin, nor that she would be asked to engage in sexual conduct with him or ███████ (Counter Rubin 56.1, ¶ 77; Fuller Dep., Ex.D, 89:21-90:19.) In fact, Fuller did not expect rough sex at all (Counter Rubin 56.1, ¶ 78; Fuller Dep., Ex. D, 98:1-3), and "would have never agreed to come here to New York and meet with Mr. Rubin" had she known "[she] was going to be assaulted the way [she] was." (Counter Rubin 56.1, ¶ 78; Fuller Dep., Ex. D, 97:3025.) At Rubin's Penthouse, ███████ and Fuller drank all day and

18

███████████████████ (Counter Rubin 56.1, ¶ 79; Fuller Dep., Ex. D, 115:17-23.) Once he

arrived, Rubin presented Fuller with an NDA, and, although she did not fully understand the NDA,

Rubin required that Fuller sign it. (Counter Rubin 56.1, ¶ 80; Fuller Dep., Ex. D, 115:17-23.) Once

Rubin brought Fuller back to his dungeon, Fuller asked Rubin to stop almost immediately, using

the safe word. (Counter Rubin 56.1, ¶ 81; Fuller Dep., Ex. D, 143:11-16; 145:25-146:4.) Despite

Fuller using the safe word *several times* (Counter Rubin 56.1, ¶ 82; Fuller Dep., Ex. D, 143:11-

16; 145:25-146:4), Rubin did not stop, and instead penetrated Fuller with an object. (Counter

Rubin 56.1, ¶ 82; Fuller Dep., Ex. D, 143:22-25.) Once Rubin allowed Fuller to leave the dungeon,

Fuller remained in the Penthouse in a state of shock. (Counter Rubin 56.1, ¶ 83; Fuller Dep., Ex.

D, 151:11–17.) When Rubin was finished with ██████ he left the apartment. (Counter Rubin

56.1, ¶ 84; Fuller Dep., Ex. D, 156:11–14.)

## LEGAL STANDARD

Summary judgment is inappropriate if there exists a "genuine dispute as to any material

fact." *See* Fed. R. Civ. P. 56(a). At the summary judgment stage, "the judge's function is not

himself to weigh the evidence to determine the truth of the matter but to determine whether there

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

## ARGUMENT

## I.   RUBIN FAILS TO SHOW THAT NO ISSUES OF MATERIAL FACT EXIST WITH REGARDS TO HIS CONSENT AFFIRMATIVE DEFENSE, WARRANTING DENIAL OF HIS MOTION

There are, at a minimum, material questions of fact regarding each Plaintiff's purported

consent, precluding summary judgment. Consent is only a defense when it is an "affirmative act

of an unconstrained and undeceived will." *People v. Steinberg*, 190 Misc. 413, 416-17 (Magis. Ct.

1947). Consent must be "voluntary and intelligent, and free from force or fraud," and may not be

19

obtained "by stupefaction, or through the ignorance or incapacity of the person assaulted." *Id.* While consent may be a defense to certain causes of action, the physical attack giving rise to those causes of action must not exceed the consent provided, if any. *Van Vooren v. Cook*, 273 A.D. 88, 92 (4th Dep't 1947); *see also Goff v. Clarke*, No. 98-2101, 2002 WL 126276, at *2 (Sup. Ct., Madison Cty., Jan. 22 2002) (citing *Warner v. Orange Cty. Dep't of Probation*, 968 F. Supp. 917, 924 (S.D.N.Y. 1997) ("the intensity of the physical contact must not exceed the consent.")).

This is true even in the context of a relationship involving BDSM, where, as here, there was evidence that *some* applications of force by defendant were non-consensual." *United States v. Marcus*, 487 F. Supp. 2d 289, 309 (E.D.N.Y. 2007), *vacated* 538 F.3d 97, *cert. granted* 558 U.S. 945, *rev.* 560 U.S. 258, *on remand* 628 F.3d 36 (emphasis added) (denying motion for acquittal following trial, finding no consent to certain commercial sex acts despite finding that victim had been in a BDSM relationship with defendant for years). And even if a party does at one time provide consent, she can revoke it at any time. *See, e.g., In re Kalah O.*, 154 A.D.3d 615, 616 (1st Dep't 2017) (upholding fact-finding determination that, when sexual activity occurred "after the victim had plainly revoked any consent she may have given," defendant committed a sex crime.) Indeed, this Court has already found that because "other plaintiffs met with Rubin more than once does not establish their consent on any given occasion." (MTD Order, Dkt. No. 105, at 30). Defendants present nothing requiring the Court to change its decision, which alone warrants denial of Defendants' Motions. Each Plaintiff was beaten, restrained, and/or raped by Rubin in a manner that exceeded any purported consent provided, warranting denial of the Rubin Motion.

## A. Whether a Victim Consented to Rape and Human Trafficking—if Legally Possible— Is A Fact-Intensive Issue Not Appropriate for Summary Judgment

The issue of whether each Plaintiff consented each and every time to being assaulted, restrained, raped, and trafficked by Rubin and his associates requires a fact-intensive analysis

requiring consideration of the circumstances of each particular incident not suitable for summary judgment. Generally, fact-intensive inquiries are not appropriate on summary judgment. *See*, *e.g.*, *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980) (considering consent in the context of a police search, finding "[t]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all the circumstances").[10] Determination of whether Plaintiffs consented to Rubin's misconduct requires consideration of the specific facts in each assault, and is more properly suited for consideration by a jury at trial rather than by the Court on papers filed in support of or in opposition to summary judgment. This alone warrants denial of Rubin's Motion.

Moreover, the issue of consent in particular is a subjective determination regarding Plaintiffs' states of mind, which may only in rare circumstances be decided on summary judgment. This case in not one of those rare circumstances. The Second Circuit has consistently held "where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial *indispensable*." *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (emphasis added).[11] "The need for a full exposition of facts is profound under such circumstances since determining a man's state of mind is 'an awesome problem,' capable of resolution only by reference to a panoply of subjective

---

[10] *See also Morales v. M. Alfonso Painting Corp.*, No. 11 Civ. 1263(NRB), 2013 WL 5289789, at *4 (S.D.N.Y. Sept. 19, 2013) ("[g]iven the fact-intensive nature of this inquiry, the question of whether an employee-employer relationship exists is rarely amendable to summary judgment"); *Tavares v. Amato*, 954 F. Supp. 2d 79, 99 (N.D.N.Y. 2013) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) ("'Generally, whether parties are similarly situated is a fact-intensive inquiry,' best suited for the jury"); *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012) (regarding individual liability under the NYHRL, finding that a "fact-intensive balancing inquiry . . . is typically not suited for summary judgment").

[11] *See also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983); *Landmark Land Co., Inc. v. Sprague*, 701 F.2d 1065, 1070 (2d Cir. 1983); *Am. Int'l. Group, Inc. v. London Am. Int'l. Co., Ltd.*, 664 F.2d 348, 353 (2d Cir. 1981); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir. 1980); *Empire Electronics Co., Inc. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962); *Arnstein v. Porter*, 154 F.2d 464, 471 (2d Cir. 1946).

factors." *Id.* (internal citations omitted). Here, Defendants ask the Court to consider the subjective question of whether Plaintiffs felt coerced or forced to engage in commercial sex acts. Even though the testimony referenced above and below shows, in fact, that the Plaintiffs did not consent to Rubin's rapes and assaults, this specifically is the type of state of mind consideration not appropriate for resolution on summary judgment.

Indeed, at the very best for Rubin, the issue of consent would come down to a determination of the credibility of Plaintiffs versus that of Defendants, which, again, is a decision specifically reserved for the jury. In reviewing the evidence and the inferences that may reasonably be drawn on a motion for summary judgment, "a court may not make credibility determinations or weigh the evidence." *Proctor v. Leclair*, 846 F.3d 597, 608 (2d Cir. 2017). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Defendants present a one-sided selection of testimony and documents culled to support their arguments—all from statements made after the sexual assaults and coercion took place, when Plaintiffs may have been fearful of repercussions from Rubin, who knew their names, dates of birth, and other personal information. (*See, e.g.*, Opposition to Powers' Motion § II (regarding Powers's knowledge of Plaintiffs' personal information in order to arrange for flights and payment.)) The Court cannot rule as a matter of law what the states of mind were of the Plaintiffs, and any credibility determination must be made by the jury. Defendants' Motions with regards to their consent affirmative defense should be denied.

