# Exhibit 90

```
                                                                    1

              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

HILLARY LAWSON, et al.,           :
                                            17-CV-6404(BMC)
          Plaintiffs,             :

     -against-                    :
                                     United States Courthouse
                                     Brooklyn, New York
HOWARD RUBIN, et al.,             :
                                     July 12, 2018
          Defendants.             :  12:00 o'clock p.m.

- - - - - - - - - - - - - - X

           TRANSCRIPT OF PRE-MOTION CONFERENCE
           BEFORE THE HONORABLE BRIAN M. COGAN
                UNITED STATES DISTRICT JUDGE.


APPEARANCES:

For the Plaintiffs:         BALESTRIERE FARIELLO
                            225 Broadway, Suite 2900
                            New York, NY 10007

                            BY: JOHN G. BALESTRIERE, ESQ.
                                JILLIAN L. MCNEIL, ESQ.
                                BRIAN L. GROSSMAN, ESQ.


For Defendant H. Rubin:     DECHERT LLP
                            1095 Avenue Of The Americas
                            New York, NY 10036

                            BY: BENJAMIN E. ROSENBERG, ESQ.
                                MICHAEL J. GILBERT, ESQ.
                                BENJAMIN M. ROSE, ESQ.


For Deft. Powers:           SCHLAM, STONE & DOLAN, ESQS.
                            26 Broadway, 18th Floor
                            New York, NY 10004

                            BY: JEFFREY M. EILENDER, ESQ.
                                JOLENE F. LAVIGNE-ALBERT, ESQ.
```

            CMH      OCR      RMR      CRR      FCRR

3

1         MR. ROSENBERG:  Benjamin Rosenberg, Dechert, for
2  Howard Rubin.
3         MR. GILBERT:  Michael Gilbert, Dechert, on behalf of
4  Howard Rubin.
5         MR. ROSE:  Benjamin Rose from Dechert for Howard
6  Rubin as well.
7         THE COURT:  First of all, my sincere apologies for
8  keeping you waiting for so long.  In twelve years on the
9  bench, I have never had lawyers wait for more than 5 or
10 10 minutes at the most and that happens rarely.  I just got
11 stuck in this meeting in Midtown and I could not extricate
12 myself any sooner than I did extricate myself.
13        It does appear, notwithstanding the lengthy delay
14 that is entirely my fault, that it was rather productive.  You
15 all talked.  Most things, it seems to me, have been resolved.
16 I will go through the ones that I think are not resolved and
17 tell you where I am coming out on those.
18        First, on Mr. Rubin's motions for sanctions, I am
19 denying that on the ground of silliness.  If, in fact, the
20 plaintiffs recover a multi-million dollar judgment here and
21 there is an offset for some attorneys' fees, what would we do?
22 Would we give back the money at that point?  I mean, why
23 should we deal with that now?  Is anybody thinking out there
24 practically?  Let's net out the claims and then figure out
25 whether any money is owed for Rule 11 sanctions.  So you can

4

1 renew the motion when you win the entire case. Since the
2 record does not reflect what may be a little sarcasm, I will
3 make it clear I am not in any way predicting who is going to
4 win the case.
5       With regard to Schnur's motions for sanctions, at
6 least she is out of the case. Does plaintiffs' counsel have
7 anything else to say about that?
8       MR. BALESTRIERE: I'm John Balestriere.
9       No, Your Honor. I believe we said what we needed to
10 say in the papers. Obviously, I can answer any questions that
11 the Court seeks to ask of me right now. I believe we engaged
12 in the reasonable inquiry we needed to, we believed our
13 clients with their assertions and, again, Your Honor, this is
14 all in our papers. I can go through that if you want or
15 answer your questions.
16       THE COURT: I do not need you to read your papers to
17 me, but I am not seeing how the papers say anything like what
18 you just said.
19       Schnur called you in October. She tells you that
20 she did not draft the nondisclosure agreements, that she never
21 had any interaction in person or otherwise with the plaintiffs
22 and then your client goes ahead and says, yeah, that's all
23 true.
24       MR. BALESTRIERE: May I, Your Honor? That's not
25 when she said in October. Instead, she did not deny that she

