UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HILLARY LAWSON, KRISTINA HALLMAN, STEPHANIE CALDWELL, MOIRA HATHAWAY, MACEY SPEIGHT, ROSEMARIE PETERSON and LAUREN FULLER,

                     *Plaintiffs*,

-against-

HOWARD RUBIN, JENNIFER POWERS, and the DOE COMPANY,

                     *Defendants*.

Case No.: 1:17-CV-06404 (BMC)(SMG)

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT HOWARD RUBIN'S MOTION FOR SUMMARY JUDGMENT

Edward A. McDonald
Benjamin E. Rosenberg
Michael J. Gilbert
Benjamin M. Rose
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for Defendant Howard Rubin*

In his opening memorandum, Howard Rubin demonstrated that he is entitled to summary judgment because each Plaintiff consented to engage in BDSM sexual relations with him. Consensual sexual activities, including BDSM, cannot form the basis for liability under the TVPA, and consent is the death knell to Plaintiffs' common law tort claims.[1] Evidence of Plaintiffs' consent consists of approximately 800 pages of documentary evidence, including: (1) acknowledgments signed by each Plaintiff voluntarily agreeing to engage in BDSM with Rubin; (2) numerous electronic communications from Plaintiffs themselves, sent before, immediately following, and, in some cases, months and years after their encounters with Rubin; and (3) documented evidence that five of the six Plaintiffs voluntarily traveled to Manhattan for additional encounters with Rubin *after* he allegedly assaulted them. Plaintiffs' communications sent before the encounters demonstrate they fully understood their encounters with Rubin would involve BDSM. Communications Plaintiffs sent shortly after the encounters expressed no concern about what had occurred, let alone suggested Plaintiffs had been in any way "forced" to engage in any part of the encounters. In subsequent communications, Plaintiffs frequently expressed their desire to engage in further BDSM encounters with Rubin. Plaintiffs' messages, as well as their conduct, are unimpeachable evidence that Plaintiffs consented to participate in

---

[1] *See United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) ("consensual BDSM activities alone [can]not constitute the basis for a conviction under [Section 1591]"); *United States v. Rivera*, No. 13-CR-149, 2015 U.S. Dist. LEXIS 54326, at *18 (E.D.N.Y. Apr. 24, 2015) (evidence of plaintiffs' sexual activity with defendants during the relevant time period was admissible to support defendants' consent defense against TVPA claim); *People v. Loja*, 305 A.D.2d 189, 192-93 (1st Dep't 2003) (in rape case, "[t]he critical question is whether or not [sex] was consensual on the complainant's part"); Dkt. 105 (stating that the absence of consent is an element, or "would neutralize at least one of the elements," of each of Plaintiffs' state-law claims). Plaintiffs' argument that consent should not be a defense to TVPA claims or rape, Dkt. 259 (Plaintiffs' Mem. Of Law in Opposition to Rubin's Summ. J. ("Pls.' Opp. Br.")) at 37-38, has no support and is contrary to the unanimous authority.

BDSM encounters with Rubin, and that none was forced or tricked into participating.[2]

Plaintiffs barely address the pages upon pages of contemporaneous documentary evidence, including Rubin's explicit warnings, and Plaintiffs' own words demonstrating their positive experiences with Rubin and their desire to see him again. When confronted with this overwhelming record of consent during their depositions, Plaintiffs dissembled: they claimed not to recognize their own text messages and notes, or to have no recollection of them. Now, Plaintiffs assert that their text messages were "taken out of context," *see* Dkt. 259 ("Pls.' Opp. Br.") at 3, but they fail to provide a single example. Their observation that the text messages and emails were "all sent before or after, *not* during" the sex acts themselves, *id.* (emphasis in original), cannot be taken seriously. Plaintiffs contend because their electronic communications did not specifically state, "I consent," the communications cannot evidence consent. *See, e.g.*, *id.* at 3. Plaintiffs offer no support for this absurd contention, and ignore the language in the Releases each Plaintiff signed confirming that she "voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity."[3]

