John G. Balestriere
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (212) 374-5401
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER, BRITTANY HASSEN,** and **BRITTANY REYES,**<br><br>Plaintiffs,<br><br>– against –<br><br>**HOWARD RUBIN** and **JENNIFER POWERS,**<br><br>Defendants. | Case No.: 1:17-cv-06404 (BMC) (SMG)<br><br><br>**FOURTH AMENDED COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Amy Moore ("Moore"), Mia Lytell ("Lytell"), Stephanie Caldwell ("Caldwell"), Natasha Tagai ("Tagai"), Emma Hopper ("Hopper"), Brittany Hassen ("Hassen"), and Brittany Reyes ("Reyes") by their attorneys, Balestriere Fariello, for their Complaint against Jennifer Powers ("Powers"), Howard Rubin ("Rubin"), and the Doe Company (the "Doe Company") respectfully allege as follows, upon information and belief, except as to allegations concerning Plaintiffs, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

1.      Under the leadership of Howard Rubin, all Defendants have worked and conspired together in a human trafficking venture exploiting women from around the United States (the "Venture"), causing many millions of dollars in damages to dozens of women over the years.

2.      Under the ruse of payments for supposed companionship and photo- shoots, Rubin and his associates have lied to Plaintiffs and dozens of others, luring them across the country to assault them as part of a pattern of criminal sexual misconduct including beatings to the point of unconsciousness and acts of rape. Rubin even tells victims of the scheme that he will rape them after they are tied down but before proceeding to do so—threatening one victim, "I'm going to rape you like I rape my daughter"—as well as assault them and imprison them against their will.

3.      Defendants have through their sex trafficking scheme caused injuries so extreme that multiple women have needed cosmetic and dental reconstructive surgery, and all victims of the scheme have required hospitalization and experienced extreme emotional trauma.

4.      Rubin and his associates' misconduct even continued after Plaintiffs finally overcame their fear and engaged counsel. Rubin has directed his associates to undermine and interfere with Plaintiffs' relationships with their counsel, to tamper with witnesses, and  to even illegally hack into Plaintiffs' computer systems in an apparent attempt to destroy evidence. Such hacking has continued even since the filing of the original pleading in this action.

## JURISDICTION AND VENUE

5.      Venue is appropriate in the Eastern District of New York as the Plaintiffs were transported into and out of airports located in the Eastern District.

6.      This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of

18 U.S.C. § 1591.

7.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28

U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal

claims over which this Court has original jurisdiction.

8.     This Court has personal jurisdiction over the parties, as the actions that constitute

the violations of 18 U.S.C. § 1591(a) were conducted in relation to the relationship between Lytell,

Moore, Caldwell, Tagai, Hopper, Hassen, Reyes, Rubin, Shon, and Powers at the Venture's chief

crime location (the "Penthouse"), owned by Blue Icarus, at the Metropolitan Tower located on 146

West 57th Street, 76th Floor, New York, New York in the Southern District of New York and the

Plaintiffs were flown into and out of airports in the Eastern District of New York.

## PARTIES

### *Plaintiffs*

9.     Plaintiff Lytell is an individual who is a model for Playboy Enterprises, Inc. Lytell

resides in Fort Lauderdale, Florida.

10.    Plaintiff Moore is an individual who is a model for Playboy Enterprises, Inc. Moore

resides in Daytona Beach, Florida.

11.    Plaintiff Caldwell is an individual who is a freelance model. Caldwell resides in

Fort Lauderdale, Florida.

12.    Plaintiff Tagai is an individual who is a model for Playboy Enterprises, Inc. Tagai

resides in Chicago, Illinois.

13.    Plaintiff Hopper is an individual who is a freelance model and student. Hopper

resides in Atlanta, Georgia.

14.    Plaintiff Hassen is an individual who was a Playboy model. Hassen resides in

Brooklyn, New York, but at the time of at least some of the conduct against her, she resided in Los Angeles, California.

15.     Plaintiff Reyes is an individual who is a model. Reyes resides in Miami, Florida.

### *Defendants*

16.     Howard Rubin is an experienced money manager with a highly regarded reputation in the financial field. Rubin also goes by Howie Rubin. At least one other member of the Venture, Shon, has referred to Rubin as the "boss." Upon information and belief, Rubin is also the manager of the Doe Company. Rubin resides in New York, New York. Unless otherwise specified, every time that Rubin is alleged to have committed an action, that action was committed both in his individual capacity, and on behalf of the Doe Company.

17.     Jennifer "Jenn" Powers is an individual who works with Rubin, and, upon information and belief, is an employee of the Doe Company. Powers herself admits to being Rubin's "assistant." Powers resides in New York, New York.

18.     Upon information and belief, the Doe Company is located in New York, New York. The Doe Company is the vehicle through which the Venture operates, and through which Rubin pays his employees—like Powers and Shon—as well as the models he hires, including Plaintiffs Lytell, Moore, Caldwell, Tagai, Hopper, Hassen, and Reyes. Upon information and belief, the Venture paid Blue Icarus rent through the Doe Company.

### STATEMENT OF FACTS

### Rubin Background

19.     Howie Rubin has worked in the financial industry for thirty-five years and has years of experience trading mortgage-backed securities.

20.     Rubin was a chief mortgage-securities trader from 1985–1987 at Merrill Lynch and

4

was a Senior Managing Director at Bear Stearns Companies, Inc. from 1987– 1999.

21.     Rubin also served as a Director of the Commercial Industrial Finance Corporation (also known as Deerfield Capital Corporation) from December 2004 until May 19, 2009.

22.     From February 2007 to January 1, 2011, Rubin served as a Director of Fortress Investment Group, LLC.

23.     Rubin served as a Director of New Media Investment Group, Inc. from October 24, 2006, to December 18, 2008.

24.     Rubin served as a Director of GateHouse Media, Inc. from October 2006 to December 2008.

25.     He has also served as an Independent Director of Global Signal, Inc. since February 2004.

### With the Assistance of An Attorney, Blue Icarus Rents the Penthouse to Serve as the Base for the Venture

26.     Blue Icarus filed incorporation documents on November 30, 2010, and registered its address in New York to be located at 501 Madison Avenue, 14th Floor, 10022, the same address as Sanders Ortoli, LLP, now known as Ortoli Rosenstadt LLP.

27.     On February 7, 2011, the deed for Block 01009 Lot 1060 and Lot 1104—the Penthouse—was signed by seller Sanchez, JR., A.R. c/o Oved & Oved LLP, and buyer Blue Icarus c/o Sanders Ortoli, LLP.

28.     Blue Icarus's Department of State ("DOS") ID number is 4024393 and it has no registered agent.

29.     Blue Icarus is aware of the Venture as well as the Venture's purpose, and has benefitted financially by receiving monthly rent of $18,000 per month from Rubin because of Blue Icarus's participation in Rubin's sex trafficking venture.

30.     Indeed, representatives of Blue Icarus were present in the Penthouse on at least one occasion involving Plaintiffs. Rubin introduced the representatives of Blue Icarus to Plaintiff Hopper at the Penthouse in or around November 2016.

31.     Blue Icarus was at least recklessly indifferent to the Venture and its acts as Blue Icarus failed to inquire following separate incidents at the Penthouse where an ambulance was called on one occasion and police were called on a separate occasion.

32.     Blue Icarus has given Rubin and the Venture access to the Penthouse and is aware that Rubin does not live at the Penthouse as Rubin has a primary residence, with his family, within walking distance of the Penthouse.

33.     Blue Icarus is aware of how Rubin and the Venture utilize the Penthouse.

34.     Blue Icarus's Penthouse has a built-in "dungeon," designed solely for the purposes of the Venture, which contains devices and other BDSM-type instruments designed solely to harm victims.

## The Venture

35.     Defendants conspired to form the Venture in or around February 2011, at the latest, when Rubin rented the Penthouse from Blue Icarus, Powers and Shon began to actively recruit women for transportation to the Penthouse, and, upon information and belief, an attorney of Rubin's provided Rubin and his associates with the non-disclosure agreements (the "NDAs").In fact, Powers, at the direction of Rubin, has tried to contact at least Plaintiff Hopper in furtherance of the improper objectives of the Venture as recently as February 7, 2018, less than two weeks before the filing of the Amended Complaint.

36.     At least Rubin, Powers, and the Doe Company worked together to pay and transport women to New York to serve as companions and entertainment for Rubin and, at times, his

associates. In exchange, many of these women expected that Rubin could help with their careers or otherwise supplement their income.

37.     The Venture did not reveal to Plaintiffs the other, improper, objective of the Venture: to cover up Rubin's sexual misconduct and criminal abuse of the women, and to serve as a cover for his wide-ranging human trafficking scheme.

38.     However, some form of the Venture has been in existence for decades, likely with members beyond the current Defendants.

39.     Rubin is the head or, as Shon referred to him, the "boss" of the Venture. Individually or through his company, the Doe Company, Rubin pays each member of the Venture for their services.

40.     Powers, Rubin's admitted "assistant," participated in the direction of the Venture by working directly below Rubin. Powers is not only responsible for recruiting, transporting, and paying the Venture's victims directly through her personal PayPal account, but is the Venture's primary "fixer," coming in to cover up any injuries sustained by the women as a result of the Venture's crimes, as well as to prevent and even bribe the Venture's victims who threaten to go public with the Venture's crimes. Powers is paid for her services by Rubin individually or by the Doe Company.

41.     Shon works below both Rubin and Powers. Shon participated in the direction or conduct of the affairs of the Venture by recruiting women for the Venture and making those women feel comfortable before Rubin forces them to engage in commercial sex acts to which the women never agreed. Shon was frequently the first point of contact for Plaintiffs and the Venture's other victims, introducing them to Rubin and the Venture. Shon is paid for her services by Rubin individually or by the Doe Company.

42.     There are multiple other women who have held and/or currently hold the same position as Shon and are also members of the Venture. These women include at least the unidentified female representative who initially contacted Plaintiff Tagai through the Model Mayhem website, a woman named "Tracy" who contacted Plaintiff Hassen on the Venture's behalf, and a woman named Taren Cassidy who contacted Plaintiff Reyes on the Venture's behalf. These women are also paid for their services by Rubin individually or by the Doe Company.

43.     For the past six years, Blue Icarus has participated in the direction or conduct of the affairs of the Venture by providing the space in which the Venture harbors its victims, knowing or acting in reckless disregard of the fact that means of force and coercion would be used to cause women to engage in commercial sex acts. Rubin, either personally or through the Doe Company, paid Blue Icarus monthly rent of $18,000 from at least February 2011 to September 2017.

### Powers—a Former Model and Victim of Rubin's—Joins the Venture and Becomes an Integral Member of the Conspiracy

44.     Powers, a former Hawaiian Tropics model, became involved with Rubin ten to twelve years ago, when Rubin was in what he has referred to as his "brunette phase." Rubin now prefers blondes.

45.     Like Plaintiffs here, Powers was induced into a BDSM relationship with Rubin, and, upon information and belief, sustained injuries as a result.

46.     However, Powers continued to associate with Rubin. Powers eventually married one of Rubin's associates after Rubin introduced Powers to him, and Powers has had multiple children with him.

47.     When she became involved with Rubin's associate, Powers began to work for Rubin in a professional capacity. Instead of acting as Rubin's girlfriend or playmate, Powers began to run the day-to-day operations of the Venture.

8

48.     Powers's role was recruiting women to bring to New York, and arranging the logistics, including flight purchases and payment.

49.     To advance the Venture's scheme and build trust with the victims of the Venture, Powers acts as a sister-figure for the women. After Powers builds some trust with the victims of the Venture, Rubin and Powers invite the women to New York under false pretenses. Rubin then physically assaults them, sexually abuses them, and falsely imprisons them.

50.     Powers also acts as the Venture's "fixer," cleaning up Rubin's messes and seeking to minimize problems with victims of the Venture.

51.     Indeed, once Plaintiffs here began to attempt to seek an escape from being continually victimized by the Venture, Powers attempted to interfere with Plaintiffs' plans, including, but not limited to, offering money to Plaintiffs to attempt to buy Plaintiffs' silence and to pay for medical services which were the result of Rubin's actions which have caused Plaintiffs great financial hardship.

52.     Upon information and belief, Powers is paid through the Doe Company for her services.

53.     Further, upon information and belief, the money used to sustain the Venture—for payment of Rubin's women, paying rent to Blue Icarus for the Penthouse, travel arrangements, and later pay-offs—goes from Rubin to the Doe Company, to Powers, to wherever the money is then needed.

54.     Powers made the transfers to Plaintiffs in this action directly from her personal PayPal account.

**Schnur, One of Rubin's Attorneys, Assists the Venture**

55.     Yifat Schnur, a former prosecutor, represents Howard Rubin in connection with the

9

Venture's activities.

56.     Schnur drafted the October 4, 2016 agreement which Powers provided to Plaintiff Caldwell.

57.     In August 2017, Schnur also advised Rubin and Powers with regards to Plaintiff Lytell's criminal action, and eventually attempted to meet with Plaintiff Lytell at Rubin's and Powers's direction.

## Tagai's Background

58.     Tagai, also a single mother to her nine-year-old son, is an International Playboy Playmate and model. Tagai worked as a cocktail waitress at the LAX nightclub and shortly after, she worked as a cocktail server at Tao Nightclub at the Venetian in Las Vegas. Tagai is the third oldest of eight siblings. At the time she was introduced to Rubin, Tagai resided in Las Vegas, Nevada.

59.     In or around 2012, Tagai moved to Chicago, Illinois. Tagai then moved to Seattle on December 26, 2015, but returned to Chicago the following summer in June 2016.

## Hassen's Background

60.     Hassen is a former Playboy model.

61.     Hassen formerly lived in Los Angeles, California until 2015, but currently resides in Brooklyn, New York.

## Reyes's Background

62.     Reyes is a freelance model and cocktail waitress.

63.     Reyes resides in Miami Beach, Florida.

## Hopper's Background

64.     Hopper is a freelance model and student.

10

65.     Hopper also works as a cocktail waitress and server at the Tavern in Atlanta, Georgia, where she met Stephanie Shon through her coworker.

## Lytell's Background

66.     Lytell is an International Playboy Playmate. Approximately two years ago, after working as a cocktail waitress in her hometown of Fort Lauderdale, Florida, Lytell began modelling.

67.     Playboy soon thereafter hired Lytell and Lytell has since then appeared in multiple international Playboy publications. She has participated in multiple modeling events and conventions, including Paradise Challenge in Jamaica, where Lytell met Plaintiff Moore.

68.     Lytell has a substantial social media following. As has become the industry standard for models in the Playboy or bikini model industries, social media sites Instagram and Snapchat are essential marketing tools for Lytell.

69.     Lytell commonly arranges photo or video shoots through these social media platforms.

## Moore's Background

70.     Moore is also an International Playboy Playmate. Moore grew up in Rockford, Illinois, and is the oldest of five siblings. Moore moved to Florida when she was 19, and, shortly thereafter, when her mother passed away, adopted her 10-year-old sister, who came to live with her.

71.     Over the course of the next ten years, Moore worked in an office performing accounts receivable and other clerical work to support her sister and other siblings. When her sister began college, Moore began to pursue a modeling career, participating in workshops and training

to further her career.

72.     Moore eventually left her clerical job and became a full-time model. Moore shoots for magazines and attends many of the same modeling conventions as Lytell, including the Paradise Challenge where the two met.

## Caldwell's Background

73.     Caldwell is a single mother to her now five-year-old daughter. Before Caldwell met Rubin, she worked as a cocktail waitress and dancer at Eleven, a club in Miami, her hometown.

74.     Caldwell met Lytell at Eleven in October, 2015, and the two have been friends ever since.

## The Venture Lures Tagai

75.     In late 2009 or early 2010, Tagai received a message through a social media platform called Model Mayhem, which is used to message models and initiate conversations, from a female representative. The representative indicated that she worked for Howard Rubin and that Rubin, who was familiar with Tagai's work as a Playboy model, would like to meet Tagai in New York for dinner.

