Richard H. Dolan
Partner

212-612-1219
rdolan@schlamstone.com

Schlam Stone & Dolan LLP

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

March 28, 2022

BY ECF

Honorable Brian M. Cogan
United States District Court
Eastern District Court of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Moore, et al. v. Rubin, et al.*, 1:17-cv-06404 (BMC)

Dear Judge Cogan:

We are counsel to Defendant Jennifer Powers. The last plaintiff asserting a claim against Ms. Powers has now concluded her testimony, and this letter is submitted in anticipation of Defendant Powers' Rule 50 motion for a judgment as a matter of law dismissing all claims against her. If the case against Ms. Powers survives the Rule 50 motion, this letter also addresses the proposed jury charge on the sex trafficking claim against her.

### A. Plaintiffs' Theory of The Case Does Not Support a TVPA Claim

In relevant part, to establish civil liability under Section 1595, a plaintiff must prove a violation of Section 1591, which in relevant part requires a showing that the defendant "knew or recklessly disregarded the fact that means of force, fraud, or coercion will be used to cause the [plaintiff] to engage in a commercial sex act…." [irrelevant portions deleted.] Section 1591 goes on to define a "commercial sex act" as any sex-for-money transaction. On defendant Powers' reading of that statute, it subjects to liability anyone who knows (or recklessly disregards) the "fact" that force, fraud, or coercion will be used to cause a victim to engage in a sex-for-money act, more commonly called prostitution. On plaintiffs' reading, the statute reaches a different issue – whether a person who has already consented to engage in a sex-for-money transaction has been forced into some particular sex act beyond the scope of her agreement. Essentially, plaintiffs' reading asks the court to parse the terms of the sex-for-money agreement, rather than the question to which defendant Powers contends the statute is actually addressed: whether the plaintiff was forced into a "commercial sex act," meaning prostitution.

There are several reasons why the Court should reject Plaintiffs' reading of the statute. First, the statutory term "commercial sex act" has significant work to do in defining the scope of a Section 1591 crime. A "commercial sex act" involving adults is necessarily consensual, like every other act that can properly be described as "commercial." The statutory definition makes that point clearly, in focusing the inquiry on the normal criteria in a commercial transaction – whether it involved an exchange between two parties, one providing services and the other paying for them in money or something else of value. 18 U.S.C. 1591(e)(3). For the same

reason, the term "commercial sex act" excludes sexual assault – by definition, sexual assault is not a sex-for-money transaction (if it were, it would be prostitution, not sexual assault).

On that understanding, Section 1591 focuses on precisely the conduct that, in ordinary parlance, is described as "trafficking" – recruiting a person either by force (kidnapping, threats of harm), coercion (confiscating a passport) or fraud ("we are seeking cocktail waitresses ….") in interstate commerce, and by those means "causing the person to engage in a commercial sex act." The "commercial sex act" is consummated between the plaintiff and the customer of her prostitution services. But the customer is not the target of Section 1591, nor is he liable as a 'sex trafficker' under this statute. Rather, liability falls on the person who forced the victim into prostitution (the cases refer to him as the "trafficker," and in the language of that trade, he acts as the pimp). *See, e.g., Lundstrom v. Choice Hotels Int'l Inc.,* 2021 WL 5579117 at *1 (D. Colo. Nov. 30, 2021) ("plaintiff was 'forced to provide sexual services to strangers for her traffickers' financial gains' for over two years."); *E.S. v. Best Western Int'l Inc.,* 510 F.Supp.3d 420, 424 (N.D. Tex. 2021) ("Plaintiff asserts that her trafficker controlled a ring of women who were prostituted in Defendants' brand hotels."); *H.G. v. Inter-Continental Hotels Inc.,* 489 F.Supp.3d 697, 700 (E.D. Mich. 2020) ("at all times that H.G. was 'kept' at the hotels, 'her trafficker or one of his partners was stationed downstairs in the lobby in public view, standing surveillance as H.G. repeatedly serviced buyers of commercial sex.'"); *A.B. v. Hilton Worldwide Holdings Inc.,* 484 F.Supp.3d 921, 930 (D. Or. 2020) ("After booking the room, her trafficker would get two keys and take one key to Plaintiff, who would be waiting in the car. Id. Plaintiff's trafficker used hotel WiFi to post advertisements, talk to 'johns', and watch and record Plaintiff's sexual acts.").

