1623

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

2
     ------------------------------x
3                                        17-CV-6404(BMC)
     AMY MOORE, MIA LYTELL,
4    NATASHA TAGAI, EMMA HOPPER,
     BRITTANY HASSEN and BRITTANY
5    REYES,
                                         United States Courthouse
6            Plaintiffs,                 Brooklyn, New York

7            – versus –                  March 31, 2022
                                         9:30 a.m.
8    HOWARD RUBIN and JENNIFER
     POWERS,
9
             Defendants.
10
     ------------------------------x
11
                     TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
12                   BEFORE THE HONORABLE BRIAN M. COGAN
                     UNITED STATES SENIOR DISTRICT JUDGE
13                          BEFORE A JURY

14   APPEARANCES

15   Attorney for Plaintiffs: BALESTRIERE FARIELLO
                              225 Broadway
16                            29th Floor
                              New York, New York 10007
17                            BY:  JOHN G. BALESTRIERE, ESQ.
                                   MANDEEP S. MINHAS, ESQ.
18

19   Attorney for Defendant:  DECHERT LLP
     Howard Rubin            1095 Avenue of the Americas
20                            New York, New York 10036-6797
                              BY:  EDWARD A. McDONALD, ESQ.
21                                 BENJAMIN E. ROSENBERG, ESQ.
                                   MAY K. CHIANG, ESQ.
22                                 CHRISTINE ISAACS, ESQ.

23

24

25

1624

 1    APPEARANCES (CONTINUED)

 2    Attorney for Defendant:    SHEPPARD MULLIN RICHTER
      Howard Rubin                & HAMPTON, LLP
 3                               30 Rockefeller Plaza
                                 New York, NY 10112
 4                               BY:  MICHAEL J. GILBERT, ESQ.
                                      KATHERINE BOY-SKIPSEY, ESQ.
 5

 6    Attorney for Defendant:    SCHLAM STONE & DOLAN LLP
      Jennifer Powers            26 Broadway
 7                               New York, New York
                                 BY:  DOUGLAS E. GROVER, ESQ.
 8                                    JOLENE LAVIGNE-ALBERT, ESQ.
                                      ANGELA LI, ESQ.
 9

10

11    Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, CCR
                                 Phone:  718-613-2330
12                               Fax:    718-804-2712
                                 Email:  LindaDan226@gmail.com
13

14    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
15

16

17

18

19

20

21

22

23

24

25

1          In open court; Jury not present.)

2          THE COURTROOM DEPUTY:  All rise.  Judge Cogan

3  presiding.

4          THE COURT:  Good morning.  I am shocked.  Shocked.

5  Nobody wants the argument deposition order number two.

6          You can bring in the jury, please.

7          (Jury enters the courtroom.)

8          THE COURT:  All right.  Everyone be seated, please.

9          Good morning, ladies and gentlemen.

10         THE JURY:  Good morning.

11         THE COURT:  I think we are still in Defendant

12  Rubin's case.  Am I right about that?

13         MS. CHIANG:  Correct, Your Honor.

14         THE COURT:  What's next?

15         MS. CHIANG:  Good morning, jury.  Good morning, Your

16  Honor.  Good morning, counsel.

17         Defendant Rubin would first like to offer

18  designations from the depositions of Taren Cassidy and

19  Stephanie Shon.

20         And these depositions are not videotaped, and so we

21  propose to have Ms. Isaacs read the witness, and

22  Ms. Boy-Skipsey to read the part of the questioner.

23         THE COURT:  Okay.  I will tell you I find it easier

24  for the jury to follow and for me to follow if you actually

25  have the reader of the answers in the witness stand.

DEPOSITION OF TAREN CASSIDY                    1626

1          MS. CHIANG:  We would propose to have them come you

2     up.  Thank you.

3          THE COURT:  Okay, please proceed.

4          MS. BOY-SKIPSEY:  Good morning, Members of the Jury.

5     We will start by reading the questions and answers of the

6     petitioner, Taren Cassidy, held on November 12th, 2018.

7          We'll start at page 39, lines 10 to 21.

8          (Reading of Deposition of TAREN CASSIDY, questions

9     read by Ms. Boy-Skipsey; answers read by Ms. Isaacs.)

10    BY MS. BOY-SKIPSEY:

11    Q    Do you know somebody by the name of Brittany Reyes?

12    A    I do.

13    Q    How long have you known Brittany Reyes?

14    A    Over ten years.

15    Q    Over ten years?

16    A    Uh-huh.

17    Q    What's your relationship like with Brittany Reyes?

18    A    We have fun when we hang out together.  But it doesn't

19    happen too often because she's a lot to handle.

20         MS. BOY-SKIPSEY:  Moving on to page 43, lines 2

21    through 7.

22    Q    When you and Miss Reyes were at Mr. Rubin's apartment in

23    New York, how did that come to be, if you recall?

24    A    I invited her.

25         MS. BOY-SKIPSEY:  Lines 44 -- excuse me, page 44,

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    lines 15 to 17 -- to page 45, line 17.

2    Q    Did you tell Miss Reyes that she would be paid money to

3    come hang out with you and Mr. Rubin?

4    A    It's possible.

5             MS. BOY-SKIPSEY:  Page 65, line 5 --

6             MS. ISAACS:  Oh sorry, go back to -- 44-15 to 45-17.

7             MS. BOY-SKIPSEY:  We just read 44, lines 15 to 17.

8             MS. ISAACS:  45-15.

9             MS. BOY-SKIPSEY:  Oh, excuse me.

10            THE COURT:  Start from that portion again, please?

11            MS. BOY-SKIPSEY:  I'm sorry, Your Honor?

12            THE COURT:  I said, read the question that you had

13   and the part you omitted.

14   BY MS. BOY-SKIPSEY:

15   Q    Did you tell Miss Reyes that she would be paid money to

16   come hang out with you and Mr. Rubin?

17   A    It's possible.

18   Q    It's possible?

19   A    Yes.

20   Q    Okay, and --

21   A    I believe actually, yes.

22   Q    Okay.  And Miss Reyes did ultimately come and hang out

23   with you and Mr. Rubin?

24   A    Yes.

25   Q    Did you invite Miss Reyes to come meet with Mr. Rubin to

DEPOSITION OF TAREN CASSIDY                    1628

1    have a BDSM encounter of some sort?

2    A    Yes.

3    Q    Were you aware of that when you invited her to come?

4    A    Yes.

5    Q    Did you tell her that?

6    A    I wouldn't have invited her to come without telling her.

7    Although looking over my messages, I saw that I was vague.  So

8    I must have had previous conversations with her about him.

9    Q    By previous conversations, do you mean on the phone or in

10   person and not via WhatsApp?

11   A    Yeah, you had asked me earlier if I had ever told

12   anybody, anyone about my relationship with Howie.  This would

13   be one of those examples.  She was one of the people -- one of

14   the few people that I spoke about that stuff with.

15         MS. ISAACS:  Page 65, line 5 to page 66, line 9.

16   Q    Did you ever tell Brittany before she came to Mr. Rubin's

17   apartment there was a chance she could be injured?

18   A    In those words?

19   Q    Or in your words.

20   A    I -- I don't know.

21   Q    Did you think that there was a chance that Miss Reyes

22   could be injured?

23   A    Like -- injured, like can you elaborate?

24   Q    Like physically injured, whether it would be a cut, a

25   bruise, a broken bone, something else.

DEPOSITION OF TAREN CASSIDY                    1629

1    A    Well, she knew that she was going to be physically hit,

2    or she knew that she was going to be possibly like I -- I

3    don't know.

4    Q    Why do you say she knew she was going to be physically

5    hit?

6    A    Well, because I told her about Howie and the dungeon.

7    Q    And you told her, not over WhatsApp, you told her some

8    other way, I believe, is what your testified to before; is

9    that correct?

10   A    In my messages to her in here, the sentence where I tell

11   her, the guy with the dungeon, that's me talking to

12   somebody -- someone I had already --

13             (Court reporter interrupts for clarification.)

14   A    -- with someone I've already had a conversation with

15   about this.  But I can't recall what it was that we spoke

16   about.  But the way that I'm saying that to her, we must have

17   had conversations about it in the past.

18   Q    But you just can't remember the time?

19   A    I can't, no.

20             MS. BOY-SKIPSEY:  Page 73, line 22 to page 74,

21   line 23.

22   Q    When you introduced Brittany Reyes to Mr. Rubin, did you

23   tell her a -- an amount of money that she could expect to be

24   paid when she met Mr. Rubin?

25   A    I would say that it's probably more than likely I did.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

DEPOSITION OF TAREN CASSIDY                    1630

1    Q    And what do you recall that number being?

2    A    5,000.

3    Q    And let me see if I understand this correctly.  You did

4    introduce her to other men in the past so she would be able to

5    have sexual -- paid sexual encounters with those men.

6              Well, did you -- did you testify to that?

7    A    I believe that I have, but I don't know for certain.

8    Q    Do you know whether she had ever been paid for sexual --

9    A    Yes.

10   Q    Do you know whether she's ever been paid by other men in

11   return for giving -- or in return for having sexual relations

12   with them?

13   A    Yes.

14   Q    And how do you know that?

15   A    Conversations and maybe even personal history with her,

16   but that -- I'm not a hundred percent about that.

17             MS. BOY-SKIPSEY:  Page 75, line 7 to page 76,

18   line 19.

19   Q    Now turning to the exhibit that you have in front of you

20   on page 578, the last three digits of 578.

21   A    Okay.

22   Q    And this is at the top on the third line.  And you say,

23   This is the guy that has the dungeon.

24             You are speaking to -- excuse me, you were texting

25   with Miss Reyes about Mr. Rubin when you said that, right?

DEPOSITION OF TAREN CASSIDY                    1631

1   A     I was, correct.

2   Q     And you said that that indicated to you that you had

3   spoken to her about Mr. Rubin in the past?

4   A     Again, reading this again, I feel exact same thing that I

5   did when I read it prior.  That we had past conversations

6   about this.  This is the way I said I was speaking.

7   Q     And does the use of the word dungeon suggest to you that

8   you had previously talked to her about having rough sex with

9   Mr. Rubin?

10  A     Absolutely, yes.  That's exactly what this sentence means

11  to me reading what I said.

12          This is the guy that has the dungeon.  That means

13  that reading that, like her and I had spoke about him in the

14  past.

15  Q     Okay.  And what did you say?  What do you recall that you

16  said to her in the past about Mr. Rubin?

17  A     I don't recall what -- what it would have been.  But we

18  had definitely spoken about him in the past.

19  Q     Well, was it about the fact that you had rough sex with

20  Mr. Rubin?

21  A     That, along other things, I would imagine.  I'm not sure.

22  I'm not certain.

23  Q     Okay.  What did you -- did she know that you had BDSM

24  relations --

25  A     Yes.

DEPOSITION OF TAREN CASSIDY                1632

1    Q      -- with Mr. Rubin?

2    A      Yes, she did.

3             MS. BOY-SKIPSEY:  Page 80, line 10 to page 81,

4    line 6.

5    Q    When you invited Miss Reyes to come to meet Mr. Rubin in

6    New York, did you do anything to trick here to get her to come

7    to New York?

8    A    She lived in New York.

9    Q    Well, did you do anything to trick her to get her to meet

10   Mr. Rubin?

11   A    That certainly was not my intention.  If she felt that

12   way, it was not done intentionally.

13            But, no, not that I believe so.  I don't believe I

14   would do anything to trick her.  She was a friend that I knew

15   for ten, ten years.  So if I was doing something, it's just

16   that -- that doesn't make sense to me, no.

17   Q    Well, did you feel that you were being entirely upfront

18   with her?

19   A    Yes.

20   Q    About what she could expect when she met with Mr. Rubin?

21   A    Yes.

22   Q    Did you do anything to coerce her to come to New York to

23   meet Mr. Rubin?

24   A    No.

25            MS. BOY-SKIPSEY:  Page 84, line 1 to line 3.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

DEPOSITION OF STEPHANIE SHON                1633

1    Q    Do you recall her ever complaining to you about Mr. Rubin

2    causing any tearing of her vagina?

3    A    No.

4         MS. BOY-SKIPSEY:  That concludes the questions and

5    answers for Ms. Cassidy's deposition transcript.

6         We'll be moving on to Stephanie Shon's deposition,

7    which was held on October 10, 2018.

8         We will begin on page 6, line 14 to 23.

9         (Reading of Deposition of STEPHANIE SHON, questions

10   read by Ms. Boy-Skipsey; answers read by Ms. Isaacs.)

11   BY MS. BOY-SKIPSEY:

12   Q    What is your highest level of education?

13   A    College undergrad.

14   Q    Undergrad.

15        What college was that?

16   A    University of Louisville, Kentucky.

17   Q    What did you study there?

18   A    Prelaw.

19   Q    What year did you graduate?

20   A    Tenth.

21        MS. BOY-SKIPSEY:  Page 14, line 23 to page 15,

22   line 3.

23   Q    Do you know a man named Howard Rubin?

24   A    I do, yes.

25   Q    How did you meet Howard Rubin?

DEPOSITION OF STEPHANIE SHON                1634

1    A    Through a mutual friend.

2              MS. BOY-SKIPSEY:  Page 15, line 22 to page 16,

3    line 11.

4    Q    How did she introduce you to Mr. Rubin?

5    A    I went to high school with her and she knew Howie through

6    a friend of hers that had dated Howie for a long period of

7    time.  And I was already in New York with a friend and I had

8    heard a conversation about Howie.  His name mentioned, I

9    wanted to meet him.  I expressed interest in meeting him.

10             MS. BOY-SKIPSEY:  And I do believe we skipped some

11   lines, so I'm going to go back to page 15, line 2 to 3.

12   Q    How did you meet Howard Rubin?

13             MS. ISAACS:  I'm sorry, can you repeat that page?

14             MS. BOY-SKIPSEY:  Page 15, lines 2 to 3.

15             MS. ISAACS:  Oh.

16   A    Through a mutual friend.

17             MS. BOY-SKIPSEY:  We'll continue with page 15,

18   line 22.

19   Q    How did she introduce you to Mr. Rubin?

20   A    I went to high school with her and she knew Howie through

21   a friend of hers that had dated Howie for a long period of

22   time.  And I was already in New York with a friend.  And I had

23   heard conversations about Howie, his name mentioned, and I

24   wanted to meet him.  I expressed interest in meeting him.

25   Q    About what year was that, if you recall?

DEPOSITION OF STEPHANIE SHON                    1635

1   A     Around April of 2015.

2              MS. BOY-SKIPSEY:  Page 15, line 22 to page -- excuse

3   me, that was already said.

4              Page 28, line 8 to 15.

5   Q    You said you had reached out to Mia.  How did you reach

6   out Mia?

7   A     Initially I sent a blast, a mass message, to a bunch of

8   girls, a bunch of models, promotional models, Playmates, for

9   an event that was coming up I was hosting --

10             (Court reporter interrupts for clarification.)

11             THE COURT:  You have to slow down.

12  A     -- that was coming up that I was hosting, cohosting or

13  working on, and she was one of the ones that responded.

14             MS. BOY-SKIPSEY:  Page 32, line 23 to page 34,

15  line 2.

16  Q    Do you remember what Ms. Lytell said to you when she

17  called you back or messaged you back?

18  A     I remember what we spoke about, yes.

19  Q     What was that?

20  A     I had seen her on Instagram that she had posted a picture

21  about BDSM, which is in this, in one of these, and I saw that

22  she, through submission, even talking about being bad to the

23  bone and kind of looked like she is into BDSM, so I asked her

24  and she said, yes.

25  Q     So when we said that, what was your response?

DEPOSITION OF STEPHANIE SHON                    1636

1   A    Have you ever been in a BDSM relationship before?

2   Q    How did the rest of that conversation go?

3   A    She said, yes.

4        I had mentioned my friend Howie and thought that

5   maybe she would like him and that, you know, she was

6   interested in meeting him.

7        She was super excited, and that conversation moved

8   into her conferencing email Nicole, and all three of us were

9   on a call talking about BDSM, Howie and them wanting to meet

10  him.

11       MS. BOY-SKIPSEY:  Page 34, line 13 to 24.

12  Q    The only way that Amy became involved, according to you,

13  is Mia brought her into this?

14  A    Yes.

15  Q    That was a call, that wasn't text messages or Instagram

16  messages or anything else?

17  A    No, not initially.  Later I think I started a group

18  message with all of us.

19  Q    By all of us, who do you mean?

20  A    All of us being Mia -- me, Mia, Amy and Howie.

21       MS. BOY-SKIPSEY:  Page 43, lines 3 to 5.

22  Q    Have you ever talked with Ms. Powers about your

23  experience with Mr. Rubin?

24  A    Yes.

25       MS. BOY-SKIPSEY:  Page 43, lines 9 to 11.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

DEPOSITION OF STEPHANIE SHON                    1637

1    Q    Did you discuss that it was a BDSM-type of relationship

2    with Ms. Powers?

3    A    Yes, she knew.

4         MS. BOY-SKIPSEY:  Page 50, lines 22 to page 51,

5    line 10.

6    Q    I believe earlier you testified that you introduced

7    Miss Lytell and Miss Moore to Mr. Rubin; is that correct?

8    A    Indirectly, yes.

9    Q    By indirectly, what do you mean?

10   A    I never physically introduced them to each other.

11   Q    I believe you testified that you started WhatsApp group

12   chat with everyone?

13   A    Yes.

14   Q    By introduce, did you put them in touch with one another?

15   A    Yes.

16        MS. BOY-SKIPSEY:  Page 52, line 3 to page 52,

17   line 9.

18   Q    Do you know someone by the name Emma Hopper?

19   A    Yes.

20   Q    Did you introduce Mr. Rubin to Miss Hopper?

21   A    Indirectly, yes.  Courtney introduced me to Emma, so,

22   yes.

23        MS. BOY-SKIPSEY:  Page 55, line 21 to page 56,

24   line 4.

25   Q    To your knowledge, did Miss Hopper go and meet with

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    Mr. Rubin?

2    A    Yes.

3    Q    Were you there at that first meeting, or was it to your

4    knowledge just Miss Hopper and Mr. Rubin?

5    A    I met Emma when she flew in for the first time, yes.

6            MS. BOY-SKIPSEY:  Page 64, line 15 to 65, line 10.

7    Q    So earlier I believe you testified regarding Miss Lytell

8    and Miss Moore.  You reach out to them about the MS Hope for a

9    Cure Charity Poker Event.

10   A    Yes.

11   Q    And, unfortunately, neither of them could make it to that

12   event.

13   A    Yes.  It was last minute.

14   Q    But they messaged you later after it had finished?

15   A    Yes.

16   Q    And that is when you kind of fell into discussing with

17   them either other opportunities or coming to meet Mr. Rubin;

18   is that correct?

19   A    Yes.

20   Q    I also believe that you said that you looked at

21   Miss Lytell's Instagram and felt how she would potentially be

22   someone to introduce to Mr. Rubin; is that correct?

23   A    Yes.

24           MS. BOY-SKIPSEY:  Page 90, line 15 to page 91,

25   line 5.

DEPOSITION OF STEPHANIE SHON                    1639

1  Q    Did she ever tell you any specifics about BDSM in

2  particular and what she had done before?

3  A    Yes.

4  Q    What did she tell you.

5  A    She said she had done bondage, been whipped, tied up,

6  things of that nature.

7  Q    Did you have discussions about that, or was that really

8  just she told you and you just took it for what she said.

9  A    She told me it, and when she flew in, we talk about it,

10 and I shared some of the experience that I had with Mr. Rubin

11 with her, and she was excited and couldn't wait to meet him.

12         MS. BOY-SKIPSEY:   Page 92, line 3 to line 10.

13 Q    I believe you testified that you had a conversation with

14 Miss Hopper about what to expect with Mr. Rubin; is that

15 correct?

16 A    Yes.

17 Q    Was that a in-person conversation, or was that phone

18 conversation, or something else?

19 A    Both.

20         MS. BOY-SKIPSEY:   Page 100, line 15 to page 101,

21 line 16.

22 Q    When you spoke with Miss Lytell and Miss Moore, I believe

23 you said it was a conference call?

24 A    Yes, Mia called me and she conferenced Amy in on that

25 call.

DEPOSITION OF STEPHANIE SHON                    1640

1    Q    Were you aware that Amy was going to be on the call when

2    she called?

3    A    Not at that time, but later I learned.

4    Q    So you learned that this happened?

5    A    Kind of, yes.

6             THE COURT:  Let me interrupt you for a minute.

7             One of you has your computer on, and the lawyers,

8    just the lawyers and the witness, can all see your Outlook

9    inbox.

10            Okay, go ahead.

11            If you want to run the transcript, fine, you were

12   doing that before, but that's not what we were seeing a moment

13   ago.

14            THE COURTROOM DEPUTY:  It's undenied, counsel.  It's

15   undenied.  Hold on.

16            (Pause in the proceedings.)

17            THE COURTROOM DEPUTY:  Do you want to show the

18   transcript to the Judge?

19            Okay, go again.

20            THE COURT:  Well, the question is:  Do you want to

21   show the transcript to the court reporter to make it easier.

22            The answer is no, and I'm sure she'll do a fine job

23   without it, you were showing it before.

24            MR. GROVER:  Your Honor, certainly, yes, we would

25   like the court reporter to take it down properly.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

DEPOSITION OF STEPHANIE SHON                    1641

1    THE COURT:  Okay, the court reporter just uses it as

2    an aide, obviously, and writes down what the witness is

3    saying, not what's shown on her screen.  But the screen does

4    help.

5         So if you can restore that, please go ahead.

6         MS. BOY-SKIPSEY:  One hundred -- page 100, line 15

7    to page 101, line 16.

8         I will continue on page 101, line 2.

9    Q    Did you tell Miss Lytell and Miss Moore to do anything

10   before they met with Mr. Rubin?

11   A    Do anything?

12   Q    To purchase anything or to prepare themselves in any way.

13   A    No, they asked me questions about what they should bring.

14   They were excited, sent me pictures of themselves.

15        Mia actually -- I actually had to stop sending

16   pictures because she continued to send me a flood of messages,

17   but I think it says so in this thing.

18        But they were excited, couldn't wait to come, and

19   wanted to know what they should bring.

20        MS. BOY-SKIPSEY:  Page 107, line 18 to 25.

21   Q    Miss Hopper, about how many times have you met with her

22   in New York, if you know?

23   A    Once or twice.

24   Q    The first time I believe you said you met with her in the

25   condo.  And that was, to your knowledge, prior to her first

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1   meeting with Mr. Rubin; is that correct?

2   A    To my knowledge.

3           MS. BOY-SKIPSEY:   Page 117, line 21 to page 118,

4   line 3.

5   Q    Did Miss Hopper ever discuss her encounters with

6   Mr. Rubin with you?

7   A    Yes.  Yes.

8   Q    What did she tell you?

9   A    One particular occasion she told me that he was upset

10  with her because she came to see him and she was on her

11  menstrual cycle.

12          MS. BOY-SKIPSEY:   Page 118, line 11 to line 16.

13  Q    Did she ever tell you anything else about any of her

14  interactions with Mr. Rubin?

15  A    She had fun.  She sent me pictures of her tied up.  It

16  was great and she loved him, and couldn't wait to see him

17  again.

18          MS. BOY-SKIPSEY:   Page 119, line 2 to line 9.

19  Q    Did she ever tell you about any injuries she sustained

20  while with Mr. Rubin?

21  A    No, I'm unaware that she had any injuries besides mental.

22  Q    Had she ever mentioned any emotional injuries that she

23  had had from dealing with Mr. Rubin?

24  A    No.

25          MS. BOY-SKIPSEY:   Page 120, line 6 to page 121,

DEPOSITION OF STEPHANIE SHON                    1643

1    line 4.

2    Q    Did either Miss Lytell or Miss Moore have any

3    reservations about meeting Mr. Rubin?

4    A    Reservations in terms of what?  What do you mean by

5    reservations?

6    Q    Were they nervous about meeting Mr. Rubin?

7    A    I would be unaware if they were nervous or not.  They

8    told me they were excited and couldn't wait to meet him.

9    Q    They never said they were nervous about meeting him?

10   A    No.

11   Q    Did they have any concerns that they articulated with you

12   on this phone call?

13   A    Who is they?

14   Q    Miss Lytell and Miss Moore.

15   A    Did they have any concerns?

16   Q    Yes.

17   A    No.

18   Q    Did you discuss the conversation that you had with

19   Miss Lytell and Miss Moore with either Mr. Rubin or

20   Ms. Powers?

21   A    Yes, with Howie.

22        MS. BOY-SKIPSEY:  Page 131, line 5 to line 16.

23   Q    Did you ever tell Miss Mia Lytell that Mr. Rubin was

24   interested in having girls come to New York for photo shoots?

25   A    No.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1  Q    Did you ever tell Miss Amy Moore that Mr. Rubin was

2  interested in having girls come to New York for photo shoots?

3  A    No.

4  Q    Did you ever tell Miss Emma Hopper that Mr. Rubin was

5  interested in having girls come to New York for photo shoots?

6  A    No.

7        MS. BOY-SKIPSEY:  Page 132, line 6 to page 135,

8  line 12.

9  Q    Do you recall, Miss Shon, that you testified that you set

10  up a group chat with Miss Lytell, Miss Moore, Mr. Rubin and

11  yourself?

12  A    Yes, I do.

13  Q    Can you take a look at this and tell me does that appear

14  to be a group chat that you referred to?

15  A    Yes.

16        And the only thing that I would note is these emojis

17  aren't the right -- like some of the emojis there are not

18  there.  They are not what they were.

19  Q    In other words, when they print, they are not the same

20  thing as they were on the screen?

21  A    They are not the same thing.  They threw some other

22  things in here but, yes.

23  Q    Apart from this, does that appear to you to be the chat

24  that you set up with Miss Lytell, Miss Moore and Mr. Rubin and

25  yourself?

1  A     Yes, it does.

2  Q     Is this the chat that was at about the time that you

3  first spoke with them, that is, Miss Lytell and Miss Moore,

4  and told them what they would expect from Mr. Rubin?

5  A     Yes.

6  Q     And turning to the last page of this.

7  A     The back?

8  Q     The back, yes.

9          For the record, it is Lawson 834-004.

10 A     Yes.

11 Q     Do you see that it says on -- there is a line for

12 August 23rd, 2016, it says, Stephanie NYC.  And it says,

13 quotation, glad you guys had fun, end quotation?

14 A     Yes.

15 Q     Is that you saying to Miss Moore and Miss Lytell that you

16 were glad they had fun in their meeting with Mr. Rubin?

17 A     Can you repeat the question?

18 Q     Is that you telling them that you were glad that

19 Miss Moore and Miss Lytell had fun in their meeting with

20 Mr. Rubin.

21 A     Yes.  They had intonated that they had this great time,

22 couldn't wait to come back.  And there was -- his is not here,

23 but I obviously independent messages with Mia and Mia that are

24 not party to this group message thing.  They had a blast,

25 couldn't wait to come back, things like that.

DEPOSITION OF STEPHANIE SHON                    1646

1    Q    Did Miss Lytell ever voice to you -- ever voice to you

2    any problems or concerns or surprises about anything that

3    happened in her encounters with Mr. Rubin?

4    A    No.  Only on one particular occasion.  I don't know what

5    the situation was, but I think Howie had left her, and Katrina

6    was begging him to come back and asked me if I could call

7    Howie.  But I had no idea what was going on.

8    Q    So who was begging you to call Howie?

9    A    Mia.

10   Q    What was she asking you to do?

11   A    To convince Howie to come back so they could spend time

12   together.

13   Q    To ask Howie to coming back to her?

14   A    Yes.

15   Q    So Miss Lytell and Miss Rico?

16   A    Yes.

17   Q    Any other time that she ever complained in any way,

18   shape, or form about her encounter with Mr. Rubin?

19   A    Never complained once.

20   Q    Were there any instances in which Miss Moore complained

21   to you ever about any of her encounters with Mr. Rubin?

22   A    Never explained, but nothing but nice things about him.

23        MS. BOY-SKIPSEY:  Page 135, line 25 to page 136,

24   line 10.

25   Q    The same question for Miss Hopper.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    1647

1          Other than the instances that you told us about

2    where there was some disappointment in connection with her

3    menstrual cycle and the timing of that and her visit with

4    Mr. Rubin, did she ever complain about any treatment that she

5    received by Mr. Rubin or surprises or disappointment or

6    anything related to him?

7    A    No, always said she had a blast, best time ever.

8          MS. BOY-SKIPSEY:   Page 136, line 20 to page 137,

9    line 2.

10   Q    You mentioned there were one one-on-one text messages

11   that you had with Miss Lytell that are not in here.

12   A    Yes.

13   Q    Would those have been taking place around the same dates?

14   A    Yes.

15         MS. BOY-SKIPSEY:   Page 137, line 19 to page 138,

16   line 2.

17   Q    What about Miss Hopper, you would have had one-on-one

18   text messages with her as well?

19   A    Unfortunately, too many that I'm proud up.

20   Q    For all of these, do you recall if this was all WhatsApp?

21   A    Yes.

22         MS. BOY-SKIPSEY:   That concludes the questions and

23   answers of Stephanie Shon's deposition.

24         THE COURT:   Okay.   Next?

25         MS. CHIANG:   We would request some time to organize

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                              1648

1    our deposition destinations, per your Judge's ruling, so then

2    we can have Ms. Powers' exam.

3                THE COURT:  You're calling Ms. Powers as part of

4    Mr. Rubin's case?

5                MS. CHIANG:  No.

6                MR. GROVER:  Your Honor, if we may take Ms. Powers'

7    testimony out of order.

8                THE COURT:  Okay.  So we're going to take a break

9    from Defendant Rubin's case for a short time, right?  Short

10   time.

11               And we'll start -- usually the defendant would rest,

12   Mr. Rubin would rest, but he's keeping his case opened so can

13   he get organized.

14               And in the meantime, Ms. Powers will start her case.

15               And you may call your first witness for Ms. Powers.

16               MS. CHIANG:  Thank you, Your Honor.

17               MR. GROVER:  Your Honor, may I have the microphone,

18   please?

19               Your Honor, at this time, I'd like to call my

20   client, Jennifer Powers.

21               THE COURT:  All right.

22               (Continued on next page.)

23

24

25

1          (Witness takes the witness stand.)

2     **JENNIFER POWERS**, called as a witness, having been first duly

3     sworn/affirmed, was examined and testified as follows:

4               THE WITNESS:  Yes, sir.

5               THE COURTROOM DEPUTY:  Speak into the microphone.

6               THE WITNESS:  Thank you.

7               THE COURT:  All right, you may inquire.

8               MR. GROVER:  Thank you, Your Honor.

9     DIRECT EXAMINATION

10    BY MR. GROVER:

11    Q    Good morning, Ms. Powers.

12    A    Good morning.

13    Q    You sat her for several days listening to testimony;

14    haven't you?

15    A    Yes, sir, I have.

16    Q    And while we're on the subject, you sat through all the

17    depositions in this case?

18    A    Yes, sir.

19    Q    Did you miss any of the depositions?

20    A    I believe there was one out of town that I didn't attend.

21    Q    And can you tell the jury why you sat through the

22    depositions in this case?

23    A    I mean, I felt that it was my right to hear the crazy

24    allegations that were being forced upon me.  I had a right to

25    hear why I was being sued.

POWERS - DIRECT - GROVER                          1650

1    Q    Now let me start by asking you:

2              Were you ever present in the apartment at

3    157th Street when any of the plaintiffs and Mr. Rubin were

4    meeting for sexual activity?

5    A    No.

6    Q    Did you believe that these encounters were consensual?

7    A    Yes, I did.

8    Q    What was the basis for you belief?

9    A    Well, no one complained in the text messages that they

10   ever sent me.  All the girls came back that I had met.

11             A couple of the girls wrote love letters.  And many

12   of the girls recruited their friends to come and see Howie

13   after they left.

14             So I had no reason to believe, other than my own

15   text messages that I just stated, that they had -- had done

16   anything nonconsensual.

17   Q    And were you aware that these ladies were coming to New

18   York to meet with Mr. Rubin to engage in BDSM sexual activity?

19   A    Yes.

20   Q    Now, did any of the plaintiffs ever say anything to you,

21   or write anything to you, about anything that happened to them

22   without their consent?

23   A    No.

24   Q    Did Mr. Rubin ever say anything to you, or write anything

25   to you, about his interactions with the plaintiffs that would

POWERS - DIRECT - GROVER                    1651

1   have been without their consent?

2   A    No.

3   Q    Did Mr. Rubin ever tell you that he intended to do

4   anything to the plaintiffs without asking their permission?

5   A    Absolutely not.

6   Q    And we just heard some testimony from Stephanie Shon.

7        Do you know Stephanie Shon?

8   A    Yes, sir, I do.

9   Q    And do you know Taren Cassidy?

10  A    Yes, I do.

11  Q    And you heard their testimony that was written in the

12  record that related to several individuals that came to New

13  York to meet Mr. Rubin?

14  A    Yes.

15  Q    At any time did you personally recruit anyone to come and

16  meet with Mr. Rubin to engage in BDSM sexual activity?

17  A    Absolutely not.

18  Q    Now, did you say anything false to any of these

19  plaintiffs in this case about what Mr. Rubin was interested in

20  engaging in?

21  A    No.

22  Q    And prior to your conversations, whether they be text or

23  in person with any of the plaintiffs, did you have any

24  understanding in advance whether they had already made their

25  decision to come to New York and meet Mr. Rubin?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS – DIRECT – GROVER                    1652

1   A    It had always been decided in advance.  The decision had

2   already been made that they were coming, because Howie would

3   reach out to me and ask for me to book them a flight.

4           So I introduced myself as such on the messages to

5   them.

6   Q    Okay.  Now, Ms. Powers, where are you from?

7   A    I'm from Dallas, Texas.

8   Q    What is your education?

9   A    I have a bachelor's of science in elementary education.

10  Q    And is that how you work, as a teacher?

11  A    Yes.

12  Q    For how many years?

13  A    For six years I was a kindergarten teacher.

14  Q    And where do you live today?

15  A    I live back in Dallas.

16  Q    Now you said back in Dallas.

17          Are you married?

18  A    Yes, sir, I am.

19  Q    Do you have any children?

20  A    I have three small boys.

21  Q    Can you tell us their ages?

22  A    They are seven, five, and one.

23  Q    And did there come a time that you lived in New York

24  City?

25  A    Yes, there was.

1    Q    And what years were you living there?

2    A    Um, I moved to New York in 2007, and I moved out of New

3    York in 2020.

4    Q    Now can you tell us, you know Howard Rubin?

5    A    Yes.

6    Q    And I think that Mr. Rubin testified yesterday that you

7    two were close friends?

8    A    Yes.

9    Q    How did you meet Mr. Rubin?

10   A    I was working in the hospitality industry, and Howie was

11   a client at one of the nightclubs that I worked at.

12   Q    And as a result of that, you and Mr. Rubin became --

13   become romantically involved?

14   A    Eventually, yes.

15   Q    Now did there come a time when you started working as

16   Mr. Rubin's assistant?

17   A    Yes, sir, there was.

18   Q    And in your capacity as Mr. Rubin's assistant, did you

19   arrange for the flights of a number of the plaintiffs in this

20   case?

21   A    Yes, I did.

22   Q    I would like to go through those one by one, if I may,

23   starting with Natasha Tagai.  Did you arrange flights for --

24   withdrawn.

25            Did you arrange flights for Natasha Tagai?

1   A    Not to come and visit Howie, no.

2   Q    And was there ever an occasion in which you booked a

3   flight for Natasha Tagai?

4   A    Yes, there was.

5   Q    Tell us what that occasion was?

6   A    Howie was having a birthday party and --

7   Q    What year are you referring to?

8   A    This is 2015, I believe.

9   Q    Okay.

10  A    And I had booked a flight for Natasha to come and visit,

11  or to come and to attend that birthday party, and she never

12  took the flight.

13  Q    So apart from that, you never purchased a ticket for

14  Natasha Tagai?

15  A    No.  Never.

16  Q    Now we've seen a series of text messages between you and

17  Natasha Tagai in this case; is that right?

18  A    Yes, sir, we have.

19  Q    And in those text messages, very often there's a copy of

20  a ticket for Natasha Tagai to fly from Chicago to New York and

21  to return; is that correct?

22  A    Yes, there was.

23  Q    Why were the tickets in the text messages?  What was

24  going on that you sent those?

25  A    So when Natasha sent me the screenshot of her tickets, it

POWERS – DIRECT – GROVER                          1655

1    was my job to book logistically when she was coming in, when

2    to have the condo ready and cleaned for her.

3                It was for logistical purposes that she would send

4    me her flight.  I knew when she was coming and going.

5    Q    Now I'd like to ask you about a woman named Brittany

6    Reyes.

7                Do you know Brittany Reyes?

8    A    I do not know Brittany Reyes.

9    Q    And do you recall when the first time was you met

10   Brittany Reyes?

11   A    At the deposition in this suit.

12   Q    Did you ever arrange for any flights for Brittany Reyes?

13   A    No, I did not.

14   Q    Amy Moore.

15               Have you ever met Amy Moore?

16   A    Yes.

17   Q    And did you arrange for any flights for Amy Moore?

18   A    Yes, I did.  I believe there was one.

19   Q    And when do you recall was that flight for Amy Moore?

20   A    It was in October of 2016.

21   Q    I'm going to ask you, you indicated you arranged for one

22   flight?

23   A    Yes, sir.

24   Q    And with respect to Ms. Moore, was this a flight that she

25   came to New York with Ms. -- that she came to New York to meet

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS – DIRECT – GROVER                    1656

1    with Ms. Lytell as well as Mr. Rubin?

2    A    Yes, she did.

3    Q    Okay.  And as I'm asking you these questions, does that

4    jar your memory in any way as to when that occurred?

5    A    They came in October -- in August of 2016.

6    Q    Well, I'll going to show you some text messages in a

7    while about Ms. Lytell and Ms. Moore.  My question to you is:

8         Was this the first visit that these two ladies had

9    came to New York to see Mr. Rubin?

10   A    Yes, it was.

11   Q    And we will return to that document in a while.

12        Again with Ms. Lytell, did you arrange for flights

13   for Ms. Lytell?

14   A    Yes, I did.

15   Q    And do you recall on how many occasions you would have

16   arranged for flights for Ms. Lytell?

17   A    I believe she had seen Howie three times.  And then also

18   I arranged for her flights after her court case.

19        Because after she was arrested, she -- she asked

20   Howie if he would book her flights so she could defend herself

21   in her criminal case.

22   Q    So would it be fair to say that you had arranged numerous

23   flights for Mia Lytell?

24   A    Yes, through that mid-summer of 2017.

25   Q    And finally Emma Hopper.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS - DIRECT - GROVER                    1657

 1              Do you know Emma Hopper?

 2    A      Yes.

 3    Q      Did you arrange flights for Emma Hopper?

 4    A      Yes, I did.

 5    Q      And I think we saw some plane reservations or tickets on

 6    the screen earlier in this case; is that correct?

 7    A      Yes.

 8    Q      Would it be fair to say that you made most of her flight

 9    arrangements?

10    A      I would say most over the span of two years.

11    Q      Now, when the plaintiffs were coming to New York, was it

12    your understanding that they were coming to have BDSM sex with

13    Mr. Rubin?

14    A      Yes.  And get paid for it.

15    Q      And did you ever tell the plaintiffs the purpose of their

16    trip was something else?

17    A      No.

18    Q      Did you ever suggest to anybody that it was for a photo

19    shoot?

20    A      No, never.

21    Q      Did you ever suggest to anyone that it was for dinner and

22    a movie?

23    A      No.

24    Q      Or to hang out?

25    A      No.  I never spoke to these women before they came.  It

POWERS – DIRECT – GROVER                        1658

1    was already decided that they were comping.  The meeting had

2    already been arranged.

3    Q    Now I'd like to ask you some specific questions about

4    Natasha Tagai.

5              Do you recall Natasha Tagai?

6    A    Yes, sir, I do.

7              MR. GROVER:  And I would like to have on the screen

8    Exhibit P, as in Peter, X117A.

9              THE COURTROOM DEPUTY:  In evidence, counsel?

10             MR. GROVER:  It is in evidence.  I'm sorry.

11             (Exhibit published.)

12   Q    Ms. Powers, you have a choice of using the screen, and we

13   left a book in front of you, if that's easier.

14   A    Yes.  Thank you.

15   Q    Tell me when you're ready to proceed.

16   A    I'm ready.

17   Q    Okay.  Well, first of all, do you recognize the document?

18   A    Yes, I do.

19   Q    And what do you recognize it as?

20   A    This is the confidentiality agreement and release.

21   Q    For a particular person?

22   A    For Natasha Tagai.

23   Q    And were you present on the day that this document was

24   signed by Natasha Tagai?

25   A    Sitting here, I don't have an independent recollection of

1    signing this with this woman, but I do notice that I asked her

2    to sign her initials on each paragraph.  And that –– that's my

3    practice of how I was able to follow along with these women as

4    they read the document.

5              So I do believe that I was with her the day that she

6    signed this.

7    Q    And that was in January of 2015?

8    A    Yes, sir.

9    Q    And that was her –– as far as you knew –– well, let me

10   withdraw.

11             You heard testimony that she had been visiting

12   Mr. Rubin for several years before January of 2015, correct?

13   A    Yes.

14   Q    Were you aware that Mr. Rubin had been seeing Natasha

15   Tagai before this?

16   A    I believe so.

17   Q    And was this first time you actually met her?

18   A    Yes.

19   Q    Now with this confidentiality agreement and release, as

20   it's entitled, related to a photo shoot?

21   A    No, it wasn't.

22   Q    And this is ––

23   A    Yes, sir.

24   Q    I'd like to move ahead that year to April of 2015.

25             Did there come a time that you were organizing a

1   birthday calendar for Mr. Rubin?

2   A    Yes, there was.

3   Q    And what did that mean, what was the birthday calendar

4   for Mr. Rubin supposed to mean or be?

5   A    Well, some of the girls were celebrating Howie's

6   birthday, and they thought it would be a cool idea to make a

7   calendar where some of the girls were featured in the calendar

8   to give as a gift for Howie.  And Natasha was eager and

9   excited to be one of the girls photographed for the calendar.

10  Q    And so Ms. Tagai agreed to engage in a photo shoot?

11  A    Yes.

12  Q    And were you present for Ms. Tagai's photo shoot?

13  A    No, I wasn't.

14  Q    And do you recall when precisely the photo took place?

15  A    I believe it was April 2015.

16       MR. GROVER:  And I'd like you to take a look at

17  document DXC7.

18       Just the witness, not for the distribution at this

19  time.

20       (Exhibit published to the witness.)

21       MR. GROVER:  Witness and counsel, that is, Your

22  Honor.

23  Q    And what do you recognize this document to be?

24  A    These are WhatsApp messages between the photographer and

25  I.

POWERS – DIRECT – GROVER                     1661

1   Q    In looking at that, could you tell us what month the

2   photo shoots were taking place?

3   A    They were April.

4   Q    And could you tell us, do you recall or are you able to

5   ascertain, after looking at DXC7, are you able to ascertain

6   what day Ms. Tagai's photo shoot took place, if you are?

7   A    Yes.

8           So Howie was supposed to see her at a certain time

9   on Tuesday.  And Natasha was set to depart on Wednesday, but

10  the photographer wasn't able to make that -- that shoot time

11  work.  So I remember Natasha extending her flight one more day

12  enabling her to shoot after she saw Howie for the calendar.

13  Q    So we're clear, Natasha was already in New York that day

14  for -- to see Mr. Rubin?

15  A    Yes, sir, she was.

16  Q    And had flown in and flown back in the manner in which

17  she normally flew in and flew back?

18  A    Yes.

19  Q    And you said she extended flight?

20  A    She did.  She told me that she had changed it.

21  Q    And so she planned on doing the photo shoot the day after

22  spending time with Mr. Rubin?

23  A    Yes.

24  Q    Now, I'd like to direct your attention to approximately

25  five months later, maybe six months later, September 30th,

POWERS – DIRECT – GROVER                                    1662

1    2015.

2              And Ms. Tagai had been seeing Mr. Rubin for years at

3    this point; is that right?

4    A    Yes.

5    Q    And do you recall hearing testimony from Ms. Tagai in

6    this courtroom that she sent you a text in which she wrote

7    that Mr. Rubin had hit her in the face and punched her after a

8    meeting on or about September 30th, 2015?

9    A    Yes, I heard that she said that.

10   Q    Did she ever say such a thing to you?

11   A    Absolutely not.

12   Q    Now I'd like you to take a look at Defendant's Exhibit

13   I4.

14              (Exhibit published.)

15              This has been received in evidence.

16              And before I direct you to a page, do you recognize

17   this as text messages between you and Natasha Tagai?

18   A    Yes, I do.

19   Q    And I would like to focus Ms. Palmore's attention and

20   your attention on pages 5 -- bottom of 5 and the top of 6.

21              And we see one of those plane tickets; is that

22   right?

23   A    Yes.

24   Q    And this is how Ms. Tagai could inform you, this is my

25   schedule, this is when I'm coming in and going out?

POWERS - DIRECT - GROVER                           1663

1    A    Yes, sir, that's how she did it.

2    Q    And without scrolling, if I said to you, this is a return

3    trip, if you look closely, this is New York to Chicago, the

4    previous photograph would have been the trip into New York?

5    A    Yes.

6         MR. BALESTRIERE:  Okay.  And if we can blow that up

7    so we get the date so we get everything clear.  The date of

8    travel is what I'm actually looking at.  Okay.

9         And looking at that, can you tell what day she

10   actually flew -- this is the return trip, excuse me.

11        Go to the previous photograph.  That's my mistake.

12        Great.  And then if we can put that and get the date

13   and time or date of travel, okay.

14   Q    Tell us, what day was she coming into New York?

15   A    Wednesday, September 30th.

16        MR. GROVER:  Okay.  So now, Ms. Palmore, if we can

17   scroll down to the bottom of page 5.

18   Q    This is the conversation between you and Ms. Tagai before

19   she had left Chicago?

20   A    Yes.

21        MR. GROVER:  And if we turn to the next page, and

22   stop right there and if we can blow that up.

23   Q    The next conversation you had with Ms. Tagai is on

24   October 1st, 2015, 12:52 in the afternoon; is that right?

25   A    Yes, sir.

1    Q    And that's -- well, and you're asking:  What's your

2    PayPal addy?  Do you see that?

3    A    Yes.

4

5                (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

POWERS - DIRECT - GROVER                    1665

1    DIRECT EXAMINATION (Continued)

2    BY MR. GROVER:

3    Q    And you've heard, I think, Ms. Tagai testify about that?

4    A    Yes.

5    Q    And when you say "addy," you mean address?

6    A    Yes, I do.

7    Q    And you're asking for PayPal because that's the manner in

8    which you made payment to the plaintiffs in this case?

9    A    Yes, I did.

10   Q    Now, were there any text messages that took place between

11   the previous message which was on September 29th and

12   October 1, 2015, between you and Ms. Tagai?

13   A    No, there weren't.

14   Q    And I'm going to ask you because it's been raised by

15   counsel:  Did you delete any text messages?

16   A    Absolutely not.

17   Q    And I'm specifically referring to between September 29th

18   and October 1st.  Did you delete anything from this e-mail

19   chain?

20   A    No, I never did.  Everything was produced in its

21   entirety.

22   Q    And I'm going to get to that in a few minutes.

23         Now, I'd like you to take a look at Defendant's

24   Exhibit T4-1, Page 3, bottom half.

25         It's Page 65, Ms. Palmore.

POWERS – DIRECT – GROVER                 1666

1          Oh, I'm sorry this is in evidence already so it can

2    go up on the screen.

3          So we're looking at the bottom of Page 3, and the

4    top of Page 4, but I'll start with September 30, 2015.

5          Do we have that up on the screen at 11:50 p.m.

6          Okay.  This is you talking to Mr.  Rubin?

7    A    Yes, it is.

8    Q    And you're asking him, How are you?  Are you okay?

9          You've asked him twice; is that correct?

10   A    Yes.

11   Q    And we're now in the wee hours of the morning and you're

12   talking to Mr. Rubin.  When I say talking, I meant on a

13   WhatsApp text message?

14   A    Yes.

15   Q    You're not chatting on a phone?

16   A    No.

17   Q    And Mr. Rubin says to you, Drunk, no sex as usual.

18         That doesn't need explanation does it?

19   A    No, it doesn't.

20   Q    And you wrote, Why?  And you wrote, Howie, and you wrote

21   where is Natasha; is that right?

22   A    Yes.

23   Q    And we just saw your text messages from September 29th to

24   October 1st.

25         You had no contact with Natasha; is that right?

POWERS - DIRECT - GROVER                    1667

1   A    No, I hadn't.

2   Q    So if we could scroll down the page to the next day at,

3   approximately, 12:47 p.m.

4          And you wrote:  So what happened last night with

5   Natasha?

6          Do you see that?

7   A    Yes, I do.

8   Q    And Mr. Rubin wrote to you, She was supposed to meet me

9   with blank for drinks and she fell asleep.

10         By the way, the blank, that's -- we lawyers did

11   that.  That was actually a word, a name, at some point?

12   A    Yes.

13   Q    And it wasn't Natasha?

14   A    It was two names, right.

15   Q    Okay.  She was supposed to meet me with blank for drinks

16   and she fell asleep.  I should just have blown blank off and

17   gone over there.

18         Do you see that?

19   A    Yes.

20   Q    And Mr. Rubin then said to you at  -- and we're talking

21   at 12:50 p.m.  in the afternoon, aren't we?

22   A    Yes, we are.

23   Q    And she says, excuse me, Mr. Rubin says, She didn't wake

24   up till around 10:00 p.m.

25         And his final line.  Then he says, I should have

1    just gone back to the condo.

2             Do you see that?

3    A    Yes.

4    Q    Now, he gives you an instruction, doesn't he?

5    A    He does.

6    Q    And the instruction is what, if you could look at

7    12:50 p.m.?

8    A    To send Natasha $2,500 via PayPal.

9    Q    And then within minutes, or within a minute, you ask him,

10   Drunk?  Meaning, you've questioned him as to whether he had

11   been drunk?

12   A    Yes.

13   Q    And his response was:  I was having fun with blank and

14   was there with her B friend.

15            Do you see that?

16   A    Yes.

17   Q    Now, based on these texts, what was your understanding

18   about whether or not Mr. Rubin  had engaged in a sexual

19   encounter with Ms. Tagai on the previous evening?

20   A    Well, it was my understanding from these messages that

21   there was no sexual encounter that happened because he said

22   that he blew her off to go with someone else.

23   Q    And based on these texts, did it even occur to you that

24   Mr. Rubin had done anything to Ms. Tagai that she would not

25   have consented to?

POWERS – DIRECT – GROVER                    1669

1    A    No.

2    Q    I'd like to move on.  This is October 1st that we're

3    looking at these texts; is that right?

4    A    Yes.

5    Q    Okay.  Now, as I understand it, and think you've --

6              As I understand it, and I think you've used the

7    words already, after someone was in the apartment you might

8    come to clean?

9    A    Yes.

10   Q    And did a time come that you returned to the apartment

11   after Ms. Tagai left on or about October 1st?

12   A    Yes.

13   Q    By the way, just so we're clear, she had a plane ticket

14   to return to Chicago -- I think we saw it on the screen

15   momentarily -- to return to Chicago on October 1st?

16   A    Yes, she did.

17   Q    And did a time come that you returned to that apartment?

18   A    Yes.

19   Q    All right.  And I'd like you to take a look at

20   Defendant's Exhibit L4 and it's in evidence.

21              Do you recognize Exhibit L4?

22   A    Yes, I do.

23   Q    What do you recognize it to be?

24   A    It's a love letter from Natasha to Howie.

25   Q    And do you recall what day you found this?

POWERS - DIRECT - GROVER                          1670

1   A    It was October 6th and it was right after the previous

2   encounter on the first of October.

3   Q    And did this letter come alone or was it left in the

4   apartment.

5        How did you discover this letter?

6   A    There was a package that I received with Howie's name on

7   it and I texted Howie and asked if I should open it and I did.

8   And inside, there was a pair of sunglasses that Natasha had

9   borrowed while she was there.  She oftentimes walked around

10  the city and liked to make a little vacation out of her stay

11  with Howie and this note was in it.

12  Q    And did you send a copy of this to Mr. Rubin?

13  A    Yes, I did.

14  Q    And did you take a photograph of this on that date,

15  October 6th?

16  A    Yes, I did.

17  Q    And I would like you to take a look at Defendant's

18  Exhibit K4.

19        Are you able to see that?

20  A    Yes, I can see it.

21        MR. GROVER:  Your Honor, I'll ask that this be

22  received in evidence.  I did that a little out of order.

23        MR. BALESTRIERE:  No objection.

24        THE COURT:  Received.

25        (Defendants' Exhibit K4, was received in evidence.)

POWERS – DIRECT – GROVER                    1671

1    Q    So we're looking at Exhibit K4.  My apologies

2    Mr. Jackson.

3              Do you recognize DK4?

4    A    Yes, I do.

5    Q    What is K4?

6    A    This is a photograph I had taken of my phone because when

7    I was trying to produce all of the evidence in this case, I

8    was having trouble uploading this photo, and so, I took a

9    photo of it to submit in evidence.

10   Q    And so, we're clear about the photo.  This is a

11   photograph of that letter which was marked as the previous

12   exhibit, L4?

13   A    Yes, sir.

14   Q    And when you took a photograph of the screen, it has the

15   date of October 6, 2015 on top?

16   A    Yes, sir, that's the date that I had found the photo.  I

17   had actually sent that screenshot to Howie.

18   Q    But you took this photo a long time later?

19   A    Yes.

20   Q    Okay.  And that's your phone behind it if you can make it

21   out?

22   A    Yes, it was.

23   Q    Okay.  And this was six days after Natasha Tagai flew out

24   of New York after she supposedly had texted you with messages

25   that no longer exist?

1   A    Correct.

2   Q    I'd like to direct your attention to June 12th and 13th

3   of 2017 and you've heard testimony about that from Natasha

4   Tagai?

5   A    Yes.

6   Q    When I asked you about dates and plaintiffs, were you

7   prepared to testify in this case?

8   A    Yes, sir.

9   Q    And did you prepare for your depositions in this case?

10  A    Yes, sir.

11  Q    And did you review documents and text messages?

12  A    I did.

13  Q    And you took it seriously?

14  A    I took it very seriously.

15  Q    Now, I'd like to draw your attention again to June 13th,

16  or 12th and 13th, and I'd like you again to take a look at

17  Defendant's Exhibit I4, very bottom of the Page 10, it's in

18  evidence.

19        Okay.  Do you recall seeing this photo here in the

20  courtroom?

21  A    Yes, I do.

22  Q    And, of course, you'd seen it before; is that right?

23  A    Yes.

24  Q    Who sent you that photo?

25  A    Natasha sent it to me.

POWERS - DIRECT - GROVER                    1673

1    Q    And that was at 3:05 p.m. or thereabouts?

2    A    Yes.

3    Q    And then, if we scroll forward to  the top of Page 11, if

4    you will, we see a text message at June 13, 2017, if we can

5    blow that up, at 8:32 in the morning.

6              Do you see that?

7    A    Yes, sir, I do.

8    Q    And you say to Natasha, Good morning.  Did you make it

9    out alive?

10   A    Yes.

11   Q    Did you think she had died?

12   A    No.  No.  This was just a way of making a joke.  Like did

13   you get out?  Did you make your flight?

14   Q    Now, do you recall that Ms. Tagai testified in this

15   courtroom, again, that she sent a text to you and that you

16   responded to her some time between these texts in which she

17   October 6, 2015 to you about Mr. Rubin?

18   A    Yes, I do.  She's lying.

19   Q    Did that text ever happen?

20   A    No, it didn't.

21   Q    And did you delete any text messages from this text chain

22   from that time period?

23   A    No, I did not.

24   Q    Now, I'd also like you to take a look at Defendant's

25   Exhibit T-4-1 and it's already in evidence.

POWERS – DIRECT – GROVER                    1674

1          And I'd like you to take a look at on June 13, 2017,

2    that would be page -- it's around Page 58 but I'm not sure.

3    June 13, 2017, at 11:18 p.m. okay?

4          Are you able to read that?

5    A    Yes.

6    Q    And it says, We should -- Mr. Rubin says to you, We

7    should send Natasha 1K to cover her flights.

8          Do you see that?

9    A    Yes, I do.

10   Q    Did that just one sentence send a message to you about

11   whether or not Mr. Rubin had had sex with Natasha Tagai who he

12   had been seeing for careers on that occasion?

13   A    Yes, it indicated to me that they had not had a sexual

14   encounter, for $1,000 only to be sent.

15   Q    Now, I notice that you indicate, or you say, with

16   question marks and in bold, What happened last night?  Excuse

17   me, I put it in bold so I would remember to say this.  So

18   there's no bold, there are question marks.

19         Do you remember that you said, What happened last

20   night.

21   A    Yes.

22   Q    Do you remember that?

23   A    Yes, I do.

24   Q    Well, did you find out what happened last night?

25   A    Yes.

POWERS – DIRECT – GROVER                    1675

1    Q    What was the source of your information for finding out

2    what happened the previous evening?

3    A    I had found out from Loredana and also from Howie.

4    Q    Specifically, I would like to direct your attention to

5    June 13 , 2017, at 11:22 a.m. and I think we have to scroll

6    more.

7                And at the top of the page and Mr. Rubin –– now, I

8    think we're not where I intended to be.  Okay.  Let me just go

9    back a step.

10                At 11:17 a .m., you said, What happened last night?

11   Do you see that?

12   A    Yes.

13   Q    And let's go to the next at 11:22 a.m., excuse me, 11:

14   22 a.m. and Mr. Rubin says to you, We went upstairs after RTR

15   and I think we all know now RTR is the Russian Tea Room?

16   A    Yes, it is.

17   Q    That's across the street or in the vicinity of the 57th

18   Street condo?

19   A    It's next door to the condo.

20   Q    And he wrote, Natasha was passed out in the bedroom.

21                Do you see that?

22   A    Yes.

23   Q    And he opened –– he said, Opened some wine.  Then LD was,

24   like, pushing for a threesome or twosome or onesome.  It was

25   weird.  Anyway, I wasn't interested and went home, which was

POWERS – DIRECT – GROVER                    1676

1    good.

2              Do you see that?

3    A    Yes, I do.

4    Q    What was your understanding of what had happened in the

5    previous 24 hours with Mr. Rubin with Natasha and with

6    Loredana?

7    A    Well, from my understanding here, it says here in the

8    messages that Natasha was passed out in the room, in the

9    bedroom, and they didn't have sex.

10   Q    And did a time come that you had an opportunity to also

11   talk to Loredana Ferriollo?

12   A    Yes.

13   Q    And we've heard that name, haven't we?

14   A    Yes, we have.

15   Q    Who is Loredana  Ferriollo?

16   A    Loredana was a friend of Howie's.

17   Q    And I would like you to take a look at Plaintiff's

18   Exhibit 126 already in evidence and I'm focusing on June 13,

19   2017, at 10:18 in the morning.

20              And if we could blow that up about a half a dozen

21   lines.

22              Okay.  I would like to go to  10:18, which is a

23   couple of lines earlier, great.  Okay.

24              And if we could just blow that up a little, that

25   first section at the bottom of the page.

POWERS - DIRECT - GROVER                    1677

1          So this is June 13, 2017, am I right?

2    A    Yes.

3    Q    And this is at 10:18 in the morning?

4    A    Yes.

5    Q    And you are talking to Loredana Ferriollo?

6    A    Yes, I am.

7    Q    You asked the question, Was Natasha still there?  Who was

8    there?

9          Do you see that?

10   A    Yes.

11   Q    And you wrote, He wrote me at 12:00 that everyone there

12   sucked.

13         Do you see that?

14   A    Yes, I do.

15   Q    Who is he that wrote you?

16   A    Howie did.

17   Q    And then, at 10:20, Loredana writes to you, I don't know,

18   I think they texted that day and planned to -- in not really

19   sure, but I took a friend, blond with big boobs, def was a

20   little bit of a cock block for her.

21         And you responded, Natasha isn't too happy.

22         And Loredana said, I know.  Feel bad with Natasha?

23         What was going on that this conversation was all

24   about?

25   A    So Howie had called me at some point after meeting

1  Natasha and he mentioned to me that Loredana was coming into

2  the City with her girlfriend to celebrate Loredana's birthday,

3  and Loredana felt, like, this woman that she was bringing

4  Howie would be into.  So eventually Howie ended up ditching

5  Natasha and he went out to meet with Loredana and her friend.

6  Q    So, in other words, Natasha had flown in from Chicago to

7  meet with Howie and Howie was out galavanting  with Loredana?

8  A    Yeah.  I mean, I felt bad for Natasha that she had come

9  that way.

10  Q    And so, when you wrote, Natasha isn't too happy, that was

11  because she was being ignored?

12  A    He had sleighted her.  He had gone out with Loredana and

13  her friend instead of seeing Natasha.  And I knew Natasha

14  wasn't going to get the full amount that she had come to get.

15  Q    And I think at 10:20 a.m. just above this, it says, I

16  took a friend, blond with big boobs, def was a little of a

17  cock block for her, a phrase I never heard.

18        What does that mean?

19  A    That just meant like a distraction.  That he  -- she had

20  ultimately blocked Natasha from seeing Howie because she threw

21  another girl in front of him.

22  Q    All right.  So from all of these texts both from

23  Mr. Rubin and from Loredana Ferriollo, did you reach any

24  conclusion or understanding as to whether Mr. Rubin had a

25  sexual encounter with Natasha Tagai in the previous 24 hours?

POWERS - DIRECT - GROVER                    1679

1    A    It was from my understanding from these messages that

2    they had not.  That she was sleeping in the room.

3    Q    And based on these texts, did you even conceive of the

4    idea that Mr. Rubin would have done anything nonconsensual

5    with Ms. Tagai?

6    A    Well, it was just the opposite because they didn't even

7    get to start.  He left.

8    Q    Now, you mentioned a few moments ago that you provided

9    your text messages, I think, or brought them to your lawyers I

10   think you said?

11   A    Yes, sir, I did.

12   Q    All right.  So let me ask you.

13        Did a time come that you provided your documents and

14   text messages, don't talk about conversations, but did a come

15   time that you turned over documents and text messages to your

16   counsel?

17   A    Yes, I did.

18   Q    Do you recall when you did that?

19   A    Well, the first complaint was filed in November of 2017.

20   And right after that was filed, I turned over my cell phones

21   and my computer, e-mails, to my attorneys.

22   Q    And when you say, To your attorneys, did you give it to

23   someone like me that could lose everything, or did you give it

24   to an IT guy?

25   A    No, the IT guy named David had introduced himself to me

POWERS - DIRECT - GROVER                          1680

1    and he actually took my phone and he kept it for several

2    hours.  He told me that he needed to download it in its

3    entirety.

4    Q    And at the time that you gave your phone to the IT guy,

5    this was in after the first complaint?

6    A    It was shortly after November 2017.

7    Q    And was Natasha Tagai a plaintiff in this case in the

8    first complaint that had been filed in this action?

9    A    No, she wasn't.

10   Q    So when you turned over your phone, you didn't know

11   Natasha was going to be one of the plaintiffs?

12   A    Howie and her had always had in what my opinion to be a

13   consensual relationship from everything that she had said to

14   me.  So, no, I didn't think that she would become a plaintiff.

15   Q    And so, at the time you gave your phone to your

16   attorneys, this was before Natasha Tagai became a plaintiff in

17   this case?

18   A    Yes, sir, it was.

19   Q    And do you recall when that was?

20   A    She became a plaintiff in February of 2017.

21          MR. GROVER:  May I have a moment, please.  I would

22   like to refresh her recollection on that.

23          THE COURT:  Please.

24   A    Excuse me, I do remember that the first complaint was

25   filed in November of 2017 and the second complaint was in

POWERS – DIRECT – GROVER                    1681

1    February of 2018.

2    Q    Okay.  And later on, I'm going to ask you a couple of

3    questions about that date in February of 2018?

4    A    Yes, sir.

5    Q    And we've already heard testimony on that as well,

6    haven't we?

7    A    Yes.

8    Q    Okay.  Well, you saved me finding an exhibit.

9    A    I'm sorry.

10   Q    Do you know whether or not Ms. Tagai ever produced any

11   text messages from her conversations with you that had taken

12   place?

13   A    To my knowledge, no, she did not.

14   Q    Okay.  I'd like to move on.

15          I mentioned Brittany Reyes earlier prior to this

16   case.  You had never met her?

17   A    No, sir.

18   Q    Had you ever communicated with her?

19   A    No.

20   Q    And you said earlier that you never booked a flight for

21   her?

22   A    No, I did not.

23   Q    Was there a discussion that you ever had regarding

24   whether or not a flight would be booked for her?

25   A    Yes.

POWERS - DIRECT - GROVER                            1682

1    Q    And what was that discussion and who was it with?

2    A    Well, Taren Cassidy had reached out to me randomly one

3    day and asked me to book her friend to come to New York.

4    Q    And before you continue that, Taren Cassidy whose

5    deposition transcript was read to the jury today?

6    A    Yes, sir.

7    Q    Okay.  And go on, if you will?

8    A    And I was confused because I hadn't heard anything about

9    this woman from Howie.  So I asked Howie if should I book this

10   woman, who she was?  And I felt like Taren was just trying to

11   get her friend to New York.  I was also confused because Taren

12   told me she lived in New York, so I didn't know what was going

13   on.

14   Q    Did you ultimately receive instructions from Mr. Rubin as

15   to whether or not you should book a flight on behalf of

16   Brittany Reyes?

17   A    He told me not to book a flight.

18   Q    And did you book a flight?

19   A    No, I did not.

20   Q    Okay.  All right.  I'd like to talk to you about Amy

21   Moore and Mia Lytell.

22        Do you know who they are?

23   A    Yes, I do.

24   Q    And I would like you to take a look at Defendant's

25   Exhibit D if we could put it up on the screen from August of

POWERS - DIRECT - GROVER                    1683

1    2016, top of the page.

2              Can we blow up the top couple of lines, please.

3              Can you see that?

4    A    Yes, I can.

5    Q    And this says at 4:20 in the afternoon, Hey, Amy, this is

6    Jennifer Powers, Howie's assistant in New York.  I'll be

7    overseeing your trip to the city next week.  Will you please

8    send me your full legal booking name, date of birth, and

9    e-mail.

10             Do you see that?

11   A    Yes, I do.

12   Q    Was this your first communication ever with Amy Moore?

13   A    Yes, it was.

14   Q    Now, I'd like you to take a look at Defendant's Exhibit

15   M2-1.

16             Same drill, Ms. Palmore, I'd like to see the top of

17   the page and if you could blow it up.  And this is already in

18   evidence.

19             You've seen this before in the trial?

20   A    Yes, I have.

21   Q    And this is on the same day but one minute later at

22   4:21 p.m., Hey, Mia, this is Jennifer Powers Howie's

23   assistant.

24             Do you see that?

25   A    Yes, I do.

POWERS – DIRECT – GROVER                    1684

1   Q    Then it goes on.

2        Now, was this your first communication with

3   Ms. Lytell?

4   A    Yes, I was introducing myself.

5   Q    And what caused you to send these texts to Mia Lytell and

6   Amy Moore at this time, 4:20, 4:21 on August 17, 2016?

7   A    Howie told me that Stephanie Shon had introduced him to

8   these two girls and he gave me their contact information and

9   asked me to reach out to them so I could black them a flight

10  to New York.

11  Q    Okay.  And I'm not going to take the time to open up

12  Defendant's Exhibit T4-1.  But in that exhibit, did you have

13  an opportunity to review that before testifying today?

14  A    Yes.

15  Q    And would it be fair to say you received the phone

16  numbers of both ladies so you could chat with them?

17  A    Yes.

18  Q    And was that before you sent these text messages?

19  A    No.  I had only WhatsApp message texted them.  And I had

20  never spoken to them before this message or on the phone

21  before these messages.

22  Q    Okay.  And prior to these messages -- I guess you looked

23  ahead of me prior to these messages.

24       Had you ever any conversations on the phone with

25  either of these ladies?

POWERS – DIRECT – GROVER                    1685

1    A    No, I hadn't.

2    Q    And you heard testimony several days ago from Ms. Moore

3    that there had been a phone conversation with a group of

4    people and from Ms. Lytell that there was a text message with

5    a group of people on the text in which you joined in and spoke

6    to them?

7    A    I heard her say that.

8    Q    Was that true?

9    A    No, it wasn't true.  That's why I introduced myself on

10   these messages.  I never spoke to her before.

11   Q    And so the jury understands, you know, we've been seeing

12   lots of WhatsApp messages and text messages and some e-mails

13   relating to plane tickets and things like that; is that right?

14   A    Yes.

15   Q    And you turned over everything you had?

16   A    I sure did.

17   Q    And there were other documents that were accumulated here

18   that you at some point had an opportunity to review?

19   A    Yes.

20   Q    And did you ever see a group chat that took place between

21   you Amy Moore, Mia Lytell, and Stephanie Shon?

22   A    No, never.

23   Q    And did such a conversation ever take place?

24   A    No, it didn't take place.

25   Q    Now --

POWERS - DIRECT - GROVER                          1686

1   A    Not me with on it I would like to add.

2   Q    I'm sorry.

3   A    A conversation like that didn't take place with me on it.

4   I just wanted to add.

5   Q    Okay.  Now, did a time come that you first spoke to Amy

6   Moore on the telephone?

7   A    Yes.

8   Q    And do you recall that conversation with Amy Moore?

9   A    I do.

10  Q    That's because you already had her phone number and she

11  had yours because of text messaging?

12  A    Yes.

13  Q    When was that first conversation, if you recall?

14  A    It was on the day that she arrived at the airport to

15  see -- in New York -- when she had come to see Howie.

16  Q    All right.  So I think we had previously opened

17  Defendant's Exhibit M2-1.

18        If we could open that up again on the first page,

19  Ms. Palmore.

20        And I think we're going to search down the pages a

21  little bit to, approximately, 1:45 p.m?

22        I made a mistake?  And I'm going to direct your

23  attention to your first communication with Ms. Moore which is

24  DX-D.  And the page looks the same but it's a different

25  conversation.

POWERS - DIRECT - GROVER                    1687

1          All right.  If we could go, again, to the middle of

2    the page.  Let me see if I can find that.

3          Okay.  Now, if we look at DX-D at the bottom of the

4    page, if you will?

5    A    Yes.

6    Q    Could we make the last ten lines a little more visible if

7    we can.  Great.

8          And this is already in evidence and to says, Good

9    morning, I guess you're a little delayed today.  And there's

10   an image and Amy Nicole -- Nicole says, Okay; thank you.

11         Do you see all that?

12   A    Yes, I do.

13   Q    And I think we heard testimony her flight was delayed?

14   A    Yes.

15   Q    Okay.  Could we scroll to the next page, please.  And

16   this is all on August 22, 2016; is that right?

17   A    Yes, it is.

18   Q    And I know we addressed this before, but was this the

19   first date that Ms. Moore and Lytell came to New York?

20   A    Yes, it was.

21   Q    Okay.  To meet Mr. Rubin, I should have said?

22   A    To meet Mr. Rubin.

23   Q    And if we scroll down the page to, approximately,

24   2:56 p.m., we see a text message from Amy Nicole?

25              COURTROOM DEPUTY:  Counsel, is your mic on, sir?

PROCEEDINGS                                          1688

1    Q    At 2:56 p.m., about Amy Nicole is Amy Nicole Moore?

2    A    Yes.  Yes, that's her name.

3    Q    And she indicated she landed; is that right?

4    A    Yes.

5    Q    And I think you may have even mentioned that she had some

6    difficulty or, excuse me, that you had to arrange for a

7    driver?

8    A    Yes.

9    Q    And if we look through that conversation at 3:12 p.m.,

10   you write to, Her call me on a regular phone.  Can't hear on

11   WhatsApp.

12        Do you see that?

13   A    Yes, I do.

14   Q    And did she call you?

15   A    She was calling me, yes.

16   Q    And what was the purpose of that call?

17   A    She couldn't find her driver when she landed.

18   Q    Did that call have anything to do with Mr. Rubin?

19   A    No, she just couldn't find the driver.

20   Q    How long did that call last?

21   A    A couple minutes.  A minute.

22   Q    Okay.

23        THE COURT:  Mr. Grover, at a good time, I would to

24   take a morning break.

25

PROCEEDINGS                              1689

1                MR. GROVER:  Yes, I think so.

2                THE COURT:  15 minutes, ladies and gentlemen.

3     Please don't talk about the case.  We'll see you shortly.

4                (Jury exits courtroom at 11:15a.m.)

5                THE COURT:  You may step down.

6                (Witness leaves the witness stand.)

7                (Recess taken.)

8                (Witness takes the witness stand.)

9                THE COURT:  Have a seat.  What do we need to talk

10    about?

11                MS. LAVIGNE-ALBERT:  So there's three specific lines

12    and they pertain to the Natasha Tagai deposition designations

13    and I will put them on the record.  They are Page 29, Lines 17

14    through 23 .  Page 82 , Lines 21 through Page 83, Line 5.  And

15    finally, Page 108, Line 18 through Page 109 , Line 8.

16                These three specific designations were not in the

17    original JPTO, frankly, because we could never have imagined

18    that Natasha Tagai was going to make up text messages on the

19    stand that, from our perspective, never happened.  And in

20    these designations, she gets asked, What did you text Jennifer

21    Powers about?  And she said, You know, logistics what time I

22    would arrive, what time I would leave.  She said that she

23    looked in her phone, her messages with Jennifer Powers, and

24    that she confirmed that she was asked for them in her

25    deposition.

PROCEEDINGS                                      1690

1        So this became relevant for the first time ever in

2   this case after we heard her testimony at trial and for that

3   reason we would request the Court's permission to  put them in

4   evidence at this point.

5        THE COURT:  Why didn't you use them when you had her

6   on the stand?

7        MS. LAVIGNE-ALBERT:  Well, that is a good question.

8   Quite frankly, as I said, it was not on our mind because we

9   never expected that testimony.

10       THE COURT:  I'm just not getting it.  She says this

11  terribly unexpected thing and it must have caused a bell to go

12  off saying wait a minute that's not what she said in her

13  deposition.  It just went right by you?

14       MS. LAVIGNE-ALBERT:  It did.  Because, quite

15  frankly, we never next focused on -- it was kind of a vanilla

16  question at her deposition that we never looked at until we

17  went back and read it all that evening after her cross ended

18  and then saw it.

19       THE COURT:  Mr. Balestriere?

20       MR. BALESTRIERE:  I'd ask Mr. Minhas to argue this

21  your Honor.

22       THE COURT:  Sure.

23       MR. MINHAS:  Good morning, your Honor.

24       We stand by your objection, your order from this

25  morning.  They had ample opportunity to cross-examine

PROCEEDINGS                                    1691

1    Ms. Tagai on the issue.  We all her heard testimony and the

2    opportunity was there and, you know, quite frankly, bringing

3    it up after the fact is unfair and prejudicial to plaintiffs.

4                THE COURT:  Let me think about it.

5                That's the only thing we've got?

6                MS. LAVIGNE-ALBERT:  It is, your Honor.

7                THE COURT:  Let me think about that.

8                I'll tell what you I'm going to do when I come out

9    after the break.

10               MS. CHIANG:  Your Honor, may I ask an administrative

11   question?

12               THE COURT:  Sure.

13               MS. CHIANG:  We understood that your Honor did not

14   want us to replay clips of depositions if they were played to

15   impeach the witness, but we were unclear as to whether those

16   clips would be available to the jury because they weren't

17   formally admitted into evidence.

18               THE COURT:  Well, right, the transcript will simply

19   say video clip played.  Let's put it this way, we're not going

20   to send the video clips in to the jury because it's not an

21   exhibit.  But if they ask about it, then I think we'll replay

22   it.

23               MS. CHIANG:  All right.  Then just for clarity's

24   sake, we will not replay clips that have already been played.

25               THE COURT:  Yes, you don't need to do that assuming

PROCEEDINGS                                      1692

1    the jury asks to see it, right?

2            MS. CHIANG:  Thank you.

3            MR. MCDONALD:  Excuse me, I have a question.  Will

4    we be able to make reference to those clips on summations?

5            THE COURT:  Absolutely.  You can play them on

6    summation.

7            MR. MCDONALD:  Thanks.

8            (A recess in the proceedings was taken.)

9            THE COURT:  With regard to the issue we discussed

10   before the break, I'm going to allow defendants to put it in.

11   It seems to me if one small mistake in a very voluminous case,

12   it's still a search for the truth not a game of gotcha.  And

13   because it's simple, overlooking a very small thing, I will

14   grant the motion for reconsideration as well.

15           MR. BALESTRIERE:  Your Honor, may I be heard at

16   least for the record?

17           THE COURT:  Sure.

18           MR. BALESTRIERE:  Sure.  I do note that the

19   examination, the direct examination, of Ms. Tagai ended on the

20   first day, Monday, so they had 19 hours, I guess, by my math.

21           THE COURT:  It's a mistake.  It's definitely a

22   mistake.

23           MR. BALESTRIERE:  Then I don't get to the chance to

24   redirect her about this particular issue?

25           THE COURT:  Do you want to bring her back?  I'll let

POWERS – DIRECT – GROVER                    1693

1   you bring her back.

2              MR. BALESTRIERE:  Okay.  Thank you.  We'll see what

3   we'll do.

4              THE COURT:  Frankly, what's motivating me is I don't

5   see what she would say about that, right, if you wanted to

6   bring her back.  So I don't think I'm prejudicing the

7   plaintiffs by getting this out.  But if you think it is,

8   bring her back.

9              MR. BALESTRIERE:  Thanks for your consideration,

10  your Honor.

11             THE COURT:  Let's have the jury, please.

12             (Witness takes the witness stand.)

13             (Jury exits courtroom at 11:39a.m.)

14             THE COURT:  All right.  Let's continue with direct

15  examination.

16  DIRECT EXAMINATION (Continued)

17  BY MR. GROVER:

18  Q     Thank you, your Honor.

19             Ms. Powers, when we left off, I was asking you about

20  Ms. Moore and Ms. Lytell.

21             Do you recall that?

22  A     Yes, I do.

23  Q     And I had one last question on this subject and that was

24  Ms. Lytell testified that you told Ms. Moore to bring black

25  lingerie to New York.

POWERS - DIRECT - GROVER                    1694

1          Did you ever do that?

2    A    No, I did not.

3    Q    Now, I'd like to direct your attention to that day,

4    August 22, 2016, in the condo when you met Ms. Moore and

5    Ms. Lytell.

6          You've heard their testimony on that?

7    A    Yes, I have.

8    Q    Was that the day on which you presented them with the

9    confidentiality agreement and release?

10   A    Yes, it was.

11   Q    And do you recall if they signed the document together at

12   approximately the same type on the same day?

13   A    They did.  All three of us were sitting in the living

14   room of Howie's condo.

15   Q    And the three of you were in the apartment?

16   A    Yes, sir.

17   Q    And did either of them have any questions for you about

18   the document?

19   A    No, they did not.

20   Q    Did either of them ask you for a copy of the document?

21   A    No, but I assumed if they wanted a copy, they could have

22   taken a photo with their cell phone.

23   Q    Did any of them make any effort to copy this document

24   while you were there in the apartment?

25   A    No --

POWERS - DIRECT - GROVER                          1695

1   Q    Now --

2   A    -- not that I saw.

3   Q    Do you recall any specific were conversation about the

4   substance of the document?

5   A    I'm sorry.

6   Q    Let me withdraw the question.  Well, let me go back a

7   step.

8           You told us that they didn't ask you any questions?

9   A    Correct.

10  Q    Did you discuss the meaning or the terms in the document?

11  A    No.

12  Q    Did you think they had -- well, from your perspective,

13  what did you observe as to whether or not they read the

14  document?

15  A    Again, I had asked each of them to initial each paragraph

16  and that was my way of knowing where they were in the document

17  and that just made it easy for me to follow along while they

18  were reading.  And that's what they did, they initialed and I

19  followed along with them.

20  Q    Did you serve any drinks?

21  A    No.

22  Q    Or provide any food at that point?

23  A    No.

24  Q    Why not?

25  A    Well, by this point, I was pregnant, I was trying to get

POWERS – DIRECT – GROVER                    1696

1    in and out.  That just wasn't my style to provide anything.

2    Also, I knew that they were going to the Viceroy to meet Howie

3    after, so I wasn't trying to stick around.

4    Q    And did you ever tell Ms. Moore that she could not speak

5    Mr. Rubin's name, and if she did there would be a fine?

6    A    No, I didn't say that.

7    Q    Did you ever tell Ms. Moore that Mr. Rubin was a very

8    high-profile person?

9    A    No.

10   Q    Now, I'd like you to take a look at an exhibit already in

11   evidence, DX-R2, if you would, Ms. Palmore.  Already in

12   evidence.

13            Okay.  See it?

14   A    Yes, I do.

15   Q    You've seen it during the trial?

16   A    Yes.

17   Q    And you saw it a very long time ago, am I correct?

18   A    I did.

19   Q    When did you first see this?

20   A    I had first seen it after Mia and Amy had left the condo,

21   after they had seen Howie, and I had found it when I had gone

22   over there to clean up.

23   Q    Where was it located?

24   A    It was on the mirror.

25   Q    And was there anything else on the mirror?

POWERS - DIRECT - GROVER                    1697

1  A    Yes.  There was lipstick kisses and Amy on there drawing

2  hearts.

3  Q    And how long was that after they had left, do you know?

4  A    I'm not sure.  Maybe a couple hours.

5  Q    And what did you do with the note after you found it?

6  A    I took it and I took a photo of it and sent it to Howie

7  like I always do when I found stuff for sending him

8  correspondence.

9  Q    Okay.  And was this the last time that Ms. Lytell had

10 come to visit Howie in New York ?

11 A    No, it wasn't.

12 Q    And I'd like you to take a look at Defendant's Exhibit

13 DX-V2 already in evidence.

14         And we heard testimony in this trial about

15 Ms. Lytell being in New York on September 24th and 25th, about

16 a month later, of 2016; is that right?

17 A    Yes.

18 Q    And do you recognize this note here that's previously

19 been admitted?

20 A    I do.

21 Q    And what's that?

22 A    This was another love note that Mia wrote to Howie after

23 she had seen him and I found it the day after she left.

24 Q    And did you send that to Howie as well?

25 A    I believe so.  I definitely stuck it in his safe with the

POWERS - DIRECT - GROVER                              1698

1    other love letter.

2    Q    And where was this located?

3    A    It was located on the mirror as well.

4    Q    Was there anything else on the mirror on that occasion?

5    A    Not that I can recall.  I don't remember.

6    Q    Okay.  And I would like to move ahead with Ms. Lytell to

7    her third visit to New York.

8              Do you recall that she testified that she was in

9    New York on or about October 19, 2016?

10   A    Yes, I do.

11   Q    And I believe you heard her testify --

12             MR. GROVER:  Withdrawn.

13   Q    I believe Ms. Lytell testified about a time she came to

14   New York in which she was very sick even before she got to the

15   apartment; is that right?

16   A    Yes.

17   Q    And do you recall whether or not you had met Ms. Lytell

18   on this occasion?

19   A    I do recall because I had gone over to the condo to sign

20   the NDA with the friend that she brought with her.

21   Q    And was this the -- how many times had you met Mia Lytell

22   before?

23   A    I had only seen her once before, but I knew that she had

24   come some time else.

25   Q    Okay?

POWERS - DIRECT - GROVER                            1699

1    A    The time we just spoke about with the sticky note.

2    Q    So, that September visit, you didn't see her on that

3    occasion?

4    A    No, I did not.

5    Q    Okay.  But in the October visit, you came over to the

6    apartment; is that right?

7    A    Yes, I did.

8    Q    Were you there when she got there, or was she there

9    first?

10   A    They were there first.

11   Q    And when we talk about them being there first, when

12   people came to visit, what was the manner in which they would

13   gain access to the apartment?

14   A    I would e-mail the concierge service downstairs, the

15   front desk, and I would mention to that person:  Please allow

16   guest name to have entry access to the apartment and they

17   would then give them a key.

18   Q    And so, somebody that visits would have a key to the

19   apartment so that they could come and go?

20   A    Yes, sir, that's how it worked.

21   Q    And I thought you just -- I thought I heard you say a few

22   moments ago that Natasha Tagai very often came and went and

23   went shopping or did things like that?

24   A    Yeah.  She actually would joke with me that she like to

25   act like a tourist.

POWERS - DIRECT - GROVER                    1700

1    Q    And that's in some of the text messages as well, isn't

2    it?

3    A    Yes, sir.

4    Q    And when the guests came to the condo, was there WiFi?

5    A    Yes, there was.

6    Q    And was the WiFi provided to them as well?

7    A    Yes, it was.

8    Q    So they could communicate with anybody at any time?

9    A    Of course.

10   Q    And I noticed on some of the text messages, particularly

11   with Emma Hopper, a request to use Seamless?

12   A    Yes, sir.

13   Q    Seamless is that food service for delivery?

14   A    Yes.  There was also a restaurant in the building that

15   they had access to to order food as well.

16   Q    So when someone came to visit Mr. Rubin, they had access

17   to WiFi, to having food delivered, they could go to a

18   restaurant, or they could walk around in Midtown New York?

19   A    Yes.

20   Q    Now, on October 19th, you said you did go over to the

21   apartment?

22   A    Yes, I did.

23   Q    And why did you go over?

24   A    I had gone over to initiate the agreement release with

25   the friend that Mia recruited for Howie.

POWERS - DIRECT - GROVER                         1701

1    Q    And that person is not a plaintiff in this case?

2    A    No.

3    Q    And what do you recall you observed about Mia Lytell when

4    you got to the apartment that day?

5    A    Oh, man, she was sick.  She was throwing up all over the

6    apartment.  She was calling out for her father who was dead

7    and she was asking for her father's girlfriend to come and

8    help.  The whole scene was chaotic.  Other than vomit being

9    all over the floor, I was trying to clean it and help Mia.

10   She was trying to take a bath and a shower.  It was a messy

11   situation.

12   Q    And you mentioned her father's former girlfriend --

13   A    Yes.

14   Q    -- is that right?

15   A    Yes.

16   Q    And what was her name?

17   A    Zoe.

18   Q    Did Zoe eventually come to the apartment?

19   A    Yes, Mia asked to call Zoe.

20   Q    And, by the way, just so we're clear.

21        Did something happen to you between August and

22   October 2016?

23   A    Yes.

24   Q    What happened?

25   A    I had the birth of my second son.

POWERS - DIRECT - GROVER                    1702

1    Q    And when did that take place?

2    A    Two weeks before --

3    Q    Two weeks before what?

4    A    -- this meeting.

5    Q    So, in other words, you had just given birth to your

6    second son and you were on the floor cleaning vomit?

7    A    Yes, sir.

8    Q    And did a time come that Ms. Lytell asked to call an

9    ambulance?

10   A    Eventually she did, but she was asking for Zoe.  She

11   asked Nancy to call Zoe, and then she was asking for IV

12   treatment to come to the apartment.  And then she was trying

13   to make herself feel better and she thought that she was.  And

14   eventually, she said that she wanted an ambulance and I called

15   one.

16   Q    And you passed over a name Nancy.  Who was Nancy?

17   A    Nancy was the woman that Mia had recruited for Howie.

18   Q    Okay.  And did an ambulance eventually come?

19   A    Yes.

20   Q    And did you do anything to delay calling an ambulance and

21   getting her to get some help?

22   A    Me personally, no.  But Mia was the one that delayed it.

23   I feel like at one point she felt better and Nancy and I were

24   trying to help her and Zoe eventually.  But when she was, when

25   she said she wanted an ambulance, I called one.

POWERS - DIRECT - GROVER                    1703

1   Q    And did a time come later on that you had conversations

2   with her in text messages in which she thanked you?

3   A    Yes.

4   Q    Now, I want to fast forward a couple of months -- well,

5   let me just say --

6          MR. GROVER:  Let me withdraw that.

7   Q    In October of 2016, this is the days of that third visit

8   of Mia Lytell, did an event occur that resulted in the police

9   coming to the apartment?

10  A    Yes.

11  Q    And I think we heard that Ms. Lytell got arrested?

12  A    Yes.  She broke her dad's girlfriend's nose.

13          MR. BALESTRIERE:  Objection.

14          THE COURT:  How do you know she broke her

15  girlfriend's nose?

16          THE WITNESS:  Mia told me.

17          THE COURT:  All right.  Objection sustained, that's

18  stricken.

19  EXAMINATION BY

20  MR. GROVER:

21  (Continuing.)

22  Q    And a case was initiated.  You were aware of that?

23  A    Yes.

24  Q    By the district attorney's office?

25  A    Yes, it was.

POWERS - DIRECT - GROVER                    1704

1    Q    And, at a time later, and I think we have heard testimony

2    on this when Ms. Lytell was on the stand.  She got a lawyer;

3    is that right?

4    A    Yes, she did.

5    Q    Now, I'd like to fast forward to July of 2017.

6              THE COURT:  Before you go there, I'm going to

7    reverse myself on that last ruling and unstrike the testimony

8    that Mia told her that Mia had broken Nancy's nose.

9              MR. ROSENBERG:  Thank you, your Honor.

10             THE COURT:  Go ahead.

11   Q    I'm going to move to July of 2017.  So we were just in

12   October of '16, I'm going forward eight months.

13             Now, at that time, Mia's case was still pending in

14   criminal court in New York City?

15   A    Yes, it was.

16   Q    And, at that time, did anyone you know offer to pay legal

17   fees for Mia Lytell?

18   A    Yes, Howie offered that he would pay after Mia was

19   begging him that she needed representation.

20   Q    And, in addition to that, was there also --

21             Well, let me go back a step.

22             As a practical matter, she lived in Florida?

23   A    Yes, sir, she did.

24   Q    And so, how did she get back and forth to attend the

25   multiple court appearances that criminal court cases generally

1    require?

2    A    She was also begging me and complaining to me that she

3    didn't have any money to defend herself against this woman

4    that she had broken her nose.  And she asked for help and

5    Howie, through Howie, to book her flights back to New York and

6    a hotel and eventually an attorney.

7    Q    And so, now we're in July of 2017.  And I believe that we

8    saw in this trial portions of an exhibit that's entitled

9    PX-119  on Page 1.  And I'm starting at 6:27 p.m. and just at

10   6:27 p.m. just that, please, I don't believe anything else was

11   offered.

12            Now, on July 19th at 6:27, it says:  Jennifer

13   Powers, I don't think it's smart to be involved with Mia.

14            This is months after she's been coming back to

15   New York to go to her court case?

16   A    Yes.

17   Q    And Mr. Rubin says, Check.  And Mr. Rubin says, You

18   really think it's not good to see Mia and her friend?

19            Do you see that?

20   A    Yes, I do.

21   Q    And you write:  Mia's too close for comfort.  She was a

22   back case and the root of all our problems.

23            What do you mean when you write, She was a basket

24   case and the root of all our problems?

25   A    Well, I was trying to convey to Howie that he shouldn't

POWERS – DIRECT – GROVER                    1706

1   see her.  And I felt that back that previous fall, you know,

2   there was the instance where she was throwing up all over the

3   condo, but even worse she had broken someone's nose in his

4   apartment and she had gotten arrested and The Post followed

5   her to court and they published his address.

6            And it was just –– at this point, I was trying to

7   convey to him I just didn't feel like it was a good idea for

8   him to see these girls because she was more of a headache than

9   she was worth in my opinion.

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continued)

2    BY MR. GROVER:

3    Q    Okay.  And then if we can look at the same exhibit, 119,

4    moving into August of 2017.  This is about -- I think it's

5    about a month later.

6              And this was also read to the jury.

7              On August 17 at 1:  13 p.m.  I'm reading on August

8    20, 2017 at 1:13 p.m.

9              Jennifer Powers:  I think you need to be gentle if

10   you see Heather.  What if it's a setup?  She is a good friend

11   of Mia.

12             Now, who was Heather?

13   A    Heather was another woman that she recruited to see

14   Howie.

15   Q    And then you write, I think you need to be extremely

16   careful with anyone Mia sets you up with.  Now that she's gone

17   MIA, looks more and more like a setup.

18             Mr. Rubin responds, Okay, let me think.

19             You write, Yeah, the whole group knows going on.

20   NDA means nothing I'm afraid.

21             Do you see that?

22   A    Yes, I do.

23   Q    And what did you mean when you wrote I think you need to

24   be gentle if you see Heather.  What if it's a setup?  She is a

25   good friend of Mia?

POWERS – DIRECT – GROVER                    1708

1      What did you mean?

2  A    At this point, Mia's boyfriend, Bob Aloi, was trying to

3  extort Howie and this whole –– this whole situation during

4  this time period was insane for the fact that there was a

5  shakedown going on.  We didn't know how Mia was involved.  We

6  knew that Mia and Bob Aloi knew each other.

7           And we also knew at this one point Mia had gone MIA.

8  She was missing.  She just stopped talking to us all of a

9  sudden.  So we didn't know if she was involved with Bob, and

10  all this.  So since Heather was a friend of Mia and Mia had

11  recruited Heather, I felt like if Howie had given her a bruise

12  during a BDSM session, that would have –– that she would've

13  take a photo of it and extort him, or –– you know, the whole

14  thing was a shakedown.

15           I didn't trust these girls.

16           Amy was –– or, I'm sorry, Mia –– there came a point

17  in time where I just didn't trust Mia anymore because of her

18  and Bob Aloi.

19  Q    Okay.  I'm going to change gears for a moment and go back

20  to something I missed with respect to Brittany Reyes.

21           You remember Brittany Reyes?

22  A    Yes, sir, I do.

23  Q    And just to refresh your recollection, she paid one visit

24  to Mr. Rubin?

25  A    Yes.

POWERS – DIRECT – GROVER                    1709

1   Q    And did a time come after she paid a visit to Mr. Rubin

2   that you had a conversation, text conversation with Taren

3   Cassidy, whose deposition we heard earlier?

4   A    Yes, I do.

5   Q    And I would like you to take a look DX-P4 --

6         MR. GROVER:  And it's not in evidence.  Excuse me.

7   Please don't put it on the page, on the screen.

8         And if the witness could look at DX-P4.

9   Q    I'm directing your attention to March 10, 2016.

10  Actually, March 9, 2016.

11        And take a look at that running through March 10th

12  in the evening and tell me if you recognize those passages.

13  A    Yes, I do.

14  Q    And who is that a conversation between?

15  A    That's a conversation between Taren Cassidy and I.

16        MR. GROVER:  At this time I would like to move this

17  into evidence.

18        MR. BALESTRIERE:  No objection.

19        THE COURT:  Received.

20        (Defendants' Exhibit DX-P4, was received in

21  evidence.)

22        MR. GROVER:  It is PX, Peter, four.  And if we have

23  this -- I'm starting at 4:49 p.m.  Could we get a little

24  higher on the page.

25        I'm sorry, if we can look at DX-P4.  And we're

POWERS - DIRECT - GROVER                    1710

1    looking at 3:58 p.m. on the 9th.

2    Q    Do you see that?

3    A    Yes.

4    Q    My apologies.  I lost my page.

5            And it says, No, but H hadn't told me to -- first of

6    all, you're talking to Taren Cassidy, you said?

7    A    Yes, I am.

8    Q    And at this point, was the Taren Cassidy looking for

9    something from you?

10   A    I'm not sure.

11   Q    Okay.

12           So, No, but H hadn't told me to send money yet.  He

13   actually didn't speak of the night which I thought was weird.

14   That's why I was asking you how the night went.

15           What's he referring to when he says, How the night

16   went?

17   A    I was asking Taren how the night went.

18   Q    And I meant what was you asking, sorry.

19           And Taren's response was, It went really good other

20   than the fact that he didn't love Brittany.

21           Do you see that?

22   A    Yes.

23   Q    Then she added, Her look.

24           And Taren then said, But it went.  I couldn't tell.

25   I only know because he told me.

*Michele Lucchese, Official Court Reporter*

POWERS - DIRECT - GROVER                    1711

1          Do you see that?

2    A    Yes.

3    Q    Did you get anything else from Taren about this evening?

4    A    No.

5    Q    Now, did anything about these texts suggest to you that

6    Mr. Rubin had done anything to Ms. Reyes that she did not

7    consent to?

8    A    No, I didn't.

9    Q    And Taren had been someone who Mr. Rubin had been seeing

10   for a long time?

11   A    For a very long time, yes.

12   Q    We heard this morning that Taren was a long-time friend

13   of Ms. Reyes?

14   A    Yes.

15   Q    All right.  I'm going to hopefully move quickly, and I'm

16   going to ask you a couple of questions about Emma Hopper?

17         Do you remember Emma Hopper?

18   A    Yes, sir, I do.

19   Q    And I'd like you to take a look at DX-M3 and we have seen

20   this before.

21         Have you seen this document?

22   A    Yes.

23   Q    And the date on this document, if you go to the second

24   page, is October 12, 2015.

25   A    Yes, it is.

POWERS - DIRECT - GROVER                    1712

1    Q    And, you know, I'm just curious.  I'm looking at the

2    second page, the signature seems to be -- the signature is

3    written on the signature line but you also had a print line

4    where it's printed in?

5    A    Yes, sir.

6    Q    They both seem fairly neat above those lines?

7    A    Oh, yes.

8    Q    Now, were you present when she signed this agreement?

9    A    I was.

10   Q    And at the time she signed the agreement, did you think

11   she was reading it as she was initializing  it or initialing

12   it?

13   A    Yes, I did.

14   Q    And did you follow along?

15   A    I did.  We were sitting right next to each other on the

16   master bedroom bed.

17   Q    You were sitting on a bed in the bedroom?

18   A    Yes, sir, we were.

19   Q    Right next to each other?

20   A    We were.  She -- actually, Emma had just come out of the

21   bathroom.  She was finishing her makeup.  So I sat on the bed

22   and waited for her.

23   Q    Was she sitting at a mirror or standing up or doing

24   something like that?

25   A    Well, in the bathroom, she was standing at the mirror.

*Michele Lucchese, Official Court Reporter*

POWERS – DIRECT – GROVER                 1713

1   But when she came out, she sat on my right on the edge of the

2   bed.

3   Q    Now, did you notice if she smelt like alcohol?

4   A    No, she –– I didn't, not that I'm aware of.

5   Q    Did you notice wether there was anything about her speech

6   or her demeanor that suggested that she was inebriated?

7   A    No, nothing.

8   Q    And did she have any trouble reviewing the –– or I should

9   say executing the agreement with initials line by line?

10  A    No, she ––

11  Q    Or I should say paragraph by paragraph?

12  A    No, she didn't.

13  Q    Okay.  Now, I'm going to ask you about something that

14  I've think you've seen before, to go on to something else.

15  Defendant Exhibit DX-X7.

16          MR. GROVER:  I'm going to ask the witness to take a

17  look at it, please.  Let me know when you have seen the

18  document.

19          MR. BALESTRIERE:  I'm sorry, counsel, which is this?

20          MR. GROVER:  DX-X7.

21          MR. BALESTRIERE:  Thank you.

22  Q    Just a yes or no, you recognize the document?

23  A    Yes.

24  Q    What is the document in a general sense, just tell me?

25  A    This is a missed call that I had from Emma Hopper.

POWERS – DIRECT – GROVER                          1714

1         MR. GROVER:  Your Honor, may we receive that

2    document in evidence, DX-X7?

3         MR. BALESTRIERE:  No objection, Your Honor.

4         THE COURT:  Received.

5         (Defendants' Exhibit DX-X7 , was received in

6    evidence.)

7         MR. GROVER:  May it be displayed for the jury.

8         (Exhibit published.)

9    Q    Does this -- this is from a cell phone?

10   A    I assume, yes.

11   Q    And is there a date and time on it as you can tell?

12   A    There is.  Thursday, February 22nd --

13   Q    And just --

14   A    -- 2018.

15   Q    I'm sorry?

16   A    2018.

17   Q    And does that date have any significance to you, February

18   22, 2018?

19   A    Yes.  It's the call that Mia called taunting me.

20   Q    Excuse me, did you say Mia?

21   A    I mean, I'm sorry, Emma had called taunting me on this

22   date after she had filed a lawsuit against me.

23   Q    What do you mean taunting you?

24   A    She had sent me several messages back the last fall when

25   the first Complaint was filed and then after she jumped on the

*Michele Lucchese, Official Court Reporter*

POWERS - DIRECT - GROVER                    1715

1   second suit, right before this date, she called and taunted me

2   with a voicemail.

3   Q    I'm going to ask you -- are you okay?

4   A    I'm okay.  It's just hard to hear.

5   Q    Okay.  Well, first I'd like you to take a look, if you

6   can, at an exhibit DX-U3-1.

7        MR. GROVER:  And just for the witness, I'm sorry.

8   Q    Could you take a look at DX-U3-1?

9   A    Yes, I see it.

10  Q    Just yes or no, do you recognize it?

11  A    I do.

12  Q    Just generally, what is the document?

13  A    This is the transcript of the voicemail that she left me.

14  Q    And when you say the transcript, did you create this

15  transcript?

16  A    No, I didn't.

17  Q    But did you listen to the voice recording and compare it

18  to the transcript?

19  A    Yes, I did.

20       MR. GROVER:  And before I ask to receive that, the

21  voice recording is DX-U3, which doesn't have a physical

22  presence, Your Honor; it's an electronic document.

23       THE COURT:  You may.

24  Q    Did you compare the electronic recording to this

25  document?

POWERS - DIRECT - GROVER                              1716

1    A    Yes, I did.

2              MR. GROVER:  At this time I ask that the electronic

3    recording be played and that the transcript be displayed --

4    received in evidence and displayed for the jury at the same

5    time.

6              MR. BALESTRIERE:  I don't believe I have an

7    objection.  May I ask a clarifying question?

8              THE COURT:  Sure.

9              MR. BALESTRIERE:  I just want to be clear, counsel,

10   that Defendant's X7 --

11             MR. GROVER:  Yes.

12             MR. BALESTRIERE:  -- about which Ms. Powers just

13   testified relates to the message you want to play in the

14   transcript; correct?

15             This is all regarding the same call and then  a

16   message is left and this is the transcript?

17             MR. GROVER:  Yes.

18             MR. BALESTRIERE:  Then no objection, Your Honor.

19             MR. GROVER:  May I have a moment, Your Honor?

20             THE COURT:  Yes.

21             MR. GROVER:  Okay.  All right.  First of all, can we

22   put Exhibit DX-U3-1, which is the transcript up on the screen.

23             MR. BALESTRIERE:  But you're going to play the

24   messages?

25             MR. GROVER:  We are.

POWERS - DIRECT - GROVER                    1717

1          THE COURT:  Go ahead.

2          MR. GROVER:  And I don't know the technology, but

3    once we have it large enough to read, I would like to play a

4    message.

5          Can we do that at the same time or is that not

6    possible?

7          So I think what we'll do is, Miss Palmore, can you

8    play the voice message first and then we will take a look at

9    the transcript.

10         (Audio playing.) (Audio stopped.)

11         MR. GROVER:  All right.  I think that's fine.  Thank

12   you.

13   Q    Ms. Powers, you recognize Ms. Hopper's voice?

14   A    Yes, I do.

15         MR. GROVER:  And can we put the exhibit back up.

16   That was DX-U3-1.

17   Q    And I'll read it.  You don't have to.

18         Hey, Jennifer.  It's Emma.  Yeah.  I just wanted to

19   touch base with you.  I know it's been so long and all this

20   crazy stuff is going on, but I finally got my WhatsApp working

21   again and I just sent you a text and a WhatsApp message.  So,

22   yeah.  I hope to hear from you soon.  Bye.

23         Did you contact Emma Hopper?

24   A    No, I was told that I couldn't because she was part of

25   the suit, and she had been retained by an attorney.  I didn't

*Michele Lucchese, Official Court Reporter*

1   know why she was calling me and messaging me.

2   Q    And I think you heard previously or you saw previously in

3   DX-Q3 that there was a series of text messages from Emma

4   Hopper back in November.

5            Do you recall receiving those as well?

6   A    I do.

7   Q    Okay.

8            MR. GROVER:  May I have one moment, Your Honor?

9            THE COURT:  Yes.  This is being shown to the jury,

10  is that okay?

11           MR. GROVER:  No, that can come down, Your Honor.

12           I would like to put DX-Q3 up on the screen and that

13  is already admitted in evidence.

14           THE COURT:  You may.

15  Q    And this is November 11, 2017; is that right?

16  A    Yes, it is.

17  Q    And you recall receiving this?

18  A    Yes, I do.

19  Q    And Ms. Hopper wrote to you, Jen, what's going on?  I'm

20  so worried about everyone.  If you y'all need me to do

21  anything to help like testify that we agreed to everything, I

22  will.

23           Did you receive this text message --

24  A    Yes, and --

25  Q    -- at or about the same time that you learned that a

1    lawsuit had been filed against you and Mr. Rubin?

2    A    Yes, I did.

3           MR. GROVER:  I have no further questions.  Your

4    Honor, thank you.

5           THE COURT:  Anyone at Mr. Rubin's table?

6           MS. CHIANG:  No, Your Honor.

7           THE COURT:  All right.  Cross-examination.

8           MR. BALESTRIERE:  Thank you.

9           Just one moment, please, Your Honor.

10          THE COURT:  And your microphone.

11          MR. BALESTRIERE:  Thank you.

12   CROSS-EXAMINATION

13   BY MR. BALESTRIERE:

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    Sorry, that was loud.

17   A    Yeah, that was loud.

18   Q    With regards to the nondisclosure agreements, you were

19   present when all of the plaintiffs signed them with the

20   exception of two plaintiffs:  Brittany Reyes and Brittany

21   Hassen; correct?

22   A    Correct.  Yes.

23   Q    I'm sorry?

24   A    Yes, sir.

25   Q    And they signed all of them at the penthouse; correct?

1    A    Let's see.  Emma did.  Amy and Mia.  Yes, they all did.

2    Q    And there was a safe at the penthouse; right?

3    A    Yes, sir.

4    Q    And amongst the other things that were kept in that safe

5    were extra copies of the nondisclosure agreement; correct?

6    A    Yes, sir.

7    Q    You also sometimes kept some copies at your house;

8    correct?

9    A    That's where I made -- that's where I printed the copies

10   from.

11   Q    Besides your house and the penthouse, as we've been

12   calling it, they weren't maintained anywhere else; right?

13   A    No, not that I can recall.

14        MR. BALESTRIERE:  I'd like to ask, Ms. Saydah, if

15   you can put up Plaintiff's Exhibit 92, which is in evidence.

16   We have seen some of these texts before, I'm not going to take

17   too much time with them.

18        But this is a text exchange --

19        Actually, this should be for the jury, this is in

20   evidence.

21   Q    So this is a text exchange -- you can focus in on the

22   yellow highlight, please, Ms. Saydah, which is between you and

23   Stephanie Shon that we've already seen where you say, Now H

24   just has to behave, on October 12, 2015.

25        You see that; right?

POWERS - CROSS - BALESTRIERE                    1721

1    A    Yes, I do.

2    Q    And H, of course, is Mr. Rubin; right?

3    A    Is Howie, yes.

4    Q    And Ms. Shon says, LOL, that's never the case, with some

5    laughing.

6            You respond, I know.  This girl seems fragile.

7            The woman being referenced there is Emma Hopper;

8    correct?

9    A    Yes, it is.

10   Q    And Ms. Shon says, Mentally or physically, LOL, with

11   laughing.  And you write, Mentally; correct?

12   A    Yes.

13           MR. BALESTRIERE:  Can I ask, Ms. Saydah, can you put

14   up Plaintiff's Exhibit 126 -- also in evidence, Your Honor --

15   at two.

16           And it should begin at 10:00 - - I just want to see.

17   That's Plaintiff's Exhibit 126 at page 2.  Is that what you

18   have there?  I may have the wrong cite.  It's 2015, November.

19   Thank you.

20   Q    You see this is between you -- these are texts between

21   you and Loredana Ferriollo who we've heard from; correct?

22   A    Yes.

23   Q    What you're saying is Natasha's here today, and you make

24   some other comments about her, And she's the most normal.  She

25   has tears in her eyes every time I see her.

POWERS - CROSS - BALESTRIERE                    1722

1          Do you see that?

2    A    Yes, I do.

3          MR. BALESTRIERE:  If you can go down a little more

4    on the next page, at 10:59 a.m.

5    Q    You end up saying that H was -- H was mean to her the

6    last time she was here, came all this way and H had an episode

7    and didn't even pay her anything.

8          Do you see that?

9    A    Yes, I do.

10   Q    Thank you.

11         MR. BALESTRIERE:  If you can go to page 6,

12   Ms. Saydah, where we're going to go to June 13th at 2017.

13   Q    And the L, that's Miss Loredana Ferriollo; right?

14   A    Yes, sir, it is.

15   Q    And she is saying to you, Listen, you and I know him when

16   he gets drunk, it's so funny, but other girls don't know so

17   it's funny to see how nuts he can get and the girl's

18   reactions, ps Natasha was sleeping in the other room, LOL.

19         Do you see that?

20   A    Yes, I do.

21   Q    And then you write -- there's a little bit of a wide

22   space, which I'm not commenting on.

23         So the next text that  we see here is at 10:34,

24   where you say, I'm friendly with all the girls, and then

25   Natasha isn't too happy.  Do you see that?

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE          1723

1  A    Yes, I do.

2          MR. BALESTRIERE:  Ms. Saydah, can I now ask you to

3  go to -- actually, the same date but a different exhibit,

4  Defendant's Exhibit I-4 at 11:00.

5  Q    We have seen this a little bit but just to clarify the

6  timing here, it's the same day, June 13, 2017 at 8:32 a.m.,

7  and you write to Natasha, Good morning, did you make it out

8  alive; right?

9  A    Yes, I did.

10 Q    Thank you.

11         MR. BALESTRIERE:  Can I ask, Ms. Saydah, can you go

12 to Plaintiff's 130.

13         Again, these are all in evidence, Your Honor.  I may

14 be moving for some, but we'll make sure the jury doesn't see

15 it first.

16 Q    So here, this is a text exchange that begins on June 30,

17 2017 between you and Mr. Rubin; right?

18 A    Yes.

19 Q    I do want to talk a little bit about this.

20         So he says in the evening -- for some reason the

21 text time seems slightly off.  You could see it says 8:26 p.m.

22 and then 8:25.  Perhaps some time difference on your phones,

23 but they're listed in what I believe is chronological  order.

24         And Mr. Rubin says, Howie, yes, at condo, two hours

25 of sex, I may leave soon.

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1724

```
 1              And you advise him wow, nice, yes, go to sleep.

 2              Do you see that?

 3    A    Yes, I do.

 4    Q    And then he writes, She was asleep when I got here.  She

 5    is sleep now again.

 6              And in reference to the "she," you respond

 7    crack-head, at least you got the sex in; right?

 8    A    Yes.

 9    Q    Then Mr. Rubin writes, She can't talk anyway.

10              And then your response is why did you stick your

11    dick down her throat, with some question marks and an emoji.

12              Do you see that?

13    A    Yes, I do.

14    Q    Mr. Rubin, again, I'm not going to try to say it out

15    loud.  Does laugh, writing, and writes yes.

16              Do you see that?

17    A    Yes, I do.

18              MR. BALESTRIERE:  Go down just a little bit,

19    Ms. Saydah, 9:31.

20    Q    He talks about how he woke her up and had her blow me.

21    Do you see that?

22    A    Yes, I do.

23    Q    And responds, after that, Very efficient.

24              To which you again write, Laughing, why can't it

25    always be like that.
```

POWERS - CROSS - BALESTRIERE                    1725

1           And Howie said, I said are you hungry?  She said I'm

2    just going to sleep.

3           To which you respond again with laughter, So funny,

4    I love it.

5           Do you see that?

6    A    Yes, I do.

7    Q    Thank you.

8           Now, that's 2017.  And I'm going to bring you back a

9    little bit, please, to show you --

10          MR. BALESTRIERE:  Only the witness right now.

11   Because this has been read, Your Honor, but I don't think they

12   had moved in, Plaintiffs' 132, at page 2.

13   Q    And there's going to be a text, Ms. Powers, that starts

14   on June 5th, 2014.

15          You may recall these were the texts that we

16   discussed about that come up as Tom on them that we talked

17   about yesterday.

18   A    Yes.

19          MR. BALESTRIERE:  Your Honor, I move for the

20   admission of the texts between 9:14 p.m. -- or rather, 9:14

21   p.m. and 9:21 on June 5th.

22          THE COURT:  Received.

23          (Plaintiffs' Exhibit 132, was received in evidence.)

24          MR. BALESTRIERE:  And, then, since we're doing it,

25   it's on the same page, June 30th, 10:29 a.m. and 10:39 a.m.

POWERS - CROSS - BALESTRIERE                1726

1      Thank you.

2  Q    So here we are now back in June 2014.  There are two

3  Brittanys that are plaintiffs, of course.

4           Here, June 2014, the Brittany that's being

5  referenced to is Brittany Hassen; right?

6  A    Yes, it is.

7  Q    Who testified earlier this week; correct?

8  A    Yes.

9  Q    And Brittany Reyes was last week.

10          And Mr. Rubin writes, Brittany is a mess, but it was

11  fun, we're about to leave for dinner.

12          To which you respond with laughter seven minutes

13  later; right?

14  A    Yes.

15  Q    And then the events that Ms. Hassen testified regarding

16  had now all taken place and it's June 30th.  There is another

17  text exchange between you and Mr. Rubin where he says, LD and

18  I are having dinner and then that girl Brittany is coming

19  over, with an exclamation point.

20          Do you see that?

21  A    Yes, I do.

22  Q    And then you respond, Oh, fun; right?

23  A    Yes.

24  Q    Then do you remember hearing Mr. Rubin testify yesterday

25  regarding the Rick's Cabaret incident or encounter, as I'll

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1727

1    call it?

2    A    Yes, I do.

3    Q    And do you remember that Mr. Rubin agreed with Ms. Hassen

4    that that took place about three months after this; right?

5    A    I'm not exactly sure of the dates.

6    Q    Okay.  But let me talk -- the date doesn't matter so, so

7    much.

8         Do you remember Ms. Hassen testifying that she

9    signed a non-disclosure with Mr. Rubin before going to Rick's

10   Cabaret?

11   A    I don't know where they were in relation to going to the

12   cabaret because I wasn't involved with that, so I'm not sure.

13   Q    But your testimony, to be clear, that you confirmed for

14   me earlier, is that NDAs were kept at the apartment, right?

15   At the penthouse?

16   A    The blanks ones?

17         I'm not sure what you're talking about.

18   Q    I'm sorry.  I didn't hear what you said.

19   A    I'm a bit little confused.  Can you --

20   Q    Sure.  There are two places where the NDAs were kept,

21   either in that safe at the penthouse; right?

22   A    Yes.

23   Q    Unless they were being taken out for a moment, but they

24   were kept in the safe at the penthouse; right?

25   A    Right.

POWERS - CROSS - BALESTRIERE                    1728

1   Q    And then you said you also printed them at your home;

2   right?

3   A    Yes.

4   Q    So Mr. Rubin he said what he did in September was

5   texted -- someone texted Brittany Hassen to ask her to come to

6   Rick's Cabaret.

7        Do you remember hearing that testimony?

8   A    I believe so, yes.

9   Q    But Ms. Hassen said that she signed the NDA back at the

10  apartment, which is where you said those NDAs were maintained.

11  Do you remember hearing that --

12  A    Yes.

13  Q    -- testimony?

14  A    Yes.  Yes, I do.

15       MR. BALESTRIERE:  Can you please put up -- thank

16  you, Ms. Saydah.  Thank you, Ms. Powers.

17       Can you please put up Plaintiff's Exhibit 85?  This

18  is in evidence.  We saw this.  This was first read in by my

19  colleagues.

20  Q    This is January 27, 2016 where Mr. Rubin says, I hate

21  feeling like this.  Then immediately responds, Just kidding.

22       Do you see that?

23  A    Yes, I do.

24  Q    And then about a half hour later, you say what?  With

25  laughter.

POWERS - CROSS - BALESTRIERE                    1729

1          Immediately thereafter, You beat a hot girl and got

2     laid, what's there to be upset about, right?

3     A    Yes.

4     Q    To which Mr. Rubin responds, Joke.

5          And then you respond immediately thereafter, You're

6     funny?

7     A    Yes.

8          MR. BALESTRIERE:  Can I ask just the witness see

9     Plaintiff's Exhibit 87 at page two.

10         Most of this exhibit is in, Your Honor.  I read from

11    some of it yesterday and I would like to move for the

12    admission of the text we heard about yesterday -- and I see

13    two counsel standing up -- from June 25th, 2016, at 11:09 p.m.

14         The three lines that Your Honor can see are

15    highlighted, which Mr. Rubin answered questions about

16    yesterday.

17         MR. GROVER:  Your Honor, objection.

18         MS. CHIANG:  We object as well.

19         MR. GROVER:  And would like a sidebar.

20         MS. CHIANG:  And would like a sidebar.

21         THE COURT:  Let's have two sidebars.

22         (Sidebar held; continues on next page.)

23

24

25

SIDEBAR                                                1730

1                    (Sidebar.)

2              THE COURT:  Who's first?

3              MS. LAVIGNE-ALBERT:  Your Honor, this is Ms. Powers.

4    It's not Mr. Rubin.

5              MR. BALESTRIERE:  I'm sorry.  I didn't hear

6    anything.

7              THE COURT:  She said this text is from Mr. Rubin,

8    not Ms. Powers.

9              MS. LAVIGNE-ALBERT:  No.  What I meant to say is we

10   are now -- on the stand is Ms. Powers, not Mr. Rubin.  There

11   is no claim for Miss Rico in this case.  What's the relevance

12   for her?

13             MR. BALESTRIERE:  Well, I mean, Your Honor, I think

14   he's saying to her, as you can see, it got very, very rough.

15   State of mind is essentially their argument, that these things

16   may have happened, but she had no idea about him.

17             MS. LAVIGNE-ALBERT:  It's not about any of the

18   plaintiffs, nor is the one plaintiff claiming sexual assault.

19             THE COURT:  Couldn't the jury -- first of all, we

20   are not going to let the jury, because you don't want the jury

21   to know that this was someone other than the plaintiffs.  But

22   isn't the fact that he did this to someone else, could not the

23   jury draw an inference, that it got too rough with one of the

24   plaintiffs?

25             MS. LAVIGNE-ALBERT:  Did what?  No one is claiming

SIDEBAR                                          1731

1   sexual assault or lack of consent.

2            The text doesn't suggest lack of consent.  It's

3   prejudicial.  We have a 403 argument for the prejudicial.

4            MS. CHIANG:  Your Honor already precluded this the

5   other day.  This was part of the exhibit that we showed you

6   and argued, DX-T4-6 and Your Honor agreed that this text would

7   not be read to the jury.

8            MR. BALESTRIERE:  For that purpose, Your Honor.  But

9   then I brought it up yesterday with Mr. Rubin and you did

10  allow me to ask questions about it.  So they've already heard

11  about it, but I had chose not to publish it at that time.

12           THE COURT:  I'm going to allow it.

13           MR. BALESTRIERE:  Thank you, Your Honor.

14           (Sidebar concluded.)

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

POWERS - CROSS - BALESTRIERE                    1732

1          THE COURT:  All right.  That exhibit is received.

2          (Plaintiffs' Exhibit 87, was received in evidence.)

3          MR. BALESTRIERE:  Thank you, Your Honor.

4   CROSS-EXAMINATION (Continued)

5   BY MR. BALESTRIERE:

6   Q    So, Ms. Powers, you saw before, but now I'm going to ask

7   you, this is Mr. Rubin writing you in yellow highlight;

8   correct?

9   A    Yes.

10  Q    What he says to you, on September 25, 2016, in the

11  morning, is, It got really rough, Jen, we need to be -- all in

12  caps -- very, very, very nice.

13         Then he says, Very important, trust me, very

14  important; correct?

15  A    Yes.

16  Q    Thank you.

17         Mr. Rubin is paying for your counsel; correct?

18  A    Yes, he is.

19  Q    We heard this morning some very limited lines of Ms.

20  Shon's deposition.

21         Do you remember hearing that?

22  A    Yes, I do.

23         THE COURT:  Is your mic on?

24         MR. BALESTRIERE:  It is now.  I'm sorry, Your Honor.

25  Q    So I will repeat my question.  I'm sorry.

POWERS - CROSS - BALESTRIERE                    1733

1          I first asked whether or not Mr. Rubin was paying

2     for your counsel and you confirmed that he is.

3          I was then asking you about Ms. Shon who --

4     Ms. Shon's not going to testify; right?

5     A    Not that I'm aware of.

6     Q    But Stef Shon, as Mr. Rubin called him -- called her, her

7     lawyers were also being paid for?

8          MR. GROVER:  Objection.

9          MS. CHIANG:  Objection.  What's the relevance?

10         THE COURT:  Overruled.  I see it.

11    Q    So, just again, I'll just ask the question.  Her lawyers

12    were being paid for by Mr. Rubin as well; correct?

13    A    I'm not sure.

14    Q    Well, you attended Mr. Rubin's deposition; right?

15    A    Yes, I did.

16    Q    Do you remember Mr. Rubin being asked whether or not he

17    was paying for Ms. Shon's attorneys?

18    A    I don't remember.

19         MR. BALESTRIERE:  So I'd like to show just to the

20    witness to Friday to try to refresh her recollection,

21    Mr. Rubin's deposition, page 197, at line 3.

22         I'm going to get closer to my colleague, Your Honor.

23    Q    So when you have the chance, Ms. Powers, to read what's

24    in yellow highlight, please then look up at me.

25    A    I've read it.

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                1734

1    Q    Does that refresh your recollection -- let me ask a

2    question.  I'm sorry.

3            Does that refresh your recollection that, in fact,

4    Mr. Rubin was paying for Ms. Shon's lawyers in this case?

5    A    Yes, he was.

6    Q    And are you aware of a conversation that Mr. Rubin and

7    Ms. Shon had where she discussed her receiving some kind of

8    severance?

9            MS. CHIANG:  Objection, Your Honor.

10           THE COURT:  Overruled.

11   A    I don't -- I don't know.

12   Q    So your answer is you don't know?

13   A    Yes.  That's my answer.

14   Q    Thank you.  So --

15           MR. BALESTRIERE:  You can take that down,

16   Ms. Saydah.

17           May I ask you to put up Plaintiff's Exhibit 88.

18           This is in evidence, Your Honor.  And go to a text.

19   It's on page 2, a text on March 30, 2017.

20   Q    Can you see, starting at 9:52 p.m. that's from you?

21           MR. BALESTRIERE:  You can blow that up maybe just a

22   little bit.  Thank you.

23   Q    You say, Ahhh, I love playing mother hen.  Do you see

24   that?

25   A    Yes, I do.

1    Q    You said that means a lot to me, more laughter, and then

2    you put in quotes Mother Jen.  Do you see that?

3    A    Yes, I do.

4    Q    And then Mr. Rubin says, You're their psychology.

5            To which you respond, again, with laughter, Yeah,

6    because you drive them crazy, again, with more laughter;

7    correct?

8    A    Yes.

9    Q    There is some more banter.  And then Mr. Rubin calls you

10   a great team; right?

11   A    Yes.

12   Q    And your response is absofuckinglutely?

13   A    Yes, it was.

14           MR. BALESTRIERE:  I'd like to show just the witness

15   right now S3-1 at page 3.  And it is a text that begins on

16   October 12, 2015.  Actually, if we can go down below the

17   screen shot because that's what I  would want to ask questions

18   about and go to 9:33 p.m.

19   Q    So are you at least able to see that in front of you,

20   ma'am?

21   A    I am.

22   Q    Okay.  Do you recall that Ms. Hopper says to you –– we

23   saw this, but I still don't believe this part was actually

24   admitted into evidence, that Mr. Rubin is the rudest man I

25   have ever met, I would have not come this far for a man like

POWERS - CROSS - BALESTRIERE                    1736

1      this.

2              Do you remember her saying that?

3      A    I do remember.

4      Q    And do you remember your response was to not be insulted

5      and that he is entitled to his own opinion?  And then you say

6      to her I wouldn't want to hook up with a gal on her period

7      either.

8              Do you remember saying that?

9      A    Yes, I do.

10             MR. BALESTRIERE:  Your Honor, I move for the

11     admission of at least this page, which I don't think was

12     actually in evidence.

13             MR. GROVER:  No objection, but we think it's in

14     evidence.

15             THE COURT:  It is again.  It is received.

16             MR. GROVER:  The entire exhibit is in, Your Honor.

17     It is Defendant's Exhibit S3 -1.

18             THE COURT:  Thank you.

19             MR. BALESTRIERE:  It makes it easy.

20             I asked, Ms. Saydah, actually put up -- let's hold

21     off for a second.

22     Q    Do you remember telling Mia, after she went to the

23     hospital, that you were very, very scared; correct?

24     A    I don't know in contact -- in context what you're

25     referring to.

POWERS - CROSS - BALESTRIERE                    1737

1              MR. BALESTRIERE:  This is already in evidence.  I

2    will ask, Ms. Saydah, to put up DX-JP 206 at page 2.

3    Q    And this will be a text that is sent at 9:01 p.m., on

4    October 19, 2016 where, this is between you and Mia Lytell;

5    correctly -- correct?  Excuse me.

6    A    Yes.  Yes.

7    Q    So, the Oh, that's great, we were very, very scared,

8    that's from you; right?

9    A    Yes, sir, it is.

10   Q    And do you remember -- I can go to another exhibit if we

11   need to, where Ms. Powers -- excuse me, where Ms. Lytell

12   actually says she's sorry to you for what took place at the

13   penthouse that night; correct?

14   A    Ms. Lytell?  I'm a little bit confused.

15   Q    I'm sorry.  We're talking about Mia.

16   A    Oh, I'm sorry.  Yes, Mia Lytell.

17   Q    That's okay, I know it says Mia Rachel here.

18   A    Right.

19   Q    Just to confirm, Mia Raquel is the plaintiff Mia Lytell;

20   right?

21   A    Yes.

22   Q    So my question was, do you recall at some point the next

23   day or maybe very early in the morning Ms. Lytell actually

24   says, I adore you, Jen, and I honestly can't say how sorry I

25   am to you and H?

                Michele Lucchese, Official Court Reporter

POWERS - CROSS - BALESTRIERE                    1738

1        Do you remember saying that?

2    A    Yes, I do.

3    Q    Thank you.

4            Now, forgive me for being direct about this, but you

5    started crying earlier because you said that Ms. Hopper called

6    you to taunt you about initiating a lawsuit; right?

7    A    Yes, sir.

8            MR. BALESTRIERE:  Can we see DX-Q3, please.

9            This is in evidence.  Your counsel actually

10   referenced this.

11           Just go to the very bottom, please, and then blow

12   that up, please.

13   Q    We have seen a little of this before.  So I'm just going

14   to ask you some questions about this.

15           So, that message was left for you in February of

16   2018, the taunting message; right?

17   A    Yes.

18   Q    Okay.  And right here, the messages that we see from, at

19   least from Emma in February 2018 are her saying to you

20   Jennifer, how are you, love, I miss all y'all, how is Howie;

21   right?

22   A    Yes.

23   Q    There is nothing taunting about that; right?

24   A    The lawsuit had already been filed.

25   Q    Do you consider -- I want to be clear on what your

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1739

1    testimony is.

2           Do you consider the three lines of texts which I

3    actually asked Ms. Hopper about last week and defense counsel

4    asked Ms. Hopper about --

5           MR. McDONALD:  Objection, Your Honor.

6           THE COURT:  Overruled.

7    Q    So I will -- do you consider those -- is your testimony

8    that those three lines are taunting?  Is that your testimony?

9    A    Yes.

10   Q    Okay.

11          MR. BALESTRIERE:  Your Honor, may I ask if defense

12   counsel plays the audio.  I think we have it set up, but I

13   wasn't sure, Defendant's B3, they played it this morning.

14          THE COURT:  If they are willing to.

15          MR. GROVER:  Defendant's Exhibit U3.

16          MR. BALESTRIERE:  I'm sorry, my U looked like a V to

17   me.

18          (Audio playing.) (Audio stopped.)

19          MR. BALESTRIERE:  Thank you.

20   Q    So I just want to be, again, clear what your testimony

21   is.  Your testimony was that that voicemail is Emma Hopper,

22   who the jury saw, taunting you; correct?

23   A    Yes.  I didn't know --

24   Q    Miss, if you -- your counsel can --

25   A    -- could be so wicked.

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1740

1  Q    Miss, please.  Here's my question.  The jury has now

2  heard that twice, okay.

3  A    Yes, sir.

4  Q    And you cried this morning because you said that that

5  message sent around the same time as these texts was taunting;

6  correct?

7  A    Yes, sir.

8  Q    There was a question about Brittany Reyes about arranging

9  her flight and the jury has already seen certain texts about

10 H's assistant.  I'm not going to go over that.  But you did

11 effect payment to her after Mr. Rubin authorized that;

12 correct?

13 A    Yes.

14 Q    Now, there were some questions, perhaps more than there

15 should be, in this case about discovery and how people produce

16 things.

17           With regards to --

18           MR. BALESTRIERE:  And, actually, if I can ask you to

19 put it up in evidence, Ms. Saydah, K4.

20 Q    This is the photo, I believe, of -- it's a photo of what

21 you call the love letter that Natasha had left for Mr. Rubin

22 that you took a photo of on October 6, 2015; right?

23 A    Yes.

24 Q    And, so, you maintained a copy of this before this

25 lawsuit, I'm saying; right?

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1741

1    A    I believe it was in the safe.

2    Q    That's my point.  You kept a copy of this love letter, as

3    you called it, in the safe; right?

4    A    Yes, sir.

5    Q    And there were two other Post-its that we have seen.  I

6    can bring them up if we need to.

7              You kept copies of those in the safe as well; right?

8    A    Yes.

9    Q    In fact, there's a couple of texts that you talk about

10   your records, so you did maintain some records here as well;

11   right?

12   A    These were a part of the things that I kept in the safe.

13   Q    Right.  Thank you.

14             Now, you testified earlier that you had some trouble

15   uploading this photo.  Do you remember that?

16   A    Yes.

17   Q    And again you testified -- withdrawn.

18             No, I think you actually did say this, that you

19   had -- that you were present at all of the plaintiffs'

20   depositions?

21   A    Yes, sir, I was.

22   Q    And I think you said to hear the crazy things they would

23   say.  Well, I'm going to ask you about questions asked about

24   Natasha Tagai, if you remember them, and I can show you a

25   deposition transcript if you don't.

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1742

1          But do you remember that Ms. Tagai was asked by, I

2   believe it was Mr. Rubin's lawyer, what she did to identify

3   electronic communications responsive to the discovery requests

4   in this case and her answer was that she was asked what

5   devices she had used in the time frame that was asked and was

6   given directions to drop them off to a service where the

7   discovery process took place.

8          Do you remember that?

9   A    Yes, I do.

10          MR. GROVER:  Your Honor, I object.

11          I realize the question has been answered, but I

12   think that these type of questions are not appropriate for

13   this witness.

14          THE COURT:  Well, right now he's just asking is if

15   she heard it.  I don't know what the next question is going be

16   to.  Ask it and then we will see.

17   Q    Similar question --

18          MR. BALESTRIERE:  And if easier, Your Honor, I can

19   put up the deposition transcript.

20   Q    I have only more question about what you heard Ms. Tagai

21   said.

22          Do you remember her being asked what devices did you

23   provide to the service you have testified about?

24          And she said I dropped off my laptop, my iPhone, and

25   an older iPhone just in case they needed that, and I believe

*Michele Lucchese, Official Court Reporter*

POWERS - CROSS - BALESTRIERE                          1743

1    my iPad too.

2              I can show you the transcript.

3              MR. GROVER:  Objection.

4              THE COURT:  Let's send the jury to lunch and have a

5    sidebar.

6              Ladies and gentlemen, we will take one hour now.

7    Come back at 20 to 2:00, please.  You know the restrictions

8    about speaking about the case.

9              Have a nice lunch.

10             (Jury enters the courtroom.)

11             THE COURT:  Mr. Balestriere, is there any reason for

12   asking these questions other than --

13             MS. CHIANG:  The judge is talking.

14             MR. GROVER:  I'm sorry, Your Honor.

15             THE COURT:  I'm talking to the plaintiffs' attorney.

16             Is there any reason to ask these questions other

17   than to re-emphasize what your own clients said at their

18   depositions?

19             MR. BALESTRIERE:  In essence, and that was as far

20   as -- and what she heard, because there had been questions

21   raised about what the defendants did and what the plaintiffs

22   did in terms of how they turned over text messages.

23             The deposition designation question from this

24   morning, in fact, regards Ms. Tagai.  That was my last

25   question on it, Your Honor.

POWERS – CROSS – BALESTRIERE                    1744

1          THE COURT:  How does that impeach this witness?

2          MR. BALESTRIERE:  I -- this is relevant to further

3    cross that I will be doing later on.  So I'm not going to ask

4    any more questions about this.  And I suppose if you Your

5    Honor thinks I don't connect it up, then maybe it could be

6    stricken.

7          THE COURT:  I'll leave it in for now, but I'll go

8    back if you don't connect it up.

9          MR. BALESTRIERE:  Thank you, Your Honor.

10         THE COURT:  Okay.  See you in an hour.

11         (Lunch recess.)

12         (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            A F T E R N O O N   S E S S I O N

 2            (Time noted:  1:45 p.m.)

 3            (In open court; Jury not present.)

 4            THE COURT:  Okay, what's up.

 5            MR. GROVER:  Your Honor, thank you for your time.

 6            The parties have a request that we'd like to

 7   schedule, and the Court's pleasure, of course, we would like

 8   it, all the parties would like to submit some written

 9   requests, as well as Mr. Balestriere as well, we would ask the

10   Court, if you would, to allow us until 8 p.m. tonight to make

11   a 5K filing of various kinds.

12            And if Your Honor did find time to schedule

13   tomorrow, I would suggest, I know Your Honor's very --

14            THE COURT:  That we could, no.  No, the Judge is

15   telling you that he's too busy for the lawyers.

16            MR. GROVER:  We would really appreciate if Your

17   Honor would find the time, and we prefer to do it by video, if

18   it were possible and, of course, at the Court's pleasure.

19            THE COURT:  Is this solely on jury charges?

20            MR. GROVER:  Solely on jury charge.

21            MR. BALESTRIERE:  And we have no problem.

22            THE COURT:  I have no hesitation about doing it, I'm

23   working for what I can move.

24            How long do you think?

25            MR. GROVER:  Everybody's saying an hour, Your Honor.
```

PROCEEDING                           1746

1    I think we're all guessing.

2                (Discussion was had off the record.)

3                THE COURT:  I'll need to get court reporter willing

4    to work Saturday.  This on Saturday.

5                So Saturday 10 a.m. by Zoom.

6                MR. BALESTRIERE:  Your Honor, sorry one of my son's

7    has like a retreat and a mass, can I ask 2 p.m. on, please?

8                THE COURT:  In that case, 2 p.m.

9                MR. BALESTRIERE:  Thank you, Your Honor.

10               THE COURT:  Thank you, Your Honor.

11               Send around a Zoom link.

12               MR. GROVER:  And I have one last question.  What's

13   your preference with respect to summations?  Is it defendant

14   first, plaintiffs after, or it is like in criminal with

15   plaintiff --

16               THE COURT:  I do that in criminal, and in civil I do

17   defendant and then plaintiff.

18               If you all stipulate to something else, which I you

19   probably won't, that's the way we're going to do it.

20               MR. GROVER:  Okay.  Thank you, Your Honor.

21               THE COURT:  All right, let's have the jury in,

22   please.

23               MR. BALESTRIERE:  I do have Ms. Lytell outside, and

24   I think we're going to be fine, I just would really like to

25   get her in today.  If we can bring her in before all of the

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDING                                    1747

1    deposition designations.  She should be very short.

2                MR. McDONALD:  No objection.

3                THE COURT:  Bring the jury in.

4                (The witness resumes the stand.)

5                THE COURT:  Anything's better than trying to squeeze

6    you in to, you know, an half hour on an hour tomorrow.  It's

7    better all over.

8                I used to tell my associates and I tell to my law

9    clerks, this is a 24/7 job.

10               (Jury enters the courtroom.)

11               THE COURT:  All right, everyone be seated.

12               Ladies and gentlemen, as you know, this morning we

13   interrupted Mr. Rubin's case to start Ms. Powers' case.

14               And we have another phase to the case that's called

15   rebuttal, that's usually very short, and I think it will be

16   here.

17               And rebuttal is when the plaintiff gets to go and

18   respond to things that the plaintiffs heard during the

19   defendants' cases.

20               We're going to interrupt Ms. Powers case now to

21   start plaintiffs' rebuttal.

22               So let's have a new witness for the plaintiff.

23               But the reason we're doing this is just convenience

24   of witnesses.  We're just trying to get people out.

25               MS. LAVIGNE-ALBERT:  Your Honor, I'm sorry, may I

1    approach?

2         THE COURT:  No.  If it's 30 seconds, then talk to

3    her.  I do not want the jury waiting any longer.

4         (Pause in the proceedings.)

5         MS. LAVIGNE-ALBERT:  Your Honor, we had a

6    misunderstanding.  We thought we were going to finishing

7    Ms. Powers and then calling Miss Lytell on plaintiffs'

8    rebuttal.

9         THE COURT:  That's not what he said during the

10   break.  He said we're going to bring her in -- I

11   misunderstood?

12        MR. BALESTRIERE:  Forgive me, Your Honor, maybe I

13   misstated it.

14        But what Ms. Lavigne-Albert said is what I intended

15   and what I planned on doing.

16        THE COURT:  Okay.

17        So continue with Defendant Powers case.

18        I will have Ms. Powers back to the stand here.

19        MR. BALESTRIERE:  Thank you, Your Honor.

20        (The witness resumes the stand.)

21        MR. BALESTRIERE:  May I, Your Honor?

22        THE COURT:  Please.

23        MR. BALESTRIERE:  Thank you.

24   CROSS-EXAMINATION

25   BY MR. BALESTRIERE:

POWERS - CROSS - BALESTRIERE                    1749

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    So you were paid on a monthly basis by Mr. Rubin for

4    years, correct?

5    A    Yes.

6    Q    And your pay ended up going to $15,000 a month?

7    A    Yes, it did.

8    Q    Thank you.

9         Now, we discussed yesterday how Mr. Rubin could have

10   gone to services like those which you can find in that

11   Eros.com website.

12        Do you remember that testimony?

13   A    I do remember that.

14   Q    And, in fact, you can get a, what's called a girlfriend

15   experience, on Eros.Com; isn't that right?

16   A    I have no idea.

17   Q    If Mr. Rubin would have procured services from there, he

18   would not have needed you to make arrangements for flights at

19   a minimum, correct?

20        MR. GROVER:  Objection.

21        THE COURT:  Sustained.

22   Q    If Mr. Rubin had met with women in New York instead on

23   Eros.Com, no one would have had to make arrangements for

24   flights?

25        MR. GROVER:  Objection.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS – CROSS – BALESTRIERE                    1750

1          THE COURT:  Sustained.  It's argument.

2          MR. BALESTRIERE:  Thank you.

3          I'm not going to ask too much about this, but you

4    know that the name of Mr. Rubin's soon to be ex-wife is Mary,

5    right?

6          MS. CHIANG:  Objection, Your Honor.

7          THE COURT:  I don't know where he's going.

8          MR. BALESTRIERE:  I have very few questions on this.

9          THE COURT:  Well, it's not the number, it's the

10   quality of the questions.

11         MR. BALESTRIERE:  Sure.

12         THE COURT:  We better have a sidebar.

13         MR. BALESTRIERE:  Thank you, Your Honor.

14         (Continued on the next page.)

15         (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                           1751

1          (The following occurred at sidebar.)

2          MR. GROVER:  Yes, Your Honor, just before we get

3    started, this strange man behind the mask is my colleague, Jon

4    Mazur, from my law firm.

5          THE COURT:  Fine.

6          MR. BALESTRIERE:  So where I want to ask is a text

7    exchange, Your Honor, where is the name Mary is mentioned, and

8    Mr. Rubin talks about coming up with a tennis excuse.

9          Ms. Powers knows about this and shows that she's

10   aware that he was lying but what was going on.

11         I do intend to ask her if she knows that Mary is a

12   graduate of Harvard business school.  The reason why I ask

13   that is that Mr. Rubin was able to hide this from her for

14   years, including a bank account.

15         THE COURT:  You already brought out through

16   Mr. Rubin's testimony that he was lying to his wife for years.

17         You don't need to pile it on with this specific

18   example, so no.

19         MR. BALESTRIERE:  So, Your Honor, may I bring out

20   the texts?

21         THE COURT:  What's in the text?

22         MR. BALESTRIERE:  That he has a tennis excuse, and

23   he puts "tennis" in quotes.

24         THE COURT:  No, it's not necessary, when the witness

25   has admitted.

SIDEBAR CONFERENCE                    1752

1          You can line that without this process.

2          MR. BALESTRIERE:  Understood, Your Honor.  Thank

3    you.

4          THE COURT:  Okay.

5          (End of sidebar conference.)

6          (Continued on the next page.)

POWERS - CROSS - BALESTRIERE                    1753

1              (In open court; Jury present.)

2              THE COURT:  The basis for that ruling was Rule 403.

3              Okay, continue.

4              MR. BALESTRIERE:  Thank you, Your Honor.

5    CROSS-EXAMINATION (Continued)

6    BY MR. BALESTRIERE:

7    Q    Now, Ms. Powers, we've heard some -- we've heard a good

8    deal of testimony, in fact, about the fact that in

9    October 2016, Ms. Lytell was arrested.

10             Do you remember that testimony?

11   A    Yes, I do.

12   Q    And you remember that she had a criminal case that

13   preceded at least into August of 2017.

14             Do you remember hearing about that?

15   A    Yes, sir, I do.

16   Q    And that in August 2017, she ended up disclosing to her

17   lawyer, a name the jury's heard, Jeremy Saland, what you and

18   Mr. Rubin had told her.

19             Do you remember hearing that?

20   A    I do remember hearing that.

21             MR. BALESTRIERE:  I want to ask some questions about

22   that.

23             So first I am not totally sure this is in evidence.

24   It may have been put in the other day.

25             Can I show to the witness and the Court Defendants'

POWERS – CROSS – BALESTRIERE          1754

1  231 at 2.

2          (Exhibit published to the witness.)

3          MR. BALESTRIERE:  I believe this is in evidence, but

4  I'm a little uncertain, given the way it came in on

5  Ms. Lytell's cross, Your Honor.

6          MS. LAVIGNE-ALBERT:  It's in.

7          MR. BALESTRIERE:  Okay, it is in.  So I ask that it

8  be published to the jury.

9          (Exhibit published.)

10  BY MR. BALESTRIERE:

11  Q    So the blue lines here, and I think throughout, if I ask

12  you questions without clarifying, are from you, Ms. Powers,

13  and the yellow are from Mia Lytell.

14          Do you see that?

15  A    I'm sorry, can you -- yes, I do understand that, yes.

16  Q    Let me say below.  The blue rows, is that you writing a

17  text?

18          Do you agree with me?

19  A    Yes, sir.

20  Q    Okay, thank you.

21          And the yellow is Mia writing a text?

22  A    Yes.

23  Q    Let's go to this second text by you.  This is about six

24  weeks after Mia was arrested.

25          December 12th, 2016, it says, 9:42 p.m., and you ask

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS - CROSS - BALESTRIERE          1755

1    Mia:  What did H end up saying about the post?

2           Do you see that?

3    A    Yes.

4    Q    And then Mia responds, in fairly quick succession:  He

5    asked if they mentioned his name at all or his address.  I

6    said, no, because they did not.

7           Do you see that?

8    A    Yes, I do.

9    Q    So do you remember that was you asking Mia about her

10   conversations with Mr. Rubin about the ongoing criminal case?

11   A    Yes.

12          MR. BALESTRIERE:  Now -- and you can take that down,

13   please.

14          This one at least I am sure is in evidence, DXJP220.

15          I ask Ms. Saydah to put up.  This is going to be a

16   further text exchange, ma'am.

17          And go to page 3, text that begin on February 2nd,

18   line 9.

19          THE COURT:  This is in, right?

20          MR. BALESTRIERE:  This is in evidence, yes, Your

21   Honor.

22          (Exhibit published.)

23          MR. BALESTRIERE:  And the jury can see this.

24   Q    So there's a conversation.  Again, the blue is you.  The

25   yellow is Mia.  And you're going back and forth.  And you're

POWERS - CROSS - BALESTRIERE          1756

1    asking her questions about what happened in the court case,

2    right?

3    A    Yes, I am.

4    Q    Where she said:  Lawyer said not to plea.

5            You say you would:  Said no deal, too.

6            And it just kind of goes back and forth between the

7    two of you, right?

8    A    Yes, it does.

9    Q    And on line 15, which is at 11:33 p.m., by you, you

10   write:  Trust your lawyer, I'm so sorry, right?

11   A    Yes.

12   Q    I think your testimony was that during this time Mia was

13   begging you and Mr. Rubin to make arrangements for her,

14   correct?

15   A    No, it's not what I meant.

16   Q    So let me ask you:  You testified this morning that you

17   did make flight arrangements for Mia, correct?

18   A    For her court case, yes.

19   Q    In fact, you arranged her flights for all criminal court

20   appearances, correct?

21   A    I believe so.

22   Q    And Mr. Rubin paid for her lawyer, at least through this

23   point, correct?

24   A    Yes.  He had.

25            MR. BALESTRIERE:  So that's -- I showed you it was

POWERS - CROSS - BALESTRIERE                    1757

1    October, December.  This is February.

2              Now I'd like to show you some text exchange five

3    months later.

4              So, Ms. Saydah, can you put up, in evidence,

5    DXJP221, and go to page 4.

6              (Exhibit published.)

7    Q    Again, the same thing, Ms. Powers, the blue is from you,

8    the yellow is from Mia.  And amongst the things that Mia

9    writes is:  You are both outstanding to me.

10             See that at 11:16 a.m.?

11   A    Yes, I do.

12   Q    And here you write to her, and I think I'm going to

13   correct something you said:  Of course, we need to keep

14   ticking away as much as this ducks.  Maybe you meant goes.

15   But we need answers, and it doesn't help that your lawyer

16   sounds like a dickhead.

17             You see that?

18   A    Yes.  But ducks, I meant sucks.

19   Q    Okay, thank you.

20             Now this is on July 17th in the morning, right?

21   A    Yes.

22             MR. BALESTRIERE:  I ask just for the witness,

23   because I don't believe this is in yet.  Plaintiffs' 83 at

24   page 2.  The text which begins, Your Honor, on July 17, 2017

25   at 10:50 a.m.

POWERS - CROSS - BALESTRIERE                1758

1              (Exhibit published to the witness.)

2              MR. BALESTRIERE:  And I want to get in through

3    11:19 a.m., and then ask some questions below.

4              Maybe you can scroll down so counsel can see.

5              Yes, so this it the redacted.

6              THE COURT:  Received.

7              Thank you, Your Honor.

8              (Plaintiffs' Exhibit 83 at page 2, was received in

9    evidence.)

10             (Exhibit published.)

11             MR. BALESTRIERE:  So let's publish this.  Let's

12   start with July 17th at 10:50 a.m. so the jury can see.

13   Q    So this is you writing to Mr. Rubin on the 17th with

14   what's going on, keeping him informed about the court case,

15   right?

16   A    Yes.

17   Q    And at 11:19 he responds:  Oh, Jesus, right?

18   A    Yes.

19             MR. BALESTRIERE:  And then if we go down, I think

20   Mr. Grover asked you a couple of questions about this.

21             So just go down some more, Ms. Saydah, so we can

22   see -- that's good enough.

23   Q    On July 22nd, at 4:26, you say:  Mia is too close for

24   comfort.  She was a basket case and the root of all of our

25   powers?

POWERS - CROSS - BALESTRIERE                    1759

```
 1              You say that, right?
 2    A    The root of all of our problems.
 3              MR. BALESTRIERE:  I'm sorry, all of our problems.
 4    Forgive me.  Thank you.
 5    Q    And then you note -- some things we don't see, but you
 6    note:  I don't think we should see Mia at least until the
 7    court case is over.
 8    A    Yes, sir, I did say that.
 9              MR. BALESTRIERE:  So this is July 22nd.  I want to
10    bring you a few weeks later now, please.
11              So this is in evidence, Your Honor, DXJP225.
12              (Exhibit published.)
13              MR. BALESTRIERE:  And if we could go to page 8.  The
14    lines that start at 90 --
15    Q    Actually, looking at the very top, you see this:  Police,
16    RPT, def in order?
17    A    Yes, I see that.
18    Q    So that's you talking to Mia about a police report
19    definitely in order, right?
20              I could show you above it, if you wish.
21    A    I would like to see, because I'm not sure.
22              MR. BALESTRIERE:  Sure.
23              Ms. Saydah, can you go up just a little bit?
24              Keep going up some more.
25              Jeremy said:  We're filing a police report.
```

POWERS – CROSS – BALESTRIERE                    1760

1          I don't want to go further than that.

2    Q    But do you see what's there?

3    A    Yes.

4    Q    If we can go down some more.

5          So then you're referencing this police report

6    definitely in order, right?

7    A    Yes.

8          MR. BALESTRIERE:  Then if you go down, you see maybe

9    the third blue line, I think the jury can see now,

10   August 13th, 2017, at 10:15 a.m.

11   Q    There you write Mia:  You should speak to our lawyer

12   today.  I think her and Jeremy could work together, right?

13   A    Yes.

14   Q    By "our lawyer," on August 13th, 2017, you were

15   referencing a name I think we heard, Yifat Schnur, correct?

16   A    Yes.

17         MR. BALESTRIERE:  Can I ask you to go to -- it's

18   page 10, I believe line 129, please, Ms. Saydah.  It's the

19   same exhibit.  Just go to the very top.

20         And here we see a text that you write to Mia.  I'm

21   going to read it.

22         Dear Jeremy.  I am writing to express authorization

23   for you to discuss my case with another attorney by the name

24   of Yifat Schnur.  You have my express permission to share any

25   and all information in regards to my case with Ms. Schnur.

POWERS – CROSS – BALESTRIERE          1761

1    Ms. Schnur can be reached at a given number.  Thank you.

2    Q    You see that?

3    A    Yes, I do.

4    Q    You wrote that to Mia, right?

5    A    Yes.

6    Q    And you wanted Mia to send that on to Jeremy Saland,

7    correct?

8    A    Yes, I did.

9    Q    So within a couple of days, Mia ended up stopping having

10   contact with you; is that correct?

11   A    I believe so.

12          MR. BALESTRIERE:  Can you take that down and show to

13   the witness and the Court and counsel, Plaintiffs' 84, where I

14   think we have part of this in evidence, but I'll ask counsel

15   to confirm, that this part, it's going to be text that begin

16   on August 20th, 2017 at 1:13 p.m. and they go through

17   2:29 p.m.

18          (Exhibit published.)

19          MR. BALESTRIERE:  So can we now put it up.

20          And, again, just some more texts.  This is a few

21   days later.  And I'm going over the highlighted text messages.

22          So you write:  I think you need to be extremely

23   careful with anyone Mia sets you up you.  Now that she's gone

24   MIA, looks more and more like a set-up, to which Mr. Rubin

25   responds:  Okay, let me think.

POWERS - CROSS - BALESTRIERE          1762

1      And you say:  Yeah, that whole group knows what's

2   going on, NDA means nothing, I'm afraid.

3   Q    That's what you said, right?

4   A    Yes, it is.

5           MR. BALESTRIERE:  You can take at that down, please.

6           Now, we've talked a lot about this penthouse.  I'm

7   going to ask you some questions about with regards to how

8   things terminated with the lease at the penthouse.

9   Q    You were asked questions about at that at your

10  deposition, right?

11  A    Yes.

12  Q    And you testified that the lease ended really by around

13  this time in September of 2017, right?

14  A    Yes, sir, it did.

15  Q    So this is really just weeks after that last text that we

16  just saw, right?

17  A    Yes.

18  Q    Now, you heard Mr. Rubin testify that he had this

19  penthouse because it was within a few blocks of his job,

20  right?

21  A    Yes.

22  Q    And through 2015 at least, he worked at -- he worked a

23  few blocks away from the penthouse, correct?

24  A    Yes.

25  Q    You testified that he chose to give up the lease because

POWERS - CROSS - BALESTRIERE          1763

1    he had retired and he no longer needed a penthouse, right?

2    A    That was one reason, yes.

3    Q    Let me just -- you testified that the reason why you gave

4    up the lease was because Mr. Rubin had retired.

5         That's what you said in your deposition, right?

6    A    Yes.

7    Q    He retired in 2015, right?

8    A    Yes.

9    Q    We're talking about August, September of 2017, right?

10   A    Yes.

11   Q    You renewed the lease after he retired in 2015; isn't

12   that true?

13   A    Yes.

14   Q    In fact, you almost were considering purchasing the

15   penthouse where Mr. Rubin was in early 2017; isn't that right?

16   A    No.  Not that I'm aware of.

17        MR. BALESTRIERE:  All right, can I ask that the

18   witness be shown Plaintiffs' 98.  Just the witness and the

19   Court, Plaintiffs' 98B.  This has been somewhat redacted.

20        (Exhibit published to the witness.)

21        MR. BALESTRIERE:  And I believe Your Honor and

22   counsel can see the relevant portions of this.

23        And I would move for its admission, Your Honor.

24        MR. GILBERT:  Your Honor, objection.

25        THE COURT:  Let me look at it.

1          Sidebar.   Sorry.

2          (Continued on the next page.)

3          (Sidebar conference.)

SIDEBAR CONFERENCE                    1765

1              (The following occurred at sidebar.)

2              THE COURT:  It's hearsay, and what does possibly

3    show?

4              MR. BALESTRIERE:  She just said she doesn't

5    remember.

6              MR. McDONALD:  Hold on.

7              MR. BALESTRIERE:  Okay.

8              It's an exchange between her and her real estate

9    agent about possibly buying the place.  We redacted the

10   amounts because of the concerns that defendants have made.

11             It's being put in because she said she doesn't

12   remember if, in fact, they started it, or testimony about what

13   they actually did with the lease.  I think it's inconsistent

14   with what they have said here.

15             They gave up the lease because of this case.  And

16   you'll see where I'm going with this, Your Honor.

17             But she just doesn't seem to remember, otherwise I

18   wouldn't have sought to put this up.

19             THE COURT:  Okay, he's taking out the numbers.  It's

20   being used for impeachment.

21             What's the problem?

22             MS. LAVIGNE-ALBERT:  So, so --

23             MR. BALESTRIERE:  Do you have the redacted one?

24             MS. LAVIGNE-ALBERT:  No.

25             MR. BALESTRIERE:  So, yes, so.

SIDEBAR CONFERENCE                              1766

1          MS. LAVIGNE-ALBERT:  Where does it say that he was

2    considering buying it?

3          MR. BALESTRIERE:  I'm not sure he would sell, but

4    Howie was interested in buying one of those if it was for

5    sale.

6          And then she kind of responds in turn.

7          MS. LAVIGNE-ALBERT:  This is -- this is Alexander

8    Glibbery.  He's been working for the property management

9    company they had been dealing together with years.

10          It's not like she just called up and his office.

11    He's offering, he's saying, Hey, Howie can buy this.

12          It's not like he's saying Howie told me he was

13    considering buying it for you, Jennifer.

14          THE COURT:  Right, it doesn't say any of those

15    things.

16          Why can't you bring that out on redirect?

17          MR. BALESTRIERE:  I --

18          MS. LAVIGNE-ALBERT:  I don't think it impeaches her.

19          MR. BALESTRIERE:  She says she doesn't remember.

20          THE COURT:  Let's plaintiff make his argument.

21          I will allow it.

22          MR. BALESTRIERE:  Thank you, Your Honor.

23          (End of sidebar conference.)

24          (Continued on the next page.)

25

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS – CROSS – BALESTRIERE                    1767

1              (In open court; Jury present.)

2              THE COURT:  Go ahead.

3              MR. BALESTRIERE:  Okay, Your Honor.

4              So this is --

5              THE COURT:  It's admitted.

6              MR. BALESTRIERE:  Thank you, Your Honor.

7              (Plaintiffs' Exhibit 98B, was received in evidence.)

8              (Exhibit published.)

9      CROSS-EXAMINATION (Continued)

10     BY MR. BALESTRIERE:

11     Q    I'm going to ask you a few questions.  You say, I

12     believe, that you weren't sure about whether there were

13     conversations about purchasing the penthouse.

14              You had an opportunity to take a look at this

15     exhibit just admitted, Plaintiffs' 98B, right, Ms. Powers?

16     A    Yes, I have.

17     Q    Okay.  And the date of this is April 3rd, 2017, right?

18     A    Yes.

19     Q    And there's a correspondence that you have there.  We can

20     see all the relevant portions on the screen.

21              There's a correspondence with a man by the name of

22     Alexander Glibbery.

23              You see that?

24     A    Yes.

25     Q    Mr. Glibbery was some kind of real estate adviser or

POWERS – CROSS – BALESTRIERE                1768

1    professional who worked for the building in some fashion,

2    correct?

3    A    No.

4    Q    With the building, I should say.

5    A    It was my understanding that he was the owner's nephew.

6    Q    Mr. Glibbery was?

7    A    Yes.

8    Q    Okay.  But he's talking about what we've been -- one of

9    the units, at least, that he's talking about is what we called

10   the penthouse, right?

11   A    Yes.

12        Ah -- yes, he is.  I'm sorry.

13   Q    That's okay.

14        And you see at 3, he says:  As per selling 76 and

15   75B.  That's near the bottom.

16        Do you see that?

17   A    Yes, I do.

18   Q    The -- what we've been calling the penthouse is 76A,

19   correct?

20   A    Yes.

21   Q    And your response at 3 is:  I will run -- at the top -- I

22   will run all the following by boss man, right?

23   A    Yes.

24   Q    And "boss man" is Mr. Rubin, right?

25   A    Yes.

POWERS - CROSS - BALESTRIERE                1769

1       MR. BALESTRIERE:  So that's early in 2017.  I just

2    walked you through a little bit from October 2016 to August of

3    2017, and that's where I wanted us to come to.

4           Actually, can I ask, Ms. Saydah, can you just put up

5    Defendants' DXJP225 at 10, again.  I think it was the same you

6    were showing before.  This is in evidence, Your Honor.

7           (Exhibit published.)

8    Q    So, again, on August 16th, that's the text that you send

9    on to Mia Lytell, right?

10   A    Yes, it is.

11          MR. BALESTRIERE:  Thank you.  You can take that

12   down, Ms. Saydah.

13   Q    Now on September 19th, I made contact with your lawyer

14   Yifat Schnur, correct?

15          MR. GROVER:  Objection.

16          THE COURT:  Overruled.

17   A    I'm not sure when you made contact with counsel.

18          MR. BALESTRIERE:  If I can just show just the

19   witness, and the Court, and counsel, Plaintiffs' 102-B.

20          (Exhibit published to the witness.)

21          MR. BALESTRIERE:  This is not in evidence, Your

22   Honor, but on my exhibit list.

23   Q    So first I'm going to ask you:  Does this refresh your

24   recollection as to whether or not in fact on September 19th at

25   6:37 p.m. I made contact with Yifat Schnur?

1   A    Well, I wasn't on this email, so...

2   Q    I know you weren't.

3   A    So looking at this now, I do see that.

4            MR. BALESTRIERE:  You do see that.

5            I would move for admission at least the first page,

6   right now, Your Honor.

7            MR. GROVER:  Objection.

8            THE COURT:  I agree.

9            Refreshing her recollection is one thing, but I

10  don't see it coming in.

11  Q    Okay.  So it does refresh your recollection, though, that

12  on September 19th of 2017, at 6:37 p.m. I made contact with

13  your lawyer, correct?

14           MR. GROVER:  Objection to the form.  The question

15  is --

16           THE COURT:  She's not really saying it refreshes her

17  recollection, she's saying she didn't know, but she assumes it

18  to be true, which means you have to get it in through some

19  other source.

20           MR. BALESTRIERE:  Okay, understood, Your Honor.

21  Q    To be clear, Ms. Schnur was your lawyer at that time,

22  right?

23  A    Yes.

24           (Court reporter interrupts.)

25  BY MR. BALESTRIERE:

1   Q    I think Ms. Powers just testified that 27 minutes after

2   the email, at 7:04 p.m., on September 19th, she called

3   1-800 --

4               THE COURT:  Wait until the question.

5   Q    -- she called 1-800-got-junk.

6               MR. GROVER:  Objection.

7               THE COURT:  I will allow it.

8               MR. BALESTRIERE:  So then, right, now, Your Honor, I

9   ask that Ms. Saydah show to the Court and counsel

10  Plaintiffs' 110.

11              (Exhibit published to the witness.)

12              MR. BALESTRIERE:  Blow that up, please.

13              It's a multi-page document, if it has any relevance

14  to the objection, Your Honor, so we can go through it, if you

15  wish.

16              THE COURT:  No need, scroll.

17              MR. BALESTRIERE:  I think you can see what I want to

18  ask about in your lower right-hand.

19              THE COURT:  I will allow it with this one.

20              MR. BALESTRIERE:  Okay, thank you.

21              (Exhibit published.)

22              MR. BALESTRIERE:  So actually can we go now just to

23  the very top so Ms. Powers can see that.  Just blow that up

24  just a little bit.

25  Q    And so you see this is some -- a record from

1    1-800-got-junk.

2        Do you see that?

3    A    I do.

4    Q    And the yellow highlight is your name and the date of

5    9/19/2017.

6        Do you see that?

7    A    Yes.

8        MR. BALESTRIERE:  Then if you go down to that

9    lower-right-hand portion that the Court -- right.

10    Q    Do you see there it has a name Tia Joiner, 9/19/2017, and

11    then the time we just discussed, 7:04 p.m.

12        Do you see that?

13    A    Yes.

14    Q    Are you aware that the tag line for 1-800-got-junk is,

15    "We make junk disappear"?

16    A    No.  I didn't realize that.

17    Q    All right.  So this is September 19th, which is the date

18    here that's important, September 19th, 2017, right here it

19    says 7:04 p.m.

20        The next day, at about 6:47 p.m., Mia Lytell sent

21    you and Mr. Rubin a text message telling you and Mr. Rubin to

22    not text her and instead contact me, her attorney; isn't that

23    correct?

24    A    I believe so.

25        MR. BALESTRIERE:  Your Honor, I'd like to show

POWERS - CROSS - BALESTRIERE                    1773

1    Plaintiffs' 116 at page 2.

2              I move for the admission of it.

3              THE COURT:  Why?  It just confirms what she just

4    said.

5              MR. BALESTRIERE:  That is the reason why, Your

6    Honor.

7              If you think I don't need it for that reason, that's

8    fine.

9              THE COURT:  Well, you're not disputing what she

10   said.

11             MR. BALESTRIERE:  No, I can withdraw the offer.

12             Thank you, Your Honor.

13   BY MR. BALESTRIERE:

14   Q    And then are you aware that less than a hour later, on

15   September 20th, my firm sent a formal letter, with a copy of

16   the complaint to yours and Mr. Rubin's lawyer, Yifat Schnur,

17   and then to you and Mr. Rubin personally by FedEx.

18             Are you aware of that?

19   A    Which address did you send it to me?

20   Q    Well, first -- let me break it down.

21   A    Okay.

22   Q    On September 20th, the day after I first contacted

23   Ms. Schnur and sent over a copy of the -- what lawyers call a

24   "draft complaint," on the 20th, I sent a letter to Ms. Schnur,

25   right?

POWERS - CROSS - BALESTRIERE                    1774

1                MR. McDONALD:  Objection, Your Honor, assumes facts

2      not in evidence.

3                MR. BALESTRIERE:  I'm asking if she knows.

4      A    I'm not aware of what you sent.

5      Q    Okay, so your testimony is you're not aware of what was

6      sent; is that right?

7      A    Correct.

8      Q    But a FedEx was sent, not just to Ms. Schnur and

9      Mr. Rubin, but to you?

10               MR. McDONALD:  Objection, Your Honor.

11               THE COURT:  Sustained.

12               You got all there is.

13     Q    Did you receive a --

14               MR. McDONALD:  Objection, Your Honor.

15               MR. BALESTRIERE:  I'm asking if she received it.

16               THE COURT:  Let's have the question.

17               MR. BALESTRIERE:  I'm sorry?

18     Q    Did you receive a FedEx on September 21st?

19               THE COURT:  Is there an objection to that question?

20               MR. McDONALD:  No, Your Honor.

21               THE COURT:  Answer.

22     A    No, I did not.

23               MR. BALESTRIERE:  I'd like to show you, I see here,

24     Plaintiffs' 211, not in evidence.

25               (Exhibit published to the witness.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS - CROSS - BALESTRIERE                    1775

1         MR. BALESTRIERE:  And if you can just highlight --

2    or just blow up a little bit the top part there.

3    Q    So my question is to you:  Was whether or not you

4    received, on September 21st, 2017, a FedEx from my office?

5    A    And I said, no.

6    Q    The address of the, what we've been calling the

7    penthouse, is 146 West 57th Street, correct?

8    A    Yes.

9    Q    So are you disputing that any FedEx was sent there that

10   day?

11   A    I'm not disputing it, but that's not my permanent

12   address.  I didn't get the mail there regularly.

13   Q    You said that you go there to maintain the penthouse,

14   right?

15   A    Not every day.

16   Q    That's not my question.  Here's my question:

17        You testified a lot about how you went there and you

18   maintained things at the penthouse, right?

19   A    Yes.

20   Q    And we also just saw an email exchange between you and

21   Mr. Glibbery regarding the penthouse, right?

22   A    Yes.

23   Q    And 146 West 57th Street is, in fact, the penthouse,

24   right?

25   A    Yes, it is.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POWERS - CROSS - BALESTRIERE                1776

1   Q    And a FedEx, with a copy of a complaint and a formal

2   letter, was sent to the penthouse and received on Thursday,

3   September 21st, right?

4   A    Yes.

5   Q    The letters that were sent to you, is your testimony that

6   you did not read them?

7   A    I did not receive them on this day that it was delivered.

8   That's my testimony.

9   Q    So then when did you receive it?  It sounds like you're

10  saying you received it at a later date?

11  A    Yes, I received them at a later date.

12  Q    What's that later date?

13  A    I can't remember.

14  Q    Okay.  Well, with regards to 1-800-got-junk, they did end

15  up arriving at the penthouse on September 22nd in the morning,

16  correct?

17  A    I believe that's correct.

18  Q    And you were there for that, right?

19  A    Yes, sir, I was.

20  Q    In fact, you ended up signing off on 1-800-got-junk

21  removing everything, correct?

22  A    Yes.

23

24            (Continued on the following page.)

25

POWERS - CROSS - BALESTRIERE                    1777

1    CROSS-EXAMINATION (Continued)

2    MR. BALESTRIERE:

3    (Continuing.)

4    Q    Now, you remember at your deposition, I asked you where

5    the materials were in that restaurant -- in the penthouse, do

6    you remember that?

7    A    I'm sorry, what were the materials?

8    Q    Sure.  I'll break it down.

9         I asked you questions about where the materials that

10   were in the penthouse were by the time of your deposition in

11   2018.

12        Do you remember that?

13   A    Yes, I do.

14   Q    And what you said is that you actually threw out the sex

15   toys, right?

16   A    Among some other things, yes.

17   Q    Well, you said that you also threw out the BDSM rope,

18   right?

19   A    Yes.

20   Q    So the rope that we've seen here and anything that we've

21   seen here are not the actual items that were in the penthouse

22   on September 22, 2017, right?

23   A    Correct.

24   Q    You said you threw out the sex toys for sanitary reasons,

25   right?

POWERS – CROSS – BALESTRIERE                    1778

1    A    Yes.

2    Q    Okay.  You didn't say that about the rope, right?

3    A    I don't believe I did.

4    Q    And then those cuffs that we saw you didn't say, Oh, I

5    threw out the cuffs because of sanitary reasons; right?

6    A    I don't believe I did.

7    Q    And then the other machines as they've been called, or

8    the BDSM furniture, they weren't thrown out because of

9    sanitary reasons; right?

10   A    I wouldn't be able to tell you.

11   Q    I'm sorry, say that again.

12   A    I said I wouldn't be able to tell you if I threw them out

13   for sanitary purposes or not, I didn't throw them out.

14   Q    You didn't say at your deposition that you threw them out

15   for sanitary reasons, right?

16   A    No.

17   Q    You said that they were recycled, in fact, right?

18   A    Yes.

19   Q    But after September 22nd, and after all the letters and

20   everything we heard over the last few days, anything regarding

21   the BDSM activity in that penthouse was gone, right?

22   A    I --

23   Q    It's yes or no.  It was gone after September 22nd, right?

24   A    I can't remember if all of it was gone or not, but the

25   dungeon --

1    Q    Let me stop you.

2          Nothing has been provided, no physical items have

3    been provided to the plaintiffs; right?

4    A    Correct.

5    Q    So if there is something, the plaintiffs haven't seen it;

6    right?

7    A    Correct.

8    Q    That means the plaintiffs have not seen anything that was

9    actually used on them:  The machines or the sex toys or

10   anything because on September 22, 2017, after all these texts

11   and letters and e-mails we saw, you had them removed and

12   destroyed, right?

13         MR. GROVER:  Objection, form.

14         THE COURT:  Overruled.

15   A    I did have them removed, yes.

16         MR. BALESTRIERE:  I have no further questions, your

17   Honor.

18         THE COURT:  All right.  Redirect.

19         MR. ROSENBERG:  One moment, your Honor.

20         THE COURT:  Sure.

21         MR. GROVER:  I have no questions, your Honor.

22         THE COURT:  You may step down.  Thank you very much.

23         THE WITNESS:  Thank you.

24         (Witness leaves the witness stand.)

25         THE COURT:  Okay.  So now we're back to Mr. Rubin's

POWERS – CROSS – BALESTRIERE                1780

1    case, or are we back to Ms. Powers' case?

2              Now, we're going to do the rebuttal?

3              MS. CHIANG:  Right.

4              MR. BALESTRIERE:  May I get one minute with the

5    witness and then I'll bring her in, your Honor?  She's right

6    outside.

7              THE COURT:  You get one minute.  We're all waiting

8    her.

9              MR. BALESTRIERE:  Thank you.

10             (A brief pause in the proceedings was held.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Witness takes the witness stand.)

 2      RAQUEL MIA LYTELL, recalled as a witness, having been

 3      previously first duly sworn/affirmed, was examined and

 4      testified further as follows:

 5                  THE COURT:  Remember you are still under oath.

 6                  Go ahead.

 7                  MR. BALESTRIERE:  Thank you, your Honor.  I move for

 8      the admission of now Plaintiff's 212, which is the modified

 9      version of the exhibit that we discussed.  I don't believe

10      there's an objection based on earlier conversations.

11                  THE COURT:  Received.

12                  (Plaintiffs' Exhibit 212, was received in evidence.)

13                  MR. ROSENBERG:  What do you mean modified?

14                  MS. LAVIGNE-ALBERT:  Do you have a copy?

15                  MR. BALESTRIERE:  We sent you one, the other thing.

16      But we can e-mail it to you.  Do you want to see it?

17                  MS. LAVIGNE-ALBERT:  Yes.

18                  MR. BALESTRIERE:  It's on your screen there, too.

19                  (A brief pause in the proceedings was held.)

20                  THE COURT:  I admitted this over objection, right?

21                  MS. LAVIGNE-ALBERT:  No objection.

22                  THE COURT:  Okay.  Go ahead.

23                  MR. BALESTRIERE:  Thank you.  So I think it would be

24      published, Mr. Jackson.  Thank you.

25
```

LYTELL – DIRECT – BALESTRIERE                 1782

 1  DIRECT EXAMINATION

 2  BY MR. BALESTRIERE:

 3  Q    Good afternoon.  Thank you for coming.  I'll try to keep

 4  this quick.

 5          So you see in front of you a text exchange, right?

 6  A    Yes.

 7  Q    And the bottom three texts that we now see on this page,

 8  and only those three, was shown to you on Monday morning, do

 9  you remember?

10  A    Yes.

11  Q    And I asked you if you remembered them and you did not?

12  A    Right.

13  Q    Do you remember that?

14  A    Yes.

15  Q    Since that time, other texts beyond just those three were

16  shown to you, right?

17  A    Yes.

18  Q    Did that give you an opportunity to refresh your memory

19  about what these texts are about?

20  A    Yes.

21  Q    So that, in particular, I suppose this shit could

22  actually work out well for us.  I'm sure H will pay nice.  I

23  think the exhibit you saw the other day there was a dollar

24  sign or a money bag, if everything goes smooth.

25          What this is this whole series of texts with?

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

LYTELL - CROSS - GILBERT                    1783

1    A    We're talking about Bob Aloi and hoping H would pay to

2    make it go away.

3    Q    And you would have nothing to do with any payments by H,

4    Mr. Rubin, regarding Bob Aloi, correct?

5    A    No.

6              MR. BALESTRIERE:  No further questions, your Honor.

7              THE COURT:  Anything further.

8    CROSS-EXAMINATION

9    BY MR. GILBERT:

10   Q    If we can get the exhibit back up on the screen, please.

11             Good afternoon, Ms. Lytell.

12             So you just testified that you would have nothing to

13   do with any payments that Bob Aloi might get from Mr. Rubin;

14   is that correct?

15   A    That's correct.

16   Q    So you understood that Bob Aloi was threatening to expose

17   Mr. Rubin's private life, correct?

18   A    That's correct.

19   Q    And he was seeking millions of dollars from Mr. Rubin

20   only with the promise that he would not reveal his private

21   life if Mr. Rubin paid him all that money?

22   A    I don't know what Bob Aloi asked.  All I know is he was

23   posting things about him on the internet.

24   Q    You know that Mr. Aloi was arrested, correct?

25   A    Yes.

LYTELL – CROSS – GILBERT                    1784

1    Q    And you know he was charged with extortion, correct?

2    A    I did not know that.

3    Q    Now, when you wrote, I'm sorry, Ms. Moore wrote, This

4    shit could actually work out well for us.

5              Do you see what Ms. Moore wrote there?

6    A    Yes, I see that.

7    Q    You wrote, No shit?

8    A    Yes.

9    Q    In response?

10   A    Yes.

11   Q    Can we bring up, please, GX-8, the blurred version of it

12   with the same text on August 11, 2017, at 5:35 p.m.?

13             MR. BALESTRIERE:  What is this?

14             MR. GILBERT:  Thank you.

15   Q    This is the same text exchange that we were just looking

16   at that's now on your screen?

17             MR. BALESTRIERE:  235?

18   Q    Looking at the text on August 11th, the same text.

19   A    Yes, I see it.

20   Q    You see in this version, and we can pull up a bit closer,

21   where you respond and you write, No shit.  There's actually

22   about eight emoticons there.

23             Do you see that?

24   A    Yes, I see them.

25   Q    If it's possible to go a little bit closer.  Do you know

1    what those are?

2    A    Smiley face or -- smiley face with money over the eyes.

3    Q    That's what you wrote.  Not only do you write, No shit,

4    you also included emoticons with dollar signs where the

5    eyeballs go?

6    A    Yes.

7    Q    And, Ms. Lytell, when Ms. Moore wrote, That this could

8    go smoothly for us, she was referring to you and to her;

9    correct?

10    A    I think she was just referring to the entire situation.

11    Q    Well, at the time she wrote that, you knew that Mr. Aloi

12    was demanding money from Mr. Rubin, correct?

13    A    No.  I knew he was posting things about him on the

14    internet.

15    Q    Well, when she wrote, This could work out well for us,

16    I'm sure H will pay nice money to have everything go smooth.

17         Is it your testimony that you didn't understand that

18    she was referring to a possibility where you and Ms. Moore

19    would get money from Mr. Rubin?

20    A    No.

21         MR. GILBERT:  No further questions.

22         MR. BALESTRIERE:  May I briefly, your Honor?

23         THE COURT:  Very briefly.

24         MR. BALESTRIERE:  Thank you.

25         Can I get back the fuller exhibit to go back for

LYTELL - REDIRECT - BALESTRIERE          1786

1    those texts, please.

2              Let me go to the chronologically earliest one,

3    please.

4    REDIRECT EXAMINATION

5    BY MR. BALESTRIERE:

6    Q    So there's a few different people here, right, but I just

7    want to be clear on whose -- do you see the from?  Can you see

8    that?  Almost all the way to the right you --

9    A    Yes.

10   Q    -- Ms. Saydah will put the put the cursor over it?

11   A    Yes.

12   Q    So the first few messages those are from you.  I'm so

13   scared now.  I hate him.  I hate Bob.

14             That's Bob Aloi, right?

15   A    Yes.

16   Q    And beneath that, there's a Chelsea who writes, But if

17   you haven't at least let your lawyer know something honest,

18   that worries me slightly because the only MF you can talk to

19   is your lawyer that will not be blind sided in court with shit

20   you didn't tell him.

21             Do you see that?

22   A    Yes, I see that.

23   Q    And go down, Ms. Saydah.

24             And you write, He knows.  Lawyer knows now.  Lawyer

25   talked to Bob.

LYTELL - REDIRECT - BALESTRIERE          1787

1          That lawyer is Jeremy Saland?

2    A    Yes.

3    Q    Lawyer talked to Nancy.

4          Keep going, Ms. Saydah.

5          He knows.

6          Keep going.

7          And then you write, just Jen and Howie don't know

8    yet, right?

9    A    Yes.

10   Q    And then Amy says, Yes.  And then he says, she may be

11   able to legally stop him, right?

12   A    Yes.

13   Q    Amy is referring to he as Howie Rubin, right?

14   A    Yes.

15         MR. BALESTRIERE:  No further questions, your Honor.

16         THE COURT:  All right.  You may step down.  Thank

17   you very much.

18         (Witness leaves the witness stand.)

19         THE COURT:  Okay.  Whose case are we back to?

20         Anything further from defendant Rubin?

21         MS. CHIANG:  We have deposition designations to

22   play.

23         THE COURT:  Go ahead.

24         MR. BALESTRIERE:  May I just go out for one moment,

25   your Honor it won't slow things.  Mr. Minhas will be here.

PROCEEDINGS                          1788

1          MS. CHIANG:  We will start with plaintiff Tagai's

2     deposition.  Could we please have a clip.

3          THE COURT:  Hang on a second, I think

4     Mr. Balestriere just wanted to run out for a minute.

5          MR. MINHAS:  We can continue without

6     Mr. Balestriere, your Honor.

7          THE COURT:  Did you want to put someone on the stand

8     to answer the questions.

9          MS. CHIANG:  These are video chips, your Honor.  So

10    we will be playing the clips.

11         THE COURT:  Go ahead.

12         MS. CHIANG:  Can we please have clip NT-302.  This

13    is Page 29, Line  17 through Line 23.

14         (Video file played in open court.)

15         (Video file concludes.)

16         MS. CHIANG:  Could we have clip NT-303, Page 82,

17    Line 21 through page 83, Line 5.

18         (Video file played in open court.)

19         (Video file concludes.)

20         MS. CHIANG:  Clip NT-304.  Page 108, Line 18 through

21    Page 109, Line 8.

22         (Video file played in open court.)

23         (Video file concludes.)

24         MS. CHIANG:  Could we please have clip NT-307.

25    That's Page 133 , Line 3 through Page  134, Line 24.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

PROCEEDINGS                                    1789

 1                (Video file played in open court.)

 2                (Video file concludes.)

 3                MS. CHIANG:  Could we please have clip NT-308.

 4     That's Page 138, Line 21 through Page 139, Line  13.

 5                (Video file played in open court.)

 6                (Video file concludes.)

 7                MS. CHIANG:  Can we please have clip NT-309.  That

 8     would be Page 148, Lines 6 through 23.

 9                (Video file played in open court.)

10                (Video file concludes.)

11                MS. CHIANG:  Can we please have clip NT-310.

12     Page 154, Line 22 through Page 155, Line 2.

13                (Video file played in open court.)

14                (Video file concludes.)

15                MS. CHIANG:  That concludes the playing of the

16     portions of Ms. Tagai's deposition.

17                We will now move on to Ms. Reyes's deposition.

18                Could we please have Clip B, as in boy, R310.

19     That's Page 104/18 through 105/5.

20                (Video file played in open court.)

21                (Video file concludes.)

22                MS. CHIANG:  Could we please have clip BR-312.

23     That's Page 134, Lines 9 through 12.

24                (Video file played in open court.)

25                (Video file concludes.)

PROCEEDINGS                                    1790

```
 1              MS. CHIANG:  Could we please have clip BR-319.

 2    That's Page 145, Lines 7 through 22.

 3              (Video file played in open court.)

 4              (Video file concludes.)

 5              MS. CHIANG:  Could we please have clip BR-322,

 6    Page 151, Lines 7 through 10.

 7              (Video file played in open court.)

 8              (Video file concludes.)

 9              MS. CHIANG:  Clip BR-324.  That's Page 157 , Lines

10    11 through 20.

11              (Video file played in open court.)

12              (Video file concludes.)

13              MS. CHIANG:  Clip BR-325, that's Page 159, Line 8

14    through 159, Line 24.

15              (Video file played in open court.)

16              (Video file concludes.)

17              MS. CHIANG:  Clip BR-328.  That's Page 194, Lines 12

18    through 17.

19              (Video file played in open court.)

20              (Video file concludes.)

21              MS. CHIANG:  Clip BR-329.  That's Page 196, Lines 4

22    through 8.

23              (Video file played in open court.)

24              (Video file concludes.)

25              MS. CHIANG:  And then BR-330, Page 197, Lines 5
```

PROCEEDINGS                                    1791

1    through 15.

2              (Video file played in open court.)

3              (Video file concludes.)

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                        1792

1          MS. CHIANG:  (Cont'g.)  That concludes the clips

2    from Ms. Reyes's deposition.

3          And we will now move on to plaintiff Amy Moore's

4    deposition.

5          Could we please have clip AM-302.  That's page 36,

6    line 24 through 37, line 4.

7          (Video playing.)

8          (Video stopped.)

9          MS. CHIANG:  Clip AM-303, page 37, lines 8 through

10   11.

11         (Video playing.)

12         (Video stopped.)

13         MS. CHIANG:  Clip AM-304.  That's page 42, line 10

14   from do you recall, to page 42, line 20.

15         (Video playing.)

16         (Video stopped.)

17         MS. CHIANG:  Could we have clip AM-305, page 67,

18   lines 15 through 22.

19         (Video playing.)

20         (Video stopped.)

21         MS. CHIANG:  Clip AM-315.  That's page 107, line 6

22   through page 112, line 11.

23         (Video playing.)

24         (Video stopped.)

25         MS. CHIANG:  Could we have clip AM-316.  That's page

*Michele Lucchese, Official Court Reporter*

PROCEEDINGS                                    1793

1    118, lines 24 through page 121, line 4.

2              (Video playing.)

3              (Video stopped.)

4              MS. CHIANG:  Could we please have clip AM-317.

5    That's page 129, line 14 through page 130, line 20.

6              (Video playing.)

7              (Video stopped.)

8              MS. CHIANG:  Could we please have clip AM-318, page

9    135, line 19, through page 137, line 23.

10             (Video playing.)

11             (Video stopped.)

12             MS. CHIANG:  Could we please have clip AM-319.

13   That's page 137, line 24 through page 138, line 15.

14             (Video playing.)

15             (Video stopped.)

16             MS. CHIANG:  Could we please have clip AM- 320, page

17   138, line 16 through page 139, line 14.

18             (Video playing.)

19             (Video stopped.)

20             MS. CHIANG:  Could we please have clip AM-322, page

21   185, line 15 through 188, line 13.

22             (Video playing.)

23             (Video stopped.)

24             MS. CHIANG:  Could we please have clip AM-307, page

25   260, lines 17 through 22.

PROCEEDINGS                              1794

1          (Video playing.)

2          (Video stopped.)

3          MS. CHIANG:  Could we please have clip AM-309.

4  That's page 305, lines 8 through 22.

5          (Video playing.)

6          (Video stopped.)

7          MS. CHIANG:  Could we please have clip AM-328.  It's

8  page 316, lines 19 through 24.

9          (Video playing.)

10         (Video stopped.)

11         MS. CHIANG:  Clip AM-329.  That's page 327, lines 13

12 through page 328, line 6.

13         (Video playing.)

14         (Video stopped.)

15         MS. CHIANG:  Clip AM-330.  That's page 334, line 17

16 through 25.

17         (Video playing.)

18         (Video stopped.)

19         MS. CHIANG:  Then clip AM-331.  That's page 338,

20 line 8 through page 339, line 5.

21         (Video playing.)

22         (Video stopped.)

23         MS. CHIANG:  We will move on to Ms. Mia Lytell's

24 deposition.  The first clip is ML-302.  That's page 70, line 9

25 through page 71, line 7.

*Michele Lucchese, Official Court Reporter*

PROCEEDINGS                                        1795

1          (Video playing.)

2          (Video stopped.)

3          MS. CHIANG:  Could we please have clip ML-304.  This

4   clip is comprised of page 103, lines 21 through 24; page 104,

5   line 9 through 105, line 7; and then page 105, line 19 through

6   106, line 10.

7          (Video playing.)

8          (Video stopped.)

9          MS. CHIANG:  Could we please have clip ML-305, page

10  107, lines 2 through 8.

11         (Video playing.)

12         (Video stopped.)

13         MS. CHIANG:  Clip ML- 306, please, page 107, 21

14  through page 108, line 4.

15         (Video playing.)

16         (Video stopped.)

17         MS. CHIANG:  Could we please have clip ML-308, page

18  140, lines 10 through 16.

19         (Video playing.)

20         (Video stopped.)

21         MS. CHIANG:  Could we please have clip ML-313, page

22  260, lines 22, through 261, line 6.

23         (Video playing.)

24         (Video stopped.)

25         MS. CHIANG:  Clip ML- 315.  That's page 294, line 21

PROCEEDINGS                                    1796

 1   through page 296, line 10.

 2              (Video playing.)

 3              (Video stopped.)

 4              MS. CHIANG:  That concludes the clips from Ms. Mia

 5   Lytell's deposition.

 6              And the final plaintiffs' deposition from whom we

 7   will play clips from is Ms. Brittany Hassen.

 8              Could we please have clip BH- 110.  That's

 9   transcript page 194, line 23 through page 195, line 9.

10              (Video playing.)

11              (Video stopped.)

12              MS. CHIANG:  Could we please have clip BH- 88.

13   That's transcript page 326, line 5 through page 27, line 6.

14              (Video playing.)

15              (Video stopped.)  (Video stopped.)

16              MS. CHIANG:  That concludes the playing of clips

17   from plaintiffs' designations.

18              I believe that Defendant Rubin's case rest.

19              THE COURT:  All right.

20              Any further evidence from Defendant Powers?

21              MR. GROVER:  Defendant Powers rests as well, Your

22   Honor.

23              I have just one question for sidebar when Your Honor

24   has a moment.

25              THE COURT:  Let me just ask plaintiff.

PROCEEDINGS                                    1797

1           MR. BALESTRIERE:   No more rebuttal.  We're done.

2           THE COURT:   Okay.  Is there any reason I can't send

3  the jury home?  Mr. Grover, is there any reason send the jury

4  home.

5           MR. GROVER:  No, Your Honor, I'm sorry.  I was

6  talking to --

7           THE COURT:  That's all right.

8           Ladies and gentlemen, we have finished the

9  presentation of evidence in the case, as I told you I thought

10  we would.

11          We will have you back here on Monday morning at 9:30

12  and we'll have the closing arguments and the charge and then

13  you can start your deliberations.

14          It is particularly important at this point in the

15  case that you remember your oath and stay away from any

16  publicity about the case that you might run into.  Do not

17  research anything or anybody on the internet having do with

18  this case.  Don't communicate on social media about it.  Keep

19  your minds clear of everything you've heard.  Have a good

20  night's sleep, a few nights of it, and you will be here on

21  Monday morning.

22          Thanks again for your attention.

23          (Jury exits the courtroom.)

24          THE COURT:  Okay.  Be seated.

25          What now?

*Michele Lucchese, Official Court Reporter*

PROCEEDINGS                                    1798

1         MR. GROVER:  Your Honor, I'm not sure procedurally

2    what to say, but it seems to me there is one stipulation that

3    may not have been read to the jury and we just realized it.

4    It's the stipulation of authenticity of all the documents.

5    It's not terribly factual in the sense that people have to

6    remember anything.

7         THE COURT:  No.

8         MR. GROVER:  But it is an important document.

9         THE COURT:  Any objection to reading it Monday

10   morning before we start closings?

11        MR. BALESTRIERE:  No, I thought it of more anyways

12   of a document to allow us to move evidence in.  So I am not

13   even sure of relevance, but certainly no objection.

14        THE COURT:  We can just stipulate now that the

15   documents I said received as to, those are all authentic and

16   in evidence.

17        How about that?

18        MR. GROVER:  That's great, Your Honor.  We agree.

19        THE COURT:  Anything else?

20        MR. ROSENBERG:  One brief question, Your Honor, for

21   providing comment to the draft, can we do that in a red line

22   document on the document that the Court provided?

23        THE COURT:  Yes, that would be the best way to do

24   it.

25        MR. ROSENBERG:  Very well.

*Michele Lucchese, Official Court Reporter*

PROCEEDINGS                                    1799

1           THE COURT:  Insert extra pages if you need to.

2           I will tell you all the proposed charges you gave me

3    before, they were much too specific.  They're beyond what I

4    use and I don't think we need to define the legal issues for

5    the jury, just the instructions and let them apply the facts

6    as they accept it from your arguments at closing.

7           MR. ROSENBERG:  Understood, Your Honor.

8           THE COURT:  Okay.  We will talk to you at two

9    o'clock tomorrow.  Like I said -- something else?

10          MR. GILBERT:  Sorry.  One more thing.  For the

11   record, we will renew our Rule 50 motion at this time.

12          THE COURT:  Okay.  It's denied for the reasons

13   previously denied.

14          Same for Ms. Powers; right?

15          MS. LAVIGNE-ALBERT:  Right.

16          THE COURT:  Same result.

17          MS. LAVIGNE-ALBERT:  Thank you.

18          MR. GROVER:  Your Honor, one last thing.  I'm sorry.

19          Your Honor, we didn't discussion with Your Honor the

20   amount of time we would set aside for summation.

21          THE COURT:  I'm glad you raised that.

22          MR. GROVER:  That's why I raised it.  I figured it

23   would make your day.

24          THE COURT:  I feel we do need a time limit, but I'm

25   open to the parties suggesting what it should be.

*Michele Lucchese, Official Court Reporter*

PROCEEDINGS                                    1800

1          I would like to finish closing and charge in one

2    day, Monday, maybe the whole day, probably the whole day.  But

3    I'd like not to go over into Tuesday, although I suppose if I

4    had to do the charge Tuesday morning.  You will start to get a

5    little rebellion from the jurors at that point.

6          The charge I estimate, if we don't change it too

7    much by length on Saturday, probably 45 minutes to like an

8    hour, somewhere around there.

9          MR. McDONALD:  Judge, with respect to the length of

10   the summation, you know we've had a lot of evidence introduced

11   over the last week and a half and it's really sort of -- I

12   don't know, putting this together it's just seems like a large

13   task and I think I will have a much better sense on Saturday

14   when we get together --

15         THE COURT:  Okay.

16         MR. McDONALD:  -- a better sense then.

17         THE COURT:  All right.  That's fine.  I don't need

18   to know right now.

19         My tentative theory as to how it should go is the

20   defendants can have the morning and the plaintiff can have

21   most of the afternoon.  Maybe two and a half hours each,

22   something like that.  That's what I'm thinking about.

23         If you want to talk me into more, you can, but talk

24   to each other first.

25         MR. McDONALD:  Okay.

PROCEEDINGS                                    1801

1          THE COURT:  Okay.  Talk to you tomorrow.

2          MR. BALESTRIERE:  Talk to you Saturday.

3          THE COURT:  What?

4          MR. ROSENBERG:  Tomorrow is Friday.

5          MR. BALESTRIERE:  Thank you.

6          (Matter adjourned to April 4, 2022 at 9:30 a.m.)

7

8                         oooOooo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Michele Lucchese, Official Court Reporter*

1802

1       I N D E X

2    WITNESS                                    PAGE

3    **JENNIFER POWERS**

4    DIRECT EXAMINATION     BY MR. GROVER      1649

5
     CROSS-EXAMINATION      BY MR. BALESTRIERE 1719
6
     CROSS-EXAMINATION      BY MR. BALESTRIERE 1748
7

8    **RAQUEL MIA LYTELL**

9    DIRECT EXAMINATION     BY MR. BALESTRIERE 1782

10   CROSS-EXAMINATION      BY MR. GILBERT     1783

11   REDIRECT EXAMINATION   BY MR. BALESTRIERE 1786

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1803

1

2                               E X H I B I T S

3    PLAINTIFF                    PAGE

4    132                          1725

5    87                           1732

6    83 at page 2                 1758

7    98B                          1767

8    212                          1781

9
     DEFENDANT                    PAGE
10   K4                           1670

11   DX-P4                        1709

12   DX-X7                        1714

13

14

15

16

17

18

19

20

21

22

23

24

25

COURTROOM DEPUTY: [1]
1687/25
MR. BALESTRIERE: [141]
MR. GILBERT: [4]   1763/24
1784/14 1785/21 1799/10
MR. GROVER: [64]   1640/24
1648/6 1648/17 1649/8 1658/7
1658/10 1660/16 1660/21
1663/16 1663/21 1670/21
1680/21 1689/1 1698/12
1703/6 1709/6 1709/16
1713/16 1713/20 1714/1
1714/7 1715/20 1716/2
1716/11 1716/17 1716/19
1716/21 1716/25 1717/2
1717/11 1717/15 1718/8
1718/11 1719/3 1729/17
1729/19 1733/8 1736/13
1736/16 1739/15 1742/10
1743/3 1743/14 1745/5
1745/16 1745/20 1745/25
1746/12 1746/20 1749/20
1749/25 1751/2 1769/15
1770/7 1770/14 1771/6
1779/13 1779/21 1796/21
1797/5 1798/8 1798/18
1799/18 1799/22
MR. MCDONALD: [12]   1692/3
1692/7 1739/5 1747/2 1765/6
1774/1 1774/10 1774/14
1774/20 1800/9 1800/16
1800/25
MR. MINHAS: [2]   1690/23
1788/5
MR. ROSENBERG: [7]   1704/9
1779/19 1781/13 1798/20
1798/25 1799/7 1801/4
MS. BOY-SKIPSEY: [41]
1626/4 1626/20 1626/25
1627/5 1627/7 1627/9 1627/11
1629/20 1630/17 1632/3
1632/25 1633/4 1633/21
1634/2 1634/10 1634/14
1634/17 1635/2 1635/14
1636/11 1636/21 1636/25
1637/4 1637/16 1637/23
1638/6 1638/24 1639/12
1639/20 1641/6 1641/20
1642/3 1642/12 1642/18
1642/25 1643/22 1644/7
1646/23 1647/8 1647/15
1647/22
MS. CHIANG: [65]   1625/13
1625/15 1626/1 1647/25
1648/5 1648/16 1691/10
1691/13 1691/23 1692/2
1719/6 1729/18 1729/20
1731/4 1733/9 1734/9 1743/13
1750/6 1780/3 1787/21 1788/1
1788/9 1788/12 1788/16
1788/20 1788/24 1789/3
1789/7 1789/11 1789/15
1789/22 1790/1 1790/5 1790/9
1790/13 1790/17 1790/21
1790/25 1791/5 1792/9

1792/13 1792/17 1792/21
1792/25 1793/4 1793/8
1793/12 1793/16 1793/20
1793/24 1794/3 1794/7
1794/11 1794/15 1794/19
1794/23 1795/3 1795/9
1795/13 1795/17 1795/21
1795/25 1796/4 1796/12
1796/16
MS. ISAACS: [5]   1627/6
1627/8 1628/15 1634/13
1634/15
MS. LAVIGNE-ALBERT: [21]
1689/11 1690/7 1690/14
1691/6 1730/3 1730/9 1730/17
1730/25 1747/25 1748/5
1754/6 1765/22 1765/24
1766/1 1766/7 1766/18
1781/14 1781/17 1781/21
1799/15 1799/17
THE COURT: [163]
THE COURTROOM DEPUTY: [5]
1625/2 1640/14 1640/17
1649/5 1658/9
THE JURY: [1]   1625/10
THE WITNESS: [4]   1649/4
1649/6 1703/16 1779/23

$
$1,000 [1]   1674/14
$15,000 [1]   1749/6
$2,500 [1]   1668/8

'
'16 [1]   1704/12

—
-- and [1]   1667/20
-- is [1]   1701/14
-- Ms [1]   1786/10
-- she [1]   1678/19
-- this [1]   1702/4
------------------------------
-x [2]   1623/2 1623/10
-1 [1]   1736/17

.
.m [1]   1675/10

0
004 [1]   1645/9

1
1-800 [1]   1771/3
1-800-got-junk [5]   1771/5
1772/1 1772/14 1776/14
1776/20
10 [16]   1626/7 1632/3 1633/7
1637/5 1638/6 1639/12
1646/24 1672/17 1709/9
1760/18 1769/5 1790/6
1792/13 1795/6 1795/18
1796/1
10 a.m [1]   1746/5
100 [2]   1639/20 1641/6
10007 [1]   1623/16

10036-6797 [1]   1623/20
101 [3]   1639/20 1641/7
1641/8
10112 [1]   1624/3
103 [1]   1795/4
104 [1]   1795/4
105 [2]   1795/5 1795/5
105/5 [1]   1789/19
106 [1]   1795/6
107 [4]   1641/20 1792/21
1795/10 1795/13
108 [3]   1689/15 1788/20
1795/14
109 [2]   1689/15 1788/21
1095 [1]   1623/19
10:00 [1]   1721/16
10:00 p.m [1]   1667/24
10:15 a.m [1]   1760/10
10:18 [2]   1676/19 1676/22
10:18 in [1]   1677/3
10:20 [1]   1677/17
10:20 a.m [1]   1678/15
10:29 [1]   1725/25
10:34 [1]   1722/23
10:39 [1]   1725/25
10:50 a.m [2]   1757/25
1758/12
10:59 [1]   1722/4
10th [1]   1709/11
11 [10]   1634/3 1636/25
1642/12 1673/3 1675/13
1718/15 1784/12 1790/10
1792/10 1792/22
110 [2]   1771/10 1796/8
112 [1]   1792/22
116 [1]   1773/1
117 [1]   1642/3
118 [3]   1642/3 1642/12
1793/1
119 [3]   1642/18 1705/9
1707/3
11:00 [1]   1723/4
11:09 [1]   1729/13
11:15a.m [1]   1689/4
11:16 a.m [1]   1757/10
11:17 a [1]   1675/10
11:18 [1]   1674/3
11:19 [1]   1758/17
11:19 a.m [1]   1758/3
11:22 [1]   1675/13
11:22 a.m [1]   1675/5
11:33 p.m [1]   1756/9
11:39a.m [1]   1693/13
11:50 [1]   1666/5
11th [1]   1784/18
12 [6]   1644/8 1711/24
1720/24 1735/16 1789/23
1790/17
120 [1]   1642/25
121 [2]   1642/25 1793/1
126 [3]   1676/18 1721/14
1721/17
129 [2]   1760/18 1793/5
12:00 [1]   1677/11
12:47 [1]   1667/3
12:50 p.m [2]   1667/21 1668/7

**1**

**12:52 [1]**  1663/24
**12th [4]**  1626/6 1672/2
1672/16 1754/25
**13 [12]**  1636/11 1673/4
1674/1 1674/3 1675/5 1676/18
1677/1 1707/7 1723/6 1789/4
1793/21 1794/11
**130 [2]**  1723/12 1793/5
**131 [1]**  1643/22
**132 [3]**  1644/7 1725/12
1725/23
**133 [1]**  1788/25
**134 [2]**  1788/25 1789/23
**135 [3]**  1644/7 1646/23
1793/9
**136 [2]**  1646/23 1647/8
**137 [4]**  1647/8 1647/15
1793/9 1793/13
**138 [4]**  1647/15 1789/4
1793/13 1793/17
**139 [2]**  1789/4 1793/17
**13th [6]**  1672/2 1672/15
1672/16 1722/12 1760/10
1760/14
**14 [4]**  1633/8 1633/21 1793/5
1793/17
**140 [1]**  1795/18
**145 [1]**  1790/2
**146 [2]**  1775/7 1775/23
**148 [1]**  1789/8
**15 [20]**  1627/1 1627/6 1627/7
1627/8 1633/21 1634/2
1634/11 1634/14 1634/17
1635/2 1635/4 1638/6 1638/24
1639/20 1641/6 1756/9 1791/1
1792/18 1793/13 1793/21
**15 minutes [1]**  1689/2
**151 [1]**  1790/6
**154 [1]**  1789/12
**155 [1]**  1789/12
**157 [1]**  1790/9
**157th Street [1]**  1650/3
**159 [2]**  1790/13 1790/14
**16 [7]**  1634/2 1639/21 1641/7
1642/12 1643/22 1793/17
1795/18
**16th [1]**  1769/8
**17 [12]**  1627/1 1627/1 1627/6
1627/7 1684/6 1689/13 1707/7
1757/24 1788/13 1790/18
1793/25 1794/15
**17-CV-6404 [1]**  1623/3
**17th [3]**  1757/20 1758/12
1758/13
**18 [4]**  1641/20 1689/15
1788/20 1789/19
**185 [1]**  1793/21
**188 [1]**  1793/21
**19 [7]**  1630/18 1647/15
1698/9 1737/4 1793/9 1794/8
1795/5
**19 hours [1]**  1692/20
**194 [2]**  1790/17 1796/9
**195 [1]**  1796/9
**196 [1]**  1790/21

**197 [2]**  1733/21 1790/25
**19th [8]**  1700/20 1705/12
1769/13 1769/24 1770/12
1771/2 1772/17 1772/18
**1:13 [1]**  1707/8
**1:13 p.m [1]**  1761/16
**1:45 [1]**  1745/2
**1:45 p.m [1]**  1686/21
**1K [1]**  1674/7
**1st [6]**  1663/24 1665/18
1666/24 1669/2 1669/11
1669/15

**2**

**2 p.m [2]**  1746/7 1746/8
**20 [6]**  1647/8 1707/8 1743/7
1790/10 1792/14 1793/5
**2007 [1]**  1653/2
**2014 [3]**  1725/14 1726/2
1726/4
**2015 [21]**  1635/1 1654/8
1659/7 1659/12 1659/24
1660/15 1662/1 1662/8
1663/24 1665/12 1666/4
1671/15 1673/17 1711/24
1720/24 1721/18 1735/16
1740/22 1762/22 1763/7
1763/11
**2016 [20]**  1645/12 1655/20
1656/5 1683/1 1684/6 1687/16
1694/4 1697/16 1698/9
1701/22 1703/7 1709/9
1709/10 1728/20 1729/13
1732/10 1737/4 1753/9
1754/25 1769/2
**2017 [43]**  1656/24 1672/3
1673/4 1674/1 1674/3 1675/5
1676/19 1677/1 1679/19
1680/6 1680/20 1680/25
1704/5 1704/11 1705/7 1707/4
1707/8 1718/15 1722/12
1723/6 1723/17 1725/8
1734/19 1753/13 1753/16
1757/24 1760/10 1760/14
1761/16 1762/13 1763/9
1763/15 1767/17 1769/1
1769/3 1770/12 1772/5
1772/10 1772/18 1775/4
1777/22 1779/10 1784/12
**2018 [10]**  1626/6 1633/7
1681/1 1681/3 1714/14
1714/16 1714/18 1738/16
1738/19 1777/11
**2020 [1]**  1653/3
**2022 [2]**  1623/7 1801/6
**206 [1]**  1737/2
**20th [4]**  1761/16 1773/15
1773/22 1773/24
**21 [9]**  1626/7 1637/23 1642/3
1689/14 1788/17 1789/4
1795/4 1795/13 1795/25
**211 [1]**  1774/24
**212 [2]**  1781/8 1781/12
**21st [3]**  1774/18 1775/4
1776/3
**22 [16]**  1629/20 1634/2

1634/18 1635/2 1637/4
1687/16 1694/4 1714/18
1777/22 1779/10 1789/12
1790/2 1792/18 1793/25
1794/4 1795/22
**22 a.m [1]**  1675/14
**225 [1]**  1623/15
**22nd [6]**  1714/12 1758/23
1759/9 1776/15 1778/19
1778/23
**23 [9]**  1629/21 1633/8
1633/21 1635/14 1689/14
1788/13 1789/8 1793/9 1796/9
**231 [1]**  1754/1
**2330 [1]**  1624/11
**235 [1]**  1784/17
**23rd [1]**  1645/12
**24 [8]**  1636/11 1788/25
1790/14 1792/6 1793/1
1793/13 1794/8 1795/4
**24 hours [2]**  1676/5 1678/25
**24/7 [1]**  1747/9
**24th [1]**  1697/15
**25 [4]**  1641/20 1646/23
1732/10 1794/16
**25th [2]**  1697/15 1729/13
**26 [1]**  1624/6
**260 [2]**  1793/25 1795/22
**261 [1]**  1795/22
**27 [3]**  1728/20 1771/1
1796/13
**2712 [1]**  1624/12
**28 [1]**  1635/4
**29 [2]**  1689/13 1788/13
**294 [1]**  1795/25
**296 [1]**  1796/1
**29th [4]**  1623/16 1665/11
1665/17 1666/23
**2:00 [1]**  1743/7
**2:29 p.m [1]**  1761/17
**2:56 p.m [2]**  1687/24 1688/1
**2nd [1]**  1755/17

**3**

**30 [5]**  1624/3 1666/4 1723/16
1734/19 1748/2
**302 [3]**  1788/12 1792/5
1794/24
**303 [2]**  1788/16 1792/9
**304 [3]**  1788/20 1792/13
1795/3
**305 [3]**  1792/17 1794/4
1795/9
**306 [1]**  1795/13
**307 [2]**  1788/24 1793/24
**308 [2]**  1789/3 1795/17
**309 [2]**  1789/7 1794/3
**30th [5]**  1661/25 1662/8
1663/15 1725/25 1726/16
**31 [1]**  1623/7
**310 [1]**  1789/11
**312 [1]**  1789/22
**313 [1]**  1795/21
**315 [2]**  1792/21 1795/25
**316 [2]**  1792/25 1794/8
**317 [1]**  1793/4

**3**

**318 [1]**  1793/8
**319 [2]**  1790/1 1793/12
**32 [1]**  1635/14
**320 [1]**  1793/16
**322 [2]**  1790/5 1793/20
**324 [1]**  1790/9
**325 [1]**  1790/13
**326 [1]**  1796/13
**327 [1]**  1794/11
**328 [3]**  1790/1 1794/7
 1794/12
**329 [2]**  1790/21 1794/11
**330 [2]**  1790/25 1794/15
**331 [1]**  1794/19
**334 [1]**  1794/15
**338 [1]**  1794/19
**339 [1]**  1794/20
**34 [2]**  1635/14 1636/11
**36 [1]**  1792/5
**37 [2]**  1792/6 1792/9
**39 [1]**  1626/7
**3:05 p.m [1]**  1673/1
**3:12 p.m [1]**  1688/9
**3:58 [1]**  1710/1
**3rd [1]**  1767/17

**4**

**403 [2]**  1731/3 1753/2
**42 [2]**  1792/13 1792/14
**43 [3]**  1626/20 1636/21
 1636/25
**44 [3]**  1626/25 1626/25
 1627/7
**44-15 [1]**  1627/6
**45 [2]**  1627/1 1800/7
**45-15 [1]**  1627/8
**45-17 [1]**  1627/6
**4:20 [1]**  1684/6
**4:20 in [1]**  1683/5
**4:21 [1]**  1684/6
**4:21 p.m [1]**  1683/22
**4:26 [1]**  1758/23
**4:49 [1]**  1709/23

**5**

**5,000 [1]**  1630/2
**50 [2]**  1637/4 1799/11
**51 [1]**  1637/4
**52 [2]**  1637/16 1637/16
**55 [1]**  1637/23
**56 [1]**  1637/23
**578 [2]**  1630/20 1630/20
**57th [2]**  1675/17 1775/23
**58 [1]**  1674/2
**5:35 p.m [1]**  1784/12
**5K [1]**  1745/11
**5th [2]**  1725/14 1725/21

**6**

**64 [1]**  1638/6
**6404 [1]**  1623/3
**65 [4]**  1627/5 1628/15 1638/6
 1665/25
**66 [1]**  1628/15
**67 [1]**  1792/17

**6797 [1]**  1623/20
**6:27 [1]**  1705/12
**6:27 p.m [2]**  1705/9 1705/10
**6:37 p.m [2]**  1769/25 1770/12
**6:47 p.m [1]**  1772/20
**6th [2]**  1670/1 1670/15

**7**

**70 [1]**  1794/24
**71 [1]**  1794/25
**718-613-2330 [1]**  1624/11
**718-804-2712 [1]**  1624/12
**73 [1]**  1629/20
**74 [1]**  1629/20
**75 [1]**  1630/17
**75B [1]**  1768/15
**76 [2]**  1630/17 1768/14
**76A [1]**  1768/18
**7:04 p.m [3]**  1771/2 1772/11
 1772/19

**8**

**8 p.m [1]**  1745/10
**80 [1]**  1632/3
**800 [1]**  1771/3
**81 [1]**  1632/3
**82 [2]**  1689/14 1788/16
**83 [4]**  1689/14 1757/23
 1758/8 1788/17
**834-004 [1]**  1645/9
**84 [2]**  1632/25 1761/13
**85 [1]**  1728/17
**87 [2]**  1729/9 1732/2
**88 [2]**  1734/17 1796/12
**8:25 [1]**  1723/22
**8:26 [1]**  1723/21
**8:32 [1]**  1723/6
**8:32 in [1]**  1673/5

**9**

**9/19/2017 [2]**  1772/5 1772/10
**90 [2]**  1638/24 1759/14
**91 [1]**  1638/24
**92 [2]**  1639/12 1720/15
**98 [1]**  1763/18
**98B [3]**  1763/19 1767/7
 1767/15
**9:01 [1]**  1737/3
**9:14 [2]**  1725/20 1725/20
**9:21 [1]**  1725/21
**9:30 [3]**  1623/7 1797/11
 1801/6
**9:31 [1]**  1724/19
**9:33 [1]**  1735/18
**9:42 p.m [1]**  1754/25
**9:52 [1]**  1734/20
**9th [1]**  1710/1

**A**

**a.m [16]**  1623/7 1675/5
 1675/13 1675/14 1678/15
 1722/4 1723/6 1725/25
 1725/25 1746/5 1757/10
 1757/25 1758/3 1758/12
 1760/10 1801/6
**able [13]**  1630/4 1659/3

 1661/4 1661/5 1661/10
 1670/19 1674/4 1692/4
 1735/19 1751/13 1778/10
 1778/12 1787/11
**absofuckinglutely [1]**
 1735/12
**Absolutely [6]**  1631/10
 1651/5 1651/17 1662/11
 1665/16 1692/5
**accept [1]**  1799/6
**access [4]**  1699/13 1699/16
 1700/15 1700/16
**according [1]**  1636/12
**account [1]**  1751/14
**accumulated [1]**  1685/17
**act [1]**  1699/25
**action [1]**  1680/8
**activity [4]**  1650/4 1650/18
 1651/16 1778/21
**actual [1]**  1777/21
**add [2]**  1686/1 1686/4
**added [1]**  1710/23
**addition [1]**  1704/20
**address [6]**  1665/5 1706/5
 1755/5 1773/19 1775/6
 1775/12
**addressed [1]**  1687/18
**addy [2]**  1664/2 1665/5
**adjourned [1]**  1801/6
**administrative [1]**  1691/10
**admission [7]**  1725/20
 1729/12 1736/11 1763/23
 1770/5 1773/2 1781/8
**admitted [8]**  1691/17 1697/19
 1718/13 1735/24 1751/25
 1767/5 1767/15 1781/20
**adore [1]**  1737/24
**advance [2]**  1651/24 1652/1
**advise [1]**  1724/1
**adviser [1]**  1767/25
**affirmed [2]**  1649/3 1781/3
**afraid [2]**  1707/20 1762/2
**afternoon [10]**  1663/24
 1667/21 1683/5 1719/14
 1719/15 1749/1 1749/2 1782/3
 1783/11 1800/21
**agent [1]**  1765/9
**ages [1]**  1652/21
**ago [5]**  1640/13 1679/8
 1685/2 1696/17 1699/22
**agree [3]**  1754/18 1770/8
 1798/18
**agreed [4]**  1660/10 1718/21
 1727/3 1731/6
**agreement [8]**  1658/20
 1659/19 1694/9 1700/24
 1712/8 1712/10 1713/9 1720/5
**agreements [1]**  1719/18
**ahead [12]**  1640/10 1641/5
 1659/24 1684/23 1698/6
 1704/10 1717/1 1767/2 1781/6
 1781/22 1787/23 1788/11
**Ahhh [1]**  1734/23
**aide [1]**  1641/2
**aided [1]**  1624/14
**airport [1]**  1686/14

**A**

**ALBERT [2]**   1624/8 1748/14
**alcohol [1]**   1713/3
**Alexander [2]**   1766/7 1767/22
**alive [2]**   1673/9 1723/8
**allegations [1]**   1649/24
**allow [9]**   1692/10 1699/15
1731/10 1731/12 1745/10
1766/21 1771/7 1771/19
1798/12
**almost [2]**   1763/14 1786/8
**Aloi [11]**   1708/2 1708/6
1708/18 1783/1 1783/4
1783/13 1783/16 1783/22
1783/24 1785/11 1786/14
**alone [1]**   1670/3
**AM-302 [1]**   1792/5
**AM-303 [1]**   1792/9
**AM-304 [1]**   1792/13
**AM-305 [1]**   1792/17
**AM-307 [1]**   1793/24
**AM-309 [1]**   1794/3
**AM-315 [1]**   1792/21
**AM-316 [1]**   1792/25
**AM-317 [1]**   1793/4
**AM-318 [1]**   1793/8
**AM-319 [1]**   1793/12
**AM-322 [1]**   1793/20
**AM-328 [1]**   1794/7
**AM-329 [1]**   1794/11
**AM-330 [1]**   1794/15
**AM-331 [1]**   1794/19
**ambulance [5]**   1702/9 1702/14
1702/18 1702/20 1702/25
**Americas [1]**   1623/19
**amount [3]**   1629/23 1678/14
1799/20
**amounts [1]**   1765/10
**ample [1]**   1690/25
**AMY [28]**   1623/3 1636/12
1636/20 1639/24 1640/1
1644/1 1655/14 1655/15
1655/17 1655/19 1682/20
1683/5 1683/12 1684/6
1685/21 1686/5 1686/8
1687/10 1687/24 1688/1
1688/1 1696/20 1697/1
1708/16 1720/1 1787/10
1787/13 1792/3
**ANGELA [1]**   1624/8
**answer [6]**   1640/22 1734/12
1734/13 1742/4 1774/21
1788/8
**answered [2]**   1729/15 1742/11
**answers [7]**   1625/25 1626/5
1626/9 1633/5 1633/10
1647/23 1757/15
**anyway [2]**   1675/25 1724/9
**anyways [1]**   1798/11
**apart [2]**   1644/23 1654/13
**apartment [23]**   1626/22
1628/17 1650/2 1669/7
1669/10 1669/17 1670/4
1694/15 1694/24 1698/15
1699/6 1699/13 1699/16
1699/19 1700/21 1701/4

1701/6 1701/18 1702/12
1703/9 1706/4 1727/14
1728/10
**apologies [2]**   1671/1 1710/4
**appear [2]**   1644/13 1644/23
**appearances [4]**   1623/14
1623/22 1704/25 1756/20
**apply [1]**   1799/5
**appreciate [1]**   1745/16
**approach [1]**   1748/1
**appropriate [1]**   1742/12
**April [6]**   1635/1 1639/24
1660/15 1661/3 1767/17
1801/6
**April 2015 [1]**   1660/15
**April 3rd [1]**   1767/17
**argue [1]**   1690/20
**argued [1]**   1731/6
**argument [5]**   1625/5 1730/15
1731/3 1750/1 1766/20
**arguments [2]**   1797/12 1799/6
**arrange [8]**   1653/19 1653/23
1653/25 1655/12 1655/17
1656/12 1657/3 1688/6
**arranged [6]**   1655/21 1656/16
1656/18 1656/22 1658/2
1756/19
**arrangements [5]**   1657/9
1749/18 1749/23 1756/13
1756/17
**arranging [1]**   1740/8
**arrested [6]**   1656/19 1703/11
1706/4 1753/9 1754/24
1783/24
**arrive [1]**   1689/22
**arrived [1]**   1686/14
**arriving [1]**   1776/15
**articulated [1]**   1643/11
**ascertain [2]**   1661/5 1661/5
**aside [1]**   1799/20
**asleep [3]**   1667/9 1667/16
1724/4
**assault [2]**   1730/18 1731/1
**assistant [5]**   1653/16
1653/18 1683/6 1683/23
1740/10
**associates [1]**   1747/8
**assume [1]**   1714/10
**assumed [1]**   1694/21
**assumes [2]**   1770/17 1774/1
**assuming [1]**   1691/25
**attend [3]**   1649/20 1654/11
1704/24
**attended [1]**   1733/14
**attention [10]**   1661/24
1662/19 1662/20 1672/2
1672/15 1675/4 1686/23
1694/3 1709/9 1797/22
**audio [5]**   1717/10 1717/10
1739/12 1739/18 1739/24
**August [20]**   1645/12 1656/5
1682/25 1684/6 1687/16
1694/4 1701/21 1707/4 1707/7
1707/7 1753/13 1753/16
1760/10 1760/14 1761/16
1763/9 1769/2 1769/8 1784/12

1784/18
**August 11 [1]**   1784/12
**August 13th [2]**   1760/10
1760/14
**August 16th [1]**   1769/8
**August 17 [1]**   1684/6
**August 2017 [1]**   1753/16
**August 20th [1]**   1761/16
**August 22 [2]**   1687/16 1694/4
**August 23rd [1]**   1645/12
**authentic [1]**   1798/15
**authenticity [1]**   1798/4
**authorization [1]**   1760/22
**authorized [1]**   1740/11
**available [1]**   1691/16
**Avenue [1]**   1623/19
**aware [15]**   1628/3 1640/1
1650/17 1659/14 1703/22
1713/4 1733/5 1734/6 1751/10
1763/16 1772/14 1773/14
1773/18 1774/4 1774/5

**B**

**B3 [1]**   1739/13
**bachelor's [1]**   1652/9
**bad [3]**   1635/22 1677/22
1678/8
**bag [1]**   1782/24
**BALESTRIERE [16]**   1623/15
1623/17 1690/19 1719/13
1732/5 1743/11 1745/9 1777/2
1782/2 1786/5 1788/4 1788/6
1802/5 1802/6 1802/9 1802/11
**bank [1]**   1751/14
**banter [1]**   1735/9
**base [1]**   1717/19
**based [4]**   1668/17 1668/23
1679/3 1781/10
**basis [3]**   1650/8 1749/3
1753/2
**basket [2]**   1705/23 1758/24
**bath [1]**   1701/10
**bathroom [2]**   1712/21 1712/25
**BDSM [15]**   1628/1 1631/23
1635/21 1635/23 1636/1
1636/9 1637/1 1639/1 1650/18
1651/16 1657/12 1708/12
1777/17 1778/8 1778/21
**BDSM-type [1]**   1637/1
**beat [1]**   1729/1
**became [5]**   1636/12 1653/12
1680/16 1680/20 1690/1
**because [49]**   1626/19 1629/6
1641/16 1642/10 1652/2
1656/19 1665/7 1665/14
1668/21 1671/6 1678/11
1678/20 1679/6 1682/8
1682/11 1686/10 1686/11
1689/17 1690/8 1690/14
1691/16 1691/20 1692/13
1698/19 1706/8 1708/17
1710/25 1717/24 1725/11
1727/12 1730/20 1735/6
1735/17 1738/5 1740/4
1743/20 1755/6 1757/23
1759/21 1762/19 1762/25

**B**

**because... [8]** 1763/4 1765/10 1765/11 1765/15 1778/5 1778/8 1779/10 1786/18
**bed [4]** 1712/16 1712/17 1712/21 1713/2
**bedroom [4]** 1675/20 1676/9 1712/16 1712/17
**begging [5]** 1646/6 1646/8 1704/19 1705/2 1756/13
**begins [3]** 1723/16 1735/15 1757/24
**behalf [1]** 1682/15
**behave [1]** 1720/24
**belief [1]** 1650/8
**bell [1]** 1690/11
**below [3]** 1735/16 1754/16 1758/3
**beneath [1]** 1786/16
**BENJAMIN [1]** 1623/21
**best [2]** 1647/7 1798/23
**beyond [2]** 1782/15 1799/3
**BH [2]** 1796/8 1796/12
**big [2]** 1677/19 1678/16
**birth [3]** 1683/8 1701/25 1702/5
**birthday [6]** 1654/6 1654/11 1660/1 1660/3 1660/6 1678/2
**bit [16]** 1677/20 1686/21 1722/21 1723/5 1723/19 1724/18 1725/9 1727/19 1734/22 1737/14 1759/23 1769/2 1771/24 1775/2 1784/20 1784/25
**black [2]** 1684/9 1693/24
**blank [5]** 1667/9 1667/10 1667/15 1667/16 1668/13
**blanks [1]** 1727/16
**blast [3]** 1635/7 1645/24 1647/7
**blew [1]** 1668/22
**blind [1]** 1786/19
**block [2]** 1677/20 1678/17
**blocked [1]** 1678/20
**blocks [2]** 1762/19 1762/23
**blond [2]** 1677/19 1678/16
**blow [13]** 1663/6 1663/22 1673/5 1676/20 1676/24 1683/2 1683/17 1724/20 1734/21 1738/11 1771/12 1771/23 1775/2
**blown [1]** 1667/16
**blue [5]** 1754/11 1754/16 1755/24 1757/7 1760/9
**blurred [1]** 1784/11
**BMC [1]** 1623/3
**Bob [12]** 1708/2 1708/6 1708/9 1708/18 1783/1 1783/4 1783/13 1783/16 1783/22 1786/13 1786/14 1786/23
**bold [3]** 1674/16 1674/17 1674/18
**bondage [1]** 1639/5
**bone [2]** 1628/25 1635/23
**boobs [2]** 1677/19 1678/16

**book [10]** 1652/3 1655/1 1656/20 1658/13 1682/3 1682/9 1682/15 1682/17 1682/18 1705/5
**booked [4]** 1654/2 1654/10 1681/20 1681/24
**booking [1]** 1683/8
**borrowed [1]** 1670/9
**boss [2]** 1768/22 1768/24
**bottom [10]** 1662/20 1663/17 1665/24 1666/3 1672/17 1676/25 1687/3 1738/11 1768/15 1782/7
**boy [5]** 1624/4 1625/22 1626/9 1633/10 1789/18
**BOY-SKIPSEY [3]** 1624/4 1626/9 1633/10
**boyfriend [1]** 1708/2
**boys [1]** 1652/20
**BR [8]** 1789/22 1790/1 1790/5 1790/9 1790/13 1790/17 1790/21 1790/25
**BR-312 [1]** 1789/22
**BR-319 [1]** 1790/1
**BR-322 [1]** 1790/5
**BR-324 [1]** 1790/9
**BR-325 [1]** 1790/13
**BR-328 [1]** 1790/17
**BR-329 [1]** 1790/21
**BR-330 [1]** 1790/25
**break [7]** 1648/8 1688/24 1691/9 1692/10 1748/10 1773/20 1777/8
**BRIAN [1]** 1623/12
**brief [3]** 1780/10 1781/19 1798/20
**briefly [2]** 1785/22 1785/23
**bringing [2]** 1678/3 1691/2
**BRITTANY [27]** 1623/4 1623/4 1626/11 1626/13 1626/17 1628/16 1629/22 1655/5 1655/7 1655/8 1655/10 1655/12 1681/15 1682/16 1708/20 1708/21 1710/20 1719/20 1719/20 1726/4 1726/5 1726/9 1726/10 1726/18 1728/5 1740/8 1796/7
**Brittanys [1]** 1726/3
**Broadway [2]** 1623/15 1624/6
**broke [2]** 1703/12 1703/14
**broken [4]** 1628/25 1704/8 1705/4 1706/3
**Brooklyn [1]** 1623/6
**brought [5]** 1636/13 1679/9 1698/20 1731/9 1751/15
**bruise [2]** 1628/25 1708/11
**building [3]** 1700/14 1768/1 1768/4
**bunch [2]** 1635/7 1635/8
**business [1]** 1751/12
**busy [1]** 1745/15
**buy [1]** 1766/11
**buying [4]** 1765/9 1766/2 1766/4 1766/13
**Bye [1]** 1717/22

**C**

**cabaret [4]** 1726/25 1727/10 1727/12 1728/6
**calendar [6]** 1660/1 1660/3 1660/7 1660/7 1660/9 1661/12
**capacity [1]** 1653/18
**caps [1]** 1732/12
**careers [1]** 1674/12
**careful [2]** 1707/16 1761/23
**case [60]** 1625/12 1648/4 1648/9 1648/12 1648/14 1649/17 1649/22 1651/19 1653/20 1654/17 1656/18 1656/21 1657/6 1665/8 1671/7 1672/7 1672/9 1680/7 1680/17 1681/16 1689/3 1690/2 1692/11 1701/1 1703/22 1704/13 1705/15 1705/22 1705/24 1721/4 1730/11 1734/4 1740/15 1742/4 1742/25 1743/8 1746/8 1747/13 1747/13 1747/14 1747/20 1748/17 1753/12 1755/10 1756/1 1756/18 1758/14 1758/24 1759/7 1760/23 1760/25 1765/15 1780/1 1780/1 1787/19 1796/18 1797/9 1797/15 1797/16 1797/18
**cases [2]** 1704/25 1747/19
**Cassidy [10]** 1625/18 1626/6 1626/8 1651/9 1682/2 1682/4 1709/3 1709/15 1710/6 1710/8
**Cassidy's [1]** 1633/5
**caused [2]** 1684/5 1690/11
**causing [1]** 1633/2
**CCR [1]** 1624/11
**celebrate [1]** 1678/2
**celebrating [1]** 1660/5
**cell [3]** 1679/20 1694/22 1714/9
**certain [4]** 1630/7 1631/22 1661/8 1740/9
**certainly [3]** 1632/11 1640/24 1798/13
**chain [2]** 1665/19 1673/21
**chance [4]** 1628/17 1628/21 1692/23 1733/23
**change [2]** 1708/19 1800/6
**changed [1]** 1661/20
**chaotic [1]** 1701/8
**charge [5]** 1745/20 1797/12 1800/1 1800/4 1800/6
**charged [1]** 1784/1
**charges [2]** 1745/19 1799/2
**Charity [1]** 1638/9
**chat [7]** 1637/12 1644/10 1644/14 1644/23 1645/2 1684/16 1685/20
**chatting [1]** 1666/15
**Check [1]** 1705/17
**Chelsea [1]** 1786/16
**CHIANG [1]** 1623/21
**Chicago [6]** 1654/20 1663/3 1663/19 1669/14 1669/15 1678/6

**C**

children **[1]**  1652/19
chips **[1]**  1788/9
choice **[1]**  1658/12
chose **[2]**  1731/11 1762/25
CHRISTINE **[1]**  1623/22
chronological **[1]**  1723/23
chronologically **[1]**  1786/2
cite **[1]**  1721/18
city **[5]**  1652/24 1670/10
 1678/2 1683/7 1704/14
civil **[2]**  1623/11 1746/16
claim **[1]**  1730/11
claiming **[2]**  1730/18 1730/25
clarification **[2]**  1629/13
 1635/10
clarify **[1]**  1723/5
clarifying **[2]**  1716/7
 1754/12
clarity's **[1]**  1691/23
clean **[3]**  1669/8 1696/22
 1701/9
cleaned **[1]**  1655/2
cleaning **[1]**  1702/6
clear **[12]**  1661/13 1663/7
 1669/13 1671/10 1701/20
 1716/9 1727/13 1738/25
 1739/20 1770/21 1786/7
 1797/19
clerks **[1]**  1747/9
client **[2]**  1648/20 1653/11
clients **[1]**  1743/17
clip **[44]**  1691/19 1788/2
 1788/12 1788/16 1788/20
 1788/24 1789/3 1789/7
 1789/11 1789/18 1789/22
 1790/1 1790/5 1790/9 1790/13
 1790/17 1790/21 1792/5
 1792/9 1792/13 1792/17
 1792/21 1792/25 1793/4
 1793/8 1793/12 1793/16
 1793/20 1793/24 1794/3
 1794/7 1794/11 1794/15
 1794/19 1794/24 1795/3
 1795/4 1795/9 1795/13
 1795/17 1795/21 1795/25
 1796/8 1796/12
clips **[10]**  1691/14 1691/16
 1691/20 1691/24 1692/4
 1788/10 1792/1 1796/4 1796/7
 1796/16
close **[3]**  1653/7 1705/21
 1758/23
closely **[1]**  1663/3
closer **[3]**  1733/22 1784/20
 1784/25
closing **[3]**  1797/12 1799/6
 1800/1
closings **[1]**  1798/10
cock **[2]**  1677/20 1678/17
coerce **[1]**  1632/22
COGAN **[2]**  1623/12 1625/2
cohosting **[1]**  1635/12
colleague **[2]**  1733/22 1751/3
colleagues **[1]**  1728/19
college **[2]**  1633/13 1633/15

comfort **[2]**  1705/21 1758/24
coming **[19]**  1635/9 1635/12
 1638/17 1646/13 1650/17
 1652/2 1655/1 1655/4 1657/11
 1657/12 1662/25 1663/14
 1678/1 1703/9 1705/14
 1726/18 1751/8 1770/10
 1782/3
comment **[1]**  1798/21
commenting **[1]**  1722/22
comments **[1]**  1721/24
communicate **[2]**  1700/8
 1797/18
communicated **[1]**  1681/18
communication **[3]**  1683/12
 1684/2 1686/23
communications **[1]**  1742/3
company **[1]**  1766/9
compare **[2]**  1715/17 1715/24
comping **[1]**  1658/1
complain **[1]**  1647/4
complained **[4]**  1646/17
 1646/19 1646/20 1650/9
complaining **[2]**  1633/1
 1705/2
complaint **[9]**  1679/19 1680/5
 1680/8 1680/24 1680/25
 1714/25 1773/16 1773/24
 1776/1
comprised **[1]**  1795/4
computer **[3]**  1624/14 1640/7
 1679/21
computer-aided **[1]**  1624/14
conceive **[1]**  1679/3
concerns **[4]**  1643/11 1643/15
 1646/2 1765/10
concierge **[1]**  1699/14
concluded **[1]**  1731/14
concludes **[22]**  1633/4
 1647/22 1788/15 1788/19
 1788/23 1789/2 1789/6
 1789/10 1789/14 1789/15
 1789/21 1789/25 1790/4
 1790/8 1790/12 1790/16
 1790/20 1790/24 1791/3
 1792/1 1796/4 1796/16
conclusion **[1]**  1678/24
condo **[12]**  1641/25 1655/2
 1668/1 1675/18 1675/19
 1694/4 1694/14 1696/20
 1698/19 1700/4 1706/3
 1723/24
conference **[5]**  1639/23
 1750/15 1752/5 1764/3
 1766/23
conferenced **[1]**  1639/24
conferencing **[1]**  1636/8
confidentiality **[3]**  1658/20
 1659/19 1694/9
confirm **[2]**  1737/19 1761/15
confirmed **[3]**  1689/24
 1727/13 1733/2
confirms **[1]**  1773/3
confused **[4]**  1682/8 1682/11
 1727/19 1737/14
connect **[2]**  1744/5 1744/8

connection **[1]**  1647/2
consensual **[2]**  1650/6
 1680/13
consent **[5]**  1650/22 1651/1
 1711/7 1731/1 1731/2
consented **[1]**  1668/25
consider **[3]**  1738/25 1739/2
 1739/7
consideration **[1]**  1693/9
considering **[3]**  1763/14
 1766/2 1766/13
Cont'g **[1]**  1792/1
contact **[10]**  1666/25 1684/8
 1717/23 1736/24 1761/10
 1769/13 1769/17 1769/25
 1770/12 1772/22
contacted **[1]**  1773/22
context **[1]**  1736/24
continue **[7]**  1634/17 1641/8
 1682/4 1693/14 1748/17
 1753/3 1788/5
continued **[21]**  1624/1
 1641/16 1648/22 1664/5
 1665/1 1693/16 1706/10
 1707/1 1731/15 1732/4
 1744/12 1750/14 1752/6
 1753/5 1764/2 1766/24 1767/9
 1776/24 1777/1 1780/11
 1791/4
continues **[1]**  1729/22
Continuing **[2]**  1703/21
 1777/3
convenience **[1]**  1747/23
conversation **[25]**  1629/14
 1634/8 1636/2 1636/7 1639/13
 1639/17 1639/18 1643/18
 1663/18 1663/23 1677/23
 1685/3 1685/23 1686/3 1686/8
 1686/13 1686/25 1688/9
 1695/3 1709/2 1709/2 1709/14
 1709/15 1734/6 1755/24
conversations **[14]**  1628/8
 1628/9 1629/17 1630/15
 1631/5 1634/23 1651/22
 1679/14 1681/11 1684/24
 1703/1 1755/10 1767/13
 1781/10
convey **[2]**  1705/25 1706/7
convince **[1]**  1646/11
cool **[1]**  1660/6
copies **[4]**  1720/5 1720/7
 1720/9 1741/7
copy **[11]**  1654/19 1670/12
 1694/20 1694/21 1694/23
 1740/24 1741/2 1773/15
 1773/23 1776/1 1781/14
correct **[69]**  1625/13 1629/9
 1631/1 1637/7 1638/18
 1638/22 1639/15 1642/1
 1654/21 1657/6 1659/12
 1666/9 1672/1 1695/9 1696/17
 1716/14 1719/21 1719/22
 1719/25 1720/5 1720/8 1721/8
 1721/11 1721/21 1726/7
 1732/8 1732/14 1732/17
 1733/12 1735/7 1736/23

**C**

**correct... [38]** 1737/5 1737/13 1739/22 1740/6 1740/12 1749/4 1749/19 1756/14 1756/17 1756/20 1756/23 1757/13 1760/15 1761/7 1761/10 1762/23 1768/2 1768/19 1769/14 1770/13 1772/23 1774/7 1775/7 1776/16 1776/17 1776/21 1777/23 1779/4 1779/7 1783/4 1783/14 1783/15 1783/17 1783/18 1783/24 1784/1 1785/9 1785/12
**correctly [2]** 1630/3 1737/5
**correspondence [3]** 1697/8 1767/19 1767/21
**counsel [23]** 1625/16 1640/14 1658/9 1660/21 1665/15 1679/16 1687/25 1713/19 1716/9 1729/13 1732/17 1733/2 1738/9 1739/3 1739/12 1739/24 1758/4 1761/13 1761/14 1763/22 1769/17 1769/19 1771/9
**couple [11]** 1650/11 1676/23 1681/2 1683/2 1688/21 1697/4 1703/4 1711/16 1741/9 1758/20 1761/9
**course [7]** 1672/22 1700/9 1721/2 1726/3 1745/7 1745/18 1757/13
**Court's [3]** 1690/3 1745/7 1745/18
**Courthouse [1]** 1623/5
**Courtney [1]** 1637/21
**courtroom [9]** 1625/7 1662/6 1672/20 1673/15 1689/4 1693/13 1743/10 1747/10 1797/23
**cover [1]** 1674/7
**crack [1]** 1724/7
**crack-head [1]** 1724/7
**crazy [4]** 1649/23 1717/20 1735/6 1741/22
**create [1]** 1715/14
**cried [1]** 1740/4
**criminal [8]** 1656/21 1704/14 1704/25 1746/14 1746/16 1753/12 1755/10 1756/19
**cross [12]** 1690/17 1690/25 1719/7 1719/12 1732/4 1744/3 1748/24 1753/5 1754/5 1767/9 1776/25 1783/8
**Cross-examination [8]** 1719/7 1719/12 1732/4 1748/24 1753/5 1767/9 1776/25 1783/8
**cross-examine [1]** 1690/25
**crying [1]** 1738/5
**CSR [1]** 1624/11
**cuffs [2]** 1778/4 1778/5
**Cure [1]** 1638/9
**curious [1]** 1712/1
**cursor [1]** 1786/10
**cut [1]** 1628/24

**CV [1]** 1623/3
**cycle [2]** 1642/11 1647/3

**D**

**dad's [1]** 1703/12
**Dallas [3]** 1652/7 1652/15 1652/16
**DANELCZYK [1]** 1624/11
**date [23]** 1663/7 1663/7 1663/12 1663/13 1670/14 1671/15 1671/16 1681/3 1683/8 1687/19 1711/23 1714/11 1714/17 1714/22 1715/1 1723/3 1727/6 1767/17 1772/4 1772/17 1776/10 1776/11 1776/12
**dated [2]** 1634/6 1634/21
**dates [3]** 1647/13 1672/6 1727/5
**David [1]** 1679/25
**dead [1]** 1701/6
**deal [2]** 1753/8 1756/5
**dealing [2]** 1642/23 1766/9
**Dear [1]** 1760/22
**December [2]** 1754/25 1757/1
**December 12th [1]** 1754/25
**DECHERT [1]** 1623/19
**decided [2]** 1652/1 1658/1
**decision [2]** 1651/25 1652/1
**def [3]** 1677/19 1678/16 1759/16
**defend [2]** 1656/20 1705/3
**defendant [16]** 1623/19 1624/2 1624/6 1625/11 1625/17 1648/9 1648/11 1713/15 1746/13 1746/17 1748/17 1787/20 1796/18 1796/20 1796/21 1803/9
**Defendant Powers [1]** 1748/17
**Defendant's [16]** 1662/12 1665/23 1669/20 1670/17 1672/17 1673/24 1682/24 1683/14 1684/12 1686/17 1697/12 1716/10 1723/4 1736/17 1739/13 1739/15
**defendants [5]** 1623/9 1692/10 1743/21 1765/10 1800/20
**defendants' [6]** 1670/25 1709/20 1714/5 1747/19 1753/25 1769/5
**defense [2]** 1739/3 1739/11
**define [1]** 1799/4
**definitely [5]** 1631/18 1692/21 1697/25 1759/19 1760/6
**delay [1]** 1702/20
**delayed [3]** 1687/9 1687/13 1702/22
**delete [3]** 1665/15 1665/18 1673/21
**deliberations [1]** 1797/13
**delivered [2]** 1700/17 1776/7
**delivery [1]** 1700/13
**demanding [1]** 1785/12
**demeanor [1]** 1713/6

**denied [2]** 1799/12 1799/13
**depart [1]** 1661/9
**deposition [35]** 1625/5 1626/8 1633/5 1633/6 1633/9 1647/23 1648/1 1655/11 1682/5 1689/12 1689/25 1690/13 1690/16 1709/3 1732/20 1733/14 1733/21 1741/25 1742/19 1743/23 1747/1 1762/10 1763/5 1777/4 1777/10 1778/14 1787/21 1788/2 1789/16 1789/17 1792/2 1792/4 1794/24 1796/5 1796/6
**depositions [9]** 1625/18 1625/20 1649/17 1649/19 1649/22 1672/9 1691/14 1741/20 1743/18
**designation [1]** 1743/23
**designations [7]** 1625/18 1689/12 1689/16 1689/20 1747/1 1787/21 1796/17
**desk [1]** 1699/15
**destinations [1]** 1648/1
**destroyed [1]** 1779/12
**devices [2]** 1742/5 1742/22
**dick [1]** 1724/11
**dickhead [1]** 1757/16
**died [1]** 1673/11
**difference [1]** 1723/22
**different [3]** 1686/24 1723/3 1786/6
**difficulty [1]** 1688/6
**digits [1]** 1630/20
**dinner [3]** 1657/21 1726/11 1726/18
**direct [14]** 1649/9 1661/24 1662/16 1664/6 1672/2 1675/4 1686/22 1692/19 1693/14 1693/16 1694/3 1706/11 1738/4 1781/25
**directing [1]** 1709/9
**directions [1]** 1742/6
**disappear [1]** 1772/15
**disappointment [2]** 1647/2 1647/5
**disclosing [1]** 1753/16
**disclosure [1]** 1727/9
**discover [1]** 1670/5
**discovery [3]** 1740/15 1742/3 1742/7
**discuss [5]** 1637/1 1642/5 1643/18 1695/10 1760/23
**discussed [6]** 1692/9 1725/16 1734/7 1749/9 1772/11 1781/9
**discussing [1]** 1638/16
**discussion [4]** 1681/23 1682/1 1746/2 1799/19
**discussions [1]** 1639/7
**displayed [3]** 1714/7 1716/3 1716/4
**disputing [3]** 1773/9 1775/9 1775/11
**distraction [1]** 1678/19
**distribution [1]** 1660/18
**district [4]** 1623/1 1623/1

**D**

**district... [2]** 1623/12 1703/24
**ditching [1]** 1678/4
**DK4 [1]** 1671/3
**document [28]** 1656/11 1658/17 1658/23 1659/4 1660/17 1660/23 1694/11 1694/18 1694/20 1694/23 1695/4 1695/10 1695/14 1695/16 1711/21 1711/23 1713/18 1713/22 1713/24 1714/2 1715/12 1715/22 1715/25 1771/13 1798/8 1798/12 1798/22 1798/22
**documents [6]** 1672/11 1679/13 1679/15 1685/17 1798/4 1798/15
**DOLAN [1]** 1624/6
**dollar [2]** 1782/23 1785/4
**dollars [1]** 1783/19
**done [8]** 1632/12 1639/2 1639/5 1650/15 1668/24 1679/4 1711/6 1797/1
**door [1]** 1675/19
**DOUGLAS [1]** 1624/7
**down [29]** 1635/11 1640/25 1641/2 1663/17 1667/2 1686/20 1687/23 1689/5 1718/11 1722/3 1724/11 1724/18 1734/15 1735/16 1755/12 1758/4 1758/19 1758/21 1760/4 1760/8 1761/12 1762/5 1769/12 1772/8 1773/20 1777/8 1779/22 1786/23 1787/16
**download [1]** 1680/2
**downstairs [1]** 1699/14
**dozen [1]** 1676/20
**draft [2]** 1773/24 1798/21
**draw [2]** 1672/15 1730/23
**drawing [1]** 1697/1
**drill [1]** 1683/16
**drinks [3]** 1667/9 1667/15 1695/20
**drive [1]** 1735/6
**driver [3]** 1688/7 1688/17 1688/19
**drop [2]** 1742/6
**dropped [1]** 1742/24
**drunk [4]** 1666/17 1668/10 1668/11 1722/16
**ducks [2]** 1757/14 1757/18
**duly [2]** 1649/2 1781/3
**dungeon [6]** 1629/6 1629/11 1630/23 1631/7 1631/12 1778/25
**DX [23]** 1686/24 1687/3 1696/11 1697/13 1709/5 1709/8 1709/20 1709/25 1711/19 1713/15 1713/20 1714/2 1714/5 1715/6 1715/8 1715/21 1716/22 1717/16 1718/3 1718/12 1731/6 1737/2 1738/8
**DX-D [2]** 1686/24 1687/3

**DX-JP [1]** 1737/2
**DX-M3 [1]** 1711/19
**DX-P4 [4]** 1709/5 1709/8 1709/20 1709/25
**DX-Q3 [3]** 1718/3 1718/12 1738/8
**DX-R2 [1]** 1696/11
**DX-T4-6 [1]** 1731/6
**DX-U3 [1]** 1715/21
**DX-U3-1 [4]** 1715/6 1715/8 1716/22 1717/16
**DX-V2 [1]** 1697/13
**DX-X7 [4]** 1713/15 1713/20 1714/2 1714/5
**DXC7 [2]** 1660/17 1661/5
**DXJP220 [1]** 1755/14
**DXJP221 [1]** 1757/5
**DXJP225 [2]** 1759/11 1769/5

**E**

**e-mail [4]** 1665/18 1683/9 1699/14 1781/16
**e-mails [3]** 1679/21 1685/12 1779/11
**eager [1]** 1660/8
**earliest [1]** 1786/2
**early [3]** 1737/23 1763/15 1769/1
**easier [4]** 1625/23 1640/21 1658/13 1742/18
**EASTERN [1]** 1623/1
**easy [2]** 1695/17 1736/19
**edge [1]** 1713/1
**education [3]** 1633/12 1652/8 1652/9
**EDWARD [1]** 1623/20
**effect [1]** 1740/11
**efficient [1]** 1724/23
**effort [1]** 1694/23
**eight [2]** 1704/12 1784/22
**either [8]** 1638/17 1643/2 1643/19 1684/25 1694/17 1694/20 1727/21 1736/7
**elaborate [1]** 1628/23
**electronic [4]** 1715/22 1715/24 1716/2 1742/3
**elementary [1]** 1652/9
**email [5]** 1624/12 1636/8 1770/1 1771/2 1775/20
**EMMA [21]** 1623/4 1637/18 1637/21 1638/5 1644/4 1656/25 1657/1 1657/3 1700/11 1711/16 1711/17 1712/20 1713/25 1714/21 1717/18 1717/23 1718/3 1720/1 1721/7 1738/19 1739/21
**Emma Hopper [1]** 1700/11
**emoji [1]** 1724/11
**emojis [1]** 1644/16 1644/17
**emoticons [2]** 1784/22 1785/4
**emotional [1]** 1642/22
**emphasize [1]** 1743/17
**enabling [1]** 1661/12
**encounter [8]** 1628/1 1646/18 1668/19 1668/21 1670/2

1674/14 1678/25 1726/25
**encounters [5]** 1630/5 1642/5 1646/3 1646/21 1650/6
**engage [3]** 1650/8 1651/16 1660/10
**engaged [1]** 1668/18
**engaging [1]** 1651/20
**enters [3]** 1625/7 1743/10 1747/10
**entire [2]** 1736/16 1785/10
**entirely [1]** 1632/17
**entirety [2]** 1665/21 1680/3
**entitled [3]** 1659/20 1705/8 1736/5
**entry [1]** 1699/16
**episode [1]** 1722/6
**Eros.com [3]** 1749/11 1749/15 1749/23
**ESQ [11]** 1623/17 1623/17 1623/20 1623/21 1623/21 1623/22 1624/4 1624/4 1624/7 1624/8 1624/8
**essence [1]** 1743/19
**essentially [1]** 1730/15
**estate [2]** 1765/8 1767/25
**estimate [1]** 1800/6
**evening [6]** 1668/19 1675/2 1690/17 1709/12 1711/3 1723/20
**event [4]** 1635/9 1638/9 1638/12 1703/8
**events [1]** 1726/15
**eventually [8]** 1653/14 1678/4 1701/18 1702/10 1702/14 1702/18 1702/24 1705/6
**evidence [59]** 1658/9 1658/10 1662/15 1666/1 1669/20 1670/22 1670/25 1671/7 1671/9 1672/18 1673/25 1676/18 1683/18 1687/8 1690/4 1691/17 1696/11 1696/12 1697/13 1709/6 1709/17 1709/21 1714/2 1714/6 1716/4 1718/13 1720/15 1720/20 1721/14 1723/13 1725/23 1728/18 1732/2 1734/18 1735/24 1736/12 1736/14 1737/1 1738/9 1740/19 1753/23 1754/3 1755/14 1755/20 1757/4 1758/9 1759/11 1761/14 1767/7 1769/6 1769/21 1774/2 1774/24 1781/12 1796/20 1797/9 1798/12 1798/16 1800/10
**ex [1]** 1750/4
**ex-wife [1]** 1750/4
**exact [1]** 1631/4
**exactly [2]** 1631/10 1727/5
**exam [1]** 1648/2
**examination [18]** 1649/9 1665/1 1692/19 1692/19 1693/15 1693/16 1703/19 1707/1 1719/7 1719/12 1732/4 1748/24 1753/5 1767/9

**E**

examination... **[4]**  1776/25 1782/1 1783/8 1786/4
examine **[1]**  1690/25
examined **[2]**  1649/3 1781/3
example **[1]**  1751/18
examples **[1]**  1628/13
exception **[1]**  1719/20
exchange **[11]**  1720/18 1720/21 1723/16 1726/17 1751/7 1755/16 1757/2 1765/8 1775/20 1782/5 1784/15
excited **[6]**  1636/7 1639/11 1641/14 1641/18 1643/8 1660/9
exclamation **[1]**  1726/19
excuse **[17]**  1626/25 1627/9 1630/24 1635/2 1663/10 1667/23 1674/16 1675/13 1680/24 1688/6 1692/3 1709/6 1714/20 1737/5 1737/11 1751/8 1751/22
executing **[1]**  1713/9
exhibit **[76]**  1630/19 1658/8 1658/11 1660/20 1662/12 1662/14 1665/24 1669/20 1669/21 1670/18 1670/25 1671/1 1671/12 1672/17 1673/25 1676/18 1681/8 1682/25 1683/14 1684/12 1684/12 1686/17 1691/21 1696/10 1697/12 1705/8 1707/3 1709/20 1713/15 1714/5 1714/8 1715/6 1716/22 1717/15 1720/15 1721/14 1721/17 1723/3 1723/4 1725/23 1728/17 1729/9 1729/10 1731/5 1732/1 1732/2 1734/17 1736/16 1736/17 1737/10 1739/15 1754/2 1754/9 1755/22 1757/6 1758/1 1758/8 1758/10 1759/12 1760/19 1761/18 1763/20 1767/7 1767/8 1767/15 1769/7 1769/20 1769/22 1771/11 1771/21 1774/25 1781/9 1781/12 1782/23 1783/10 1785/25
Exhibit 126 **[1]**  1676/18
Exhibit P **[1]**  1658/8
exist **[1]**  1671/25
exits **[3]**  1689/4 1693/13 1797/23
expect **[4]**  1629/23 1632/20 1639/14 1645/4
expected **[1]**  1690/9
experience **[3]**  1636/23 1639/10 1749/15
explained **[1]**  1646/22
explanation **[1]**  1666/18
expose **[1]**  1783/16
express **[2]**  1760/22 1760/24
expressed **[2]**  1634/9 1634/24
extended **[1]**  1661/19
extending **[1]**  1661/11
extort **[2]**  1708/3 1708/13

extortion **[1]**  1784/1
extra **[2]**  1720/5 1799/1
extremely **[2]**  1707/15 1761/22
eyeballs **[1]**  1785/5
eyes **[2]**  1721/25 1785/2

**F**

face **[3]**  1662/7 1785/2 1785/2
fact **[18]**  1631/19 1691/3 1708/4 1710/20 1730/22 1734/3 1741/9 1743/24 1749/14 1753/8 1753/8 1756/19 1763/14 1765/12 1769/24 1775/23 1776/20 1778/17
facts **[2]**  1774/1 1799/5
factual **[1]**  1798/5
fair **[3]**  1656/22 1657/8 1684/15
fairly **[2]**  1712/6 1755/4
fall **[2]**  1706/1 1714/24
false **[1]**  1651/18
far **[3]**  1659/9 1735/25 1743/19
FARIELLO **[1]**  1623/15
fashion **[1]**  1768/1
fast **[2]**  1703/4 1704/5
father **[1]**  1701/6
father's **[2]**  1701/7 1701/12
Fax **[1]**  1624/12
featured **[1]**  1660/7
February **[9]**  1680/20 1681/1 1681/3 1714/12 1714/17 1738/15 1738/19 1755/17 1757/1
February 2nd **[1]**  1755/17
FedEx **[6]**  1773/17 1774/8 1774/18 1775/4 1775/9 1776/1
fees **[1]**  1704/17
fell **[3]**  1638/16 1667/9 1667/16
felt **[9]**  1632/11 1638/21 1649/23 1678/3 1678/8 1682/10 1702/23 1706/1 1708/11
Ferriollo **[6]**  1676/11 1676/15 1677/5 1678/23 1721/21 1722/13
few **[14]**  1628/14 1665/22 1679/8 1699/21 1750/8 1759/10 1761/20 1762/19 1762/23 1767/11 1778/20 1786/6 1786/12 1797/20
figured **[1]**  1799/22
file **[32]**  1788/14 1788/15 1788/18 1788/19 1788/22 1788/23 1789/1 1789/2 1789/5 1789/6 1789/9 1789/10 1789/13 1789/14 1789/20 1789/21 1789/24 1789/25 1790/3 1790/4 1790/7 1790/8 1790/11 1790/12 1790/15 1790/16 1790/19 1790/20 1790/23 1790/24 1791/2

1791/3
filed **[8]**  1679/19 1679/20 1680/8 1680/25 1714/22 1714/25 1719/1 1738/24
filing **[2]**  1745/11 1759/25
final **[2]**  1667/25 1796/6
finally **[3]**  1656/25 1689/15 1717/20
fine **[8]**  1640/11 1640/22 1696/5 1717/11 1746/24 1751/5 1773/8 1800/17
finish **[1]**  1800/1
finished **[2]**  1638/14 1797/8
finishing **[2]**  1712/21 1748/6
firm **[2]**  1751/4 1773/15
first **[52]**  1625/17 1638/3 1638/5 1641/24 1641/25 1645/3 1648/15 1649/2 1655/9 1656/8 1658/17 1659/17 1670/2 1676/25 1679/19 1680/5 1680/8 1680/24 1683/12 1684/2 1686/5 1686/13 1686/18 1686/23 1687/19 1690/1 1692/20 1696/19 1696/20 1699/9 1699/10 1699/11 1710/5 1714/25 1715/5 1716/21 1717/8 1723/15 1728/18 1730/2 1730/19 1733/1 1746/14 1753/23 1769/23 1770/5 1773/20 1773/22 1781/3 1786/12 1794/24 1800/24
five **[3]**  1652/22 1661/25 1757/2
flew **[6]**  1638/5 1639/9 1661/17 1661/17 1663/10 1671/23
flight **[21]**  1652/3 1654/3 1654/10 1654/12 1655/4 1655/19 1655/22 1655/24 1657/8 1661/11 1661/19 1673/13 1681/20 1681/24 1682/15 1682/17 1682/18 1684/9 1687/13 1740/9 1756/17
flights **[16]**  1653/19 1653/23 1653/25 1655/12 1655/17 1656/12 1656/16 1656/19 1656/20 1656/23 1657/3 1674/7 1705/5 1749/18 1749/24 1756/19
flood **[1]**  1641/16
floor **[3]**  1623/16 1701/9 1702/6
Florida **[1]**  1704/22
flown **[3]**  1661/16 1661/16 1678/6
fly **[1]**  1654/20
focus **[2]**  1662/19 1720/21
focused **[1]**  1690/15
focusing **[1]**  1676/18
follow **[5]**  1625/24 1625/24 1659/3 1695/17 1712/14
followed **[2]**  1695/19 1706/4
following **[6]**  1664/5 1731/15

**F**

following... **[4]**  1751/1 1765/1 1768/22 1776/24
follows **[2]**  1649/3 1781/4
food **[4]**  1695/22 1700/13 1700/15 1700/17
forced **[1]**  1649/24
forgive **[3]**  1738/4 1748/12 1759/4
form **[1]**  1646/18 1770/14 1779/13
formal **[2]**  1773/15 1776/1
formally **[1]**  1691/17
former **[1]**  1701/12
forth **[3]**  1704/24 1755/25 1756/6
forward **[4]**  1673/3 1703/4 1704/5 1704/12
four **[1]**  1709/22
fragile **[1]**  1721/6
frame **[1]**  1742/5
frankly **[5]**  1689/17 1690/8 1690/15 1691/2 1693/4
Friday **[2]**  1733/20 1801/4
friend **[23]**  1632/14 1634/1 1634/6 1634/7 1634/16 1634/21 1634/22 1636/4 1668/14 1676/16 1677/19 1678/5 1678/13 1678/16 1682/3 1682/11 1698/20 1700/25 1705/18 1707/10 1707/25 1708/10 1711/12
friendly **[1]**  1722/24
friends **[2]**  1650/12 1653/7
front **[6]**  1630/19 1658/13 1678/21 1699/15 1735/19 1782/5
full **[2]**  1678/14 1683/8
fuller **[1]**  1785/25
fun **[8]**  1626/18 1642/15 1645/13 1645/16 1645/19 1668/13 1726/11 1726/22
funny **[4]**  1722/16 1722/17 1725/3 1729/6
furniture **[1]**  1778/8

**G**

gain **[1]**  1699/13
gal **[1]**  1736/6
galavanting **[1]**  1678/7
game **[1]**  1692/12
gears **[1]**  1708/19
general **[1]**  1713/24
generally **[2]**  1704/25 1715/12
gentle **[2]**  1707/9 1707/24
gentlemen **[5]**  1625/9 1689/2 1743/6 1747/12 1797/8
gift **[1]**  1660/8
GILBERT **[3]**  1624/4 1783/9 1802/10
girl **[4]**  1678/21 1721/6 1726/18 1729/1
girl's **[1]**  1722/17
girlfriend **[4]**  1678/2 1701/7 1701/12 1749/14

girlfriend's **[2]**  1703/12 1703/15
girls **[15]**  1635/8 1643/24 1644/2 1644/5 1650/10 1650/11 1650/12 1660/5 1660/7 1660/9 1684/8 1706/8 1708/15 1722/16 1722/24
given **[5]**  1702/5 1708/11 1742/6 1754/4 1761/1
glad **[4]**  1635/13 1645/16 1645/18 1799/21
Glibbery **[5]**  1766/8 1767/22 1767/25 1768/6 1775/21
gmail.com **[1]**  1624/12
gotcha **[1]**  1692/12
graduate **[2]**  1633/19 1751/12
grant **[1]**  1692/14
great **[8]**  1642/16 1645/21 1663/12 1676/23 1687/7 1735/10 1737/7 1798/18
group **[10]**  1636/17 1637/11 1644/10 1644/14 1645/20 1685/3 1685/5 1685/20 1707/19 1762/1
GROVER **[11]**  1624/7 1665/2 1688/23 1703/20 1707/2 1709/22 1715/7 1758/20 1797/3 1798/1 1802/4
guess **[3]**  1684/22 1687/9 1692/20
guessing **[1]**  1746/1
guest **[1]**  1699/16
guests **[1]**  1700/4
guy **[6]**  1629/11 1630/23 1631/12 1679/24 1679/25 1680/4
guys **[1]**  1645/13
GX **[1]**  1784/11
GX-8 **[1]**  1784/11

**H**

H's **[1]**  1740/10
half **[6]**  1665/24 1676/20 1728/24 1747/6 1800/11 1800/21
HAMPTON **[1]**  1624/2
hand **[2]**  1771/18 1772/9
handle **[1]**  1626/19
hang **[6]**  1626/18 1627/3 1627/16 1627/22 1657/24 1788/3
happy **[3]**  1677/21 1678/10 1722/25
hard **[1]**  1715/4
Harvard **[1]**  1751/12
HASSEN **[9]**  1623/4 1719/21 1726/5 1726/15 1727/3 1727/8 1728/5 1728/9 1796/7
hate **[3]**  1728/20 1786/13 1786/13
head **[1]**  1724/7
headache **[1]**  1706/8
heard **[43]**  1634/8 1634/23 1651/6 1651/11 1659/11 1662/9 1665/3 1672/3 1676/13 1678/17 1681/5 1682/8 1685/2

1685/7 1687/13 1690/2 1691/1 1692/15 1694/6 1697/14 1698/11 1699/21 1703/11 1704/1 1709/3 1711/12 1718/2 1721/21 1729/12 1731/10 1732/19 1740/2 1742/15 1742/20 1743/20 1747/18 1753/7 1753/7 1753/17 1760/15 1762/18 1778/20 1797/19
hearsay **[1]**  1765/2
hearts **[1]**  1697/2
Heather **[6]**  1707/10 1707/12 1707/13 1707/24 1708/10 1708/11
held **[5]**  1626/6 1633/7 1729/22 1780/10 1781/19
hen **[1]**  1734/23
herself **[3]**  1656/20 1702/13 1705/3
hesitation **[1]**  1745/22
hide **[1]**  1751/13
high **[3]**  1634/5 1634/20 1696/8
high-profile **[1]**  1696/8
higher **[1]**  1709/24
highest **[1]**  1633/12
highlight **[5]**  1720/22 1732/7 1733/24 1772/4 1775/1
highlighted **[2]**  1729/15 1761/21
himself **[1]**  1679/25
history **[1]**  1630/15
hit **[3]**  1629/1 1629/5 1662/7
hold **[3]**  1640/15 1736/20 1765/6
home **[4]**  1675/25 1728/1 1797/3 1797/4
honest **[1]**  1786/17
honestly **[1]**  1737/24
Honor **[124]**
Honor's **[1]**  1745/13
HONORABLE **[1]**  1623/12
hook **[1]**  1736/6
hope **[2]**  1638/8 1717/22
hopefully **[1]**  1711/15
hoping **[1]**  1783/1
HOPPER **[27]**  1623/4 1637/18 1637/20 1637/25 1638/4 1639/14 1641/21 1642/5 1644/4 1646/25 1647/17 1656/25 1657/1 1657/3 1700/11 1711/16 1711/17 1713/25 1717/23 1718/4 1718/19 1721/7 1735/22 1738/5 1739/3 1739/4 1739/21
Hopper's **[1]**  1717/13
hospital **[1]**  1736/23
hospitality **[1]**  1653/10
hosting **[2]**  1635/9 1635/12
hot **[1]**  1729/1
hotel **[1]**  1705/6
hour **[8]**  1728/24 1743/6 1744/10 1745/25 1747/6 1747/6 1773/14 1800/8
hours **[8]**  1666/11 1676/5

**H**

hours... **[6]**   1678/25 1680/2
1692/20 1697/4 1723/24
1800/21
house **[2]**   1720/7 1720/11
HOWARD **[7]**   1623/8 1623/19
1624/2 1633/23 1633/25
1634/12 1653/4
Howie **[69]**   1628/12 1629/6
1634/5 1634/6 1634/8 1634/20
1634/21 1634/23 1636/4
1636/9 1636/20 1643/21
1646/5 1646/7 1646/8 1646/11
1646/13 1650/12 1652/2
1653/10 1654/1 1654/6
1656/17 1656/20 1660/8
1661/8 1661/12 1666/20
1669/24 1670/7 1670/11
1671/17 1675/3 1677/16
1677/25 1678/4 1678/4 1678/7
1678/7 1678/20 1680/12
1682/9 1682/9 1684/7 1686/15
1696/2 1696/21 1697/6
1697/10 1697/22 1697/24
1700/25 1702/17 1704/18
1705/5 1705/5 1705/25
1707/14 1708/3 1708/11
1721/3 1723/24 1725/1
1738/20 1766/4 1766/11
1766/12 1787/7 1787/13
Howie's **[6]**   1660/5 1670/2
1676/16 1683/6 1683/22
1694/14
hundred **[2]**   1630/16 1641/6
hundred percent **[1]**   1630/16
hungry **[1]**   1725/1

**I**

I-4 **[1]**   1723/4
I4 **[2]**   1662/13 1672/17
idea **[6]**   1646/7 1660/6
1679/4 1706/7 1730/16
1749/16
identify **[1]**   1742/2
ignored **[1]**   1678/11
image **[1]**   1687/10
imagine **[1]**   1631/21
imagined **[1]**   1689/17
immediately **[3]**   1728/21
1729/1 1729/5
impeach **[2]**   1691/15 1744/1
impeaches **[1]**   1766/18
impeachment **[1]**   1765/20
important **[5]**   1732/13
1732/14 1772/18 1797/14
1798/8
in-person **[1]**   1639/17
inbox **[1]**   1640/9
incident **[1]**   1726/25
included **[1]**   1785/4
including **[1]**   1751/14
inconsistent **[1]**   1765/13
independent **[2]**   1645/23
1658/25
indicate **[1]**   1674/15
indicated **[4]**   1631/2 1655/21

1674/13 1688/3
indirectly **[3]**   1637/8 1637/9
1637/21
individuals **[1]**   1651/12
industry **[1]**   1653/10
inebriated **[1]**   1713/6
inference **[1]**   1730/23
inform **[1]**   1662/24
information **[3]**   1675/1
1684/8 1760/25
informed **[1]**   1758/14
initial **[1]**   1695/15
initialed **[1]**   1695/18
initialing **[1]**   1712/11
initializing **[1]**   1712/11
initials **[2]**   1659/2 1713/9
initiate **[1]**   1700/24
initiated **[1]**   1703/22
initiating **[1]**   1738/6
injured **[4]**   1628/17 1628/22
1628/23 1628/24
injuries **[3]**   1642/19 1642/21
1642/22
inquire **[1]**   1649/7
insane **[1]**   1708/4
Insert **[1]**   1799/1
inside **[1]**   1670/8
Instagram **[3]**   1635/20
1636/15 1638/21
instance **[1]**   1706/2
instances **[2]**   1646/20 1647/1
instead **[3]**   1678/13 1749/22
1772/22
instruction **[2]**   1668/4
1668/6
instructions **[2]**   1682/14
1799/5
insulted **[1]**   1736/4
intend **[1]**   1751/11
intended **[3]**   1651/3 1675/8
1748/14
intention **[1]**   1632/11
intentionally **[1]**   1632/12
interactions **[2]**   1642/14
1650/25
interest **[2]**   1634/9 1634/24
interested **[7]**   1636/6
1643/24 1644/2 1644/5
1651/19 1675/25 1766/4
internet **[3]**   1783/23 1785/14
1797/17
interrupt **[2]**   1640/6 1747/20
interrupted **[1]**   1747/13
interrupts **[3]**   1629/13
1635/10 1770/24
intonated **[1]**   1645/21
introduce **[6]**   1630/4 1634/4
1634/19 1637/14 1637/20
1638/22
introduced **[9]**   1629/22
1637/6 1637/10 1637/21
1652/4 1679/25 1684/7 1685/9
1800/10
introducing **[1]**   1684/4
invite **[1]**   1627/25
invited **[4]**   1626/24 1628/3

1628/6 1632/5
involved **[6]**   1636/12 1653/13
1705/13 1708/5 1708/9
1727/12
iPad **[1]**   1743/1
iPhone **[2]**   1742/24 1742/25
ISAACS **[4]**   1623/22 1625/21
1626/9 1633/10
issue **[3]**   1691/1 1692/9
1692/24
issues **[1]**   1799/4
items **[2]**   1777/21 1779/2
IV **[1]**   1702/11

**J**

Jackson **[2]**   1671/2 1781/24
January **[3]**   1659/7 1659/12
1728/20
jar **[1]**   1656/4
Jen **[5]**   1718/19 1732/11
1735/2 1737/24 1787/7
JENNIFER **[13]**   1623/8 1624/6
1648/20 1649/2 1683/6
1683/22 1689/20 1689/23
1705/12 1707/9 1717/18
1738/20 1766/13
Jeremy **[6]**   1753/17 1759/25
1760/12 1760/22 1761/6
1787/1
Jesus **[1]**   1758/17
job **[4]**   1640/22 1655/1
1747/9 1762/19
JOHN **[1]**   1623/17
joined **[1]**   1685/5
Joiner **[1]**   1772/10
joke **[3]**   1673/12 1699/24
1729/4
JOLENE **[1]**   1624/8
Jon **[1]**   1751/3
JP **[1]**   1737/2
JPTO **[1]**   1689/17
judge **[6]**   1623/12 1625/2
1640/18 1743/13 1745/14
1800/9
Judge Cogan **[1]**   1625/2
Judge's **[1]**   1648/1
July **[9]**   1704/5 1704/11
1705/7 1705/12 1757/20
1757/24 1758/12 1758/23
1759/9
July 17 **[1]**   1757/24
July 17th **[2]**   1757/20
1758/12
July 19th **[1]**   1705/12
July 22nd **[2]**   1758/23 1759/9
jumped **[1]**   1714/25
June **[18]**   1672/2 1672/15
1673/4 1674/1 1674/3 1675/5
1676/18 1677/1 1722/12
1723/6 1723/16 1725/14
1725/21 1725/25 1726/2
1726/4 1726/16 1729/13
June 13 **[6]**   1673/4 1674/1
1674/3 1675/5 1676/18 1677/1
June 13th **[1]**   1672/15
junk **[6]**   1771/5 1772/1

**J**

junk... **[4]**  1772/14 1772/15 1776/14 1776/20
jurors **[1]**  1800/5
jury **[50]**  1623/13 1625/1 1625/6 1625/7 1625/15 1625/24 1626/4 1649/21 1682/5 1685/11 1689/4 1691/16 1691/20 1692/1 1693/11 1693/13 1707/6 1714/7 1716/4 1718/9 1720/19 1723/14 1730/19 1730/20 1730/20 1730/23 1731/7 1739/22 1740/1 1740/9 1743/4 1743/10 1745/3 1745/19 1745/20 1746/21 1747/3 1747/10 1748/3 1753/1 1754/8 1755/23 1758/12 1760/9 1767/1 1797/3 1797/3 1797/23 1798/3 1799/5
jury's **[1]**  1753/17
just -- I **[1]**  1699/21

**K**

K4 **[5]**  1670/18 1670/25 1671/1 1671/5 1740/19
KATHERINE **[1]**  1624/4
Katrina **[1]**  1646/5
keep **[6]**  1757/13 1759/24 1782/3 1787/4 1787/6 1797/18
keeping **[2]**  1648/12 1758/14
Kentucky **[1]**  1633/16
kept **[9]**  1680/1 1720/4 1720/7 1727/14 1727/20 1727/24 1741/2 1741/7 1741/12
key **[2]**  1699/17 1699/18
kidding **[1]**  1728/21
kindergarten **[1]**  1652/13
kinds **[1]**  1745/11
kisses **[1]**  1697/1
knowing **[1]**  1695/16
knowledge **[5]**  1637/25 1638/4 1641/25 1642/2 1681/13
known **[1]**  1626/13
knows **[8]**  1707/19 1751/9 1751/11 1762/1 1774/3 1786/24 1786/24 1787/5

**L**

L4 **[3]**  1669/20 1669/21 1671/12
lack **[2]**  1731/1 1731/2
ladies **[9]**  1625/9 1650/17 1656/8 1684/16 1684/25 1689/2 1743/6 1747/12 1797/8
laid **[1]**  1729/2
landed **[2]**  1688/3 1688/17
laptop **[1]**  1742/24
large **[2]**  1717/3 1800/12
laugh **[1]**  1724/15
laughing **[3]**  1721/5 1721/11 1724/24
laughter **[6]**  1725/3 1726/12 1728/25 1735/1 1735/5 1735/6
LAVIGNE **[2]**  1624/8 1748/14

LAVIGNE-ALBERT **[1]**  1624/8
law **[2]**  1747/8 1751/4
Lawson **[1]**  1645/9
lawsuit **[5]**  1714/22 1719/1 1738/6 1738/24 1740/25
lawyer **[19]**  1704/2 1742/2 1753/17 1756/4 1756/14 1756/22 1757/15 1760/11 1760/14 1769/13 1770/13 1770/21 1773/16 1786/17 1786/19 1786/24 1786/24 1787/1 1787/3
lawyers **[9]**  1640/7 1640/8 1667/10 1679/9 1733/7 1733/11 1734/4 1745/15 1773/23
LD **[2]**  1675/23 1726/17
learned **[3]**  1640/3 1640/4 1718/25
lease **[7]**  1762/8 1762/12 1762/25 1763/4 1763/11 1765/13 1765/15
least **[13]**  1692/16 1724/7 1735/19 1736/11 1738/19 1753/13 1755/14 1756/22 1759/6 1762/22 1768/9 1770/5 1786/17
leave **[4]**  1689/22 1723/25 1726/11 1744/7
leaves **[3]**  1689/6 1779/24 1787/18
left **[15]**  1646/5 1650/13 1658/13 1663/19 1669/11 1670/3 1679/7 1693/19 1696/20 1697/3 1697/23 1715/13 1716/16 1738/15 1740/21
legal **[3]**  1683/8 1704/16 1799/4
legally **[1]**  1787/11
length **[2]**  1800/7 1800/9
less **[1]**  1773/14
letter **[10]**  1669/24 1670/3 1670/5 1671/11 1698/1 1740/21 1741/2 1773/15 1773/24 1776/2
letters **[4]**  1650/11 1776/5 1778/19 1779/11
level **[1]**  1633/12
LI **[1]**  1624/8
life **[2]**  1783/17 1783/21
likely **[1]**  1629/25
limit **[1]**  1799/24
limited **[1]**  1732/19
LINDA **[1]**  1624/11
LindaDan226 **[1]**  1624/12
line **[126]**
line 1 **[1]**  1632/25
line 10 **[5]**  1632/3 1637/5 1638/6 1639/12 1646/24
line 11 **[2]**  1634/3 1642/12
line 12 **[1]**  1644/8
line 129 **[1]**  1760/18
line 13 **[1]**  1636/11
line 14 **[1]**  1633/8
line 15 **[5]**  1638/6 1638/24

1639/20 1641/6 1756/9
line 16 **[4]**  1639/21 1641/7 1642/12 1643/22
line 18 **[3]**  1641/20 1689/15 1788/20
line 19 **[2]**  1630/18 1647/15
line 2 **[7]**  1634/11 1635/15 1641/8 1642/18 1647/9 1647/16 1789/12
line 20 **[1]**  1647/8
line 21 **[4]**  1637/23 1642/3 1788/17 1789/4
line 22 **[5]**  1629/20 1634/2 1634/18 1635/2 1789/12
line 23 **[4]**  1629/21 1633/21 1635/14 1788/13
Line 24 **[2]**  1788/25 1790/14
line 25 **[1]**  1646/23
line 3 **[6]**  1632/25 1633/22 1637/16 1639/12 1642/4 1788/25
line 4 **[2]**  1637/24 1643/1
line 5 **[6]**  1627/5 1628/15 1638/25 1643/22 1689/14 1788/17
line 6 **[3]**  1632/4 1642/25 1644/7
line 7 **[1]**  1630/17
line 8 **[3]**  1635/4 1788/21 1790/13
line 9 **[4]**  1628/15 1637/17 1642/18 1755/18
lines **[43]**  1626/7 1626/20 1626/25 1627/1 1627/7 1634/11 1634/14 1636/21 1636/25 1637/4 1676/21 1676/23 1683/2 1687/6 1689/11 1689/13 1689/14 1712/6 1729/14 1732/19 1739/2 1739/8 1754/11 1759/14 1789/8 1789/23 1790/2 1790/6 1790/9 1790/17 1790/21 1790/25 1792/9 1792/18 1793/1 1793/25 1794/4 1794/8 1794/11 1795/4 1795/10 1795/18 1795/22
lines 15 **[1]**  1627/1
Lines 17 **[1]**  1689/13
Lines 21 **[1]**  1689/14
Lines 5 **[1]**  1790/25
Lines 6 **[1]**  1789/8
lingerie **[1]**  1693/25
link **[1]**  1746/11
lipstick **[1]**  1697/1
list **[1]**  1769/22
listed **[1]**  1723/23
listen **[2]**  1715/17 1722/15
listening **[1]**  1649/13
LLP **[3]**  1623/19 1624/2 1624/6
located **[3]**  1696/23 1698/2 1698/3
logistical **[1]**  1655/3
logistically **[1]**  1655/1
logistics **[1]**  1689/21
LOL **[3]**  1721/4 1721/10

**L**

**LOL... [1]** 1722/18
**long-time [1]** 1711/12
**looked [6]** 1635/23 1638/20
1684/22 1689/23 1690/16
1739/16
**looks [3]** 1686/24 1707/17
1761/24
**Loredana [16]** 1675/3 1676/6
1676/11 1676/15 1676/16
1677/5 1677/17 1677/22
1678/1 1678/3 1678/5 1678/7
1678/12 1678/23 1721/21
1722/13
**Loredana's [1]** 1678/2
**lose [1]** 1679/23
**lost [1]** 1710/4
**loud [3]** 1719/16 1719/17
1724/15
**Louisville [1]** 1633/16
**love [10]** 1650/11 1669/24
1697/22 1698/1 1710/20
1725/4 1734/23 1738/20
1740/21 1741/2
**loved [1]** 1642/16
**lower [2]** 1771/18 1772/9
**lower-right-hand [1]** 1772/9
**lunch [3]** 1743/4 1743/9
1744/11
**lying [3]** 1673/18 1751/10
1751/16
**LYTELL [60]** 1623/3 1635/16
1637/7 1638/7 1639/22 1641/9
1643/2 1643/14 1643/19
1643/23 1644/10 1644/24
1645/3 1645/15 1645/19
1646/1 1646/15 1647/11
1656/1 1656/7 1656/12
1656/13 1656/16 1656/23
1682/21 1684/3 1684/5 1685/4
1685/21 1687/19 1693/20
1693/24 1694/5 1697/9
1697/15 1698/6 1698/13
1698/17 1698/21 1701/3
1702/8 1703/8 1703/11 1704/2
1704/17 1737/4 1737/11
1737/14 1737/16 1737/19
1737/23 1746/23 1748/7
1753/9 1754/13 1769/9
1772/20 1781/2 1783/11
1785/7
**Lytell's [4]** 1638/21 1754/5
1794/23 1796/5

**M**

**M2 [2]** 1683/15 1686/17
**M2-1 [2]** 1683/15 1686/17
**M3 [1]** 1711/19
**ma'am [2]** 1735/20 1755/16
**machines [2]** 1778/7 1779/9
**mail [5]** 1665/18 1683/9
1699/14 1775/12 1781/16
**mails [3]** 1679/21 1685/12
1779/11
**maintain [2]** 1741/10 1775/13
**maintained [4]** 1720/12

1728/10 1740/24 1775/18
**makeup [1]** 1712/21
**man [8]** 1633/23 1701/5
1735/24 1735/25 1751/3
1767/21 1768/22 1768/24
**management [1]** 1766/8
**MANDEEP [1]** 1623/17
**March [5]** 1623/7 1709/9
1709/10 1709/11 1734/19
**marked [1]** 1671/11
**marks [3]** 1674/16 1674/18
1724/11
**married [1]** 1652/17
**Mary [3]** 1750/4 1751/7
1751/11
**mask [1]** 1751/3
**mass [2]** 1635/7 1746/7
**master [1]** 1712/16
**materials [3]** 1777/5 1777/7
1777/9
**math [1]** 1692/20
**matter [3]** 1704/22 1727/6
1801/6
**Mazur [1]** 1751/4
**McDONALD [1]** 1623/20
**mean [18]** 1628/9 1636/19
1637/9 1643/4 1649/23 1660/3
1660/4 1665/5 1678/8 1678/18
1705/23 1707/23 1708/1
1714/21 1714/23 1722/5
1730/13 1781/13
**meaning [2]** 1668/10 1695/10
**means [7]** 1631/10 1631/12
1707/20 1735/1 1762/2
1770/18 1779/8
**meant [7]** 1666/12 1678/19
1710/18 1730/9 1756/15
1757/14 1757/18
**meantime [1]** 1648/14
**mechanical [1]** 1624/14
**media [1]** 1797/18
**meet [26]** 1627/25 1632/5
1632/9 1632/23 1633/25
1634/9 1634/12 1634/24
1636/9 1637/25 1638/17
1639/11 1643/8 1650/18
1651/13 1651/16 1651/25
1653/9 1655/25 1667/8
1667/15 1678/5 1678/7
1687/21 1687/22 1696/2
**meeting [15]** 1634/9 1634/24
1636/6 1638/3 1642/1 1643/3
1643/6 1643/9 1645/16
1645/19 1650/4 1658/1 1662/8
1677/25 1702/4
**Members [1]** 1626/4
**memory [2]** 1656/4 1782/18
**men [3]** 1630/4 1630/5
1630/10
**menstrual [2]** 1642/11 1647/3
**mental [1]** 1642/21
**Mentally [2]** 1721/10 1721/11
**mention [1]** 1699/15
**mentioned [12]** 1634/8

1634/23 1636/4 1642/22
1647/10 1678/1 1679/8
1681/15 1688/5 1701/12
1751/7 1755/5
**mess [1]** 1726/10
**message [21]** 1635/7 1636/18
1645/24 1665/11 1666/13
1673/4 1674/10 1684/19
1684/20 1685/4 1687/24
1716/13 1716/16 1717/4
1717/8 1717/21 1718/23
1738/15 1738/16 1740/5
1772/21
**messaged [2]** 1635/17 1638/14
**messages [49]** 1628/7 1629/10
1636/15 1636/16 1641/16
1645/23 1647/10 1647/18
1650/9 1650/15 1652/4
1654/16 1654/19 1654/23
1656/6 1660/24 1662/17
1665/10 1665/15 1666/23
1668/20 1671/24 1672/11
1673/21 1676/8 1679/1 1679/9
1679/14 1679/15 1681/11
1684/18 1684/21 1684/22
1684/23 1685/10 1685/12
1685/12 1689/18 1689/23
1700/1 1700/10 1703/2
1714/24 1716/24 1718/3
1738/18 1743/22 1761/21
1786/12
**messaging [2]** 1686/11 1718/1
**messy [1]** 1701/10
**met [16]** 1629/24 1632/20
1638/5 1641/10 1641/21
1641/24 1650/10 1655/9
1655/15 1659/17 1681/16
1694/4 1698/17 1698/21
1735/25 1749/22
**MF [1]** 1786/18
**MIA [82]** 1623/3 1635/5
1635/6 1636/13 1636/20
1636/20 1639/24 1641/15
1643/23 1645/23 1645/23
1646/9 1656/23 1682/21
1683/22 1684/5 1685/21
1696/20 1697/22 1698/21
1700/25 1701/3 1701/9
1701/19 1702/17 1702/22
1703/8 1703/16 1704/8 1704/8
1704/17 1704/18 1705/13
1705/18 1707/11 1707/16
1707/17 1707/25 1708/5
1708/6 1708/7 1708/7 1708/10
1708/10 1708/16 1708/17
1714/19 1714/20 1720/1
1736/22 1737/4 1737/15
1737/16 1737/17 1737/19
1737/19 1754/13 1754/21
1754/24 1755/1 1755/4 1755/9
1755/25 1756/12 1756/17
1757/8 1757/8 1758/23 1759/6
1759/18 1760/11 1760/20
1761/4 1761/6 1761/9 1761/23
1761/24 1769/9 1772/20
1781/2 1794/23 1796/4

**M**

**Mia's [3]** 1704/13 1705/21 1708/2
**mic [2]** 1687/25 1732/23
**MICHAEL [1]** 1624/4
**microphone [3]** 1648/17 1649/5 1719/10
**mid [1]** 1656/24
**mid-summer [1]** 1656/24
**middle [1]** 1687/1
**Midtown [1]** 1700/18
**might [3]** 1669/7 1783/13 1797/16
**millions [1]** 1783/19
**mind [2]** 1690/8 1730/15
**minds [1]** 1797/19
**MINHAS [3]** 1623/17 1690/20 1787/25
**minimum [1]** 1749/19
**minute [9]** 1638/13 1640/6 1668/9 1683/21 1688/21 1690/12 1780/4 1780/7 1788/4
**minutes [7]** 1665/22 1668/9 1688/21 1689/2 1726/12 1771/1 1800/7
**mirror [6]** 1696/24 1696/25 1698/3 1698/4 1712/23 1712/25
**Miss Amy [1]** 1644/1
**Miss Emma [1]** 1644/4
**Miss Hopper [8]** 1637/20 1637/25 1638/4 1639/14 1641/21 1642/5 1646/25 1647/17
**Miss Lytell [15]** 1637/7 1638/7 1639/22 1641/9 1643/2 1643/14 1643/19 1644/10 1644/24 1645/3 1645/15 1645/19 1646/1 1646/15 1647/11
**Miss Lytell's [1]** 1638/21
**Miss Mia [1]** 1643/23
**Miss Moore [13]** 1637/7 1638/8 1639/22 1641/9 1643/2 1643/14 1643/19 1644/10 1644/24 1645/3 1645/15 1645/19 1646/20
**Miss Reyes [8]** 1626/22 1627/2 1627/15 1627/22 1627/25 1628/21 1630/25 1632/5
**Miss Rico [1]** 1646/15
**Miss Shon [1]** 1644/9
**missed [2]** 1708/20 1713/25
**missing [1]** 1708/8
**misstated [1]** 1748/13
**mistake [5]** 1663/11 1686/22 1692/11 1692/21 1692/22
**misunderstanding [1]** 1748/6
**misunderstood [1]** 1748/11
**ML [7]** 1794/24 1795/3 1795/9 1795/13 1795/17 1795/21 1795/25
**ML-302 [1]** 1794/24
**ML-304 [1]** 1795/3
**ML-305 [1]** 1795/9

**ML-308 [1]** 1795/17
**ML-313 [1]** 1795/21
**models [2]** 1635/8 1635/8
**modified [2]** 1781/8 1781/13
**moment [10]** 1640/12 1680/21 1708/19 1716/19 1718/8 1719/9 1727/23 1779/19 1787/24 1796/24
**momentarily [1]** 1669/15
**moments [2]** 1679/8 1699/22
**Monday [6]** 1692/20 1782/8 1797/11 1797/21 1798/9 1800/2
**money [11]** 1627/2 1627/15 1629/23 1705/3 1710/12 1782/24 1783/21 1785/2 1785/12 1785/16 1785/19
**month [4]** 1661/1 1697/16 1707/5 1749/6
**monthly [1]** 1749/3
**months [7]** 1661/25 1661/25 1703/4 1704/12 1705/14 1727/4 1757/3
**months -- well [1]** 1703/4
**MOORE [40]** 1623/3 1637/7 1638/8 1639/22 1641/9 1643/2 1643/14 1643/19 1644/1 1644/10 1644/24 1645/3 1645/15 1645/19 1646/20 1655/14 1655/15 1655/17 1655/19 1655/24 1656/7 1682/21 1683/12 1684/6 1685/2 1685/21 1686/6 1686/8 1686/23 1687/19 1688/1 1693/20 1693/24 1694/4 1696/4 1696/7 1784/3 1784/5 1785/7 1785/18
**Moore's [1]** 1792/3
**morning [36]** 1625/4 1625/9 1625/10 1625/15 1625/15 1625/16 1626/4 1649/11 1649/12 1666/11 1673/5 1673/8 1676/19 1677/3 1687/9 1688/24 1690/23 1690/25 1711/12 1723/7 1732/11 1732/19 1737/23 1739/13 1740/4 1743/24 1747/12 1756/16 1757/20 1776/15 1782/8 1797/11 1797/21 1798/10 1800/4 1800/20
**most [5]** 1657/8 1657/10 1721/24 1729/10 1800/21
**mother [2]** 1734/23 1735/2
**motion [2]** 1692/14 1799/11
**motivating [1]** 1693/4
**move [19]** 1659/24 1669/2 1681/14 1698/6 1704/11 1709/16 1711/15 1725/19 1729/11 1736/10 1745/23 1763/23 1770/5 1773/2 1781/7 1789/17 1792/3 1794/23 1798/12
**moved [4]** 1636/7 1653/2 1653/2 1725/12
**movie [1]** 1657/22
**moving [4]** 1626/20 1633/6

1707/4 1723/14
**Mr. Aloi [2]** 1783/24 1785/11
**Mr. Balestriere [4]** 1690/19 1745/9 1788/4 1788/6
**Mr. Glibbery [3]** 1767/25 1768/6 1775/21
**Mr. Grover [2]** 1688/23 1758/20
**Mr. Jackson [2]** 1671/2 1781/24
**Mr. Minhas [2]** 1690/20 1787/25
**Mr. Rubin [122]**
**Mr. Rubin -- now [1]** 1675/7
**Mr. Rubin's [13]** 1626/22 1628/16 1648/4 1653/16 1653/18 1696/5 1733/21 1747/13 1750/4 1751/16 1773/16 1779/25 1783/17
**Ms. Boy-Skipsey [1]** 1625/22
**Ms. Cassidy's [1]** 1633/5
**Ms. Isaacs [1]** 1625/21
**Ms. Lavigne-Albert [1]** 1748/14
**Ms. Lytell [23]** 1635/16 1656/1 1656/7 1656/12 1656/13 1656/16 1684/3 1685/4 1693/20 1693/24 1694/5 1697/9 1697/15 1698/6 1698/13 1698/17 1702/8 1703/11 1704/2 1746/23 1753/9 1783/11 1785/7
**Ms. Lytell's [1]** 1754/5
**Ms. Moore [13]** 1655/24 1656/7 1685/2 1686/23 1687/19 1693/20 1693/24 1694/4 1696/4 1696/7 1784/3 1784/5 1785/18
**Ms. Palmore [5]** 1663/16 1665/25 1683/16 1686/19 1696/11
**Ms. Palmore's [1]** 1662/19
**Ms. Powers [20]** 1636/22 1637/2 1643/20 1648/3 1648/14 1648/15 1649/11 1652/6 1658/12 1663/19 1747/20 1748/7 1748/18 1751/9 1753/7 1754/12 1757/7 1767/15 1771/1 1771/23
**Ms. Powers' [4]** 1648/2 1648/6 1747/13 1780/1
**Ms. Reyes's [1]** 1789/17
**Ms. Saydah [12]** 1722/12 1724/19 1734/16 1755/15 1757/4 1758/21 1759/23 1760/18 1769/4 1769/12 1771/9 1786/23
**Ms. Schnur [6]** 1760/25 1761/1 1770/21 1773/23 1773/24 1774/8
**Ms. Shon's [1]** 1733/4
**Ms. Tagai [16]** 1660/10 1662/2 1662/5 1662/24 1663/18 1663/23 1665/3 1665/12 1668/19 1668/24 1669/11 1673/14 1679/5

**M**

Ms. Tagai... **[3]** 1681/10 1691/1 1692/19
Ms. Tagai's **[3]** 1660/12 1661/6 1789/16
MULLIN **[1]** 1624/2
multi **[1]** 1771/13
multi-page **[1]** 1771/13
multiple **[1]** 1704/25
must **[3]** 1628/8 1629/16 1690/11
mutual **[2]** 1634/1 1634/16

**N**

name **[22]** 1626/11 1634/8 1634/23 1637/18 1667/11 1670/6 1676/13 1683/8 1688/2 1696/5 1699/16 1701/16 1702/16 1750/4 1751/7 1753/17 1755/5 1760/15 1760/23 1767/21 1772/4 1772/10
named **[3]** 1633/23 1655/5 1679/25
names **[1]** 1667/14
Nancy **[6]** 1702/11 1702/16 1702/16 1702/17 1702/23 1787/3
Nancy's **[1]** 1704/8
NATASHA **[58]** 1623/4 1653/23 1653/25 1654/3 1654/10 1654/14 1654/17 1654/20 1654/25 1658/4 1658/5 1658/22 1658/24 1659/14 1660/8 1661/9 1661/11 1661/13 1662/17 1666/21 1666/25 1667/5 1667/13 1668/8 1669/24 1670/8 1671/23 1672/3 1672/25 1673/8 1674/7 1674/11 1675/20 1676/5 1676/8 1677/7 1677/21 1677/22 1678/1 1678/5 1678/6 1678/8 1678/10 1678/13 1678/13 1678/20 1678/25 1680/7 1680/11 1680/16 1689/12 1689/18 1699/22 1722/18 1722/25 1723/7 1740/21 1741/24
Natasha's **[1]** 1721/23
nature **[1]** 1639/6
NDA **[4]** 1698/20 1707/20 1728/9 1762/2
NDAs **[3]** 1727/14 1727/20 1728/10
near **[1]** 1768/15
neat **[1]** 1712/6
necessary **[1]** 1751/24
need **[21]** 1666/18 1689/9 1691/25 1707/9 1707/15 1707/23 1718/20 1732/11 1737/11 1741/6 1746/3 1751/17 1757/13 1757/15 1761/22 1771/16 1773/7 1799/1 1799/14 1799/24 1800/17
needed **[5]** 1680/2 1704/19

1742/25 1749/18 1763/1
nephew **[1]** 1768/5
nervous **[3]** 1643/6 1643/7 1643/9
never **[22]** 1637/10 1643/9 1646/19 1646/22 1654/11 1654/13 1654/15 1657/20 1657/25 1665/20 1678/17 1681/16 1681/20 1684/20 1685/10 1685/22 1689/17 1689/19 1690/9 1690/15 1690/16 1721/4
New York **[17]** 1671/24 1682/3 1682/11 1682/12 1683/6 1684/10 1686/15 1687/19 1693/25 1697/10 1697/15 1698/7 1698/9 1698/14 1700/18 1705/5 1705/15
next **[27]** 1625/14 1647/24 1648/22 1663/21 1663/23 1667/2 1675/13 1675/19 1683/7 1687/15 1690/15 1706/10 1712/15 1712/19 1722/4 1722/23 1729/22 1737/22 1742/15 1744/12 1750/14 1752/6 1764/2 1766/24 1772/20 1780/11 1791/4
nice **[6]** 1646/22 1724/1 1732/12 1743/9 1782/22 1785/16
Nicole **[6]** 1636/8 1687/10 1687/10 1687/24 1688/1 1688/1
night **[10]** 1667/4 1674/16 1674/20 1674/24 1675/10 1710/13 1710/14 1710/15 1710/17 1737/13
night's **[1]** 1797/20
nightclubs **[1]** 1653/11
nights **[1]** 1797/20
Nobody **[1]** 1625/5
non **[1]** 1727/9
non-disclosure **[1]** 1727/9
nonconsensual **[2]** 1650/16 1679/4
nondisclosure **[2]** 1719/18 1720/5
normal **[1]** 1721/24
normally **[1]** 1661/17
nose **[5]** 1703/12 1703/15 1704/8 1705/4 1706/3
note **[9]** 1644/16 1670/11 1692/18 1697/5 1697/18 1697/22 1699/1 1759/5 1759/6
noted **[1]** 1745/2
nothing **[8]** 1646/22 1707/20 1713/7 1738/23 1762/2 1779/2 1783/3 1783/12
notice **[4]** 1659/1 1674/15 1713/3 1713/5
noticed **[1]** 1700/10
November **[7]** 1626/6 1679/19 1680/6 1680/25 1718/4 1718/15 1721/18
November 12th **[1]** 1626/6

NT **[7]** 1788/12 1788/16 1788/20 1788/24 1789/3 1789/7 1789/11
NT-302 **[1]** 1788/12
NT-303 **[1]** 1788/16
NT-304 **[1]** 1788/20
NT-307 **[1]** 1788/24
NT-308 **[1]** 1789/3
NT-309 **[1]** 1789/7
NT-310 **[1]** 1789/11
number **[6]** 1625/5 1630/1 1653/19 1686/10 1750/9 1761/1
numbers **[2]** 1684/16 1765/19
numerous **[1]** 1656/22
nuts **[1]** 1722/17
NY **[1]** 1624/3
NYC **[1]** 1645/12

**O**

o'clock **[1]** 1799/9
oath **[2]** 1781/5 1797/15
object **[2]** 1729/18 1742/10
objection **[35]** 1670/23 1690/24 1703/13 1703/17 1709/18 1714/3 1716/7 1716/18 1729/17 1733/8 1733/9 1734/9 1736/13 1739/5 1743/3 1747/2 1749/20 1749/25 1750/6 1763/24 1769/15 1770/7 1770/14 1771/6 1771/14 1774/1 1774/10 1774/14 1774/19 1779/13 1781/10 1781/20 1781/21 1798/9 1798/13
observe **[1]** 1695/13
observed **[1]** 1701/3
obviously **[2]** 1641/2 1645/23
occasion **[8]** 1642/9 1646/4 1654/2 1654/5 1674/12 1698/4 1698/18 1699/3
occasions **[1]** 1656/15
occur **[2]** 1668/23 1703/8
occurred **[3]** 1656/4 1751/1 1765/1
October **[29]** 1633/7 1655/20 1656/5 1663/24 1665/12 1665/18 1666/24 1669/2 1669/11 1669/15 1670/1 1670/2 1670/15 1671/15 1673/17 1698/9 1699/5 1700/20 1701/22 1703/7 1704/12 1711/24 1720/24 1735/16 1737/4 1740/22 1753/9 1757/1 1769/2
October 1 **[1]** 1665/12
October 10 **[1]** 1633/7
October 19 **[1]** 1698/9
October 19th **[1]** 1700/20
October 1st **[6]** 1663/24 1665/18 1666/24 1669/2 1669/11 1669/15
October 2016 **[3]** 1701/22 1753/9 1769/2
October 6th **[2]** 1670/1 1670/15

**O**

offer [3]   1625/17 1704/16 1773/11
offered [2]   1704/18 1705/11
offering [1]   1766/11
office [3]   1703/24 1766/10 1775/4
often [3]   1626/19 1654/19 1699/22
oftentimes [1]   1670/9
older [1]   1742/25
omitted [1]   1627/13
one-on-one [2]   1647/10 1647/17
onesome [1]   1675/24
ongoing [1]   1755/10
ooOOooo [1]   1801/8
open [24]   1625/1 1670/7 1684/11 1686/18 1745/3 1753/1 1767/1 1788/14 1788/18 1788/22 1789/1 1789/5 1789/9 1789/13 1789/20 1789/24 1790/3 1790/7 1790/11 1790/15 1790/19 1790/23 1791/2 1799/25
opened [4]   1648/12 1675/23 1675/23 1686/16
opinion [3]   1680/12 1706/9 1736/5
opportunities [1]   1638/17
opportunity [7]   1676/10 1684/13 1685/18 1690/25 1691/2 1767/14 1782/18
opposite [1]   1679/6
order [9]   1625/5 1648/7 1670/22 1690/24 1700/15 1723/23 1759/16 1759/19 1760/6
organize [1]   1647/25
organized [1]   1648/13
organizing [1]   1659/25
original [1]   1689/17
otherwise [1]   1765/17
Outlook [1]   1640/8
outside [2]   1746/23 1780/6
outstanding [1]   1757/9
overlooking [1]   1692/13
Overruled [5]   1733/10 1734/10 1739/6 1769/16 1779/14
overseeing [1]   1683/7
own [3]   1650/14 1736/5 1743/17
owner's [1]   1768/5

**P**

p.m [40]   1666/5 1667/3 1667/21 1667/24 1668/7 1673/1 1674/3 1683/22 1686/21 1687/24 1688/1 1688/9 1705/9 1705/10 1707/7 1707/8 1709/23 1710/1 1723/21 1725/20 1725/21 1729/13 1734/20 1735/18 1737/3 1745/2 1745/10 1746/7 1746/8 1754/25 1756/9 1761/16 1761/17 1769/25 1770/12 1771/2 1772/11 1772/19 1772/20 1784/12
P4 [4]   1709/5 1709/8 1709/20 1709/25
package [1]   1670/6
page -- it's [1]   1674/2
Page 1 [1]   1705/9
page 10 [2]   1672/17 1760/18
page 100 [2]   1639/20 1641/6
page 101 [3]   1639/20 1641/7 1641/8
Page 104/18 [1]   1789/19
Page 107 [1]   1641/20
Page 108 [2]   1689/15 1788/20
Page 109 [2]   1689/15 1788/21
Page 11 [1]   1673/3
Page 117 [1]   1642/3
page 118 [2]   1642/3 1642/12
Page 119 [1]   1642/18
Page 120 [1]   1642/25
page 121 [1]   1642/25
Page 131 [1]   1643/22
Page 132 [1]   1644/7
Page 133 [1]   1788/25
Page 134 [1]   1789/23
page 135 [2]   1644/7 1646/23
page 136 [2]   1646/23 1647/8
page 137 [2]   1647/8 1647/15
page 138 [2]   1647/15 1789/4
Page 139 [1]   1789/4
Page 14 [1]   1633/21
Page 145 [1]   1790/2
Page 148 [1]   1789/8
page 15 [6]   1633/21 1634/2 1634/11 1634/14 1634/17 1635/2
Page 151 [1]   1790/6
Page 154 [1]   1789/12
Page 155 [1]   1789/12
Page 157 [1]   1790/9
Page 159 [1]   1790/13
page 16 [1]   1634/2
Page 194 [1]   1790/17
Page 196 [1]   1790/21
Page 197 [1]   1790/25
page 2 [2]   1757/24 1773/1
Page 28 [1]   1635/4
Page 29 [2]   1689/13 1788/13
page 3 [3]   1665/24 1666/3 1755/17
Page 32 [1]   1635/14
page 34 [2]   1635/14 1636/11
page 39 [1]   1626/7
page 4 [2]   1666/4 1757/5
page 43 [2]   1626/20 1636/25
page 44 [1]   1626/25
page 45 [1]   1627/1
page 5 [1]   1663/17
Page 50 [1]   1637/4
page 51 [1]   1637/4
Page 52 [2]   1637/16 1637/16
Page 55 [1]   1637/23
Page 56 [1]   1637/23
page 578 [1]   1630/20
Page 58 [1]   1674/2
page 6 [1]   1633/8
Page 64 [1]   1638/6
Page 65 [3]   1627/5 1628/15 1665/25
page 66 [1]   1628/15
Page 73 [1]   1629/20
page 74 [1]   1629/20
Page 75 [1]   1630/17
page 76 [1]   1630/17
page 8 [1]   1759/13
Page 80 [1]   1632/3
page 81 [1]   1632/3
Page 82 [2]   1689/14 1788/16
Page 83 [1]   1689/14
Page 84 [1]   1632/25
Page 90 [1]   1638/24
page 91 [1]   1638/24
Page 92 [1]   1639/12
pages [3]   1662/20 1686/20 1799/1
paid [14]   1627/2 1627/15 1629/24 1630/5 1630/8 1630/10 1657/14 1708/23 1709/1 1733/7 1733/12 1749/3 1756/22 1783/21
pair [1]   1670/8
Palmore [6]   1663/16 1665/25 1683/16 1686/19 1696/11 1717/7
Palmore's [1]   1662/19
paragraph [4]   1659/2 1695/15 1713/11 1713/11
part [10]   1625/22 1627/13 1648/3 1717/24 1731/5 1735/23 1741/12 1761/14 1761/15 1775/2
particular [6]   1639/2 1642/9 1646/4 1658/21 1692/24 1782/21
particularly [2]   1700/10 1797/14
parties [3]   1745/6 1745/8 1799/25
party [3]   1645/24 1654/6 1654/11
passages [1]   1709/12
passed [3]   1675/20 1676/8 1702/16
past [7]   1629/17 1630/4 1631/3 1631/5 1631/14 1631/16 1631/18
pause [4]   1640/16 1748/4 1780/10 1781/19
pay [7]   1704/16 1704/18 1722/7 1749/6 1782/22 1783/1 1785/16
paying [4]   1732/17 1733/1 1733/17 1734/4
payment [2]   1665/8 1740/11
payments [2]   1783/3 1783/13
PayPal [3]   1664/2 1665/7 1668/8
pending [1]   1704/13
penthouse [27]   1719/25 1720/2 1720/11 1727/15

**P**

penthouse... **[23]**  1727/21
1727/24 1737/13 1762/6
1762/8 1762/19 1762/23
1763/1 1763/15 1767/13
1768/10 1768/18 1775/7
1775/13 1775/18 1775/21
1775/23 1776/2 1776/15
1777/5 1777/10 1777/21
1778/21
per **[2]**  1648/1 1768/14
percent **[1]**  1630/16
perhaps **[2]**  1723/22 1740/14
period **[5]**  1634/6 1634/21
1673/22 1708/4 1736/6
permanent **[1]**  1775/11
permission **[3]**  1651/4 1690/3
1760/24
person **[7]**  1628/10 1639/17
1651/23 1658/21 1696/8
1699/15 1701/1
personal **[1]**  1630/15
personally **[3]**  1651/15
1702/22 1773/17
perspective **[2]**  1689/19
1695/12
pertain **[1]**  1689/12
Peter **[2]**  1658/8 1709/22
petitioner **[1]**  1626/6
phase **[1]**  1747/14
phone **[20]**  1624/11 1628/9
1639/17 1643/12 1666/15
1671/6 1671/20 1680/1 1680/4
1680/10 1680/15 1684/15
1684/20 1684/24 1685/3
1686/10 1688/10 1689/23
1694/22 1714/9
phones **[2]**  1679/20 1723/22
photo **[25]**  1643/24 1644/2
1644/5 1657/18 1659/20
1660/10 1660/12 1660/14
1661/2 1661/6 1661/21 1671/8
1671/9 1671/10 1671/16
1671/18 1672/19 1672/24
1694/22 1697/6 1708/13
1740/20 1740/20 1740/22
1741/15
photograph **[6]**  1663/4
1663/11 1670/14 1671/6
1671/11 1671/14
photographed **[1]**  1660/9
photographer **[2]**  1660/24
1661/10
phrase **[1]**  1678/17
physical **[2]**  1715/21 1779/2
physically **[5]**  1628/24
1629/1 1629/4 1637/10
1721/10
picture **[1]**  1635/20
pictures **[3]**  1641/14 1641/16
1642/15
pile **[1]**  1751/17
place **[16]**  1647/13 1660/14
1661/2 1661/6 1665/10
1681/12 1685/20 1685/23
1685/24 1686/3 1702/1

places **[1]**  1727/20
plaintiff **[17]**  1680/7
1680/14 1680/16 1680/20
1701/1 1730/18 1737/19
1746/15 1746/17 1747/17
1747/22 1766/20 1788/1
1792/3 1796/25 1800/20
1803/3
Plaintiff's **[9]**  1676/17
1720/15 1721/14 1721/17
1723/12 1728/17 1729/9
1734/17 1781/8
Plaintiff's 212 **[1]**  1781/8
plaintiffs **[28]**  1623/6
1623/15 1650/3 1650/20
1650/25 1651/4 1651/19
1651/23 1653/19 1657/11
1657/15 1665/8 1672/6
1680/11 1691/3 1693/7
1719/19 1719/20 1726/3
1730/18 1730/21 1730/24
1743/21 1746/14 1747/18
1779/3 1779/5 1779/8
plaintiffs' **[21]**  1725/12
1725/23 1732/2 1741/19
1743/15 1747/21 1748/7
1757/23 1758/8 1761/13
1763/18 1763/19 1767/7
1767/15 1769/19 1771/10
1773/1 1774/24 1781/12
1796/6 1796/17
Plaintiffs' 102-B **[1]**
1769/19
Plaintiffs' 110 **[1]**  1771/10
Plaintiffs' 116 **[1]**  1773/1
Plaintiffs' 211 **[1]**  1774/24
Plaintiffs 83 **[1]**  1757/23
Plaintiffs 84 **[1]**  1761/13
Plaintiffs 98 **[1]**  1763/18
Plaintiffs 98B **[2]**  1763/19
1767/15
plane **[4]**  1657/5 1662/21
1669/13 1685/13
planned **[3]**  1661/21 1677/18
1748/15
play **[7]**  1692/5 1716/13
1716/23 1717/3 1717/8
1787/22 1796/7
played **[21]**  1691/14 1691/19
1691/24 1716/3 1739/13
1788/14 1788/18 1788/22
1789/1 1789/5 1789/9 1789/13
1789/20 1789/24 1790/3
1790/7 1790/11 1790/15
1790/19 1790/23 1791/2
playing **[32]**  1717/10 1734/23
1739/18 1788/10 1789/15
1792/7 1792/11 1792/15
1792/19 1792/23 1793/2
1793/6 1793/10 1793/14
1793/18 1793/22 1794/1
1794/5 1794/9 1794/13
1794/17 1794/21 1795/1
1795/7 1795/11 1795/15

1795/19 1795/23 1796/2
1796/10 1796/14 1796/16
Playmates **[1]**  1635/8
plays **[1]**  1739/12
Plaza **[1]**  1624/3
plea **[1]**  1756/4
pleasure **[2]**  1745/7 1745/18
point **[19]**  1662/3 1667/11
1677/25 1685/18 1690/4
1695/22 1695/25 1702/23
1706/6 1708/2 1708/7 1708/16
1710/8 1726/19 1737/22
1741/2 1756/23 1797/14
1800/5
Poker **[1]**  1638/9
police **[5]**  1703/8 1759/15
1759/18 1759/25 1760/5
portion **[2]**  1627/10 1772/9
portions **[4]**  1705/8 1763/22
1767/20 1789/16
possibility **[1]**  1785/18
possible **[6]**  1627/4 1627/17
1627/18 1717/6 1745/18
1784/25
possibly **[3]**  1629/2 1765/2
1765/9
post **[3]**  1706/4 1741/5
1755/1
Post-its **[1]**  1741/5
posted **[1]**  1635/20
posting **[2]**  1783/23 1785/13
potentially **[1]**  1638/21
powers **[45]**  1623/8 1624/6
1636/22 1637/2 1643/20
1648/3 1648/14 1648/15
1648/20 1649/2 1649/11
1652/6 1658/12 1683/6
1683/22 1689/21 1689/23
1693/19 1705/13 1707/9
1716/12 1717/13 1725/13
1728/16 1730/3 1730/8
1730/10 1732/6 1733/23
1737/11 1747/20 1748/7
1748/17 1748/18 1751/9
1753/7 1754/12 1757/7
1758/25 1767/15 1771/1
1771/23 1796/20 1796/21
1799/14
Powers' **[4]**  1648/2 1648/6
1747/13 1780/1
practical **[1]**  1704/22
practice **[1]**  1659/3
preceded **[1]**  1753/13
precisely **[1]**  1660/14
precluded **[1]**  1731/4
prefer **[1]**  1745/17
preference **[1]**  1746/13
pregnant **[1]**  1695/25
prejudicial **[3]**  1691/3
1731/3 1731/3
prejudicing **[1]**  1693/6
Prelaw **[1]**  1633/18
prepare **[2]**  1641/12 1672/9
prepared **[1]**  1672/7
presence **[1]**  1715/22
present **[10]**  1625/1 1650/2

**P**

**present... [8]** 1658/23 1660/12 1712/8 1719/19 1741/19 1745/3 1753/1 1767/1
**presentation [1]** 1797/9
**presented [1]** 1694/8
**presiding [1]** 1625/3
**previous [12]** 1628/8 1628/9 1663/4 1663/11 1665/11 1668/19 1670/1 1671/11 1675/2 1676/5 1678/25 1706/1
**previously [7]** 1631/8 1686/16 1697/18 1718/2 1718/2 1781/3 1799/13
**print [2]** 1644/19 1712/3
**printed [3]** 1712/4 1720/9 1728/1
**private [2]** 1783/17 1783/20
**problem [2]** 1745/21 1765/21
**problems [5]** 1646/2 1705/22 1705/24 1759/2 1759/3
**procedurally [1]** 1798/1
**proceed [2]** 1626/3 1658/15
**proceedings [6]** 1624/14 1640/16 1692/8 1748/4 1780/10 1781/19
**process [2]** 1742/7 1752/1
**procured [1]** 1749/17
**produce [2]** 1671/7 1740/15
**produced [3]** 1624/14 1665/20 1681/10
**professional [1]** 1768/1
**profile [1]** 1696/8
**promise [1]** 1783/20
**promotional [1]** 1635/8
**properly [1]** 1640/25
**property [1]** 1766/8
**propose [2]** 1625/21 1626/1
**proposed [1]** 1799/2
**proud [1]** 1647/19
**provide [3]** 1695/22 1696/1 1742/23
**provided [6]** 1679/8 1679/13 1700/6 1779/2 1779/3 1798/22
**providing [1]** 1798/21
**ps [1]** 1722/18
**psychology [1]** 1735/4
**publicity [1]** 1797/16
**publish [2]** 1731/11 1758/11
**published [22]** 1658/11 1660/20 1662/14 1706/5 1714/8 1754/2 1754/8 1754/9 1755/22 1757/6 1758/1 1758/10 1759/12 1761/18 1763/20 1767/8 1769/7 1769/20 1771/11 1771/21 1774/25 1781/24
**pull [1]** 1784/20
**punched [1]** 1662/7
**purchase [1]** 1641/12
**purchased [1]** 1654/13
**purchasing [2]** 1763/14 1767/13
**purpose [3]** 1657/15 1688/16 1731/8
**purposes [2]** 1655/3 1778/13

**pushing [1]** 1675/24
**put [32]** 1637/14 1663/12 1674/17 1682/25 1689/13 1690/3 1691/19 1692/10 1709/7 1716/22 1717/15 1718/12 1719/15 1721/13 1728/15 1728/17 1734/17 1735/2 1736/20 1737/2 1740/19 1742/19 1753/24 1755/15 1757/4 1761/19 1765/11 1765/18 1769/4 1786/10 1786/10 1788/7
**puts [1]** 1751/23
**putting [1]** 1800/12
**PX [2]** 1705/9 1709/22
**PX-119 [1]** 1705/9

**Q**

**Q3 [3]** 1718/3 1718/12 1738/8
**quality [1]** 1750/10
**questioned [1]** 1668/10
**questioner [1]** 1625/22
**questions [41]** 1626/5 1626/6 1633/4 1633/9 1641/13 1647/22 1656/3 1658/3 1681/3 1694/17 1695/8 1711/16 1719/3 1729/15 1731/10 1735/17 1738/14 1740/14 1741/23 1742/12 1743/12 1743/16 1743/20 1744/4 1750/8 1750/10 1753/21 1754/12 1756/1 1758/3 1758/20 1762/7 1762/9 1767/11 1777/9 1779/16 1779/21 1783/6 1785/21 1787/15 1788/8
**quick [2]** 1755/4 1782/4
**quickly [1]** 1711/15
**quite [3]** 1690/8 1690/14 1691/2
**quotation [2]** 1645/13 1645/13
**quotes [2]** 1735/2 1751/23

**R**

**R2 [1]** 1696/11
**R310 [1]** 1789/18
**Rachel [1]** 1737/17
**raised [4]** 1665/14 1743/21 1799/21 1799/22
**randomly [1]** 1682/2
**Raquel [2]** 1737/19 1781/2
**rather [1]** 1725/20
**re [1]** 1743/17
**re-emphasize [1]** 1743/17
**reach [5]** 1635/5 1638/8 1652/3 1678/23 1684/9
**reached [3]** 1635/5 1682/2 1761/1
**reactions [1]** 1722/18
**read [26]** 1625/21 1625/22 1626/9 1626/9 1627/7 1627/12 1631/5 1633/10 1633/10 1659/4 1674/4 1682/5 1690/17 1695/13 1707/6 1717/3 1717/17 1725/11 1728/18

1729/10 1731/7 1733/23 1733/25 1760/21 1776/6 1798/3
**reader [1]** 1625/25
**reading [10]** 1626/5 1626/8 1631/4 1631/11 1631/13 1633/9 1695/18 1707/7 1712/11 1798/9
**ready [3]** 1655/2 1658/15 1658/16
**real [2]** 1765/8 1767/25
**realize [2]** 1742/11 1772/16
**realized [1]** 1798/3
**really [11]** 1639/7 1677/18 1705/18 1710/19 1732/11 1745/16 1746/24 1762/12 1762/15 1770/16 1800/11
**reason [13]** 1650/14 1690/3 1723/20 1743/11 1743/16 1747/23 1751/12 1763/2 1763/3 1773/5 1773/7 1797/2 1797/3
**reasons [5]** 1777/24 1778/5 1778/9 1778/15 1799/12
**rebellion [1]** 1800/5
**rebuttal [6]** 1747/15 1747/17 1747/21 1748/8 1780/2 1797/1
**recalled [1]** 1781/2
**receive [8]** 1682/14 1714/1 1715/20 1718/23 1774/13 1774/18 1776/7 1776/9
**received [28]** 1647/5 1662/15 1670/6 1670/22 1670/24 1670/25 1684/15 1709/19 1709/20 1714/4 1714/5 1716/4 1725/22 1725/23 1732/1 1732/2 1736/15 1758/6 1758/8 1767/7 1774/15 1775/4 1776/2 1776/10 1776/11 1781/11 1781/12 1798/15
**receiving [3]** 1718/5 1718/17 1734/7
**recess [3]** 1689/7 1692/8 1744/11
**recognize [12]** 1658/17 1658/19 1660/23 1662/16 1669/21 1669/23 1671/3 1697/18 1709/12 1713/22 1715/10 1717/13
**recollection [10]** 1658/25 1680/22 1708/23 1733/20 1734/1 1734/3 1769/24 1770/9 1770/11 1770/17
**reconsideration [1]** 1692/14
**record [7]** 1645/9 1651/12 1689/13 1692/16 1746/2 1771/25 1799/11
**recorded [1]** 1624/14
**recording [4]** 1715/17 1715/21 1715/24 1716/3
**records [2]** 1741/10 1741/10
**recruit [1]** 1651/15
**recruited [5]** 1650/12 1700/25 1702/17 1707/13 1708/11
**recycled [1]** 1778/17

**R**

**red [1]**   1798/21
**redacted [4]**   1758/5 1763/19 1765/9 1765/23
**redirect [4]**   1692/24 1766/16 1779/18 1786/4
**reference [2]**   1692/4 1724/6
**referenced [3]**   1721/7 1726/5 1738/10
**referencing [2]**   1760/5 1760/15
**referred [1]**   1644/14
**referring [8]**   1654/7 1665/17 1710/15 1736/25 1785/8 1785/10 1785/18 1787/13
**refresh [8]**   1680/22 1708/23 1733/20 1734/1 1734/3 1769/23 1770/11 1782/18
**refreshes [1]**   1770/16
**Refreshing [1]**   1770/9
**regard [1]**   1692/9
**regarding [8]**   1638/7 1681/23 1716/15 1726/15 1726/25 1775/21 1778/20 1783/4
**regards [6]**   1719/18 1740/17 1743/24 1760/25 1762/7 1776/14
**regular [1]**   1688/10
**regularly [1]**   1775/12
**related [3]**   1647/6 1651/12 1659/20
**relates [1]**   1716/13
**relating [1]**   1685/13
**relation [1]**   1727/11
**relations [2]**   1630/11 1631/24
**relationship [5]**   1626/17 1628/12 1636/1 1637/1 1680/13
**release [4]**   1658/20 1659/19 1694/9 1700/24
**relevance [4]**   1730/11 1733/9 1771/13 1798/13
**relevant [4]**   1690/1 1744/2 1763/22 1767/20
**remember [53]**   1629/18 1635/16 1635/18 1661/11 1674/17 1674/19 1674/22 1680/24 1698/5 1708/21 1711/17 1726/24 1727/3 1727/8 1728/7 1728/11 1732/21 1733/16 1733/18 1736/2 1736/3 1736/4 1736/8 1736/22 1737/10 1738/1 1741/15 1741/24 1742/1 1742/8 1742/22 1749/12 1749/13 1753/10 1753/12 1753/14 1753/19 1753/20 1755/9 1765/5 1765/12 1765/17 1766/19 1776/13 1777/4 1777/6 1777/12 1778/24 1781/5 1782/9 1782/13 1797/15 1798/6
**remembered [1]**   1782/11
**removed [2]**   1779/11 1779/15
**removing [1]**   1776/21

**renew [1]**   1799/11
**renewed [1]**   1763/11
**repeat [3]**   1634/13 1645/17 1732/25
**replay [3]**   1691/14 1691/21 1691/24
**report [3]**   1759/18 1759/25 1760/5
**reporter [8]**   1624/11 1629/13 1635/10 1640/21 1640/25 1641/1 1746/3 1770/24
**representation [1]**   1704/19
**request [4]**   1647/25 1690/3 1700/11 1745/6
**requests [2]**   1742/3 1745/9
**require [1]**   1705/1
**research [1]**   1797/17
**reservations [4]**   1643/3 1643/4 1643/5 1657/5
**respect [4]**   1655/24 1708/20 1746/13 1800/9
**respond [9]**   1721/6 1724/6 1725/3 1726/12 1726/22 1729/5 1735/5 1747/18 1784/21
**responded [3]**   1635/13 1673/16 1677/21
**responds [8]**   1707/18 1724/23 1728/21 1729/4 1755/4 1758/17 1761/25 1766/6
**response [8]**   1635/25 1668/13 1710/19 1724/10 1735/12 1736/4 1768/21 1784/9
**responsive [1]**   1742/3
**rest [4]**   1636/2 1648/11 1648/12 1796/18
**restaurant [3]**   1700/14 1700/18 1777/5
**restore [1]**   1641/5
**restrictions [1]**   1743/7
**rests [1]**   1796/21
**result [2]**   1653/12 1799/16
**resulted [1]**   1703/8
**resumes [2]**   1747/4 1748/20
**retained [1]**   1717/25
**retired [4]**   1763/1 1763/4 1763/7 1763/11
**retreat [1]**   1746/7
**return [8]**   1630/11 1630/11 1654/21 1656/11 1663/2 1663/10 1669/14 1669/15
**returned [2]**   1669/10 1669/17
**reveal [1]**   1783/20
**reverse [1]**   1704/7
**review [3]**   1672/11 1684/13 1685/18
**reviewing [1]**   1713/8
**REYES [27]**   1623/5 1626/11 1626/13 1626/17 1626/22 1627/2 1627/15 1627/22 1627/25 1628/21 1629/22 1630/25 1652/5 1655/6 1655/7 1655/8 1655/10 1655/12 1681/15 1682/16 1708/20 1708/21 1711/6 1711/13 1719/20 1726/9 1740/8

**Reyes's [2]**   1789/17 1792/2
**RICHTER [1]**   1624/2
**Rick's [3]**   1726/25 1727/9 1728/6
**Rico [2]**   1646/15 1730/11
**right-hand [1]**   1771/18
**rise [1]**   1625/2
**Rockefeller [1]**   1624/3
**romantically [1]**   1653/13
**room [5]**   1675/15 1676/8 1679/2 1694/14 1722/18
**root [4]**   1705/22 1705/24 1758/24 1759/2
**rope [3]**   1777/17 1777/20 1778/2
**ROSENBERG [1]**   1623/21
**rough [5]**   1631/8 1631/19 1730/14 1730/23 1732/11
**rows [1]**   1754/16
**RPR [1]**   1624/11
**RPT [1]**   1759/16
**RTR [2]**   1675/14 1675/15
**RUBIN [172]**
**Rubin's [19]**   1625/12 1626/22 1628/16 1648/4 1648/9 1653/16 1653/18 1696/5 1719/5 1733/14 1733/21 1742/2 1747/13 1750/4 1751/16 1773/16 1779/25 1783/17 1796/18
**rudest [1]**   1735/24
**Rule [2]**   1753/2 1799/11
**Rule 403 [1]**   1753/2
**ruling [3]**   1648/1 1704/7 1753/2
**run [5]**   1640/11 1768/21 1768/22 1788/4 1797/16
**running [1]**   1709/11
**Russian [1]**   1675/15

**S**

**S3 [2]**   1735/15 1736/17
**S3-1 [1]**   1735/15
**safe [9]**   1697/25 1720/2 1720/4 1727/21 1727/24 1741/1 1741/3 1741/7 1741/12
**sake [1]**   1691/24
**Saland [3]**   1753/17 1761/6 1787/1
**sale [1]**   1766/5
**sanitary [5]**   1777/24 1778/5 1778/9 1778/13 1778/15
**sat [5]**   1649/13 1649/16 1649/21 1712/21 1713/1
**Saturday [6]**   1746/4 1746/4 1746/5 1800/7 1800/13 1801/2
**saved [1]**   1681/8
**saw [20]**   1628/7 1635/21 1657/5 1661/12 1666/23 1669/14 1690/18 1695/2 1696/17 1705/8 1718/2 1728/18 1732/6 1735/23 1739/22 1762/16 1775/20 1778/4 1779/11 1782/23
**Saydah [23]**   1720/14 1720/22 1721/13 1722/12 1723/2

**S**

**Saydah... [18]** 1723/11 1724/19 1728/16 1734/16 1736/20 1737/2 1740/19 1755/15 1757/4 1758/21 1759/23 1760/18 1769/4 1769/12 1771/9 1786/10 1786/23 1787/4
**scared [3]** 1736/23 1737/7 1786/13
**scene [1]** 1701/8
**schedule [3]** 1662/25 1745/7 1745/12
**SCHLAM [1]** 1624/6
**Schnur [11]** 1760/15 1760/24 1760/25 1761/1 1769/14 1769/25 1770/21 1773/16 1773/23 1773/24 1774/16
**school [3]** 1634/5 1634/20 1751/12
**science [1]** 1652/9
**screen [19]** 1641/3 1641/3 1644/20 1657/6 1658/7 1658/12 1666/2 1666/5 1669/14 1671/14 1682/25 1709/7 1716/22 1718/12 1735/17 1767/20 1781/18 1783/10 1784/16
**screenshot [2]** 1654/25 1671/17
**scroll [8]** 1663/17 1667/2 1673/3 1675/5 1687/15 1687/23 1758/4 1771/16
**scrolling [1]** 1663/2
**Seamless [2]** 1700/11 1700/13
**search [2]** 1686/20 1692/12
**seat [1]** 1689/9
**seated [3]** 1625/8 1747/11 1797/24
**second [9]** 1680/25 1701/25 1702/6 1711/23 1712/2 1715/1 1736/21 1754/23 1788/3
**seconds [1]** 1748/2
**section [1]** 1676/25
**seeking [1]** 1783/19
**seem [2]** 1712/6 1765/17
**sell [1]** 1766/3
**selling [1]** 1768/14
**sending [2]** 1641/15 1697/7
**SENIOR [1]** 1623/12
**sense [5]** 1632/16 1713/24 1798/5 1800/13 1800/16
**sent [29]** 1635/7 1641/14 1642/15 1650/10 1654/24 1654/25 1662/6 1671/17 1672/24 1672/25 1673/15 1674/14 1684/18 1697/6 1714/24 1717/21 1737/3 1740/5 1772/20 1773/15 1773/23 1773/24 1774/4 1774/6 1774/8 1775/9 1776/2 1776/5 1781/15
**sentence [3]** 1629/10 1631/10 1674/10
**September [29]** 1661/25 1662/8 1663/15 1665/11

1665/17 1666/4 1666/23 1697/15 1699/2 1728/4 1732/10 1762/13 1763/9 1769/13 1769/24 1770/12 1771/2 1772/17 1772/18 1773/15 1773/22 1774/18 1775/4 1776/3 1776/13 1777/22 1778/19 1778/23 1779/10
**September 19th [6]** 1769/13 1769/24 1770/12 1771/2 1772/17 1772/18
**September 20th [2]** 1773/15 1773/22
**September 21st [3]** 1774/18 1775/4 1776/3
**September 22 [2]** 1777/22 1779/10
**September 22nd [3]** 1776/15 1778/19 1778/23
**September 24th [1]** 1697/15
**September 29th [3]** 1665/11 1665/17 1666/23
**September 30 [1]** 1666/4
**September 30th [3]** 1661/25 1662/8 1663/15
**series [3]** 1654/16 1718/3 1782/25
**seriously [2]** 1672/13 1672/14
**serve [1]** 1695/20
**service [4]** 1699/14 1700/13 1742/6 1742/23
**services [2]** 1749/10 1749/17
**session [1]** 1708/12
**set [6]** 1644/9 1644/24 1661/9 1739/12 1761/24 1799/20
**set-up [1]** 1761/24
**sets [2]** 1707/16 1761/23
**setup [3]** 1707/10 1707/17 1707/24
**seven [2]** 1652/22 1726/12
**several [6]** 1649/13 1651/12 1659/12 1680/1 1685/2 1714/24
**severance [1]** 1734/8
**sex [11]** 1631/8 1631/19 1657/12 1666/17 1674/11 1676/9 1723/25 1724/7 1777/14 1777/24 1779/9
**sexual [13]** 1630/5 1630/5 1630/8 1630/11 1650/4 1650/18 1651/16 1668/18 1668/21 1674/13 1678/25 1730/18 1731/1
**shakedown [2]** 1708/5 1708/14
**shape [1]** 1646/18
**share [1]** 1760/24
**shared [1]** 1639/10
**SHEPPARD [1]** 1624/2
**shit [6]** 1782/21 1784/4 1784/7 1784/21 1785/3 1786/19
**shocked [2]** 1625/4 1625/4
**Shon [13]** 1625/19 1633/9

1644/9 1651/6 1651/7 1684/7 1685/21 1720/23 1721/4 1721/10 1733/3 1733/6 1734/7
**Shon's [6]** 1633/6 1647/23 1732/20 1733/4 1733/17 1734/4
**shoot [8]** 1657/19 1659/20 1660/10 1660/12 1661/6 1661/10 1661/12 1661/21
**shoots [4]** 1643/24 1644/2 1644/5 1661/2
**shopping [1]** 1699/23
**short [4]** 1648/9 1648/9 1747/1 1747/15
**shortly [2]** 1680/6 1689/3
**shot [1]** 1735/17
**should -- Mr. Rubin [1]** 1674/6
**shower [1]** 1701/10
**shown [5]** 1641/3 1718/9 1763/18 1782/8 1782/16
**sick [2]** 1698/14 1701/5
**sidebar [15]** 1729/19 1729/20 1729/22 1730/1 1731/14 1743/5 1750/12 1750/15 1751/1 1752/5 1764/1 1764/3 1765/1 1766/23 1796/23
**sidebars [1]** 1729/21
**sided [1]** 1786/19
**sign [3]** 1659/2 1698/19 1782/24
**signature [3]** 1712/2 1712/2 1712/3
**signed [9]** 1658/24 1659/6 1694/11 1712/8 1712/10 1719/19 1719/25 1727/9 1728/9
**significance [1]** 1714/17
**signing [2]** 1659/1 1776/20
**signs [1]** 1785/4
**Similar [1]** 1742/17
**simple [1]** 1692/13
**simply [1]** 1691/18
**sitting [5]** 1658/25 1694/13 1712/15 1712/17 1712/23
**situation [4]** 1646/5 1701/11 1708/3 1785/10
**six [4]** 1652/13 1661/25 1671/23 1754/23
**skipped [1]** 1634/10
**SKIPSEY [4]** 1624/4 1625/22 1626/9 1633/10
**sleep [4]** 1724/1 1724/5 1725/2 1797/20
**sleeping [2]** 1679/2 1722/18
**sleighted [1]** 1678/12
**slightly [2]** 1723/21 1786/18
**slow [2]** 1635/11 1787/25
**small [3]** 1652/20 1692/11 1692/13
**smart [1]** 1705/13
**smelt [1]** 1713/3
**smiley [2]** 1785/2 1785/2
**smooth [2]** 1782/24 1785/16
**smoothly [1]** 1785/8
**social [1]** 1797/18

**S**

**solely [2]**   1745/19 1745/20
**somewhat [1]**   1763/19
**somewhere [1]**   1800/8
**son [2]**   1701/25 1702/6
**son's [1]**   1746/6
**soon [3]**   1717/22 1723/25 1750/4
**sort [2]**   1628/1 1800/11
**sought [1]**   1765/18
**sounds [2]**   1757/16 1776/9
**source [2]**   1675/1 1770/19
**space [1]**   1722/22
**span [1]**   1657/10
**speaking [3]**   1630/24 1631/6 1743/8
**specific [6]**   1658/3 1689/11 1689/16 1695/3 1751/17 1799/3
**specifically [2]**   1665/17 1675/4
**specifics [1]**   1639/1
**speech [1]**   1713/5
**spend [1]**   1646/11
**spending [1]**   1661/22
**spoken [3]**   1631/3 1631/18 1684/20
**squeeze [1]**   1747/5
**stand [17]**   1625/25 1649/1 1689/6 1689/8 1689/19 1690/6 1690/24 1693/12 1704/2 1730/10 1747/4 1748/18 1748/20 1779/24 1781/1 1787/18 1788/7
**standing [3]**   1712/23 1712/25 1729/13
**start [16]**   1626/5 1626/7 1627/10 1648/11 1648/14 1650/1 1666/4 1679/7 1747/13 1747/21 1758/12 1759/14 1788/1 1797/13 1798/10 1800/4
**started [6]**   1636/17 1637/11 1653/15 1738/5 1751/3 1765/12
**starting [4]**   1653/23 1705/9 1709/23 1734/20
**starts [1]**   1725/13
**State [1]**   1730/15
**STATES [3]**   1623/1 1623/5 1623/12
**stay [2]**   1670/10 1797/15
**Stef [1]**   1733/6
**stenography [1]**   1624/14
**step [6]**   1675/9 1689/5 1695/7 1704/21 1779/22 1787/16
**Stephanie [10]**   1625/19 1633/6 1633/9 1645/12 1647/23 1651/6 1651/7 1684/7 1685/21 1720/23
**stick [2]**   1696/3 1724/10
**sticky [1]**   1699/1
**stipulate [2]**   1746/18 1798/14
**stipulation [2]**   1798/2

1798/4
**STONE [1]**   1624/6
**stop [4]**   1641/15 1663/22 1779/1 1787/11
**stopped [30]**   1708/8 1717/10 1739/18 1792/8 1792/12 1792/16 1792/20 1792/24 1793/3 1793/7 1793/11 1793/15 1793/19 1793/23 1794/2 1794/6 1794/10 1794/14 1794/18 1794/22 1795/2 1795/8 1795/12 1795/16 1795/20 1795/24 1796/3 1796/11 1796/15 1796/15
**stopping [1]**   1761/9
**strange [1]**   1751/3
**street [5]**   1650/3 1675/17 1675/18 1775/7 1775/23
**stricken [2]**   1703/18 1744/6
**stuck [1]**   1697/25
**study [1]**   1633/17
**stuff [3]**   1628/14 1697/7 1717/20
**style [1]**   1696/1
**subject [2]**   1649/16 1693/23
**submission [1]**   1635/22
**submit [2]**   1671/9 1745/8
**substance [1]**   1695/4
**succession [1]**   1755/4
**sucked [1]**   1677/12
**sucks [1]**   1757/18
**sudden [1]**   1708/9
**sued [1]**   1649/25
**suggest [6]**   1631/7 1657/18 1657/21 1711/5 1731/2 1745/13
**suggested [1]**   1713/6
**suggesting [1]**   1799/25
**suit [3]**   1655/11 1715/1 1717/25
**summation [3]**   1692/6 1799/20 1800/10
**summations [2]**   1692/4 1746/13
**summer [1]**   1656/24
**sunglasses [1]**   1670/8
**super [1]**   1636/7
**suppose [3]**   1744/4 1782/21 1800/3
**supposed [4]**   1660/4 1661/8 1667/8 1667/15
**supposedly [1]**   1671/24
**surprises [2]**   1646/2 1647/5
**sustained [5]**   1642/19 1703/17 1749/21 1750/1 1774/11
**sworn [2]**   1649/3 1781/3
**sworn/affirmed [2]**   1649/3 1781/3

**T**

**T-4-1 [1]**   1673/25
**T4 [3]**   1665/24 1684/12 1731/6
**T4-1 [2]**   1665/24 1684/12

**table [1]**   1719/5
**tag [1]**   1772/14
**TAGAI [42]**   1623/4 1653/23 1653/25 1654/3 1654/14 1654/17 1654/20 1658/4 1658/5 1658/22 1658/24 1659/15 1660/10 1662/2 1662/5 1662/17 1662/24 1663/18 1663/23 1665/3 1665/12 1668/19 1668/24 1669/11 1671/23 1672/4 1673/14 1674/11 1678/25 1679/5 1680/7 1680/16 1681/10 1689/12 1689/18 1691/1 1692/19 1699/22 1741/24 1742/1 1742/20 1743/24
**Tagai's [4]**   1660/12 1661/6 1788/1 1789/16
**talks [2]**   1724/20 1751/8
**Taren [17]**   1625/18 1626/6 1626/8 1651/9 1682/2 1682/4 1682/10 1682/11 1709/2 1709/15 1710/6 1710/8 1710/17 1710/24 1711/3 1711/9 1711/12
**Taren's [1]**   1710/19
**task [1]**   1800/13
**taunt [1]**   1738/6
**taunted [1]**   1715/1
**taunting [8]**   1714/19 1714/21 1714/23 1738/16 1738/23 1739/8 1739/22 1740/5
**Tea [1]**   1675/15
**teacher [2]**   1652/10 1652/13
**team [1]**   1735/10
**tearing [1]**   1633/2
**tears [1]**   1721/25
**technology [1]**   1717/2
**telephone [1]**   1686/6
**ten [5]**   1626/14 1626/15 1632/15 1632/15 1687/6
**tennis [3]**   1751/8 1751/22 1751/23
**tentative [1]**   1800/19
**Tenth [1]**   1633/20
**terminated [1]**   1762/8
**terms [3]**   1643/4 1695/10 1743/22
**terribly [2]**   1690/11 1798/5
**testified [26]**   1629/8 1637/6 1637/11 1638/7 1639/13 1644/9 1649/3 1653/6 1673/14 1693/24 1698/8 1698/13 1716/13 1726/7 1726/15 1741/14 1741/17 1742/23 1756/16 1762/12 1762/25 1763/3 1771/1 1775/17 1781/4 1783/12
**testify [8]**   1630/6 1665/3 1672/7 1698/11 1718/21 1726/24 1733/4 1762/18
**testifying [2]**   1684/13 1727/8
**testimony [35]**   1648/7 1649/13 1651/6 1651/11

**T**

**testimony... [31]**  1659/11 1662/5 1672/3 1681/5 1685/2 1687/13 1690/2 1690/9 1691/1 1694/6 1697/14 1704/1 1704/7 1727/13 1728/7 1728/13 1739/1 1739/7 1739/8 1739/20 1739/21 1749/12 1751/16 1753/8 1753/10 1756/12 1765/12 1774/5 1776/5 1776/8 1785/17
**Texas [1]**  1652/7
**text [78]**  1636/15 1647/10 1647/18 1650/9 1650/15 1651/22 1654/16 1654/19 1654/23 1656/6 1662/6 1662/17 1665/10 1665/15 1666/13 1666/23 1672/11 1673/4 1673/15 1673/19 1673/21 1673/21 1679/9 1679/14 1679/15 1681/11 1684/18 1685/4 1685/5 1685/12 1686/11 1687/24 1689/18 1689/20 1700/1 1700/10 1703/2 1709/2 1717/21 1718/3 1718/23 1720/18 1720/21 1722/23 1723/16 1723/21 1725/13 1726/17 1729/12 1730/7 1731/2 1731/6 1734/18 1734/19 1735/15 1737/3 1743/22 1751/6 1751/21 1754/17 1754/21 1754/23 1755/16 1755/17 1757/2 1757/24 1760/20 1761/15 1761/21 1762/15 1769/8 1772/21 1772/22 1782/5 1784/12 1784/15 1784/18 1784/18
**texted [6]**  1670/7 1671/24 1677/18 1684/19 1728/5 1728/5
**texting [1]**  1630/24
**texts [24]**  1668/17 1668/23 1669/3 1673/16 1678/22 1679/3 1684/5 1711/5 1720/16 1721/20 1725/15 1725/20 1739/2 1740/5 1740/9 1741/9 1751/20 1761/20 1779/10 1782/7 1782/15 1782/19 1782/25 1786/1
**thanked [1]**  1703/2
**themselves [2]**  1641/12 1641/14
**theory [1]**  1800/19
**thereabouts [1]**  1673/1
**thereafter [2]**  1729/1 1729/5
**they've [2]**  1731/10 1778/7
**thinking [1]**  1800/22
**thinks [1]**  1744/5
**third [4]**  1630/22 1698/7 1703/7 1760/9
**threatening [1]**  1783/16
**three [15]**  1630/20 1636/8 1652/20 1656/17 1689/11 1689/16 1694/13 1694/15

**threesome [1]**  1675/24
**threw [8]**  1644/21 1678/20 1777/14 1777/17 1777/24 1778/5 1778/12 1778/14
**throat [1]**  1724/11
**throughout [1]**  1754/11
**throw [1]**  1778/13
**throwing [2]**  1701/5 1706/2
**thrown [1]**  1778/8
**Thursday [2]**  1714/12 1776/2
**Tia [1]**  1772/10
**ticket [3]**  1654/13 1654/20 1669/13
**tickets [5]**  1654/23 1654/25 1657/5 1662/21 1685/13
**ticking [1]**  1757/14
**tied [2]**  1639/5 1642/15
**timing [2]**  1647/3 1723/6
**today [7]**  1652/14 1682/5 1684/13 1687/9 1721/23 1746/25 1760/12
**together [7]**  1626/18 1646/12 1694/11 1760/12 1766/9 1800/12 1800/14
**Tom [1]**  1725/16
**tomorrow [5]**  1745/13 1747/6 1799/9 1801/1 1801/4
**tonight [1]**  1745/10
**top [14]**  1630/22 1662/20 1666/4 1671/15 1673/3 1675/7 1683/1 1683/2 1683/16 1759/15 1760/19 1768/21 1771/23 1775/2
**totally [1]**  1753/23
**touch [2]**  1637/14 1717/19
**tourist [1]**  1699/25
**town [1]**  1649/20
**toys [3]**  1777/15 1777/24 1779/9
**travel [2]**  1663/8 1663/13
**treatment [2]**  1647/4 1702/12
**trial [6]**  1623/11 1683/19 1690/2 1696/15 1697/14 1705/8
**trick [3]**  1632/6 1632/9 1632/14
**trip [5]**  1657/16 1663/3 1663/4 1663/10 1683/7
**trouble [3]**  1671/8 1713/8 1741/14
**true [4]**  1685/8 1685/9 1763/12 1770/18
**trust [4]**  1708/15 1708/17 1732/13 1756/10
**truth [1]**  1692/12
**Tuesday [3]**  1661/9 1800/3 1800/4
**turn [2]**  1663/21 1766/6
**turned [5]**  1679/15 1679/20 1680/10 1685/15 1743/22
**turning [2]**  1630/19 1645/6
**twice [3]**  1641/23 1666/9 1740/2
**two [20]**  1625/5 1653/7

1727/4 1729/14 1739/2 1739/8 1782/7 1782/8 1782/15

**twosome [1]**  1675/24
**type [3]**  1637/1 1694/12 1742/12

**U**

**U3 [6]**  1715/6 1715/8 1715/21 1716/22 1717/16 1739/15
**ultimately [3]**  1627/22 1678/20 1682/14
**unaware [2]**  1642/21 1643/7
**uncertain [1]**  1754/4
**unclear [1]**  1691/15
**undenied [2]**  1640/14 1640/15
**undergrad [2]**  1633/13 1633/14
**understood [5]**  1691/13 1752/2 1770/20 1783/16 1799/7
**unexpected [1]**  1690/11
**unfair [1]**  1691/3
**unfortunately [2]**  1638/11 1647/19
**UNITED [3]**  1623/1 1623/5 1623/12
**units [1]**  1768/9
**University [1]**  1633/16
**Unless [1]**  1727/23
**unstrike [1]**  1704/7
**upfront [1]**  1632/17
**uploading [2]**  1671/8 1741/15
**upset [2]**  1642/9 1729/2
**upstairs [1]**  1675/14
**uses [1]**  1641/1
**usual [1]**  1666/17

**V**

**V2 [1]**  1697/13
**vacation [1]**  1670/10
**vagina [1]**  1633/2
**vague [1]**  1628/7
**vanilla [1]**  1690/15
**various [1]**  1745/11
**version [3]**  1781/9 1784/11 1784/20
**versus [1]**  1623/7
**via [2]**  1628/10 1668/8
**Viceroy [1]**  1696/2
**vicinity [1]**  1675/17
**video [89]**  1691/19 1691/20 1745/17 1788/9 1788/14 1788/15 1788/18 1788/19 1788/22 1788/23 1789/1 1789/2 1789/5 1789/6 1789/9 1789/10 1789/13 1789/14 1789/20 1789/21 1789/24 1789/25 1790/3 1790/4 1790/7 1790/8 1790/11 1790/12 1790/15 1790/16 1790/19 1790/20 1790/23 1790/24 1791/2 1791/3 1792/7 1792/8

**V**

**video... [51]** 1792/11
1792/12 1792/15 1792/16
1792/19 1792/20 1792/23
1792/24 1793/2 1793/3 1793/6
1793/7 1793/10 1793/11
1793/14 1793/15 1793/18
1793/19 1793/22 1793/23
1794/1 1794/2 1794/5 1794/6
1794/9 1794/10 1794/13
1794/14 1794/17 1794/18
1794/21 1794/22 1795/1
1795/2 1795/7 1795/8 1795/11
1795/12 1795/15 1795/16
1795/19 1795/20 1795/23
1795/24 1796/2 1796/3
1796/10 1796/11 1796/14
1796/15 1796/15
**videotaped [1]** 1625/20
**visible [1]** 1687/6
**visit [13]** 1647/3 1654/1
1654/10 1656/8 1697/10
1698/7 1699/2 1699/5 1699/12
1700/16 1703/7 1708/23
1709/1
**visiting [1]** 1659/11
**visits [1]** 1699/18
**voice [6]** 1646/1 1646/1
1715/17 1715/21 1717/8
1717/13
**voicemail [3]** 1715/2 1715/13
1739/21
**voluminous [1]** 1692/11
**vomit [2]** 1701/8 1702/6

**W**

**wait [8]** 1639/11 1641/18
1642/16 1643/8 1645/22
1645/25 1690/12 1771/4
**waited [1]** 1712/22
**waiting [2]** 1748/3 1780/7
**wake [1]** 1667/23
**walk [1]** 1700/18
**walked [2]** 1670/9 1769/2
**wants [1]** 1625/5
**website [1]** 1749/11
**Wednesday [2]** 1661/9 1663/15
**wee [1]** 1666/11
**week [5]** 1683/7 1726/7
1726/9 1739/3 1800/11
**weeks [5]** 1702/2 1702/3
1754/24 1759/10 1762/15
**weird [2]** 1675/25 1710/13
**West [2]** 1775/7 1775/23
**West 57th Street [1]** 1775/7
**wether [1]** 1713/5
**WhatsApp [11]** 1628/10 1629/7
1637/11 1647/20 1660/24
1666/13 1684/19 1685/12
1688/11 1717/20 1717/21
**whipped [1]** 1639/5
**whole [9]** 1701/8 1707/19
1708/3 1708/3 1708/13 1762/1
1782/25 1800/2 1800/2
**whose -- do [1]** 1786/7
**wicked [1]** 1739/25

**wide [1]** 1722/21
**wife [2]** 1750/4 1751/16
**WiFi [3]** 1700/4 1700/6
1700/17
**willing [2]** 1739/14 1746/3
**wine [1]** 1675/23
**wish [2]** 1759/20 1771/15
**withdraw [4]** 1659/10 1695/6
1703/6 1773/11
**withdrawn [3]** 1653/24
1698/12 1741/17
**witness [52]** 1625/21 1625/25
1640/8 1641/2 1648/15 1649/1
1649/1 1649/2 1660/18
1660/20 1660/21 1689/6
1689/6 1689/8 1689/8 1691/15
1693/12 1693/12 1709/8
1713/16 1715/7 1725/10
1729/8 1733/20 1735/14
1742/13 1744/1 1747/4
1747/22 1748/20 1751/24
1753/25 1754/2 1757/22
1758/1 1761/13 1763/18
1763/18 1763/20 1769/19
1769/20 1771/11 1774/25
1779/24 1779/24 1780/5
1781/1 1781/1 1781/2 1787/18
1787/18 1802/2
**witnesses [1]** 1747/24
**woke [1]** 1724/20
**woman [9]** 1655/5 1659/1
1678/3 1682/9 1682/10
1702/17 1705/3 1707/13
1721/7
**women [3]** 1657/25 1659/3
1749/22
**word [2]** 1631/7 1667/11
**words [6]** 1628/18 1628/19
1644/19 1669/7 1678/6 1702/5
**worried [1]** 1718/20
**worries [1]** 1786/18
**worse [1]** 1706/3
**worth [1]** 1706/9
**would've [1]** 1708/12
**wow [1]** 1724/1
**write [20]** 1650/21 1650/24
1688/10 1705/21 1705/23
1707/15 1707/19 1721/11
1722/21 1723/7 1724/24
1756/10 1757/12 1760/11
1760/20 1761/22 1784/21
1785/3 1786/24 1787/7
**writes [8]** 1641/2 1677/17
1724/4 1724/9 1724/15
1726/10 1757/9 1786/16
**writing [6]** 1724/15 1732/7
1754/16 1754/21 1758/13
1760/22
**written [3]** 1651/11 1712/3
1745/8
**wrote [24]** 1650/11 1662/6
1666/20 1666/20 1666/20
1667/4 1667/8 1675/20
1677/11 1677/11 1677/15
1678/10 1697/22 1707/23
1718/19 1761/4 1784/3 1784/3

1784/5 1784/7 1785/3 1785/7
1785/11 1785/15

**X**

**X117A [1]** 1658/8
**X7 [5]** 1713/15 1713/20
1714/2 1714/5 1716/10

**Y**

**y'all [2]** 1718/20 1738/20
**year [4]** 1633/19 1634/25
1654/7 1659/24
**years [13]** 1626/14 1626/15
1632/15 1652/12 1652/13
1653/1 1657/10 1659/12
1662/2 1749/4 1751/14
1751/16 1766/9
**yellow [8]** 1720/22 1732/7
1733/24 1754/13 1754/21
1755/25 1757/8 1772/4
**yesterday [8]** 1653/6 1725/17
1726/24 1729/11 1729/12
1729/16 1731/9 1749/9
**Yifat [5]** 1760/15 1760/24
1769/14 1769/25 1773/16
**YORK [54]** 1623/1 1623/6
1623/16 1623/16 1623/20
1623/20 1624/3 1624/7 1624/7
1626/23 1632/6 1632/7 1632/8
1632/22 1634/7 1634/22
1641/22 1643/24 1644/2
1644/5 1650/18 1651/13
1651/25 1652/23 1653/2
1653/3 1654/20 1655/25
1655/25 1656/9 1657/11
1661/13 1663/3 1663/4
1663/14 1671/24 1682/3
1682/11 1682/12 1683/6
1684/10 1686/15 1687/19
1693/25 1697/10 1697/15
1698/7 1698/9 1698/14
1700/18 1704/14 1705/5
1705/15 1749/22
**yourself [2]** 1644/11 1644/25

**Z**

**Zoe [6]** 1701/17 1701/18
1701/19 1702/10 1702/11
1702/24
**Zoom [2]** 1746/5 1746/11