UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                    :

AMY MOORE, MIA LYTELL, NATASHA    :
TAGAI, EMMA HOPPER, BRITTANY    :
HASSEN and BRITTANY REYES,       :   **MEMORANDUM DECISION AND**
                                    :   **ORDER**
             Plaintiffs,    :
                                    :   17-cv-6404 (BMC)
       -against-         :
                                    :
HOWARD RUBIN,            :
                                  :
            Defendant.    :
-------------------------------------------------------- X

**COGAN**, District Judge.

Before the Court is defendant Howard Rubin's [413] motion for judgment as a matter of law or a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59, respectively. Following a seven-day trial, a jury found Rubin liable for violating the Trafficking Victim Protection Act ("TVPA") by bringing women into New York and sexually brutalizing them. For the following reasons, his motion is denied.

## BACKGROUND

Rubin is a successful, Harvard-educated bond trader who hired various women, including some of the plaintiffs here, to travel to New York City to engage in conduct involving sadomasochism. He had assistants who would locate and contact these women. He would then pay for their flights to New York, and they would sign contracts in which they acknowledged that in return for payment, they would engage in one-on-one sadomasochism[1] with him. Rubin rented a penthouse in Manhattan specifically for this purpose and equipped it with various sex

---

[1] The parties interchangeably referred to the term "sadomasochism" as "bondage, discipline, domination, and sadomasochism" or "BDSM."

toys and instruments for inflicting sexual pain.  During these encounters, he would also penetrate the women with other objects, like pool cues and electric prods.

Notwithstanding having voluntarily traveled to New York City from out of state and agreeing to engage in sadomasochism with Rubin, the six plaintiffs in this action, Natasha Tagai, Brittany Reyes, Brittany Hassen, Emma Hopper, Mia Lytell, and Amy Moore, believed he went too far, forcing them into acts to which they had not consented.  They therefore brought this action, alleging that he violated the TVPA, 18 U.S.C. § 1591(a), *et seq.*, together with various common law claims.  The case went to the jury on all of the plaintiffs' TVPA claims and some of the common law claims of plaintiffs Tagai and Moore.  After a seven-day trial, a jury found Rubin liable for violating the TVPA as to each plaintiff and, additionally, in favor of plaintiff Moore on her battery claim.   The jury awarded each plaintiff $500,000 in compensatory damages and $120,000 in punitive damages, except for plaintiff Moore, to whom the jury awarded $500,000 in compensatory damages and $250,000 in punitive damages.

Before the Court is Rubin's motion for judgment as a matter of law or, alternatively, for a new trial.  Although he raises a number of points, his main argument is that neither the language nor the purpose of the TVPA fit the facts here.  I think they do, and because his remaining points are also without merit, his motion is denied.

## DISCUSSION

## I.    Legal Standard

A Rule 50 motion for judgment as a matter of law "may be granted only when, considering the evidence in the light most favorable to the non-moving party and drawing all reasonable evidentiary inferences in that party's favor, there was no legally sufficient evidentiary

basis for a reasonable jury to find in favor of the non-moving party." <u>Nimely v. City of New York</u>, 414 F.3d 381, 390 (2d Cir. 2005) (cleaned up).  The court "may not make credibility determinations or weigh the evidence," because those are "jury functions, not those of a judge." <u>Zellner v. Summerlin</u>, 494 F.3d 344, 370 (2d Cir. 2007) (cleaned up).  For the moving party to prevail, there must be "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" or the evidence must be "so overwhelming that reasonable and fair minded persons could only have reached the opposite result." <u>Martinez v. City of New York</u>, No. 16-cv-79, 2023 WL 4627739, at *7 (E.D.N.Y. July 19, 2023) (internal citations omitted).

Rule 59 provides that the Court may grant a new trial "on all or some of the issues … for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Grounds for granting a new trial include a verdict that is against the weight of the evidence, <u>see Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 417 (2d Cir. 2012), and non-harmless errors in jury instructions, <u>see Velez v. City of New York</u>, 730 F.3d 128, 134 (2d Cir. 2013).  Although the court has more leeway in granting a Rule 59 motion for a new trial than a Rule 50(b) motion for judgment as a matter of law, the trial court should exercise its discretion to order a new trial only if it finds that the jury's verdict was egregious, a seriously erroneous result, or a miscarriage of justice.  <u>See Amorgianos v. Nat'l R.R. Pass. Corp.</u>, 303 F.3d 256, 261 (2d Cir. 2002); <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998).

