UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
AMY MOORE, MIA LYTELL, NATASHA
TAGAI, EMMA HOPPER, BRITTANY
HASSEN and BRITTANY REYES,

                Plaintiffs,

      -against-

HOWARD RUBIN,

                Defendant.
------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

17-cv-6404 (BMC)

**COGAN**, District Judge.

Presently before the Court is the motion by plaintiffs for an award of attorneys' fees and costs, the result of plaintiffs having obtained a jury verdict pursuant to the Trafficking Victims Protection Act, 18 U.S.C. § 1591, in the aggregate amount of $3,850,000. The facts surrounding this action are discussed at length in the Court's decision denying defendant's motion for judgment as a matter of law or for a new trial, see Moore v. Rubin, 724 F. Supp. 3d 93 (E.D.N.Y. 2024), and thus will not be repeated here, but to summarize, defendant is a successful bond trader who entered into contracts with each of the plaintiffs to travel to New York and engage in sadomasochistic sexual acts with him. They contended that the acts he inflicted on them exceeded the limits of their consent and the jury agreed.

Defendant does not seriously dispute that plaintiffs are entitled to recover some amount of attorney fees and costs as prevailing parties. The TVPA, although a criminal statute, provides a private right of action in which a prevailing plaintiff may recover "damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Furthermore, as the prevailing parties, plaintiffs are entitled to an award of costs. See Fed. R. Civ. P. 54(d)(1).

This case, delayed by the pandemic, extensive discovery, and endless motion practice, took seven years and culminated in a seven-day trial. Plaintiffs seek $8,793,940.80 in attorneys' fees based on 12,006.9 hours and $2,035,386.10 in costs and expenses. Counsel's fee arrangement with plaintiffs was contingent on recovery.

Having considered what are reasonable fees and costs for this massive case, I grant plaintiffs' motion to the extent of $4,830,148.15.

I.     **The Lodestar**

I must first calculate the lodestar – "the product of a reasonable hourly rate and the reasonable number of hours required by the case" – and then adjust it based on case-specific considerations. Millea v. Metro-N. R.R., 658 F.3d 154, 166 (2d Cir. 2011).

Here, the 12,006.9 hours that plaintiffs claim was generated by thirty-six timekeepers. This consisted of five partners, with claimed rates ranging from $1,089/hour to $1,670/hour; one of counsel, at $860/hour; one senior attorney, at $715/hour; seven mid-level attorneys, each at a rate of $650/hour; one chief of staff, at $590/hour; two junior attorneys, at $450/hour and $417/hour; one Operations Manager, at $410/hour; four legal apprentices, at $385/hour; and fourteen non-attorney analysts (paralegals), at $385/hour.

Defendant challenges these rates on a number of grounds.

Relying principally on Paguirigan v. Prompt Nursing Emp. Agency LLC, 17-cv-1302, 2022 WL 6564755 (E.D.N.Y. April 7, 2022), defendant contends that the prevailing rates in this district for TVPA cases are at most $550 for exceptionally qualified partners, $300 to $450 for partners, $200 to $325 for senior associates, $100 to $200 for junior associates, and $70 to $100 for legal support staff.

I consider the reasonableness of plaintiff's claimed rates starting with several assumptions. First, the prevailing rates have to be considered with reference to the Eastern District of New York, not the Southern District of New York or some other district, see Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009), notwithstanding my previously expressed concern that the permeability of the border between the districts makes this distinction unrealistic. See Gutman v. Klein, No. 03-cv-1570, 2009 WL 3296072, at *2 n.1 (E.D.N.Y. Oct. 13, 2009), aff'd, 515 F. App'x 8 (2d Cir. 2013) (Cogan, J. discussing Simmons). Second, there are different rates applicable to different kinds of cases because the demand for lawyers is different, the volume of lawyers bringing those cases is different, the size of overhead costs of the firms bringing those cases is different, and the expertise needed for different kinds of cases is different. See Rubin v. HSBC Bank USA, NA, ___ F. Supp. 4th ___, 2025 WL 248253, at *3 (E.D.N.Y. Jan. 21, 2025).

