24-2018-cv
*Moore et al. v. Rubin*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2024

(Argued: April 8, 2025    Decided: November 21, 2025)

Docket No. 24-2018-cv

---

AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER,
BRITTANY HASSEN, BRITTANY REYES,

*Plaintiffs-Appellees,*

*- against -*

HOWARD RUBIN,

*Defendant-Appellant.*[*]

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

Before:

WALKER, CHIN, and PARK, *Circuit Judges.*

---

[*]    The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Cogan, *J.*), following a jury trial, holding defendant-appellant liable for sex trafficking under the Trafficking Victims Protection Act and awarding six women compensatory and punitive damages totaling $3,850,000.  Defendant-appellant appeals on several grounds, including the sufficiency of the evidence, purported errors in the district court's jury instructions, and the availability of punitive damages under the statute.

AFFIRMED.

---

> BRIAN J. ISAAC, Pollack, Pollack, Isaac & DeCicco, LLP, New York, NY, *for Plaintiffs-Appellees Amy Moore and Emma Hopper*.
>
> MATTHEW W. SCHMIDT, Schmidt Law Corporation, Tiburon, CA, *for Plaintiff-Appellee Mia Lytell*.
>
> EDWARD A. MCDONALD (Benjamin E. Rosenberg and May Chiang, *on the brief*), Dechert LLP, New York, NY, *for Defendant-Appellant*.

---

CHIN, *Circuit Judge*:

In this case, defendant-appellant Howard Rubin, a successful bond trader, recruited women from around the country to travel to New York and

- 2 -

engage in sadomasochism with him in exchange for money.  Rubin employed

assistants, whom he paid up to $15,000 per month, to lure women with promises

of cash, fancy dinners, and first-class airline tickets to travel to his New York

penthouse for sexual activity.  Although some of the women knew that they

might have rough sex, including getting spanked or slapped during the

encounters, they were not aware that Rubin would -- against their will -- beat

them, gag them, verbally degrade them, insert objects inside them, assault them

in public, and shock them with electrical instruments.

Together, six plaintiffs[1] brought a civil action against Rubin and his

agents, asserting claims under the Trafficking Victims Protection Act (the

"TVPA") and state tort claims for assault, battery, false imprisonment, and

intentional infliction of emotional distress.  A jury found Rubin liable under the

TVPA and awarded $500,000 in compensatory damages to each plaintiff.  The

jury also awarded $120,000 in punitive damages to five of the plaintiffs and

$250,000 to one of them.  Rubin appeals, arguing that there was insufficient

evidence to support plaintiffs' claims under the TVPA, the court delivered

erroneous jury instructions, and the TVPA does not authorize punitive damages.

---

[1]      Only three of the six women filed briefs in response to Rubin's appellate brief.

- 3 -

For the reasons set forth below, the judgment of the district court is

AFFIRMED.

## *BACKGROUND*

### I.    *The Facts*[2]

#### A.    *The Parties*

##### 1.    **Howard Rubin**

Rubin is a Harvard-educated bond trader with an extensive and

lucrative career on Wall Street, including most recently at the Soros Fund

Management in Manhattan.  At the time of trial, he was sixty-six years old with a

net worth estimated to be upwards of $50 million.  He was married and a father

of three children, although he was in the process of getting divorced.  He

testified that he "personally derive[d] sexual pleasure from inflicting -- you

know, getting off, [from] inflicting physical pain and verbal abuse" upon women.

*Id.* at 1584.

---

[2]    On appeal following a jury verdict, we construe the evidence and draw all reasonable inferences in favor of the prevailing party -- here, plaintiffs.  *See Arlio v. Lively*, 474 F.3d 46, 48 (2d Cir. 2007); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998).

- 4 -

### 2.    Plaintiffs

Six women -- plaintiffs Natasha Tagai, Brittany Reyes, Amy Moore, Mia Lytell, Emma Hopper, and Brittany Hassen -- filed this action against Rubin.

Tagai met Rubin in 2009, when she was twenty-six years old.[3]  She engaged in encounters with him for approximately eight years.  She was a nightclub server and former model for Playboy and had attended one year of college and a few months of cosmetology school.

Reyes met Rubin in 2016, after being introduced to him by a close friend.  She met Rubin for a single encounter and never returned to visit him.  She was an emergency medical technician who flew to New York from Las Vegas, Nevada to meet Rubin and was living in Miami, Florida when the case was filed.  She did not graduate high school.

Moore met Rubin in 2016 after one of Rubin's agents recruited her.  Moore flew out to meet Rubin once more following their initial encounter.  She grew up in the foster care system and attained an eleventh-grade education before dropping out of high school and becoming a Playboy model.

---

[3]    Although the record is unclear as to exactly when Tagai's son was born, she became a young, single mother around the same time she met Rubin.

Lytell met Rubin for the first time in 2016 during a visit with Moore. Following their first encounter, Rubin paid Lytell to recruit her friends to engage in sexual encounters with him.  At the time, she was in a poor financial situation and dependent on Xanax and Percocet.  She visited Rubin two additional times following their initial encounter.

Hopper, an esthetician in Atlanta, Georgia, was twenty-two years old and employed at a strip club when she met Rubin in 2015.  She had been sexually abused as a child.

Hassen was a twenty-one-year-old model when she met Rubin in 2011.  When they met for the first time, Rubin encouraged one of his assistants to give her oxycodone.  Hassen developed an addiction to the drug and became financially dependent upon Rubin.  She engaged in numerous encounters with Rubin after 2011 but stopped after he brutalized her in an incident in 2014.

### B.      *Rubin's Network, Penthouse, and Contracts*

In or around the mid-2000s, Rubin developed an interest in sadomasochistic sex.[4]  He soon found and solicited women online to engage in

---

[4]      Sadomasochism is defined as "the derivation of sexual gratification from the

BDSM in exchange for money. Rubin eventually became acquainted with a "madam[e]" who found partners willing to engage in BDSM with him. Supp. App'x at 1585. Rubin rented hotel rooms across New York City and "br[ought] a duffle bag full of sex toys" for his various BDSM encounters. *Id.* at 1595.

In early 2007, Rubin met Jennifer Powers at a nightclub, and the two entered into a romantic relationship. Throughout their relationship, Rubin and Powers engaged in BDSM. Rubin and Powers eventually ended their two-and-a-half-year affair, and Rubin continued engaging in BDSM with other women. To keep up with his "secondary life," that is, a life separate from his family life, Rubin hired Powers to be his personal assistant to coordinate the logistics of meeting women for his BDSM encounters. *Id.* at 1597-98. Powers agreed.

In 2011, Rubin rented a penthouse apartment to use as a base for his BDSM encounters. Rubin covered the walls of his penthouse living room with

---

infliction of physical pain or humiliation either on another person or on oneself." *Sadomasochism*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ sadomasochism [https://perma.cc/57LY-V8WM] (last visited Sep. 21, 2025). Throughout this opinion, we interchangeably refer to Rubin's encounters as either sadomasochistic sex or "BDSM," as the parties did below. *See, e.g.*, Supp. App'x at 1582. BDSM refers to "a combination of the abbreviations of bondage and discipline (BD) and dominance and submission (DS) along with sadism and masochism (SM)" but covers a wide range of sexual activity. *See generally* Anouk Schori, Christian Jackowski & Corinna A. Schön, *How Safe Is BDSM? A Literature Review on Fatal Outcome in BDSM Play*, 136 Int'l J. Legal Med. 287, 287 (2022).

photos of different models.  He converted one of the bedrooms into a "sex dungeon," *id.* at 1597, borne out of his fixation with the movie *Fifty Shades of Grey*.[5]  Some of the plaintiffs referred to the dungeon as the "red room" because Rubin painted the walls of the room red.  Supp. App'x at 122.  Rubin adorned the walls of his dungeon with whips, chains, ropes, dildos, and sexual devices, including a large X-shaped machine to which he tied women by their wrists and ankles and a restraint device to which a woman could be affixed on all fours.  As detailed further below, Rubin subjected all the plaintiffs to the various torture devices residing in the dungeon.

---

[5]  "The novel, selling more than 100 million copies, and the film, earning more than $500 million since its release, have spread recognition and attention towards BDSM behavior.  *Fifty Shades of Grey* featured a recent college grad, Anastasia Steele, who engaged in a BDSM relationship with [the] older CEO of Grey Enterprises Holdings, Inc., Christian Grey.  Christian, experienced with BDSM, attempted to negotiate a contract with Anastasia, who was inexperienced with BDSM."  Andrea E. White, Note, *The Nature of Taboo Contracts: A Legal Analysis of BDSM Contracts and Specific Performance*, 84 U.M.K.C. L. Rev. 1163, 1167 (2016).  The movie has been criticized as romanticizing intimate partner violence and abuse and control over women.  *See* Megan K. Maas & Amy E. Bonomi, *Love Hurts?: Identifying Abuse in the Virgin-Beast Trope of Popular Romantic Fiction,* 36 J. Fam. Violence 511, 513-18 (2021) (describing how *Fifty Shades of Grey* depicts a man exhibiting control over women that is disguised by wealth or social status, stalking that is romanticized as wanting to protect women, threatened and/or physical violence that is romanticized as uncontainable emotion, manipulation disguised by grand gestures, a woman's loss of identity romanticized as sacrifice, and harm disguised as love conquering obstacles).