**B. The Evidence Shows that Rubin Repeatedly Physically and Sexually Assaulted Plaintiffs Beyond Any Consent They Provided, Rendering Rubin's Consent Defense Meritless**

Even if the evidence were to show that some Plaintiffs consented to some of Rubin's conduct for which Plaintiffs are suing Defendants (which it does not), each Plaintiff maintains that she did not provide consent on certain occasions, that she revoked her consent, or that Rubin exceeded any consent given. In order to assert consent as a defense to a tort or to the TVPA, the complained of "physical attack must not exceed the consent." *Van Vooren,* 273 A.D. at 92. It is not "whether she initially consented that is relevant, but whether [plaintiff] withdrew her consent and whether defendant continued to act despite withdrawal of consent." *People v. Jovanovic*, 263 A.D.2d 182, 197–98 (1st Dep't 1999); *see also United States v. Valenzuela*, 495 F. App'x 817, 820 (9th Cir. 2012) ("Even if some of the victims consented initially, [the trafficker] violated § 1591 by continuing to harbor and maintain them once [the trafficker] realized that force, fraud, or coercion would have to be used to cause the girls to engage in a commercial sex act"). Thus, even if a Plaintiffs provided consent on some occasions, or even at the beginning of any given encounter with Rubin, such consent is not static, and is no longer a defense to any claim after the Plaintiff revoked it or Rubin exceeded it.

Even the existence of a prior consensual BDSM relationship between two parties cannot establish future consent. The district court and Second Circuit in *United States v. Marcus* considered this issue at length. 487 F. Supp. 2d at 309 (rejecting defendants' argument "that the existence of a prior consensual relationship between the defendant and [victim] in which the infliction of punishment and pain was part of their mutual sexual gratification makes it impossible to determine whether defendant abused [victim] to compel the performance of a commercial sex act"). The district court found that a jury could have found that "defendant's non-consensual

23

application of force directly caused [victim] to engage in a commercial sex act," despite the victim having previously agreed to a BDSM relationship. *Id.* at 308. Indeed, the victim's testimony that "she was screaming and crying throughout the incident, and that she was physically restrained" was "more than sufficient to allow a reasonable jury to draw the inference that the defendant used force to cause her, in whole or in part, to engage in this act." *Id.* at 308. When the case was remanded, the Second Circuit concluded that "over time, the violence Marcus inflicted upon [victim] became nonconsensual," violating the TVPA. *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010).

As in *Marcus*, each Plaintiff testified that she protested to certain acts by Rubin, often screaming or crying throughout the incident while being physically restrained (*See, e.g.* Hallman Dep., Ex. H, 135:12-25 (Hallman testifying that she asked Rubin not to tie her up during the August 22, 2016, encounter); Lawson Dep., Ex. C, 166:17-22 (Lawson testifying that after Rubin assaulted her with a cattle prod, she "was crying. [She] remember[ed] crying. [She] remember[ed] where [her] legs were hurting really bad, [her] arm[s] were hanging."); Hathaway Aff., Ex. I, ¶ 4, (Hathaway swearing that she "begged for [Rubin] to stop when he penetrated her with a poll cue"); SAC ¶ 266[12] (Speight alleging that Rubin dragged her to the dungeon after slapping Speight in the face, "and even though Speight was screaming and telling Rubin to stop, Rubin proceeded to tie Speight up on all fours."); Peterson Dep., Ex. G, 260:6-261:4 (Peterson testifying that, when Rubin assaulted her in the club, she screamed out, and Rubin did not stop, nor did anyone watching come to her aid); Fuller Dep., Ex. D., 151:11-17 (Fuller testifying that she remembered "crying and being upset.").) This evidence is more than sufficient to raise a question of material fact with regards to consent.

---

[12] Speight was not asked about this specific incident in her deposition. (*See, generally,* Speight Dep., Ex. J.)

**1.  Amongst Other Violations, *Hallman* Never Consented to Being Punched in the Head to the Point of Unconsciousness and Subsequently Sexually Assaulted**

There can be no question that Hallman never consented to being punched in the head to the point of unconsciousness and being subsequently sexually assaulted on either August 22, 2016, or September 24, 2016. One who is unconscious, or otherwise so impaired as to be unable to communicate unwillingness to act, is incapable of consent. *See* N.Y. Penal Law § 130.65(2) (defining sexual abuse in the first degree as "when the victim is incapable of consent by reason of being physically helpless); *see also* N.Y. Penal Law § 130.00(7) (finding one is physically helpless when that person is unconscious "or for any other reason is physically unable to communicate unwillingness to act."). Hallman testified that on August 22, 2016, Rubin tied her up "[w]ith black tape or rope" against her express wishes. (Hallman Dep., Ex. H, 135:16-25.) She then testified that, after she was tied up she "wanted to leave" but could not as she was "already tied up at that point with the tape in my mouth and around my hands with my hands behind my back." (*Id.*, 141:10-20.) Indeed, Hallman testified that she was not even able to walk and described Rubin's assault. (*Id.*, 142:12-24.)[13] Rubin did not have Hallman's consent to engage in any of these acts. Indeed, this type of violent assault to Hallman's head is specifically the type of crime which carries such a risk of serious harm that one cannot consent to it. (*See* discussion *infra* § I(D).) Moreover, Hallman testified that she lost consciousness due to Rubin's blows to her head. (Hallman Dep., Ex. H, 143:17-24.) Any sexual activity after that point must be considered to have been without consent. After she was raped, Hallman testified that she could not "remember anything but crying."

---

[13] "Q. In the Complaint, you allege that Rubin penetrated you causing tears to your vagina. Is that accurate? A. Yes. Q. You also allege that you were in and out of consciousness during this time. Is that accurate? A. Yes. Q. Do you know what caused you to go in and out of consciousness? A. When he started punching me in the back of my head."

She stated that she did not call the police because she "was embarrassed." (*Id.*, 146:6-21.) Hallman's testimony makes judgment for Rubin on claims regarding her inappropriate.

While Defendants did not ask Hallman much about the September 24, 2016, assault, Hallman did testify that she and Caldwell were very intoxicated at the time of the occurrence. (Hallman Dep., Ex. H, 213:22-25 ("Q. How much had you had to drink? A. A lot.").) Hallman's testimony that she was extremely intoxicated, at a minimum, creates a question of material fact with regards to whether Hallman consented to Rubin's assault on September 24, 2016 (and thus was forced into a commercial sex act), further warranting denial of Rubin's Motion with regards to Hallman.

Hallman's lack of consent is further highlighted by her statements that she never agreed to travel to New York to engage in rough sex with Rubin. Despite Rubin's counsel's best efforts to pressure Hallman into stating that she traveled to New York to engage in rough sex, Hallman expressly denied it. (*See* Hallman Dep., Ex. H, 84:23-85:6 (referring to the August 22, 2016 encounter, "Q. You didn't have any understanding at the time before you traveled to New York that the purpose of the trip was to engage in rough sex with Mr. Rubin in exchange for money? A. No. Q. You didn't know that? A. No."); *Id.,* 200:11-19 (referring to the September 24, 2016 encounter, "Q. You understood that in September of 2016 when you were traveling to New York with [former Plaintiff Caldwell], the purpose of the trip was to engage in rough sex with Mr. Rubin in exchange for money; correct? A. No. Q. What was the purpose of the trip? A. We were supposed to have dinner and drinks this time, which we did.").) Indeed, Hallman testified that, at the time she decided to travel to New York she did not think that there would by *any* type of sexual activity. (*Id*., 76:13-21 ("Q. At the time you decided to travel to New York . . . to meet Mr. Rubin, did you have any understanding that there would be any type of sexual activity? A. No. Q. That never

crossed your mind? A. No.").) Hallman's testimony shows she did not consent to come to New York to be assaulted and raped by Rubin.