1  drafted the nondisclosure agreements.  We only learned very
2  recently, in fact, that it was some other attorney, a criminal
3  defense lawyer, who had crafted those.  Our clients came to us
4  and gave us Ms. Schnur's name, meaning it's not just, like,
5  oh, she just happened to be the lawyer for the other side so
6  let's include her here.
7          She said she had no direct contact with our clients.
8  Our clients don't allege she had any direct contact.  Instead,
9  exactly at the moment that Ms. Hallman was about to reveal to
10 her lawyer about the venture, and that's what really began
11 this investigation and began this litigation, she attempts to
12 interfere with that relationship between Mr. Salan and
13 Ms. Hallman and we did look at everything through that prism,
14 Your Honor, that at that point, that's that strange, and when
15 we give her the complaint, she doesn't deny the allegations in
16 it.
17         THE COURT:  But you get the Rule 11 contact after
18 that, right?
19         MR. BALESTRIERE:  Yes, Your Honor.  Well, I mean she
20 did --
21         THE COURT:  Isn't that the denial?
22         MR. BALESTRIERE:  Yes -- no, but I'm saying the
23 question is why do we include her in the original complaint
24 which is what you were just saying?  Because at that point,
25 everything we had led us to believe she belonged in here.

6

1    THE COURT: What did you have?
2    MR. BALESTRIERE: We had the fact that she attempted
3 to interfere in the relationship --
4    THE COURT: No. No. Don't give me conclusions.
5 Tell me what your client was prepared to testify to that she
6 did.
7    MR. BALESTRIERE: That she had drafted the
8 nondisclosure agreements. That turns out to be false, but at
9 the time, and that's the time that the Court needs to look at
10 in terms of imposing --
11    THE COURT: Where did you get information that
12 Schnur had drafted the nondisclosure agreement?
13    MR. BALESTRIERE: From the clients.
14    THE COURT: How did the client know that?
15    MR. BALESTRIERE: That is what they believe that
16 they were told from Powers and Rubin. They may have been
17 mistaken or maybe that is, in fact, what Powers and Rubin had
18 said, but it turned out that it was Mr. Bronfman instead who
19 had done so. But that is what they believed, we certainly
20 believed them, and then the lack of any denial, even though
21 there were something like 24 e-mails, letters and calls
22 between me and Ms. Schnur in that time period before we filed
23 the complaint, never was there the denial that she had drafted
24 the NDA. It did turn out she drafted what's called the
25 Caldwell agreement here so it seemed that she was attempting

1  to interfere with her clients' abilities to come forward and
2  initiate this lawsuit.
3         THE COURT:  She was being a lawyer.  At worst, she
4  drafted a document.
5         MR. BALESTRIERE:  Well, do you mean the NDA or the
6  Caldwell?
7         THE COURT:  Whatever she drafted.
8         MR. BALESTRIERE:  Well, Your Honor even said you
9  questioned the validity of the nondisclosure agreements and
10 the fact that they were drafted and then not even --
11        THE COURT:  That doesn't make it illegal.  I
12 invalidate agreements lawyers draft all the time but that
13 doesn't mean that the lawyer can be sued for that.  Maybe the
14 lawyer can be sued by the client if it's a bad agreement.
15        MR. BALESTRIERE:  I agree, Your Honor, but here we
16 thought that she was going -- I did something here I've never
17 done which is bring a claim against a lawyer.  But I, I
18 believed, I engaged in -- this is all on me, of course -- a
19 reasonable inquiry based on the facts that I had --
20        THE COURT:  I just want to know when your client
21 told you that Schnur had drafted this agreement, did you say,
22 Oh, okay, or did you say, How do you know that?
23        MR. BALESTRIERE:  I'm now needing to recall back to
24 last summer because what led you to believe that, it was that
25 they believed she was the lawyer who was always drafting these