---

[2] *See e.g.*, Dkt. 231-1 (Mem. of Law in Support of Def. Howard Rubin's Mot. for Summ. J. ("Rubin MSJ")) at 3-4, 6-9, 13-16, 18-19, 21-31, 33-34 (collecting such messages). Plaintiffs cite *People v. Jovanovic*, 263 A.D.2d 182 (1st Dep't 1999) to suggest that text messages before their encounters are irrelevant to whether subsequent encounters were consensual or whether Plaintiffs later withdrew their consent. *See* Pls.' Opp. Br. at 23. But *Jovanovic* expressly rejected that argument. *See* 263 A.D.2d at 197-98 ("[T]the extent to which the complainant initially indicated to [the defendant] an interest in participating in sadomasochism with him *is* relevant to a determination of whether that consent was withdrawn.") (emphasis in original). Plaintiffs also cite *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015), in support of the proposition that Plaintiffs' repeated solicitations of Rubin to engage in rough sex do not support the inference that Plaintiffs consented to engage in rough sex with him (cited in Pls.' Br. at 36). But *Rivera* held the opposite: it found that the victims' decisions to return to the defendants' bar/brothel after having been made aware of the practices there was evidence of consent. 799 F.3d at 184-89; *see also Rivera*, 2015 U.S. Dist. LEXIS 54326, at *18.

[3] Equally without foundation is Plaintiffs' accusation that Rubin is asserting that Plaintiffs could not be raped because they are prostitutes. *See* Pls.' Opp. Br. at 3, 35-37. This is not, and has never been, Rubin's position. Rather, Rubin has consistently argued that each Plaintiff was a

2

Plaintiffs rely entirely on their own deposition testimony and, in the case of Hathaway, an affidavit that directly contradicts Hathaway's deposition testimony and admissions. *See id.* at 24-35. Self-serving deposition testimony – riddled as it was with concessions, admissions, purported memory lapses about their own behavior and about the central facts of the case, and implausible and contradictory assertions – cannot create an issue of fact when weighed against overwhelming documentary evidence; nor can a *post hoc* affidavit that contradicts the affiant's own prior deposition testimony.[4] [5]

## I. PLAINTIFFS' SELF-SERVING AND INCONSISTENT TESTIMONY CANNOT CREATE A GENUINE DISPUTE ON THE ISSUE OF CONSENT

*Hallman* – Plaintiffs rely on Hallman's deposition testimony asserting that she did not believe she was traveling to New York to engage in any sexual activity with Rubin. Pls.' Opp. Br. at 25-27. That testimony is conclusory and incredible. There are voluminous text messages and notes evidencing Hallman's consent to engage in sexual activities with Rubin – yet Hallman

---

willing participant in BDSM sexual encounters with him, and some evidence of their willingness was the terms of their agreement to be paid. There is no "prostitute defense."

[4] *See* Rubin MSJ at 44 (citing authorities); *see also Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) ("Such testimony, unsupported by documentary or other concrete evidence . . ., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary."); *Kennedy v. City of N.Y.*, 570 F. App'x 83, 85 (2d Cir. 2014) (a party may not create an issue of fact by "testif[ying] in his deposition that he was unable to remember a particular fact, and then, in response to a summary judgment motion, submitt[ing] an affidavit claiming a recollection of events that would have raised an issue for trial") (*citing Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997)); *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 367-68, n.5 (S.D.N.Y. 2018) (plaintiff's uncorroborated deposition testimony describing an alleged assault was insufficient to defeat summary judgment); *Cruz v. Reiner*, No. 11 Civ. 2131, 2013 U.S. Dist. LEXIS 149199, at *7-12 (E.D.N.Y. Oct. 16, 2013) (collecting cases); *Capital Distrib. Servs., Ltd. v. Ducor Express Airlines, Inc.*, 440 F. Supp. 2d 195, 203 (E.D.N.Y. 2006) ("A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

[5] Rubin incorporates by reference Powers' Reply Mem. of Law in Further Supp. of Jennifer Powers' Mot. for Summ. J.; and Powers' Reply to Pls.' Counterstatement to Powers' Rule 56.1 Statement of Undisputed Facts.