76.     Rubin's representative described Rubin as a kind businessman who simply loved spending time with and sharing meals with models, and would pay those models for their time.

77.     Rubin's representative even noted that she could provide references for Rubin, including a reference from a former model named Jennifer Powers, who had shared similar experiences with Rubin.

78.     While, Tagai was living in Las Vegas at the time, she happened to be in New York for the weekend. Thus, relying on the representations of Rubin's representative, Tagai agreed to meet Rubin for dinner.

79.     The brief communications through Model Mayhem were the only conversations Tagai had with Rubin's representative. Tagai never met her in person.

80.     Following her receipt of these messages, Tagai met Rubin at the Russian Tea Room in midtown Manhattan. The two enjoyed drinks and dinner together. At the time, Rubin made no comments which caught Tagai off guard or caused her to be suspicious.

81.     Towards the end of their dinner, Rubin asked Tagai how long she planned to remain in New York and where she was staying.

82.     Tagai confirmed that she would be in New York through the weekend, and told Rubin the name of her hotel.

83.     Rubin then asked if Tagai would like to get together the next day. Rubin also offered to pay for Tagai to stay in a nicer hotel, the Loews Regency New York Hotel on Park Avenue and East 61st Street (the "Loews"), for the rest of her time in New York.

84.     Tagai, who had enjoyed her dinner with Rubin, agreed and accepted his offer.

85.     The two then said their goodbyes for the evening, and Rubin paid Tagai $2,000 in cash for her time.

86.     The next day, after she had checked into the Loews, Tagai again met Rubin for dinner. Because the dinner went well and the two of them got along well, Tagai invited Rubin back to her hotel room.

87.     At the hotel, Rubin and Tagai engaged in consensual sex. While Rubin made some out-of-the-ordinary requests, he did not ask for or do anything that Tagai deemed extreme. Tagai did not feel threatened and viewed this first encounter as simply fun and playful.

88.     Rubin then left the hotel, with a plan to stay in touch, and see each other in the near future.

**Rubin Flies Tagai To New York on Multiple Occasions in 2010 and 2011**

89.     Following this first weekend with Rubin, Tagai returned to Las Vegas, but remained in near constant contact with Rubin. The two texted each other nearly every other day, and continued to meet in New York.

90.     In 2010, Rubin flew Tagai to New York from Las Vegas to meet with him on at least three occasions. During this time period, Rubin was in direct communication with Tagai, and would help her to arrange the flights himself. Rubin would either pay for the flights himself, or would reimburse Tagai for any flights she purchased. Rubin also arranged for and paid for Tagai to stay at the Loews hotel for each of her trips.

91.     As with their first date, Rubin and Tagai would typically meet for drinks or a meal at the Russian Tea Room or a restaurant called the Wayfarer, and then would return to the hotel to engage in consensual sex.

92.     Rubin would typically see Tagai between the hours of noon to 4 p.m. or 4 p.m. to 10 p.m., when he would need to leave to return to his home. Rubin would see Tagai depending on his schedule at home.

93.     On one occasion, Rubin sent Tagai to a sex store with a list so that the she could pick up various sex toys to use that evening. Rubin's credit card was on file at the store and Rubin had Tagai buy around $800 worth of sex toys from the list. At the time, Tagai believed that Rubin simply had a curiosity about BDSM play, and, though it was all very new to her, she was accepting of his interest in exploring that curiosity with her. Rubin at first proceeded very slowly with Tagai. As time went on, however, Rubin's conduct and requests grew more extreme.

94.     Rubin, who always kept a key to the hotel room in which Tagai was staying, also liked to sneak into her room early in the mornings while she was still asleep. When he would come

14

over, Rubin would visit with a duffle bag of sex toys, ropes, and other BDSM-type objects. Rubin

enjoyed initiating intercourse with Tagai as she slept, telling her that he liked to feel like he was

raping her while she was sleeping.

95.     Following each encounter, Rubin would pay Tagai a sum of $2,000 to $5,000 in

cash or by wire transfer.

**The Venture's Criminal Acts Against Tagai**

96.     In or around early 2011, Rubin introduced Tagai to Jennifer Powers, stating that

Powers would be handling the travel arrangements and logistics of their meetings going forward.

97.     From that time forward, Powers purchased Tagai's flights and coordinated Tagai's

meetings with Rubin. However, towards the end of the relationship, Tagai purchased most of the

flights and was reimbursed. Powers would then coordinate Tagai's arrival time.

98.     On one occasion in mid-2011, Powers asked Tagai to meet her at a new location: a

condominium that turned out to by Rubin's newly rented Penthouse.

99.     Powers presented Tagai with an NDA and persuaded her to sign. This was the first

time Rubin or anyone associated with Rubin had asked her to sign any document.

100.    Tagai felt confused by the sudden appearance of a legal document, but agreed to

sign, thinking it was simply a whim of Rubin's.

101.    Powers did not give Tagai, who was not familiar with legal documents, a chance to

consult with any advisor, and did not permit Tagai to keep a copy of the NDA for her records.

102.    Over the next four years, Tagai continued to see Rubin.

103.    At one point, in or around 2014, Rubin encouraged Tagai to quit her job, promising

that he would "take care of her." As a result, Tagai visited Rubin once a month in New York and

spent close to two years without a job. During this time period, Rubin paid Tagai approximately

$5,000 a month.

104.    On one occasion, Tagai saw Rubin texting another woman and saw that he was belittling this woman by letting her know that he was with Tagai.

105.    While Rubin's interest in BDSM appeared to increase, introducing new devices and equipment into the Dungeon, or as he referred to it to Tagai, the "red room," Rubin generally sought Tagai's consent during this time period, and she did not feel threatened.

106.    But, beginning in early 2015, Rubin's behavior changed completely—so much so that Tagai feared that Rubin had started taking drugs, something she had never known Rubin to do.

107.    Tagai also began to notice new devices in the Dungeon each time she arrived at the Penthouse, including large-scale structures, ropes, and knives, which caused her for the first time to begin to fear Rubin.

108.    Each time Rubin brought Tagai to the Dungeon, his behavior escalated. Rubin began to subject Tagai to painful experiences, which resulted in actual injury and severe bruising.

109.    Worse, Rubin ceased asking for Tagai's consent, and deliberately ignored her requests to "stop."

110.    Following these encounters, Powers would recommend Tagai a special cream, called Arnica cream, that was intended to treat the appearance of the bruising. Powers recommended the cream to speed up the healing process as Rubin did not like to see Tagai until the bruising he had caused disappeared.

111.    On one occasion, in 2015, Tagai met Rubin for dinner at a lounge across the street from the Penthouse. Rubin was with an older gentleman, and two other women, one of which Tagai believed to also be in some sort of intimate relationship with Rubin.

112.     The group returned to the Penthouse to play pool. After a few rounds of pool, the older gentleman and the two other women left. Rubin pulled Tagai onto the pool table, and, without warning or obtaining Tagai's consent, shoved a pool cue into Tagai's vagina, causing pain and tearing. Tagai did not want Rubin to do this and begged for him to stop.

113.     Following her protestations, Rubin left the room and returned with ropes. Rubin proceed to bind Tagai, and dragged Tagai along the floor by the ropes through the Penthouse to the Dungeon.

114.     By the time they made it to the Dungeon, Tagai had sustained burns across her body from the ropes and from contact with the floor. Rubin then proceeded to tie Tagai to a large, black sex device, where her body was forced into an x-shape, and to punch her in the face. Tagai could not escape this device as Rubin frequently tied her onto the machine.

115.     Rubin hurled insults at Tagai while she was bound, and eventually untied her and left without saying anything further.

116.     After Tagai returned home, Rubin continued to contact her and acted as though nothing out of the ordinary had occurred. Though Tagai was afraid of Rubin, she thought that perhaps something had triggered him that evening, and decided to give him another chance.

117.     But, when Tagai returned to New York (now from Chicago as she had moved from Las Vegas), Rubin's bad behavior continued.

118.     On several occasions, Rubin punched Tagai in her face and in her stomach. Rubin also hit Tagai in the ribs and would repeatedly say, "stupid girls." He would then laugh in Tagai's face and force Tagai to say, "I'm a stupid girl."

119.     On at least one occasion, without Tagai's permission, Rubin penetrated Tagai with a glass dildo, causing Tagai to bleed. Rubin blamed the bleeding on Tagai and yelled at her that

the bleeding was from her period, not from the dildo. During this time, Rubin would smack Tagai in the vagina over and over again and even proceed to whip Tagai from the floor up to her vagina.

120.    When Tagai protested, Rubin shouted at her, "Fuck you, you wasted my time," and left.

121.    Rubin would pay Tagai based on how he perceived she acted. If Tagai cried or protested in any way, he would pay her substantially less than if she simply took his threats and beatings without complaint.

122.    In October 2016, Tagai asked Rubin for financial help as he was providing substantial financial support. Because of her credit and down payments for security, Tagai needed $4,800 to move into her new apartment in Chicago. At this time, Tagai asked Rubin for help, who responded by saying he could not help, knowing Tagai could be homeless. As a result, Tagai borrowed the money from her friend, who she paid back.

123.    Rubin reached out two weeks later and asked Tagai to come to New York to see him. Rubin had no problem beating Tagai for his selfish reasons to help Tagai financially. As long as Rubin got what he wanted, he then felt it was okay to help Tagai.

124.    On at least one occasion, Tagai, who had returned to work, now as a waitress at the Prysm Club in Chicago, had to take a significant amount of time off of work due to bruising caused by Rubin. Tagai had sustained such severe bruising to her breasts that she could not wear the v-cut uniform required for her job.

125.    On more than one occasion during this time period, Tagai lost consciousness completely, waking up in a new location with no recollection of what had occurred.

126.    On the first of these occasions, Rubin ordered wine, cheese, and fruit up to the Penthouse between 4 p.m. and 5 p.m. The last thing Tagai remembers is sitting on the couch, fully

clothed, drinking the wine that Rubin had poured for her and engaging in a typical conversation.

127.    Tagai had consumed no other alcoholic beverages, nor had she taken any medications or drugs.

128.    At approximately 8:30 p.m., Tagai woke up in the guest room of the Penthouse completely naked and sore. Rubin was nowhere to be seen.

129.    Tagai got up to explore the Penthouse to try to determine what happened. When she entered the Dungeon, it looked as though a tornado had run through the room, with equipment and toys strewn about and knocked over.

130.    Tagai had no memory of being in the room, but, based on the injuries she felt, suspected that Rubin had taken her there after she had lost consciousness.

131.    On other occasions, Tagai remembered being tied up in the red room, but would wake up in the bedroom with no recollection of what had occurred.

132.    Tagai does not know whether Rubin had caused injuries which caused her to black out, or if Rubin had slipped some sort of drug into her drink.

133.    On any occasion that Tagai blacked out, Rubin would act as though Tagai had done something wrong. As a result, Rubin would give Tagai significantly less money than he had otherwise.

134.    In or around June of 2017, Tagai finally had enough of Rubin's treatment. Tagai had avoided Rubin for approximately six months following several of the incidents described above.

135.    However, Rubin continued to contact Tagai, and began to act and speak to Tagai as he had prior to 2015. Hoping that Rubin was back to his old self, Tagai agreed to meet with him.

136.    After Powers arranged for Tagai's travel, Tagai paid for her flight and flew to New

York and met with Rubin.

137.    Once in the Penthouse, Rubin bound and gagged Tagai. Without Tagai's permission or consent, Rubin attached clothespins to Tagai's breasts, causing Tagai intense pain.

138.    The pain was simply too much for Tagai, who, although gagged, attempted to plead with Rubin to stop. Rubin refused.

139.    Rubin then approached Tagai with a device she had never seen before, which appeared to her to be a long electric shocker of some variety. Although she did not know it at the time, the device was a cattle prod.

140.    Again, without Tagai's permission or consent, Rubin used the cattle prod to shock Tagai on multiple occasions across her body.

141.    After Rubin was finished, he simply untied Tagai and left, without anything more.

142.    Tagai was left in pain and felt extremely uncomfortable and wary towards Rubin. This was the last time she saw him.

143.    Following the June encounter, Rubin and Tagai exchanged a handful of text messages. Rubin never mentioned what had occurred in June, and acted as though nothing was out of the ordinary.

144.    On or around October 31, 2017, Rubin contacted Tagai for the last time, wishing her happy birthday. Tagai has not contacted him since.

**Tagai's Injuries**

145.    As a result of the Venture's violations of the TVPA and 18 U.S.C. § 2422, Tagai suffered significant injuries.

146.    Following the incident in which Rubin dragged Tagai through the apartment, Tagai sustained burns on her body from the rope Rubin used to drag Tagai around with.

20

147.    Tagai sustained bruising to her face and breasts on numerous encounters with Rubin. Such injuries were so significant that Tagai had to miss work for a significant period of time.

148.    Since the extreme encounters with Rubin, Tagai suffered from anxiety and inability to sleep. As a result, Tagai was prescribed Xanax pills to help Tagai sleep and overcome anxiety.

149.    Tagai is a cocktail waitress and model who depends on her appearance to earn her income. Thus, the injury to her body caused Tagai to sustain economic damages.

**The Venture Lures Hassen**

150.    On or around May of 2011, after Hassen appeared in Playboy, a female representative of Rubin who identified herself as "Tracy" contacted Hassen to persuade her to meet Rubin.

151.    Tracy told Hassen that Rubin was interested in taking some fetish style pictures and that Hassen would be compensated for her time in the amount of $5,000 but could also leave at any time if she felt uncomfortable.

152.    Tracy also informed Hassen that she may receive minor bruises from the restraints for the pictures but not from Rubin himself.

153.    Tracy also told Hassen that Rubin was a little over the top but a sweet and great guy that is just into role playing and fantasy and that Hassen should just say yes to everything.

154.    In or around September 2011, Hassen flew from Los Angeles to New York City to meet with Rubin.

**The Venture's Criminal Acts against Hassen**

155.    Hassen met Rubin at the Mandarin Oriental Hotel in New York City, as well as three other women.

156.     While at the hotel, Rubin poured shots for all of the women, including Hassen, and had them drink until they became intoxicated.

157.     Hassen noticed sexual instruments on the bed and became nervous.

158.     Upon Rubin noticing that Hassen was nervous, he asked another woman in the hotel room to give Hassen something to take the edge off.

159.     The woman crushed a pill up and put it in Hassen's drink. Hassen did not see the pill, what shape it was, or what color it was.

160.     After some time in the hotel, Hassen began to not feel well and became very itchy. Hassen also did not like the way Rubin had been touching her. Because of this Hassen asked to, and did, leave the hotel room.

161.     Hassen later discovered that what was crushed up and put in her drink was oxycodone, a Schedule II narcotic.

162.     Hassen did not see Rubin again for three to five years.

163.     The next time Hassen saw Rubin was one of the times she was back in New York from Los Angeles, and it was by coincidence at a restaurant called BLT Prime in New York on Rubin's birthday.

164.     Hassen ran into one of the women that she had met the night in the Mandarin Hotel in Rubin's room.

165.     Hassen also saw a number of other Playboy models with Rubin at the restaurant and decided that she would reach out to Rubin to give him another chance and because Hassen believed that if she refused to take the drugs she would still be paid for the modeling work.

166.     Hassen contacted Rubin through email and met up with Rubin as a friend on several occasions, simply having a meal together or getting a drink and talking.

22

167.     In the back and forth of the email, Rubin stated that Hassen would be beaten and bound and would be black and blue, but Hassen did not take these statements seriously as she had previously been told by Rubin's female representative that Rubin was sweet and a great guy and only into role playing and fantasy.