By the same reasoning, plaintiffs' contrary reading cannot be squared with the words of the statute. Nothing in Section 1591 suggests any Congressional intent to police compliance with the terms of the agreement between the victim-prostitute and her customer about the scope of the sex acts contemplated by their agreement rather than to address "trafficking" in its ordinary and natural meaning.

First, the placement of the statute in "Chapter 77 – Peonage Slavery and Trafficking in Persons" supports a reading focused on whether a person's freedom is restricted such that the victim has been forced into prostitution rather than policing the terms of an otherwise voluntary prostitution agreement.

Second, as explained above, the statutory term "commercial sex act" rules out Plaintiffs' theory of liability: if force is used during an encounter to cause the victim-prostitute to perform or undergo sex acts to which she did not consent, the requirement that the "sex act" be commercial, meaning consensual in the same sense as any other commercial transaction, is not satisfied.

Third, the "will be used" requirement also necessarily excludes those acts from Section 1591's reach. The reason is that the statute requires the defendant to know or recklessly disregard the "fact" that force "will be used" before there is any sex act at all – a future act, one occurring after the point in time when the defendant is required to "know or recklessly

Hon. Brian M. Cogan
March 28, 2022
Page 3

disregard" it. The few cases addressing that aspect of Section 1591 have concluded that the required proof must show a pre-formed plan, known or recklessly disregarded by the defendant at the inception of the interaction with the victim, to use force, fraud or coercion to cause the victim to engage in prostitution ("commercial sex act"). *Noble v. Weinstein*, 335 F. Supp. 3d 504, 517-518 (S.D.N.Y. 2018) (the plain language of Section 1591 requires "knowledge, or a modus operandi, associated with above-described 'enticement,' that Defendant enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place. … [The statute] requires [proof of] awareness, at the initial recruitment or enticement stage, that certain prohibited means will be employed to achieve a perverse end goal: a commercial sex act"). *See also United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010) ("The knowledge required of the defendant is such that if things go as he has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction.").

The case at the outermost reach of the statute is *Noble v. Weinstein*, where the defendant was acting both in the role of the "trafficker" and as the customer for the prostitution services. The theory of liability in that case was that Weinstein had a pre-formed plan to entice an actress by fraud to make her believe he was considering her for a role in a movie. He eventually enticed her to come up to his hotel room under the same false pretense, and then used both the false promise as well as physical force to cause her to engage in a "commercial sex act," meaning a sex-for-value transaction, with him.[1] The would-be actress was caused to prostitute herself (although the case is careful to avoid being so insensitive), where she had not otherwise consented to participate in any commercial sex act.

This case is one large step beyond *Noble v. Weinstein*, in that Plaintiffs were willing participants in commercial sex transactions, and most of them had engaged in many such transactions with Mr. Rubin. None of them was caused to engage in a sex-for-money act by reason of force or fraud. All but one of the Plaintiffs has acknowledged that before travelling to meet Rubin, they understood and agreed that the meeting would involve a commercial sex act. *See* Exhibits A1, A2, A3, A5 (Tagai, Reyes, Moore and Hopper each understood they were coming to meet Rubin for paid sexual activity). The fifth Plaintiff, Lytell, claimed that she believed her first meeting with Rubin would involve "dinner and drinks" with him in exchange for $2,000. Even accepting that testimony, Rubin told Lytell in advance of her coming to New York: "It's total BDSM. Most girls love it and come back for more, but I just like to be upfront about everything" and "can't wait to meet/greet/beat you tomorrow. 😈" *See* Exhibit B (excerpts from DX-C2). Thus, no claim of fraud can be maintained on this record. Further, Lytell conceded that she returned two more times for the purpose of commercial sex acts herself, and referred several other women to Rubin for commercial sex acts, hoping Rubin would pay her money for that. *See* Exhibit A4.

---

[1] *See Noble*, 335 F. Supp. 3d at 512 ("Harvey then grabbed the Plaintiff, pulled her towards him, and groped her breasts. [] Harvey told Noble that he "had to have her." [] Noble resisted, saying "No, Harvey, No!" [] At the same time, "because of the tangible and intangible benefits Harvey Weinstein promised," Noble physically complied.").