## II.    The TVPA

The TVPA provides, in relevant part, that

> Whoever knowingly … in or affecting interstate or foreign commerce ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person … knowing, or ... in reckless disregard of the fact, that means of force, threats of force, fraud, coercion ... or any combination of such means will be used to cause the person to engage in a commercial sex act, shall be punished[.]

18 U.S.C. § 1591(a)(1).  Although this section is part of the Criminal Code, the same chapter also provides for a private right of action in favor of any victim of a violation of this statute.  18 U.S.C. § 1595.

Rubin argues the Court should grant judgment as a matter of law because: (1) plaintiffs were not forced to engage in commercial sex; rather, they were willing sex workers; (2) the evidence cannot support the jury's verdict that Rubin had the requisite *mens rea* required under the TVPA; and (3) to the extent Rubin exceeded consent during the course of the initially-consensual sex acts, those non-consensual acts were not "commercial sex."  On the record here, however, each of these arguments presented a jury question that the jury was entitled to resolve against Rubin.

## III.    Voluntary Agreement

Rubin's first argument is essentially the same one that he made on his motion for summary judgment, which the Court denied, and the evidence at trial was not materially different than the summary judgment record.  The argument is that plaintiffs were just prostitutes doing their jobs.  They were not "forced," he argues.  What they did, they did voluntarily and in exchange for money.  And the TVPA does not cover unforced, voluntary, commercial sex.

4

Rubin principally relies on the contract that each plaintiff signed and their voluntary appearance in New York to engage in sex for money.  The contract that each plaintiff signed disclosed that she was going to be participating in what are sometimes referred to as "rough" sex acts.  The contracts stated: "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with [Rubin] including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person," together with a release for such injuries.  The agreement also included a non-disclosure provision, and a $500,000 penalty provision if the non-disclosure provision was violated.

However, Rubin only acknowledges in passing what was the central issue in this case – did plaintiffs "consent" to extreme acts of violence as part of their contracts for sexual services?  Coming to New York to participate in consensual sex, even something falling under the general rubric of "sadomasochism," was not tantamount to declaring open season on them once they got here.  As I stated in denying Rubin's summary judgment motion:

> The problem with Rubin's argument is its false assumption that there was a meeting of the minds on the notion of what constitutes "BDSM."  All parties must agree that whatever consent plaintiffs gave did not extend to killing them, dismembering them, causing third degree burns, prying off fingernails, or disfiguring them (this is just by way of example; it is not alleged that Rubin did these things).  It was obviously something less than these acts.  But how much less is a fact issue.  The brutality Rubin had in mind may well have been less than plaintiffs intended to receive; there is certainly evidence to that effect.  If there is such a thing as a BDSM consent that the law will enforce, and there may not be, it's going to have to be a lot more specific about what the perpetrator and the victim have in mind.

The examples I gave above did not include what the evidence actually showed – penetration with an electric prod and a pool cue, for example – but the point is the same.  If Rubin wanted to assert consent as a matter of law for conduct like this – if it is legally possible – then he probably had to spell out *verbatim* what he had in mind.  A reference to "sadomasochism" or "injury"

might well have meant something different to plaintiffs than it did to him, and a finding that it did would be fully consistent with the jury's verdict.

In other words, Rubin certainly adduced evidence to show that plaintiffs were on notice that he was going to engage in some kind of BDSM with them, but a reasonable jury could well have concluded that the degree of BDSM plaintiffs experienced was more severe than any kind of BDSM in which plaintiffs, or any reasonable person, consented to participate. "[T]he physical attack must not exceed the consent." Van Vooren v. Cook, 273 A.D. 88, 92, 75 N.Y.S.2d 362, 366 (4th Dep't 1947). That was an issue for the jury to decide, and it did.

### IV.    Rubin's State of Mind

Rubin's next argument as to why the TVPA does not apply to his conduct is that he didn't know, *at the time he solicited* plaintiffs to come to New York, that he would exceed their consent. If he exceeded their consent, he urges, he did so only once the particular encounter was underway in the New York apartment and he decided to take it further. Because he only formed his intent to exceed consent during the encounter (or, theoretically, after they arrived in New York), then the language of the statute doesn't cover his conduct.