Beyond these considerations, I am guided by the Second Circuit's decision in Lilly v. City of New York, 934 F.3d 222 (2d Cir. 2019), which reaffirmed the test from its prior decision in Arbor Hill Concerned Citizens Neighborhood Association v. City of Albany, 522 F.3d 182 (2d Cir. 2008). Arbor Hill, in turn, approved the twelve factor test from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). Although the Supreme Court had some criticism of Johnson in Perdue v. Kenny A., 559 U.S. 542 (2010), observing that it "gave very little actual guidance to district courts [and that s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results," id. at 550-51 (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563 (1986)), the Second Circuit's decision in Lilly still relies on the Johnson factors in determining the lodestar rate, and so I will as well. Nevertheless, the fundamental

3

question that Perdue and all of the attorneys' fee cases raise is "the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," 559 U.S. at 551. See also Lilly, 934 F.3d at 232, 234; Arbor Hill, 522 F.3d at 190.

My colleague Judge Block's recent decision in Rubin, an FCRA case, stressed the importance of avoiding slavish adherence to historical market rates as defined by decades-old case law. He recognized that markets are dynamic and reliance on historical rates does not account for inflation. After an extensive and well-documented discussion of the impact of inflation on the cost of living, he found that the reasonable hourly rates in this district are now $450 to $650 for partners, $300 to $450 for senior associates, $150 to $300 for junior associates, and $100 to $150 for paralegals, which are more than one-third higher than many of my other colleagues, relying on authority going back to 2012 and earlier, still regularly apply. See Rubin 2025 WL 248253, at *6. Judge Block reduced the claimed rates in the case before him of $760 to $1,185/hour for partner time and other lower-charging timekeepers to fall within those ranges. Id. at *7.

I agree with Judge Block as to the reasonable hourly rates that should prevail in this district overall. I would fine-tune it for this case, however, because although Judge Block acknowledged that different areas of law may generate a different supply and demand curve for legal services, his case did not present the need to work that potential difference into his inflation-adjusted calculation of the reasonable hourly rate. Judge Block noted that FCRA cases might command a higher rate than, for example, FDCPA cases, reasoning that the former are sometimes more complex, id. at *3, but he did not have occasion to consider if he would have applied an upwards adjustment in a more complex case.

4

That is an issue I cannot avoid confronting in the instant case because the "market" for TVPA cases is so limited. There are dozens of lawyers in this district whose practice is largely or exclusively focused on, for example, FCRA cases, or FDCPA cases, or Title VII cases, and rarely do their practices overlap. But there are no "TVPA lawyers." Defendant cites only two TVPA cases for its argument that plaintiffs' claimed rates are much too high, one of which is itself a Southern District of New York case. See Paguirigan, 2022 WL 6564755; Hemant Patel, M.D., P.C. v. Bandikatla, 18-cv-10227, 2024 WL 1509238, at *11 (S.D.N.Y. April 5, 2024). Both are readily distinguishable – Paguirigan was the settlement of a class action with no objection to the claimed hourly rates, and Hemant Patel was an action by a physician for her employer's attempt to hold her to an employment contract, resulting in a $45,000 TVPA verdict, where the physician's retainer agreement with some of her lawyers had a fee cap. Neither one of those cases considered the impact of inflation or case-type in fixing the reasonable rate.

There are not many more than that, and it hardly presents an abundance of authority from which to fix a "reasonable rate" for TVPA cases in this district. A few cases here or there are of little value in establishing a reasonable rate for a rarely invoked statutory claim like the TVPA. It is certainly not like FLSA or FDCPA cases, where the Court can draw from its experience in hundreds if not thousands of cases.

Of course, the absence of a market for TVPA cases cuts against Perdue's rationale that one need only consult fees charged in similar cases to determine the lodestar rate and thus the Johnson factors are not all that helpful. Nevertheless, Perdue's primary directive is to determine "a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious" TVPA case, 559 U.S. at 552, on the presumption that such a determination will

5

subsume most or all of the twelve Johnson factors. Once that is done, Perdue made it clear that rarely should that lodestar fee be enhanced. Id.