Over the years, Rubin escalated the frequency of his encounters, the depravity of the BDSM acts, and his care in hiding his tracks. Rubin created a separate bank account, of which his wife was unaware, to pay for his encounters and Powers's salary. Rubin tasked Powers with handling the maintenance of the penthouse, contacting women for the BDSM encounters, booking flights for them, making dinner reservations, and coordinating payments. She often met women before their encounters to provide a pretense of safety and placated women after their encounters with Rubin. Rubin paid Powers $15,000 per month, and she referred to him as "the boss man." *Id.* at 1705.

In 2014, Rubin, drawing more inspiration from *Fifty Shades of Grey*, began prompting women to sign non-disclosure/consent agreements ("NDAs"), which he apparently drafted with the aid of a lawyer. The NDAs stated: "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person." App'x at 722. The contracts provided that "[t]he activity in question may be undertaken on this date, dates prior to this date and on dates in the future." *Id.* It also provided that "I agree that damages sustained by any breach of this Agreement would be

- 9 -

impractical or extremely difficult to determine.  Therefore, I agree that in the event that I disclose Confidential Information covered by this Agreement, I . . . will pay Rubin an additional **Five-Hundred Thousand (500,000.00)** as a <u>penalty</u>."  *Id.*

Despite the contract stating, "I am not under the influence of drugs or alcohol," Rubin (or Powers) often gave women the NDAs after they had consumed multiple alcoholic beverages and had them sign the agreements without lawyers or a chance to review the agreements separately from the BDSM encounter.  *Id.*  None of the plaintiffs was given a copy of the NDA, but each believed that speaking out about any of their encounters with Rubin would result in hefty fines and legal action.

By the time Rubin began pushing the women to sign the NDAs, his encounters had become increasingly violent.  He often beat women so severely that they sustained bruises for weeks, and some required hospitalization.  When a few of his long-time escorts used safe words,[6] screamed, or cried during their encounters, he became enraged and grew more violent.  On at least two

---

[6]     "[A] word previously agreed upon for use as a signal during sex, especially sex involving bondage, dominance, or sadism, to let one's partner know that they should stop what they are doing."  *Safe word*, Dictionary.com, https://www.dictionary.com/browse/safe%20word [https://perma.cc/RA76-FTXF] (last visited Sept. 21, 2025).

- 10 -

occasions, he continued assaulting women for an hour after they had begged him to stop. Most of the plaintiffs testified that although they had consented to their initial encounters, Rubin's later actions severely exceeded what they had agreed to. All plaintiffs testified that they had grown afraid of Rubin's power and influence.

C.       *The Sexual Exploitation of Plaintiffs*

1.       **Natasha Tagai**

In 2009, Tagai was contacted through a modeling platform by a woman who told her she had a client looking for Playboy models to accompany him at dinners. Tagai was told that the man lived in New York and would pay for her to visit him. Tagai reported that she felt comfortable entertaining a visit because a woman had reached out to her. Rubin eventually flew Tagai out to meet him, and she described their initial encounter as "really nice." Supp. App'x at 113. She engaged in consensual prostitution with Rubin six to eight times at various hotels and locations around New York. Although they engaged in some BDSM sex, all their encounters were consensual. Indeed, they discussed safe words casually, but Rubin never assigned her one.

On January 21, 2015, Powers organized a photo shoot with twelve women to make a calendar for Rubin's birthday. Before the shoot, Powers presented Tagai with an NDA to sign. This was the first time Tagai met Powers in person. Tagai did not have much time to read the contract, was not able to consult a lawyer, and did not receive a copy of what she signed. Tagai thought the contract was a symptom of Rubin's proclivity for *Fifty Shades of Grey* because a similar contract was portrayed in the movie. After Tagai signed the NDA, her encounters with Rubin changed, and it was the incidents in and after 2015 that led to her filing a lawsuit against him.

The first such incident occurred in Rubin's penthouse on October 1, 2015. Tagai met Rubin in the lobby of a hotel across the street from his penthouse, where he was having drinks with an older gentleman and two women. After a couple of hours, the five returned to Rubin's condo and played a few rounds of pool. Eventually, the three guests left, and Rubin and Tagai continued playing. Tagai was sitting on the pool table when suddenly Rubin shoved a pool cue into her vagina with little warning. Tagai asked him to stop, and Rubin did not; instead, he became upset and grabbed ropes from the dungeon. He proceeded to tie her up with ropes, drag her by her feet to the red

- 12 -

room, place a ball gag in her mouth, and slice her breasts with a pizza cutter-shaped knife.  Tagai was scared.  He then penetrated her with a glass dildo, cuffed her to his X-shaped cross device, whipped her, punched her in the face and stomach, and called her a "stupid girl." *Id.* at 149.  She was too afraid of upsetting him to cry.

The hitting and punching lasted about forty-five minutes, but after Rubin hit Tagai in the face, she squirmed on the cross to attempt to indicate for him to stop.  Rubin became upset that she was moving, untied her, and stormed out of the apartment.  Rubin texted her later that evening that she was "a cunt, [who] wasted his time" and that he "could have been with anybody else." *Id.* at 151.

After the incident, Tagai texted Powers what had transpired because it was the first time Rubin had seriously harmed her.  Powers downplayed what had occurred and stated that Rubin must have been drunk or dealing with other issues.  Tagai reported that she experienced bruising on her breasts, bleeding, and a sore vagina "from being whipped over and over again." *Id.* at 154.

Tagai testified that although it "seems crazy" that she returned to visit Rubin after that encounter, she agreed to visit him again because she cared

for him and thought "he would go back to how he acted prior." *Id.* at 155. Tagai also knew Rubin was a "very powerful, wealthy person" and was afraid of what reporting her last encounter could lead to. *Id.* at 152. Indeed, she described her next two encounters with Rubin as pleasant.

Then, in May of 2016, Tagai visited Rubin again. Tagai waited at his penthouse for him to arrive, and when he did, he seemed to be in a "nice" and "happy" mood. *Id.* at 157. After the two shared a bottle of wine, Rubin pushed her to enter the dungeon, which she was afraid to enter after the prior incident. Nevertheless, she agreed, and Rubin tied her to the X cross and placed a ball gag in her mouth. When she could no longer speak, Rubin put clothes pins on her breasts and took a photo of her tied up. Tagai stated that she began "zoning in and out" and was trying to squirm to escape. *Id.* at 158. Rubin then tied her to the X-cross machine and whipped her repeatedly. Tagai next remembered waking up on the bathroom floor. Tagai surveyed the dungeon when she woke up alone and was sickened by the state of it and what it indicated of a night she could not remember. Tagai documented her injuries with a photo; she had not consented to any of the things he did to her after she was gagged.

- 14 -

Following this incident, Tagai did not visit Rubin for nearly a year. Eventually, however, she did visit him again in March 2017, because she "felt like [she] needed him to not be mad at [her]" and "wanted the times that [they] used to share." *Id.* at 164. That visit was pleasant.

Tagai's following visit on June 13, 2017, gave rise to her next nonconsensual encounter. Tagai voluntarily entered the dungeon and agreed to Rubin's tying her up and placing a ball gag in her mouth. Once the gag was in Tagai's mouth, however, Rubin brought out an electric device that he used to penetrate and send electrical shocks into her. Tagai was gagged and restrained, and she did not consent to his use of the device. Rubin, however, merely tied her up to the X-cross and whipped her. He called her a "slut" and "a stupid girl" and then slapped her in the face. *Id.* at 177. He eventually untied her and stormed out. Tagai never visited Rubin again.

Tagai was diagnosed with PTSD, experienced trouble sleeping, and visited a therapist weekly because of her encounters with Rubin. She never reported Rubin to police because she was afraid that she would be liable for $500,000 for breaching the NDA.

- 15 -

## 2.    Brittany Reyes

In 2016, Reyes was contacted by a friend who told her that she knew a man who would pay her to meet with him and that he had a dungeon. Reyes agreed, and one of Rubin's assistants arranged her flight from Las Vegas to New York. When she arrived at Rubin's penthouse, her friend was there, and the two drank alcohol, smoked marijuana, and snorted cocaine provided by Rubin. Rubin arrived shortly thereafter, presented Reyes with an NDA, and instructed her that she would have to sign it or leave. Reyes signed the agreement without reading it because she had nowhere else to go. She understood the agreement to mean that she could not discuss what happened with others. After she signed the agreement, Rubin discussed safe words with her and then led her to the dungeon. Reyes stated that she entered the dungeon because she was misled into believing that she and her friend would engage only in light spanking with Rubin.