Rubin's reliance on text messages and notes from Hallman from after the sexual assaults in which Hallman noted that she had "fun" and "would love to see him again" (*see* Rubin MOL, at 6), do not show that Hallman unquestionably consented to Rubin's assault or to engage in commercial sex at times before she wrote those notes. All these messages show is that Hallman felt she had reason to appease the man she testified had just beaten her to the point of unconsciousness (*see* Hallman Dep., Ex. H, 142:12-24), who was incredibly wealthy and well connected, had her personal information, and could be a continued threat to her. Rape victims often have a continuing fear of their perpetrators and will seek to appease them after the rapes have taken place. *See People v. Page*, 166 A.D.2d 886, 886 (4th Dep't 1990) (considering when victim failed to report the incidences and continued to associate with her abuser after the incidents occurred); *see also People v. Abdur-Razzaq*, 60 Misc. 3d 631, 645 (N.Y. Sup. Ct. Bronx Cty. 2018) (discussing "trauma bonding" between sex trafficking victims and their perpetrators, which explains the "often paradoxical behaviors of victims of sex trafficking"). Hallman's conduct is consistent with that of a rape and sex trafficking victim and, at best for Rubin, would only create a question of fact regarding consent, warranting denial of Rubin's Motion with regards to Hallman.

**2. Amongst Other Violations, Lawson Never Consented to Being Assaulted with an Instrument Providing Electric Shocks and Subsequently Sexually Assaulted**

The evidence shows that Lawson never consented to Rubin's physical assaults, at either the August 22, 2016, encounter or the December 21, 2016, encounter. During the first encounter, Lawson testified that Rubin hit her in the face after she expressly asked him not to. (Lawson Dep., Ex. C, 86:2-25 ("Q. Why don't you tell me what happened after you were smacked in the face. A.

27

I remember saying that, not to, because of my filler. Q. What happened next? A. Smacked again.");

*see also* Hallman Dep., Ex. H, 140:17 - 141:6 ("Q. I remember he smacked [Plaintiff Lawson]

across the face and she told him don't do that because she just had fillers put in her cheeks. Q. Did

he say anything to [Plaintiff Lawson] about her statement about the fillers . . . ? A. He said he

didn't care . . . . And he did it again.")) Rubin then forced Lawson—out of fear that he would turn

his violence on her—to hit Hallman. Specifically, Rubin directed Lawson to hit Hallman, stating

that "she was a baby and he was the daddy, and we had to beat our baby." (Lawson Dep., Ex. C,

88:8-10.) But Lawson did not want to hit her friend, and, instead hit her own leg so that Rubin

would think she was complying with his demands. (*Id.* 88:8-14.) When Rubin discovered Lawson

was not doing as he demanded, he physically attacked Lawson. (*Id.,* 21-24 ("A. He noticed that I

didn't hit her, so I got smacked for that.").)

  In December, 2016, Rubin again coerced Lawson to engage in commercial sex, both raping

and assaulting her. Lawson was nervous to see Rubin again, but returned to see him as Rubin

assuaged those fears when he asked Lawson to simply meet him in the middle of the day for lunch.

(Lawson Dep., 134:16-136:19.) Lawson did not know that she would even be physically restrained

on the second encounter, let alone raped or assaulted. (*Id.*, 138:22-24 ("Q. Did you understand that

you would end up having sex with him on the second occasion? A. No . . . . Q. Did you understand

that you would be tied up on the second occasion? A. No.")) Lawson then testified that she was

bound and then sexually assaulted by Rubin against her will with a device resembling a cattle prod.

(*Id.*, at 18.) Lawson testified that Rubin used the cattle prod in her vagina, shocking her. (*Id.*, at

144:10-24.) Immediately thereafter, Lawson confirmed that she had never before used an object

liked the cattle prod, and requested a break from the deposition as she had become visibly upset.

(*Id.*) Indeed, Lawson testified that "I was raped. I was raped and I was beat. I had a cattle prod

used on my, inside of my vagina. I would pay someone $5,000 not to do that to my vagina, okay? Do you know what that feels like." (*Id.*) Lawson further confirmed that all of the allegations in the Complaint regarding this encounter were true. (*Id.*, 168:24-169:8.) Lawson's testimony shows she did not consent.

As with Hallman, Lawson's text messages after she was assaulted do not show that she consented to Rubin's misconduct. In response to Powers's statement that Rubin "said he had a terrific time, see you again soon? XO" Lawson wrote to Powers, "awesome! Can't wait . . . I was hoping he liked me lol." (*See* Rubin MOL, at 6 (citing Rose Decl., Ex. 15, at 2-3.)) There is nothing in the language of these messages with Powers provides consent to Rubin for assaulting Lawson. There is at least a question of fact to be put before a jury as to what Lawson meant by sending these messages. The same is true for the messages Lawson sent to Rubin shortly thereafter. (*See* Rubin MOL, at 6 (citing Rose Decl., Ex. 14, at 203530) (which, in fact, shows that Lawson was experiencing pain).) After the second encounter, Lawson's only exchange with either Powers or Rubin, was requesting payment. (*See* Rubin MOL, at 9 (citing Rose Decl. Ex. 15 at 2-3.)) This message says nothing about whether she consented to Rubin's assault. In fact, Lawson testified regarding the events immediately following the assault, noting that she and Rubin exited the apartment and "were arguing . . . [a]bout what happened." (Lawson Dep., Ex. C, 171:21-172:4.) Lawson noted that Rubin left her, telling her "to get down the street" and called her a "whore." (*Id.*, 172:11-16.) Lawson then departed to her hotel, upset. (*Id.*) This testimony further undermines any claims that Lawson consented to Rubin's sexual assault, warranting denial of his Motion with regards to her.

### 3. Amongst Other Violations, Hathaway Never Consented to Being Dragged Through the Condo and Sexually Assaulted with a Pool Cue

While Hathaway at one time had a consensual relationship with Rubin (Hathaway Dep.,

Ex. F, at 85:8-18), she affirmed that, beginning in 2015, consistent with the evidence that Rubin evolved from engaging in consensual BDSM activities to more and more violent non-consensual assaults, Rubin frequently exceeded any purported consent. (Hathaway Aff., Ex. I, ¶¶ 2-3.) Hathaway swears that, in 2015, Rubin penetrated Hathaway with a pool cue without her consent, and against her requests that he stop. (*Id.* ¶ 4.) On the same occasion, Rubin physically dragged Hathaway across the floor through the apartment to his dungeon, causing Hathaway to sustain burns from the friction of being dragged. (*Id.* ¶ 4.) Even worse, Rubin frequently ignored Hathaway's requests to "stop." (*Id.* ¶¶ 4-5.) None of this is consistent with Defendants' position that Hathaway consented to each and every sex act with Rubin.

Hathaway also testifies that, on certain occasions, Rubin sexually assaulted her when she was rendered unconscious due to her consumption of alcohol. (*Id.* ¶¶ 8-14). On one such occasion, Hathaway believes that Rubin may have drugged here without her consent, and then proceeded to assault and rape her while she was unconscious. (*Id.*, at ¶¶ 8-13.) Under the New York Penal Law, an individual is incapable of consent when they are physically helpless, which can include unconscious by means of alcohol. *See* N.Y. Penal Law §§ 130.65(2), 130.00(7). One is also incapable of consent when she is administered drugs or alcohol without her consent. *See* N.Y. Penal Law § 130.00(6). Both of these are present here, such that Hathaway was, at least on one occasion, incapable of consent. The only evidence adduced shows that Rubin exceeded any purported consent, warranting denial of his Motion with respect to Hathaway.

### 4. Amongst Other Violations, Peterson Never Consented to Being Sexually Assaulted and Beaten When She Was Intoxicated and Revoked Any Purported Consent by Saying Rubin's Purported Safe Word, After Which Point Rubin Continued to Sexually Assault Her

Peterson did not consent to certain acts by Rubin. Before her first encounter with Rubin, ██████████ who connected Peterson and Rubin, told Peterson only that there may be light

30

restraints that could cause some bruising, but "never told [Peterson] that [she] was going to be smacked in the face with somebody's hand." (Peterson Dep., Ex. G, 57:5-24.) This at least suggests that when Rubin slapped Peterson in 2011 for the purpose of causing her to engage in a commercial sex act causing her to leave the hotel he did so without her consent. Peterson also testified that, in 2014, when Rubin assaulted her at a strip club in front of other women, Rubin continued to assault her despite Peterson saying the alleged safe word. (*See Id.,* 258:13-260:13.) Indeed, Peterson testified that "Rubin never stopped, even if you used [the safe word] . . . . . [H]e would always continue, even if you wanted to slow down." (*Id.*). Any act by Rubin after Peterson uttered the safe word was without consent.