8

1  agreements because perhaps she did, and this is a fact we
2  know, she did end up drafting what we've called the Caldwell
3  agreement and that went back a year before.
4          THE COURT:  Let's say she had drafted the NDA.  How
5  is that a RICO claim?
6          MR. BALESTRIERE:  It's not, not by itself, but
7  because the way we even learned of Schnur was that, the way we
8  saw it, she was attempting to prevent Hallman from disclosing
9  the venture because that is the time --
10         THE COURT:  Every lawyer who drafts an agreement
11 containing a nondisclosure clause is trying to prevent someone
12 from disclosing something.  That's the purpose of the clause.
13 What's wrong?
14         MR. BALESTRIERE:  Because if the nondisclosure
15 agreement is valid --
16         THE COURT:  If it's invalid.  Is the lawyer liable
17 for covering up the tort if they draft an agreement and some
18 judge says, I think it's invalid?
19         MR. BALESTRIERE:  No, but when you have the other
20 facts that we have here -- I see which way the Court is going
21 but I am going to answer, of course, the Court's questions.
22         THE COURT:  I appreciate that.
23         MR. BALESTRIERE:  I believed that this was not
24 simply a lawyer and I think it was reasonable at the time for
25 me to say, to believe our clients.

9

1         THE COURT: But your clients did not give you -- you
2 have not told me of any facts that your clients gave you that
3 would lead you to reasonably believe that Schnur did anything
4 other than draft documents.
5         MR. BALESTRIERE: No. No. That is all they said
6 that she did but she was the, the lawyer for Rubin, in
7 general. Right? And I'm not saying that by itself is enough.
8         THE COURT: Did the lawyer for General Motors get
9 sued in the General Motors ignition litigation?
10         MR. BALESTRIERE: I don't think so. I don't know
11 but I doubt it and I understand what the Court is saying, but
12 I was saying that I thought it was enough for her to actually
13 be considered -- the Court disagreed, of course -- part of the
14 venture, part of the RICO enterprise.
15         THE COURT: I think you took such a leap there that
16 I think it is not reasonable. I don't know how much I am
17 going to impose in sanctions but I am going to impose
18 sanctions.
19         MR. BALESTRIERE: Understood, Your Honor.
20         THE COURT: I will probably stay the order until the
21 end of the case subject to good behavior. Let's see if you
22 can do that.
23         MR. BALESTRIERE: I can, Your Honor. Thank you.
24         THE COURT: So those are the sanction motions.
25         I understand you have resolved the disqualification

```
                                                                    10
```

1  motion which is -- well, let me just say, you have resolved
2  it, I understand, because the plaintiff Hallman will get
3  independent counsel to advise her as to whether it is okay for
4  plaintiff's lawyer to continue to represent her.  Is that the
5  deal?
6           MR. BALESTRIERE:  Essentially, yes.  I ask my
7  colleagues if they disagree but I think that's correct, Your
8  Honor.
9           MR. ROSENBERG:  It is, Your Honor.
10          THE COURT:  How long?
11          MR. BALESTRIERE:  To do so?  Can I get, please,
12 three weeks to do so just because it's the summer.
13          THE COURT:  That's fine.
14          I have to ask Mr. Rubin's lawyers why did you make
15 that motion?  Were you thinking you are the policemen of the
16 courts and you don't want to let there be some sort of
17 compromise of integrity, because you understand the motion
18 screams tactical.  What is the reason?  What do you care
19 whether she is adequately represented?
20          MR. GILBERT:  Well, we read the cases, Your Honor,
21 to require us as officers of the court to bring it to your
22 attention.  The real concern here is that as we develop more
23 information about the case, and it became apparent that this
24 one plaintiff in particular had a significant role recruiting
25 others and was paid to do that, our concern was we want to get

```
1   to the point later on where depositions are happening where
2   this issue would come to a head and force, you know, a change
3   in the, in counsel or concern on her part that her counsel can
4   adequately represent her.
5           THE COURT:  So?
6           MR. GILBERT:  I'm sorry?
7           THE COURT:  So what?  So we give her 30 days to get
8   a new lawyer.  This is why the motion screams tactical.  I
9   think it is a very good thing that you are able to resolve it
10  and all of you should keep in mind that I can impose Rule 11
11  sanctions even when Safe Harbor notice has not been given by
12  the parties.  I can do this.  I might well have done that here
13  but it is withdrawn so I don't need to do that.
14          MR. GILBERT:  Thank you, Your Honor.
15          THE COURT:  I understand you either have resolved or
16  you are going to try harder to resolve the discovery disputes.
17  Is that right?
18          MR. McNEIL:  Yes, Your Honor.  We have time set
19  aside to do this.
20          THE COURT:  Okay.  Let me tell you my approach to
21  discovery disputes.
22          Almost always, loser pays winner's attorney's fees
23  in a discovery dispute.  My window of good faith tends to be
24  much smaller than lawyers' windows of good faith.  If indeed
25  you got some kind of cutting edge privilege issue, then you do
```