3

purported not to recognize or recall a single one of them. *See, e.g.*, Dkt. 231-3 ("1st Rose Decl.") Ex. 1 (Hallman Dep.) at 283:2-285:11; Decl. of Benjamin M. Rose, dated March 27, 2019, filed herewith ("2nd Rose Decl.") Ex. 1 (Hallman Dep.) at 84:3-11, 156:4-164:8, 168:2-170:23, 216:22-217:25, 292:4-296:25. Hallman similarly purported not to recall anything she was told before she agreed to go to New York in August 2016 for her first sexual encounter with Rubin, *see* 1st Rose Decl. Ex. 1 (Hallman Dep.) at 70:9-20, or what she said to Rubin when she allegedly told him not to tie her up during that encounter, *id.* at 135:24-136:4.[6] In any event, actions speak louder than words: Hallman (and Lawson) spent the night at the Apartment after Rubin left after their first sexual encounter even though they had each been given $5,000 in cash, and could have stayed at any hotel in New York City, *id.* at 147:13-148:25, and Hallman left a note after the second (and final) BDSM encounter declaring "H. You are one crazy sexy lover! Ha Ha! And I can't get enough ♥." *See* Dkt. 231-1 ("Rubin MSJ") at 8. For several months after that encounter, Hallman recruited numerous women to engage in BDSM with Rubin, sending them texts that stated that "it's kinda crazy stuff very much bondage S&M stuff," "sexual torture stuff," "u have to sign an nda." *See* Rubin MSJ at 13-14.

*Lawson* – Plaintiffs rely on Lawson's testimony describing what purportedly happened during her two (August 2016 and December 2016) encounters with Rubin, including her testimony that she was "raped" and that allegations in the SAC were true. Pls.' Opp. Br. at 28-

---

[6] Hallman's testimony contained numerous contradictions about her encounters with Rubin. *See, e.g.*, 2nd Rose Decl. Ex. 1 (Hallman Dep.) at 77:8-83:7 (testifying that she did not communicate with Rubin before traveling to New York, but then confirming text messages with Rubin before her trip); *compare id.* at 67:16-25 (Hallman remembered ▮ telling her Rubin would pay $2,000 for Hallman spend time with him), *with id.* at 321:23-322:14 (Hallman could not remember whether she discussed payment with ▮); *compare id.* at 109:19-21 ("Q. You have no reason to think you didn't sign this document; correct? A. I remember signing it, so…"), 347:16 ("I signed it."), *with id.* at 345:10-13 ("Q. Did you sign [your name] there or write it there? A. I signed an NDA. I don't know if this is the document that I signed.").

4

29. Much of the testimony that Plaintiffs point to in this section of their brief describes the sexual activities in which she and Rubin allegedly engaged, but the descriptions have no bearing on the issue of consent. The remainder of the testimony Plaintiffs cite is undermined by Lawson's testimony in which – like Hallman – Lawson purported not to recall allegedly critical events, nor to recognize or recall any of her extensive text messages or conversations with Rubin and Powers about her sexual activities with Rubin. *See* 1st Rose Decl. Ex. 2 (Lawson Dep.) at 34:24-37:11, 42:4-44:11, 50:23-51:6, 53:19-65:7; 2nd Rose Decl. Ex. 2 (Lawson Dep.) at 107:6-121:4.[7]

Plaintiffs rely on Lawson's testimony that when she agreed to see Rubin a second time (December 2016), she did not understand, notwithstanding their initial BDSM encounter, that they would engage in additional BDSM. But after testifying that she had no recollection of any of the events or conversations leading to her second encounter with Rubin, *see* 1st Rose Decl. Ex. 2 (Lawson Dep.) at 137:24-139:7, Lawson was at a complete loss to explain why she believed her second encounter with Rubin would be any different than her first: (*id.* at 139:8-17):

> Q: Would it be fair to say, Ms. [Lawson], that you expected much of the same behavior that had happened the first time?
> A: No. That would not be fair to say.
> Q: What basis did you have to expect anything different, Ms. [Lawson]?
> A: I don't remember why.
> Q: You don't remember why you had a different expectation?

---

[7] Like Hallman's testimony, Lawson's testimony was riddled with contradictions regarding her encounters with Rubin. For instance, Lawson stated at least ten times at her deposition that she could not recall her communications with ▇▇▇ and Powers in August 2016; but when confronted with the allegations in the SAC, Lawson suddenly recalled being told by Powers that "photos and videos would be taken," and that the encounter would involve bondage. 1st Rose Decl. Ex. 2 (Lawson Dep.) at 34:24-37:11; 2nd Rose Decl. Ex. 2 (Lawson Dep.) at 40:3-47:12. Lawson later refused to confirm her prior testimony, admitted that she could not remember what was said to her, *see id.* at 47:16-48:15, and admitted that she did not know whether she communicated with Powers at all before her first encounter, *id.* at 262:15-266:17.