168.     Hassen believed this conversation to all be part of this role playing and fantasy.

169.     Hassen and Rubin went out at least ten times for dinner and drinks. On some of these occasions Hassen would go back to the Penthouse with Rubin and one or two other women, but each of these encounters was merely social and included no beatings or sex.

170.     Hassen believed that Rubin did not want Hassen to be one of the women that he had BDSM relations with as he was dating one of her friends.

171.     However, in 2015 or 2016, after Rubin stopped seeing Hassen's friend he took Hassen out for drinks and got Hassen very drunk.

172.     Once Rubin got Hassen drunk, he forced her to take oxycodone again.

173.     At this time, Hassen was not aware that the pill that was crushed in her drink the first night was oxycodone, nor was she aware that this was oxycodone.

174.     The next thing Hassen remembers is waking up in a bed in the Penthouse with Rubin next her.

175.     Rubin then told Hassen that they were going to go do something fun and forcefully grabbed Hassen.

176.     Because Hassen was numb from the drugs and alcohol, she could not stop Rubin, and Rubin took her to the Dungeon while Hassen was going in and out of consciousness.

177.     Inside the Dungeon, Rubin tied Hassen to the "X" shaped cross and woke Hassen up by beating and whipping her.

178.    Rubin would scream at Hassen things such as "[i]t's just your pussy" and then kick Hassen in her vagina.

179.    If Hassen did not repeat what Rubin said, he would again hit her.

180.    The more Hassen screamed, the more involved Rubin would get, saying things such as "I love it when you cry."

181.    Hassen also noticed that the more she cried and screamed, the more erect Rubin would become and the more he wanted sex.

182.    Furthermore, during the beating, Rubin would use things he had learned about Hassen to upset her and elicit emotions, such as "nobody loves you," "you're so ugly," and "why do you think you don't have a boyfriend."

183.    Rubin also gave Hassen more oxycodone during the ordeal, finally telling Hassen what he had been giving her after he crushed up a pill and put it in a drink for Hassen.

184.    Hassen was in and out of consciousness throughout but remembers being placed in a machine that had her arms tied to her ankles, while blindfolded, gagged, and with her ears plugged.

185.    The next morning, Rubin told Hassen he had a great a time and paid  her $5,000.

186.    Hassen told Rubin that she did not have a great time and that she was in pain.

187.    Hassen saw Rubin monthly for a span of a few months, as Rubin had caused Hassen to become addicted to oxycodone, and Rubin was Hassen's only supplier.

188.    Every time Hassen went back, she was supplied more of the drug but was also beaten and raped.

189.    This was Rubin's game with Hassen: he got her addicted to drugs so that she would have to keep coming back to him to get the drugs, allowing him to further abuse her.

190.     These encounters eventually became so bad that they included electrocution and attaching various devices to Hassen's nipples.

191.     Hassen often asked to leave, but Rubin would not allow her to leave and would say things such as, "no one can hear you scream or hear you cry."

192.     Following one occasion,  Hassen sustained an injury to her buttocks. Hassen previously had Bio Gel injections in her buttocks. Like breast implants and other cosmetic prosthetics, these injections are intended to provide a Reyes appearance.

193.     Hassen experienced pain in her buttocks that was so severe that she had to be admitted to the hospital. As it turns out, Rubin had ruptured one of Hassen's Bio Gel injections.

194.     This rupture caused an infection, which required Hassen to take strong antibiotics.

195.     To this day, the ruptured Bio Gel injection continues to give Hassen problems. On more than one occasion since she was admitted to the hospital, Hassen's ruptured injection has become infected causing additional pain and requiring treatment with antibiotics.

196.     The last time Hassen saw Rubin was in the summer of 2017.

197.     In 2015, Hassen reached out to Rubin to inform him that a mutual friend of theirs had passed away.

198.     Hassen met with Rubin and they had a few drinks while Hassen told Rubin what had occurred.

199.     However, Hassen became intoxicated quicker than normal and after having a cigarette blacked out. Hassen believes she was drugged on this occasion without her knowledge.

200.     Hassen woke up in the Dungeon to beatings, electrocution, and clamps on her vagina.

201.     Hassen demanded that he let her go.

25

202.    In retaliation, Rubin ripped her off of the "X" cross and threw her to floor.

203.    Hassen demanded money so that she could go home, as she had nothing on her because she believed she only meeting Rubin to tell about their friend passing away.

204.    Rubin then hit her in the face so hard that he split her lip.

205.    On one occasion Rubin brought Hassen—along with several other women—to the strip club Cheetahs located in Manhattan.

206.    Rubin got a private room for him and the women at the strip club.

207.    While inside, Rubin beat Plaintiff Hassen—but none of the other women.

208.    A waitress came in to the private room on several occasions to ask if everything was okay because of what Rubin was doing to Hassen.

209.    After the waitress came back several times, the group was removed from the strip club because of Rubin's conduct.

210.    After a long time of not seeing Rubin, Hassen went back because she wanted to understand what had happened to her and why.

211.    It was only upon Hassen going back to see Rubin that she was required to sign an NDA.

### Hassen's Injuries

212.    As a result of Rubin's abuse and the Venture's violations of the TVPA and 18 U.S.C. § 2422, Hassen suffered significant injuries to her business and to her property.

213.    After the Venture first transported Hassen to New York to meet with Rubin, she woke up in extreme pain, with one of her eyes swollen shut, her breasts swollen, and her shoulders hurting.

214.    As a result of Rubin forcing her to take oxycodone and in conjunction with her

injuries, Hassen became addicted to the drug.

215.   This required Hassen to go back to Rubin for more pills, where Rubin then assaulted Hassen before giving her the pills, and resulted in a cyclical relationship: every time Hassen would go to Rubin, he would give her oxycodone and beat her so badly that she would need more the morning following the beatings. As the addiction grew worse, Rubin would take more and more advantage of Hassen and used her addiction to his advantage and forcing Hassen to come back to him for more drugs.

216.   Hassen has also sustained damage to her Bio Gel implants due to Rubin's use of force. As a result, Hassen frequently suffers from infections which require treatment with antibiotics and costly doctors' visits.

217.   Hassen, who previously earned her living as a model, has not been able to work in the industry as a result of the physical and emotional trauma she sustained at the hands of the Venture.

### The Venture Lures Reyes

218.   On or around early March of 2016, Reyes was contacted by one of her girlfriends who was a recruiter for Rubin's sex trafficking scheme, Taren Cassidy. Cassidy invited Reyes to come from Las Vegas, where Reyes had been vacationing, to New York to meet with Defendant Rubin. Cassidy assisted Reyes in making her travel arrangement to come to New York, which required Reyes to change her planned return trip to Florida.

219.   Cassidy told Reyes a little about Rubin but was very vague when describing Rubin. Cassidy did not explain what Rubin would require of Reyes, or what Reyes should expect.

220.   Because she was acting on behalf of Rubin, Cassidy knew or should have known that Rubin would use threats of force, force, and coercion to cause Reyes to engage in commercial

sex acts.

221.    Upon information and belief, Rubin and his associates paid Cassidy for her recruitment of Reyes.

### The Venture's Criminal Acts Against Reyes

222.    Later that night, Reyes and Cassidy were drinking and partying at the Penthouse when Rubin visited the apartment.

223.    Rubin provided Reyes and Cassidy alcohol and recreational drugs, such as cocaine. Rubin pressed the women to take the cocaine and continued to refill their drinks.

224.    After ensuring that the women were intoxicated, Rubin then proceeded to tell Reyes to sign an NDA. Reyes did not know what an NDA was and asked Rubin to explain why she needed to sign the document.

225.    Instead of providing any explanation, Rubin told Reyes, "If you can't sign this, you can't be here."

226.    Reyes did not know what she was signing as she had been drinking and partying and had no intention or prior knowledge of Rubin's requirement to sign any document. Reyes would not have signed the NDA had she not been intoxicated and pressured into doing so by Rubin.

227.    Reyes ended up signing the NDA, which promptly changed the mood. Rubin then proceeded to throw Reyes over his lap and started to hit Reyes on her buttocks. Reyes told Rubin that that had hurt.

228.    Then Rubin's behavior began to escalate. Rubin opened a door to a room, which Reyes entered with her friend. Rubin started tying Reyes up and told her that there was a safe word that she could use if she felt uncomfortable.

229.    But immediately thereafter, Rubin proceeded to insert a ball gag into Reyes's

mouth, preventing her from saying the safe word or making any protestations.

230.    Rubin produced a dildo which he first showed to Reyes, and then forcibly inserted the dildo into Reyes's vagina, causing tears and bruising. Rubin did not ask Reyes if she was okay with his use of the dido.

231.    Reyes tried to protest, but could not as Rubin had gagged her.

232.    Rubin also blindfolded Reyes with a mask and bound her with rope. He then proceeded to beat and punch Reyes in the head, stomach, buttocks, and legs, causing bruising and a large contusion on the back of Reyes's thigh, approximately the size of a football.

233.    Rubin also hit Reyes with different instruments, but Reyes could not identify the instruments as she was blindfolded.

234.    At one point, Reyes was able to remove the gag from her mouth for long enough to say the safe word. Despite this, Rubin continued to beat Reyes.

235.    Rubin eventually became upset at Reyes's protestations and kicked Reyes of the room, shut the door, and locked it. He then proceeded to continue beating Reyes's friend.

236.    Left on her own, Reyes climbed onto the pool table and started crying. She could hear her friend get beaten during this time and feared what was happening to her.

237.    After another 30–45 minutes, both Rubin and her friend came out of the room.

238.    Rubin said "everything is fine," and left the apartment.

239.    Cassidy told Reyes that she would feel better once she goes to bed.

240.    The next morning, Reyes packed her stuff and left the Penthouse.

241.    Jennifer Powers sent Reyes $2,500 via PayPal on March 11, 2016.

242.    Following her encounter with Rubin, Reyes experienced extensive bruising and tears to her vagina, which Reyes had to treat with iodine to prevent further infection.

243.    Reyes grew depressed and suffered from insomnia and anxiety as a result of her trauma. Reyes could not stand to be hugged or otherwise touched following the experience. Reyes feared that Rubin, who she knew had far greater resources than she did, could do bad things to her if she contacted the police or otherwise came forward with regards to what had happened to her.

244.    Reyes never again came into contact with Rubin or Powers.

### Reyes's Injuries

245.    Rubin's beating caused Reyes to suffer a contusion about the size of a football on the back of her leg, bruising on her backside and all over her body.

246.    Reyes also sustained extensive tearing to her vagina, requiring treatment with antiseptic.

247.    Since her encounter with Rubin, Reyes has struggled with intimacy, and does not like to be touched by other people, including even feeling twitchy when her child gives Reyes a hug or a kiss.

248.    Reyes has sustained extensive emotional and mental trauma which has required treatment.

249.    Reyes is model who depends on her appearance to earn her income. Thus, the injury to her body caused Reyes to sustain damages to her business.

### The Venture Lures Hopper

250.    Hopper, while working as a cocktail waitress and server at the Tavern in Georgia, met Stephanie Shon through a mutual friend. At the time, Shon also lived in Atlanta, Georgia.

251.    Shon told Hopper about Rubin and that Rubin, at the time, was looking to spend time with beautiful women. Shon explained to Hopper that Rubin would fly Hopper up to New York and that Hopper would have a nice place to stay at during her trip there. Shon also said that

Rubin was really nice.

252.    Shon introduced Hopper to Rubin and Hopper, believing Shon's portrayal of Rubin's character, flew to New York. Hopper and Rubin had an intimate relationship with each other until Rubin became violent.

### The Venture's Criminal Acts Against Hopper – The March Trip

253.    On or around March 24, 2016, Hopper arrived in New York on a flight purchased by Powers.

254.    Powers arranged for all of Hopper's travel, and simply emailed Hopper the flight itinerary when all was set.

255.    Per Powers's instructions, Hopper went to the Penthouse.

256.    Hopper signed an NDA in 2015.

257.    Powers requested that Hopper sign the NDA.

258.    Hopper is not familiar with legal documents and contracts like NDAs and did not understand the contents. Powers did not explain the contents, nor did Powers provide Hopper adequate time to review the NDA or have an attorney or advisor review the NDA.

259.    Hopper met Shon and Rubin at a restaurant, where there was no further interaction between Hopper and Rubin that night.

260.    Immediately following this trip, on March 30, 2016, Hopper learned that Shon, without Hopper's permission, had posted on the Internet naked photos of Hopper, which Shon had previously procured for Rubin.

261.    Instagram, at Hopper's urging, eventually removed these photos.

### The Venture's Criminal Acts Against Hopper – The April Trip

262.    A month later, in or around late April 2016, Hopper flew from Georgia to New

York and met Rubin for dinner.

263.    At the restaurant, Rubin encouraged Hopper to drink heavily. Eventually Hopper became intoxicated.

264.    Hopper then returned to the Penthouse with Rubin, when Rubin forced Hopper to open a bottle of wine and drink the whole bottle of wine herself, causing Hopper to become nearly unconscious.

265.    Rubin then pushed Hopper to the floor and slapped Hopper's face and called her a "slut" and "whore" and jokingly laughed the comments off.

266.    Rubin then dragged Hopper to the Dungeon, and even though Hopper was screaming and telling Rubin to stop, Rubin proceeded to tie Hopper up on all fours.

267.    Hopper was so intoxicated, she blacked out and woke up alone at the Penthouse with no memory of how the night ended.

268.    The next morning, Hopper returned to Atlanta.

**The Venture's Criminal Acts Against Hopper – May 2016 Through August 2017**

269.    Hopper continued to make occasional trips to New York, which continued until May 2017. However, Hopper was invited to New York by Rubin for an August 2017 trip, but a conflict arose requiring Rubin to cancel the trip but still pay Hopper a lesser amount.

270.    The Venture flew Hopper to New York on at least four additional occasions: on or around September 2016, November 24, 2016, January 31, 2017, and May 26, 2017,.

271.    The Venture paid Hopper through PayPal on each of these occasions.

272.    On these occasions, without her consent, Rubin tied Hopper down and shoved foreign objects, such as a glass dildo, into Hopper's vagina.

273.    While Hopper was screaming and crying, Rubin also whipped Hopper. Hopper did

32

not consent to being whipped.

274.    Hopper to this day has a scar from the whips on her arm.

275.    After shoving foreign objects into Hopper and whipping Hopper, Rubin would flip Hopper over and rape Hopper from behind. Hopper did not consent to having sexual intercourse with Rubin.

276.    When Hopper continued crying, Rubin slapped Hopper and said, "Shut up, whore. This is what you like."

277.    Sometime during their relationship, Rubin found out about Hopper's history of sexual and physical abuse at a young age and took advantage of this knowledge. Hopper suspects Shon, who claimed to be Hopper's friend and had knowledge of Hopper's history of abuse, told Rubin. It was evident that Rubin used this knowledge to enhance his sexual experience.

278.    Rubin told Hopper of his fantasies of pretending to rape women and scaring women. He then slapped Hopper and called her names.

279.    During these interactions, Rubin would also say to Hopper, "I'm your father raping you, like when he raped you as a little girl."

280.    On multiple occasions, Rubin offered Hopper pills at dinner or at the Penthouse, assuring Hopper that this would help with her anxiety and help Hopper get through their evening. Hopper felt that she had little choice but to do what Rubin said.

281.    On one of these occasions, Rubin punched Hopper in her breasts, causing one implant to burst and creating very dark bruises. In fact, Hopper's body was covered in bruises to the point Hopper could not wear a bikini in the summer time.

282.    On another occasion, during dinner, Rubin bragged to Hopper that he had broken a woman's jaw. Upon hearing this, Hopper was scared as she thought Rubin could do the same thing

to her as well.

### Hopper's Injuries

283.     As a result of Rubin's abuse, Hopper suffered significant injuries.

284.     Hopper sustained major bruising to her face and body, as well as scarring to her arms where Rubin whipped her.

285.     On one occasion, Rubin beat Hopper in the face so badly that he dislodged a facial injection.

286.     Hopper had to go to a doctor and plastic surgeon to have the injection fixed. Because she was afraid and embarrassed, Hopper did not tell the doctors what Rubin had done to her, simply noting that she wasn't sure what had occurred.