Hon. Brian M. Cogan
March 28, 2022
Page 4

Instead of alleging that they were forced to engage in a commercial sex act, Plaintiffs' claim focuses, as noted above, only on the scope of the prostitution agreement itself – instances in which, according to them, Mr. Rubin exceeded the scope of the parties' prostitution agreement by doing certain acts they allege they had not consented to.

Given the evidence in this case, we think this argument provides an ample basis on which Plaintiffs' sex trafficking claim against both defendants should be dismissed at the conclusion of Plaintiffs' case. But if the Court concludes that the sex trafficking claim against either defendant must be submitted to the jury, the charge needs to address the scope of Section 1591's reach so that the jury's deliberations are focused on the relevant factors.

**B.** *Even If* **The Court Finds That Plaintiffs' Theory of The Case Supports A TVPA Claim, The Claims Against Powers By All Plaintiffs But Tagai Should Be Dismissed Because There Is No Evidence That Powers Had Any Knowledge of Force, Fraud or Coercion**

Even accepting Plaintiffs' theory of the case, the TVPA claims by Reyes, Moore, Lytell and Hopper must be dismissed as to Jennifer Powers because there is no evidence whatsoever that Powers ever had knowledge of the "fact" that force, fraud or coercion was used on them. Powers was never present for any of the sexual encounters – none of the Plaintiffs have claimed otherwise. The evidence as to each Plaintiff regarding Powers is as follows:

- **Reyes**. The only evidence of Powers' involvement in Reyes' encounter with Rubin is that Powers sent Reyes money after she had been with Rubin (and Reyes was only with Rubin once, in March 2016). Reyes conceded that she never met or spoke to Powers. *See* Exhibit C1. *Even if* the jury were to accept that force, fraud or coercion was used against Reyes, there is absolutely no evidence that Powers had any knowledge of it.

- **Moore**. Although Moore claimed to have had a phone call with Powers before coming to New York, she conceded that she knew the trip would involve paid sexual activity, and therefore any fraud fails on that record. *See* Exhibit A3. Moore further conceded that she had never told Powers that she had "been abused or mistreated by Howard Rubin." (She replied "absolutely not," to that question in cross examination."). *See* Exhibit C2. The text messages Moore sent to Powers after having been with Rubin did not suggest in any way that force or coercion had been used against her—instead, they suggested that Moore was happy about the encounters. *See* Exhibits D, E.

- **Lytell**. Lytell did not claim that she had a phone conversation with Powers (or anyone else) prior to coming to New York for her first meeting with Rubin. (*See* Exhibit C3.) Her communications with Powers prior to her coming to New York were by text messages, and were introduced in full at DX-M2-1 (*see* Exhibit F)-- Lytell did not claim that there were texts other than the ones at DX-M2-1 between her and Powers. There are no representations in those texts about the purpose for

Hon. Brian M. Cogan
March 28, 2022
Page 5

>the trip in New York, and therefore a claim for fraud against Powers cannot stand. Lytell did not claim that she ever told Powers that she had been forced or coerced into any sexual act. In addition, her messages to Powers after having been with Rubin on August 22, 20216—the only encounter for which Lytell claims that force/coercion was used against her—indicate she was quite pleased with the encounter and eager to return. *See* Exhibit F.
>
>- **Hopper**. Hopper conceded she knew the purpose of her trip to New York was a BDSM sex in exchange for money, and has not claimed that she was ever tricked or that false representations about the purposes of the trip were made to her. *See* Exhibit A5. She also did not claim that she ever told Powers that forced or coercion had been used against her.

Thus, for the same reason that the Court dismissed all claims against Stephanie Shon on Shon's pleading motion, this Court should enter a judgment as a matter of law, dismissing the claims by Reyes, Lytell, Moore and Hopper against Powers. *See* ECF Doc. 105 at 25 ("plaintiffs have not alleged any facts to show that Shon knew or acted in reckless disregard of the fact that Rubin would use force, fraud, or coercion to cause plaintiffs to engage in commercial sex acts with him. [] The amended complaint, like the original complaint, does not allege that Shon was present for any of the alleged assaults, was told about them before or after they occurred, or knew that any of the plaintiffs were afraid of Rubin; nor does it allege anything similar, which might show knowledge or reckless disregard. The human-trafficking claim against Shon is therefore dismissed.").

Respectfully,

Richard H. Dolan

Encl.
cc: all counsel (by ECF)