Assuming for the moment that Rubin has correctly stated the standard (and, as discussed at the end of this subpoint, he is ignoring part of the statute), there are multiple failings within his argument. One arises from the language of the statute itself, which allows recovery not only for threatening to use force to compel sexual conduct knowingly, but recklessly.[2] How many women have to tell Rubin to stop before he gets the message that when he's bringing them to

---

[2] Rubin does not omit the term "recklessly" in his motion, but each time he refers to it, the reference is contained only in a parenthetical, as if to suggest that it is a mere congressional afterthought. In fact, reckless disregard is just as actionable as knowing disregard.

New York to do the things he's doing, they felt forced into doing those things?  Certainly the jury could find that reasonably that all of these plaintiffs told him to stop.  If Rubin didn't know that he was bringing women in to inflict upon them a level of force beyond their consent, the jury could reasonably find that he was kidding himself, *i.e.*, that he was certainly reckless in disregarding that likelihood.

The second failing is that, again, his argument presented a factual issue for the jury. Rubin must have known that he had brought or was going to bring electric prods and pool cues into the apartment at the time he solicited these plaintiffs to visit the apartment, and that he intended to use them.  It is fully consistent with the jury's verdict to conclude that Rubin wanted to spring the more extreme behavior on them once they were bound and gagged (as if that wasn't extreme enough), and that he so intended at the time he tricked plaintiffs to come to New York for what they thought would be less extreme behavior.  Each of the plaintiffs testified to conduct that the jury could find Rubin knew he was going to undertake when he brought them to New York but plaintiffs did not.  Those acts included vaginal penetration with a pool cue; clamping clothes pins to breasts; insertion of electric artificial phalli; penetration while gagged; intercourse while tied up; penetration with a "cattle prod"; and repeated punching, slapping, whipping, and dragging while bound.  Viewing the facts most favorably to plaintiffs, the results of this activity to which plaintiffs testified included vaginal tearing, heavy and permanent bruising, a "capsulated breast,"[3] and a bruised or broken rib, to say nothing of the psychological impacts from the encounters.  Rubin may well have thought that all falls within BDSM, but the jury

---

[3] Plaintiff Moore was not entirely clear what she meant by this.  She may have been referring to damage to a breast implant.

could reasonably find that this level of force was not that for which these women signed up, and that if he didn't know that, he recklessly disregarded it.

Moreover, in his post-trial motion, Rubin has focused on his state of mind at the time of recruitment of the women.  But the TVPA is not so narrow.  It also applies if the trafficker "harbor[ed]; "obtain[ed]; or "patronize[d]" a victim with knowledge or reckless disregard of the fact that the force would be used to commit sexual acts.  18 U.S.C. § 1591(a)(1).  Thus, the temporal component that forms the basis of Rubin's argument is absent when it comes to "harboring," "obtaining," or "patronizing" a victim.  The evidence was more than sufficient for the jury to find that here.

## V.    Commercial Sex

In the alternative, Rubin asserts that if, in fact, he coerced plaintiffs to engage in sex acts that went beyond their consent, those sex acts lost their character as "commercial sex" and thus fell outside the TVPA because they were not part of the parties' contract.  But I see nothing in the TVPA that requires a contract.  All that is required is that the plaintiff has to be promised some value in exchange for a sex act.  Plaintiffs received money, which was of value to them and covered both consensual and nonconsensual sex acts, regardless of whether they fell under the contract.  Rubin received, well, whatever it was he needed to receive through his conduct.  Rubin admitted in his testimony that he enjoyed abusing women and delivering physical pain.[4]  Value received through a sex act by either party to the transaction is enough to bring it under the TVPA.  See United States v. Maneri, 353 F.3d 165, 168 (2d Cir. 2003); Ardolf v. Weber, 332

---

[4] Rubin actually testified that "I personally derive sexual pleasure from inflicting – you know, getting off, but inflicting physical pain and verbal abuse."  More than a couple of jurors' mouths dropped open.

F.R.D. 467, 478 (S.D.N.Y. 2019); Noble v. Weinstein, 335 F. Supp. 3d 504, 520 (S.D.N.Y. 2018).  Here, the jury had ample evidence that both sides received value.

A sexual assault claim would be the more natural fit for the facts of this case, but that does not preclude recovery under 18 U.S.C. § 1591, pursuant to which a "commercial sex act need not [even] occur for a [d]efendant to be liable."  Ardolf, 332 F.R.D. at 476 (citing United States v. Alvarez, 601 F. App'x 16, 18 (2d Cir. 2015)) (finding that because 18 U.S.C. § 1591 employs "the future tense," "the [sex act] itself is not an element of the offense"); United States v. Maynes, 880 F.3d 110, 114 (4th Cir. 2018) ("[T]he crime is complete when the defendant recruits, entices, harbors, etc. the victim with knowledge that the prohibited means will be used in the future to cause them to engage in commercial sex acts.")).