One way to try to expand the sample would be to brand cases brought under the TVPA as "complex" statutory or common-law tort cases and use other "complex" cases as comparators. But if we broaden the sample, it becomes highly arbitrary because, again, there are largely separate plaintiffs' bars that bring all different kinds of complex cases that require different skill sets and investments of time and resources.

There are two more accurate ways to assess the reasonable hourly rate in a case like this, and both tie into the analyses approved in Perdue and Lilly. First, we need to focus on what plaintiffs' attorneys charge their paying clients. Despite protestations from defendant, plaintiffs have established to my satisfaction that the rates they claim are typical of those that they charge paying clients. Second, the question is whether the reasonable hourly rates that Judge Block has established and I have accepted should be enhanced because of extraordinary circumstances. In answering this second question, I have to exercise great caution, because the Supreme Court and the Second Circuit could not have been clearer that any such enhancement should be a rarity. See Perdue, 559 U.S. at 552, 553-54; Lilly, 934 F.3d at 231. The danger is that "rate creep," although purportedly only occurring on a case-by-case basis, will present the opposite problem to rate stagnation that Judge Block identified in Rubin. Nevertheless, my inquiry ties back to the overarching question of what a lawyer would reasonably charge a paying client to take on a matter of this nature.

Perdue's criticism of the Johnson factors was based on the presumption that the "going rate" for a particular kind of case (there, a civil rights case), was fairly easy to ascertain. See Perdue, 559 U.S. at 550-52. When it is not, however, the applicable Johnson factors become

6

more useful. That is the case here. And when I consider those factors in this case, they point to this being one of the rare cases requiring a rate in excess of the usual rate commanded for litigation brought in this district.

The first Johnson factor is the time and labor required. The time commitment here was enormous. This case falls in the top echelon of the most intensively litigated civil cases that I have handled. Although I do not consider either side to be more at fault for that than the other, the fact is that both sides pushed their positions to the outside of whatever envelope the issues presented. That was because both sides' lawyers were creative and aggressive, but it resulted in an extensive time commitment from everyone involved (and the Court), both pretrial and at trial.

The second Johnson factor is the novelty and difficulty of the questions. Defendant argues that this was "obviously not a complex commercial case involving securities law, antitrust issues, or business torts," and if the word "obviously" qualifies only the words "commercial," the three areas of law listed, and the word "business" before "torts," then the statement is true. But the statement is just as "obviously" too narrowly focused. A case does not have fall under securities law, antitrust law, or "business torts" to present complex questions. This case was not only complex because it presented untested legal and factual issues under the TVPA, but because there were so many other pretrial issues that required the exercise of great skill in briefing and arguing that it could in no way be characterized as routine. Including the decision denying defendant's motion for judgment as a matter of law or a new trial (a mammoth undertaking by itself), the Court published sixteen decisions in this case, applying the standard for publication laid down by the Administrative Office of the Courts.[1] In short, defendant simply cannot tell me

---

[1] Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, § 205(a)(5), this Court must publish online all "written opinions," defined as "any document issued by a judge or judges of the court, sitting in that capacity, that sets forth a reasoned explanation for a court's decision." Memorandum from the Administrative Office of the

7

that this case did not present highly complex questions.  If there is a line between this case and the "average" securities fraud case in terms of complexity, it is too hard for me to find.

The third <u>Johnson</u> factor is the level of skill required.  Defendant's criticism is that the lead partner did not attend plaintiffs' depositions nor prepare his clients for them.  This is thin gruel for a case of this magnitude, and defendant's silence as to the extensive input that plaintiffs' lead counsel had in virtually every other aspect of the case, including the trial, and result obtained at the trial, renders the criticism immaterial. Indeed, the logical inference from defendant's argument is that plaintiffs' counsel should have devoted more resources to the depositions and charged even more.

<u>Johnson</u> also suggests consideration of reputation and experience in the area, and defendant's criticism is, first, that plaintiffs' counsel has never litigated any TVPA cases.  But who has?  Plaintiffs' lead counsel has experience handling sex crime matters as a prosecutor and sexual harassment civil cases against well-known public figures; substantial experience in handling sexual abuse victims, for reasons I discuss below, had to be a key skill in prosecuting this case.  I'd like to see defendant come up with someone who would be better qualified to handle this case based on experience alone and be willing to take it on.