Once inside the dungeon, Rubin restrained Reyes's wrists behind her back, positioned her face down, inserted a ball gag into her mouth without asking, and placed a blindfold over her eyes. Rubin then hit her several times and sexually assaulted her with a dildo while she was gagged and unable to

- 16 -

speak.  Reyes attempted multiple times to speak and use the safe word but was unable to.  When Rubin removed the ball gag, Reyes used the safe word, but he ignored her and became angrier and more violent.  He raped her for five to ten additional minutes before stopping, and only after she spoke the safe word multiple times.  He then removed the restraints and let Reyes leave the red room but stayed inside with Reyes's friend.  While they remained in the dungeon, Reyes cried and tried to calm herself down.  Rubin eventually left the apartment, and Reyes stayed the night because she was intoxicated and had no other accommodation.  Reyes never engaged in another encounter with Rubin.

After the encounter, Reyes texted her friend that she "felt bad . . . [and] had bruises everywhere."  *Id.* at 369.  She was paid a few days later.  Reyes reported that she experienced PTSD, depression, trouble connecting with her children, and anxiety as a result of this encounter with Rubin.

### 3.     Amy Moore and Mia Lytell

#### a.     Moore and Lytell's First Encounter with Rubin

In 2016, when both Moore and Lytell were modeling as "Playmates" for *Playboy* magazine, they were contacted on Instagram by a woman who worked for Rubin.  The assistant messaged that she knew a "very nice" man who liked to take photos and videos of Playmates and pay to fly out models for "light

- 17 -

fetish play." *Id.* at 431-32, 437. Moore was receptive to the pitch but asked to speak with another reference first. The assistant then connected Moore and Lytell with Powers, and the four women coordinated Lytell and Moore's visit with Rubin. Moore understood that she would be paid to engage in some BDSM sexual encounters with Rubin, her flight and transportation would be taken care of, and she would be required sign an NDA. The assistant also connected Rubin with Moore, and the two exchanged messages briefly over WhatsApp.

Powers arranged for Moore's flight from Florida to New York and for a car to take her from the airport to Rubin's penthouse. Once Moore arrived, Powers greeted her with wine and handed her a contract to sign. Powers explained to Moore that the contract was an NDA, which Moore understood to provide that she was not permitted to "t[ell] anybody about [Rubin] because he was very high profile." *Id.* at 441. Moore did not read the NDA carefully before she signed it and was not given a copy. She neither read nor was aware of the clause that stated, "I have voluntarily agreed to engage in sexual activity with Rubin, including sadomasochistic activity, that can be hazardous and on occasion cause injury to my person." *Id.* at 442-43. Shortly thereafter, Lytell arrived, and Powers rushed Lytell to sign the NDA.

Case: 24-2018, 02/24/2026, DktEntry: 86.2, Page 19 of 61

Once the women signed the NDAs, they walked over to a nearby restaurant and bar to meet Rubin for the first time. The three shared several drinks and appetizers and then walked back to the penthouse.

Once back at the apartment, Rubin made more drinks and then instructed the women to adorn "fetish-style" lingerie, *i.e.*, black bodysuits with lace cutouts and leather features. *Id.* at 447-48. Both women were fairly intoxicated by this point. While in the living room, Rubin slapped Moore across the face. Moore grabbed her cheek and told Rubin not to hit her, but Rubin hit her again.

Rubin then led them into the dungeon and directed Lytell to lay on her stomach and Moore to sit on the floor next to Lytell. He tied Lytell's wrists behind her back, taped her mouth shut, and bound both her and Moore's ankles with rope. Rubin proceeded to climb on top of Lytell's buttocks as she lay on her stomach. He then said to Moore, "I'm the daddy. You are the mommy. This is the baby [referring to Lytell] and we need to beat our baby." *Id.* at 451. He yelled at Moore to hit Lytell, but Moore hit herself on the leg instead, and Rubin became angry and hit Moore. He also began punching Lytell in the back of her head. He

- 19 -

then said to Lytell, "I am going to rape you like [I] rape my daughter." *Id.* at 453-54; *see also id.* at 681.

Next, he flipped Moore over onto her stomach, bound her hands behind her back, slapped her in the face, and called her a "cunt whore." *Id.* at 454 Afterwards, he penetrated Lytell from behind with a large dildo for approximately ten minutes before discarding the object and penetrating her from behind, while continuing to punch her in the head. Once he was done with Lytell, he flipped Moore over again and punched her in her breasts so many times she lost count. Throughout the ordeal, both women were crying, and Lytell was screaming. Lytell was not moving when Rubin was done.

Once he finished, Rubin untied the women, retrieved cash from his safe, and threw $10,000 in cash on the floor in front of them. He then left the apartment entirely, and both women stayed until their arranged flights home the following morning. Both women testified that they had not consented to what transpired in the dungeon and that they were afraid of Rubin.

Rubin and Powers exchanged several texts with Moore and Lytell following their initial encounter. Both Moore and Lytell thanked Rubin and Powers for having them and stated that they had a good time and would like to

- 20 -

"do it again."  App'x at 810, 812; *see also id.* at 843-44.  Lytell also texted Powers that "last night was unreal crazy wild fun stuff," *id.* at 843, and left a note for Rubin stating, "You are absolutely insane sexy, hot, wild, & Fun," *id.* at 853. Moore testified that she was friendly over text because she wanted additional compensation for the injuries sustained from her encounter.  Lytell testified that she remained friendly because she was in a bad financial situation, was taking Xanax and Percocet, and was afraid to tell Rubin that she had been hurt.  Moore sustained lasting injuries to her breast, and Lytell sustained a broken or bruised rib that caused her trouble with breathing.

### b.    Moore's Subsequent Encounter

A few months later, Moore agreed to see Rubin again because she wanted additional money for her injuries sustained from the previous encounter. She flew to New York and met him at the Russian Tea Room, but he was on his phone during most of their encounter.  Once back at the penthouse, she brought up her injuries and additional compensation, but he stated that he did not remember her.

Rubin began playing a pornographic video and pulled her into the dungeon, which she did not want to go into at the time.  Rubin tied her to a cross, cuffed her wrists and ankles, and shoved a large dildo inside of her.  He

- 21 -

then put a ball gag in her mouth.  He proceeded to insert an electric device, described as a "cattle prod," into her vagina before inserting himself inside of her. Supp. App'x at 507.  She was upset.  When he finished, she brought up her injuries and compensation, and Rubin became extremely angry with her.  Moore left the apartment and never saw Rubin again.  She testified that after this encounter, she wanted to take her own life.

###### c.    Lytell's Later Encounters

Lytell continued to engage in explicit text messages with Rubin and recruited other women to meet up with him.  During this time, she was abusing Xanax and Percocet and experiencing financial trouble.  Rubin told her that if she sent photos of other women to meet him, he would give her a "finder's fee" of $2,000.  *Id.* at 683.  Lytell acquiesced and set him up with a friend.

Lytell and her friend were flown to New York where they met up with Rubin at a restaurant, but the three got into a verbal altercation at dinner that resulted in Rubin storming out.  The women returned to the penthouse, changed into comfortable clothes, and were packing up to leave when Rubin came inside, dragged Lytell's friend into the bedroom, pushed her on the bed, taped her mouth shut, and bound her hands, breasts, and ankles.  He then instructed Lytell to hit the woman, and Lytell obeyed, hitting her once on the

- 22 -

back.  He instructed Lytell to hit her friend again, but she refused, and Rubin

punched her in the face.  Rubin then cut her friend's jean shorts open and

penetrated her.  The tape in her mouth became loose, and she bit Rubin.

Enraged, he punched her in the face.  He then left the apartment altogether.  He

paid both women $5,000 a few days later.

In October 2016, Lytell returned to New York with another friend

but was sick and anxious on the plane.  When she arrived at the penthouse, she

asked Powers to call her an ambulance and was admitted to the hospital for a

few hours.  When they returned from the hospital, Lytell and her friend fell

asleep in Rubin's bedroom but woke up to screams coming from inside the

apartment.  They fell back asleep, and a few hours later, another friend came into

the bedroom and confronted Lytell, contending that Lytell had let her get raped

by Rubin.  This escalated into a physical altercation, and her friend called the

police.  Rubin was not present in the apartment.  Lytell called Powers, who

instructed her to hide all the drugs located in the apartment, to lie to the police

that it was her apartment, and not to mention Rubin at all.  Powers promised

Lytell that they would take care of her legal costs so long as she did not mention

- 23 -

her or Rubin's name.  Lytell did as she was told and was arrested.  After this incident transpired, she decided to file the lawsuit.

### 4.    Emma Hopper

Hopper learned about Rubin through a coworker.  Hopper was told that Rubin was a very wealthy man who wanted to have BDSM sexual relationships with young women and models.  Hopper eventually connected with Powers, who arranged for Hopper to meet Rubin.  As with Lytell and Moore, Powers arranged Hopper's flight, ordered her a car to his penthouse, and produced an NDA to sign.  Hopper skimmed the agreement and understood it to mean she could not tell anyone about Rubin.  She also did not receive a copy or have an opportunity to review the contract in depth before signing.