Finally, Peterson testified that she was addicted to oxycodone throughout 2014. (*Id.*, 310:6-7.) Peterson testified that the first time she took oxycodone was when she first met Rubin and another woman in 2011 (*id.*, at 312:9-17), but that she did not become addicted until 2014. (*Id.*, at 310:607; 312:20-313:22.) Peterson's intoxication creates at least a question of fact as to whether she was capable of consent in 2014, including the assault by Rubin at the strip club.

As with the other Plaintiffs, any text messages or emails between Peterson and Rubin sent before or after any given incident, do not prove consent as a matter of law. Indeed, Peterson acknowledges that ███ (who originally connected Peterson to Rubin) told her to say yes to everything when communicating with Rubin. (*Id.*, at 59:2-24.) Beyond that, Peterson was admittedly under the influence of drugs on many occasions when she spoke with Rubin. (*Id.,* at 310:607; 312:20-313:22.) At least one district court has found that opiate addiction and the subsequent fear of withdrawal can result in coercion under the TVPA. *See United States v. Fields*, No. 8:13-cr-198-T-30TGW, 2013 WL 5278499, at *1 (M.D. Fla. Sept. 18, 2013) (fear of withdrawal symptoms met the definition of "serious harm" for coercion under the TVPA). A

31

reasonable jury could determine that Peterson's conduct while high was sufficient to establish

coercion under the TVPA, warranting denial of Rubin's Motion with regards to Peterson.

###### 5. Amongst Other Violations, Speight Never Consented to Being Whipped or Sexually Assaulted While Unconscious

Nothing in Rubin's Motion shows that Speight consented to being whipped, rendered

unconscious, and then raped by Rubin. In her deposition, Speight confirmed that the allegations

regarding her relationship with Rubin were true. (*See* Speight Dep., Ex. J, 30.) In the Complaint,

Speight alleges that Rubin whipped her without her consent (Complaint ¶ 273); penetrated her

with foreign objects against her protestations (*id.* ¶ 272); and engaged in some sort of sexual

activity with Speight when she was so intoxicated as to be rendered unconscious (*id.* ¶¶ 266-67.)

Speight later testified that she sustained scars from when Rubin whipped her without her consent.

(Speight Dep., Ex. J, 256:25-257:5 ("A. I have scars on my arms. Q. From being whipped by Mr.

Rubin? A. Yes.").) These allegations and testimony confirming the allegations are sufficient to at

least raise questions of material fact with regards to Speight's consent.

Speight also repeatedly testified that Rubin acted beyond any purported consent she

provided on multiple occasions. (*See Id.*, 220:25-221:5 ("Q. You alleged that you did not consent

to having rough sex with Mr. Rubin, isn't that right? A. Not to the extent of what happened

sometimes."); *id.*, at 220:10-16 ("Q. By [reaching out to Rubin], you were consenting to having

rough sex with him? A. No, not to the extent some things that happened."); *id.*, at 220:25-221:2

("Q. Did you ever tell [Rubin] that you didn't want to do certain things, that you would do some

rough things with him? A. Yeah, there were sometimes where I told him to stop and . . ." Rubin's

counsel then interrupted Speight, preventing her from finishing her answer.).) Speight's testimony

supports the allegation that Rubin exceeded any purported consent.

The text messages relied upon by Rubin at best for Rubin raise questions of fact with

regards to consent, which are not appropriately decided on summary judgment. For example, Speight testified that her August 2017 text messages (Rubin MOL, at 23), were "part of a role play we were doing," rather than a request that Rubin beat her. (Speight Dep., Ex. J, 220:25 – 221:2.) Likewise, Speight's messages to Defendants following the filing of the original and first amended complaints in this action (Rubin MOL, at 24) reflect her fear of Rubin and desire to assuage him and Powers. (*See* March 14, 2018, Decl. of John G. Balestriere (Dkt. No. 87), ¶¶ 2-4, which this considered when upholding Speight's claims on the motions to dismiss.) There is at least a question as to whether Speight's fear caused her to feel she needed to please Rubin and Powers, even up to and including the date upon which she filed her claims. *See Page*, 166 A.D.2d at 886. Such statements anyway made months *after* any assault do not prove as a matter of law that Speight consented to Rubin's assault or willingly engaged in commercial sex on every occasion. Rubin's Motion with regards to Speight should be denied.

### 6. Amongst Other Violations, Fuller Revoked Any Purported Consent by Saying Rubin's Purported Safe Word, After Which Point Rubin Continued to Sexually Assault Her

Finally, Fuller's testimony reveals that she revoked any purported consent, after which Rubin continued his assault, further undermining Rubin's Motion. Fuller testified that, when she agreed to travel from Las Vegas to New York she did not understand that she would be asked to spend the night with Rubin, nor that she would be asked to engage in sexual conduct with him or ██████████████ (Fuller Dep., Ex. D, 89:21-90:19.) Fuller later confirmed that she did not expect rough sex at all. (*Id.,* at 98:1-3 ("Q. Did you understand that there would be some rough sex but not as rough as it was? A. No.") Indeed, Fuller testified that she felt her friend, ██████████████ had not "fully communicate[d] what would be happening" despite having "prior knowledge of what" Rubin intended. (*Id.*, at 100:20-101:3) ███████ confirmed that she had not been completely up

front with Fuller in a text message conversation three days after the assault. (Rose Decl., Ex. 106, 000579-580 (██████ writing to Fuller, "No but I feel bad because I told you one thing . . . I would never have intentionally put you in a situation like that.")) Fuller testified that, had she known what Rubin was going to do to her, she "would have never agreed to come here to New York and meet with Mr. Rubin," and that she "didn't know [she] was going to be assaulted the way [she] was." (Fuller Dep.., Ex. D, 97:13-25.) Fuller was not "fully told of what was happening and details," (*id.*, at 101:2-3), so she could not have provided consent.

Further demonstrating Fuller's lack of consent, Fuller testified that she was very intoxicated by the time she met with Rubin. Fuller and ██████ began drinking liquor—provided by Rubin—in his apartment almost immediately upon their arrival. (*Id.*., 110:10-21.) Rubin's friend, ████████████████████████████████████████████. (*Id.*, 111:9-23.) Fuller also testified that she and ████████████ during this time period. (*Id.*, 115:8-16.) Rubin appeared and presented Fuller with the NDA after she and ██████ had been drinking, ████████████████. (*Id.*, 115:17-23.) There is at least a question of fact as to whether Fuller was even capable of consent under all of these circumstances, or if her intoxication was severe enough to render her incapable of consent.

Finally, Fuller testified that, after being bound (Fuller Dep., Ex. D, 135-136), and gagged by Rubin (*id.*, 147:8-9, 149), she had to use the safe word "several times" to get Rubin to stop. (*See id.*, 143:11-16 ("I remember feeling pain. I remember wanting this activity to stop. I remember the activity stopping *after asking several times* for it to stop. I remember going out to the living room and Miss ██████ remained in the room with Mr. Rubin.") (emphasis added); *id.,* at 143:11-16 ("I remember knowing a word. I remember being a little confused about the word. I remember using the word *several times*.") (emphasis added); *id.*, at 145:25-146:4 ("I do remember I had used

the word a couple of times").) Despite using the safe word multiple times, Rubin proceeded to sexually assault Fuller before releasing her from his dungeon. (*See id.*, at 143:22-25 ("Q. What else was happening to you after you were tied up? A. I was sexually assaulted with an instrument.").) Rubin exceeded any consent Fuller gave (if she was in fact capable of giving such consent) when he continued to beat and assault Fuller after she used the safe word in the first instance. There is no point to a safe word if one has to use it *several times* before her partner recognizes it.[14] Any acts by Rubin following Fuller's first utterance of the safe word are without consent, warranting denial of his Motion with regards to Fuller.