12

1  not have to worry about attorney's fees.  It's something that
2  has to be teed up and resolved.  There could be a substantive
3  issue that there isn't a resolution of, but if it is the usual
4  kind of thing which I think these motions were that this
5  request is too broad, this response is too narrow, odds are
6  overwhelming that Rule 37 is going to come into play
7  *sua sponte*.
8          Okay.  So do what you can to resolve those disputes
9  keeping in mind that -- I really do not want to sanction
10 anyone but you are all litigating by frenzy here and sometimes
11 a judge has to do that to tamp down the frenzy.  So work those
12 out, please.  Don't come back to me with those unless you feel
13 it's something you are really right on and something you
14 really need or need to oppose.
15         Okay.  On the motion to dismiss the counterclaims, I
16 understand that Powers has now joined Rubin in withdrawing the
17 contribution claim.  Is that correct?
18         MR. EILENDER:  That's partially correct, Your Honor.
19 She's withdrawing the contribution claim as to the federal
20 cause of action.  She's maintaining the contribution claim as
21 to the state cause of action.  We have an agreement that
22 they're withdrawing their motion to dismiss that aspect of the
23 contribution claim.
24         THE COURT:  Okay.  That's good.
25         Okay.  On the motion to amend the complaint, I want

13

1 to understand better what the amendment is.

2 Part of the amendment, as I understand it, is to add
3 more arguments to the complaint. There is no reason to do
4 that. Okay? You do not need to argue any more in a
5 complaint. I can guarantee you this complaint will never be
6 seen by a jury so don't worry about what is in it. Only worry
7 about is enough in it to make sure you have a plausible claim.
8 Right now you've got a plausible claim.

9 MR. McNEIL: So for DMM, we have since discussed
10 since we, an agreement as to the motion to amend. I will
11 answer your question first though.

12 THE COURT: No, you don't have to answer my question
13 if indeed the motion has been resolved.

14 MR. McNEIL: Yes.

15 THE COURT: What is the resolution?

16 MR. McNEIL: The resolution was to allow the changes
17 to the motion to amend to add the facts about Ms. Fuller
18 regarding her recruitment into the venture and then to add the
19 fact that, correct certain dates for plaintiff's case because
20 certain discovery has shown that the dates are incorrect.
21 Kind of in return, the plaintiffs have agreed to change the
22 sort of RICO enterprise language to venture language that will
23 be, you know, less.