5

      A:      I don't remember why.[8]

Finally, a complainant must do more than merely endorse her complaint,[9] and reliance on the complaint is especially inappropriate where, as here, Lawson did not recognize the complaint, and when asked about it stated that "it was not [her] document." *See, e.g.*, 1st Rose Decl. Ex. 2 (Lawson Dep.) at 38:12-40:21, 43:4-8, 44:12-15. In any event, contrary to what Plaintiffs allege, Lawson did not endorse her complaint: When directed to the portions of the complaint about her second encounter with Rubin, and asked if any of it refreshed her recollection about that encounter, Lawson testified "It's really hard to talk about. Unfortunately, some of it, I don't know." *See id.* at 168:12-14.

*Hathaway* – Plaintiffs rely on an affidavit of Hathaway, dated after her deposition, which includes detailed accounts of her alleged abuse by Rubin beginning in 2015. *See* Pls.' Opp. Br. at 29-30 (*citing* Dkt. 258-2 ("Balestriere Decl.") Ex. I). But at her deposition, Hathaway testified that her encounters with Rubin had been consensual from 2015 through 2016, *see* 1st Rose Decl. Ex. 39 (Hathaway Dep.) at 129:23-130:19, 138:21-139:13, and she could not remember a single detail of any of her meetings with Rubin from 2015 to 2017, *see id.* at 132:14-134:24, 138:21-139:9, 148:6-23. Hathaway may not now rely on an affidavit that contradicts her prior

---

[8] Repeating an allegation in their SAC, *see* Dkt. 161-1 ¶ 447, Plaintiffs assert that "Lawson was nervous to see Rubin again, but returned to see him as Rubin assuaged those fears when he asked Lawson to simply meet him in the middle of the day for lunch." Pls.' Opp. Br. at 28. In her deposition, however, Lawson stated repeatedly that she could not remember if that statement was true. Dkt. 258-2 ("Balestriere Decl.") Ex. C (Lawson Dep.) at 134:16-136:5.

[9] *See, e.g.*, *Randolph v. Griffin*, No. 12-CV-745S, 2019 U.S. Dist. LEXIS 10129, at *26 (W.D.N.Y. Jan. 22, 2019) (plaintiff cannot survive summary judgment where "[h]is testimony is simply a restatement of the allegations contained in his second amended complaint."); *Hernandez v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234, 2013 U.S. Dist. LEXIS 172400, at *9-10 (E.D.N.Y. Dec. 6, 2013) ("[I]t is of course fundamental that allegations in a complaint are not 'evidence' that can defeat a motion for summary judgment.") (citation omitted); *Storck v. Suffolk Cty. Dep't of Soc. Servs.*, 122 F. Supp. 2d 392, 397 (E.D.N.Y. 2000) ("At this summary stage of the proceedings, Plaintiff may not rely only on the allegations of her complaint. Instead, she must come forward with evidence supporting her claim.").

6

testimony. *See supra* n. 5.

*Speight* – At her deposition, Speight was unable to recall the specifics about her encounters with Rubin. *See* Rubin MSJ at 21-22. Moreover, to the extent she had any recollection of her encounters, her testimony was often internally contradictory.[10] Plaintiffs consequently cite to allegations in the SAC as evidence, because Speight purportedly "confirmed that the allegations regarding her relationship with Rubin were true." Pls.' Opp. Br. at 17, 32. Plaintiffs' reliance on the SAC's allegations is unavailing. *See supra* n.9.

Plaintiffs point to Speight's testimony that on unspecified occasions her sexual activities with Rubin went beyond the scope of her consent, and that she has scars from being whipped by Rubin. Pls.' Opp. Br. at 32-33. But Speight could not recall the details of any of her encounters with Rubin, and failed to identify a single occasion when Rubin exceeded the bounds of her consent,[11] or any occasion she was whipped. *See* Rubin MSJ at 21-22 (collecting testimony about Speight's encounters with Rubin and her lack of recollection thereof).

*Peterson* – Plaintiffs rely on Peterson's testimony that her "madam" ▮ "never told [Peterson] that [she] was going to be smacked in the face" prior to her first encounter in 2011. Pls.' Opp. Br. at 30-31. But, in addition to the numerous emails exchanged between Peterson

---

[10] *See, e.g.*, 1st Rose Decl. Ex. 43 (Speight Dep.) at 47:8-48:3 ("Q. Are you certain that March 24, 2016 was the first time you met him? A. Yes. [. . .] Q. Isn't it a fact that the first time you traveled to New York to meet Mr. Rubin was not March 24, 2016, but, rather, October 12, 2015? A. I guess it was."); *compare id.* at 148:10-11 ("I was tricked, I was told one thing, other things happened"), *with* 148:12-17 ("Q. What were you told? You already testified that ▮ told you that you would come to New York for rough sex with Mr. Rubin for $5,000. You testified to that earlier today, correct? A. Yes.").