287.     On one occasion, Rubin punched Hopper so hard in the breast that he popped her breast implant, causing severe bruising and scarring.

288.     Hopper has also sustained emotional injuries after Rubin triggered Hopper's memories from her abusive past.

289.     Hopper's injuries harmed Hopper in her business. As at least Rubin, Powers, and Shon knew, Hopper is a model and cocktail server whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Hopper's body prevented Hopper from working, causing Hopper to sustain economic losses.

290.     Further, the Venture caused injury to Hopper's personal property in the form of the prosthetics implanted in her face and breasts.

### The Venture Lures Lytell

291.     On or around August 23, 2016, Lytell received a direct message on Instagram from Stephanie Shon on behalf of Rubin. Shon indicated that she worked for Howard Rubin, and that

34

Rubin, who had seen images of Lytell on Instagram, would like to meet Lytell in New York.

292.     While Shon initially identified Rubin by name, she then insisted that Lytell refer to him only as "H" so as to protect Rubin's identity.

293.     Shon noted that while she would not be at the meeting in New York, Lytell would have the opportunity to meet her "boss," Rubin.

294.     Shon told Lytell that Rubin would pay for Lytell to fly from Florida to New York and pay Lytell $2,000 to meet and spend time with Rubin.

295.     Shon explained that if Rubin liked her, Rubin would pay an additional $3,000, for a total of $5,000, to Lytell. Shon represented that Rubin loved spending time with Playboy models and frequently set up this type of arrangement.

296.     Because Lytell did not know who Rubin was, and was wary of the somewhat out-of-the-ordinary arrangement, she initially refused the offer.

297.     However, Rubin was persistent. Rubin next had Powers contact Lytell to persuade Lytell to travel to New York. Powers spoke with Lytell on the phone and through the messaging application WhatsApp.

298.     When Lytell identified her reservations, consistent with the Venture's scheme of lying to its victims to induce them to meet with Rubin, Powers lied to Lytell.

299.     Powers assured Lytell that Rubin was "a great guy," and would not do anything to make Lytell feel uncomfortable. Powers noted that she herself had initially entered into a similar arrangement as proposed, and claimed she had a positive experience which led to her current employment with Rubin.

300.     In fact, Powers told Lytell that if Lytell ever felt uncomfortable she could simply ask to leave, and would not only be allowed to do so, but would still be paid the initial $2,000 for

her time.

301.    Relying on Shon's and Powers's representations, Lytell agreed to come to New York, with the condition that she could bring a friend with her, who Rubin would also pay to travel to New York.

302.    Rubin and Powers agreed to Lytell's condition.

303.    Lytell contacted Plaintiff Moore, another International Playboy Playmate, and asked Moore if she would join her.

304.    As described further below, Moore had in fact already been contacted by the Venture and was herself also wary of the arrangement.

305.    However, again at Rubin's direction and to further the Venture, Powers also lied to Moore and wrongly claimed that Moore would be safe, and would not be asked to do anything that she did not want to do.

306.    As such, Powers purchased plane tickets on JetBlue Airways to New York for Lytell and Moore with funds supplied by Rubin through the Doe Company, arranging for Lytell and Moore to meet with Rubin at the Penthouse.

**The Venture Lures Moore**

307.    At about the same time that Shon contacted Lytell, Shon also direct messaged Moore through Instagram.

308.    Moore initially ignored Shon. People contact Moore frequently through Instagram with proposals and job offers, the vast majority of which are not legitimate. Thus, Moore was initially very skeptical.

309.    But, after Powers convinced Lytell to travel to New York to meet Rubin, Lytell called Moore to persuade her to join her on the trip.

310.     Still not completely convinced, Moore had phone calls with both Shon and Powers. Because of her initial skepticism, Moore wanted as much information as she could obtain.

311.     Consistent with the Venture's goals and Rubin's direction, both Shon and Powers lied in all communications with Moore, claiming Rubin was not threatening, and noting that Rubin was a very wealthy man who enjoyed women and liked to take care of them.

312.     Powers and Shon told Moore that Rubin liked large breasted women and that Rubin said he liked the photos he had seen of Moore.

313.     Powers reassured Moore that she did not need to worry and that the trip would not be about sex, and, at most, would entail some fetish play and potentially photos.

314.     As Moore had previously done photo shoots involving light fetish work, and  had always  been  treated  well  and  with  respect  to  her  boundaries,  she decided to travel to New York and to the Penthouse consistent with her previous professional work.

**The Venture's Criminal Acts Against Lytell and Moore – The August 2016 Trip**

315.     Lytell and Moore arrived in New York from Florida on flights purchased for them by Powers on behalf of Rubin on or around August 23, 2016.

316.     Upon arrival and as per Powers's instruction, Lytell took a cab from the airport to the Penthouse and Moore took a car to the Penthouse after Moore's flight had been delayed and the two did not arrive at the airport at the same time as planned.

317.     Lytell and Moore were greeted at the Penthouse by Powers, who poured them cocktails and showed them around the Penthouse. The Penthouse appeared to be a typical high-end New York residence, but with photos of various Playboy Playmates displayed throughout. The models in the images were very well-known Playboy Playmates, as well as some lesser-known models. Many of the photos included Rubin with these other women.

37

318. Lytell and Moore recognized many of the models on the walls, and were comforted by the fact that women they knew had presumably entered into the same arrangement with Rubin that they had.

319. At  the Penthouse, Powers presented both Lytell and Moore with   an NDA.

320. Powers requested that Lytell and Moore sign the NDA before meeting with Rubin for dinner.

321. Neither Lytell nor Moore were familiar with legal documents and contracts  like NDAs and did not understand the contents. Powers did not explain the contents, nor did Powers provide the women adequate time to review the NDAs themselves or have an attorney review the NDAs.

322. Instead Powers persuaded each of them to sign, noting that it was simply standard practice for Rubin and not to worry because "everything will be great."

323. Despite Powers and the Venture knowing that they would require Lytell and Moore to sign the NDAs upon arriving at the Penthouse, they did not provide Plaintiffs the NDAs in advance for their review, for them to have attorneys review, or copies for the women to keep, nor did they inform Plaintiffs prior to their trip that they would be required to sign any contracts to meet with Rubin.

324. Powers then took the executed NDAs but refused to allow either Lytell or Moore to keep a copy for their own records.

325. At approximately 5:00 p.m., after signing the NDAs, Powers brought Lytell and Moore to meet Rubin at a rooftop bar located at Viceroy Central Park, a hotel next door to the Penthouse.

326. It is Rubin's practice to meet the victims who the Venture lures to the Penthouse at

38

this hotel immediately prior to returning to the Penthouse to sexually assault them.

327.    Rubin, Lytell, and Moore had drinks and dinner at the hotel bar before heading back to the Penthouse. Throughout their interactions at the Viceroy, Rubin treated Lytell and Moore respectfully and cordially. Lytell and Moore slowly became more comfortable, believing that Rubin would treat them with respect as claimed by Powers.

328.    However, when the group returned to the Penthouse at approximately 7:00 p.m., the mood quickly changed. Upon entering the Penthouse, Rubin ordered Lytell and Moore to change into fetish-style clothing before returning to the living room to have additional drinks with him. Rubin made each of the cocktails himself, out of the sight of Lytell and Moore.

329.    Rubin's demeanor was different inside the Penthouse than in public. He became cold and authoritative, ordering Lytell and Moore to do as he commanded. Because of this change, Lytell and Moore grew nervous.

330.    In what appeared to be an attempt to assuage their concerns, Rubin went to a safe located in the Penthouse and paid both women $5,000 in cash.

331.    Even more concerning was that a room that had been previously locked was now open, and revealed a room with a white carpet and red walls, filled with ropes, chains, dildos labeled A–Z, and other apparatuses which neither Lytell nor Moore recognized.

332.    Lytell noticed a large x-shaped machine with straps, a bench, full-face masks with zippers, and metal hooks.

333.    At this time, Moore was also beginning to feel strange, and believes now that something had been added to her drink to increase her intoxication.

334.    Rubin brought the women into this side room (the "Dungeon") and immediately slapped Moore across the face. Moore protested, telling Rubin not to hit her in the face. Not only

had the slap been unexpected and hurt, but Moore had recently undergone a cosmetic treatment to her face, known commonly as fillers, and was concerned that Rubin would damage the treatment.

335.    At no point did Rubin or Powers ask either of the women about any potential medical conditions, something that someone in a responsible, consensual interaction would have done prior to any interactions of this type. However, had Rubin or Powers asked such a question, they would have lost the element of surprise, a crucial element of the Venture's ability to lure women to Rubin.

336.    At one point, Rubin demanded that Moore hit Lytell for him. When Moore objected, Rubin turned his violence on her. Moore, who was at this point scared of what Rubin would do if she did not obey, then attempted to pretend to hit Lytell, slapping her leg instead of Lytell. However, Rubin quickly caught on, and, as a consequence, hit Moore.

337.    Rubin ignored Moore and proceeded to restrain both of the women, tying their hands behind their backs and binding their breasts with rope and what appeared to be red flagging tape (a non-adhesive type of plastic ribbon typically used in surveying or construction).

338.    After telling Lytell and Moore that if they became uncomfortable he would stop, Rubin gagged both of the women so that neither could speak or object to anything that Rubin was going to do.

339.    Rubin then told Lytell and Moore, "I'm going to rape you like I rape my daughter."

340.    At this point, both Lytell and Moore began to panic. While they had suspected that Rubin would want them to play some mild fetish games and perhaps take photos, neither one expected to be restrained in this manner or to be actually beaten.

341.    Neither Moore nor Lytell consented to be restrained in this manner or beaten, nor could either woman verbally object after Rubin gagged them despite their many attempts to do so.

342.     Moore had previously done some fetish modeling work, and, based on Powers's representations, expected the same scenario with Rubin. However, in her previous experiences, the restraint had been for show, and she had always felt that she was free to go when she requested.

343.     This was different. Not only was Moore so restrained that she could not leave on her own, she could not even voice her objections. When either Lytell or Moore screamed or protested, Rubin would simply become more violent.

344.     Once the women were tied up, Rubin took the side of his fist and punched Lytell in the back of the head.

345.     Rubin began to beat both women in the breasts, calling the women "cunts," and slapping and punching their breasts and ribcages repeatedly.

346.     Rubin pushed Lytell to the ground, face down, and continued to punch Lytell in the back of the head, stating that Lytell "is the baby, and Howie is the daddy. The daddy has to beat his baby." Rubin punched Lytell so strongly that Lytell fell unconscious.

347.     Without her consent, Rubin penetrated Lytell, causing tears to her vagina. Because she was restrained and in and out of consciousness, Lytell does not know if Rubin penetrated her with an object or if it was Rubin himself.

348.     After approximately one hour of raping and beating Lytell and Moore, Rubin abruptly stopped and left the Dungeon, loosening Lytell's and Moore's restraints before he left.

349.     Both Moore and Lytell were shocked following Rubin's departure and simply lay in the Penthouse, attempting to gather themselves.

350.     Neither saw any other individuals in the Penthouse, but Lytell noticed a laptop and keys on the coffee table that had not been there previously.

351.     Both women experienced bruising and pain immediately thereafter. They were also

tremendously emotionally distraught.

352.    Rubin beat the women on the breasts so badly that Lytell's left breast became swollen and later developed scar tissue and hardening, causing visible damage to Lytell's implant and tissue, as well as pain.

353.    They decided to message Powers to tell her what had happened.

354.    Powers was not surprised.

355.    Indeed, as it turns out, Powers had recruited many women to participate in the same exchange with Rubin. After Rubin is through with the victims—and returns home to his wife and children—it is Powers's job to soothe the traumatized women and to help make arrangements with doctors to take care of any of the damage that Rubin had done.

356.    This was not the first time Powers did this, nor would it be the last.

357.    Moore and Lytell, who had nowhere else to go, stayed in the Penthouse for the night and returned to Florida the next day on the tickets the Venture had purchased for them.

**The Venture Lures Caldwell**

358.    Shortly thereafter, Powers contacted Lytell and asked if Lytell knew any other women that Rubin might like.

359.    Lytell was afraid of what Rubin would do if she did not cooperate with Rubin. Rubin was, and remains, a very wealthy man who at this point knew her address, phone number, date of birth, and how to find her if he wanted to hurt her.

360.    Out of fear of not cooperating with the Venture, Lytell introduced Powers to her friend, Caldwell, who was looking for additional ways to supplement her income to support her daughter, and made the introduction of Caldwell to Powers.

361.    Rubin, through Powers's personal PayPal account, paid Lytell $2,000 for making

42

the introduction.

362.     Powers contacted Caldwell through WhatsApp, and made arrangements to fly Caldwell to New York to meet with Rubin. Powers made the same offer and same fraudulent representations to Caldwell that she had previously made to Lytell and to Moore: simply for traveling to New York and meeting with him, Rubin would pay Caldwell $2,000. If Rubin liked her, he would ask her to stay and would pay an additional $3,000 for a total of $5,000.

363.     Lytell had told Caldwell everything about her previous experience with Rubin, so Caldwell was nervous about going. However, Powers assured Caldwell that Rubin would be respectful of Caldwell's concerns, and would not ask her to do anything she was uncomfortable with and downplayed Lytell's representations about what actually happened with Rubin.

364.     As a result, Caldwell travelled to New York in early September 2016, by herself to meet with Rubin. Like Lytell and Moore, Caldwell met Powers at the Penthouse, who presented her with an NDA.

365.     Just as with Moore and Lytell, Powers again did not provide any explanation of the NDA and did not confirm that Caldwell understood the agreement

366.     In fact, Caldwell did not. Powers also did not permit Caldwell to keep a copy of the NDA.

367.     Caldwell then met Rubin for dinner at the rooftop bar at the Viceroy Central Park. Stephanie Shon joined the two of them.

368.     At the dinner, Caldwell, who had become more anxious as the night proceeded, turned to Rubin and told him that she was feeling nervous about what he might want to do later. Caldwell told Rubin that she had seen Lytell's and Moore's bruises and was concerned that he would do the same to her.

369.     Rubin told Caldwell that he did not like her attitude and refused to answer her questions regarding her concerns.

370.     Caldwell, Rubin, and Shon soon returned to the Penthouse. Caldwell, alone in New York, was quite scared at this point, and asked Shon to stay.

371.     But Shon said she could not, and left Caldwell at the Penthouse alone with Rubin for between thirty and forty-five minutes while Shon went to a party. Shon only returned after Caldwell kept messaging her to come back.

372.     Rubin continued to provide Caldwell alcoholic drinks. Due in part to her nervousness, and in part to Rubin continuously giving her drinks, Caldwell drank more than she intended to, becoming intoxicated. Caldwell began to speak to Rubin about her daughter.

373.     Rubin stood and slapped Caldwell across the face. Rubin told Caldwell that he was "completely turned-off" by the conversation.

374.     Rubin put $2,000 in cash on the table and left the Penthouse, telling Caldwell she needed to leave by the next day.

375.     Caldwell stayed the night at the Penthouse with Shon, while Shon attempted to take Caldwell under her wing, but Caldwell flew back to Florida on the ticket purchased by Powers because Caldwell needed to take care of her daughter.

376.     Days after Caldwell left New York, Rubin began contacting her through WhatsApp, both on his own and through Powers.

377.     Rubin proceeded to convince Caldwell to return to New York. Caldwell told Rubin she would only come if she could bring Lytell with her. Rubin eventually agreed and Powers again arranged and paid for flights and travel.

378.     When she agreed to meet with Rubin the second time, Caldwell believed that, at

worst, she could go with Lytell, meet Rubin for dinner and simply be paid $2,000 for her time. Consistent with the representations of Powers and Shon, Caldwell did not expect to participate in anything further.