## VI.    Plaintiff Reyes: Travel in Interstate Commerce

Rubin concedes that as to five of the six plaintiffs, the jury had sufficient evidence to support the interstate commerce requirement under the TVPA because he arranged for them to fly from outside of New York to the Eastern District.  As to plaintiff Reyes, however, Rubin contends that he had nothing to do with her travel to New York.  He points to evidence showing that Reyes arrived here at the solicitation of her "friend" Taren Cassidy.

However, the record was far from one-sided as to who Cassidy was acting for in presenting Reyes with the "opportunity" to have encounters with Rubin.  In fact, it is hard to believe that Cassidy was acting solely on her own account.  As necessary background, substantial evidence showed that Rubin's *modus operandi* was not usually to make first contact with his victims himself, but to utilize other women as intermediaries to locate and entice women to come to New York for his adventures.  The use of female intermediaries, the jury could find, was a method by which Rubin could build trust with his victims.

9

In Reyes's case, Cassidy told her "I have job for you, big job."  She told Reyes that if she would meet Rubin, Rubin would pay for her flight to New York and give her $5,000 for the encounter.  There was also evidence before the jury that Cassidy was working with Rubin's main "procurer," co-defendant Jennifer Powers.[5]  Cassidy relayed to Reyes that she had sent pictures of Reyes to Rubin, and he would arrange her flight if he liked what he saw.  There was also a writing from Cassidy showing she had been in the building where Rubin maintained the apartment.

In light of the evidence, the jury could conclude that either Cassidy on behalf of Rubin or Rubin himself had enticed Reyes to come to New York.  There is no basis for drawing an inference favorable to Rubin on this score.

### VII.   Jury Instruction on "Consent"

Part of the Court's instruction on consent under the TVPA to the jury was as follows:

> If you find that plaintiff consented to a commercial sex act, then the defendant doesn't have the requisite knowledge for liability under the sex trafficking law.  In other words, if the plaintiff you're considering consented to engage in a commercial sex act about which you've heard evidence, then her claim under this cause of action fails.  That is, consent is a complete defense to this cause of action. … Consent isn't permanent; if a person willingly agrees to engage in a commercial sex act, but later changes her mind, and then is forced to continue to engage in a commercial sex act against her will by force, threat of force, fraud or coercion, then a commercial act becomes involuntary, not with consent.

Rubin objected to this instruction on the ground that it did not advise the jury that to be liable, Rubin had to know, or recklessly disregard the fact, that a plaintiff had withdrawn her consent.

First, Rubin's argument disregards the standard instruction given to all juries, including this one, that they should not isolate on any one jury instruction but must view the charge as a

---

[5] Plaintiffs had sued Powers as well and their claims against her were submitted to the jury; Powers was found not liable.

whole.  Second, his argument ignores that the need for a defendant to know of the withdrawal was even more explicitly addressed in response to a note from the jury, in which I stated:

> Where consent has been given and then a person is not present when the consent is withdrawn, the person who is not present must know, or recklessly disregard, the withdrawal of the consent during the commercial sex act to be liable for that act of sex trafficking.

These instructions dovetailed with the instruction that plaintiffs had the burden of proving that Rubin knew or recklessly disregarded that prohibited conduct would be used to obtain sex. Because the jury had already been told that was an element of plaintiff's case, it did not have to be repeated multiple times.

In addition, Rubin's point is largely immaterial because he concedes that "the fair inference from the jury's verdict is that it found that each Plaintiff withdrew her consent at some point during her encounter with Rubin[.]"  He only argues that the jury needed to know that Rubin needed to know that they had withdrawn their consent.  But that is how the jury was instructed.  Indeed, considering the reckless disregard standard, I almost could have directed a verdict on that issue in plaintiffs' favor as a matter of law.  Plaintiff Reyes testified that even when she used the safe word, Rubin didn't stop.  And Plaintiffs Tagai, Reyes, Lytell, Hopper, and Hassen testified that they asked Rubin to stop, but he would not.  As rhetorically suggested above, with all of these women telling him to stop and, crediting their testimony as the jury did, at what point is Rubin recklessly disregarding the fact that maybe he shouldn't even start or, at least, listen a lot harder for indications that they want him to stop?  And the fact that the jury heard from different women saying the same thing (while denying that they knew each other or had discussed their testimony with one another) further supported the jury's inference that Rubin didn't care much about safe words or any other means of withdrawing consent.