Defendant's more material criticism is that the reputation of plaintiffs' lead counsel is stained.  There is something to that.  I was compelled to sanction him twice in this case, once for bringing a frivolous discovery dispute, and once for having included a frivolous RICO claim against a tangential party.  Defendant points to three other cases criticizing or sanctioning plaintiffs' lead counsel for either bringing frivolous claims, engaging in unethical conduct

---

United States Courts to all Chief Judges, U.S. Courts re: Compliance with Website Requirements of the E-Government Act (INFORMATION) at 2 (Nov. 10, 2004).

8

towards a client, or performing legal work of insufficient quality. I must consider all of that conduct under Johnson in determining the reasonable hourly rate.

Finally (as material here), Johnson counsels courts to consider the stakes involved and the actual recovery. Defendant points out that the verdict had to be well below plaintiffs' expectations based on his litigation funding arrangement with a third-party provider, and I suppose that has some relevance, but nearly $4 million seems to me a lot for plaintiffs who put themselves into the vulnerable position that these plaintiffs did. If plaintiffs' counsel overestimated the recovery, it was likely on the punitive damages side, the recovery for which was relatively modest and could have been much higher, but that was always going to be a risk and plaintiffs' counsel decided to take it. I will also consider the fact that although there is no legal prohibition against an award of attorneys' fees exceeding the amount of the plaintiffs' recovery, there comes a point at which an award can be so disproportionate to the recovery that a reasonable client would not want to pay it. See Solnin v. Sun Life & Health Ins. Co., 776 F. App'x 731, 732-33 (2d Cir. 2019) (summary order). Of course, it is also true that a reasonable client may be neutral or all in favor of her attorney getting a fee in excess of her recovery if she is satisfied with her own recovery, and attorneys' fees may not "be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." Fisher v. SD Prot. Inc., 948 F.3d 593, 602 (2d Cir. 2020) (quoting Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005)); see also Millea v. Metro-N. R. Co., 658 F.3d 154, 169 (2d Cir. 2011) ("The whole purpose of fee-shifting statutes is to generate attorneys' fees that are *disproportionate* to the plaintiff's recovery." (emphasis in original)).

Having considered the relevant Johnson factors, I circle back to the overarching question of what it would take to induce a reasonable, qualified lawyer to take on this case. Quite a bit, I

9

think. It was not a case for the faint-hearted. There were substantial factual, legal, and practical obstacles that would have reduced the desirability of this case for any timid or risk-averse plaintiff's lawyer. For one thing, each plaintiff signed a contract to come to New York and be paid thousands of dollars in exchange for sex. And not just sex, but contractually designated "sadomasochistic (SM) activity" which the contract stated, "can be hazardous and on occasion cause injury to my person." The contracts that each plaintiff signed included a non-disclosure provision and a general release for any injuries sustained in the encounter. Additionally, some of the plaintiffs, despite the brutality of their initial encounter, returned for at least one subsequent encounter, although they contended that the brutality increased in the subsequent encounter. Moreover, even if a jury found in plaintiffs' favor, these same difficulties could well (and may well have) reduced the jury's determination of the appropriate amount of damages. Thus, there was always a substantial risk that a jury (or even one juror) would simply throw up their hands in disgust at what plaintiffs agreed defendant could do to them, not even reaching the issue of whether he went beyond their agreement, and find *in pari delicto*, or a pox on both your houses, and award no or nominal damages.

Based on these facts, the legal issue on how to construe consent under the TVPA also became one of first impression and thus high risk. Plaintiffs had to walk a fine line – they voluntarily came to New York to engage in sadomasochistic activity, but had to show that the abuse to which they consented in writing or on location was less than the involuntary acts proscribed by the TVPA. They also had to show that a reasonable person in defendant's position would have known that the abuse to which he subjected them was more than that to which they had consented. I ultimately ruled that it was a jury question as to whether it could perceive any

10

distinction, but when plaintiffs' counsel accepted this case, it presented another issue of high risk.