Hopper proceeded to engage in a few separate BDSM encounters with Rubin.  During one of their earlier meetings, while they dined at a restaurant before engaging in BDSM, Rubin had probed Hopper for details about sexual abuse she had suffered as a child.  During subsequent BDSM encounters, he reenacted the abuse and would ask for further details during their sexual encounters.  Each of these earlier encounters followed a similar pattern: She and Rubin dined together at a restaurant, shared drinks, went back to the penthouse,

and engaged in BDSM in the dungeon. He would then pay her for these sessions.

Hopper's fourth encounter with Rubin gave rise to her claim against him. Like the other encounters, Rubin flew her out to New York, only this time she arrived alone at the penthouse. Rubin directed her over text to drink wine, and she complied. When he eventually arrived, he slapped her across the face without saying a word. He dragged her into the dungeon by the arm, pulled her clothes off, pushed her on all fours using his knee on her back, and forced himself inside her. She began crying, and he called her a "whore" and a "stupid slut." *Id.* at 1047. Hopper asked him to stop and said no multiple times, but he continued penetrating her for an hour. She testified that this entire encounter was not consensual.

Rubin scheduled another time to see Hopper after this encounter, but she ended up not boarding her flight because she was afraid. Eventually she rescheduled and visited again, citing financial dependence and a psychological dependence because of their reenactment of her childhood abuse. On April 25, 2016, she met Rubin at a restaurant, and he gave her Vicodin. After taking the pills and leaving the restaurant, she did not remember much but knew that they

had an encounter. She texted Powers the next morning, "[I]t's my fault, I'm so sorry." *Id.* at 1055. She then continued, "I need to be more responsible. I had no idea how strong Vicodin is. I'm so sorry again. I cannot belie[ve] I did that to H," referring to Rubin by his first name. *Id.* When asked why she apologized, she testified that she did not remember but that "they made it feel like it was [her] fault for . . . taking [the pills]." *Id.* Powers texted Rubin the next day, "No one can drink for six hours straight then take two Vicodins. You were egging her on." *Id*. at 1750. Rubin then responded, "You're right." *Id.*

Hopper agreed to engage in a few additional encounters, which she testified were mostly consensual. She described one additional nonconsensual encounter during which Rubin put clothes pins on her vagina and laughed at her while she cried.

After the lawsuit was filed, Hopper reached out to Powers and said, "Jen, what is going on? I am so worried about everyone. If you all need me to do anything to help, like testify we agreed to everything happening, I will. . . . Is this going [to] stop Howie from seeing us?" *Id.* at 63. Hopper also texted Rubin after she joined the lawsuit, "Howie, I'm yours" and "I'm your little slut girl for

- 26 -

life." *Id.* at 1065.  She stated she texted them because she was afraid that Rubin

would think she had filed the lawsuit.

### 5. Brittany Hassen

In 2011, Hassen was contacted by one of Rubin's assistants about

meeting a man who was wealthy and "over the top." *Id.* at 1218.  The assistant

told Hassen that the man was into "fetish-style" pictures and bondage sex but

that Hassen would not get injured.  *Id.* at 1219.  Before putting her and Rubin in

touch, the assistant instructed Hassen to "just say yes to everything," and Hassen

was under the impression that her communication with Rubin played into his

fantasy.  *Id.* at 1220.  Rubin and Hassen began emailing, and Rubin stated,

> I love to be with girls that love being dominated and enjoy both
> physical and verbal humiliation.  It's a very intense experience.
> Most girls I've been with seem to love it, but I want you to
> understand completely before we get together.  There's bondage,
> spanking, your ass, pussy, tits, use of whips and paddles, vibrators
> and dildos, nipple and clit clamps.  I can guarantee, though, you will
> feel safe.  I always use a safe word and I will always slow down/stop
> if it's too intense for you.

*Id.* at 1222-23.  He then stated that "I've been with a lot of girls, including two

Playmate centerfolds, Penthouse pet, Playboy lingerie cover girl, Maxim model

of the year, Hustler cover girl, and Maxim and Playgirl and FHM models." *Id.* at

1224.  Hassen testified that she became more interested in visiting Rubin because she thought "he could help [her] career." *Id.*

Hassen was flown to New York and met Rubin in a hotel with two other women, and they ordered drinks.  Rubin asked her if she had been "molested as a child." *Id.* at 1230.  She and the other women all answered yes.  That conversation lasted an hour, during which Rubin instructed one of the other women to give Hassen "something to take the edge off." *Id.* at 1231.  The woman brought out a pill of oxycodone,[7] crushed it with her lighter, put the powder in Hassen's drink, and handed Hassen the drink, which Hassen consumed because "everybody was . . . high." *Id.* at 1232.  She started to get extremely itchy and next remembered Rubin tying her up with tape.  Hassen was high and inebriated at this point, and she next remembered being face-down on the bed with Rubin penetrating her repeatedly.  Hassen was crying, and Rubin became unhappy with her; he gave her $5,000 and instructed her to leave.  Hassen testified that she did not consent to what had transpired.

Nearly two years passed before Hassen reached out to Rubin in August 2013.  She had developed an addiction to oxycodone, and she reached

---

[7]     Hassen had never before consumed oxycodone.

out to Rubin to get together.  Hassen cited her addiction to pills and financial desperation as the reason for her reaching out.  She told him she was "really desperate by this point . . . . [and] willing to do whatever [she] had to do." *Id.* at 1246.  Rubin responded that he had "gotten more intense than when [they] were together" and that he had bought a condo and had a rotation of eight to ten "steady girls." *Id.* at 1246-47.  Rubin texted that "[i]n addition to clamps . . . I slap you hard all over your body. . . . I use whips and paddles and sometimes electric shock." *Id.* at 1247.  He then stated, "I don't want to run into the same problems as we did the last time." *Id.*  Hassen chose not to meet up with him after this email.

On May 19, 2014, Hassen was dining in a restaurant when she encountered Rubin dining with a few Playboy models.  Hassen had a pleasant interaction with everyone at the table and began to doubt her initial impression of him.  Around this time, Hassen had gone to rehab, "was completely clean" of drugs, and wanted to get into modeling again. *Id.* at 1255.

A few weeks later, Rubin and Hassen began exchanging messages.  Hassen texted Rubin, "I know we didn't hit it off last time, but honestly I'm desperate right now. . . .  I'm willing to be submissive and whatever you wish."

*Id.* at 1254.  She also said, "I will take a Valium and I'll be fine."  *Id.* at 1255.

Hassen then texted again, "I'm willing to do it, please, I need the money Howie.

My life is crazy right now, and I need help."  *Id.* at 1256.  Rubin agreed, and they

arranged a visit.

Rubin met up with her and another woman at his penthouse, and

the three split a bottle of wine.  Hassen immediately began to feel woozy and

sleepy and suspected Rubin had put Valium in her drink.  The next thing Hassen

remembered was waking up naked, gagged, and restrained on the X-shaped

cross with no memory of how she was taken there.  Rubin was whipping her all

over her body and called her "fat" and a "stupid girl."  *Id.* at 1267.  He also used a

suction-cup and electrical device all over her body without consent.  She

remembered the abuse going on for a long time, blacking out, and eventually

coming to in a cab.

Shortly afterwards, Hassen was still financially desperate and now

wanted additional funds to help with her schooling and the pain and injuries she

was suffering.  She sought out Rubin for money for additional encounters.  The

woman who was present at her last encounter instructed her to "beg Howie

again, like you're desperate for money."  *Id.* at 1319.  Hassen texted Rubin, "I

could really use the work right now. . . . I'll take the bigger beating this time I promise." *Id.* at 1318. They met up, and after drinking Rubin tied her up and hit her in the face. Hassen eventually fainted and woke up in a cab.

Later that year, Hassen agreed to meet up with Rubin for another encounter. This time, Rubin gave her the NDA to sign. Like the other women, she did not read the contract, was not provided a copy, and was unable to consult a lawyer. After she signed the contract, Rubin took her and his friends to a private room in a strip club, undressed her in front of other people, and handcuffed her. He then called her a "stupid girl" and berated her by stating that her breasts were much smaller than those of the other women present and that she was "so ugly" compared to them. *Id.* at 1331. Rubin started to beat her with his fists and then began penetrating her. A waitress entered the room a few times and asked if Hassen was okay, and eventually she and Rubin were asked to leave due to Rubin's behavior.

As a result of her encounters with Rubin, Hassen sustained lasting injuries to her body, developed nightmares, and relapsed into drug use. She also testified that she lost her ability to taste and sing due to his use of the ball gag, which he had cleaned using pool cleaner. Eventually, she started using heroin

- 31 -

because she no longer had access to oxycodone.  She had an ongoing fear of retaliation due to Rubin's status and influence.