## C.   Evidence of Prior or Subsequent Prostitution and Sexual Activity Is Irrelevant to the Issue of Consent

Whether some Plaintiffs had previously engaged in commercial sex or later went on to engage in commercial sex is irrelevant to the determination of Rubin's liability under the TVPA, or any one of the four intentional torts alleged by Plaintiffs. The Court of Appeals has found that, under the TVPA, "[p]rior sexual conduct for money or pleasure was irrelevant to whether the victims' sexual activities [underlying their claims] were the result of coercion." *United States v. Rivera*, 799 F.3d 180, 185 (2d Cir. 2015). Each Circuit that has considered this issue has agreed. *Id.*[15] There is no basis for this Court to deviate from this broadly accepted standard.

---

[14] *See* Dietz Report, Ex., K, at 10 (a submissive party's use of a safe word must always be respected).

[15] Citing to *United States v. Roy*, 781 F.3d 416, 420 (8th Cir. 2015) (excluding evidence of victim's prior prostitution as irrelevant to defendant's charged conduct of sex trafficking); *Valenzuela*, 495 F. App'x at 819–20 (9th Cir. 2012) ("Appellants cannot show the relevance of questions about prior prostitution to either Appellants' knowledge of the use of force, fraud, or coercion, or the victims' consent to work in prostitution"); *see also United States v. Gemma*, 818 F.3d 23, 29–30 (1st Cir. 2016) ("There is nothing in the record that explains how prior prostitution would make it less likely that Gemma sex trafficked A.L. during the time period charged in the indictment, much less 'squarely contradict' the sex trafficking charge"); *United States v. Williams*, 564 F. App'x 568, 575 (11th Cir. 2014) (limiting questioning of a sex-trafficking victim's "preoffense" sexual activity under Rules 401, 403, and 412 and prohibiting evidence of postoffense sexual activity); *United States v. Cephus*, 684 F.3d 703, 708 (7th Cir. 2012) ("[Defendants] wanted to suggest that having already been a prostitute she would not have been deceived by [Defendant] and therefore her testimony that she was coerced into working for him . . . should be disbelieved. But the testimony sought to be elicited by the cross-examination would have been irrelevant . . . [and] would not be evidence that she consented to be beaten").

The Court of Appeals decision in *Rivera* is particularly instructive here. Rubin's primary (if not legally recognized) "defenses" include that some Plaintiffs returned to Rubin on multiple occasions (*see* Rubin MOL, 8, 14-16 (regarding Hallman and Lawson); *id.,* 17 (regarding Hathaway); *id.,* 21 (regarding Speight); *id.* at 28-30), had been warned of what to expect (*id.,* 3-4 (regarding Hallman and Lawson); *id.,* 18 (regarding Hathaway); *id.*, 20 (regarding Speight); *id.*, 26 (regarding Peterson); *id.,* 33 (regarding Fuller)), or had recruited others to meet with Rubin. (*id.* 12-14 (regarding Hallman); *id.*, at 12 (regarding Lawson).) In *Rivera*, the Court of Appeals excluded evidence of similar conduct as irrelevant and prejudicial. *See Rivera*, 799 F.3d at 184 (excluding evidence showing that certain victims returned to the traffickers after being forced to engage in commercial sex, had knowledge that others were coerced into commercial sex prior to being recruited by the traffickers, and had even themselves recruited relatives or friends to work in the bars where the commercial sex took place). This Court should do the same.

Rubin's assertions that Plaintiffs knew that they would be beaten and raped ahead of time (and, according to Rubin, consented to being the victims of crimes) is undermined by the testimony in which some Plaintiffs stated they did not even know what BDSM stood for or could entail. (*See, e.g.,* Hallman Dep., Ex. H, 82:7-18 ("Q: . . . [Rubin's message] says: It's total BDSM, most girls love it and come back for more, but just like to be upfront about everything . . . . What was your understanding about what Mr. Rubin communicated to you on August 17, 2016 at 7:01 p.m.? A. I don't really know what BDSM is, so I didn't know what that meant."); *see, e.g.,* Peterson Dep., Ex. G, 238:6-239:22 ("Q. What do you understand 'sadomasochistic activity' to be? A. At this time I'm not sure what I interpreted it to be . . . . Q. Would it help you if I described it as rough sex? A. I wouldn't describe it as rough sex."); *see, e.g.,* Speight Dep., Ex. J, at 60:14-61:10 ("Q. Did you understand what [sadomasochistic SM activity] meant in 2015? A. I don't think I knew.

Q. You don't think you knew, what? A. I don't think I knew what that meant . . . . I don't understand the sadomasochistic, all this sexual, I didn't know what this meant exactly.").) Without such evidence, which anyway should be excluded, Defendants' arguments with regards to consent fail. Defendants' cannot point to any admissible (or indeed any) evidence showing that Plaintiffs consented to each and every assault by Rubin, warranting denial of Rubin's Motion.

**D. The TVPA Is a Remedial Statute, Focusing on Punishing the Perpetrators of the Sex Trafficking Scheme, Not Whether the Victims Purportedly Consented to Being Trafficked**

Defendants' focus on consent avoids the ultimate purpose of the TVPA: to protect victims of human trafficking, like Plaintiffs. The TVPA is aimed at achieving three goals: (1) combatting trafficking in persons; (2) ensuring punishment of traffickers; and (3) protecting trafficking victims. (*See* TVPA § 102(a), 22 U.S.C. § 7101(a) (2000) ("The purposes of this chapter are to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers, and to protect their victims.") "Section 1595 amended the TVPA for the remedial purpose of 'enhancing . . . protections of trafficking *victims*,'" not the traffickers themselves. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018). (quoting 18 U.S.C. § 1595, Pub. L. 108-193, Dec. 19, 2003, 117 Stat. 2878, § 4 (effective date Dec. 19, 2003) (emphasis added). Because it is a remedial statute, Section 1595 must be liberally construed. *See N.C. Freed Co., Inc. v. Board of Governors of Fed. Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973). Under this liberal construction, a determination of liability focuses not on Plaintiffs' states of mind, but on Defendants' bad acts, further warranting denial of Rubin's Motion.

**E.  As a Matter of Public Policy, a Person Cannot Consent to the Commission of a Crime That Causes Injury or Carries a Risk of Serious Harm, Like Rape or Sex Trafficking in Violation of the TVPA**

Due to the dearth of cases under Section 1595, it is not clear in the Second Circuit whether consent may even be an appropriate defense to a claim under the TVPA.[16] This Court should find that consent is not an appropriate defense to the TVPA. As a matter of public policy, a person cannot consent to the commission of a crime that causes injury or carries a risk of serious harm. *See Jovanovic*, 263 A.D.2d at 198 n.5 (1st Dep't 1999); *see also In re Khalil H.*, 80 A.D.3d 83, 83 (2d Dep't 2010) (considering the issue of fraternity hazing, "consent is not a valid defense if the activity consented to is against public policy"). By passing Trafficking Victims Protection Reauthorization Act of 2003 (the "TVPRA"), Congress created a private right of action for the victim of certain crimes described under the TVPA, which expressly rely on the commission of such crimes. *See* 18 U.S.C. § 1595 ("An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.") Thus, the criminal standard—which does not permit a consent defense when the commission of a crime causes injury or carries a risk of certain harm—should apply here, meaning that consent simply cannot be a defense to the TVPA, warranting not only denial of Rubin's Motion, but striking of Rubin's second affirmative defense of consent with regards to the TVPA (*See* Rubin's Answer and Counterclaims (Dkt. No. 168), 51; *see also* Plaintiffs' Partial Motion for Summary Judgment (Dkt.Nos. 234-234-24).)

---

[16] *See* Nam, Jennifer S., *The Case of the Missing Case: Examining the Civil Right of Action for Human Trafficking Victims*, 107 Colum. L. Rev. 1655, 1656–57 (2007) (exploring the dearth of both civil and criminal claims under the TVPA, finding that, "trafficking victims have filed very few lawsuits under this civil remedy in the four years since its creation, while sex trafficking victims in particular have not filed a single lawsuit under this provision").