24 THE COURT: You are all kind of treating this
25 complaint like the jury is going to see it. The jury is not

```
                                                              14
 1   going to see it.  Okay?
 2            MR. McNEIL:  Okay.
 3            THE COURT:  So whoever you think you are addressing,
 4   it is not the jury and I am not easily persuaded by complaints
 5   so don't worry about me.
 6            MR. McNEIL:  Understood.
 7            THE COURT:  Okay.  So I am marking that resolved.
 8   All right?
 9            MR. EILENDER:  Yes, Your Honor.
10            THE COURT:  Okay.  And that's all I've got.  Anybody
11   else have anything else?
12            MR. BRESLIN:  One question, Your Honor.
13            THE COURT:  Sure.
14            MR. BRESLIN:  I'm counsel for Ms. Schnur.  We
15   understand Your Honor's ruling.
16            THE COURT:  You want your money now?
17            MR. BRESLIN:  Well, Ms. Schnur is out of the case.
18            THE COURT:  That's why I ruled on the motion.
19            MR. BRESLIN:  Yes, and I appreciate that, but the
20   stay as to a guarantee of good behavior doesn't necessarily
21   help her in any respect because the damage to her is done.
22            THE COURT:  Right.
23            MR. BRESLIN:  And is unlikely to be undone by what
24   happens in the fall.
25            THE COURT:  I like to measure a Rule 11 violation
```

15

1  not just with respect to the violation itself because I think
2  that's artificial, but with regard to the conduct of counsel
3  throughout the case.
4       Now, I understand that by deferring ruling on it now
5  as to the amount, that deferring collection or payment of the
6  amounts now, that means that Ms. Schnur has to wait for her
7  money. I understand that, but I think that's not
8  inappropriate.
9       MR. BRESLIN: We understand, Your Honor. The order
10 will be entered. We will wait for the money.
11      THE COURT: At some point, I will quantify it and
12 either I will vacate it because I think it becomes a -- if it
13 becomes -- I'm not saying I ruled this at all -- a trivial
14 transgression in the context of the entire case which is
15 unlikely which is why I have said you are entitled to
16 sanctions or I will decide that it stands out enough and,
17 therefore, some sanction is warranted, but the amount of the
18 sanction will likely tie in to counsel's conduct otherwise as
19 well.
20      MR. BRESLIN: I understand Your Honor's ruling.
21      THE COURT: Okay.
22      No more amendments after this, right?
23      MR. BALESTRIERE: Not based on currently available
24 evidence in the well, no, Your Honor. The only thing I think
25 would result in a further amendment, what happened here,

```
                                                              16
 1   others contacted us, meaning other plaintiffs, but otherwise
 2   no amendments.
 3            THE COURT:  If that happens, I may -- I am not
 4   saying I will, I may require you to file a separate action.
 5            MR. BALESTRIERE:  Understood, Your Honor.
 6            MR. EILENDER:  Your Honor, would it be appropriate
 7   to have a Rule 16 order?
 8            THE COURT:  Sure.  Have you got one?
 9            MR. EILENDER:  Perhaps we can submit a proposed
10   order and nunc pro tunc to say no further amendments and
11   counsel will have to satisfy a Rule 16.
12            THE COURT:  I think we are at that stage.
13            MR. EILENDER:  So we will endeavor to submit
14   something to Your Honor.
15            THE COURT:  Okay.
16            Where are we on the end of discovery?  This fall,
17   right?
18            MR. BALESTRIERE:  Yes, Your Honor.
19            THE COURT:  We have dates for that.  That's all
20   taken care of?
21            MR. BALESTRIERE:  Yes.
22            THE COURT:  Okay.  Anything else?
23            MR. BALESTRIERE:  Nothing from plaintiff, Your
24   Honor.
25            THE COURT:  Okay.  Everyone has to demonstrate more
```

17

1  self restraint.  I really don't want to impose sanctions but
2  you're all just -- a thought comes into your head, you put it
3  down on paper and file it, and that's really got to stop.  It
4  really does.
5          Okay.  Nice to see you all.  Thank you for waiting.
6          MR. BALESTRIERE:  Thank you, Your Honor.
7          MR. EILENDER:  Thanks, Your Honor.
8          (Matter concluded.)
9
10
11                  *    *    *    *    *
12
13  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
14
15      /s/ Charleane M. Heading              July 26, 2018
16      ─────────────────────────────        ─────────────
        CHARLEANE M. HEADING                      DATE

CMH    OCR    RMR    CRR    FCRR