[11] Plaintiffs state that when Speight was testifying about occasions she allegedly told Rubin to stop an activity, Rubin's counsel "interrupted Speight, preventing her from finishing her answer." Pls.' Opp. Br. at 32. But the transcript clearly shows that Speight simply trailed off when she was unable to complete her response, at which point Rubin's counsel asked another question. There was no interruption or any other effort by Rubin's counsel to prevent Speight from testifying. *Compare* Balestriere Decl. Ex. J (Speight Dep.) at 220:25-221:2 (response ending with ellipsis), *with id.* at 131:2-3, 136:20-21, 286:10-11 (interrupted statements ending with two hyphens).

7

and Rubin before and after their first encounter that demonstrate Peterson's understanding that she would engage in BDSM sex with him during their meeting, *see* Rubin MSJ at 25-26, Peterson confirmed at her deposition that Rubin told her precisely the type of BDSM activities their encounter would entail before she decided to meet him, *see* 1st Rose Decl. Ex. 90 (Peterson Dep.) at 93:22-96:5. Plaintiffs also rely on Peterson's testimony that Plaintiffs claim shows that, during their encounter at a strip club in 2014, Rubin engaged in sexual activity with Peterson after she used the safe word. Pls.' Opp. Br. at 31. That was not her testimony. Peterson said she had used the safe word during previous, unspecified encounters, not with respect to the encounter at the strip club. With respect to that encounter, Peterson did not "remember exactly what [she] said." 1st Rose Decl. Ex. 90 (Peterson Dep.) at 258:13-23.

*Fuller* – Plaintiffs cite to Fuller's deposition testimony that when she agreed to meet Rubin, she did not understand she would be engaging in sexual conduct because she was not given all of the details of what would happen during the encounter. Pls.' Opp. Br. at 33-34. But, in fact, Fuller testified that she recalled virtually nothing about her numerous conversations with her close friend ███ regarding Rubin or the trip to New York, *see* 1st Rose Decl. Ex. 104 (Fuller Dep.) at 73:15-75:22, 77:24-78:3 ("Q. Okay. And what did she say on that occasion that you -- what did she tell you that got you to come to visit New York? A. I have no idea."), and the text messages (that Fuller purported not to recognize or recall, *see id.* at 79:24-81:13) demonstrate that ███ had told Fuller about Rubin's desire for BDSM. *See* 1st Rose Decl. Ex. 106 at 578 ("And it will be 5k. It's a little different. This is the guy that has a dungeon."). Fuller signed and initialed each page of the Release, 1st Rose Decl. Ex. 104 (Fuller Dep.) at 120:8-121:23, and when Rubin tied her up and hit her, she did not object, *id.* at 138:3-140:5; *see also id.* at 138:7-10.

8

Fuller's reliance on her use of the safe word proves Rubin's case. Pls.' Opp. Br. at 34-35. Her most specific recollection about her use of the safe word was: "I remember after using the safe word, I was unbound and I was able to freely walk out." 1st Rose Decl. Ex. 104 (Fuller Dep.) at 151:8-10. Fuller's testimony that Rubin stopped when Fuller asked him disproves her claim of lack of consent.

## II. PLAINTIFFS' ALLEGATIONS OF INTOXICATION AND FEAR ARE UNSUPPORTED BY ANY EVIDENCE

Plaintiffs attempt to vitiate their explicit expressions of consent to engage in BDSM with Rubin by attributing them to purported consumption of alcohol and/or drugs, and claiming the testimony that they were under the influence necessarily creates a question of fact as to whether Plaintiffs were capable of consent. *See* Pls.' Opp. Br. at 26, 31, 34, 41, 42. But there is no evidence that any Plaintiff was too intoxicated to consent, or that Rubin knew or had reason to believe that any Plaintiff was too intoxicated to consent. Nor is there evidence to suggest that Rubin forced any Plaintiff to drink or take drugs.