### The Venture's Criminal Acts Against Lytell and Caldwell – The September Trip

379.   Lytell and Caldwell flew from Florida to New York on September 24, 2017. After arriving at the airport, the two went directly to the Penthouse.

380.   There, Lytell and Caldwell changed and met Rubin at a restaurant named Tao Uptown for dinner and drinks. Powers did not require Lytell or Caldwell to sign another NDA.

381.   At some point during the dinner, a man who had spoken with Lytell outside while Lytell smoked a cigarette came over to the dinner table to say hello. Rubin became angry and demanded security, which eventually removed the man from the restaurant.

382.   After the man left, Rubin stood up and walked out of the restaurant, leaving Lytell and Caldwell behind.

383.   Not knowing what to do, Lytell and Caldwell returned to the Penthouse together.

384.   Once Lytell and Caldwell arrived at the Penthouse, Rubin began to message them via WhatsApp.

385.   Rubin returned to the Penthouse and was extremely intoxicated. When Lytell and Caldwell apologized for the disruption at dinner—which was caused by neither of them—and acted nicely to Rubin, Rubin grew frustrated and left the Penthouse.

386.   Lytell and Caldwell changed out of their dinner clothes into more comfortable clothes, and stayed in the Penthouse, not expecting Rubin to return.

387.   But Rubin returned to the Penthouse. Rubin's conduct became so bizarre that Lytell contacted Powers, asking Powers to book a room at a hotel for Lytell and Caldwell to go to.

45

388.     Lytell grew frustrated and confronted Rubin. When Lytell began to yell at Rubin for how he was treating her and Caldwell and for scaring them, Rubin became more engaged, and then told the women that they were "going to do this."

389.     Rubin took both Lytell and Caldwell to the master bedroom—rather than the usual dungeon room—and tied Caldwell up with rope from the nightstand.

390.     Rubin tied Caldwell's mouth shut with the red plastic ribbon. Caldwell grew frightened as she then understood she would have no way of telling Rubin that he was going too far.

391.     Rubin bound Caldwell's hands behind her back, and tightly wrapped rope around her breasts. Rubin pushed Caldwell face down on the bed so that she could not see.

392.     Up until this point, Lytell had simply been forced to observe. However, Rubin then threatened Lytell and forced her to hit Caldwell. When Lytell hesitated, Rubin hit her in the face.

393.     Lytell, fearing for her safety and in hopes of protecting both herself and Caldwell from further harm at the hands of Rubin, lightly hit Caldwell. At any point that Lytell refused to follow or hesitated to follow Rubin's instructions, Rubin would hit her or Caldwell harder.

394.     Rubin proceeded to beat Caldwell violently, punching her repeatedly in the back of the head and beating her breasts.

395.     Caldwell tried screaming out—as much as she could, given her restraints— to ask Rubin to stop, but she could not.

396.     However, Rubin would not listen.

397.     Caldwell was beaten in the head so badly, that she went in and out of consciousness during the beating.

398.     While Caldwell was bound, Rubin took scissors and cut off her clothing.

399.    At one point while bound, gagged, and unable to see, Rubin penetrated Caldwell, first with an object and then himself, without Caldwell's consent. Caldwell was powerless to stop him.

400.    At one point, Caldwell looked up at Lytell and realized that both she and Lytell were crying. Caldwell wanted Rubin to stop hurting both of them, so when the tape around Caldwell's mouth loosened up due to sweat, she bit his finger.

401.    Rubin was initially surprised by the bite, but then grew even more violent and continued his attack on Caldwell.

402.    After about an hour of the rape and beatings, Rubin, seemingly satisfied, untied Caldwell and left the Penthouse, leaving $5,000 on the table for Caldwell and having another $5,000 sent to Lytell via PayPal from Powers in the morning.

403.    Caldwell's head throbbed and she was already showing signs of physical trauma, including bruising and swelling.

404.    Caldwell took photos and videos of her injuries. Caldwell had severe bruising on her face, breasts, back, and buttocks. Lytell suffered bruising to her face from Rubin's assault.

405.    Rubin beat Caldwell's breasts so badly that her right implant flipped, so that the backside, which usually sat flush with her ribcage, faced outwards. Caldwell's breasts were beaten so badly that the closure for her breast implant was fully exposed and visible and Caldwell's plastic surgeon was not even willing to operate on her breasts after the incident due to the severe trauma.

406.    On the same breast, Caldwell's areola was damaged, becoming nearly twice as large as the areola on her left breast.

407.    The women's bruising only worsened as the days wore on after they returned to Florida.

408.   At the direction of the Venture, Powers paid Lytell $5,000 via PayPal the next morning and Caldwell was left $5,000 in cash as compensation.

**After Realizing How Severely Rubin Injured Caldwell, the Venture Attempts to Quiet Caldwell By Paying Her Additional Money**

409.   Caldwell's injuries, particularly those to her breasts, were so severe that she had to see a doctor. The doctor discovered not only the injury to Caldwell's breast implants, but that Caldwell had developed hematomas around the implants, causing swelling and hardening of the breasts. The doctor also noted that Caldwell's right areola would require surgery to correct.

410.   When her doctor asked what had happened to her, Caldwell lied and said that she had accidentally injured herself.

411.   Caldwell feared reprisal from Rubin if she had revealed what had truly occurred.

412.   Caldwell is a model and dancer, as such that her physical appearance is extremely important to her work. Because of her injuries, Caldwell could not work, and lost her job at Eleven.

413.   As such, she contacted Powers and Rubin to ask that they help to repair the damage Rubin caused.

414.   The Venture responded by requesting that Caldwell again fly to New York on her own so that they could discuss.

415.   Powers again purchased Caldwell's plane tickets and arranged for her travel to New York.

416.   Caldwell was terrified, but felt extremely vulnerable. She was hurt, just lost her job, and needed to take care of her daughter. Without any other options, Caldwell flew back to New York on October 4, 2016.

417.   When she arrived at the Penthouse, Powers showed Caldwell a stack of papers that had been drafted by Rubin's attorney, Schnur, and requested that she sign them. Powers then

promised that the Venture would pay Caldwell $20,000 in installments of $4,000 to repair her breasts.

418.    The Venture paid Caldwell until the amount was paid off in December of 2016 or January of 2017. At such time there was one payment that remained to be paid directly to Caldwell.

419.    However, the Venture initially refused to pay Caldwell the final payment and only did so after Caldwell asked Powers for a copy of the NDA she had signed and Caldwell wrote an apology note to Rubin about demanding the money for so long.

420.    Caldwell never received the copy of the NDA she requested from Powers.

421.    Rubin requested that Caldwell have her breast implants replaced with a sturdier material like silicone (Caldwell had saline implants, which are typically safer than silicone) so that she could return and Rubin could beat her breasts without concern of further damage.

422.    Rubin was concerned only with preserving the Venture's ability to continue to engage in crimes, and with preserving Caldwell's breasts for future beatings, and not with any of Caldwell's other injuries or emotional state.

423.    Caldwell did not have the opportunity to review the document, and did not understand what she was signing. As with the NDAs, Powers again refused to allow Caldwell to take a copy of the document with her.

424.    Powers and Rubin paid Caldwell, on the condition that she not reveal to her doctor how she was injured.

## The Venture's Criminal Acts Against Lytell and Santi – The October Trip

425.    Again, fearing that Rubin would engage in violent reprisals if Lytell did not succumb to the Venture's demands, Lytell returned to New York with another Playboy model,

Nancy Santi.

426.    On this trip, Lytell became so anxious that she got sick, eventually throwing up on the plane from Miami, in the car, and at Rubin's apartment.

427.    To ease her anxiety, Rubin and Powers asked Lytell's acquaintance, Zoe Cacciola, to tend to Lytell.

428.    But Lytell could not stop and continued to be sick.

429.    After Lytell proceeded to vomit for hours, Powers called an ambulance, which took Lytell to the emergency room, accompanied by Santi and Cacciola, spending the evening at the hospital with Santi and Cacciola.

430.    Lytell was discharged from the hospital between 2:00 a.m. and 3:00 a.m. and returned to Rubin's apartment with her friends.

431.    Upon entering, Lytell saw that Rubin had multiple individuals over at the Penthouse, including Playboy Playmate Ashley Alexa.

432.    Most in the Penthouse were drinking alcohol and snorting cocaine.

433.    As Lytell was still recovering, and as Santi did not want to be around Rubin without Lytell, Lytell and Santi went to bed. Cacciola, who did not know about Rubin's violent history, chose to join the party.

434.    At one point, later in the night, Rubin came into the room in which Lytell and Santi were sleeping and removed a document and cash from the safe that was located therein.

435.    Lytell later learned that this was an NDA and payment for Cacciola to join Rubin in the Dungeon.

436.    After her encounter with Rubin, Cacciola returned to the room in which Lytell and Santi were resting. Cacciola was distraught and looked as though she had been hurt. Cacciola grew

more and more upset over her interaction with Rubin and began to scream at Lytell and Santi.

437.    Cacciola continued to attack Lytell verbally and physically, and, eventually, Lytell fought back. Cacciola called the police.

438.    As Lytell knew the police were coming, she contacted Powers to ask her what she should do.

439.    Powers told Lytell to lie and say that the apartment belonged to Cacciola, and directed Lytell to hide any evidence of illegal conduct in the Penthouse.

440.    Lytell, who feared Rubin, did as she was told.

441.    When the police arrived, they saw that Cacciola—who had just returned from Rubin's Dungeon—appeared to have sustained more physical injuries at first glance. The police arrested Lytell.

442.    Lytell did not have a criminal record and was released with a desk appearance ticket.

443.    Rubin, through Powers and the Doe Company, told Lytell they would pay for her criminal attorney in exchange for Lytell's silence as to the involvement of the Venture.

444.    Blue Icarus was aware, or should have been aware, and was on notice of the police being called to the Penthouse but chose not to determine what events had transpired in the Penthouse.

**The Venture's Criminal Acts Against Moore – The December Trip**

445.    In late December, Moore found herself in a tough financial situation. Because Rubin and Powers had kept in touch via WhatsApp, they were aware of this and again convinced Moore to travel to New York on her own, offering her $5,000 compensation for her time, and assuring her that her safety would not be threatened.

446.    Powers again purchased Moore's plane tickets, and transmitted the flight records to Moore via email. Moore arrived in New York and immediately went to the Penthouse.

447.    This time, Rubin requested to meet Moore at the Viceroy for lunch and drinks. Moore's worries were initially assuaged due to the time of day, and because of how kind both Powers and Rubin appeared to treat her.

448.    However, this did not last. After lunch, Rubin and Moore returned to the Penthouse. Rubin brought Moore into the Dungeon room and tied Moore to a post and inserted a ball gag into Moore's mouth. Unlike in August, Rubin bound Moore's feet, so that Moore could not move in any way.

449.    Moore was not expecting this and became frightened. Rubin again began to beat Moore's breasts, repeatedly punching and slapping Moore's body. While her first experience with Rubin had not been a positive one, this was quickly becoming more violent.

450.    Rubin then came towards Moore with a large instrument, causing Moore fear of imminent harm. Moore was at first not certain what the device was, but quickly realized that Rubin was holding what appeared to be a cattle prod, which Moore knew was supposed to be used to shock livestock. Moore did not consent to being touched or shocked with the cattle prod.

451.    This did not stop Rubin. Rubin repeatedly shocked Moore with the cattle prod, placing it on the outside and inside of Moore's vagina before causing it to shock her. Moore screamed and though she was gagged, tried to beg Rubin to stop and to untie her.

452.    Rubin refused. The more Moore screamed, the more Rubin hurt her.

453.    After the cattle prod, Rubin penetrated Moore repeatedly with a large dildo, and, eventually began to engage in sex with Moore himself. Moore, who was still gagged and crying from the pain she was suffering, did not consent.

454.     After more than an hour, Rubin stopped and left Moore alone.

455.     Following this incident, Moore refused to stay in the Penthouse. Moore left and stayed at a hotel in New York before flying back to Florida the next day.

456.     Powers sent Moore a PayPal payment of $5,000 from Powers's personal PayPal account.

457.     After Moore returned to Florida, Rubin continued to harass her. Rubin sent Moore WhatsApp messages, calling her a "cunt," but continued to try to convince Moore to return.

458.     Moore refused and has not seen Rubin since December 2016.

### Moore's Injuries

459.     As a result of Rubin's abuse and the Venture's violations of the TVPA and 18 U.S.C. § 2422, Moore sustained significant injuries.

460.     Following the August 2016 encounter, Moore sustained bruising to her face and breasts, and felt intense pain in her left breast.

461.     Following the December 2016 encounter, Moore's left breast capsulated as a direct result of Rubin's physical abuse. Moore experienced severe pain in her left breast, which continues to throb today, nine months after the injury was sustained.

462.     Scar tissue has built up in Moore's breast as a result of the trauma caused by Rubin, such that her breast has become hard.

463.     As a result of the December 2016 encounter, Moore experienced tears and trauma to her vagina, and was in severe discomfort for weeks following her experience.

464.     Following the December 2016 encounter, Moore suffered from depression, inability to sleep, and anxiety. After first attempting to self-medicate, Moore eventually began seeing a doctor who is now treating her with sleeping pills and anti-depressants.

465.    Moore informed Powers and Rubin of these injuries. Both Powers and Rubin urged Moore to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Moore has not yet done so.

466.    As at least Rubin, Powers, and Shon knew, Moore is a model whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Moore's body prevented Moore from working, causing Moore to sustain economic losses.

467.    Further, the Venture caused injury to Moore's personal property in the form of the prosthetics implanted in her breasts.

### Rubin Comes to Florida and Attempts to Lure Lytell and Caldwell Into Another Encounter – The March Trip

468.    Following these encounters, Rubin and Powers continued to communicate with Lytell, and, on occasion, with Caldwell. Caldwell refused to travel anywhere to see Rubin, despite his urging that he would make her one of his "girlfriends."

469.    But, on or around March 29, 2017, Rubin came to Miami, Florida, and invited Lytell and Caldwell to dinner. Rubin was dining with Wes Edens, a prominent business man and owner of the Milwaukee Bucks in the National Basketball Association ("NBA"). Rubin offered to pay Lytell and Caldwell $500 each if they joined him and Santi for dinner.

470.    Lytell and Caldwell agreed. While they both still feared Rubin, neither had any intention of going anywhere with him beyond dinner, and expected to be safe in the public setting.

471.    At the dinner, Caldwell, who was feeling very emotional and angry at seeing Rubin again, lost control and told him he was a sick person that she never wanted to see him again. Caldwell continued, telling Rubin that he was a bad person and that, if he continued doing what he did to her, Lytell, and Moore, that he was going to end up killing someone. Rubin did not respond, merely turning to Lytell and telling her to control Caldwell.

54

472.    The dinner ended shortly thereafter. When Rubin made no move to pay the Plaintiffs, Caldwell asked for her $500.

473.    Rubin was again turned on by the women's fear and anger, said no, and that he would only pay if both Lytell and Caldwell returned to his hotel room with him.

474.    The women refused, and eventually obtained their payments.

475.    Caldwell never saw Rubin again; however, she was still in occasional contact with Powers regarding the installment payments which the Venture completed in August of 2017, only after Caldwell requested a copy of the NDA (which the Venture never provided), and wrote an apology letter to Rubin at Powers's direction.

## Lytell's Injuries

476.    As a result of Rubin's abuse and the Venture's violations of the TVPA and 18 U.S.C. § 2422, Lytell suffered significant injuries.

477.    Following the August encounter, Lytell discovered that Rubin had broken one of her ribs. She experienced extreme pain and difficulty breathing.  Lytell told Moore, who in turn told Powers, who in turn told Rubin that Rubin had broken Lytell's rib.

478.    In August, Rubin beat Lytell's left breast so roughly that he left scar tissue and caused it to harden. This caused not only damage to the appearance of the breast, but has caused and continues to cause Lytell pain.