Rubin is correct that the Court *could* have instructed the jury that Rubin needed to know, or that he recklessly disregarded, each plaintiff's withdrawal of their consent.  But considering Rubin's extreme conduct described above and plaintiffs' testimony that he would not stop the brutality even when they told him to, the lack of such an instruction was, at most, harmless.  The instruction did not cause him any prejudice: either the jury was going to believe that plaintiffs told him to stop and he wouldn't, or it was going to believe Rubin that plaintiffs didn't tell him to stop.  If the jury believed plaintiffs – and, as Rubin concedes, the unavoidable inference from the verdict is that it did – it followed *a fortiori* that Rubin was at least reckless in disregarding their entreaties.

### VIII.   "Overwhelming Evidence" or "Seriously Erroneous Result"

Rubin's motion contains a perfunctory argument that five of the six plaintiffs (excluding Reyes) gave such contradictory testimony that he is entitled to judgment as a matter of law.  He cites unspecified "blatantly false" and "contradictory" testimony in their depositions and at trial; the fact that plaintiffs signed the consent agreements; prior "sessions" with Rubin involving BDSM; and Rubin's "consistent and largely unimpeached testimony."  He asks in the alternative for a new trial to avoid a "seriously erroneous result," citing United States v. Landau, 155 F.3d 93, 104-05 (2d Cir. 1998).

The record does not come close to meeting the Rule 50(b) standard.  Sure, there were contradictions in plaintiffs' testimony, perhaps more than in Rubin's.  But these were pure issues of fact that turned on the jury's evaluation of the witnesses' credibility. The standard on a Rule 50(b) motion is essentially the same as on a motion for summary judgment under Rule 56, see This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998), and I could no more grant such a motion on the trial record than I could when I denied summary judgment.

Nor did I disbelieve these women such that I could find a new trial is warranted under Rule 59. The jury likely saw plaintiffs the same way I did – and probably the same way Rubin did – as vulnerable and desperate people with limited ability to see much beyond the moment. They were ripe for the taking, which was why Rubin was able to exploit them the way he did.

On the other hand, Rubin also likely struck the jury the same way he struck me – someone so wrapped up in his own wealth, power, and base desires that he had little regard for the consequences of his actions or his victims' reactions to them. When he testified – virtually boasted – that "I personally derive sexual pleasure from inflicting – you know, getting off, but inflicting physical pain and verbal abuse" on women, without apology or explanation, it was not egregious, a miscarriage of justice, or a seriously erroneous result for the jury to conclude that Rubin wasn't the kind of person who would have much regard for his victims' wellbeing, even if his testimony was more erudite than theirs. The jury could reasonably believe that, at least when it came to encounters with his procured women, he was more divorced from reality and societal norms than plaintiffs were, such that the jury did not want to credit his perspective over theirs.

I am not offended by the balance the jury struck and thus see no basis for a new trial.

**IX.     Compensatory Damages**

Rubin seeks a new trial or remittitur as to the jury's compensatory damage award. His argument is principally based on three grounds: (1) each of the plaintiffs received an identical award of $500,000, even though they had separate encounters and injuries from Rubin, suggesting that the jury did not have a rational basis for the awards; (2) the damage testimony from each was uncorroborated, medically or otherwise; and (3) the awards are out of line with other sexual assault cases in New York.

To find the awards excessive, I would have to hold that they "shock[] the judicial conscience and constitute[] a denial of justice." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (internal citations omitted). Although the jury's award has to be based on evidence – here, the plaintiffs' testimony – the Second Circuit has recognized that "[a]wards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress." Stampf v. Long Island R. Co., 761 F.3d 192, 205 (2d Cir. 2014). At the same time, because courts are more familiar with jury awards across different cases than any individual jury and there is a danger of raising the "floor" based on too lightly scrutinized awards, the Second Circuit has also recognized that "[e]xcessive awards for psychological and emotional distress not only disproportionally inflict harm on the tortfeasor and his or her [defendants], they also impose burdensome costs on society." Id.