Finally, it became apparent during the case that just accepting these particular plaintiffs as clients for litigation that promised and proved to be protracted presented a high risk. As I noted in my decision denying the motion for judgment as a matter of law or a new trial, these were broken, desperate, and emotionally unstable women who had lived under difficult circumstances which made them particularly vulnerable to being abused by defendant. One withdrew her claims pretrial, and post-judgment, three plaintiffs have discharged their counsel. It is not speculative to conclude that there were continuous client management issues in this case, and it took considerable time, effort, and personal skill to keep the clients on track and not just giving up the case mid-way. This would be another deterrent for many lawyers to have accepted this case.

The problem plaintiffs' attorneys have is that there is no case in this district that has ever approved rates in the range they are seeking. At least they have not cited any and I have found none. Aside from defending their rates as their customary charges, they mostly rely on the fact that defendant's attorneys' rates must have been at least that much or more. That seems a fairly safe assumption – this case had as many defense resources from large firms thrown at it as any case I have ever seen – but the rates that the defense bar is able to command from its client do not seem to me to have much bearing on the rates necessary to induce a plaintiff's lawyer to take on a case like this.

Bearing in mind the most relevant Johnson factors, the usual hourly rates in this district, and the rates typically charged by plaintiffs' law firm, I am reducing the claimed rates pursuant to the following chart but enhancing them substantially beyond the reasonable rates found by

11

Judge Block.  It will be noted that although I have considered the qualifications of each professional, I am not proceeding timekeeper-by-timekeeper, but rather experience level by experience level, as I think adjustments by individual timekeeper in this situation would be more arbitrary and unnecessarily cumbersome:

| POSITION | CLAIMED RATE | ALLOWED RATE |
|---|---|---|
| PARTNERS (5) | $1089-$1670 | $1000 |
| OF COUNSEL (1) | $860 | $800 |
| SENIOR ATTORNEY (1) | $715 | $500 |
| MID-LEVEL ATTORNEY (7) | $650 | $400 |
| CHIEF OF STAFF (1) | $590 | $0 |
| JUNIOR ATTORNEYS (2) | $417-$450 | $350 |
| OPERATIONS MANAGER (1) | $410 | $0 |
| LEGAL APPRENTICES (4) | $385 | $225 |
| NON-ATTORNEY ANALYSTS (14) | $385 | $150 |

## II. Number of Hours

Defendant disputes the 12,006.9 hours of time for which plaintiffs seek to recover on a variety of grounds.  The net result of his argument is a request that the amount of time be reduced across the board by 40%.  I agree some reduction is appropriate, but not nearly as large as he suggests.

First, defendant notes that although there were thirty-six timekeepers who recorded time during the seven years this matter lasted, plaintiffs should recover fees only for the "core team" of four timekeepers who worked on the case.  It is an insubstantial argument.  As I have noted, the manner in which a large defense firm litigated this case is not directly relevant to how plaintiffs' lawyers should have litigated, but it takes no guesswork that defendant had a number greatly in excess of the number plaintiffs used – defendant does not dispute that he had thirteen timekeepers defending his deposition, for example.  Over a seven-year period with a seven-day trial and extensive motion practice, I find nothing unreasonable about the number of timekeepers who worked for plaintiffs.

Second, defendant complains about "block billing," which is strongly discouraged in the case law because it makes it hard for courts (and defendants) to determine whether time expended on particular tasks was reasonable. See Hines v. City of Albany, 613 F. App'x 52, 55 (2d Cir. 2015). Clearly, any plaintiff's lawyer bringing a case under a fee-shifting statute or contract must be acutely aware of this rule, and my painful review of the time entries here shows quite a lot of block billing.

But defendant's main issue is not that he can't tell how much time a particular timekeeper spent on a particular task. It is that the block billing entries (and some that are not block billing) disclose tasks which defendant believes are not compensable. On some of these I agree with defendant, and some of them I don't:

- **Communications with Counsel's Litigation Funder**. I agree that this is not compensable. How a lawyer finances his practice is irrelevant to a client, whether it is a bank loan, family loan, personal assets, or a litigation funder. That is not time for which defendant should pay; it is overhead.