## II.    *Proceedings Below*

Plaintiffs commenced this action in November 2017.  Their fourth amended complaint, filed November 11, 2019, alleged that Rubin, Powers, and his other assistants had conspired together in a sex trafficking venture.  Plaintiffs brought multiple claims, including violation of the TVPA, 18 U.S.C. § 1591, and assault, battery, false imprisonment, and intentional infliction of emotional distress.  Plaintiffs sought compensatory and punitive damages, as well as a permanent injunction enjoining defendants from continuing their venture.  *See* Fourth Amended Complaint at 88, *Moore v. Rubin*, 724 F. Supp. 3d 93, 98 (E.D.N.Y. 2024) (No. 17-cv-6404).[8]

Trial commenced on March 21, 2022.  Over the course of seven days, the jury heard testimony from all six plaintiffs, Rubin, and Powers.  After deliberating for one day, the jury returned a verdict in favor of plaintiffs and found Rubin liable to each of them under the TVPA.  The jury awarded each

---

[8]    Rubin's assistants, except for Powers, were dismissed as defendants earlier in the litigation.  *See Rubin*, 724 F. Supp. 3d at Dkt. No. 105.

- 32 -

plaintiff $500,000 in compensatory damages.  The jury found Rubin not liable for

the tortious actions brought by plaintiffs, except for Moore's single claim of

battery in December 2016.[9]  The jury did not find Powers liable for any claims.

Trial then continued as to the issue of punitive damages.  The jury

awarded plaintiffs Tagai, Reyes, Hassen, Hopper, and Lytell each $120,000 and

Moore $250,000 in punitive damages under the TVPA.  Rubin moved for

judgment as a matter of law or, alternatively, for a new trial pursuant to Federal

Rules of Civil Procedure 50 and 59.  *Rubin*, 724 F. Supp. 3d at 97.  On March 20,

2024, the district court denied Rubin's motion in both respects.  *Id*. at 107.

This appeal followed.[10]

### DISCUSSION

On appeal, Rubin argues that (1) there was insufficient evidence to

support the jury's finding of liability under the TVPA; (2) the jury instruction

regarding the required mens rea under the TVPA was erroneous; and (3) the

TVPA does not authorize punitive damages.  We address each argument in turn.

---

[9]     The jury did not award any damages for Moore's battery claim.

[10]    On September 17, 2025, the government indicted Rubin and Powers on charges of sex trafficking under the TVPA and Mann Act violations and Rubin for bank fraud as well.  *See* Indictment, *United States v. Rubin*, No. 25-cr-281 (E.D.N.Y. Sept. 17, 2025), Dkt. No. 1.

- 33 -

*I.*      *Sufficiency of the Evidence*

Rubin argues that the evidence was insufficient to prove his liability

under the TVPA because plaintiffs did not prove that (1) he knew or recklessly

disregarded the fact that force or coercion would be used, and (2) the encounters

were nonconsensual.  We are not persuaded.

*A.*      *Standard of Review*

We review challenges to the sufficiency of the evidence in support of

a jury's verdict in the light most favorable to the prevailing party and draw all

reasonable inferences in that party's favor.  *Chin v. Port Auth. of N.Y. & N.J.*, 685

F.3d 135, 150-51 (2d Cir. 2012).  A party challenging the sufficiency of the

evidence bears a heavy burden.  We overturn a verdict "only if there is 'such a

complete absence of evidence supporting the verdict that the jury's findings

could only have been the result of sheer surmise and conjecture'" or if a

reasonable juror could not arrive at the verdict in light of the "overwhelming

amount of evidence in favor of the" losing party.  *Chin*, 685 F.3d at 151 (quoting

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir. 1995)).

Construing the evidence in the winning party's favor means that "we

cannot consider evidence favorable to appellant that the jury need not have

believed." *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005). Even if, "as the factfinder, we might well have found in favor of the [losing party,] . . . it is not our task to retry the case or reweigh the evidence" as an appellate court. *Id.*; *see also United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) *(*noting in assessment of 18 U.S.C. § 1591 criminal case that "our role in reviewing sufficiency arguments is exceedingly deferential, because it is the task of the jury, not the court, to choose among competing inferences" (citation modified)).

We review questions of statutory interpretation *de novo*. *See United States v. Koh*, 199 F.3d 632, 636 (2d Cir. 1999); *see also United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013) (interpreting § 1591) ("When a sufficiency argument hinges on the interpretation of a statute, we review the district court's statutory interpretation de novo." (citation modified)).

### B.     *Applicable Law*

#### 1.     **Section 1591**

In 2000, Congress passed § 1591 of the TVPA "[t]o combat trafficking in persons, especially into the sex trade, . . . to reauthorize certain Federal programs to prevent violence against women, and for other purposes." Pub. L. No. 106-386, 114 Stat. 1464 (2000) (codified at 22 U.S.C. § 7101). Congress

recognized that the sex industry, involving the "sexual exploitation of persons, predominantly women and girls, [for] activities related to prostitution, pornography, sex tourism, and other commercial sexual services," had "rapidly expanded over the past several decades." 22 U.S.C. § 7101(b)(2). The statute was enacted to "ensure just and effective punishment of traffickers, and to protect their victims." *Id.* at § 7101(a).

Section 1591 is broad and punishing by design. The criminal statute imposes a mandatory minimum term of fifteen years' imprisonment and a maximum of life imprisonment. 18 U.S.C. § 1591(b)(1). "Since enacting the TVPA in 2000, Congress [has] amended it multiple times and reauthorized it in 2003, 2005, 2008, 2013, and 2017. Several of these additions created openings for expanded liability under the TVPA." Heather Odell, *Accountable to None? Challenging Sovereign Immunity Through the Trafficking Victims Protection Act*, 63 B.C. L. Rev. 1517, 1524 (2022) (citation modified). For instance,

> In 2008, Congress . . . expanded the criminal and civil liability for individuals beyond that of the mere perpetrator. The reauthorization extended liability to anyone who *financially benefitted* from the act of sex trafficking and *was aware of* such benefit. The reauthorization also added a conspiracy charge, which extends culpability to those uninvolved in the physical act itself and to circumstances where the conduct does not culminate in a sex act.

Abigail W. Balfour, *Where One Marketplace Closes, (Hopefully) Another Won't Open: In Defense of FOSTA*, 60 B.C. L. Rev. 2475, 2488 (2019) (emphasis added).

In 2015, Congress again expanded the TVPA to apply not only to the traditional *suppliers* of commercial sex acts, but also to *consumers* and *purchasers* of forced commercial sex.  *See* 161 Cong. Rec. H3266-01, H3269 (May 18, 2015) (Congress intended for § 1591 to broadly apply to "persons who *purchase* illicit sexual acts").  Congress "add[ed] the words 'solicits or patronizes' to . . .  mak[e] absolutely clear for judges, juries, prosecutors, and law enforcement officials that criminals who purchase sexual acts from human trafficking victims may be arrested, prosecuted, and convicted as sex trafficking offenders." *Id.  Compare* 18 U.S.C. § 1591(a) (effective Dec. 23, 2008), *with* 18 U.S.C. § 1591(a) (effective May 29, 2015).

In its present form, the TVPA provides, in pertinent part:

> Whoever knowingly . . .  in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . .

18 U.S.C. § 1591(a)(1)-(2).

A "commercial sex act" is "any sex act, on account of which anything

of value is given to or received by any person." *Id.* § 1591(e)(3).

Coercion is defined as:

> (A) threats of serious harm to or physical restraint against any
> person; (B) any scheme, plan, or pattern intended to cause a person
> to believe that failure to perform an act would result in serious harm
> to or physical restraint against any person; or (C) the abuse or
> threatened abuse of law or the legal process.

*Id.* § 1591(e)(2).[11]

"Serious harm" is defined as "any harm, whether physical or

nonphysical, including psychological, financial, or reputational harm, that is

sufficiently serious, under all the surrounding circumstances, to compel *a*

*reasonable person of the same background and in the same circumstances* to perform *or*

*to continue performing* commercial sexual activity . . . to avoid incurring that

harm." *Id.* § 1591(e)(5) (emphasis added).

Thus, under the TVPA, a defendant engages in trafficking when he

recruits, transports, solicits, or patronizes a person knowing or recklessly

---

[11]   "The term 'abuse or threatened abuse of law or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* § 1591(e)(1).

disregarding the fact that he will use force, fraud, or coercion to cause the person

to engage in a sex act for payment.

### 2. Section 1595

In 2003, Congress expanded the TVPA to "enhanc[e] provisions on

prevention of trafficking, protections of victims of trafficking, and prosecution of

traffickers." H.R. Rep. No. 108-264, pt. 1, at 8 (2003). The amendment authorized

victims of the conduct proscribed in § 1591 to bring a civil action against their

perpetrators. *See* 18 U.S.C. § 1595(a). This civil remedy "expand[ed] the current

federal crimes relating to trafficking in persons" by subjecting the perpetrators to

liability for civil damages. H.R. Rep. No. 108-264, pt. 1, at 13.