## II.   THERE ARE, AT A MINIMUM, MATERIAL QUESTIONS OF FACT REGARDING PLAINTIFFS' TVPA CLAIMS, REQUIRING DENIAL OF RUBIN'S MOTION

The evidence shows that Defendants violated the TVPA, warranting denial of Rubin's

Motion on that claim. The TVPA makes it a crime for an individual to

> knowingly (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

18 U.S.C. § 1591(a). The TVPRA, passed three years after the TVPA, provides a private right of

action for any victim of the TVPA. 18 U.S.C. § 1595. The TVPRA and the TVPA are remedial

statutes that require broad interpretation. *See Noble*, 335 F. Supp. 3d at 515 (citing *Peyton v. Rowe*,

391 U.S. 54, 65 (1968) (recognizing the "canon of construction that remedial statutes should be

liberally construed.")). Besides all of the evidence of harboring and related conduct, various types

of coercion, and commercial sex, a jury could find that Defendants' conduct was in or affected

interstate commerce as Defendants transported the victims over state lines, and made financial

transactions, including PayPal payments and bank wires, which affected interstate commerce.

Beyond arguing that all Plaintiffs consented to his assault and rape (which Plaintiffs have refuted

(*see* discussion *supra* § I)), Rubin does not put forth any evidence showing that he is entitled to

judgment as a matter of law with regards to the TVPA claims. Indeed, all evidence shows that

there is no question that Rubin and his associates violated the TVPA through their interactions

with each Plaintiff.

**A.  It Is Undisputed that Rubin and His Associates Recruited, Enticed, Harbored, Transported, Provided, Maintained, and Patronized Plaintiffs In Interstate Commerce**

Rubin and his associates recruited, enticed, harbored, transported, provided, maintained, and/or patronized a person in interstate commerce in violation of the TVPA. Plaintiffs respectfully incorporate their argument on this element from their Memorandum of Law in Opposition to Defendant Powers's Motion for Summary Judgment ("Powers Opp.") § II(A)-(B).)

**B.  Rubin Acted Knowing That He Would Use Means of Force, Threats of Force, and Coercion to Cause Plaintiffs to Engage in Certain Commercial Sex Acts**

**1.  The Evidence Reveals that Rubin Had Actual Knowledge that He Would Use Whatever Means of Force or Coercion Necessary to Cause Plaintiffs to Engage in Commercial Sex Acts**

Rubin's had sufficient knowledge that he would use force or coercion to cause Plaintiffs to engage in commercial sex acts. The TVPA requires that an individual have knowledge, or act "in reckless disregard of the fact, that means of force, threats of force, fraud, [or] coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). The knowledge required is not knowledge "in the sense of certainty as to a future act," but, rather, that Defendant recruited, enticed, or patronized Plaintiff with the knowledge "that certain statutorily-prohibited means . . . will be used to cause plaintiff to engage in a sex act." *Noble,* 335 F. Supp. 3d at 518 (citing *United States v. Todd*, 627 F.3d 329, 333–34 (9th Cir. 2010)). As here, a pattern of behavior showing force, fraud, or coercion, is sufficient to establish knowledge. *Id.* Section 1595(a) provides a private right of action for any victim under the TVPA against the "perpetrator." 18 U.S.C. § 1595(a). Rubin is unquestionably the perpetrator of the crimes alleged by Plaintiffs, and, as such, cannot deny knowledge of the conduct amounting to those crimes.

Rubin knew he would coerce Plaintiffs into commercial sex acts. (*See* discussion *supra* § I.) Nearly every time Rubin patronized Plaintiffs, Rubin planned to employ means of physical

restraint, which were all prepared for him in the dungeon. (*Id.*) Rubin used these means of restraint to force or coerce Plaintiffs into engaging in acts of commercial sex. (*Id.*) In each instance that Rubin provided a safe word to a Plaintiff, he knew, through his previous patterns of behavior, that he would continue to engage in commercial sex acts even after Plaintiff employed that safe word. (*Id.*) When Rubin engaged in sex acts with any Plaintiff who was highly intoxicated or unconscious, he knew—or at the very least, acted in reckless disregard of the fact—that he would be using means of force to cause that Plaintiff to engage in a sex act he desired. (*Id.*) Rubin may not escape liability here by self-servingly stating in the face of all evidence to the contrary, and common sense, that he somehow still thought Plaintiffs consented to the encounters, or that their after-the-fact statements of satisfaction somehow absolved him of his wrongdoing at the moment of assault. (*See* Rubin MOL, 46.) Under the liberal construction afforded to the TVPA, Rubin must be found to have acted with the requisite knowledge.[17]

### 2. Under the TVPA, Coercion Is Broader than the Use of Physical Force, and, As Here, May Encompass Threats of Legal Process and Fear of Withdrawal from Drugs and Alcohol

Coercion under the TVPA is not limited to physical restraint, and covers precisely the scenarios described by Plaintiffs here. Under the TVPA, "coercion" includes "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). The TVPA defines "serious harm" as "any harm, whether physical or

---

[17] In fact, Rubin's knowledge that he transported individuals for the purpose of prostitution is enough to undermine his claimed defense. In the sole authority he cites regarding knowledge, the Court of Appeals found that a "defendant is already on notice that he is committing a crime when he transports an individual *of any age* in interstate commerce for the purpose of prostitution." *United States v. Robinson*, 702 F.3d 22, 33 (2d Cir. 2012) (citing *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002) (emphasis added)).

nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the *same background* and in the *same circumstances* to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5) (emphasis added). Here, each Plaintiff was in a vulnerable situation: away from home, alone with a man who could physically overpower her and who possessed a level of power and wealth far exceeding that of each Plaintiff, and often intoxicated or otherwise impaired. Most Plaintiffs pleaded or testified that they had previously sustained either mental or physical abuse at the hands of former partners or family members, were isolated from their families, or had otherwise suffered challenging adolescence. (*See, e.g.,* Hallman Dep., Ex. H, 55:5-56:4; Lawson Dep., Ex. C, 26:9-16; Hathaway Dep., Ex. I, 11:13-17; Peterson Dep., Ex. G, 9:8-10:7, 302:8-25; Speight Dep., Ex. J, 266:24-267:9; Fuller Dep., Ex. D, 13:12-14:2.) Each of these facts shows that Plaintiffs were more susceptible to serious harm, and more likely to think that they had to continue engaging in the commercial sex act to avoid further serious harm. Rubin chose vulnerable victims.

Coercion can include threatened abuse of law or legal process, such as misuse of the NDAs. The term "abuse or threatened abuse of law or legal process" means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1). Each NDA contained a provision prohibiting Plaintiffs from discussing their interactions with Rubin, and threatening lawsuits and liquidated damages for violating that provision. (*See* Rose Decl., Exs. 16, 17, 40, 44, 98, 107.) This provision served to isolate Plaintiffs, making each think—wrongly— that she could not report Rubin's misconduct, or otherwise seek help for her injuries as a result of

42

his misconduct. Such isolation fed into the coercion, and, often, resulted in Plaintiffs returning to Rubin. Under the broad definition of coercion employed by the TVPA, there are, at a minimum, questions of fact going to whether Rubin employed means of coercion to cause Plaintiffs to engage in commercial sex, warranting denial of his Motion.

## III. THERE ARE, AT A MINIMUM, MATERIAL QUESTIONS OF FACT REGARDING HATHAWAY'S, LAWSON'S, AND SPEIGHT'S STATE LAW CLAIMS, WARRANTING DENIAL OF RUBIN'S MOTION

### A. There Is at Least a Question of Fact Regarding Hallman's, Lawson's, and Speight's False Imprisonment Claims Regardless of Whether Certain Plaintiffs Were Free to Leave the Apartment on Certain Occasions

Evidence shows Rubin is liable for Hathaway's, Lawsons, and Speight's false imprisonment claims irrespective of whether any of them were allegedly free to leave the apartment, warranting denial of the Rubin Motion. The false imprisonment claim is based not on when Plaintiffs were simply in the Penthouse, but when they were restrained to the BDSM furniture and not able to leave. The elements of a claim for false imprisonment are: (1) the defendant had the intent to confine the plaintiff, (2) the plaintiff was aware they were confined, (3) the plaintiff did not consent, and (4) there was no privilege to the confinement. *King v. Crossland Savings Bank*, 111 F.3d 251, 255 (2d Cir. 1997). Under New York law, "the unlawful detention of the person of another, *for any length of time*, whereby [plaintiff] is deprived of his personal liberty'" is sufficient to establish a claim for false imprisonment. *Rodgers v. City of Rochester*, No. 05-CV-6220T, 2007 WL 1557465, at *5 (W.D.N.Y. May 29, 2007) (quoting *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 18 (E.D.N.Y.1978) (emphasis added) ("questions of fact regarding the circumstances leading up to the plaintiff being pepper sprayed and strapped to a Gurney against her will" precluded summary judgment on false imprisonment claim). All three Plaintiffs have submitted evidence of their lack of consent, warranting denial of the Rubin Motion.