Plaintiffs also suggest that they "*may* have been fearful of repercussions from Rubin," *id.* at 22 (emphasis added), because he had identifying information about them and was powerful and wealthy, *id.* at 22, 42. But there is no evidence that any Plaintiff was fearful of Rubin, or that Rubin ever threatened, hurt, or intimidated any Plaintiff (or anyone else) outside of the role-playing to which each Plaintiff agreed. Each Plaintiff's communications with and about him show exactly the opposite.[12] In fact, Plaintiffs testified they could not recall Rubin ever

---

[12] *See supra* n. 2; *see, e.g.*, 1st Rose Decl. Exs. 104, Fuller Dep. at 154:16-24 (Fuller was "looking maybe to be consoled a little bit" by Rubin after her encounter); 14 at 203417-18 (Hallman texts Rubin: "It was an emotional roller coaster of Fun!!!! I love getting wild n crazy with u"); 14 at 203530 (Lawson texts Rubin: "Yes so much pain lol but fun fun fun and had a great time just hanging out w you as well!"); 41 (Hathaway texts Rubin: "love to have a bday whipping from you on these big tits. It's been too long. ( . ) ( . ) my big tits want it badly 🐷😊"); 101 at 528-32 (Peterson texts Rubin: "Please I'm begging u," "Please h please see me [] Im begging you

9

threatening them, and that they were otherwise unafraid of Rubin.[13]

## III. PLAINTIFFS OFFER NO MEDICAL EVIDENCE TO SUPPORT THEIR CLAIMS OF ASSAULT

Rubin established that no Plaintiff had provided any evidence that she had suffered injuries through her encounters with Rubin.[14] In particular, no Plaintiff produced doctor's records or contemporaneous evidence of her alleged injuries.

Plaintiffs respond by pointing to self-serving testimony that they were injured, *see* Pls.' Opp. Br. at 44-50, but, as set forth above, such evidence is insufficient absent any corroboration. Plaintiffs also provide photographs that purport to show bruising on various parts of Plaintiffs' bodies. *See* Balestriere Decl. Exs. N, O, P, Q, R. Not only are these unauthenticated photographs inadmissible, but even if they did show bruising on account of Plaintiffs' encounters with Rubin, they would not support Plaintiffs' case. Rubin expressly and repeatedly warned women before they engaged in BDSM that they might be bruised, and Plaintiffs agreed to proceed. *See, e.g.*, 1st Rose Decl. Exs. 14 at 203368-69; 93 at 56059. Plaintiffs are not seeking damages for those bruises. They are, rather, seeking damages for more significant alleged physical, mental, and economic injuries, Dkt. 161 ¶¶ 145-49, 212-17, 245-49, 283-90, 459-67, 476-86, but there is no admissible evidence of such injuries.

---

please," "Please h I really need to see you please"); 82 at 443 (Speight texts Rubin: "I want you to beat the shit out of me and don't stop even if I'm crying and saying no").

[13] Plaintiffs explain their conduct by noting that "[r]ape victims often have a continuing fear of their perpetrators and will seek to appease them after the rapes have taken place." Pls.' Opp. Br. at 27. None of the Plaintiffs was a rape victim, and not one testified that she was in fear of Rubin following any encounter with him. *See, e.g.*, Rubin MSJ at 46-47 (collecting testimony in which Plaintiffs admit they were not coerced or fail to provide any factual account of coercion); *see also* 1st Rose Decl. Exs. 104 (Fuller Dep.) at 154:16-24; 1 (Hallman Dep.) at 289:22-24 (Hallman was not afraid to have dinner with Rubin after her second encounter); 43 (Speight Dep.) at 155:21-23 (Speight cannot recall Rubin ever threatening her); 2nd Rose Decl. Exs. 1 (Hallman Dep.) at 111:25-112:3 (nobody threatened Hallman before she signed the Release); 2 (Lawson Dep.) at 334:17-335:4 (nobody threatened Lawson).

[14] *See* Rubin MSJ at 9-12, 19, 24-25, 31-32, 35.

10

| | |
|---|---|
| Date: March 27, 2019<br>New York, NY | Respectfully submitted,<br><br>*/s/ Edward A. McDonald*<br>Edward A. McDonald<br>Benjamin E. Rosenberg<br>Michael J. Gilbert<br>Benjamin M. Rose<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036<br>Phone: (212) 698-3672<br>Fax: (212) 698-3599<br><br>*Attorneys for Howard Rubin* |