479.    Despite the fact that both Powers and Rubin knew that Rubin had broken Lytell's rib, the September encounter only exacerbated Lytell's injury, causing further pain to her damaged rib and chest.

480.    Lytell was knocked unconscious by Rubin's punches to the back of her head during at least the August encounter, and sustained head trauma, facial bruising, and headaches following

both encounters.

481.     Since August 2016, Lytell has suffered from depression, anxiety, and an inability to sleep. Each of these maladies was exacerbated following the September and October encounters, and each continues to this day.

482.     Because of these physical, mental and emotional injuries, Lytell has been prescribed sleeping pills and anti-anxiety medication, without which she cannot sleep. Lytell is further considering anti-depressants at the request of her doctor, but has not yet decided whether to take the anti-depressants.

483.     Because of the emotional trauma she sustained, Lytell has been unable to do any professional photo shoots since her encounters with Rubin.

484.     Lytell informed Powers and Rubin of these injuries. Both Powers and Rubin urged Lytell to get the damage to her breasts repaired, and that they would pay for it. Not wanting any further association with Powers and Rubin, Lytell has not yet done so.

485.     Once Lytell received criminal defense counsel as a result of the incident during the October trip, paid for by Rubin, she continued to lie regarding what happened out of fear of disclosing to anyone what Rubin had done.

486.     Finally, a few weeks ago, after building up trust over months, she admitted to her criminal defense lawyer Rubin's crimes and the Venture's scope.

### Caldwell's Injuries

487.     As a result of Rubin's abuse and the Venture's violations of the TVPA and 18 U.S.C. § 2422, Caldwell suffered significant injuries.

488.     Rubin's abuse caused damage to each of Caldwell's breasts, but severe damage to her right breast. As previously described, Rubin's beating caused Caldwell's right breast implant

to flip completely around. Caldwell sustained hematomas in her right breast which caused pain and scarring. Caldwell's right areola also sustained damage, such that it became enlarged and disproportionate to her left areola. Caldwell's doctor recommended surgery as the only option to fix the appearance of the right areola, which would require actual cutting of the areola and loss of sensitivity. As a direct result of this injury, Caldwell lost her job and has been unable to return to similar work since.

489.    Rubin's beating also caused Caldwell to sustain bruising to her face and buttocks.

490.    Since her encounter with Rubin, Caldwell has suffered from extreme emotional distress, depression, and anxiety.

491.    Caldwell suffered from suicidal thoughts as a result and has been prescribed medication by her doctor.

492.    Caldwell informed Powers and Rubin of these injuries. Both Powers and Rubin urged Caldwell to get the damage to her breasts repaired. Due to the extensive recovery required, Caldwell has not yet undergone the repair surgery.

493.    As at least Rubin, Powers, and Shon knew, Caldwell is a model, waitress, and dancer whose physical appearance is critical for her ability to earn a living. As such, the damage Rubin caused to Caldwell's body prevented Caldwell from working, causing Caldwell to sustain economic losses.

494.    Further, the Venture caused injury to Caldwell's personal property in the form of the prosthetics implanted in her breasts.

### The Venture Continues to Engage In Misconduct to this Day, and Is Likely To Continue Unless Stopped By the Court

495.    Rubin and the Venture continue their misconduct to this day.

496.    Lytell is aware of multiple women who have complained about Rubin's abuse and

about Power's misrepresentations inducing them to enter into the arrangement in the first place.

497.    Rubin and Powers have threatened Caldwell, Lytell, and Moore, warning each of them at different points that something bad could happen to them if they were to expose the Venture or reveal it to anyone at any time.

498.    Indeed, Rubin and Powers both told Lytell not to disclose to her own lawyer what had happened.

499.    Moreover, Rubin has told Lytell that she needs to control Caldwell and prevent her from going to the police or to a lawyer.

500.    Because of the criminal charges against her due to the altercation with Zoe Cacciola, Lytell has had continued contact with the Venture.

501.    Through Powers and the Doe Company, Rubin offered to pay for Lytell to hire a criminal defense attorney to represent her in connection with the criminal charges. Through Powers and the Doe Company, Rubin has also flown Lytell to New York for each of her court appearances and put her up in the 11 Howard hotel in SoHo.

502.    In exchange, Rubin and Powers requested that Lytell not tell the whole story regarding the October encounter, and continue to keep quiet about Rubin's ownership of the Penthouse, the existence of the Dungeon, and Rubin's misconduct. Rubin and Powers requested that Lytell lie and say that her friend, either Zoe Cacciola or Powers actually owns the Penthouse.

503.    As recently as August 18, 2017, Rubin and Powers attempted to convince Lytell to terminate her criminal attorney and allow Rubin's attorney, Schnur, to represent Lytell in her criminal action.

504.    Schnur agreed to represent Lytell, despite obvious conflicts of interest, and violations of her duties as an attorney.

505.    Rubin and Powers feared that Lytell had revealed the Venture's secrets to her criminal attorney, and feared exposure.

506.    Realizing this, and that Rubin and Powers were not acting in her best interest, Lytell ceased communicating with Rubin and Powers.

507.    Powers continued to contact Lytell, attempting to convince her to come meet with her and Rubin.

508.    Powers continues to do this to this day. In fact, when reviewing their WhatsApp messages on which Powers was previously copied, each of the Plaintiffs has seen that Powers continues to check their WhatsApp conversations nearly daily, monitoring whether Plaintiffs plan to expose the Venture.

### The Venture Attempts to Cover Up Its Wrongdoing

509.    From the time the criminal prosecution of Lytell commenced, the Venture paid for her lawyer—Jeremy Saland—and refused to pay additional fees if the matter proceeded to trial because Lytell began speaking with counsel in this case. At the time Lytell retained Saland, Saland was unaware of the Venture, its scheme, or its members.

510.    The Venture would only pay for Saland so long as Lytell agreed not to mention in the criminal trial anything about Rubin or the other members of the Venture.

511.    On August 16, 2017, Lytell sent an email to Saland, drafted by Schnur, authorizing Saland "express permission to share any and all information in regards to [Lytell's] case with Ms. Schnur." Shortly after receiving this email, Saland spoke with Lytell who told him that the Venture had flown Lytell into New York to meet with Rubin, Schnur, and Powers. Further, the Venture sought to pay Lytell $80,000 to sign a retainer with Schnur and a confidentiality agreement so that Lytell would refrain from disclosing anything about Rubin and the Venture. Saland was unaware

of any of these communications or the planned meeting despite Rubin's, Schnur's, and Powers's knowledge that Saland was Lytell's counsel.

512.     Upon learning of this planned meeting between Lytell, Rubin, Schnur, and Powers, Saland contacted Schnur with the permission of Lytell and advised Schnur both through a text message and on the phone that she, or any member of the Venture directly, through third parties or otherwise, could not communicate with Lytell. Saland reasserted that he remained Lytell's counsel. Saland explained to Schnur that despite Schnur's contention that her interest was to protect Lytell, Schnur in fact had an ethical conflict in that Schnur sought to solely protect the interests of Rubin.

513.     Throughout the evening of August 16, 2017, Powers repeatedly called and texted Lytell, attempting to convince Lytell to meet on the evening of August 16, 2017, as planned, despite Saland's specific instructions to Schnur that neither she nor any third party should communicate with Lytell. In one communication, Powers made a veiled threat to Lytell stating, "I'm not sure who's going to fund what you're doing with [Saland]."

514.     The following day, Powers texted Lytell, "We've always taken care of you [because] we completely understand . . . we want to help you, we need to meet[.]"

515.     Later that month, Powers texted Lytell and Caldwell, that both Lytell and Caldwell were "plain rude and ungrateful by deliberately not answering [Powers's] phone calls or returning [Powers's] messages." Powers claimed that she only had the best interests of Lytell and Caldwell in mind. However, they should "keep in mind that both [Lytell and Caldwell] violated the [Non-Disclosure] agreement."

516.     Concerned that the Venture had lost control of and access to Lytell, Powers, on behalf of the Venture, again communicated with Lytell advising in substance that "although the

Venture paid the initial fee for Saland, [Lytell] can still call [Powers] if a final bill is presented."

517.   In fact, when the underlying events took place at the Penthouse that resulted in the current criminal prosecution of Lytell, Powers told Lytell to lie to the police and tell them that the Penthouse was either Lytell's or Zoe Cacciola's in an effort to keep Rubin and the rest of the Venture out of the news.

518.   When the Venture became concerned with Lytell and her criminal counsel, it offered to either substitute Schnur, a member of the Venture and an attorney, or stop paying for Lytell's attorney.

519.   On September 19, 2017, counsel for Plaintiffs contacted Schnur, an attorney for Rubin to notify her of the impending lawsuit.

520.   While Schnur refused to discuss the matter and has been stalling for Defendants at Rubin's direction, other members of the conspiracy have attempted to intimidate Plaintiffs, interfere with their relationship with counsel, and have even attempted to obtain illegal access to Plaintiffs' computer systems.

521.   Since that time, multiple individuals associated with Rubin and the Venture have reached out to Plaintiffs at the direction of Rubin and the Venture, in an attempt to convince them not to file suit.

522.   In fact, as recently as February 7, 2018, Rubin and Powers were still attempting to contact the women. On that date, Powers messaged Plaintiff Hopper over WhatsApp, writing "where are you little mama." Upon information and belief, Powers was either trying again to recruit Hopper to travel to New York for Rubin, or, in the alternative, was further attempting to cover up the Venture's crimes by ensuring that Hopper, who had not yet joined this lawsuit, was not going to come forward against Rubin.

**Attempted Hacking of Plaintiffs' Accounts**

523. In order to cover up their crimes and further interfere with Plaintiffs' ability to seek relief for the injury caused by Rubin and his associates, the Venture has accessed at least four of the seven Plaintiffs' and Plaintiffs' families' Apple, Facebook, and Google accounts, changing the passwords and billing information in an attempt to interfere with evidence saved under Plaintiffs' accounts.

524. In some cases, Defendants have even deleted images documenting Plaintiffs' injuries from Plaintiffs' accounts.

525. On information and belief, an individual or group of individuals, at the direction of Rubin and Powers, are either known members of the Venture, unknown additional members of the Venture, or are working on behalf of members of the Venture.

526. This illegal interference with Plaintiffs' accounts occurred only after Defendants and Defendants' counsel were contacted regarding this matter and notifying them of the impending lawsuit, and were designed to cover up the crimes of the Venture, to gather information regarding Plaintiffs' claims, intimidate and tamper with Plaintiffs, and convince Plaintiffs not to bring suit.

527. Such hacking has occurred on multiple occasions to at least four of the seven Plaintiffs:

- Doe, at the direction of Powers and Rubin, hacked into Lytell's Apple account on October 5, 2017 and October 8, 2017. Doe changed Lytell's password and Apple ID, locking Lytell out of her Apple account. After she contacted Apple for assistance, Apple informed Lytell that Doe accessed Lytell's Apple account from an iPad. Lytell does not own an iPad;

- Doe, at the direction of Powers and Rubin, hacked into Caldwell's Facebook account on October 8, 2017. Doe changed Caldwell's password, locking Caldwell out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Lytell's Facebook account on October 10, 2017. Lytell's Facebook account was accessed from

two separate IP addresses in Fort Lauderdale, Florida, neither of which was associated with any device owned by Lytell;

- Doe, at the direction of Powers and Rubin, hacked into a Google account belonging to Lytell's brother—who was known to both Powers and Rubin—on October 10, 2017. Lytell's brother's account was accessed from an IP address located in North Tonawanda, New York;

- Doe, at the direction of Powers and Rubin, hacked into Reyes's Apple account on or around December 16, 2017. Doe changed Reyes's password and Apple ID, locking Reyes out of her Apple account, and first shared all of the images stored under Reyes's Apple ID—which Reyes had always maintained as "private"—and then deleted all of the images stored under Reyes's Apple ID;

- Doe, at the direction of Powers and Rubin, hacked into Reyes's Facebook account on or around December 16, 2017. Doe changed Reyes's password, locking Reyes out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Reyes's Google account on or around December 16, 2017. Doe changed Reyes's password, locking Reyes out of her Facebook account;

- Doe, at the direction of Powers and Rubin, hacked into Hassen's Facebook and Instagram accounts on or around February 5, 2018. Doe changed Hassen's passwords, locking Hassen out of her social media accounts;

- Doe, at the direction of Powers and Rubin, hacked into Hassen's Apple account on or around February 8, 2018. Doe changed Hassen's password and Apple ID, locking Hassen out of her Apple account, and deleted several photographs relating to Hassen's interactions with Rubin. Doe accessed Hassen's Apple account through an IP address located in New York, New York; and

- Doe, at the direction of Powers and Rubin, hacked into Hassen's Google account on or around February 8, 2018. Doe changed Hassen's password, locking Hassen out of her Gmail account, and deleted several emails and attachments regarding Hassen's interactions with Rubin.

528.  Powers and Rubin knew these accounts belonged to Plaintiffs Lytell, Caldwell, Reyes, and Hassen. Not only had Powers and Rubin previously contacted Plaintiffs through several of these accounts, but such accounts were easily determined by plugging in variations of Plaintiffs' true names.

529.  Such hacking by Doe, under the direction of Rubin and Powers, involved interstate

wires and affected interstate commerce by accessing Plaintiffs' billing information, communications, and personal records.

530.     Defendants have sought to intimidate Plaintiffs, interfere with their attorney-client relationships, tamper with witnesses in the eventual lawsuit against them, and illegally obtain access to Plaintiffs' computer records in a bald-faced attempt to destroy evidence and to discover information regarding Plaintiffs' case.

## ACTS OF MISCONDUCT BY EACH DEFENDANT

### Rubin Engaged in Multiple Acts of Misconduct

531.     From at least 2010 until the present, but likely for much longer, Rubin has engaged in multiple acts of misconduct on at least 58 separate occasions.