There were two components to the jury's compensatory damages awards here: first, the pain and suffering resulting from the actual physical abuse to which Rubin subjected plaintiffs (vaginal tearing, bleeding, and soreness; bruising of breasts and eyes; "capsulated breast"; bruised or broken rib; swollen face; bruised arm; welts; inability to sit or stand; loss of taste; lopsided buttocks), and, second, emotional and psychological injuries (anxiety, PTSD; difficulty sleeping; therapy; suicide attempt; loss of intimacy and sexual desire; difficulty bonding with children; distrust of family; relapse into drug use).

As to Rubin's first point – that $500,000 to each plaintiff bespeaks a lack of individual analysis by the jury – it was not an easy undertaking for the jury to value either of these components as to any one plaintiff, let alone to compare them as between each plaintiff. Any differentiation between the amounts awarded per plaintiff would have been no less arbitrary than deciding that each plaintiff had been grievously injured in the same amount. Rather than

14

undertaking an artificial valuation of how much each injury on each plaintiff was worth, the jury's award of $500,000 was a fair approximation as to each for similar injuries.  I do not take issue with the jury's approach.

Rubin's second point about the lack of corroboration is not without some merit. Certainly, each plaintiff's damage claim would have been stronger had friends or family corroborated the psychological effects of the trauma that plaintiffs said Rubin inflicted on them, or had treating physicians or medical experts testify about those effects.  But I see no such requirement under New York law, and perhaps if plaintiffs had offered such testimony, the jury would have awarded even more damages than it did.  But even without such evidence, most or all of these plaintiffs presented as highly traumatized individuals during their testimony, and the jury was able to determine firsthand whether their descriptions of the effects of the abuse to which they testified were genuine.  I do not think the lack of corroboration requires a new trial on damages.

Finally, Rubin attempts to portray the $500,000 awards as outliers among New York sexual assault awards.  He starts by characterizing the emotional injury component as "garden variety" because no medical testimony was presented, and compares the awards here to other garden variety emotional injury claims that yielded much smaller awards.  See Sooroojballie v. Port Auth. of New York & New Jersey, 816 F. App'x 536, 545-46 (2d Cir. 2020) (reducing $2.16 million award for emotional distress damages for employment discrimination claim). However, in virtually all of the cases plaintiff cites, the emotional injury component was the only component – like a wrongful detention or an employment discrimination case with little or no physical contact.  See, e.g., Ravina v. Columbia Univ., No. 16-cv-2137, 2019 WL 1450449, at *11 (S.D.N.Y. March 31, 2019); Duarte v. St. Barnabas Hosp., 341 F. Supp. 3d 306, 319-20

(S.D.N.Y. 2018); <u>Emamian v. Rockefeller Univ.</u>, No. 07-cv-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018).  They have little to do with the traumatic sexual acts inflicted on plaintiffs here.

When Rubin turns to sexual assault cases as comparators, he merely cherry-picks them. Some of them are more than 30 years old, and thus have diminished probative value as to what the "going rate" for sexual assault is today.  <u>See</u>, <u>e.g.</u>, <u>Laurie Marie M. v. Jeffrey T.M.</u>, 159 A.D.2d 52, 56-57, 559 N.Y.S.2d 336, 338-39 (2d Dep't 1990), <u>aff'd</u>, 77 N.Y.2d 981, 571 N.Y.S.2d 907 (1991); <u>Deborah S. v. Diorio</u>, 153 Misc. 2d 708, 715-16, 583 N.Y.S.2d 872, 878 (N.Y. C. Civ. Ct. 1992), <u>aff'd</u>, 160 Misc. 2d 210, 612 N.Y.S.2d 542 (1st Dep't 1994).  Others are not in the context of reviewing jury verdicts in post-trial proceedings, but rather are findings of fact by trial courts sitting without a jury, where there is less constraint on the court in determining the appropriate amount of damages.  <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Lasker, Jr.</u>, No. 08-cv-6001L, 2010 WL 3476017 (W.D.N.Y. Aug. 20, 2018); <u>Estevez-Yalcin v. The Children's Village</u>, No. 01-cv-8784, 2007 WL 2746807 (S.D.N.Y. Sept. 20, 2007); <u>Anna O. v. State of New York</u>, 37 Misc. 2d 1209(A), 961 N.Y.S.2d 356 (N.Y. Ct. Cl. 2012).