- **Separate Litigation in Queens County**. Apparently, unbeknownst to this Court until the instant fee application, plaintiffs filed a separate case in state court. Plaintiffs' counsel has not explained to me what this was about.

- **Dismissed Claims, Dismissed Plaintiff, and Dismissed Defendants**. I agree with plaintiffs that although a number of claims and parties were dismissed in pre-trial motion practice, and in one instance a plaintiff who had withdrawn considered re-entering the case, all of these claims and events were so intertwined (except, as noted above, as to the one RICO claim against one defendant for which counsel was sanctioned), that it would be unreasonable to

13

expect counsel to parse them out.  See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir. 1996).  This entanglement is illustrated in part by the fact that defendant paid for his co-defendants' attorneys' fees.  At the very least, the litigation over the dismissed defendants was useful to the Court and the jury in understanding how defendant operated his trafficking scheme with their assistance.

It should be noted that my review of these entries suggests that the time spent on the matters about which defendant complains is not an enormous part of the 12,006.9 hours.  Plaintiffs' counsel estimates, for example, that the successful motions to dismiss defendant's three collaborators cost about $63,000, a small portion of the over $8 million in fees that he is seeking.  The problem with this, of course, is that with block billing, one cannot know for certain.

Considering defendant's objections, I will apply an overall reduction of the time charges claimed of 15%.  Using the hourly rates allowed in the preceding section, this calculates to attorneys' fees of $4,815,033.25.

### III. Costs and Expenses

The $2,035.38610 in costs, including out-of-pocket expenses, that plaintiffs seek to recover has little basis in law.  The bulk of this amount is $1,839,424.00 for the repayment of principal and interest on litigation funding costs from a third-party funder.  I am not allowing that for the same reason I am not allowing time charges for plaintiffs' counsel's negotiations with the funder – how counsel finances his practice is not something for which defendant should have to pay.  The fact that the primary authority that plaintiffs cite for a contrary result is a decision from the High Court of England and Wales, Essar Oilfield Services Limited v. Norscot Rig Management Pvt. Ltd. [2016] EWHC (Comm) 2361, in which the court confirmed an

14

arbitration award allowing the recovery of such expenses, merely confirms how divorced plaintiffs' request is from the law of the United States.

I also reject plaintiffs' theory that "public policy" counsels in favor of this recovery. First, we have a statute and a Local Rule on this and neither of them even hint at the recovery of litigation funding costs. I am not going to insert my own view of what public policy should be. Second, every fee-shifting statute that Congress passes is obviously intended to promote some public policy, and nothing suggests that financing costs for litigation are included in the costs allowable under the statute.

As to the remaining amount of approximately $200,000 in claimed costs and expenses, little is recoverable. Defendant has specifically objected to most of the items and plaintiffs' reply has not specifically defended any of them, choosing instead to focus solely on the litigation funding issue. By not responding to the objections, which are well based in any event,[2] plaintiffs have waived their argument that they are entitled to recover them.

Defendant concedes that plaintiffs are entitled to recover costs of $15,114.90, and those shall be allowed.

---

[2] Plaintiffs have not submitted any supporting documentation such as invoices or receipts for their requested costs, see Chauca v. Park Mgmt. Sys., LLC, No. 10-cv-5304, 2016 WL 8117953, at *6 (E.D.N.Y. July 18, 2016), many of plaintiffs' requested costs are not taxable pursuant to 28 U.S.C. § 1920 or Local Civil Rule 54.1, and many of plaintiffs' requests for costs are so vague as to render their nature unidentifiable by this Court, see Torcivia v. Suffolk Cnty., 437 F. Supp. 3d 239, 258 (E.D.N.Y. 2020).

## CONCLUSION

Plaintiffs' motion for attorneys' fees and costs is granted to the extent of $4,815,033.25 in attorneys' fees and $15,114.90 in costs and expenses.  An amended judgment shall issue that includes those amounts.

**SO ORDERED.**

*Brian M. Cogan*
U.S.D.J.

Dated: Brooklyn, New York
February 14, 2025