### C. *Application*

Rubin makes two sufficiency arguments. First, Rubin argues that an

individual does not violate the TVPA unless, at the time he is recruiting the

victims, he knows or recklessly disregards the fact that force or coercion *will be*

*used* to cause the victims to engage in commercial sex acts. He contends that here

the evidence did not prove that when he recruited the plaintiffs he knew or

recklessly disregarded the fact that force or coercion *would be used* to compel

- 39 -

them to engage in commercial sex acts.  Second, Rubin contends that the

plaintiffs did not prove at trial that the encounters were nonconsensual.

> **1.      Mens Rea**

Rubin is correct that the plain language of the TVPA -- providing

that a perpetrator know or recklessly disregard the fact that force, fraud, or

coercion *will be used* to cause a person to engage in a commercial sex act --

indicates that some degree of awareness or recklessness *prior* to the forced sex act

is required.  *See* 18 U.S.C. § 1591.  The phrase "will be used" indicates that the

mens rea element must develop at some point *before* the forced sex act has

occurred, that is, typically when the defendant is recruiting, enticing, or

transporting the victim.[12]

This temporal component, however, may also be satisfied during the

course of a sexual encounter.  The statute covers a defendant who *patronizes* or

*maintains* a person with reckless disregard that a means of force *will be used* to

---

[12]      *See United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013) ("The future
verb tense of the phrase 'will be caused -- which precedes 'to engage in a commercial
sex act' -- indicates that a sex act does not have to occur to satisfy the elements of
[§ 1591].  To conclude otherwise erases the meaning of 'will be' from the statutory
text."); *United States v. Jungers*, 702 F.3d 1066, 1073 (8th Cir. 2013) ("In many, if not all
cases, the commercial sex act is still in the future at the time the purchaser . . . [is] in
violation of § 1591."); *see also United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress'
use of a verb tense is significant in construing statutes.").

- 40 -

cause the person to engage in the commercial sex act.  18 U.S.C. § 1591.

"Patronize" and "maintain" are contemporaneous terms.  *See Patronize*, Merriam-

Webster, https://www.merriam-webster.com/dictionary/patronize

[https://perma.cc/65SQ-9JPR] (last visited September 9, 2025) ("[T]o be a frequent

or regular customer or client of"); *Maintain*, Black's Law Dictionary (12th ed.

2024) ("To continue (something)"; "To continue in possession of (property, etc.)";

and "To support (someone) financially.").  This language makes clear, on its face,

that an individual is liable if he decides, while "patronizing" a victim, that he will

use force or coercion to cause the victim to further engage in a commercial sex act

against her will.  Likewise, the statute covers a defendant who repeatedly

patronizes a person, where force and coercion were regularly used in the past, as

such a defendant would have an awareness that force and coercion will be used

in the future based on prior interactions.

Although § 1591 requires that a defendant must know or recklessly

disregard the fact that force *will be used* to cause a person to engage in a

commercial sex act, the mens rea does not require factual certainty about future

events.  Indeed, a defendant cannot know for certain that a forced sex act will

occur in the future.  *See United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)

- 41 -

("What [§ 1591] requires is that the defendant *know in the sense of being aware of* an established modus operandi that will *in the future* cause a person to engage in prostitution." (emphasis added)).  As the Ninth Circuit has explained:

> What [§ 1591] means to describe, and does describe awkwardly, is a state of mind in which the knower is familiar with a pattern of conduct.  If 'to know' is taken in the sense of being sure of an established fact, no one 'knows' his own or anyone else's future. . . . [N]othing is completely stable, no plan is beyond alteration. When an act of Congress requires knowledge of a future action, it does not require knowledge in the sense of certainty as to a future act.

*Id*.  Where, as here, a defendant has a *modus operandi -- i.e.*, an established pattern of behavior involving some means of force, fraud, or coercion -- the mens rea element is met.  *See Noble v. Weinstein*, 335 F. Supp.3d 504, 517-18 (S.D.N.Y. 2018) ("The plain language of Section 1591(a) requires Plaintiff to plausibly allege knowledge, or a *modus operandi*, associated with above-described 'enticement,' that Defendant enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place."); *see also United States v. Maynes*, 880 F.3d 110, 114 (4th Cir. 2018) ("[T]here is no such requirement [in § 1591 that fraud in fact caused a commercial sex act]; the crime is complete when the defendant recruits, entices, harbors, etc., the victim with knowledge

- 42 -

that the prohibited means will be used in the future to cause them to engage in commercial sex acts.").

To the extent Rubin argues that there was insufficient evidence that he possessed the requisite mens rea to be liable under the TVPA, the evidence presented at trial makes clear that a reasonable jury could have found by a preponderance of the evidence that Rubin knew or recklessly disregarded the fact that force and coercion would be used to compel plaintiffs to perform sexual acts to which they did not and would not consent. The record is replete with evidence that Rubin developed a sophisticated operation to solicit and recruit various women, inform them that some degree of sadomasochism would take place, provide them a combination of alcohol and drugs like Vicodin and oxycodone, and then grossly exceed the parameters of the activity he told them to expect. He would then pay the women for the encounter after he finished. The evidence established that he had a *modus operandi*. Many plaintiffs testified that, although they were aware they would engage in some form of rough sex, they were not aware that Rubin would insert pool cues into them, deploy electrical devices, or escalate encounters after they were rendered incapable of objecting because he had bound and gagged them. And on many occasions,

- 43 -

even when they were able to protest and plead for him to stop, Rubin continued to rape or abuse them.  Accordingly, the jury could have reasonably found Rubin liable under the TVPA for recruiting, soliciting, transporting, and patronizing women while knowing or recklessly disregarding the fact that he would subject them to violent abuse to which they had not consented.

Although this may not be the typical sex trafficking case originally contemplated by the TVPA, Congress has expanded the TVPA to encompass conduct such as Rubin's -- the soliciting, enticing, transporting, and patronizing of women to engage in sex acts for money and using force, for one's own sexual gratification.[13]  Rubin contends that, even if he exceeded a plaintiff's consent, the TVPA was not intended to cover this conduct, which he argues is better addressed by the tort of rape.  We reject the argument.  Indeed, the TVPA was

---

[13]      "There are 'three broad categories of techniques used by . . . traffickers to exploit victims.'  The first and most rare method is kidnapping a victim and enslaving her through force or threats.  The second method is 'using fraud to gain access to a victim and then providing drugs and alcohol to incapacitate them.'  The trafficker then 'leverages the psychological impact' of the initial sexual assault to force the victim into other sex acts.  The third, and most common method used by domestic sex traffickers, is known as 'grooming.'  This method involves traffickers exploiting the vulnerabilities of their victims, often through a romantic relationship, by convincing them that they are in love.  This relationship eventually turns violent as the pimp convinces the victim to engage in commercial sex acts out of 'love' and 'devotion.'"  Allison J. Luzwick, *Human Trafficking and Pornography: Using the Trafficking Victims Protection Act to Prosecute Trafficking for the Production of Internet Pornography*, 112 Nw. U. L. Rev. 355, 366 (2017).

Case: 24-2018, 02/24/2026, DktEntry: 86.2, Page 45 of 61

passed because "[e]xisting legislation and law enforcement in the United States

. . . [were] inadequate to deter trafficking and bring traffickers to justice, failing to

reflect the gravity of the offenses involved." 22 U.S.C. § 7101(b)(14). That there

may be other laws that also cover some of Rubin's conduct does not render the

TVPA inapplicable. *Jungers*, 702 F.3d at 1074 ("As for any overlap within the

TVPA or with other criminal statutes, redundancies across statutes are not

unusual events in drafting, and so long as there is no positive repugnancy

between two laws, a court must give effect to both." (citation modified)). We

conclude that the TVPA covers the scope of Rubin's conduct.

### 2. Consent

Rubin asserted, as an affirmative defense, that plaintiffs consented to

engage in the forced commercial sex acts and that even if they withdrew their

consent, he was unaware they did so. For the following reasons, we affirm the

jury's finding that Rubin failed to prove the affirmative defense of consent. *See*

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021)

("An affirmative defense is a defense that will defeat the plaintiff's claim, even if

all allegations in the complaint are true, rather than an attack on the truth of the

allegations, or a rebuttal of a necessary element of the claim." (citation

modified)); *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 171 (2d Cir. 2023) ("The burden of proof to establish an affirmative defense . . . falls on the defendant.").