Indeed, each of the three Plaintiffs has testified or submitted sworn statements indicating that she was restrained against her will such that she was not free to escape from Rubin. (Hathaway Aff., Ex. I, ¶¶ 5 ("[A]fter [Rubin] shoved the pool cue in me [he] returned with rope and proceeded to bind me against my will."); Lawson Dep., Ex. C, 138:22-24 (Q: "Did you understand that you would be tied up on the second occasion?" A: "No."); SAC ¶ 272 ("On these occasions, without her consent, Rubin tied Speight down and shoved foreign objects, such as a glass dildo, into Speight's vagina").[18] Plaintiffs' testimony raises, at a minimum, a triable issue of fact as to their consent to Rubin's acts of imprisonment, warranting denial of the Rubin Motion.

**B. Rubin Does Not Contest that He Committed the Remaining Torts of Assault, Battery, and Intentional Infliction of Emotional Distress, But, Rather, Relies Solely on His Consent Argument, Which Fails for the Reasons Stated Above**

Rubin's attempt to argue that each of the Plaintiffs consented to his tortious actions is belied by the record, and, in any event, fails as the Court cannot find as a matter of law that Plaintiffs consented to *all* of Rubin's actions at *all* times. Indeed, as detailed in Section I, *supra*, Defendants' reliance on allegations regarding Plaintiffs' past and subsequent sexual activity, multiple encounters with Rubin, purported recruitment of others, and Rubin's argument that Plaintiffs knew "what to expect" does not mean that this Court can find as a matter of law that all Plaintiffs consented to all complained of acts at all times, warranting denial of Rubin's Motion.

**IV. EACH PLAINTIFF WAS INJURED AS A RESULT OF DEFENDANTS' MISCONDUCT, AND IS ENTITLED TO COMPENSATORY AND PUNITIVE DAMAGES**

Plaintiffs sustained both physical and emotional injuries, which are compensable under the TVPA and the state law claims. Compensatory damages for each of plaintiffs' causes of action are

---

[18] At her deposition, Speight verified that the substance of her allegations in the Second Amended Complaint was accurate. Defendants did not question Speight with regards to her consent to Rubin's use of restraints. (*See, generally,* Speight Dep., Ex. J)

not limited merely to expenses that a plaintiff may have borne, but, rather, include damages for pain and suffering, mental anguish, shock, humiliation, indignity, embarrassment, apprehension, terror, or ordeal *See Guion v. Associated Dry Goods Corp. (Lord & Taylor Div.)*, 56 A.D.2d 798, 798 (1st Dep't 1977), *aff'd*, 43 N.Y.2d 876 (1978) (awarding damages for "mental suffering such as indignity, humiliation, shame and disgrace and loss of earnings" for false imprisonment); *see also Raymond v. Marchand*, 125 A.D.3d 835, 836 (2d Dep't 2015) ("[a]lthough the sparse proof submitted by the plaintiff indicated that the injuries caused by the assault and battery committed upon her by the defendant were superficial, she was entitled to compensation for those injuries").[19] Moreover, a lack of medical records for any particular injury does not prove as a matter of law that such injury did not take place, it merely shows that the injured party may not have sought medical care (particularly common in the context of sexual assault as rape victims often refrain from reporting their assault. *See Liberta*, 64 N.Y.2d at 166 n.8). Plaintiffs' testimony and photographs are sufficient to show that Plaintiffs sustained injuries, warranting denial of Rubin's Motion.

## A. Hallman Was Injured as a Result of Defendants' Misconduct

Hallman has raised, at a minimum, a triable issue of fact regarding the physical and emotional injuries that she suffered due to Defendants' conduct, such that the Rubin Motion should be denied. Hallman testified extensively as to her physical and emotional injuries, stating that after her encounters with Rubin she sustained the following:

- Tears to her vagina as a result of Rubin penetrating her against her will (Hallman Dep., Ex. H, 143:12-16);
- Head trauma and loss of consciousness (*Id.*, 143:17-24; 154:2-7);
- Bruising and pain (*Id.,* 5-7);

---

[19] *See also Shukla v. Sharma*, No. 07-CV-2972 (CBA)(CLP), 2012 WL 481796, at *13 (E.D.N.Y. Feb. 14, 2012) (confirming award of substantial pain and suffering damages on a TVPA claim for forced servitude, despite limited out-of-pocket losses); *Rana v. Islam*, 210 F. Supp. 3d 508, 516 (S.D.N.Y. 2016), *vacated in part on other grounds*, 887 F.3d 118 (2d Cir. 2018) (awarding emotional distress damages of $241,200 where plaintiff suffered physical and mental afflictions including insomnia, chest pain, headaches, and post-traumatic stress disorder (PTSD)); *Hassan v. Marriott Corp.*, 243 A.D.2d 406, 406 (1st Dep't 1997) ("[P]hysical injury need not be present for an assault").

- A broken rib (*Id.,* 7-14; 150:5-153:12);
- Injury to her right breast implant as a result of "large hard strikes" by Rubin, causing swelling, scarring, and hardening (*Id.,* 144:15-20; 145:2-16);
- Rug burns on her face and forehead (*Id.,* 154:2-23);
- Embarrassment (*Id.*, 148:4-5; 150:3-4);
- Emotional trauma (*Id.*, 308:8-11);
- Trouble sleeping (*Id.*, 308:8-11); and
- Depression (*Id.,* 308:8-11).

Finally, Hallman testified that she became so emotionally distraught upon returning to see Rubin on or around October 20, 2016, that she suffered severe nausea and stomach pain, eventually requiring hospitalization. Specifically, Hallman testified that upon arriving at the airport in Florida, she "was an emotional wreck, throwing up" due to her "nerves" because she "knew what would happen if [she] went [to New York to see Rubin] again." (Hallman Dep., Ex. H, 228:3-24.) While Defendants attempt to characterize this ████████████████████████████████ (*id.*, 228:25-231:19.), Hallman testified that it was not. (*Id.*, 229:7-19) (████████████████████ ████████████████████████████████ Q. Sick the way that you were on your trip to New York in October of 2016? A. Similar, but different. Q. What was different? A. I hadn't eaten anything. ████████████████████ It was my nerves acting up.") The pain became so bad that Hallman eventually had to be transferred to the hospital. (*Id.*, 233:5-21.)

The medical records relied upon by Rubin at best raise a question of fact with regards to the extent and cause of Hallman's injuries. First, as previously discussed, rape and sexual assault victims frequently decline to report their assaults. *See Liberta*, 64 N.Y.2d at 166 n.8. Thus, a lack of medical records is to be expected, and cannot be not determinative. Hallman specifically testified that she was embarrassed about the August 22, 2016 encounter and did not tell her doctor about certain injuries (*see, e.g.,* Hallman Dep., Ex. H, 153:7-12), such that any failure to produce medical records regarding her injuries supports that Hallman was too embarrassed and upset by the trauma to reveal to anyone what had happened. Indeed, the medical records relied upon by

Rubin only confirm that Hallman suffered from anxiety attacks in the months following her encounters with Rubin. (*See* Rose Decl., Ex. 27, 

); Rose Decl. Ex. 28,

.") There is sufficient evidence in the record regarding Plaintiff Hallman's injuries to warrant denial of Rubin's Motion.