532.     These acts include the following:

a.   Violation of 18 U.S.C. § 2422: On at least three separate occasions in 2010, Rubin knowingly persuaded, induced, and enticed Plaintiff Tagai to travel from Las Vegas, Nevada, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

b.   Violation of 18 U.S.C. § 2422: On multiple occasions from 2011-2014, Rubin knowingly persuaded, induced, and enticed Plaintiff Tagai to travel from Las Vegas, Nevada, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. In or around 2014, Rubin persuaded Tagai to quit her job so that she could be available to travel to New York once a month to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. In exchange, Rubin paid Tagai approximately $5,000 a month.

c.   Witness Tampering: In mid-2011, Rubin directed Powers to bring Tagai to his newly rented Penthouse for the first time. Once at the Penthouse, under Rubin's direction, Powers presented Tagai with an NDA and persuaded Tagai to sign. Rubin required Tagai to sign the NDA in part for the purpose of hindering, delaying, and preventing Tagai from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

d.   Violation of 18 U.S.C. § 2422: Beginning in 2015 through June 2017, Rubin knowingly persuaded, induced, and enticed Plaintiff Tagai to travel from Chicago, Illinois, to New

York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

e.  <u>Violation of the TVPA</u>: Beginning in 2015 through June 2017, Rubin transported and solicited Tagai, who lived in Chicago, Illinois, to travel to New York, New York knowing that he would use means of force, threats of force, and coercion to cause Tagai to engage in commercial sex acts. Rubin began ignoring Tagai's pleas to "stop" and forced her to engage in sexual intercourse and other sexual activity without her consent. On several occasions, Rubin went so far as to drug Tagai, rendering her unconscious, before sexually assaulting her.

f.  <u>Dealing in a Controlled Substance</u>: On one occasion in or around 2016, Rubin drugged Plaintiff Tagai, who had been enjoying wine and cheese in the Penthouse living room with Rubin, by placing an unidentified narcotic in Tagai's wine without Tagai's knowledge or consent while Tagai. Rubin's conduct rendered Tagai unconscious, at which point Rubin  forcibly engaged in sexual intercourse and other sexual activity with Tagai. Tagai later woke up in a bedroom in the Penthouse with no recollection of how she got there.

g.  <u>Dealing in a Controlled Substance</u>: On at least one other occasion in or around 2016, Rubin drugged Plaintiff Tagai by placing an unidentified narcotic in Tagai's drink without Tagai's knowledge or consent. Rubin's conduct rendered Tagai unconscious, at which point Rubin moved Tagai to his Dungeon and proceeded to sexually assault Tagai. Tagai woke up in the Dungeon with no recollection of how she arrived there.

h.  <u>Violation of 18 U.S.C. § 2422</u>: In or around September 2011, Rubin knowingly persuaded, induced, and enticed Plaintiff Hassen to travel from Los Angeles, California, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate represent to Hassen that he was only interested in taking fetish-style photos of Hassen, and that Hassen would possibly experience some bruising from the restraint. While Hassen engaged in no sexual activity with Rubin on this occasion, Rubin made his intent clear.

i.  <u>Violation of the TVPA</u>: In or around September 2011, Rubin transported and solicited Hassen, who lived in Los Angeles, California, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Hassen to engage in commercial sex acts. Rubin eventually drugged Hassen so that she was past the point of being able to consent.

j.  <u>Dealing in a Controlled Substance</u>: In or around September 2011, Rubin provided Hassen with what turned out to be a Schedule II narcotic, oxycodone, and persuaded Hassen to take the drug without identifying what it was. Hassen had never before taken oxycodone, and quickly became intoxicated.

k.  <u>Dealing in a Controlled Substance</u>: In 2015 or 2016, Rubin brought Hassen back to the

Penthouse. Rubin again provided Hassen with a Schedule II narcotic, oxycodone. This was the first time Rubin brought Hassen back to the Dungeon, and the first time that he sexually assaulted her. Following the assault, Rubin had Hassen take additional oxycodone, telling her it would help with the pain.

l.  Dealing in a Controlled Substance: Following the Hassen's first experience with the Dungeon, Rubin continued to provide Hassen with oxycodone on a regular basis, causing Hassen to become dependent on the drug and on Rubin.

m.  Witness Tampering: In the summer of 2017, Rubin required Hassen to sign an NDA. Rubin required Hassen to sign the NDA in part for the purpose of hindering, delaying, and preventing Hassen from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

n.  Violation of 18 U.S.C. § 2422: On or around March 11, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Reyes to travel from Miami, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

o.  Violation of the TVPA: On or around March 11, 2016, Rubin transported and solicited Reyes, who lived in Miami, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Reyes to engage in commercial sex acts. Rubin ignored Reyes's pleas to "stop" and used means of force to cause Reyes engage in commercial sex acts.

p.  Dealing in a Controlled Substance: On or around March 11, 2016, after bringing her to the Penthouse, Rubin provided Reyes with a Schedule II substance, cocaine.

q.  Witness Tampering: On or around March 11, 2016, Rubin required Reyes to sign an NDA. Rubin required Reyes to sign the NDA in part for the purpose of hindering, delaying, and preventing Reyes from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

r.  Violation of 18 U.S.C. § 2422: On or around March 24, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Hopper to travel from Atlanta, Georgia, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon, convince Hopper to fly to New York, and had his other associate, Powers, purchase Hopper's airfare and arrange for the travel.

s.  Witness Tampering: On or around March 24, 2016, under Rubin's direction, Powers met with Hopper at the Penthouse and presented Hopper with an NDA and persuaded her to sign. Rubin required Hopper to sign the NDA in part for the purpose of hindering, delaying, and preventing Hopper from communicating to law enforcement officers and

courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

t.  Violation of 18 U.S.C. § 2422: One month later, in late April 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Hopper to travel from Atlanta, Georgia to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Rubin again had Powers purchase Hopper's airfare and arrange for her travel.

u.  <u>Violation of the TVPA</u>: In late April 2016, Rubin transported and solicited Hopper, who lived in Atlanta, Georgia, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Hopper to engage in commercial sex acts. After forcing Hopper to drink to the point of unconsciousness, Rubin did in fact use force to cause Hopper to engage in commercial sex acts.

v.  <u>Violation of 18 U.S.C. § 2422</u>: Once a month over the next five months, from May through September 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Hopper to travel from Atlanta, Georgia, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Rubin again had Powers purchase Hopper's airfare and arrange for her travel.

w.  <u>Violation of the TVPA</u>: Once a month over the next five months, from May through September 2016, Rubin transported and solicited Hopper, who lived in Atlanta, Georgia, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Hopper to engage in commercial sex acts. On each of these occasions, Rubin if fact used means of force—including physical violence and drugs—to cause Hopper to engage in commercial sex acts. Rubin further used means of coercion to cause Hopper to engage in commercial sex acts when he used information provided to him by Shon about Hopper's past to convince Hopper to continue returning to him.

x.  <u>Dealing in a Controlled Substance</u>: On at least one occasion between April and September 2016, Rubin provided unidentified pills to Hopper, telling Hopper that the pills would calm her down. Upon information and believe, these pills were the Schedule II narcotic, oxycodone.

y.  <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon (who referred to Rubin as her "boss") attempt to convince Lytell to fly to New York, and had his other associate, Powers, purchase Lytell's airfare and arrange for the travel.

z.  Violation of the TVPA: On or around August 23, 2016, Rubin transported and solicited Lytell who lived in Fort Lauderdale, Florida, to travel to New York knowing that he

would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Ignoring Lytell's protests, Rubin did in fact force Lytell to engage in commercial sex acts.

aa. <u>Dealing in a Controlled Substance</u>: On or around August 23, 2016, Rubin slipped an unidentified pill into Lytell's drink without Lytell's knowledge, causing Lytell to feel excessively intoxicated. Upon information and believe, this pill was the Schedule II narcotic, oxycodone.

bb. <u>Witness Tampering</u>: On or around August 23, 2016, under Rubin's direction, Powers met with Lytell at the Penthouse, provided Lytell with cocktails, and then presented Lytell with an NDA and persuaded her to sign. Rubin required Lytell to sign the NDA in part for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

cc. <u>Violation of 18 U.S.C. § 2422</u>: On or around August 23, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Moore to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Shon, attempt to convince Moore to fly to New York, and had his other associate, Powers, purchase Moore's airfare and arrange for the travel.

dd. <u>Violation of the TVPA</u>: On or around August 23, 2016, Rubin transported and solicited Moore who lived in Daytona Beach, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Moore to engage in commercial sex acts. Ignoring Moore's protests, Rubin did in fact force Moore to engage in commercial sex acts.

ee. <u>Dealing in a Controlled Substance</u>: On or around August 23, 2016, Rubin slipped an unidentified pill into Moore's drink without Moore's knowledge, causing Moore to feel excessively intoxicated. Upon information and believe, this pill was the Schedule II narcotic, oxycodone.

ff. <u>Witness Tampering</u>: On or around August 23, 2016, under Rubin's direction, Powers met with Moore at the Penthouse, provided Moore cocktails, and then presented Moore with an NDA and persuaded her to sign. Rubin required Moore to sign the NDA in part for the purpose of hindering, delaying, and preventing Hopper from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

gg. <u>Violation of 18 U.S.C. § 2422</u>: In September 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Caldwell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate,

Powers, purchase Caldwell's airfare and arrange for the travel.

hh. <u>Violation of the TVPA</u>: In September 2016, Rubin transported and solicited Caldwell who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Caldwell to engage in commercial sex acts. While Rubin grew frustrated with Caldwell and did not cause her to engage in commercial sex acts on this occasion, this was his intent.

ii. <u>Witness Tampering</u>: In September 2016, under Rubin's direction, Powers met with Caldwell at the Penthouse and presented Caldwell with an NDA and persuaded her to sign. Rubin required Caldwell to sign the NDA in part for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

jj. <u>Violation of 18 U.S.C. § 2422</u>: On or around September 24, 2016, Rubin knowingly persuaded, induced, and enticed Plaintiffs Caldwell and Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Rubin had his associate, Powers, purchase Caldwell's and Lytell's airfare and arrange for the travel.

kk. <u>Violation of the TVPA</u>: In September 2016, Rubin transported and solicited Caldwell and Lytell who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Caldwell and Lytell to engage in commercial sex acts. Rubin did in fact use force and threats of force to cause Caldwell and Lytell to engage in commercial sex acts.

ll. <u>Witness Tampering</u>: On or around October 4, 2016, under Rubin's direction and using documents drafted by Defendant Schnur, Powers flew Caldwell to New York and met with her at the Penthouse. Rubin required that Caldwell sign an agreement—without providing Caldwell the opportunity to thoroughly review the agreement, let alone consult with counsel or another advisor—for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

mm. <u>Obstruction of Criminal Investigations</u>: On or around October 4, 2016, Rubin agreed to pay—and later paid—Plaintiff Caldwell $20,000 in part to prevent Caldwell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA.

nn. <u>Violation of 18 U.S.C. § 2422</u>: In or around October 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person

69

can be charged with a criminal offense, or attempted to do so.

oo.  Violation of the TVPA: In or around October 2016, Rubin again transported and solicited Lytell who lived in Fort Lauderdale, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Ignoring Lytell's protests, Rubin did in fact force Lytell to engage in commercial sex acts. While Lytell became so sick with her anxiety over encountering Rubin again that she had to be hospitalized and did not engage in any commercial sex acts, such was Rubin's intent.

pp.  Witness Tampering: In or around October 2016, Rubin had Powers instruct Lytell to lie to the police regarding who owned or rented the Penthouse and for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. Because Lytell feared Rubin, she did as she was told.

qq.  Violation of 18 U.S.C. § 2422: In or around December 2016, Rubin knowingly persuaded, induced, and enticed Plaintiff Moore to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so. Powers again purchased Moore's airfare and arranged for the travel.

rr.  Violation of the TVPA: In or around December 2016, Rubin transported and solicited Moore who lived in Daytona Beach, Florida, to travel to New York knowing that he would use means of force, threats of force, and coercion to cause Moore to engage in commercial sex acts. Ignoring Moore's protests, Rubin did in fact force Moore to engage in commercial sex acts.

ss.  Witness Tampering: On around August 18, 2017, Rubin told Lytell not to disclose to her own lawyer what had occurred at Rubin's Penthouse or what had actually occurred with her interactions with Cacciola. Powers did so for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

tt.  Obstruction of Criminal Investigations: On or around August 18, 2017, Rubin paid Lytell's legal bills in order to prevent Lytell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA.

uu.  Witness Tampering: On October 5, 2017 Powers and Rubin directed Doe to hack into Lytell's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this

date, this action had already been initiated in the Eastern District of New York.

vv. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Lytell's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ww. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Caldwell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

xx. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Lytell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

yy. <u>Witness Tampering</u>: On or around December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

zz. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

aaa. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venturee's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

bbb. <u>Witness Tampering</u>: On or around February 5, 2018, Powers and Rubin directed Doe to hack into Hassen's Facebook and Instagram accounts for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the

United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ccc. <u>Witness Tampering</u>:  On or around February 8, 2018, Powers  and Rubin directed Doe to hack into Hassen's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422,  and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ddd. <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Hassen's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating to the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

eee. <u>Violation of 18 U.S.C. § 2422</u>: As recently as February 7, 2018, Rubin knowingly attempted to persuade, induce, entice, or coerce Plaintiff Hopper to travel from Atlanta, Georgia to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Hopper refused to respond.

fff. <u>Violation of the TVPA:</u> As recently as February 7, 2018, Rubin recruited, enticed, and solicited Hopper, who lives in Atlanta, Georgia, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts.

### **Powers Engaged in Multiple Acts of Misconduct**

533.    From at least 2011 until the present, Powers has engaged in multiple acts of misconduct on at least 42 separate occasions.

534.    These acts include the following:

a. <u>Witness Tampering</u>: In mid-2011, Powers brought Tagai to Rubin's newly rented Penthouse for the first time. Once at the Penthouse, Powers presented Tagai with an NDA and persuaded Tagai to sign. Powers had Tagai sign the NDA in part for the purpose of hindering, delaying, and preventing Tagai from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

b. <u>Violation of the TVPA:</u> Beginning in 2015 through June 2017, Powers transported and

maintained Tagai for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Tagai to engage in commercial sex acts. Additionally, by providing the means through which Rubin paid Tagai and because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Tagai. Powers had actual knowledge of Rubin's use of force as she would meet with Tagai after her encounters with Rubin and even provided Tagai with special cream to treat the appearance of Tagai's injuries.

c.  <u>Violation of the TVPA</u>: In early March 2016, Powers paid Reyes, on Rubin's behalf, via PayPal. By doing so, Powers maintained Reyes for Rubin knowing—or acting in reckless disregard of the fact—that Rubin had used means of force, threats of force, and coercion to cause Reyes to engage in commercial sex acts. Additionally, by providing the means through which Rubin paid Reyes and because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Reyes.

d.  <u>Violation of the TVPA</u>: On or around March 24, 2016, Powers transported and maintained Hopper for Rubin knowing—or acting in reckless disregard of the fact— that Rubin would use means of force, threats of force, and coercion to cause Hopper to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hopper.

e.  <u>Witness Tampering</u>: In or around March 2016, Powers met with Hopper at the Penthouse and presented Hopper with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Hopper from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

f.  <u>Violation of the TVPA</u>: On or around March 24, 2016, Powers transported and maintained Hopper for Rubin knowing—or acting in reckless disregard of the fact— that Rubin would use means of force, threats of force, and coercion to cause Hopper to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hopper.

g.  <u>Violation of the TVPA:</u> Once a month over the next five months, from May through September 2016, Powers transported and maintained Hopper for Rubin knowing—or acting in reckless disregard of the fact—that Rubin would use means of force, threats of force, and coercion to cause Hopper to engage in commercial sex acts. Because she

was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hopper.

h. Violation of 18 U.S.C. § 2422: On or around August 23, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Powers lied to Lytell, telling her that Rubin was "a great guy" and that he would not do anything to make Lytell feel uncomfortable.

i. Violation of the TVPA: On or around August 23, 2016, Powers recruited, enticed, transported, maintained, and solicited Lytell, who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Lytell.

j. Wire fraud: On or around August 23, 2016, through text messages, phone calls, and emails, Powers made representations to Lytell regarding Rubin, stating that he was "a great guy" and that he would not do anything to make Lytell feel uncomfortable. These representations, which induced Lytell to travel to New York to meet with Rubin were false. Powers was paid by the Venture for making these misrepresentations.

k. Witness Tampering: On or around August 23, 2016, Powers met with Lytell at the Penthouse, provided Lytell with cocktails, and then presented Lytell with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts the Venture's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

l. Violation of 18 U.S.C. § 2422: On or around August 23, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Moore to travel from Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Powers lied to Moore, noting that the trip would not be about sex, in order to induce her to come to New York.

m. Violation of the TVPA: On or around August 23, 2016, Powers recruited, enticed, transported, maintained, and solicited Moore who lived in Daytona Beach, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Moore to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Moore.