My own review of the case law shows nothing untoward about a $500,000 compensatory damage award, especially when one considers not just emotional damages, but the pain and suffering resulting from the cruelty of the sex acts involved here.  <u>See</u>, <u>e.g.</u>, <u>Carroll v. Trump</u>, No. 20-cv-7311, 2024 WL 339782 (S.D.N.Y. Jan. 26, 2024) ($7.3 million compensatory damages for rape victim); <u>Jane Doe 1 v. JP Morgan Chase Bank, N.A.</u>, No. 22-cv-10019 (S.D.N.Y. 2023) (settling claims of about 200 women against JPMC as facilitator for Jeffrey Epstein under the TVPA for $290 million); <u>H.B. v. Haggis</u>, No. 0161137/2017, 2022 WL 18935710 (N.Y. Co. Sup. Ct. Nov. 14, 2022) (award-winning director invited plaintiff for a drink

at his home, which she accepted for career purposes; he raped her; jury awarded $7.5 million);
Mitrione ex rel. Brittany v. Monroe, No. 02-cv-526, 2010 WL 1539719 (N.D.N.Y. April 19,
2010) (upholding $11 medical malpractice verdict against doctor who failed to report rape of
child) (citing Johnson v. NYCHA, 19 Jury Verdict Review Publications, Issue 6 (Kings County
Sup. Ct. 2002) ($5.1 million against building owner for premises liability; intruder beat and
sexually abused plaintiff) and L.A. v. Port Jervis Housing Auth., 15 Jury Verdict Review
Publications, Issue 5 (Orange Cnty. Sup. Ct. 1998) (similar facts; $3 million awarded to 81-year
old plaintiff)); Venus v. Sohn, No. 28194/92, 1997 WL 372866 (N.Y. Co. Sup. Ct. May, 1997)
($950,000 settlement for premises liability arising from rape).

Many of these cases, no doubt, had some of the corroborating personal or medical
testimony that Rubin complains was missing here.  But, then again, the awards in these cases
were much higher, and sometimes against those who, unlike Rubin, did not themselves
perpetrate the acts.  And there are other verdicts and settlements that I could have cited.

Of course, all of these cases, like the ones Rubin cites, have disparate circumstances and
turn on their own facts.  But they all have in common that women had sexual acts performed on
them by force to which they did not consent, and in the cases cited above, the compensatory
damages were much higher than those awarded here.  Read against the backdrop of all of the
cases, the jury's verdict does not warrant a new trial or remittitur.

## X.      Punitive Damages under the TVPA

Rubin's final argument is that the TVPA does not provide for punitive damages. Every
Court of Appeals to address this issue (as well as a district court within this district) has held
otherwise.  See Warfaa v. Ali, 1 F.4th 289, 293-96 (4th Cir. 2021); Adhikari v. Kellogg Brown &
Root, Inc., 845 F.3d 184, 206 (5th Cir. 2017); Francisco v. Susano, 525 Fed. Appx. 828, 834

17

(10th Cir. 2013); <u>Ditullio v. Boehm</u>, 662 F.3d 1091, 1096-1102 (9th Cir. 2011); <u>Paguirigan v.</u>
<u>Prompt Nursing Emp. Agency LLC</u>, No. 17-cv-1302, 2019 WL 4647648, at *18 (E.D.N.Y. Sept.
24, 2019).  Rubin reads the legislative history as requiring a contrary finding, but as the Ninth
Circuit found in <u>Ditullio</u>, the legislative history does not definitively eliminate the possibility that
Congress intended to provide for punitive damages under the statute, and Congress "may have
intentionally left this question to the [c]ourts."  <u>Ditullio</u>, 662 F.3d at 1098 n.5.  I agree with the
Ninth Circuit and the other courts to have addressed this issue and thus decline to set aside the
punitive damage award.

## CONCLUSION

The essence of Rubin's arguments is that the TVPA should not apply to him because
what happened in this case is not the archetypical TVPA case.  But in many respects, it was.
Rubin was not that all that much different than the sex traffickers we regularly see in this Court
who trick young women into coming into New York for what they think is money or affection
and then find themselves victims of sexual abuse.  If anything, Rubin's enormous wealth and
sophistication created an even greater power disparity than in the more usual case, and he took
full advantage of it to feed his peculiar sexual needs.  The jury's verdict reflects that it
recognized the power dynamics involved between these vulnerable women and Rubin, and the

results are fully in line with those which the TVPA's civil remedy was designed to address.

Rubin's motion is therefore denied.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       March 19, 2024