Rubin argues that the NDAs sufficiently rebut plaintiffs' contention that he was aware they did not consent to the various BDSM encounters. We are not persuaded. Even if, as Rubin argues, the NDAs indicated that he believed plaintiffs were aware of what could transpire during their BDSM encounters, it is not our task on appeal to reweigh evidence presented to the jury. *Gronowski*, 424 F.3d at 292. Rubin cross-examined plaintiffs as to their awareness of what could transpire based on the NDAs and testified himself as to what he perceived based on plaintiffs' representations to him. A rational juror could very well find that plaintiffs did not consent to the particularly violent acts to which they were subjected; instead, the NDAs indicate that Rubin used the penalty clause to intimidate women from speaking out, prevent them from taking legal action against him, or make them believe that to receive the agreed-upon payment they had no choice but to subject themselves to conduct beyond that to which they had consented.

Moreover, Rubin often rushed the plaintiffs, most of whom did not graduate high school, to sign the contracts, and often after they had consumed alcohol or drugs. None were given a meaningful opportunity to review the contract, modify its terms, or keep copies. Certainly, these contracts alone do not establish, as a factual matter, plaintiffs' consent to the acts Rubin had planned for them. If anything, the contracts exemplify the disparity in bargaining power between Rubin and the plaintiffs. *Cf.* 22 U.S.C. § 7101 ("The low status of women . . . has contributed to a burgeoning of the trafficking industry.").

Rubin further argues that plaintiffs' text conversations with him and their willingness to return for additional encounters indicate their consent, such that the jury could not have found that he possessed the mens rea required for liability under the TVPA. We reject the argument.

First, on top of consistently supplying cocaine, alcohol, Vicodin, Percocet, and oxycodone to plaintiffs, Rubin subjected the plaintiffs to significant psychological and physical abuse. He actively recruited women who were uneducated, financially dependent, and victims of childhood abuse. Rubin wanted to cultivate sexual relationships with women of his choosing, young women who were vulnerable and inexperienced. Rubin's victims also depended

- 47 -

on him in various ways.  For instance, Rubin exercised psychological control over Hopper after reenacting her childhood abuse, Hassen developed an addiction to oxycodone, and Lytell continued to send her friends to Rubin, despite her severe injuries, because she needed money.  Under these circumstances, a rational factfinder could conclude that these women would be less likely to vocally object or complain if Rubin did exceed their consent or that they might return to see him after a nonconsensual encounter.  *See, e.g.*, *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015) (holding that, in determining whether a victim would feel coerced, a "jury [may] consider the particular vulnerabilities of a person in the victim's position").

Second, it was neither incredible nor against the weight of the evidence for the jury to conclude that plaintiffs were coerced to engage in certain commercial sex acts against their consent, even though in some instances they made return visits to see Rubin.[14]  Indeed, the record established that Rubin often

---

[14]    *See United States v. Pollok*, 139 F.4th 126, 137 (2d Cir. 2025) ("Insofar as [the defendant] contends that, based on the trial evidence, the jury should not have concluded that [the victim] was recruited, solicited, or enticed into commercial sex work, but instead should have found that [the victim] participated in this conduct voluntarily, that argument is unavailing.  The evidence of sex trafficking presented to the jury was not incredible on its face, and thus it was reasonable for the jury to infer that the victim was coerced into engaging in commercial sex acts." (citation modified)).

changed his behavior and the depravity of his acts seemingly on a whim.  For

instance, Tagai and Hopper engaged in consensual prostitution with Rubin for a

long period of time.  Their earlier encounters followed a predictable pattern of

sharing dinner and wine on dates before engaging in some degree of light-

BDSM-style sexual intercourse.  Only years into their encounters with Rubin did

he spring violent behavior upon them, including shoving a pool cue into Tagai

and wordlessly entering his penthouse and throwing Hopper down, penetrating

her, and raping her after she started crying and begging him to stop.  The jury

could reasonably find that Rubin *planned* to escalate his encounters only after

plaintiffs grew comfortable and financially dependent upon him and that many

did not engage in this later conduct voluntarily despite consenting to earlier

commercial sex encounters.  *See United States v. Frey*, 736 F. Supp. 3d 128, 139

(E.D.N.Y. 2024) ("Indeed, [the victims'] initial consent to commercial sex 'does not

mean that they therefore consented to being threatened or coerced into

performing sexual acts they did not wish to perform' . . . ." (citation modified)). [15]

---

[15]    "The acts of recruiting and obtaining can be exceptionally deceptive and make a situation of human trafficking look like another crime, such as domestic violence. Traffickers may seduce their victims for an intimate relationship or marry their victims, thereby obtaining them.  The trafficker's characterization as an intimate partner or

Finally, even assuming a person *can* consent to the extreme physical and psychological abuse to which Rubin subjected these plaintiffs, the jury could have found that, notwithstanding their initial consent, they did not consent to the later, more abusive conduct. Rubin maintains that he "informed each plaintiff that the encounters would consist of sadomasochistic acts," but he never delineated, except to some extent with Hassen,[16] that those acts included sexual restraint devices, cattle prods, electrical instruments, and forcing women to beat other women. Appellant's Br. at 1. And several plaintiffs testified that Rubin continued to sexually abuse them against their will well after they had instructed

spouse creates a perception of consent, causing confusion not only to the victim, but also to bystanders." Jessica Visage, *A Labor of Love: The Intersection of Domestic Violence and Human Trafficking and Why Attorneys Have A Duty to Understand the Difference*, 49 S. Ill. U. L.J. 541, 552 (2025); *see also* Marisa Silenzi Cianciarulo, *What Is Choice? Examining Sex Trafficking Legislation Through the Lenses of Rape Law and Prostitution*, 6 U. St. Thomas L.J. 54, 75 (2008) ("Even 'willing' prostituted women who may have consented to sex work are forced to engage in prostitution under conditions to which they did not consent.").

[16]    With respect to Hassen, a jury could reasonably find that on at least one occasion, Rubin knew or recklessly disregarded the fact that she would be coerced into performing certain acts. Indeed, although he warned her that she would get slapped hard or whipped, he also explicitly promised that she would feel safe the entire time. Instead, Hassen was pressured into taking oxycodone, was beaten in a public place, and blacked out on multiple occasions. Certainly, after she cried throughout the first encounter, fainted during a different encounter, and later became addicted to oxycodone, a rational factfinder could find that Rubin continued to solicit and patronize her in reckless disregard of the fact that she did not reasonably consent to the BDSM in which he planned to engage.

him to stop.  A reasonable jury could therefore have found that Rubin was aware

of his own BDSM pattern and recklessly disregarded how his use of force could

and would compel plaintiffs to continue engaging in commercial sex acts to

which they did not consent.

On a sufficiency challenge, it is not our task to choose between

competing inferences.  Here, the jury was permitted to reject Rubin's argument

that he reasonably believed that plaintiffs' return to engage in subsequent

encounters indicated they consented to the later, more violent actions.[17]  It was

the factfinder's task to weigh Rubin's testimony that he believed plaintiffs

consented to his encounters against their testimony that he coerced them into

those encounters.  Accordingly, Rubin's argument that the bulk of plaintiffs'

testimony was simply "not credible" on the issue of consent bears little weight on

a sufficiency challenge.  *See Robinson*, 702 F.3d at 36.  We reject Rubin's

sufficiency claim.

---

[17]     *Cf. Rivera*, 799 F.3d at 185-86 ("[Defendants] wanted to suggest that having already been a prostitute she would not have been deceived by [Defendant] and therefore her testimony that she was coerced into working for him . . . should be disbelieved. . . .  Even if no promises were made to [the victim], this would not be evidence that she consented to be beaten and to receive no share of the fees paid by the johns she serviced.") (quoting *United States v. Cephus*, 684 F.3d 703, 708 (7th Cir. 2012))).

## II.    *The Jury Instructions*

Rubin challenges the district court's jury instructions on the grounds that the court misstated the TVPA's mens rea requirement.  We conclude that the district court did not err in its instructions and that, even if it did, any error was harmless.

### A.    *Standard of Review*

We review preserved challenges to a district court's jury instructions de novo.  *See Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 147 (2d Cir. 2025).[18] "We will overturn a verdict on a challenge to jury instructions only if (1) the instructions were erroneous, and (2) the error was prejudicial."  *Id.*

### B.    *Applicable Law*

"Jury instructions are erroneous if they mislead the jury or do not adequately inform the jury of the law, and error is prejudicial where the appellant can show that the error, in light of the charge as a whole, improperly influence[d] the jury's verdict."  *Id.* (citation modified) (alterations adopted). "Moreover, in determining whether a jury instruction was so prejudicial as to

---

[18]     Rubin properly preserved his challenge to the jury instruction.  *See* Supp. App'x at 2007 (district court stating: "[Y]ou have fully preserved your rights on those issues by having submitted the proposed jury instructions and having the arguments that you've made rejected.").

warrant overturning the verdict, we must examine the jury charge 'in its entirety,' rather than 'scrutinize it strand-by-strand.'" *Id.* (citing *Warren v. Dwyer*, 906 F.2d 70, 73 (2d Cir. 1990) (alterations adopted)). "And, though our review is de novo, we emphasize that 'a trial court has discretion in the style and wording of jury instructions, so long as the instructions . . . do not mislead the jury as to the proper legal standard.'" *Id.* (citing *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 106-07 (2d Cir. 2001)).