## B. Lawson Was Injured as a Result of Defendants' Misconduct

Lawson also produced sufficient evidence of her physical and emotional injuries to withstand summary judgment. Following her encounters with Rubin, Lawson testified that she suffered the following injuries:

- Bruising and pain in her breasts following the August 22, 2016, encounter (Lawson Dep, Ex. C, 121:5-15; *see* Rose Decl., Ex. 14);
- Extensive bruising and pain in her breasts following the December 21, 2016 encounter and a capsulated left breast (Lawson Photographs, Ex. O; Lawson Dep., Ex. C, 185:19; 186:6-189-10);
- Electric shocks to her vagina (Lawson Dep., Ex. C, 142:13-24; 169:19-23);
- Extreme pain (*Id.*, 166:20-167:9);
- Injury to her vagina (*Id.*, 185:21);
- Bruising and damage to cosmetic filler under her eye (*Id.*, 185:23-25; 189:19-22); and
- Insomnia, anxiety, and depression, requiring eventual medication (*Id.*, 200:2-18; 205:14-25; Rose Decl., Ex. 34, (Lawson Medical Records), at 8-10, 12-20.)

Rubin's arguments regarding Lawson's medical records and photographs only support Lawson's claims, or, at worst, raise questions of fact that must be decided by a jury. Lawson's medical records show (1) that she eventually saw a doctor for the emotional and mental trauma she experienced as a result of Rubin's assault (2) that Lawson told at least one doctor about her capsulated left breast; (3) that Lawson was in fact diagnosed with insomnia, anxiety, depression, and ADD, specifically in reference to what happened in 2016. (*See* Rose Decl., Ex. 34, 8-10, 12-20.) The photographs referenced by Defendant Rubin to argue that Lawson could not have sustained any injury as they do not reveal bruising (*see* Rubin MOL, 11), do not provide any

support for Rubin's assertions. There is nothing on these photographs or in Lawson's testimony
that shows when these photos were actually taken, only that they were posted in September 2016.
(Rose Decl., Exs. 8-11.) Further, Lawson testified that she "always wear[s] spray paint" during
photoshoots, so, even if she was bruised at the time the photos were taken, such bruises would not
show up in the photograph. (Lawson Dep., Ex. C, 128:7-18.) Likewise, ████████████████████

████████████████████████████████████████████████ has no bearing on whether she

suffered anxiety as a result from Rubin's attacks nearly 20 years later. (*Id*. 202:8-25.) ███████

████████████████████████████████████████████████████████████████████

███ Finally, like Hallman, Lawson's failure to see a doctor for her physical injuries immediately
after Rubin's attacks only supports that Lawson was embarrassed and did not want to tell anyone
about the trauma she sustained at the hands of Rubin, which is common amongst rape victims.
Lawson was injured as a result of Rubin's misconduct, further warranting denial of his Motion.

### C.  Hathaway Was Injured as a Result of Defendants' Misconduct

Hathaway also sustained significant physical and psychological injury as a result of
Rubin's attacks. Hathaway's injuries include:

- Burns across her body as a result of being restrained by rope and from contact with
  the floor when Rubin dragged her into the dungeon (Hathaway Aff., Ex. I, ¶ 5);
- Vaginal tears with bleeding (*Id*., ¶¶ 4, 6);
- Bruising to her breasts (Hathaway Photograph, Ex. P);
- Loss of consciousness (Hathaway Aff., Ex. I, ¶¶ 8-14);
- Electric shocks across her body causing pain (*Id*., ¶¶ 17-18); and
- Anxiety and insomnia (Hathaway Dep, Ex. F, 149:19-154:14).

Defendants' arguments to the contrary fail. First, Defendants' contention that "Hathaway
produced no medical records whatsoever" ignores the medical authorization form that Hathaway
produced. (Hathaway medical authorization form, Ex. S). Additionally, as with the other Plaintiffs,

a lack of medical records does not establish that Hathaway was not injured. There is sufficient evidence regarding Hathaway's injuries to warrant denial of Rubin's Motion.

### D.  Peterson Was Injured as a Result of Defendants' Misconduct

Peterson produced sufficient evidence of her physical and emotional injuries to withstand summary judgment. Peterson testified that she suffered the following injuries, without limitation:

- Bruising to her body (Peterson Dep., G, 199:3-15; 259:19-260:5);
- Sickness and headache (*Id*., 108:22-25);
- Bruising to her eye (*Id*.., 259:19-260:5; Peterson Photograph, Ex. Q);
- Injury to buttocks and implant (Peterson Dep., Ex. G, 315:2; 335:17-339:17); and
- Rubin was "the main catalyst" for her oxycodone addiction. (*Id*., 106:3-109:25.)

Rubin's contentions to the contrary are belied by the record. While Rubin tries to distance Rubin from Peterson's addiction to oxycodone, Peterson never denied that Rubin supplied her with drugs (*Id*., 306:7-307:13), and in fact testified that Rubin specifically instructed another woman to give Peterson drugs crushed up in her beverage. (*Id*., 105:22–107:9.) Peterson's medical records show that she did in fact sustain injury to the Bio Gel injections in her buttocks, and merely raise a question of fact with regards to the cause of that injury. (Rubin 56.1 Statement ¶¶ 231-233; Rose Decl., Ex. 103.) Peterson's rehabilitation facility records only confirm that Peterson did become addicted to drugs and had issues with anxiety (Rubin 56.1 Statement ¶¶ 229-230; Rose Decl, Ex.102). The questions raised by these documents are disputes of fact for the jury to resolve.

### E.  Speight Was Injured as a Result of Defendants' Misconduct

Speight also produced sufficient evidence of her physical and emotional injuries to withstand summary judgment. Indeed,

- Bruising to her face, breasts, and buttocks (Speight Dep. at 34:13-14; Speight Photographs, Ex. R);
- Damage to her facial injections, requiring plastic surgery to repair and causing extensive pain (Speight Dep., Ex. J, 256:20–261:25);
- Damages to breast implants (*Id.*, 34:16-17; 262:7-15);
- Scarring across her arms from being whipped by Rubin (*Id.*, 256:20-257:5); and

49

- Speight also testified that she suffered psychological trauma and "mental abuse . . . [and] name calling" as a result of Rubin's actions (*Id.,* 73:25-74:19; 95:22-96:9).

Each of Defendants' arguments to the contrary fails in turn. Speight did produce medical records. (*Id.*, 34:4–25, 190:6–194:2, 234:17–235:17.) But, to the extent her injuries were missing from these records, Speight admits—like many of the other Plaintiffs—that she hid the cause of her injuries from her doctors. (*Id.,* 190:22-19:21; Rose Decl. Ex. 87, KPS000006; *Id.*, Ex. 26, 3.) While Speight is not certain as to the date of her injuries, she testifies that she does remember being injured. (Speight Dep., Ex. J, 72:19-21, 73:21-24, 88:3-5, 94:9-11, 104:14-21, 105:5-8, 126:10-18, 143:23-144:7, 148:18-22, 154:4-7, 161:6-8. 174:11-14, 179:22-25, 186:14-21.) There are, at a minimum, questions of fact as to Speight's injuries, warranting denial of Rubin's Motion.

## F. Fuller Was Injured as a Result of Defendants' Misconduct

Fuller has provided ample testimony regarding her injuries to raise, at a minimum, a triable issue of fact as to her physical and emotional injuries to survive summary judgment. Fuller testified that she sustained the following injuries:

- "[B]ruises everywhere" (Rose Decl., Ex. 106, 000579-580);
- Anxiety and depression (Fuller Dep., Ex. D, 166:17-166:3);
- Fear of intimacy (*Id.*, 167:13-21); and
- General emotional trauma (*Id.*, 169:3-170:10).

Finally, that Fuller chose not to seek medical attention, and, thus, lacks medical records of her injuries, is not dispositive of the fact that she was injured. Fuller, consistent with the conduct of many victims of sexual assault, did not report Rubin's crime, and her testimony shows that she was injured.  There are questions of fact regarding her injuries warranting denial of the Motion.

## <u>CONCLUSION</u>

For the reasons stated herein and in Plaintiffs' Memorandum of Law in Opposition to the Powers Motion for Summary Judgment, Rubin's Motion must be denied.

Dated:  New York, New York
         March 6, 2019

By: _____
     John G. Balestriere
     Jillian L. McNeil
     Matthew W. Schmidt
     **BALESTRIERE FARIELLO**
     225 Broadway, 29th Floor
     New York, New York 10007
     Telephone:     (212) 374-5401
     Facsimile:     (212) 208-2613
     john.balestriere@balestrierefariello.com
     *Attorneys for Plaintiffs*