74

n. <u>Wire fraud</u>: On or around August 23, 2016, through text messages, phone calls, and emails, Powers made representations to Moore regarding Rubin, stating that the trip was not about sexual intercourse. These representations, which induced Moore to travel to New York to meet with Rubin were false. Powers was paid by the Venture for making these misrepresentations.

o. <u>Witness Tampering</u>: On or around August 23, 2016, Powers met with Moore at the Penthouse, provided Lytell with cocktails, and then presented Moore with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Moore from communicating to law enforcement officers and courts the Venture's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

p. <u>Violation of 18 U.S.C. § 2422</u>: In September 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Caldwell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

q. <u>Violation of the TVPA</u>: In September 2016, Powers recruited, enticed, transported, maintained, and solicited Caldwell who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Caldwell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Caldwell.

r. <u>Wire fraud</u>: In September 2016, through text messages, phone calls, and emails, Powers made representations to Caldwell regarding Rubin. These representations, which induced Lytell to travel to New York to meet with Rubin, were false. Powers was paid by the Venture for making these misrepresentations.

s. <u>Witness Tampering</u>: In September 2016, Powers met with Caldwell at the Penthouse and presented Caldwell with an NDA and persuaded her to sign, in part for the purpose of hindering, delaying, and preventing Caldwell from communicating to law enforcement officers and courts the Venture's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

t. <u>Violation of 18 U.S.C. § 2422</u>: On or around September 24, 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Caldwell and Plaintiff Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

u. <u>Violation of the TVPA</u>: On or around September 24, 2016, Powers recruited, enticed,

transported, maintained, and solicited Caldwell and Lytell who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Caldwell and Lytell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Caldwell and Lytell.

v.   <u>Witness Tampering</u>: On or around October 4, 2016, under Rubin's direction and using documents drafted by Defendant Schnur, Powers flew Caldwell to New York and met with her at the Penthouse. Rubin required that Caldwell sign an agreement—without providing Caldwell the opportunity to thoroughly review the agreement, let alone consult with counsel or another advisor—for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

w.   <u>Obstruction of Criminal Investigations</u>: On or around October 4, 2016, Powers assisted Rubin when he agreed to pay—and later paid—Plaintiff Caldwell $20,000 in part to prevent Caldwell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA. Powers made each payment to Caldwell through her personal PayPal account.

x.   <u>Violation of 18 U.S.C. § 2422:</u> In or around October 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Lytell to travel from Fort Lauderdale, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

y.   <u>Violation of the TVPA</u>: In or around October 2016, Powers recruited, enticed, transported, maintained, and solicited Lytell who lived in Fort Lauderdale, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Lytell.

z.   <u>Witness Tampering</u>: In or around October 2016, Powers instructed Lytell to lie to the police regarding who owned or rented the Penthouse and for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. Because Lytell feared Rubin, she did as she was told.

aa.  <u>Violation of 18 U.S.C. § 2422</u>: In or around December 2016, at Rubin's direction, Powers knowingly persuaded, induced, and enticed Plaintiff Moore to travel from

Daytona Beach, Florida, to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.

bb. <u>Violation of the TVPA</u>: In or around December 2016, Powers recruited, enticed, transported, maintained, and solicited Moore who lived in Daytona Beach, Florida, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Moore.

cc. <u>Witness Tampering</u>: On around August 18, 2017, Powers told Lytell not to disclose to her own lawyer what occurred at Rubin's Penthouse or what had actually occurred with her interactions with Cacciola. Powers did so for the purpose of hindering, delaying, and preventing Lytell from communicating to law enforcement officers and courts Rubin's possible commission of Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA.

dd.<u>Obstruction of Criminal Investigations</u>: On or around August 18, 2017, Powers facilitated Rubin's payment of Lytell's legal bills in order to prevent   Lytell from communicating information regarding Rubin's violation of multiple criminal statutes of the United States to a criminal investigator, including violation of 18 U.S.C. § 2422, and violation of the TVPA. When Lytell expressed reservations with going along with Powers's and Rubin's plan, Powers threatened Lytell.

ee. <u>Witness Tampering</u>: On October 5, 2017, Powers and Rubin directed Doe to hack into Lytell's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ff. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Lytell's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

gg. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Caldwell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

hh. <u>Witness Tampering</u>: On October 8, 2017, Powers and Rubin directed Doe to hack into Lytell's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ii. Witness Tampering: On or around December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

jj. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Facebook account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

kk. <u>Witness Tampering</u>: On December 16, 2017, Powers and Rubin directed Doe to hack into Reyes's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

ll. <u>Witness Tampering</u>: On or around February 5, 2018, Powers and Rubin directed Doe to hack into Hassen's Facebook and Instagram accounts for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

mm. <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Hassen's Apple account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including, without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

nn. <u>Witness Tampering</u>: On or around February 8, 2018, Powers and Rubin directed Doe to hack into Hassen's Google account for the purpose of hindering, delaying, and preventing communication to a law enforcement officer or judge of the United States of information relating the commission of the Venture's Federal offenses, including,

without limitation, violation of 18 U.S.C. § 2422, and violation of the TVPA. By this date, this action had already been initiated in the Eastern District of New York.

oo. <u>Violation of 18 U.S.C. § 2422</u>: As recently as February 7, 2018, at Rubin's direction, Powers knowingly attempted to persuade, induce, entice, or coerce Plaintiff Hopper to travel from Atlanta, Georgia to New York, New York to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Hopper refused to respond.

pp. <u>Violation of the TVPA</u>: As recently as February 7, 2018, Powers recruited, enticed, and solicited Hopper, who lives in Atlanta, Georgia, to travel to New York knowing that Rubin would use means of force, threats of force, and coercion to cause Lytell to engage in commercial sex acts. Because she was paid by Rubin or the Doe Company for her assistance, Powers benefited financially from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, advertising, maintaining, patronizing, or soliciting Hopper.

**FIRST CAUSE OF ACTION: ALL PLAINTIFFS**
**(Violation Of Human Trafficking Laws, 18 U.S.C. § 1591(a) -**
**All Plaintiffs Against Rubin; Plaintiffs Lytell, Moore, Caldwell, Tagai,**
**Hopper, and Reyes Against Powers)**

535.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

536.     Defendants knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, maintaining, and soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

537.     Further, all Defendants benefited, financially or by receiving something of value, from participating in a venture which has engage in recruiting, enticing, harboring, transporting, obtaining, maintaining, and soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rubin would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

538.     The venture was a group consisting of at least Rubin, Powers, and the Doe Company.

539.     As a direct result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiffs each suffered serious injury and damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION: TAGAI
### (Assault - Rubin)

540.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

541.     On numerous occasions, but specifically on June 12, 2017, Defendant Rubin acted, intending to cause harmful or offensive contact with Tagai.

542.     Plaintiff Tagai reasonably believed she was about to be touched in a harmful or offensive manner.

543.     Plaintiff Tagai did not consent to be touched in this harmful and offensive manner.

544.     Plaintiff Tagai was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

545.     Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## THIRD CAUSE OF ACTION: TAGAI
### (Battery - Rubin)

546.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

547.     On June 12, 2017, Defendant Rubin physically and intentionally attacked Plaintiff Tagai, and beating Tagai about the face and breasts, causing bruising and damages to Tagai's breasts.

548.     Tagai did not consent to these acts by Defendant Rubin.

549.     As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION: TAGAI
### (False Imprisonment - Rubin)

550.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

551.     On multiple occasions, including June 12, 2017, Rubin restrained and detained Tagai against her will.

552.     This restraint and detention, done without the consent of Tagai was unlawful. In detaining Tagai, Rubin exercised force, drugging, beating, and gagging Tagai so that she was unable to protest. This force compelled Tagai to remain in Rubin's Dungeon when she wished to leave.

553.     Rubin's false imprisonment of Tagai caused Tagai physical and mental suffering and humiliation.

### FIFTH CAUSE OF ACTION: TAGAI
### (Intentional Infliction of Emotional Distress - Powers, Rubin)

554.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

555.     In the course of battering Plaintiff Tagai on June 12, 2017, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Tagai to suffer extreme mental and emotional distress, agony, and anxiety.

556.     Defendants' conduct was intentional and malicious.

557.     Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

558.     Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Tagai.

559.     As a direct and proximate result of Defendants' intentional and negligent infliction of emotional distress, Plaintiff Tagai has suffered economic damages, and has suffered and

continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION: HASSEN**
**(Assault – Rubin)**

560.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

561.     In July 2017, Defendant Rubin acted, intending to cause harmful or offensive contact with Hassen.

562.     Plaintiff Hassen reasonably believed she was about to be touched in a harmful or offensive manner.

563.     Plaintiff Hassen did not consent to be touched in this harmful and offensive manner.

564.     Plaintiff Hassen was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

565.     Rubin's conduct was a substantial factor in causing Plaintiff's harm.

**SEVENTH CAUSE OF ACTION: HASSEN**
**(Battery – Rubin)**

566.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

567.     Defendant Rubin physically and intentionally attacked Plaintiff Hassen in July of 2017, punching Hassen all over her body, and beating Hassen about the face and breasts, causing bruising and damages to Hassen's face.

568.     As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION: HASSEN**
**(False Imprisonment – Rubin)**

569.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

570.     In July 2017, Rubin restrained and detained Hassen against her will.

571.     This restraint and detention, done without the consent of Hassen, was unlawful. In detaining Hassen, Rubin exercised force, drugging, beating, and gagging Hassen so that she was unable to protest. This force compelled Hassen to remain in Rubin's Dungeon when she wished to leave.

572.     Rubin's false imprisonment of Hassen caused Hassen physical and mental suffering and humiliation.

573.     As a direct and proximate result of Defendant Rubin's false imprisonment, Hassen suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

**NINTH CAUSE OF ACTION: HASSEN**
**(Intentional Infliction of Emotional Distress – Rubin)**

574.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

575.     In the course of battering Plaintiff Hassen in July of 2017, Defendant Rubin embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Hassen to suffer extreme mental and emotional distress, agony, and anxiety.

576.     Defendant's conduct was intentional and malicious.

577.     Defendant's conduct was extreme and outrageous and is utterly intolerable in a civilized community.

578.     Defendant's conduct was calculated to and did cause emotional distress to Plaintiff Hassen.

579.     As a direct and proximate result of Defendant's intentional and negligent infliction of emotional distress, Plaintiff Hassen has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental

psychological trauma in an amount to be determined at trial.

## TENTH CAUSE OF ACTION: HOPPER
### (Assault - Rubin)

580.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

581.     On or around November 21, 2016, January 31, 2017, and May 26, 2017, Defendant Rubin acted, intending to cause harmful or offensive contact with Hopper.

582.     Plaintiff Hopper reasonably believed she was about to be touched in a harmful or offensive manner.

583.     Plaintiff Hopper did not consent to be touched in this harmful and offensive manner.

584.     Plaintiff Hopper was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

585.     Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## ELEVENTH CAUSE OF ACTION: HOPPER
### (Battery - Rubin)

586.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

587.     On or around November 21, 2016, January 31, 2017, and May 26, 2017, Defendant Rubin physically and intentionally attacked Plaintiff Hopper

588.     Hopper did not consent to these acts by Defendant Rubin.

589.     As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION: HOPPER
### (False Imprisonment - Rubin)

590.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

591.     On or around November 21, 2016, January 31, 2017, and May 26, 2017, Rubin restrained and detained Hopper against her will.

592.     This restraint and detention, done without the consent of Hopper was unlawful. In detaining Hopper, Rubin exercised force, drugging, beating, and gagging Hopper so that she was unable to protest. This force compelled Hopper to remain in Rubin's Dungeon when she wished to leave.

593.     Rubin's false imprisonment of Hopper caused Hopper physical and mental suffering and humiliation.

## THIRTEENTH CAUSE OF ACTION: HOPPER
### (Intentional Infliction of Emotional Distress - Rubin)

594.     Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

595.     In the course of battering Plaintiff Hopper on or around November 21, 2016, January 31, 2017, and May 26, 2017, Defendant Rubin embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Hopper to suffer extreme mental and emotional distress, agony, and anxiety.

596.     Defendant's conduct was intentional and malicious.

597.     Defendant's conduct was extreme and outrageous and is utterly intolerable in a civilized community.

598.     Defendant's conduct was calculated to and did cause emotional distress to Plaintiff Hopper.

599.     As a direct and proximate result of Defendant's intentional and negligent infliction

of emotional distress, Plaintiff Hopper has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION: MOORE
### (Assault - Rubin)

600.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

601.    In December 2016, Defendant Rubin acted, intending to cause harmful or offensive contact with Moore.

602.    Plaintiff Moore reasonably believed she was about to be touched in a harmful or offensive manner.

603.    Plaintiff Moore did not consent to be touched in this harmful and offensive manner.

604.    Plaintiff Moore was harmed by Rubin's conduct, suffering extreme emotional and mental anguish.

605.    Rubin's conduct was a substantial factor in causing Plaintiff's harm.

## FIFTEENTH CAUSE OF ACTION: MOORE
### (Battery - Rubin)

606.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

607.    In December 2016, Defendant Rubin again physically and intentionally attacked Plaintiff Moore, repeatedly shocking Moore in and around the vagina with a cattle prod, and penetrating Moore against her will, causing interior and exterior damage to Moore's vagina. Rubin again beat Moore about the face and breasts, causing bruising and further damages to Moore's breasts, including Moore's breast implants.

608.    Moore did not consent to these acts by Defendant Rubin.

609.    As a direct and proximate result of Defendant Rubin's battery, Plaintiff suffered

monetary as well as non-economic damages, including emotional trauma and mental and physical anguish in an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION: MOORE
### (False Imprisonment - Rubin)

610.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

611.    In December 2016, Rubin restrained and detained Moore against her will.

612.    This restraint and detention, done without the consent of Moore, was unlawful. In detaining Moore, Rubin exercised force, drugging, beating, and gagging Moore so that she was unable to protest. This force compelled Moore to remain in Rubin's Dungeon when she wished to leave.

613.    Rubin's false imprisonment of Moore caused Moore physical and mental suffering and humiliation.

## SEVENTEENTH CAUSE OF ACTION: MOORE
### (Intentional Infliction of Emotional Distress - Powers, Rubin)

614.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

615.    In the course of battering Plaintiff Moore, Defendants Rubin and Powers embarked on a malicious, willful, and grossly negligent course of conduct intended to cause Plaintiff Moore to suffer extreme mental and emotional distress, agony, and anxiety.

616.    Defendants' conduct was intentional and malicious.

617.    Defendants' conduct was extreme and outrageous and is utterly intolerable in a civilized community.

618.    Defendants' conduct was calculated to and did cause emotional distress to Plaintiff Moore.

619.    As a direct and proximate result of Defendants' intentional and negligent infliction

of emotional distress, Plaintiff Moore has suffered economic damages, and has suffered and continues to suffer non-economic damages, including mental and emotional injury and detrimental psychological trauma in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs demand judgment against Defendants as follows:

A.  At least $3 million in compensatory damages for each Plaintiff for the injuries of Plaintiffs caused by the Venture and its individual members;

B.  A permanent injunction enjoining Defendants, their partners, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from in any way engaging in the Venture of any of the practices or crimes set forth herein;

C.  Imposition of a constructive trust upon all assets associated with the` Venture;

D.  Compensatory and punitive damages for injury caused to Plaintiff Tagai;

E.  Compensatory and punitive damages for injury caused to Plaintiff Hassen;

F.  Compensatory and punitive damages for injury caused to Plaintiff Reyes;

G.  Compensatory and punitive damages for injury caused to Plaintiff Hopper;

H.  Compensatory and punitive damages for injury caused to Plaintiff Lytell;

I.  Compensatory and punitive damages for injury caused to Plaintiff Moore;

J.  Compensatory and punitive damages for injury caused to Plaintiff Caldwell;

K.  Punitive damages pursuant to the civil remedy for human trafficking in

88

18 U.S.C. § 1595;

L.     Attorneys' fees pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595(a);

M.     Punitive damages for Plaintiffs Moore, Tagai, Hopper, and Hassen's state law claims of assault, battery, false imprisonment, and intentional infliction of emotional distress;

N.     Costs of suit herein;

O.     Applicable interest on the foregoing amounts;

P.     Declaratory relief; and

Q.     Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: New York, New York
      November 11, 2019

By: */s/ John G. Balestriere*
    John G. Balestriere
    **BALESTRIERE FARIELLO**
    225 Broadway, 29th Floor
    New York, New York 10007
    Telephone:   (212) 374-5401
    Facsimile:   (212) 208-2613
    john.balestriere@balestrierefariello.com
    *Attorneys for Plaintiffs*