### C.    *Application*

Rubin challenges only one aspect of the charge: the district court's instructions on consent, and, more specifically, the withdrawal of consent. After outlining the elements of the TVPA charge, the district court instructed the jury on Rubin's affirmative defense of consent:

> If you find that plaintiff consented to a commercial sex act, then the defendant doesn't have the requisite knowledge for liability under this sex trafficking law. In other words, if the plaintiff you're considering consented to engage in a commercial sex act about which you've heard evidence, then her claim under this cause of action fails. That is, consent is a complete defense to this cause of action.
>
> Consent isn't permanent; if a person willingly agrees to engage in a commercial sex act, but later changes her mind, and then is forced to continue to engage in a commercial sex act against her will by force, threat of force, fraud or coercion, then a commercial act becomes

involuntary, not with consent.

Supp. App'x at 2080-81.  The court further instructed on BDSM:

> Now, throughout the trial you heard evidence about practices called bondage, discipline, domination, submission, sadism, masochism or BDSM, that may involve the use of force or actual physical restraint, as well as the infliction of physical pain.  The fact that force or physical restraint was used during the course of a BDSM act does not, by itself, mean that the statute was violated.  Moreover, if you find that the plaintiff you are considering consented to the BDSM act, then by definition, neither force nor coercion were used.

*Id*. at 2081-82.

During deliberations, the court received a note asking: "Sex Trafficking.  If a person is not present when consent is withdrawn, is consent still a defense for that person?"  *Id*. at 2122.  The court consulted with both parties and issued the following note to the jury:

> Where consent has been given and then a person is not present when the consent is withdrawn, the person who is not present must know, or recklessly disregard, the withdrawal of the consent during the commercial sex act to be liable for that act of sex trafficking.

*Id*. at 2133; *see also Rubin*, 724 F. Supp. 3d at 103.[19]

---

[19]    The instruction is awkwardly phrased, but the district court was instructing the jury that a defendant who was not present when consent was withdrawn during a sex act is not liable unless he or she knew of or recklessly disregarded the withdrawal of consent.

Rubin argues that the court erred by failing to instruct the jury that

he had to know or recklessly disregard the fact that consent had been withdrawn

to be held liable under the TVPA.  The argument fails.

First, as an initial matter, it is apparent that the jury's question

concerned Powers, who was not present during the commercial sex acts in

question and thus was not present if and when consent was withdrawn during

the course of those acts.  The jury's question -- and the district court's response --

did not directly relate to Rubin, who obviously *was* present during the

commercial sex acts and therefore was present *if* and *when* consent was

withdrawn.  For this reason, Rubin's reliance on the jury's note is misplaced.

Second, to the extent Rubin argues that the district court failed to

instruct the jury that *he* had to know or recklessly disregard the fact that consent

had been *withdrawn*, the argument fails because the jury very well could have

concluded, and likely did conclude, that there was no consent to withdraw, for

the evidence showed that plaintiffs never consented to the later, more violent

and vicious acts.  As discussed above, construed in plaintiffs' favor, the evidence

established that even though plaintiffs initially consented to having sex, even

- 55 -

sadomasochistic sex, they did not consent to the much more extreme and violent conduct that actually occurred.

Third, even assuming the court should have explicitly instructed the jury that Rubin had to know or recklessly disregard the fact that the plaintiffs withdrew their consent -- and we are not persuaded that it should have -- any error in excluding the language was harmless and nonprejudicial. Consent is not a separate element that must be proved to the jury; it merely rebuts the evidence that a defendant possessed the requisite mens rea with respect to force or coercion. And the court clearly stated at the beginning of the instruction that the defendant must "*know*[] or *recklessly disregard*[] the fact that force, the threat of force, fraud or coercion, will cause the plaintiff to engage in a commercial sex act *in which the plaintiff would not otherwise have willingly engaged*." Supp. App'x at 2075-76 (emphasis added).

Rubin now argues that the district court should have instructed the jury that he was liable only if he "knew or recklessly disregarded that each [p]laintiff withdrew her consent at some point during her encounter." Appellant's Br. at 29. But Rubin did not request this withdrawal-of-consent charge at trial. Instead, he requested that the district court instruct the jury that

Rubin was not liable if he "reasonably believed . . . that the plaintiff consent[ed]."

Supp. App'x at 2231.  It is true, as Rubin argues, that, in its instructions on the

TVPA, the district court did not give this specific instruction to the jury.  But the

district court's detailed instructions on consent were sufficient, as the court

charged the jury that "consent is a complete defense to this cause of action" and

provided ample guidance on the question of consent, including, in addition to

the instructions quoted above, that consent is:

> [s]imply the willingness for conduct to occur.  It may be manifested
> by words and also by action . . . .  In determining whether a
> plaintiff's words, silence, or conduct manifests consent, you have to
> consider the surrounding facts and circumstances, including
> subsequent conduct and statements.  Consent, whether expressly
> given or implied in fact, is not a defense if such consent is obtained
> by fraud or duress.  Additionally, consent can be deemed invalid for
> numerous reasons, including the lack of capacity to consent or
> coercion or mistake.  Consent has boundaries.  A person can give
> consent as to certain type of activities or touching and not as to
> others that might occur during the same encounter.

Id. at 2080-81.  In our view, these instructions adequately conveyed the notion

that consent had to be reasonably conveyed by the plaintiffs and understood by

Rubin to defeat liability under the TVPA.  Taking the charge as a whole, the

district court made clear to the jury that consensual BDSM activities alone could

not form the basis for a valid claim under the TVPA.

- 57 -

Accordingly, the district court's jury instruction provides no basis for overturning the jury's verdict.

## III.   *Punitive Damages Under the TVPA*

Rubin contends that the TVPA does not authorize punitive damages and that the district court erred in permitting the jury to award punitive damages for the plaintiffs.  We disagree.

### A.   *Standard of Review*

We review *de novo* a district court's determination of the availability of punitive damages awards under a statute as a matter of law.  *See Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011) ("The availability of punitive damages is reviewed de novo."); *Francisco v. Susano*, 525 Fed.Appx. 828, 829 (10th Cir. 2013) (noting that rulings on punitive damages are legal determinations); *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 458 (7th Cir. 2006) ("As a question of law, we review this conclusion [on the availability of punitive damages under a federal statute] de novo."); *see also United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir. 1996) ("[W]e review all conclusions of law . . . de novo.").

B.      *Applicable Law*

"[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 62-63 (1992).  The TVPA allows any individual who is a victim to "recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).  When Congress amended the TVPA in 2003 to add the civil remedy, an earlier draft of § 1595 provided that courts could "award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred."  H.R. Rep. No. 108-264, pt. 2, at 6 (2003).  As referenced above, the final version omitted the terms "actual," "punitive," and "other litigation costs reasonably incurred."

The Second Circuit has yet to consider whether the TVPA authorizes punitive damages, but the Ninth Circuit in *Ditullio v. Boehm* found that "[b]ecause the TVPA civil remedy provision creates a cause of action that sounds in tort, . . . punitive damages are available."  662 F.3d at 1096.  Every other circuit to consider the issue has agreed that the TVPA authorizes punitive damages.  *See Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017); *Francisco*,

525 F. App'x at 834; *Warfaa v. Ali*, 1 F.4th 289, 293-96 (4th Cir. 2021) (affirming without discussion award of punitive damages on TVPA claim); *see also Paguirigan v. Prompt Nursing Emp. Agency, LLC*, No. 17-cv-1302, 2019 WL 4647648, at *18 (E.D.N.Y. Sept. 24, 2019).

    *C.*      *Application*

Rubin contends that the TVPA does not authorize punitive damages because Congress considered adding punitive damages into the statute but ultimately opted not to.  He argues that the TVPA's silence on punitive damages indicates a direction by Congress to exclude punitive damages from the statute. We hold that punitive damages are available under the TVPA.

Rubin's examination of legislative history is flawed because Congress deleted specific references to *both* actual and punitive damages and replaced them with the more generic term "damages."  Had Congress intended to eliminate punitive damages under the TVPA, it could have retained the word "actual" in the final version of the statute.  The Ninth Circuit's reasoning that courts should apply principles of common law to determine whether punitive damages are an appropriate remedy under federal statutes authorizing private actions grounded in tort law is persuasive.  *Ditullio*, 662 F.3d at 1096-98.  We

- 60 -

agree that the tortious conduct in which Rubin engaged is precisely the type of outrageous conduct and behavior against public policy targeted by increased damages awards. *See Francisco*, 525 F. App'x at 833-34 ("[T]he TVPA addresses tortious conduct -- indeed, conduct so reprehensible Congress made it criminal even before adding the civil remedy in 2003."). Accordingly, we hold that the TVPA authorizes punitive damages and that the award of punitive damages here was appropriate. We see no error here.

## *CONCLUSION*

For the reasons set forth above, the district court's judgment is AFFIRMED.